**IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT**

CHAMBER OF COMMERCE OF THE
UNITED STATES OF AMERICA, TEXAS
ASSOCIATION OF BUSINESS, and
LONGVIEW CHAMBER OF COMMERCE,

<em>Petitioners,</em>

v.

FEDERAL COMMUNICATIONS
COMMISSION and UNITED STATES OF
AMERICA,

<em>Respondents.</em>

U.S. COURT OF APPEALS
RECEIVED
**Jan 30, 2024**
FIFTH CIRCUIT

Case No. 24-____

**PETITION FOR REVIEW**

Pursuant to 5 U.S.C. § 706, 47 U.S.C. § 402(a), 28 U.S.C. §§ 2342-2344, and Federal Rule of Appellate Procedure 15(a), the Chamber of Commerce of the United States of America, Texas Association of Business, and Longview Chamber of Commerce hereby petition this Court for review of the Final Order of the Federal Communications Commission (Commission or FCC) captioned *The Infrastructure Investment and Jobs Act: Prevention and Elimination of Digital Discrimination*, Report and Order, GN Docket No. 22-69, FCC 23-100 (released November 20, 2023). The Order was published in the Federal Register on January 22, 2024. 89 Fed. Reg. 4,128

(Jan. 22, 2024).  A copy of the Order is attached to this petition as Exhibit A, and the Federal Register entry is attached as Exhibit B.

Venue in this Circuit is proper under 28 U.S.C. § 2343, because petitioners Texas Association of Business's and Longview Chamber of Commerce's principal offices are located in Texas.  *See Global Van Lines, Inc. v. ICC*, 691 F.2d 773, 774 n.1 (5th Cir. 1982).

The Order purports to implement Section 60506 of the Infrastructure Investment and Jobs Act, 47 U.S.C. § 1754, by adopting a definition of "digital discrimination of access" to broadband internet service that encompasses "[p]olicies or practices, not justified by genuine issues of technical or economic feasibility," that result in disparate treatment *or* disparate impact.  Order ¶ 33.

Petitioners participated in the proceeding before the Commission and are aggrieved by the Order.  *See* 28 U.S.C. § 2344.  Petitioners seek review of the Order on the grounds that it is arbitrary, capricious, and an abuse of discretion within the meaning of the Administrative Procedure Act, 5 U.S.C. § 701, *et seq.*; in excess of the Commission's statutory authority; and otherwise contrary to law.  Petitioners respectfully request that this Court hold unlawful, vacate, enjoin, and set aside the Order and provide such additional relief as may be appropriate.

JANUARY 30, 2024

JENNIFER B. DICKEY
KEVIN R. PALMER
U.S. CHAMBER LITIGATION CENTER
1615 H Street NW
Washington, DC 20062
(202) 463-5337

Respectfully submitted,

/s/ Jeffrey B. Wall
JEFFREY B. WALL
MORGAN L. RATNER
SULLIVAN & CROMWELL LLP
1700 New York Avenue NW
Washington, DC 20006
(202) 956-7500
wallj@sullcrom.com

*Counsel for Petitioners*

**CERTIFICATE OF ELECTRONIC SUBMISSION**

I hereby certify that: (1) any required privacy redactions have been made; (2) the electronic submission of this document is an exact copy of any corresponding paper document; and (3) the document has been scanned for viruses with the most recent version of a commercial virus-scanning program and is free from viruses.

/s/ Jeffrey B. Wall
JEFFREY B. WALL

JANUARY 30, 2024

# CERTIFICATE OF SERVICE

I hereby certify that on January 30, 2024, the foregoing Petition for Review was electronically filed with the Clerk of Court for the U.S. Court of Appeals for the Fifth Circuit through the appellate CM/ECF system and two copies were sent to the Clerk of the Court by overnight Federal Express for service on the respondents pursuant to Federal Rule of Appellate Procedure 15(c)(3) at the following addresses:

Merrick B. Garland
Attorney General
Department of Justice
950 Pennsylvania Avenue NW
Washington, DC 20530

P. Michele Ellison
General Counsel
Federal Communications Commission
Office of the General Counsel
45 L Street NE
Washington, DC 20554

I further certify that there are no parties "admitted to participate in the agency proceedings" other than the respondents for purposes of Federal Rule of Appellate Procedure 15(c)(1).

/s/ Jeffrey B. Wall
JEFFREY B. WALL

JANUARY 30, 2024

# Exhibit A

**Before the
Federal Communications Commission
Washington, D.C. 20554**

| | | |
|---|---|---|
| In the Matter of | **)** | |
| | **)** | |
| Implementing the Infrastructure Investment and | **)** | GN Docket No. 22-69 |
| Jobs Act: Prevention and Elimination of Digital | **)** | |
| Discrimination | **)** | |
| | **)** | |
| | **)** | |
| | **)** | |
| | **)** | |

**REPORT AND ORDER AND FURTHER NOTICE OF PROPOSED RULEMAKING**

**Adopted: November 15, 2023**         **Released: November 20, 2023**

**Comment Date: (30 days after date of publication in the Federal Register)**
**Reply Comment Date: (60 days after date of publication in the Federal Register)**

By the Commission: Chairwoman Rosenworcel and Commissioners Starks and Gomez issuing separate statements; Commissioners Carr and Simington dissenting and issuing separate statements.

**TABLE OF CONTENTS**

Heading          Paragraph #

I. INTRODUCTION AND SUMMARY ..................................................................................................1
II. BACKGROUND .................................................................................................................................4
     A. Commission's Efforts to Further Consumer Access to Broadband Internet Service.......................6
        1. Consumer Access to Broadband.............................................................................................10
        2. The Global COVID-19 Pandemic Heightened the Inequities Broadband Internet
           Access...................................................................................................................................12
     B. Infrastructure Investment and Jobs Act of 2021 ........................................................................14
        1. The Infrastructure Act's Funding Measures Promote Equal Access......................................15
        2. The Infrastructure Act Requires that the Commission Undertake Specific Measures to
           Support the Goal of Equal Access.........................................................................................16
     C. Commission's Actions to Further Promote Equal Access...........................................................18
        1. Commission Funding Programs .............................................................................................18
        2. Communications Equity and Diversity Council.....................................................................20
        3. Task Force to Prevent Digital Discrimination........................................................................23
     D. Notice of Inquiry and Notice of Proposed Rulemaking...............................................................25
III. DISCUSSION.....................................................................................................................................27
     A. Definition of Statutory Terms.....................................................................................................28
        1. Digital Discrimination of Access Defined ............................................................................33
        2. Technical and Economic Feasibility .....................................................................................60
     B. Prohibition of Digital Discrimination of Access ........................................................................80
     C. Scope of Prohibition ...................................................................................................................85
        1. Covered Entities ....................................................................................................................85
        2. Covered Consumers ..............................................................................................................89

3. Covered Services..................................................................................................97
D. Revising Commission's Informal Consumer Complaint Process....................................107
1. Dedicated Pathway for Digital Discrimination of Access Complaints ...................111
2. Voluntary Demographic Information Collection ...................................................114
3. Pathway for Organizations to Submit Digital Discrimination of Access Complaints ..........116
E. Enforcement......................................................................................................119
1. Legal Authority ...............................................................................................121
2. Amending Commission Rules............................................................................131
3. Enforcement Framework...................................................................................132
F. Differential Impact..............................................................................................154
1. Comparing Technical Terms of Service...............................................................158
2. Comparing Non-Technical Terms of Service........................................................162
3. Geographic Comparability ...............................................................................164
4. Data to Analyze Differential Impact ..................................................................167
G. Other Issues.......................................................................................................171
H. State and Local Model Policies and Best Practices ................................................175
IV. FURTHER NOTICE OF PROPOSED RULEMAKING.......................................................179
A. Affirmative Obligations .......................................................................................179
1. Annual Report ................................................................................................182
2. Compliance Program.......................................................................................200
B. Office of Civil Rights...........................................................................................214
C. Other Efforts to Promote Digital Equity and Inclusion ...........................................215
V. PROCEDURAL MATTERS...........................................................................................216
VI. ORDERING CLAUSES................................................................................................227
APPENDIX A – FINAL RULES
APPENDIX B – FINAL REGULATORY FLEXIBILITY ANALYSIS
APPENDIX C – INITIAL REGULATORY FLEXIBILITY ANALYSIS
APPENDIX D – REPORT OF THE COMMUNICATIONS EQUITY AND DIVERSITY
COUNCIL RECOMMENDATIONS AND BEST PRACTICES TO PREVENT DIGITAL
DISCRIMINATION AND PROMOTE DIGITAL EQUITY

# I. INTRODUCTION AND SUMMARY

1.    Today, we take an important step to promote equal access to broadband for all people in the United States.  In the Infrastructure Investment and Jobs Act (Infrastructure Act),[1] Congress appropriated more than $65 billion to help ensure that every American has access to reliable, high-speed internet.  Along with the federal initiatives of the Infrastructure Act, addressing digital discrimination of access is an important part of closing the digital divide.[2]  To that end, Congress enacted section 60506 of the Infrastructure Act, which directs the Commission to adopt final rules to facilitate equal access to broadband internet access service.[3]

2.    In this *Report and Order*, we adopt rules pursuant to section 60506 of the Infrastructure Act that establish a framework to facilitate equal access to broadband internet access service[4] by

---

[1] Infrastructure Investment and Jobs Act, Pub. L. No. 117-58, 135 Stat. 429 (2021) (codified at 47 U.S.C. § 1754) (Infrastructure Act).

[2] In 1999, the National Telecommunications and Information Administration (NTIA) defined the digital divide as: "the divide between those with access to new technologies and those without."  NTIA, *Falling Through the Net: Defining the Digital Divide* (July 08, 1999), https://www.ntia.doc.gov/legacy/ntiahome/fttn99/contents.html.

[3] 47 U.S.C. § 1754.

[4] *Id.* § 1754(b).  The Infrastructure Act defines "broadband internet access service" for section 60506 and the remainder of Title V as having "the meaning given the term in section 8.1(b) of [the Commission's rules], or any

(continued….)

preventing digital discrimination of access. These rules address policies and practices that impede equal access to broadband, while taking into account issues of technical and economic feasibility that pose serious challenges to full achievement of the equal access objective. The rules we adopt today constitute an effective, balanced means to accomplish Congress's objective of ensuring that historically unserved and underserved communities throughout the Nation have equal opportunity to receive high-speed broadband service comparable to that received by others, without discrimination as to the terms and conditions on which that service is received. Accompanying the *Report and Order* is a *Further Notice of Proposed Rulemaking* in which we seek additional comment on matters pertaining to our implementation of section 60506 and our diligent efforts to facilitate equal access.

3. The actions taken today are summarized below.

- **Digital Discrimination of Access Defined**

In furtherance of our goal to facilitate equal access to broadband internet access service, we adopt the following definition of "digital discrimination of access": "policies or practices, not justified by genuine issues of technical or economic feasibility, that differentially impact consumers' access to broadband internet access service based on their income level, race, ethnicity, color, religion or national origin, or are intended to have such differential impact." Under the rules we adopt today, we will investigate conduct alleged to be motivated by discriminatory intent, as well as conduct alleged to have discriminatory effect, based on income level, race, ethnicity, color, religion, or national origin. Consistent with the definition of "equal access" in the statute, we find that differentiation as to any available quality of service metric for broadband service may provide a basis for liability under these rules, absent sufficient justification.

- **Technical and Economic Feasibility**

Consistent with Congress's directive, our definition of digital discrimination of access fully takes into account "issues of technical and economic feasibility," constituting impediments to full achievement of the equal access goal of the statute. We define "technically feasible" to mean "reasonably achievable as evidenced by prior success by covered entities under similar circumstances or demonstrated technological advances clearly indicating that the policy or practice in question may reasonably be adopted, implemented, and utilized." We similarly define "economically feasible" to mean "reasonably achievable as evidenced by prior success by covered entities under similar circumstances or demonstrated new economic conditions clearly indicating that the policy or practice in question may reasonably be adopted, implemented, and utilized."

- **Consumers Afforded Protection from Digital Discrimination, and Entities and Services that Are Subject to the Prohibition Against Digital Discrimination of Access**

We adopt rules focusing on whether policies and practices differentially impact consumers' access to broadband internet access service or are intended to do so. In this vein, we specify that

---

(Continued from previous page)

successor regulation." *See* Infrastructure Act § 60501(1); *see also* 47 CFR § 8.1(b) (defining broadband internet access service as "a mass-market retail service by wire or radio that provides the capability to transmit data to and receive data from all or substantially all internet endpoints, including any capabilities that are incidental to and enable the operation of the communications service, but excluding dial-up internet access service. This term also encompasses any service that the Commission finds to be providing a functional equivalent of the service described in the previous sentence or that is used to evade the protections set forth in this part."). In this *Report and Order* and *Further Notice of Proposed Rulemaking*, we use the terms "broadband," "broadband service," and "broadband internet access service" interchangeably.

"consumer" means current and prospective subscribers to broadband internet access service, including individuals, groups of individuals, organizations, and groups of organizations. Moreover, the scope of the rules we adopt today extends not only to providers of broadband internet access service, but also to entities that facilitate and otherwise affect consumer access to broadband internet access service.

We adopt today the same definition of "broadband internet access service" that appears in our rules at 47 CFR § 8.1(b). In accordance with section 60506, the rules we adopt today shall apply to all policies and practices that affect a consumer's ability to have equal access to broadband internet access service, including but not limited to deployment, network upgrades, and maintenance. Covered elements of service include both technical and non-technical elements of service that may affect a consumer's ability to receive and effectively utilize the service.

- **Enforcement**

We adopt rules that allow for enforcement of our prohibition against digital discrimination of access through self-initiated Commission investigations and revise our informal complaint process to accept complaints alleging digital discrimination of access, including offering parties voluntary mediation overseen by Commission staff when appropriate. Possible violations will be investigated by Commission staff using our standard investigative toolkit, and all penalties and remedies will be available when we determine that our rules have been violated. The Commission will consider utilizing consent decrees when appropriate. We decline, at this time, to create an additional process for the filing and adjudication of formal complaints akin to section 208 of the Communications Act.

- **Consumer Complaints**

Consistent with Congress's directive, we revise our informal consumer complaint process to accept complaints from consumers or other members of the public that relate to digital discrimination of access by establishing a dedicated pathway for digital discrimination of access complaints including from organizations, and collecting voluntary demographic information from complainants.

- **State and Local Model Policies and Best Practices**

We adopt the Communications Equity and Diversity Council's recommendations that propose model policies and practices for states and localities to address digital discrimination of access.[5] We emphasize that these model policies and practices do not foreclose adoption by states and localities of additional measures to ensure equal access to broadband service in their communities.

- **Annual Reports and Compliance Programs, and Office of Civil Rights**

In the *Further Notice*, we seek comment on affirmative obligations for broadband providers, through: (1) annual reports that facilitate greater transparency regarding substantial broadband projects recently completed by providers, and (2) internal compliance programs requiring periodic evaluation of the demographics of communities served—and not served—by such recently completed projects, as well as pending and planned substantial projects. We also seek further focused comment on establishing an Office of Civil Rights.

---

[5] Communications Equity and Diversity Council, Recommendations and Best Practices to Prevent Digital Discrimination and Promote Digital Equity at 12 (2022), https://www.fcc.gov/sites/default/files/cedc-digital-discrimination-report-110722.pdf (CEDC Report). The report is attached as Appendix D.

## II.    BACKGROUND

4.        Section 60506 of Division F, Title V of the Infrastructure Act is entitled "Digital Discrimination."  This provision supports extensive broadband expansion programs in the Infrastructure Act and requires that the Commission adopt rules to facilitate equal access to broadband internet service. Section 60506(b) reads:

> "Not later than 2 years after November 15, 2021, the Commission shall adopt final rules to facilitate equal access to broadband internet access service, taking into account the issues of technical and economic feasibility presented by that objective, including –
>
> > (1) preventing digital discrimination of access based on income level, race, ethnicity, color, religion, or national origin; and
> >
> > (2) identifying necessary steps for the Commission to take to eliminate discrimination described in paragraph (1)."[6]

5.        The Commission's implementation of section 60506 builds on a robust history of Commission regulatory action premised on nondiscrimination and universal service, which, in turn, furthers the goal of broadband internet access for all and addresses the digital divide.

### A.    Commission's Efforts to Further Consumer Access to Broadband Internet Service

6.        At the core of the Commission's commitment to broadband internet access for all is section 1 of the Communications Act of 1934, as amended, which states the agency's purpose "to make available, so far as possible," a "rapid, efficient, Nation-wide" wire and radio communication service with adequate facilities "to all people of the United States, without discrimination on the basis of race, color, religion, national origin, or sex."[7]  Nondiscrimination and universal service are cornerstone principles and drive agency policies to achieve the broadest possible consumer access to communications services.[8]  In the Telecommunications Act of 1996 (1996 Act), Congress expanded the traditional goal of universal service to include increased access to telecommunications and advanced services, such as broadband internet access service, for all consumers at just, reasonable, and affordable rates.[9]  The 1996 Act established principles for universal service that focus on increasing access for consumers living in rural and insular areas, and for low-income consumers.[10]  Section 706 of the 1996 Act requires the Commission to report annually on whether broadband "is being deployed to all Americans in a reasonable and timely fashion."[11]

---

[6] 47 U.S.C. § 1754(b).

[7] *Id.* § 151.

[8] *See id.* § 202(a) (prohibiting unjust or unreasonable discrimination by common carriers in charges, practices, classifications, or regulations in connection with like communications services); *id*. § 1302(b) (requiring Commission to inquire as to whether "advanced telecommunications capability is being deployed to all Americans in a reasonable and timely fashion."); *id*. § 541(a)(3) (providing that local franchise authorities must "assure that access to cable service is not denied to any group of potential residential cable subscribers because of the income of the residents of the local area); *id*. § 257.

[9] Telecommunications Act of 1996, Pub. L. No. 104-104, 110 Stat. 56 (codified at 47 U.S.C. § 151 *et seq.*) (1996 Act); 47 U.S.C. §§ 254(b), 1302(a).

[10] 47 U.S.C. § 254(b)(3).

[11] 47 U.S.C. § 1302(b).  Annual Broadband Progress Reports are housed on the Commission's website.  FCC, *Broadband Progress Reports*, https://www.fcc.gov/reports-research/reports/broadband-progress-reports (last visited Nov. 14, 2023).

7. In 2009, Congress directed the Commission to develop a National Broadband Plan to ensure every American has "access to broadband capability."[12] The Commission released the National Broadband Plan in March 2010, highlighting ways to "[r]eform current universal service mechanisms to support deployment of broadband and voice in high-cost areas; and ensure that low-income Americans can afford broadband; and in addition, support efforts to boost adoption and utilization."[13]

8. The Commission has long used its Universal Service funding programs to further consumer access to broadband and bridge the digital divide. These funding programs, which preceded the Infrastructure Act, have historically helped to deliver broadband services to low-income consumers and to unserved and underserved communities in rural and insular areas. Further, these programs provide support in various ways, including: offering to low-income consumers discounts on voice service and/or broadband internet access service; providing funding to eligible schools and libraries for affordable broadband services to help connect students and members of local communities; providing funding for health care providers to ensure that patients have access to broadband enabled healthcare services; and offering subsidies to providers to build out, deploy, and maintain networks that provide voice and broadband service in high-cost areas.[14]

9. These Commission actions help to ameliorate a digital divide that has underpinnings in the country's historical segregation and redlining practices in housing.[15] The record in this proceeding reflects that the digital divide significantly tracks housing redlining that came into existence under the National Housing Act of 1934,[16] when the Federal Housing Administration directed the Home Owners'

---

[12] American Recovery and Reinvestment Act of 2009, Pub. L. No. 111-5, § 6001(k)(2)(D), 123 Stat. 115, 516 (2009).

[13] *See* FCC, Connecting America: The National Broadband Plan at xi (2010), https://transition.fcc.gov/national-broadband-plan/national-broadband-plan.pdf.

[14] *See Report on the Future of the Universal Service Fund*, WC Docket No. 21-476, Notice of Inquiry, 36 FCC Rcd 18006, 18017-23, paras. 30-43 (2021) (describing the various universal service programs and seeking comment on how the Commission might improve its effectiveness in achieving its universal service goals).

[15] Relying on historical research, data, and surveys, numerous commenters correlate inequities in broadband access to historically segregated housing patterns and discriminatory housing practices. *See, e.g.*, Electronic Frontier Foundation et al. Comments at 5-10, 19-20 (rec. Feb. 21, 2023) (Joint Advocates); Electronic Frontier Foundation et al. Reply at 5-6, 9 (rec. Apr. 20, 2023) (Joint Advocates); Lawyers' Committee for Civil Rights Under Law Comments at 34-40 (rec. Feb. 21, 2023); Letter from NAACP Legal Defense and Educational Fund, Inc., to Chairwoman Rosenworcel, FCC, GN Docket 22-69, at 3-4 (filed Aug. 10, 2023); National Hispanic Media Coalition Reply at 6-7 (rec. Apr. 20, 2023); National Urban League et al. Comments at 2 (rec. Feb. 21, 2023); National Digital Inclusion Alliance and Common Sense Media Comments at 5 & n.9-10 (rec. Feb. 21, 2023); Multicultural Media, Telecom and Internet Council and the U.S. Black Chambers Comments at 3-7 (rec. Feb. 21, 2023) (National Multicultural Organizations).

[16] *See* Public Knowledge et al. Comments at 61-62 & n.202 (rec. Feb. 21, 2023) (citing Benjamin Skinner, Hazel Levy, and Taylor Burtch, Digital Redlining: The Relevance of 20th Century Housing Policy to 21st Century Broadband Access and Education, at 11 (2023), https://www.edworkingpapers.com/ai21-471); Lawyers' Committee for Civil Rights Under Law Comments at 36 & n.170 (citing Congressional Research Service, The Digital Divide: What Is It, Where Is It, and Federal Assistance Programs (2021), https://crsreports.congress.gov/product/pdf/R/R46613); National Multicultural Organizations Comments at 7& n.17 (citing Shara Tibken, *The Broadband Gap's Dirty Secret: Redlining Still Exists in Digital Form* (June 28, 2021), https://www.cnet.com/home/Internet/features/the-broadband-gaps-dirty-secret-redlining-still-exists-in-digital-form/)*; see also Inclusive Communities*, 576 U.S. at 528 (explaining that some segregated housing patterns can be traced to conditions that arose in the mid-20th century, that rapid urbanization, concomitant with the rise of suburban developments accessible by car, led many white families to leave the inner cities, and that this often left minority families concentrated in the center of the Nation's cities).

Loan Corporation to create "residential security maps."[17]  These federally created maps outlined as "high-risk" those areas highly populated by minorities.  Banks used these maps to deny mortgage capital to minority residents living in those high-risk areas, leading to disinvestment in these communities.[18]  Against this historical and demographic backdrop, researchers have long found that metropolitan areas with a history of redlining "generally remain more segregated and more economically disadvantaged, [and] . . . have lower median household income, lower home values, older housing stock, and rents which are lower in absolute terms (but often higher as a percentage of income)."[19]  This history has carried forward to broadband access, as researchers have found that access to broadband in the home can decrease in tandem with historical residential risk classifications, and such differences in broadband access vary depending on income levels, race, and ethnicity.[20]

### 1.    Consumer Access to Broadband

10.    The Commission regularly reports on the number of Americans who lack access to broadband internet access service.[21]  While the Commission reported in 2021 that 14.5 million Americans lack access to broadband,[22] an independent study suggested that the actual number was as high as 42

---

[17] Joint Advocates Comments at 5 & n.1 (citing R. Rothstein, The Color of Law:  A Forgotten History of How Our Government Segregated America (2017)); *see also* Federal Reserve Bank of St. Louis: Economic Research, *Archive: Records of the Federal Home Loan Bank Board: Home Owners Loan Corporation, Record Group* 195,, https://fraser.stlouisfed.org/archival-collection/records-federal-home-loan-bank-board-6751?view=flat (last visited Nov. 14, 2023).

[18] Joint Advocates Comments at 5-9*; see also* Kerner Commission, Report of the National Advisory Commission on Civil Disorders at 259 (1968) ("Discrimination prevents access to many nonslum areas, particularly the suburbs, and has a detrimental effect on ghetto housing itself.  By restricting the area open to a growing population, housing discrimination makes it profitable for landlords to break up ghetto apartments for denser occupancy, hastening housing deterioration."); *Inclusive Communities*, 576 U.S. at 529 ("Racially restrictive covenants prevented the conveyance of properties to minorities, . . . steering by real-estate agencies led potential buyers to consider homes in racially homogenous areas; and discriminatory lending practices, often referred to as redlining, precluded minority families from purchasing homes in affluent areas.").

[19] Lawyers' Committee for Civil Rights Under Law Comments at 36 & n.168 (citing A. Perry and D. Harshbarger, *America's Formerly Redlined Neighborhoods Have Changed and So Must Solutions to Rectify Them* (Oct. 14, 2019), https://www.brookings.edu/articles/americas-formerly-redlines-areas-changed-so-must-solutions/).

[20] *See id.* at 36 (citing Congressional Research Service, The Digital Divide: What Is It, Where Is It, and Federal Assistance Programs (2021), https://crsreports.congress.gov/product/pdf/R/R46613); Public Knowledge et al. Comments at 61-62, n.202 (citing Skinner et al. at 11; *see also* Joint Center for Political and Economic Studies Reply at 3 (rec. June 30, 2022) (citing Dominique Harrison, Joint Center for Political and Economic Studies, Affordability and Availability, Expanding Broadband in the Black Rural South (2021)) (reporting that in the black rural south, 20.8% of blacks, compared to 12% of whites, lack broadband Internet infrastructure); *id.* at 4 & n.2 (citing S. Katsinas, N. Keeney, E Jacobs, E. Corley and H. Whann, Education Policy Center, Internet Access Disparities in Alabama & the Black Belt (2023), https://ir.ua.edu/bitstream/handle/123456789/9922/201018_Internet-access-disparities-al-black-belt.pdf?sequence=1); Joint Advocates Comments at 5-7; Mississippi Center for Justice Reply at 5 (rec. Apr. 17, 2023).

[21] *See* Press Release, FCC, Chairwoman Rosenworcel Proposes National Goal of 100% Access to Affordable Broadband (July 25, 2023) (announcing that the Chairwoman recently circulated an updated Notice of Inquiry that would kick off the agency's evaluation of the state of broadband across the country, as required by section 706 of the Telecommunications Act), https://www.fcc.gov/document/rosenworcel-proposes-goal-100-access-affordable-broadband.

[22] *Inquiry Concerning Deployment of Advanced Telecommunications Capability to All Americans in a Reasonable and Timely Fashion*, GN Docket No. 20-269, Fourteenth Broadband Deployment Report, 36 FCC Rcd 836, 837, para. 2 (2021), https://www.fcc.gov/reports-research/reports/broadband-progress-reports/fourteenth-broadband-deployment-report.

million.[23]  Further, Microsoft's data usage, as of 2020, suggested that as many as 120.4 million people in the United States did not *use* the internet at broadband speeds of 25/3 Mbps.[24]

11.        The uncomfortable reality is that too many households in the United States lack equal access to broadband.  Lack of equal access to broadband is not limited to historically redlined urban communities,[25] but also encompasses and acutely affects both rural and urban low-income communities, other rural communities, and Tribal areas.[26]

### 2.        The Global COVID-19 Pandemic Heightened the Inequities in Broadband Internet Access

12.        The global COVID-19 pandemic compounded the problem of unequal access to broadband internet access service in the United States.  The digital divide became more stark as shutdowns caused a heightened need for high-quality broadband internet access service to meet basic needs such as working from home, distance learning, accessing public benefits and services, telehealth, job-hunting, remote worship activities, remote family and social connections, and other daily activities.[27]  In 2020, a Pew Research Center survey found that nearly half of adults surveyed stated that internet access was essential during the pandemic.[28]  And in that same survey, Pew found that at that time, "[s]ome 43% of lower-income parents with children whose schools shut down say it is very or somewhat likely their children will have to do schoolwork on their cellphones; 40% report the same likelihood of their child having to use public Wi-Fi to finish schoolwork because there is not a reliable internet connection at home."[29]  Subsequently, in 2021, Pew surveys found that 57% of households making less

---

[23] John Busby et al., *BroadbandNow Estimates Availability for All 50 States; Confirms that More than 42 Million Americans Do Not Have Access to Broadband* (May 9, 2023), https://broadbandnow.com/research/fcc-broadband-overreporting-by-state); *see also* National Urban League et al. Reply Comments, Attach. at 33-34 (rec. Apr. 20, 2023) (citing The Lewis Latimer Plan for Digital Equity and Inclusion) (Lewis Latimer Plan)).

[24] CEDC Report at 19 (citing Microsoft Airband Initiative, Maps Showing FCC Fixed Broadband Availability and Broadband Usage Based on Microsoft Data Updated as of October 2020, https://app.powerbi.com/view?r=eyJrIjoiYzlhZWIyNWEtMDlkOS00MWJkLWExZGYtOWQ3NTNjNzJiNDIwIiwidCI6ImMxMzZlZWMwLWZlOTItNDVlMC1iZWFlLTQ2OTg0OTczZTIzMiIsImMiOjF9).

[25] *See* Skinner et al. at 2-4, 11; Letter from Task Force to Prevent Digital Discrimination to Marlene H. Dortch, Secretary, FCC, GN Docket No. 22-69 (filed Aug. 29, 2023) (Baltimore, MD, Listening Session *Ex Parte*).

[26] *See* National Urban League et al. Reply, Attach. at 34-35 citing Lewis Latimer Plan) (discussing obstacles affecting deployment on tribal lands))*; see also* Elizabeth A. Dobis et al., Economic Research Service, U.S. Department of Agriculture, Rural America at a Glance (2021), https://www.ers.usda.gov/publications/pub-details?pubid=102575 (analyzing FCC Form 477 and U.S. Census block data and finding that from 2015-2019, households in rural, persistently poor counties were the least likely to have home internet), https://www.ers.usda.gov/publications/pub-details?pubid=102575); U.S. Department of Agriculture, *Broadband*, https://www.usda.gov/broadband (last visited Nov. 14, 2023); Anahid Bauer, Donna L. Feir, Matthew T. Gregg, The Tribal Digital Divide: Extent and Explanations, 46 Telecommunications Policy 102401 at 6 (2022) https://www.minneapolisfed.org/research/cicd-working-paper-series/the-tribal-digital-divide-extent-and-explanations) (examining the broadband access gap between Tribal and non-Tribal areas).

[27] National Urban League et al. Comments at 1 ("the COVID-19 pandemic demonstrated that our country has reached a critical juncture and the need for broadband to connect households and individuals to jobs, education, healthcare, civic duties, essential services and community is more necessary than ever.").

[28] Emily A. Vogels, Andrew Perrin, Lee Rainie, Monica Anderson, *53% of Americans Say the Internet Has Been Essential During the COVID-19 Outbreak*, Pew Research Report (Apr. 30, 2020), https://www.pewresearch.org/internet/2020/04/30/53-of-americans-say-the-internet-has-been-essential-during-the-covid-19-outbreak/.

[29] *Id.*

than $30,000 had home broadband, compared to 93% of households making $100,000 or more,[30] and additionally, white survey participants were more likely than black and Hispanic survey participants to report having home broadband access.[31]

13.    Moreover, based on data contributed by civil society organizations, educational institutions, and private sector companies, among households with broadband access, lower-income communities were observed to have slower effective speeds.[32]  For example, broadband internet access service has been found to be 21% lower in Tribal areas, compared to neighboring non-Tribal areas, and download speeds were lower.[33]  Overall, research and data indicate that during the pandemic, entrenched disparities in broadband internet access service in low-income, rural, and minority households adversely affected all aspects of daily life, including accessing education, seeking housing and employment online, accessing telehealth medical care, and applying for services.[34]

## B.    Infrastructure Investment and Jobs Act of 2021

14.    On November 15, 2021, in the midst of the pandemic, Congress enacted the Infrastructure Act providing $65 billion for broadband programs for the purpose of expanding access and

---

[30] Emily Vogels, *Digital Divide Persists Even as Americans with Lower Incomes Make Gains in Tech Adoption*, Pew Research Center (June 22, 2021), https://www.pewresearch.org/short-reads/2021/06/22/digital-divide-persists-even-as-americans-with-lower-incomes-make-gains-in-tech-adoption/.

[31] Sara Atske & Andrew Perrin, *Home Broadband Adoption, Computer Ownership Vary by Race, Ethnicity in the U.S.*, Pew Research Center (2021), https://www.pewresearch.org/short-reads/2021/07/16/home-broadband-adoption-computer-ownership-vary-by-race-ethnicity-in-the-u-s/); *see also* Andrew Perrin, *Mobile Technology and Home Broadband 2021*, Pew Research Center Fact Sheet,  https://www.pewresearch.org/Internet/2021/06/03/mobile-technology-and-home-broadband-2021/.

[32] R. Gallardo & B. Whitacre, *The Real Digital Divide? Advertised vs. Actual Internet Speeds*, Purdue Center for Regional Development (2020), https://pcrd.purdue.edu/the-real-digital-divide-advertised-vs-actual-Internet-speeds/).

[33] A. Bauer, D.L. Feir, M. Gregg, *The Tribal Digital Divide: Extent and Explanation*, Center for Indian Development, Federal Reserve Bank of Minneapolis, at 4 (rev. June 27, 2022), https://www.minneapolisfed.org/research/cicd-working-paper-series/the-tribal-digital-divide-extent-and-explanations.

[34] For example, as the pandemic caused the vast majority of K-12 students across the country to receive online instruction, 14% of parents had to access public Wi-Fi because there was no reliable connection to the home.  This figure was 4% in high-income households and 23% in lower income households.  *See* C. McClain, *The Internet and the Pandemic, Parents, Their Children and School During the Pandemic*, Pew Research Center (2021), https://www.pewresearch.org/Internet/2021/09/01/parents-their-children-and-school-during-the-pandemic/; *see also* Leadership Conference on Civil and Human Rights et al. Comments at 5 & n.28 (rec. Feb. 21, 2023) (citing K. Hampton, L. Fernandez, C. Robertson and J. Bauer, Broadband and Student Performance Gaps, Michigan State Univ. (2020) (https://quello.msu.edu/wp-content/uploads/2020/03/Broadband_Gap_Quello_Report_MSU.pdf)); National Multicultural Organizations Comments at 3 n.10 (citing Julia Perrino, *Redlining" and Health Indicators: Decisions Made 80 Years Ago Have Health Consequences Today*, Nat'l Cmty. Reinvestment Coal. (July 2, 2020), https://ncrc.org/redlining-and-health-indicators-decisions-made-80-years-ago-have-health-consequences-today); Julian Agyeman, *How Urban Planning and Housing Policy Helped Create "Food Apartheid" in US Cities*, The Conversation (Mar. 9, 2021, 8:36 AM), https://theconversation.com/how-urban-planning-and-housing-policy-helped-create-food-apartheid-in-us-cities-154433); Leadership Conference on Civil and Human Rights et al. Comments at 5 n.29 (citing A. Roy, *Telehealth Is a Good Option – If Your Internet is Fast Enough*, 9News (Jan. 16, 2020), https://www.9news.com/article/news/local/next/telehealth-is-a-good-option-if-your-Internet-connection-is-fast-enough/73-1bed9e35-914b-4c97-a435-9c5622c0b42f); Lawyers' Committee for Civil Rights Under Law Comments at 39 & nn.194-198.

affordability to under-served and unserved areas and addressing the "digital divide."[35]  Division F of the Infrastructure Act is entitled "Broadband."  In the legislation, Congress found:

(1) Access to affordable, reliable, high-speed broadband is essential to full participation in modern life in the United States.

(2) The persistent "digital divide" in the United States is a barrier to the economic competitiveness of the United States and equitable distribution of essential public services, including health care and education.

(3) The digital divide disproportionately affects communities of color, lower-income areas, and rural areas, and the benefits of broadband should be broadly enjoyed by all.

(4) In many communities across the country, increased competition among broadband providers has the potential to offer consumers more affordable, high quality options for broadband service.

(5) The 2019 novel coronavirus pandemic has underscored the critical importance of affordable, high speed broadband for individuals, families, and communities to be able to work, learn, and connect remotely while supporting social distancing.[36]

### 1. The Infrastructure Act's Funding Measures Promote Equal Access

15.  The Infrastructure Act's funding measures are intended to promote access to broadband internet access service and reduce the digital divide.  Under Title I through Title V of Division F of the Act, Congress authorized funding for expansive broadband access, affordability, and digital literacy programs.  These programs fall into seven major program areas[37]:  the Broadband Equity, Access, and Deployment Program ($42.45 billion),[38] the Affordable Connectivity Program ($14.2 billion),[39] Digital Equity Planning, Capacity and Competitive Grants ($2.75 billion),[40] the Tribal Broadband Connectivity

---

[35] During House debates on the Infrastructure Act, House Majority Whip James Clyburn (D-SC) testified about the harm caused by the digital divide and the need to address inequities in access to high-speed broadband internet service.  He stated:

Millions of Americans are not connected to the internet.  In my home state of South Carolina, nearly 1 in 10 households lack access to an internet connection, and even more cannot afford service.  As a result, they cannot work remotely, cannot learn remotely, and cannot access telehealth.  The internet is as essential to the 21st century as electricity was to the 20th century, and far too many Americans are left out.  That is why I worked closely with the House Rural Broadband Task Force, Chairman Pallone, and members of the Energy and Commerce Committee to craft comprehensive legislation to make high-speed broadband accessible and affordable for all. . . the Infrastructure Investment and Jobs Act will make America's greatness accessible and affordable for all Americans.  I urge passage of this legislation.  167 Cong. Rec. H5473-06 (2021).

*See also* testimony of House Majority Leader Steny Hoyer (D-MD) (testifying about the bipartisan infrastructure bill that it is designed to "make[] sure that all of us can make it in America because we have access to the internet.").  167 Cong. Rec. H5473-06 (2021); Transcribed from House Debate on Infrastructure Bill, C-SPAN (Sept. 28, 2021), C-Span - House Debate Infrastructure Bill (Sept. 28, 2021).

[36] 47 U.S.C. § 1701.

[37] For a summary of Broadband Funding Programs, *see* White House, A Guidebook to the Bipartisan Infrastructure Law for State, Local, Tribal, and Territorial Governments and Other Partners at 383-97 (2021), https://www.whitehouse.gov/wp-content/uploads/2022/05/BUILDING-A-BETTER-AMERICA-V2.pdf.

[38] *See* 135 Stat. 1182.

[39] *See* 135 Stat. 1238.

[40] *See* 135 Stat. 1212, 1222, 1354.

Program ($2 billion),[41] Rural Utilities Service at the Department of Agriculture ($2 billion),[42] the Middle Mile Grant Program ($1 billion),[43] and Private Activity Bonds (approximately $600 million).[44]

### 2. The Infrastructure Act Requires that the Commission Undertake Specific Measures to Support the Goal of Equal Access

16.     In addition to providing funding for broadband deployment in unserved and underserved communities, the Infrastructure Act sets out specified measures for the Commission in service of the goal that "every American ha[ve] access to reliable high-speed internet."[45]  Title I directs the Commission to create a broadband funding map, which is an "online mapping tool to provide a locations overview of the overall geographic footprint of each broadband infrastructure deployment project funding by the Federal Government."[46]  Through this map, and the National Broadband Map, the Commission and other governmental and non-governmental stakeholders can track broadband deployment projects to ensure that broadband is deployed in historically unserved and underserved areas.  Title V, entitled "Broadband Affordability," addresses affordability of broadband internet for low-income consumers.  In addition to expanding funding to offset the cost of broadband internet for low-income households through the Affordable Connectivity Program (ACP), Title V promotes transparency by requiring the Commission to adopt rules for broadband providers to display easy-to-understand labels that allow consumers to comparison shop for broadband services.[47]  This promotes competition by providing consumers clear, concise, and accurate information about broadband internet prices and fees, performance, and network practices.[48]

17.     Most relevant here, section 60506 of the Infrastructure Act sets out further measures to support the fundamental objective of ensuring equal access to broadband.[49]  The Statement of Policy provides that "insofar as technically and economically feasible" the Commission "should take steps to ensure that all people of the United States benefit from equal access to broadband internet access service."[50]  In addition to mandating the adoption of rules to facilitate equal access by "preventing digital discrimination of access" on specified bases and identifying necessary steps to eliminate such discrimination,[51] matters we discuss in great depth throughout this *Report and Order*, section 60506 requires the Commission and the Attorney General to "ensure that Federal policies promote equal access to robust broadband internet access service by prohibiting deployment discrimination" on specified bases.[52]  The Commission must also "develop model policies and best practices that can be adopted by

---

[41] *See* 135 Stat. 1208, 1353.

[42] *See* 135 Stat. 1351.

[43] *See* 135 Stat. 1231, 1355.

[44] *See* 135 Stat. 1330.

[45] *See* White House Fact Sheet, Bipartisan Infrastructure Investment and Jobs Act (Aug. 2, 2021), https://www.whitehouse.gov/briefing-room/statements-releases/2021/08/02/updated-fact-sheet-bipartisan-infrastructure-investment-and-jobs-act/.

[46] *See* 135 Stat. 1206, Sec. 60105(b).

[47] *See* 135 Stat. 1238 & 1244, P.L. 117-58, Sec. 60502 (Broadband affordability) and Sec. 60504 (adoption of consumer broadband labels); 47 U.S.C. §§ 1752-53.

[48] *Empowering Broadband Consumers Through Transparency*, CG Docket No. 22-2, Report and Order and Further Noticed of Proposed Rulemaking, FCC 22-86 (Nov. 17, 2022) (*Broadband Labels Order and Further Notice*).

[49] 47 U.S.C. § 1754.

[50] *Id.* § 1754(a).

[51] *Id.* § 1754(b).

[52] *Id.* § 1754(c).

States and localities to ensure that broadband internet access service providers do not engage in digital discrimination," and revise its "public complaint process to accept complaints from consumers or other members of the public that relate to digital discrimination."[53]

### C. Commission's Actions to Further Promote Equal Access

#### 1. Commission Funding Programs

18. The Commission's most recent efforts to get marginalized communities connected to high-quality broadband internet access service include administration of well-targeted subsidy programs. The Affordable Connectivity Program and its predecessor, the Emergency Broadband Benefit (EBB) Program, have been instrumental in helping low-income households afford broadband internet. Under the program, eligible low-income households can receive a discount of $30 per month toward internet service and up to $75 per month for eligible households on qualifying Tribal lands. Eligible households can also receive a one-time discount of up to $100 to purchase a laptop, desktop computer, or tablet from participating providers. As of August 2023, more than 20 million households in the United States have enrolled in the program.

19. During the pandemic, the Commission expedited adoption of the Emergency Connectivity Fund (ECF)[54] and COVID-19 Telehealth Programs[55] to provide funding to eligible schools and libraries for broadband services and connected devices for use by students, school staff, or library patrons and health care providers for telecommunications services, information services, and connected devices.

#### 2. Communications Equity and Diversity Council

20. On June 29, 2021, the Commission chartered the Communications Equity and Diversity Council (CEDC), a federal advisory committee created for the purpose of presenting recommendations to the Commission on "advancing equity in the provision of and access to digital communication services and products for all people of the United States, without discrimination on the basis of race, color, religion, national origin, sex, or disability."[56] Within the CEDC is the Digital Empowerment and Inclusion Working Group that was tasked with recommending "model policies and best practices that can be adopted by States and localities to ensure that broadband internet access service providers do not engage in digital discrimination" as required by section 60506(d).[57]

21. Since its formation, the CEDC and its working groups have taken significant steps towards satisfying its mission. On November 7, 2022, the CEDC submitted Recommendations and Best Practices to Prevent Digital Discrimination and Promote Digital Equity to the Commission.[58] The CEDC

---

[53] *Id.* § 1754(d), (e).

[54] *Establishing Emergency Connectivity Fund to Close the Homework Gap*, WC Docket No. 21-93, Report and Order, 36 FCC Rcd 8696 (2021) (*ECF Report and Order*).

[55] *Promoting Telehealth for Low-Income Consumers: COVID 19 Telehealth Program*, WC Docket Nos. 18-213 and 20-89, Report and Order, 35 FCC Rcd 3366 (2020) (Round 1); *COVID-19 Telehealth Program; Promoting Telehealth for Low-Income Consumers*, WC Docket Nos. 20-89 and 18-213, Report and Order and Order on Reconsideration, 36 FCC Rcd 7141 (2021) (Round 2).

[56] In chartering the CEDC, the Commission renewed the charter of the Advisory Committee on Diversity and Digital Empowerment under a new name. *FCC Seeks Nominations for Membership on Communications Equity and Diversity Council,* Public Notice, 36 FCC Rcd 10391, 10391 (2021).

[57] 47 U.S.C. § 1754(d); *FCC Announces Working Group Members of the Communications Equity and Diversity Council, Public Notice*, 37 FCC Rcd 329 (MB Jan 13, 2022); *Agenda Released for February 23, 2022 Virtual Meeting of the Communications Equity and Diversity Council*, Public Notice, 37 FCC Rcd 1850 (MB Feb. 16, 2022).

[58] CEDC Report.

found that "COVID-19 exacerbated economic disparities for those who did not already have access to broadband services, especially in communities of color, where a lack of broadband access can reinforce systemic inequality."[59] The CEDC further found that data supported the conclusion that minority status and income correlated with broadband access.[60] To that end, the CEDC compiled findings from its three CEDC Working Groups and proposed recommendations for, among other things, model policies and best practices for states and localities that address discrimination in broadband access.[61]

22.        Moreover, in furtherance of its mission, on March 23, 2023, the CEDC convened a range of community organizations, broadband internet access providers, federal agencies with emergency broadband funding, and state agencies to assess lessons learned concerning programs that provided broadband connectivity to communities during the pandemic.[62] The CEDC released recommendations on this topic on June 15, 2023.[63]

### 3.        Task Force to Prevent Digital Discrimination

23.        On February 8, 2022, Chairwoman Rosenworcel announced the formation of a cross-agency Task Force to Prevent Digital Discrimination (Task Force). The Task Force is charged with coordinating the development of rules and policies to combat digital discrimination and promote equal access to broadband, overseeing the development of model state and local policies, and improving how the Commission seeks feedback from persons facing digital discrimination in their communities.[64]

24.        The Task Force has engaged in significant outreach nationwide to understand the depth of problems in accessing broadband, particularly as experienced by persons in historically excluded, low-income, rural, and marginalized communities. On January 25, 2023, the Task Force released a Broadband Access Experience Form for consumers to state their experience with accessing broadband internet.[65] The Task Force explained that the experiences shared by consumers help inform the work of the Commission.[66] Further, the Task Force has held numerous public listening sessions to gain additional

---

[59] *Id.* at 20 & n.22 (citing N. Turner, K. Henderson, M. Morial, A. Perry, Can We Alleviate Racism and Systemic Inequality by Expanding Broadband During COVID-19?, Panel, The Brookings Institution, Washington, DC, August 25, 2020, https://www.brookings.edu/events/can-we-alleviate-racism-and-systemic-inequality-by-expanding-broadband-during-covid-19/).

[60] *Id.* at 20-22.

[61] *Id.* at 33-35.

[62] Communications Equity and Diversity Council, Panel, *Lessons Learned from the Pandemic – Roundtable on Broadband Access, Affordability and Deployment* (2023), https://www.fcc.gov/news-events/events/2023/03/lessons-learned-pandemic-roundtable-broadband-access-affordability-and.

[63] Communications Equity and Diversity Council, Connecting Opportunity Communities to Broadband During the COVID-19 Pandemic: Lessons Learned and Recommendations (June 15, 2023), https://www.fcc.gov/sites/default/files/cedc-digital-empowerment-inclusion-wg-broadband-access-report-06152023.pdf. *See also* Disability Advisory Committee, Concerns and Lessons Learned Regarding Communication Access for People with Disabilities During the Pandemic (Sept. 9, 2021), https://www.fcc.gov/file/21920/download. Chairwoman Rosenworcel rechartered the CEDC for two more years effective June 22, 2023. Charter of the Federal Communications Commission's Communications Equity and Diversity Council (June 22, 2023), https://www.fcc.gov/sites/default/files/cedc-charter-06222023.pdf.

[64] Federal Communications Commission, *Task Force to Prevent Digital Discrimination* (Oct. 26, 2023), https://www.fcc.gov/task-force-prevent-digital-discrimination.

[65] Federal Communications Commission, *Broadband Access Experience Form*, https://consumercomplaints.fcc.gov/hc/en-us/articles/12303650382868-Broadband-Access-Experience-Form (last visited Nov. 14, 2023).

[66] Federal Communications Commission, *Consumer Inquiries and Complaint Center*, https://consumercomplaints.fcc.gov/hc/en-us/articles/12303650382868-Broadband-Access-Experience-Form (last visited Nov. 14, 2023).

information and understanding from affected communities, state, local and Tribal governments, public interest advocates, and providers about challenges, barriers, and experiences with accessing broadband.[67] In addition, the Task Force conducted outreach efforts to educate the public on the Commission's rulemaking procedure, and to gather data, narratives, best practices, and recommendations.[68] Summaries of these listening sessions and meetings have been entered into the record in this proceeding.[69]

---

[67] At the Los Angeles Listening Session on February 21, 2023, the Task Force heard public comments from the California Public Utilities Commission's Public Advocates Office, SoLa Impact, California Community Foundation, California Cable and Telecommunications Association, and the Utility Reform Network. Federal Communications Commission, Task Force to Prevent Digital Discrimination Listening Session (Feb. 21, 2023), https://www.fcc.gov/news-events/events/2023/02/task-force-prevent-digital-discrimination-listening-session). At the Baltimore Listening Session on March 28, 2023, the Task Force heard public comments from the Baltimore Digital Equity Coalition, Disability Rights Maryland, Enoch Pratt Free Library, Mayor's Office for the City of Baltimore, National Federation for the Blind, Baltimore Public Schools, Project Waves, Wide Angle Youth Media, and Baltimore Tracks. Federal Communications Commission, Task Force to Prevent Digital Discrimination Listening Session (Mar. 28, 2023), https://www.fcc.gov/news-events/events/2023/02/task-force-prevent-digital-discrimination-listening-session. The Washington D.C. listening session was held on September 14, 2023. The Task Force heard from representatives from the American Association of People with Disabilities, the American Foundation for the Blind, Communication First, TDIforAccess, Inc., the University of Kansas University Center on Developmental Disabilities, Telecommunications Access of Maryland, the Partnership of Employment and Accessible Technology, the Maryland Initiative for Digital Accessibility with the University of Maryland, and the Gallaudet University Technology Accessibility Program. Federal Communications Commission, Task Force to Prevent Digital Discrimination Listening Session (Sept. 14, 2023), https://www.fcc.gov/news-events/events/2023/09/task-force-prevent-digital-discrimination-listening-session-gallaudet-u. At the New York Listening Session on September 29, 2023, the Task Force heard public comments from NY ConnetALL, New York State Broadband Office; Consumer Reports; The Fortune Society; Silicon Harlem; Digital Equity Research Lab; NYC Office of Technology and Innovation; Aspen Institute Latinos and Society Program; Brooklyn Public Library; The STEM Alliance; Hispanic Federation; Asian Community Care Organization; Housing and Financial Capability, National Urban League; and Per Scholas. Federal Communications Commission, Task Force to Prevent Digital Discrimination Listening Session (Sept. 29, 2023), https://www.fcc.gov/news-events/events/2023/09/task-force-prevent-digital-discrimination-listening-session-new-york. At the Topeka, Kansas Listening Session on October 5, 2023, the Task Force heard public comment from the Deputy Mayor's office, Kansas Commerce Broadband Development Office; ISBA, Inc.; Topeka Public Schools; Jayhawk Area Agency on Aging; State of Kansas Department of Children and Families; KC Digital Drive; Topeka Shawnee County Public Library; Greater Topeka Partnership; United Methodist Health Ministry Fund. Federal Communications Commission, Task Force to Prevent Digital Discrimination Listening Session (Oct. 5, 2023), https://www.fcc.gov/news-events/events/2023/10/task-force-prevent-digital-discrimination-listening-session-topeka-ks.

[68] *See* Letter from Task Force to Prevent Digital Discrimination to Marlene H. Dortch, Secretary, FCC, GN Docket No. 22-69, at 1-2 (filed Aug. 29, 2023) (Chicago, IL, Listening Session *Ex Parte*); Letter from Task Force to Prevent Digital Discrimination to Marlene H. Dortch, Secretary, FCC, GN Docket No. 22-69, at 1-2 (filed Aug. 30, 2023) (Tacoma, WA, Listening Session *Ex Parte*); Letter from Task Force to Prevent Digital Discrimination to Marlene H. Dortch, Secretary, FCC, GN Docket No. 22-69, at 1-2 (filed Aug. 30, 2023) (Tribal Workshop Ferndale, WA, Listening Session *Ex Parte*); Letter from Task Force to Prevent Digital Discrimination to Marlene H. Dortch, Secretary, FCC, GN Docket No. 22-69, at 1 (filed Oct. 24, 2023) (Seattle, WA, Listening Session *Ex Parte*); Letter from Task Force to Prevent Digital Discrimination to Marlene H. Dortch, Secretary, FCC, GN Docket No. 22-69, at 1 (filed Oct. 24, 2023) (American Association of Retired Persons (AARP) Listening Session *Ex Parte*); Letter from Task Force to Prevent Digital Discrimination to Marlene H. Dortch, Secretary, FCC, GN Docket No. 22-69, at 1 (filed Oct. 24, 2023) (National Digital Inclusion Alliance (NDIA) Listening Session *Ex Parte*).

[69] *Ex parte* filings for the listening sessions can be found on the Commission's website by entering the docket number, 22-69, in the "Proceeding(s)" box under Search All Public Filings. Federal Communications Commission, *Welcome to the FCC's Electronic Comment Filing System*, https://www.fcc.gov/ecfs/search/search-filings (last visited Nov. 14, 2023).

### D.    Notice of Inquiry and Notice of Proposed Rulemaking

25.    The Commission has taken iterative steps to form a robust record for the rules adopted in today's *Report and Order* and proposed in the accompanying *Further Notice of Proposed Rulemaking*.  In March 2022, the Commission released a *Notice of Inquiry* seeking comment on the rules that the Commission should adopt to implement section 60506.  By the *Notice of Inquiry*, the Commission invited comment on the requirements encompassed in section 60506, in order to inform a forthcoming rulemaking to implement the requirements of the statute.[70]

26.    In December 2022, the Commission released a *Notice of Proposed Rulemaking* (*Notice*) seeking focused comment on potential rules to address digital discrimination of access pursuant to section 60506.[71]  The Commission sought comments on its proposals to:  (1) adopt a definition of "digital discrimination of access," (2) revise the Commission's informal consumer complaint process to accept complaints of digital discrimination of access, and (3) adopt model policies and best practices for states and localities combatting digital discrimination of access.  The Commission also sought comment on other rules the Commission should adopt to facilitate equal access and combat digital discrimination of access, and on the legal authority for adopting rules.  The Commission received more than 1,400 pages of record comments and ex partes from a wide range of stakeholders including public interest organizations, broadband internet access providers, state, local and Tribal governments, industry advocacy organizations, and research institutes.  Informed by this record, we adopt rules in fulfillment of our mandate from Congress in section 60506 of the Infrastructure Act.

## III.    DISCUSSION

27.    Based on our review of the record received in response to the *Notice of Inquiry* and *Notice*, we adopt rules in this *Report and Order* to implement subsections (b), (d) and (e) of section 60506.  First, we adopt a definition of "digital discrimination of access" and explain its component parts.  Next, we adopt rules to prohibit digital discrimination of access.  Third, we outline the scope of that prohibition, identifying the consumers, entities, and services covered by the prohibition.  Fourth, we adopt rules for enforcing the prohibition and other requirements set forth in our rules, and we explain how we will assess when a policy or practice differentially affects consumer access to broadband internet access service.  Finally, we adopt changes to our informal complaints process so the Commission can accept digital discrimination of access complaints, address other issues on the record, and adopt model policies and best practices for states and localities combating digital discrimination.

### A.    Definition of Statutory Terms

28.    Section 60506 is part of a comprehensive broadband access and affordability framework intended to expand broadband coverage in the United States, improve the quality of broadband services, and increase broadband adoption rates in low-income communities.  As many commenters note, the bulk of the Infrastructure Act's broadband-related provisions are directed toward (1) improving broadband access in unserved and underserved communities by incentivizing investment in hard-to-build areas (principally through tens of billions of dollars in federally administered grants), and (2) improving broadband adoption rates in low-income communities through subsidies to qualifying consumers for high-speed broadband service and related equipment.

29.    The Infrastructure Act's historic investment incentives represent an acknowledgement by Congress that:  (1) deploying, upgrading, and maintaining high-speed broadband networks is an

---

[70] *Implementing the Infrastructure Investment and Jobs Act: Prevention and Elimination of Digital Discrimination*, GN Docket No. 22-69, Notice of Inquiry, 37 FCC Rcd 4198 (2022) (*Notice of Inquiry*), https://docs.fcc.gov/public/attachments/FCC-22-21A1.pdf.

[71] *Implementing the Infrastructure Investment and Jobs Act: Prevention and Elimination of Digital Discrimination*, GN Docket No. 22-69, Notice of Proposed Rulemaking, FCC 22-98 (rel. Dec. 22, 2022) (*Notice*), https://docs.fcc.gov/public/attachments/FCC-22-98A1.pdf.

expensive enterprise, even for the largest of broadband providers, (2) networks will only be built where they can be deployed at acceptable cost and then profitably operated, and (3) such legitimate, profit and loss considerations likely account for many of the gaps in access to high-speed broadband service across the United States. The investment incentives in the Infrastructure Act directly address the very real technical and economic constraints facing many broadband providers as they work to expand their networks to reach unserved and underserved communities across the country.

30.     But even while seeking to address these legitimate business constraints, Congress recognized that other factors might also have played a significant role in creating and maintaining the digital divide in the United States. Thus, alongside the ambitious programs in the Infrastructure Act for improving broadband access in unserved and underserved communities, Congress, in section 60506, specifically directed the Commission to facilitate equal access to broadband service, including addressing discrimination in the provision of access to broadband service.

31.     Section 60506(a) first declares "the policy of the United States that, insofar as technically and economically feasible . . . subscribers should benefit from equal access to broadband internet access service within the service area of a provider of such service . . . [and that] the Commission should take steps to ensure that all people of the United States benefit from equal access to broadband internet access service." Section 60506(b) then directs the Commission to "adopt final rules to facilitate equal access to broadband internet access service, taking into account the issues of technical and economic feasibility presented by that objective," and mandates that those rules include "preventing digital discrimination of access based on income level, race, ethnicity, color, religion, or national origin" and "identifying necessary steps for the Commission[] to take to eliminate" such digital discrimination of access.

32.     Critically important to our understanding of the reach of section 60506 is its definition of "equal access." Section 60506(a) declares in the Statement of Policy that the Commission should take steps to ensure "equal access" to broadband internet access service across our Nation, and section 60506(b) directs the Commission to adopt rules to "facilitate equal access" to broadband internet access service.[72] The "equal access" that we are to ensure and facilitate is defined in subsection (a)(2) as "the *equal opportunity* to subscribe to an offered service that provides comparable speeds, capacities, latency, and other quality of service metrics in a given area, for comparable terms and conditions."[73] The statute thus focuses the Commission's energies on the objective of *equal opportunity*, a concept and goal that is well known in American life. And in service of this equal opportunity goal, the Commission is directed, and thereby authorized, to adopt rules to prevent discrimination on the listed bases and to identify ways to eliminate its occurrence and effects.

### 1.     Digital Discrimination of Access Defined

33.     By enacting section 60506, Congress vested the Commission with authority to adopt and enforce rules to address the problem of digital discrimination of access.[74] To achieve that purpose, the *Notice* advanced proposals for defining "digital discrimination of access" and the legal standard for determining a violation of the rules.[75] We adopt the following definition of "digital discrimination of access," which is essentially identical to our proposal in the *Notice*:

> Policies or practices, not justified by genuine issues of technical or economic feasibility, that
> > (1) differentially impact consumers' access to broadband internet access service based on their income level, race, ethnicity, color, religion, or national origin or

---

[72] 47 U.S.C. § 1754(a), (b).

[73] *Id.* § 1754(a)(2) (emphasis added).

[74] *Id.* §1754(b) ("Not later than 2 years after November 15, 2021, the Commission shall adopt rules to facilitate equal access. . . .").

[75] *See Notice* at 6-13, paras. 11-24.

(2) are intended to have such differential impact.

34.     In so defining "digital discrimination of access," we find that to achieve the statute's equal access purposes, the legal standard must address not only business conduct motivated by discriminatory intent, but also business conduct having discriminatory effects.

35.     Virtually all commenters agree that digital discrimination of access encompasses business conduct motivated by discriminatory intent.[76]  Certainly treating a person or a group of persons "less favorably than others because of a protected trait" is "the most easily understood type of discrimination."[77]  Under our adopted rules, business conduct *motivated by discrimination* on one of the six listed bases (income level, race, color, ethnicity, religion, and national origin) would generally be prohibited.

36.     The disagreement among commenters centers on whether policies and practices having discriminatory *effects* should be prohibited under our definition of digital discrimination of access.  Most industry commenters argue that the definition must be limited to disparate treatment, i.e., intentional discrimination, relying largely on case law interpreting the Fair Housing Act (FHA) and asserting that a Commission rule permitting claims based on disparate impact, i.e., discriminatory effect, would conflict with other provisions of the Infrastructure Act, and could disincentivize investment in broadband networks.[78]  On the other hand, most public interest and government commenters, relying on the same case law, argue that the rule must encompass disparate impact claims because most discrimination in broadband access stems from business practices having discriminatory effect, and any rule that excludes a disparate impact liability standard would render section 60506 largely meaningless.[79]  In adopting a

---

[76] Americans for Tax Reform and Digital Liberty Comments at 2 (rec. Feb. 21, 2023); California Public Utilities Commission Comments at 1 (rec. Feb. 21, 2023); City of Long Beach Comments at 1 (rec. Feb. 21, 2023); CTIA Comments at 3 (rec. Feb. 21, 2023); Greenlining Institute Comments at 5-6 (rec. Feb. 21, 2023); Jeffrey Westling Comments at 2-3 (rec. Feb. 21, 2023) (American Action Forum); Lawyers' Committee for Civil Rights Under Law Comments at 8-15; NCTA Comments at 2-3 (rec. Feb. 21, 2023); National Digital Inclusion Alliance and Common Sense Media Comments at 3; National Hispanic Media Coalition Comments at 8; National Multicultural Organizations Comments at 2; National Urban League et al. Comments at 4-5; T-Mobile Comments at 2-3 (rec. Feb. 21, 2023); U.S. Chamber of Commerce Comments at 2, 7 (rec. Feb. 21, 2023); USTelecom Comments at 3-4, 21-22 (rec. Feb. 21, 2023); Verizon Comments at 14 (rec. Feb. 21, 2023);  American Civil Liberties Union Reply at 9 (rec. Apr. 20, 2023) (ACLU); AT&T Reply at 17 (rec. Apr. 20, 2023); Competitive Carriers Association Reply at 3 (rec. Apr. 20, 2023); Free State Foundation Reply at 1,5 (rec. Apr. 20, 2023); WISPA Reply at 9-10 (rec. Apr. 20, 2023).

[77] *Ricci v. DeStefano*, 557 U.S. 557, 577 (2009).

[78] *See, e.g.*, ACA Connects Comments at 18 (rec. Feb. 21, 2023); AT&T Comments at 16-17 (rec. Feb. 21, 2023); Americans for Tax Reform and Digital Liberty Comments at 2-4; CTIA Comments at 3, 20-22; NCTA Comments at 2-3; T-Mobile Comments at 2-3, 14-16; U.S. Chamber of Commerce Comments at 6-7; USTelecom Comments at 11; Verizon Comments at 14; American Action Forum Comments at 1-5; CTIA Reply at 12 (rec. Apr. 20, 2023); International Center for Law & Economics Reply at 6 (rec. Apr. 20, 2023); Lumen Reply at 16 (rec. Apr. 20, 2023); NCTA Reply at 11 (rec. Apr. 20, 2023); Verizon Reply at 5-6 (rec. Apr. 20, 2023).

[79] *See, e.g.*, National Hispanic Media Coalition Comments at 7 (a disparate treatment only liability standard would "miss a large quantity of discrimination"); National Hispanic Media Coalition Reply at 2 (explaining that not providing for a disparate impact standard in our digital discrimination of access rules would effectively remove the "teeth" of this rulemaking); National Urban League et al. Comments at 4 ("[T]here are policies and practices that have the potential to be adopted by ISPs that may appear to be neutral, such as profit-driven deployment or customer acquisition decisions; however, those seemingly 'neutral' decisions could negatively impact historically marginalized communities' ability to connect to [broadband].");  California Public Utilities Commission Comments at 1-7; City of Long Beach Comments at 1; City of Philadelphia, City of Oklahoma, City of Minneapolis et al. Comments at 15-16, 20 (rec. Feb. 21, 2023) (Local Governments); Japanese American Citizen League Comments at 1-2 (rec. Feb. 21, 2023); Joint Advocates Comments at 17-20; Lawyers' Committee for Civil Rights Under Law Comments at 8-15; Leadership Conference on Civil and Human Rights et al. Comments at 2; National Multicultural Organizations Comments at 2-3; National Digital Inclusion Alliance and Common Sense Media Comments at 2-3;

(continued….)

17

definition of digital discrimination of access that encompasses both disparate treatment and disparate impact, we are guided primarily by the text of the statute, including its expressly stated goal of ensuring "equal access" to broadband internet access service.[80]

### a. Section 60506 Supports the Commission's Adoption of the Legal Standards Stated in the Defined Term

37. Statutory interpretation focuses on "the language itself, the specific context in which that language is used, and the broader context of the statute as a whole."[81] The text and context of section 60506 of the Infrastructure Act fully support our adopted definition of digital discrimination of access and its application, as does the overall framework of the Infrastructure Act and section 60506.

#### (i) Disparate Treatment

38. Section 60506 plainly addresses intentional discrimination, i.e., an intentional act that treats a person, or group of persons, "less favorably than others because of a protected trait."[82] Virtually all commenters agree on this point,[83] and we find no basis for disagreeing with this consensus view. Our definition of "digital discrimination of access" thus includes any act by a covered entity that is intended to differentially impact access to broadband internet access service on one of the listed bases and is not justified by genuine issues of technical or economic feasibility. Based on the record before us, we do not expect to encounter many instances of intentional discrimination with respect to deployment and network upgrades, as there is little or no evidence in the legislative history of section 60506 or the record of this proceeding indicating that intentional discrimination by industry participants based on the listed characteristics substantially contributes to disparities in access to broadband internet service across the Nation.[84] Moreover, in the cases in which we do encounter intentional discrimination, we believe the entity that engaged in the discriminatory conduct will be hard pressed to justify such conduct on technical or economic feasibility grounds. Therefore, while we will allow such justifications to be raised and will consider them on a case-by-case basis, we expect that in most cases, a determination that a covered entity engaged in intentional discrimination will lead to a finding of liability under our rules.

#### (ii) Disparate Impact

39. In determining whether section 60506 authorizes us to include disparate impact in our definition of digital discrimination of access, we look to the guidance provided in the Supreme Court's

---

(Continued from previous page)
New York State Public Service Commission Comments at 2 (rec. Feb. 21, 2023); Public Knowledge et al. Comments at 29, 50-56; WISPA Comments at 13 (rec. Feb. 21, 2023); ACLU Reply at 9.

[80] 47 U.S.C. § 1754(a)(3).

[81] *Robinson v. Shell Oil Co.*, 519 U.S. 337, 341 (1997); *see also West Virginia v. Environmental Protection Agency*, 142 S.Ct. 2587, 2607 (June 30, 2022) (quoting *Davis v. Mich. Dep't of Treasury*, 489 U.S. 803, 809 (1989)).

[82] *Ricci v. DeStefano*, 557 U.S. 557, 577 (2009).

[83] *Supra* para. 35.

[84] Lawyers' Committee for Civil Rights Under Law Comments at 12; Multicultural Media, Telecom and Internet Council Reply at 5 (rec. Apr.20, 2023); Letter from Stephanie Weiner, Chief Counsel, National Telecommunications and Information Administration, to the Federal Communications Commission, GN Docket No. 22-69, at 4-5 (filed Oct. 6, 2023) (NTIA *Ex Parte*) (arguing that the Commission should adopt a definition that encompasses both disparate treatment and disparate impact standards because disparities in service more commonly result "from business decisions and institutional behaviors that were set in motion without any discriminatory intent," and noting that industry "[has] been careful to point out that documented evidence of disparate treatment in this area is nearly non-existent"); *see also* CTIA Comments at 20; Free State Foundation Comments at 5 (rec. Feb. 21, 2023) (explaining that "no comments filed appear to allege that any recent or ongoing specific instances of broadband ISPs intentionally discriminating on the basis of deployment decisions"); NTCA Comments at 15 (rec. Feb. 21, 2023) (stating that the record in this administrative proceedings does not point to evidence of discriminatory intent based on any of the protected classes enumerated in section 60506 has been found).

decision in *Texas Department of Housing and Comm'ty Affairs v. Inclusive Communities Project*.[85] There, the Court set out a framework for determining when an antidiscrimination statute "must be construed to encompass disparate impact claims."[86]  Under that framework, a disparate impact legal standard is authorized where the statutory text is "results based" and such a standard is "consistent with statutory purpose."[87]  And, where evidence of a statistical disparity is shown to support a complaint of disparate impact, liability is properly limited where (1) the challenged policy or practice is shown to cause the disparity complained about,[88] and (2) business owners are permitted to explain the valid interests served by the challenged policy or practice.[89]  We find that 60506 authorizes a disparate impact liability standard and that our implementing rules, outlined below, fully comport with the limiting criteria set out in *Inclusive Communities*.

### (a)        Statutory Text and Context

40.        The language of section 60506 falls within Division F (Broadband Access) of the Infrastructure Act, where Congress addresses the problem of the "digital divide" in our country and the urgency of corrective action because "[a]ccess to affordable, reliable, high-speed broadband is essential to full participation in modern life in the United States."[90]  The term "equal access" is defined in section 60506 as "the equal opportunity to subscribe to an offered service" of comparable quality on comparable terms and conditions.[91]  The term "equal access" lies at the center of section 60506's Statement of Policy in subsection (a).[92]  At subsection (b) Congress directs the Commission to adopt final rules to "facilitate equal access" which includes "preventing digital discrimination" and "identifying necessary steps . . . to eliminate [such] discrimination."[93]  As we explain below, the facial text, context and purposes of the statute establish Congress's intent that our implementing rules address conduct having discriminatory effects as well as conduct motivated by discriminatory intent.

41.        The operative text mandates the adoption of rules to "facilitate equal access to broadband" which includes "preventing digital discrimination of access based on" specified characteristics, and "identifying necessary steps . . . to eliminate [such] discrimination."[94]  The term "equal access" is defined in section 60506(a) as "the *equal opportunity* to subscribe to an offered service" of comparable quality on comparable terms and conditions[95] and lies at the center of section 60506's

---

[85] *Texas Dep't of Housing and Comm'ty Affairs* v. *Inclusive Communities*, 576 U.S. 519, 533 (2015).

[86] *Id.*

[87] *Id.* at 533 (stating that "antidiscrimination laws must be construed to encompass disparate impact claims when their text refers to the consequences of actions and not just to the mindset of actors and where that interpretation is consistent with statutory purpose.").

[88] *Id.* at 541-42.

[89] *Id.* ((1) and (2) are not criteria for determining if disparate impact liability is authorized but limitations "that avoid the serious constitutional questions that might arise . . . if such liability were imposed based solely on a showing of a statistical disparity.").

[90] *Supra* para. 15; 47 U.S.C. §1701.

[91] 47 U.S.C. § 1754(a)(2).

[92] *Id.* § 1754(a)(1), (3).

[93] *Id.* § 1754(b)(1), (2).

[94] *Id.* § 1754(b).

[95] *Id.* § 1754(a)(2) (emphasis added).  We reject the argument that section 60506(a)(2) "is irrelevant to the meaning of 'discrimination'" even if it focuses on consequence. *See, e.g.*, AT&T Comments at 17.  As explained, we interpret "of access" in subsection (b)(1) to incorporate the definition of "equal access" in (a)(2). *Infra* para. 54.

Statement of Policy.[96] At subsection (b), Congress directs the Commission to adopt final rules to "facilitate equal access" to broadband internet access service.[97] Like Title VII of the Civil Rights Act of 1964 and the Age Discrimination in Employment Act, section 60506 defines "access" in terms of opportunity.[98] Because the statute defines "access" as the "*opportunity* to subscribe,"[99] this operative text focuses on the impact of a policy or practice on the consumer's chance or right to obtain service rather than intent.[100]

42.    Courts commonly look to the "ordinary meaning" of a statute's words to interpret their meaning when the statute itself does not provide a definition.[101] Looking at other operative text of section 60506, given its ordinary meaning, we find that each term targets the "consequences of actions."[102] For instance, subsection (a)(1) of the statute focuses on the "opportunity" to subscribe[103] and subsection (a)(3) states that consumers should "benefit" from equal access to broadband.[104] The plain meaning of "opportunity" is "a good chance for advancement or progress,"[105] and "benefit" means "to receive help or an advantage."[106] Neither term depends on the mindset of the actor, but rather the effect of the action.

---

[96] 47 U.S.C. § 1754(a)(1), (3) (providing in subsection (a)(1) that "subscribers should benefit from equal access to broadband internet access service" and requiring in subsection (a)(3) that the Commission take steps to ensure that all persons "benefit from equal access" to broadband service).

[97] *Id.* § 1754(b)(1), (2).

[98] *Compare id.* § 1754(a)(2) ("equal access" means "the equal *opportunity* to subscribe to an offered service that provides comparable speeds, capacities, latency, and other quality of service metrics in a given area, for comparable terms and conditions") (emphasis added) *with* 42 U.S.C. § 2000e–2(a) (making it unlawful for employers to act "in any way which would deprive or tend to deprive any individual of employment *opportunities* or otherwise adversely affect his status as an employee") (emphasis added) *and* 29 U.S.C. § 623(a)(2) (same).

[99] 47 U.S.C. § 1754(a)(2) (emphasis added).

[100] *See* Merriam-Webster, *Opportunity*, https://www.merriam-webster.com/dictionary/opportunity) (last visited Nov. 14, 2023) ("Opportunity" means "a good chance for advancement or progress.'"); National Multicultural Organizations Comments at 12-13 (arguing that the definition of "equal access" provided in subsection 60506(a)(2) is framed from the subscriber's perspective and "[t]hus[] [s]ubsection 60506(b)'s use of the term is directed towards the consequences that service-related actions and policies have on the subscriber's opportunity to obtain broadband service, not the intent of service providers").

[101] *Tanzin* v. *Tavir*, 141 S.Ct. 486, 491 (2020) (citing *FCC v. AT&T, Inc.*, 562 U.S. 397, 403 (2011) ("When a statute does not define a term, we typically give the phrase its ordinary meaning.")); *see also Inclusive Communities*, 576 U.S. at 535.

[102] *Inclusive Communities*, 576 U.S. at 533. For undefined statutory terms, courts can look to the "dictionary for clarification of the plain meaning of words selected by Congress." *Perez-Olivio* v. *Chavez*, 394 F.3d 45, 49 (1st Cir. 2005). *See also United States v. Lachman*, 387 F.3d 42, 50 (1st Cir. 2004) ("Dictionaries of the English language are a fundamental tool in ascertaining the plain meaning of terms used in statutes and regulations."). *See also* National Urban League et al. Comments at 4 (stating that "the statutory language of section 60506 is results-oriented and refers to consequences of actions taken by providers because Congress instructs the Commission to ensure that individuals 'benefit from equal access to broadband internet service' and 'identify steps to eliminate discrimination.'").

[103] 47 U.S.C. § 1754(a)(1).

[104] *Id.* § 1754(a)(3).

[105] *See supra* note 100; *see also* Lawyers' Committee for Civil Rights Under Law Comments at 21-22; Lawyers' Committee for Civil Rights Under Law Reply at 8 (rec. Apr. 20, 2023); Multicultural Media, Telecom and Internet Council and the U.S. Black Chambers Comments at 13; Greenlining Institute Comments at 6.

[106] Merriam-Webster, *Benefit*, https://www.merriam-webster.com/dictionary/benefit (last visited Nov. 14, 2023) (providing this definition for the verb form of "benefit" and defining the noun form as "something that produces good or helpful results or effects or that promotes well-being"); s*ee, e.g.*, Joint Advocates Comments at 15

(continued….)

Section 60506(b), moreover, directs the Commission to "facilitate" equal access by "preventing" digital discrimination of access, and identifying necessary steps to "eliminate" it.[107]  The plain meaning of "facilitate" is "to make easier or help bring about."[108]  The meaning of "prevent" as referenced in subsection (b)(1) is "keep[ing] (something) from happening or arising,"[109] and "eliminate" as referenced in subsection(b)(2) means to "put an end to or get rid of."[110]  Again, these definitions, taken from the Merriam-Webster's (online) Dictionary, clearly suggest an effects-based orientation—whether looking at each word independently or in context as written in the statute—rather than a singular focus on the mindset of the actor.  Equal access can be denied by policies and practices having discriminatory effects even where no discriminatory motive is present,[111] and it is our considered view that most of the gaps in access to broadband internet service in our country, to the extent that they are not a product of legitimate business constraints that Congress sought to address in other provisions of the Infrastructure Act, stem from policies and practices that are neutral on their face, rather than from intentionally discriminatory conduct on the part of covered entities and other industry participants.[112]  Further, the use of the words "based on" in section 60506(b)(1) does not limit its reach to instances of intentional discrimination under controlling precedent.[113]

(Continued from previous page) ────────────────────────
(explaining that "subsection (a)'s use of the term 'benefit' signals that the statutory objective is to improve public welfare rather than punish bad actors").

[107] 47 U.S.C. § 1754(b).

[108] Merriam-Webster, *Facilitate*, https://www.merriam-webster.com/dictionary/facilitate (last visited Nov. 14, 2023).

[109] 47 U.S.C. § 1754(b)(1); Merriam-Webster, *Prevent*, https://www.merriam-webster.com/dictionary/prevent (last visited Nov. 14, 2023); Public Knowledge et al. Comments et al. at 52-53 (citing to Lawyers' Committee for Civil Rights Under Law Dec. 12, 2022 *Ex Parte*); National Hispanic Media Coalition Reply at 3-4 (agreeing that the natural construction of "prevent" is results-oriented).

[110] 47 U.S.C. § 1754(b)(2); Merriam-Webster, *Eliminate*, https://www.merriam-webster.com/dictionary/eliminate (last visited Nov. 14, 2023); Joint Advocates Comments at 13 (arguing that effectuating the goals through "identifying [the] necessary steps . . . to eliminate discrimination" supports a disparate impact regime); National Hispanic Media Coalition Reply at 3-4 (agreeing that the natural construction of "eliminate" is results-oriented).

[111] *See, e.g.*, Japanese American Citizen League Comments at 1-2; Joint Advocates Comments at 17-20; National Hispanic Media Coalition Comments at 7; National Urban League et al. Comments at 4.  Commenters urge us to adopt a disparate impact legal standard due to the documented disparities in broadband access nationwide.  *See, e.g.*, American Library Association Comments at 2 (rec. Feb. 21, 2023); Leadership Conference on Civil and Human Rights et al. Comments at 2-4; National League of Cities Comments at 2 (rec. Feb 20, 2023); County of Santa Clara Comments at 1-3, 9 (rec. Feb. 21, 2023).

[112] *See, e.g.*, Japanese American Citizen League Comments at 1-2 ("No one would believe any [provider] would intentionally overlook a community such as Japantown because of the ethnic makeup of the community, but other decisions that somehow led to Japantown being overlooked in broadband deployment leaving a clear disparate impact upon a minority community without broadband service."); Joint Advocates Comments at 17-20 (discussing how providers' implicit biases, rather than discriminatory intent, may drive unequal access); National Hispanic Media Coalition Comments at 7 (agreeing that a regime that only accounts for a disparate treatment standard would "will miss a large quantity of discrimination" and that a disparate impact standard will encompass "facially neutral practices that result in harmful and discriminatory effects for protected classes of people"); National Urban League et al. at 4 (agreeing that a disparate impact framework is necessary because "policies and practices that have the potential to be adopted by [providers] . . . may appear to be neutral," but can "negatively impact historically marginalized communities' ability to connect to vital communications services"); Texas Coalition of Cities for Utility Issues et al. Reply at 6 (rec. Apr. 20, 2023) (Texas Coalition of Cities et al.) (reiterating their position that we should include disparate impact standard in our definition in part because "facially neutral or even unintentional practices could still produce discriminatory effects and 'the devastating consequences are much the same' as intentional discrimination," citing their comments to the *Notice of Inquiry*).

[113] Some commenters argue that the statute's use of the term "based on" limits the statute to an intent-only legal

(continued….)

43. In reaching this conclusion, we are mindful of the history of disparate impact analysis as it applies to federal anti-discrimination statutes. It was first addressed in *Griggs* v. *Duke Power Co.*[114] where the Supreme Court interpreted section 703(a)(2) of Title VII of the Civil Rights Act to authorize disparate impact liability. Section 703(a)(2) of Title VII made it "an unlawful practice for an employer" to "limit, segregate, or classify . . . employees or applicants for employment in any way which would deprive any individual of employment opportunities *or otherwise adversely affect* his status as an employee because of such individual's race, color, religion, sex or national origin."[115] There, the Court interpreted the statutory text to prohibit not only "overt discrimination" but also "practices that are fair in form, but discriminatory in operation."[116] Further, the Court stated that "[u]nder [Title VII], practices, procedures, or tests neutral on their face, and even neutral in terms of intent, cannot be maintained if they operate to 'freeze' the status quo of prior discriminatory employment practices."[117] The Court reasoned that from this language "Congress directed the thrust of [Sec. 703(a)(2)] to the consequences of employment practices, not simply the motivation."[118] Notably, the Court stated that the statute's goal of achieving "*equality of employment opportunities* and remov[ing] barriers that have operated in the past" to favor some individuals over others afforded protected status must be interpreted to allow disparate impact claims.[119] Section 4(a)(2) of the Age Discrimination in Employment Act (ADEA) contains similar language as that of Title VII, and a plurality of the Court in *Smith* v. *City of Jackson* ruled that the statutory text authorized disparate impact liability just as it did in *Griggs*.[120]

44. Similar reasoning was employed in examining section 804(a) of the FHA by the Court in *Inclusive Communities*, even though the provision used different results-based language than did Title VII and the ADEA. The FHA makes it unlawful to "refuse to sell or rent . . . or otherwise make unavailable or deny, a dwelling to any person because of" a protected status.[121] The Court in *Inclusive Communities* observed "the logic of *Griggs* and *Smith* provides strong support for the conclusion that the FHA

(Continued from previous page) ————————————————

standard. *See, e.g.*, ACA Connects Comments at 7; AT&T Comments at 6, 16-17; NCTA Comments at 20-21; T-Mobile Comments at 16; USTelecom Comments at 22-24; Verizon Comments at 13-14; ACA Connects Reply at 10-12; AT&T Reply at 19; International Center for Law & Economics Reply at 16; NTCA Reply at 5-6 (rec. Apr. 20, 2023). This argument by commenters has already been expressly rejected by the Supreme Court in *Griggs* and its progeny. Looking at the other nondiscrimination statutes that contain similar "based on" language—section 703(a)(2) of Title VII, section 4(a)(2) of the ADEA, and section 804(a) of the FHA—each of these statutes were found by the Court to authorize disparate impact claims because of the results-based statutory language. *See Inclusive Communities*, 576 U.S. at 535 (explaining that *Griggs v. Duke Power Co.*, 401 U.S. 424 (1971)*,* and *Smith v. City of Jackson*, 544 US 228 (2005), "dispose of this argument. Both Title VII and the ADEA contain identical 'because of' language . . . and the Court nonetheless held those statutes impose disparate-impact liability."). Just as with these antidiscrimination statutes, section 60506's "based on" text does not foreclose utilizing a disparate impact legal standard. The disparate impact standard is authorized by section 60506, as it is drawn from the "equal access" and other "results-based" statutory language and clear purposes of the statute. *See, e.g.*, Joint Advocates Comments at 13-17; Lawyers' Committee for Civil Rights Under Law Comments at 11-13; National Digital Inclusion Alliance and Common Sense Media Comments at 4-5; National Multicultural Organizations Comments at 12-14; Next Century Cities Comments at 8 (rec. Feb. 21, 2023); Public Knowledge et al. Comments et al. at 52-53.

[114] *Griggs*, 401 U.S. at 431.

[115] *Id.* at 426 & n.1; 42 U.S.C. § 2000e-2(a) (emphasis added).

[116] *Griggs*, 401 U.S. at 431.

[117] *Id*. at. 430.

[118] *Id*. at 432.

[119] *Id*. at 429-30 (emphasis added).

[120] *Smith*, 544 U.S. at 228.

[121] 42 U.S.C. § 3604(a).

encompasses disparate-impact claims" even though the results-oriented language was different.[122]  The Court observed that "[i]t is true that Congress did not reiterate Title VII's exact language in the FHA, but that is because to do so would have made the relevant sentence awkward and unclear."[123]  So, instead, "Congress thus chose words that serve the same purpose and bear the same basic meaning but are consistent with the structure and objectives of the FHA."[124]  Likewise, in the context of section 60506, Congress did not repeat the results-based language that appears in Title VII, the ADEA, the FHA or the many other federal anti-discrimination statutes that have been determined to prohibit disparate impacts on specified bases.[125]  Instead, Congress chose words appropriate to the statute's purpose of promoting equal access to broadband internet service; the statute appropriately references "equal access," "equal opportunity" and other terminology that goes to results or consequences of actions (or counteracting those results or consequences), and not to the mindset of actors.[126]

### (b)    Statutory Purpose

45.    Our reading of the statutory text to encompass disparate impact aligns with the overall scheme of the Infrastructure Act, and with the purpose of section 60506 specifically.[127]  As described above,[128] promoting broadband internet access has been a longstanding policy objective for the Commission.  The 1996 Act expanded the goal of universal service to include advanced services such as broadband internet service, and the Commission used its universal funding programs to address the persistent digital divide.[129]  Then, in 2020, the global COVID-19 pandemic necessitated social distancing

---

[122] *Inclusive Communities*, 576 U.S. at 534.

[123] *Id.* at 535.

[124] *Id.*

[125] Title VI authorizes promulgation of disparate impact regulations.  *Alexander v. Choate*, 469 U.S. 287, 292-294 (1985); *see also*34 CFR §§ 106.21(a), 106.23(a), 106.31(a) (Title IX regulations promulgated by the Department of Education); Department of Justice, *Title VI Legal Manual*, https://www.justice.gov/crt/fcs/T6manual (last visited Nov. 14, 2023) (stating that "the applicable legal standards under Title VI and Title IX are generally identical and investigative officials can rely on case law decided under Title VI in establishing violations under Title IX").  The Equal Credit Opportunity Act authorizes fair lending regulations promulgated by the Consumer Financial Protection Bureau.  *See* Consumer Financial Protection Bureau, *Laws and Regulations – ECOA*, https://files.consumerfinance.gov/f/201306_cfpb_laws-and-regulations_ecoa-combined-june-2013.pdf (last visited Nov. 14, 2023) ("The ECOA has two principal theories of liability:  disparate treatment and disparate impact.").

[126] *See, e.g.*, Joint Advocates Comments at 14-16 ("Taken together, § 60506(a) and (b) therefore provide the kind of 'results-oriented' language that the Court found indicative of a disparate impact approach in *Inclusive Communities*."); *see also* Lawyers' Committee for Civil Rights Under Law Comments at 12-14.  For these reasons, we disagree with commenters who argue that section 60506 does not have results-oriented language or other textual markers that authorize disparate impact liability.  *See, e.g.*, Verizon Comments at 14-16 ("In *Inclusive Communities*, the Supreme Court identified several textual through-lines in the [FHA], Title VII, and the [ADEA] that supported reading the FHA to encompass disparate-impact liability. . . use of the phrases 'otherwise adversely affect' or 'otherwise make unavailable,' which 'refer[] to the consequences of an action rather than the actor's intent'. . . placement of those 'catchall phrases looking to consequences, not intent,' 'at the end of lengthy sentences that begin with prohibitions on disparate treatment' . . . [and] uses of the 'catchall phrases' in the 'operative text' of the statute.  None of these textual through-lines appear in Section 60506(b), or anywhere else in Section 60506"); AT&T Reply at 2-3, 17-19 (arguing that Congress failed to use an established term of art like "otherwise adversely affect" in section 60506 so they did not intend for the Commission to adopt a disparate impact standard).

[127] *See Catskill Mountains Chap. Of Trout Unlim'd, Inc. v. EPA*, 846 F.3d 492, 513 (2d Cir. 2017) (The plain meaning of a statutory provision may be "understood by looking to the statutory scheme as a whole and placing the particular provision within the context of that statute").

[128] *Supra* paras. 6-8, 18-19.

[129] *Id*.

that made the ongoing digital divide even more evident and troublesome.[130]  Some commenters in this proceeding argue, directly or indirectly, that "digital discrimination" does not exist.[131]  But those arguments are belied by Congress's findings in the Infrastructure Act and the record compiled in this proceeding correlating the digital divide with historical discrimination.[132]  In all events, Congress has directed the Commission to take swift action to prevent digital discrimination of access.[133]  Indeed, section 60506 aligns with the Commission's longstanding obligation to promote nondiscrimination in the telecommunications sector.[134]

46.      Gaps in access to high-quality broadband across the country led Congress to enact the broadband-related provisions of the Infrastructure Act, which creates historic investment incentives and affordability subsidies to address some of the causes of the digital divide.  The Infrastructure Act also clearly mandates certain prophylactic measures to address discriminatory conduct that is not addressed elsewhere in the legislation.  For the past half century, our country's civil rights jurisprudence has recognized that equal opportunity to achieve economic and social benefits can be denied intentionally because of the personal characteristics or status of the person seeking the opportunity or benefit, or it can be denied unintentionally because of facially neutral policies or practices that disproportionately exclude

---

[130] *Supra* paras. 12-15.

[131] *See, e.g.*, ACA Connects Comments at 9 (explaining that the lack of complaints and enforcement of discrimination claims under authority currently provided under the Communications Act indicates that providers are not engaging in digital discrimination of access); T-Mobile Comments at 5, 7-8; Declaration of Glenn Woroch, Attach. To AT&T Reply to *Notice of Inquiry* (rec. June 30, 2022) (combining nationwide census-block broadband deployment data from Form 477 with demographic data from the Census Bureau and concluding that 100/20 Mbps wireline broadband availability rates for minority households are higher than for white households, and that availability rates for households above and below the poverty line are nearly identical); Free State Foundation Reply at 4-5 (arguing that "there is no evidence of systemic digital discrimination"); Lumen Reply at 7-13; TechFreedom Reply at 4-10 (rec. Apr. 20, 2023).  *But see* Leadership Conference on Civil and Human Rights et al. Reply at 2-3 (citing many examples of digital discrimination of access on the record as support that "[t]he allegations by some commenters that digital discrimination does not exist are belied by this evidence"); North Suburban Communications Commission Reply at 4 (explaining that claims that "digital discrimination does not exist lack credibility and ignores nationwide efforts to promote digital equity and inclusion and to eliminate digital discrimination").

[132] *See supra* paras. 9, 12-14.

[133] Therefore, we do not find it necessary to evaluate claims by commenters that digital discrimination of access does not exist.  *See infra* para. 45, note 14.  Such arguments would more appropriately have been made to Congress when it was considering this legislation.  We have neither the authority, nor the inclination, to question the factual bases for Congress's directives to the Commission.

[134] Section 202(a) of the Communications Act is a nondiscrimination provision that makes it unlawful for common carriers to "discriminat[e] in charges, practices, classifications, regulations, facilities, or services for or in connection with like communications service . . . or to . . . . advantage . . . any particular person, class of persons, or locality, or to subject any particular person, class of persons, or locality to any undue or unreasonable prejudice or disadvantage." 47 U.S.C. § 202(a).  It requires no showing of discriminatory intent to establish a violation.  Under section 202, where "like communications services" are provided by the same provider but on different terms or conditions, the provider must justify any difference as reasonable.  In *National Communications, Inc. v. AT&T Corp.*, a reseller of a common carrier's long distance service sued the carrier, alleging discrimination in the provision of "like communication services" in violation of section 202(a).  *See National Communications, Inc. v. AT&T Corp.*, 238 F.3d 124, 125 (2d Cir. 2001).  The district court "instructed the jury, and the parties [did] not dispute, that a § 202(a) claim consists of three elements: (1) whether the services are 'like'; (2) if so, whether the services were provided under different terms or conditions; and (3) whether any such difference was reasonable." *Id.* at 127; *see also Competitive Telecomm. Ass'n v. FCC*, 998 F.2d 1058, 1061 (D.C. Cir. 1993); *MCI Telecomms. Corp. v. FCC*, 917 F.2d 30, 39 (D.C. Cir. 1990).  Further, "[i]f the services are 'like,' the carrier offering them has the burden of justifying the price disparity as reasonable." *MCI Telecomms. Corp.*, 917 F.2d at 39.

persons possessing such characteristics or status, and both types of denial are unlawful.[135] Disparate impact analysis has maintained its foundational standing in the courts, most recently in *Inclusive Communities*, as a means for addressing harm caused by policies or practices that have discriminatory effects and lack adequate business justification. We find that by defining the goals of section 60506 in terms of "equal access" and "equal opportunity," especially in light of the 52-year history of disparate impact analysis in civil rights law,[136] Congress expressed its intention that the Commission's implementing regulations address business conduct having the effect of denying designated groups of consumers the equal opportunity to subscribe to an offered broadband service, regardless of the motivation for such actions.

47.    As further support for the Congressional purpose that drives our actions today, the record in this proceeding contains substantial evidence of gaps in access among persons in some low-income, rural, Tribal, and minority communities.[137] As noted above, there is little or no evidence in the legislative history of the Infrastructure Act or the record of this proceeding that impediments to broadband internet access service are the result of intentional discrimination based on the criteria set forth in the statute.[138] Rather, we must conclude that such impediments are more likely driven by neutral policies or practices (i.e., business decisions) that have discriminatory effects.[139]

### b.    Section 60506 Properly Limits Disparate Impact Liability

48.    Even where a statute contains "results-based" text that authorizes disparate impact claims, the liability standard must require a showing that a challenged policy or practice is causing the disparity complained about,[140] and "avoid displacement of legitimate practices."[141] Both of these factors are met by the rules we adopt today.

49.    First, we will require that any determination of differential impact that relies on observed disparity must point to a specific policy or practice that is causing the disparity.[142] A "robust causality requirement" ensures that any statistical imbalance does not alone establish liability and thus protects covered entities "from being held liable for . . . disparities they did not create."[143] We therefore require that any determination of liability under our rules that is founded on statistical disparity must include a determination that the disparity is caused by a specific policy or practice of the covered entity under investigation.[144]

---

[135] *See Griggs*, 401 U.S. at 431.

[136] *Id*.

[137] *See, e.g.*, Baltimore, MD, Listening Session *Ex Parte*; Letter from Vangela M. Wade, Esq., President & CEO, Mississippi Center for Justice, to Marlene H. Dortch, Secretary, FCC, GN Docket No. 22-69, at 1-2 (filed May 26, 2023); Lawyers' Committee for Civil Rights Under Law Comments at 37-40; Leadership Conference on Civil and Human Rights et al. Comments at 5-6; Next Century Cities Comments at 10-14; *supra* para. 13.

[138] *See, e.g.*, Free State Foundation Reply at 5 ("No comments filed appear to allege any recent or ongoing specific instances of broadband ISPs intentionally discriminating on the basis of deployment decisions."); CTIA Comments at 20 ("There is no evidence of intentional discrimination in the broadband industry, although in other contexts disparate treatment remains a very real problem."); Japanese American Citizen League Comments at 1-2 (alleging digital discrimination of access on a disparate impact basis in the Japantown neighborhood of San Francisco).

[139] *See supra* para. 42 & note 112.

[140] *Inclusive Communities*, 576 U.S. at 541-42.

[141] *Id.* at 541 ("An important and appropriate means of ensuring that disparate impact-liability is properly limited is to give housing and private developers leeway to state and explain the valid interest served by their policies.").

[142] *Id.* at 542.

[143] *Id.*

[144] *See infra* paras. 138-139.

50.     Next, the rules will give covered entities an opportunity to present justifications for discriminatory policies and practices.  Section 60506 sets out such limitation by requiring that our rules facilitate equal access while taking into account "issues of technical and economic feasibility."[145]  Where the Commission believes there is credible evidence that a covered entity's policy or practice differentially impacts access to broadband internet access service on the basis of income level, race, ethnicity, color, religion, or national origin, the covered entity will have the opportunity to prove that the policy or practice is nevertheless "justified by genuine issues of technical or economic feasibility."[146]  We anticipate that such justification will include proof that there is not a reasonably available and achievable alternative policy or practice that would serve the entity's legitimate business objectives with less discriminatory effect.  In this *Report and Order*, we explain the meaning of these terms, and how they will be applied on a case-by-case basis in the context of our self-initiated investigations of digital discrimination of access complaints.[147]

### c.     Adopting a Rule That Encompasses Disparate Impact Claims Does Not Conflict with the Infrastructure Act's Funding Programs and Will Not Chill Broadband Investment

51.     Contrary to some commenters' claims,[148] including disparate impact in our definition of digital discrimination of access does not conflict with the broadband funding programs set out in the Infrastructure Act and will not otherwise chill investment in broadband networks.  The deployment and digital equity funds provided for in the Infrastructure Act[149] prioritize unserved and underserved areas by addressing technical and economic issues that have hindered investment in "hard-to-build" areas.  By contrast, section 60506 and the Commission's implementing rules are centered on conduct that does not stem from such issues.  Our definition of "digital discrimination of access" highlights this contrast by specifically exempting policies and practices that are justified by "genuine issues of technical and economic feasibility."  Thus, the discrimination addressed in section 60506 and our implementing rules is not addressed in other provisions of the statute, and vice versa.  There is no conflict.

52.     Nor do we believe that including disparate impact in our definition of digital discrimination of access will chill investments in broadband networks.[150]  Congress has provided historic funding incentives aimed to spur broadband investments in unserved and underserved communities throughout the United States.[151]  Those incentives, once again, address the very real technical and

(Continued from previous page) ———————————————
[145] 47 U.S.C. § 1754(b).

[146] *See* WISPA Reply at 11 (recommending adoption of *Inclusive Communities* framework to determine whether the "disparate impact was justified by a 'legitimate rationale.'").

[147] *See infra* Part III.A.2.c.

[148] *See, e.g.*, ACA Connects Comments at 19 (explaining that complying with a disparate impact standard is unclear and "would divert resources from maintaining and improving their networks and ultimately interfere with the statute's overarching objective of facilitating equal access to broadband service"); Americans for Tax Reform and Digital Liberty Comments at 3 (contending that a disparate impact standard will impose costs on providers by subjecting them to litigation); CTIA Comments at 3, 19-22 (arguing that "[t]he [Infrastructure Act's] approach to broadband as a whole further counsels in favor of a disparate treatment approach" and that a disparate impact standard may force providers into an "all or none" approach to deployment); USTelecom Comments at 34-35 ("Such a standard would create regulatory overhang on every deployment decision made by a provider, thereby stifling innovation and investment . . . ."); American Consumer Institute Reply at 3-6 (rec. Apr. 19, 2023) ("Not only does the disparate impact standard make certain forms of normal business decisions and operations potentially illegal, but it obfuscates the underlying issue of inequality of broadband connectivity . . . ."); Verizon Reply at 3-5 (noting additionally that there are factors and parties outside of a provider's control that can effect deployment).

[149] 47 U.S.C. §§ 1721-1726.

[150] *See* Georgia Tech Center for Advanced Communications Policy Reply at 7-8 (rec. Apr. 11, 2023) (discussing how "stricter" European Union broadband guidelines have not thwarted investment).

economic challenges that have hindered deployment, upgrades, and maintenance of networks in those communities.  We are not persuaded that adoption of a disparate impact standard will disincentivize economic investments in networks out of fear that doing so might somehow require uneconomic investments.  Again, we emphasize that under the rules we adopt today, there can be no liability determination for disparate impact unless (1) there is a differential in access to broadband service; (2) the differential is caused by a specific policy or practice of the covered entity; and (3) the covered entity fails to prove that the policy or practice is justified on genuine technical or economic grounds.  When providing broadband access to a particular area is impeded by genuine issues of technical or economic feasibility, the covered entity should be able to explain those issues and offer substantial evidence to support them.  While our rules will require greater diligence by covered entities in determining and documenting the reasons for access gaps in their service areas, we do not think that result is overly burdensome in furtherance of the statutory goal of equal access, nor do we think it will disincentivize investment in broadband networks.

### d.    Other Considerations

53.     Having reached the central determinations for adopting a definition of digital discrimination of access and the applicable legal standards, we respond to other considerations commenters raise.  Commenters raise additional arguments regarding interpretation of "equal access," legislative history, and the role that a covered entity's profitability and access to consumer data should play in our definition of digital discrimination of access analysis.  We address each of those considerations in turn.

54.     *Interpretation of "equal access."*  Commenters urge us to interpret "equal access" to require a showing of intent.[152]  Given that "equal access" is defined by statute, is inherently "results based," and is coupled with other operative terms that are "results based," we must reject each of these proposals.[153]  Certainly, requiring any showing of intent would conflict with our reasoned interpretation of the statutory text and purpose.[154]  We likewise decline the City of Long Beach's suggestion that we

(Continued from previous page) ────────────────────

[151] *See, e.g.*, 47 U.S.C. § 1702 (BEAD Program).

[152] *See, e.g.*, CTIA Comments at 9-10, 19; Free State Foundation Comments at 1, 3, 9; Lincoln Network Comments at 11 (rec. Feb. 21, 2023); Kirsten Compitello Comments at 4 (rec. Feb. 20, 2023) (Michael Baker International); T-Mobile Comments at 20-21; Verizon Comments at 2; American Consumer Institute Reply at 9; Jeffrey Westling Reply at 1 (rec. Apr. 12, 2023) (American Action Forum); AT&T Reply at 17; Block Communications, Inc. Reply at 10 (rec. Apr. 20, 2023); California Emergency Tech Fund Reply at 1 (rec. Mar. 21, 2023); USTelecom Reply at 2-3, 13 (rec. Apr. 20, 2023).

[153] *Supra* Part III.A.1.a.ii.a; A.1.a.ii.b.  Some commenters argue that the intent legal standard should apply specifically to digital discrimination of access claims that pertain to the characteristics of particular technologies. *See* Competitive Carriers Association Reply at 3 ("The wisdom of an intent-based framework is particularly relevant due to the unique characteristics of wireless broadband providers"); CTIA Comments at 3, 22-23 (explaining that "a disparate impact standard is particularly inappropriate for wireless service for many reasons"); Americans for Tax Reform and Digital Liberty Comments at 6 (arguing that the Commission should reject race-based disparate impact standard because a cell tower will service any signal).  We find no basis for adopting different legal standards for specific technologies because the rules we adopt today are sufficiently flexible to accommodate all technologies through which broadband internet access service is provided.

[154] *Supra* Part III.A.1.a.ii.a; A.1.a.ii.b; *see also* American Library Association Comments at 3 ("To ensure 'all people of the United States benefit from equal access to broadband internet access service,' it should not matter if there was/is discriminatory intent creating unequal access to broadband internet services."); California Public Utilities Commission Comments at 3 ("Section 60506 does not, however, mention the intent or motive of broadband companies, the absence of which strongly indicates that Congress did not intend a finding of digital discrimination to require a finding of intent."); Public Knowledge et al. Comments at 51 (explaining that the definition of "equal access" supports adopting a disparate impact standard as "[n]owhere is there a mention of a provider's actions or decision-making"); Texas Coalition of Cities et al. Comments at 2 (rec. Feb. 21, 2023) (supporting adopting a definition that encompasses a disparate impact standard because 60506 does not specify that intent is a required

(continued….)

"should seek to achieve and facilitate *equitable* access[] rather than equal access," because that interpretation would directly conflict with the Statement of Policy.[155] We also reject TechFreedom's proposal to give a fluid meaning to "equal access" that would vary from the definition in the statute.[156] As the term "equal access" is expressly defined in section 60506(a)(2) and "access" as used in section 60506 (b)(1) is a derivative of that definition, we find no basis or authority to deviate from the statutory text.[157]

55.     We also disagree with Lincoln Network's argument that the statute's reference to an "opportunity" to subscribe requires a disparate treatment standard.[158] This interpretation ignores that a consumer's "opportunity" to subscribe could be impeded by policies and practices having discriminatory

element of digital discrimination); Joint Advocates Comments at 15 (arguing that the language of section 60506 "clearly turns on the impact of broadband providers' discriminatory policies, rather than their individual intent"). Commenters disagree as to whether language in recent telecommunications laws explicitly referencing intent is relevant. *See* Texas Coalition of Cities et al. Comments at 2 (additionally arguing that "Congress has included such language in recent telecommunications related consumer protection laws, thus indicating that Congress intended to not require discriminatory intent"); USTelecom Comments at 25 ("[I]t is irrelevant whether the Telephone Consumer Protection Act ('TCPA'), 47 U.S.C. § 227, or other telecommunications laws explicitly include language referencing intent."). Given the disagreement on the record and that section 60506's statutory text authorizes a legal standard showing for discriminatory effect, we are not persuaded that we should adopt an intent-only legal standard.

[155] 47 U.S.C. § 1754(a); City of Long Beach Comments at 1 (explaining that this "accounts for existing and historic service gaps and outcomes that have resulted from digital redlining, uneven deployment of internet and technology services, and other policy decisions").

[156] TechFreedom Comments at 15-18 (rec. Feb. 21, 2023). In particular, TechFreedom argues that the word "access" in section 60506(b)(1) "has a purely technical meaning: it is the technological 'capability to transmit [. . .] and receive data' enjoyed by the user." TechFreedom Comments at 16 ("It is precisely because 'access' has this narrow ordinary meaning that it was necessary for Congress to define 'equal access' with a special meaning in terms of the 'opportunity to subscribe.'"). We disagree. Because "preventing digital discrimination of access" is included within the broader mandate of rules to "facilitate equal access," the word "access" in the phrase "preventing digital discrimination of access" incorporates the statutory definition of "equal access." 47 U.S.C. § 1754(b), (b)(1); *see* Lawyers' Committee Comments at 18 (arguing that section 60506(b)(1) "incorporate[s] the defined term 'equal access' when it says 'digital discrimination of access' such that (b)(1) applies to discrimination impairing 'equal access' to broadband."). Congress defined "equal access" as "the equal opportunity to subscribe" to broadband. Thus, "digital discrimination of access" is best understood as referring to discrimination in the "opportunity to subscribe." For those same reasons, we also disagree with commenters who argue that section 60506's operative text does not contain results-oriented language. *See, e.g.*, AT&T Comments at 17 (arguing that "the question is . . . the meaning of the 'discrimination . . . based on' clause").

[157] *See, e.g.*, Lawyers' Committee for Civil Rights Under Law Comments at 18, 21 ("The Commission should read subsection (b)(1) to incorporate the defined term 'equal access' when it says 'digital discrimination of access'. . ."); Verizon Comments at 10 ("Because 'preventing digital discrimination of access' is included within the broader objective of 'facilitat[ing] equal access,' 'of access' in the phrase 'digital discrimination of access' is no broader than the 'equal access' that Congress directed the Commission to 'facilitate.'"). Some commenters request that we give "digital discrimination" and "digital discrimination of access" the same meaning, or define only the term "digital discrimination". *See Notice* at 7, para. 13; Lawyers' Committee for Civil Rights Under Law Comments at 18 (asking that we define "digital discrimination" because it occurs three times in section 60506 and explaining that "it would be confusing if 'digital discrimination' and 'digital discrimination of access' meant two different things"). We decline to do so. We define and give meaning to "digital discrimination of access" because Congress charged the Commission with adopting rules that "prevent[] digital discrimination of access" in subsection (b), and defining that term in our rules better aligns with our mandate to "facilitate equal access" in this proceeding. 47 U.S.C. § 1754(a), (b); Mississippi Center for Justice Reply at 2 (explaining that "[r]emoval of the phrase 'of access' is in opposition" to the language of section 60506).

[158] Lincoln Network Comments at 11 (stating that "[b]y choosing to focus on opportunity, Congress directed this Commission to focus on intent to discriminate, rather than equality of outcome"); *see also* Verizon Comments at 11 (arguing that "access" refers to intentional acts that prevent an opportunity to subscribe).

effects even where discriminatory intent is absent. [159] Consequently, limiting our definition to conduct motivated by discriminatory intent would not fully accomplish our mandate from Congress to facilitate equal access to broadband service and prevent discrimination on the listed bases.[160]

56. *Interpretation of legal standards*. We disagree with commenters who argue that the terms of section 60506 do not support including disparate impact in our definition of digital discrimination of access. AT&T argues that the phrase "to facilitate equal access" speaks only to the Commission's broader obligations to incentivize broadband deployment and does not support using disparate impact analysis to reach that objective.[161] CTIA argues that Congress would not have used the term "facilitate" "if it intended for the Commission to create a burdensome liability and enforcement regime."[162] As explained herein, the statutory text, context, and purposes of the Infrastructure Act and section 60506 make clear that Congress intended that our rules addressing digital discrimination of access reach not only discriminatory treatment, but also policies and practices having discriminatory effect.[163] By commenters' own admission, there is little to no evidence of intentional digital discrimination of access.[164] The Commission is obligated to adhere to Congress's mandate and adopt rules that address the problems that do exist rather than those that do not.[165]

57. *Legislative History*. Commenters argue that the sparse legislative history of section 60506 and/or the absence of a specific mention of disparate impact in the legislative history forecloses inclusion of a disparate impact liability standard.[166] We disagree. As explained by this *Report and Order*, we conclude that the text, context, and purpose of the statute clearly authorize that liability standard. USTelecom argues, however, that Title VII of the Civil Rights Act, the FHA, and the ADEA were all grounded in a congressional record of "specific, historic discrimination that the statute was designed to remedy and prevent" and that history of discrimination in the legislative history supported a disparate impact liability standard.[167] While the legislative history of section 60506 is not as robust as that of Title VII, the ADEA, and the FHA, the Supreme Court has made clear that even "silence in the legislative history . . . cannot defeat the better reading of the text and statutory context."[168] "If the text is

---

[159] *See, e.g.*, National Hispanic Media Coalition Comments at 7 (agreeing that a regime that only accounts for a disparate treatment standard would "will miss a large quantity of discrimination" and that a disparate impact standard will encompass "facially neutral practices that result in harmful and discriminatory effects for protected classes of people"); National Urban League et al. Comments at 4 ("[T]here are policies and practices that have the potential to be adopted by ISPs that may appear to be neutral, such as profit-driven deployment or customer acquisition decisions; however, those seemingly 'neutral' decisions could negatively impact historically marginalized communities' ability to connect to [broadband].").

[160] Lawyers' Committee for Civil Rights Under Law Comments at 12-13, 27; 47 U.S.C. § 1754(b).

[161] AT&T Reply at 17-19.

[162] CTIA Comments at 19.

[163] *See, e.g.*, Joint Advocates Comments at 14-15.

[164] *See, e.g.*, CTIA Comments at 20 ("There is no evidence of intentional discrimination in the broadband industry, although in other contexts disparate treatment remains a very real problem."); Free State Foundation Comments at 5 ("No comments filed appear to allege any recent or ongoing specific instances of broadband ISPs intentional discriminating on the basis of deployment decisions.").

[165] *See* Lawyers' Committee for Civil Rights Under Law Comments at 11-12.

[166] *See, e.g.*, International Center of Law & Economics Reply at 15; NTCA Reply at 8-9; National Multifamily Housing Council and the National Apartment Association Comments at 18 (rec. Feb. 21, 2023) (NMHC and NAA); USTelecom Comments at 26-27.

[167] USTelecom Comments at 27-28 & n.96 (citing additionally to the Equal Credit and Opportunity Act's legislative history).

[168] *Encino Motor Cars v. Navarro*, 138 S.Ct. 1134, 1143 (2018).

clear, it needs no repetition in the legislative history; and if the text is ambiguous, silence in the legislative history cannot lend any clarity."[169] As to section 60506, the text, statutory context, and purpose is clear.[170] The statute's text and purpose, to promote equal access to broadband internet, fully authorize including a disparate impact liability standard for enforcing our prohibition against digital discrimination of access.[171]

58.      *Profitability Considerations*.  We additionally decline the suggestion in the policy paper submitted by the Americans For Tax Reform and Digital Liberty that we define digital discrimination of access "[as] when differences in the deployment of and/or the quality, terms, and conditions of access to broadband services are not explained by differences in the profitability of serving the different areas, but instead reflect non-economic decisions to underserve protected classes in a manner that causes adverse or negative consequences."[172]  This definition would limit the Commission to considering "profitability" rather than "issues of technical and economic feasibility," and would appear to place primary weight on economic rather than technical considerations.  Our adopted rule properly includes both technical and economic considerations, as explained in this *Report and Order*.[173]

59.      *Data Access*.  The LGBT Technology Partnership proposes that we adopt a definition of digital discrimination of access that encompasses data access concerns and issues pertaining to personal data that is processed by an algorithm.[174]  We decline to include that within the scope of our covered services.  By LGBT Technology Partnership's own admission, section 60506 is "not directly related to how emerging technologies like algorithms facilitate greater precision of structural discrimination."[175]  However, to the extent that such privacy- and data-related practices can be shown to differentially affect consumer access to broadband service on one or more of the listed bases, those practices might fall within the scope of our definition.

### 2.      Technical and Economic Feasibility

60.      Section 60506 twice references technical and economic feasibility.  First, as noted above, Congress declared in section 60506(a)(1) the "policy of the United States that, *insofar as technically and economically feasible . . .* subscribers should benefit from equal access to broadband internet access service within the service area of a provider of such service . . . ."[176]  And in section 60506(b), Congress directed the Commission to "adopt final rules to facilitate equal access to broadband internet access service, *taking into account the issues of technical and economic feasibility presented by that objective . . . .*"[177]

---

[169] *Id*.

[170] *Supra* Part III.A.1.a.ii.a; A.1.a.ii.b.

[171] Some commenters argue that our reading of section 60506 is foreclosed because disparate-impact liability would enable the Commission to regulate the rates of broadband internet access service providers, "impose requirements to build-out service, and more."  TechFreedom Comments at 24; *see* AT&T Comments at 44 ("[H]ad Congress decided to impose massive new obligations on broadband providers in the unlikely guise of a discrimination ban, it would have taken several additional steps that, revealingly, it did not take.").  But the "new regime of unfunded mandates and price regulation" that these commenters posit has no foundation in the rules we adopt herein.  *Id*.  We also note our agreement with the Lawyers' Committee that the major questions doctrine has no application to our implementation of section 60506.  *See* Lawyers' Committee for Civil Rights Under Law Comments Reply at 9-11.

[172] Americans for Tax Reform Digital Liberty Comments Attach. A, Phoenix Center Policy Paper Number 58 at 13.

[173]  *Infra* Part III.A.2.

[174] LGBT Technology Partnership Comments at 2 (rec. Feb. 21, 2023).

[175] *Id*.

[176] 47 U.S.C. § 1754(a)(1) (emphasis added).

[177] *Id.* at (b) (emphasis added).

61.      These references are clear indicators that full achievement of the "equal access" and "equal opportunity" goals of the statute might, in some instances, be limited by genuine technical or economic constraints. If the technology does not yet exist to provide a particular broadband internet access service to a particular geographic area, or the technology to provide the service does exist but utilizing it to reach the area in question would be prohibitively expensive, the failure to provide that specific service to that specific area would be explained by genuine technical or economic constraints. In order to account for these types of circumstances, in our December 2022 *Notice*, we proposed to define the term "digital discrimination of access" in section 60506(b)(1) such that any Commission determination that prohibited discrimination has occurred must be preceded by analysis of whether the policy or practice in question was "justified by genuine issues of technical or economic feasibility."[178] Having adopted a definition of "digital discrimination of access" that includes a specific carve out for conduct found to be so justified, we now adopt definitions for the terms "technically feasible" and "economically feasible" in the context of section 60506 and we explain how the Commission will evaluate "genuine issues of technical or economic feasibility" under our rules.[179] We agree with commenters that our application of these concepts is critical to the successful implementation of section 60506.[180]

### a.      Technical and Economic Feasibility are Fundamental Components of Digital Discrimination of Access

62.      We first find that including the carve out for technical and economic feasibility in our definition of "digital discrimination of access" is the soundest, most straightforward, and most effective means of satisfying our statutory responsibility to facilitate equal access while "taking into account the issues of technical and economic feasibility presented by that objective."[181] We disagree with those commenters that suggest we omit the carve out language[182] or argue that it should only be considered as an affirmative defense if the Commission were to create a structured complaint process to receive allegations of digital discrimination of access.[183] We similarly decline USTelecom and WISPA's request

(Continued from previous page) ────────────────

[178] *Notice* at 6-7, para. 12.

[179] *See* 47 U.S.C. § 1754(a), (b).

[180] *See* USTelecom Comments at 37 ("Congress placed technical and economic feasibility at the center of the Commission's analysis."); Competitive Carriers Association Reply at 6; NCTA Reply at 15 ("Congress made 'technical and economic feasibility' a central part of the Commission's analysis.").

[181] 47 U.S.C. § 1754(b).

[182] California Public Utilities Commission Comments at 9-10 (arguing that we should not include feasibility language); Lawyers' Committee for Civil Rights Under Law Comments at 18-20 ("Whether or not someone is discriminated against—definitionally—does not turn on whether the provider has some valid reason for discriminating."); National Digital Inclusion Alliance and Common Sense Comments at 4 (arguing that the Commission should strike "not justified by genuine issues of economic and technical feasibility" from the proposed definition); *see also* Free Press Comments at 12-13 (suggesting a definition of "digital discrimination of access" that does not reference issues of technical or economic feasibility); California Emerging Technology Fund Comments at 3.

[183] *See* California Public Utilities Commission Comments at 9-10 (arguing that we should not include feasibility language because we should instead consider technical and economic feasibility as affirmative defenses); Lawyers' Committee for Civil Rights Under Law Comments at 18-20 ("[T]echnical and economic feasibility should be considerations in step two of a disparate impact analysis, where one assesses whether a provider has a legitimate business necessity for its action."); National Digital Inclusion Alliance and Common Sense Comments at 4 (arguing that the Commission should strike feasibility language because "[a]n area's feasibility is a separate issue from whether or not it suffers from digital discrimination" and including it in weakens the definition). We are also not persuaded by the argument that feasibility should not be included in our definition because it is not included in subsections (b)(1), (d), or (e). Lawyers' Committee for Civil Rights Under Law Comments at 19. The proffered

(continued….)

that we omit the word "genuine" from the carve out.[184]  The record reflects widespread concern that naked assertions of technical or economic infeasibility could become a loophole to complying with our digital discrimination of access rules such that they would not actually "facilitate equal access to broadband" as Congress intended.[185]  We include the word "genuine" in our definition of digital discrimination of access to convey that bare assertions and justifications created after the fact will not suffice to prove that a business practice falls within the carve out and is therefore exempt from liability.[186]

### b.       Consideration of Technical and Economic Feasibility Supports a Disparate Impact Approach

63.       We further find that Congress's directive in section 60506(b) that we take into account issues of technical and economic feasibility supports including a disparate impact approach in our definition of "digital discrimination of access" and fits neatly into the framework of disparate impact analysis.  Under traditional disparate impact analysis, once a policy or practice is shown to have a meaningful adverse impact on a protected group, the covered entity may affirmatively produce evidence that the challenged policy or practice is justified by a substantial, legitimate business interest.[187]  If the covered entity does so, it may still be liable if there is a less discriminatory alternative to the challenged policy or practice.  Congress's directive that the Commission take into account issues of technical and economic feasibility represents a formulation of this traditional test as tailored to the specific context of section 60506 and the issues it aims to address.  As further discussed above in the disparate impact paragraphs and below in the enforcement-related paragraphs, a covered entity in a Commission investigation under section 60506 will likewise have the opportunity to show that the policy or practice under scrutiny is justified by genuine technical or economic constraints.  And as part of the Commission's consideration of these issues, a covered entity will be allowed to present for the Commission's review any legitimate business impediment to the use of less discriminatory alternatives.[188]  We find that the feasibility provision is largely superfluous to intentional discrimination of access,[189] and that when

(Continued from previous page) ───────────────────
construction misreads subsection (b), which places feasibility concerns squarely within each of the tasks assigned to the Commission under that subsection.

[184] USTelecom Comments at 37 (arguing that including "genuine" "would incorrectly skew the Commission's consideration of technical and economic considerations in a manner that is at odds with the statutory text"); WISPA Reply at 15.  *But see* Public Knowledge et al. Reply at 38-39 (disagreeing with USTelecom and arguing also that section 60506(b)(2) provides authority for the Commission to require justifications based on "genuine" issues of technical and economic feasibility).

[185] *See, e.g.*, ACLU Reply at 10-13 (warning that technical and economic feasibility considerations could "easily create a loophole that swallows the rule if the Commission defines these terms broadly, defers to provider determinations about feasibility or creates broad safe harbors.");  Leadership Conference on Civil and Human Rights et al. Comments at 6 ("[T]he [C]ommission cannot allow these claims to serve as a loophole for providers to engage in discriminatory practices without consequence."); Local Governments at 17-18.

[186] Public Knowledge et al. Reply at 38-39.

[187] *See* Department of Justice, *Title VI Legal Manual*, *Section VII: Proving Discrimination – Disparate Impact*, https://www.justice.gov/crt/fcs/T6Manual7 (last visited Nov. 14, 2023) (explaining how an entity articulates a "substantial legitimate justification" as part of a disparate impact analysis); *Inclusive Communities*, 576 U.S. at 541.

[188] *See Inclusive Communities*, 576 U.S. at 541-42.

[189] *See* Lawyers' Committee for Civil Rights Under Law Comments at 14-15 ("The Lawyers' Committee is not aware of any anti-discrimination law where a business could excuse purposeful racial animus on economic grounds."); Local Governments Comments at 16 (noting that accounting for technical and economic feasibility "would be unnecessary if Congress intended the Commission address only discriminatory intent.")*; Smith v. City of Jackson*, 544 U.S. 279, 238-39 (2005) (reasoning that the ADEA's Reasonable Factor Other than Age (RFOA) provision supports the availability of disparate-impact liability under that statute because, in most disparate-treatment cases, an employer can defeat liability without reference to the RFOA provision by showing that it acted on a reasonable factor other than age); *Inclusive Communities*, 576 U.S. at 539 ("A similar logic applies [under the

(continued….)

Congress directed the Commission to be mindful of technical and economic considerations, its objective was to ensure that covered entities in any investigation the Commission conducts under our rules to prevent digital discrimination of access would have an opportunity to explain and justify their conduct.

64.     We disagree with commenters asserting that the technical and economic feasibility language in section 60506 does not support inclusion of disparate impact in our definition of digital discrimination of access.[190]  These commenters fail to explain why consideration of technical and economic feasibility makes sense only in the context of disparate treatment claims or why it makes more sense in the context of disparate treatment claims than in the context of disparate impact claims.

65.     We are also not persuaded by AT&T's argument that Congress's contemplation of technical and economic justifications for challenged practices does not support an inference that Congress intended to capture cases of disparate impact.  AT&T argues that section 60506's feasibility provision has "independent significance even if Congress intended the Commission to address only intentional discrimination" because "income levels are routinely used [] as a basis for business decisions in a wide variety of [] industries."[191]  But as the Lawyers' Committee for Civil Rights Under Law notes, "there is still no scenario in which intentional discrimination on the basis of income level—or any other protected characteristic—could ever be justified by technical feasibility."[192]  We find that AT&T's reading "is thus at odds with one of the most basic interpretive canons, that '[a] statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant . . ..'"[193]  And, as we have stated elsewhere, there is little or no evidence in the legislative history or in the record of this proceeding that intentional discrimination on *any* basis by industry participants contributes meaningfully to the digital divide in this country.[194]

c.     **Definitions of "Technically Feasible" and "Economically Feasible"**

66.     As discussed in more detail below, we adopt clear definitions of the terms "technically feasible" and "economically feasible" based on the record in this proceeding and Commission precedent;

---

FHA].  If a real-estate appraiser took into account a neighborhood's schools, one could not say the appraiser acted because of race.").  *See also Notice* at 11-12, para. 21 ("In directing the Commission to take into account "issues of technical and economic feasibility" when adopting our rules, did Congress effectively build a business justification defense into section 60506?").

[190] *See, e.g.*, CTIA Comments at 19 (arguing that Congress "recognizing that deployment may be uneven because it is shaped by technical and economic feasibility" shows that Congress rejected a disparate impact standard); AT&T Reply at 18 & n.52 (saying that the argument that including "technical and economic feasibility" indicates that Congress intended for our rules to cover disparate impact claims "fails both because the qualifier modifies the equal access clause rather than the discrimination clause and because, in any event, Congress plainly did wish to apply it to the concept of income discrimination"); Information Technology and Innovation Foundation Reply at 2-4 (explaining that "[t]echnical and economic feasibility are thus considerations for the Commission in making its rules" and not the creation of the business necessity defense).

[191] AT&T Comments at 18-19.

[192] Lawyers' Committee for Civil Rights Under Law Comments at 15.

[193] *Corley v. United States*, 556 U.S. 303, 314 (2009) (quoting *Hibbs v. Winn*, 542 U.S. 88, 101 (2004) (internal quotation marks and citations omitted)).

[194] AT&T also argues that the feasibility provision does not support the existence of disparate-impact liability under section 60506 because it "applies to the broader mandate to the Commission to 'facilitate equal access' and is not restricted only to the narrower included 'discrimination' provision."  AT&T Comments at 18.  In response, Lawyers' Committee for Civil Rights Under Law argues that, "the feasibility qualifier must also apply to [(b)(1)] providing specific instructions on how the Commission needs to execute that preamble.  AT&T does not explain how the 'preventing discrimination' provision—if interpreted to cover only intentional discrimination—would 'tak[e] into account technical and economic feasibility.'"  Lawyers' Committee for Civil Rights Under Law Reply at 7.

and, we explain how the Commission will assess issues of technical or economic feasibility under section 60506(b). We interpret section 60506(b)'s reference to "issues of technical and economic feasibility" to mean issues of "technical feasibility" on the one hand, and issues of "economic feasibility" on the other.[195] We define a "technically feasible" policy or practice to mean one that is "reasonably achievable as evidenced by prior success by covered entities under similar circumstances or demonstrated technological advances clearly indicating that the policy or practice in question may reasonably be adopted, implemented, and utilized." Similarly, we define an "economically feasible" policy or practice to mean a policy or practice that is "reasonably achievable as evidenced by prior success by covered entities under similar circumstances or demonstrated new economic conditions clearly indicating that the policy or practice in question may reasonably be adopted, implemented, and utilized."

67. In the *Notice*, we sought comment on how to define and incorporate into our rules the concepts of technical and economic feasibility as they are used in section 60506.[196] We asked detailed questions on the merits and mechanisms of adopting various approaches, including safe harbors, case-by-case analyses, or a combination thereof.[197] Because neither the statute nor the legislative history contain definitions of these terms, the Commission must adopt an interpretation that, taken in the context of the statute as a whole, best effectuates the goal of section 60506.[198] Based on this touchstone, the record we received in response to the *Notice*, and Commission precedent, we adopt definitions of these terms that balance the goal of facilitating equal access to broadband internet access services with the technical and economic challenges facing covered entities as they work to expand and improve their networks in unserved and underserved communities.

68. *Commission and Legal Precedent*. We adopt definitions of "technical feasibility" and "economic feasibility" that are consistent with the Commission's precedent.[199] The Commission has previously interpreted, individually or as a pair, the concepts of technical and economic feasibility in connection to its implementation of various statutes.[200] While the Commission's previous interpretations

(Continued from previous page) ───────────

[195] 47 U.S.C. § 1754(a), (b). We understand subsection (a)'s use of "technically and economically feasible" and subsection (b)'s use of "technical and economic feasibility" to reference the same concepts.

[196] *Notice*, at 18-21, paras. 34-36.

[197] *Id*. at 19-20, paras. 35-36.

[198] *See* 47 U.S.C. § 1754; *Closed Captioning of Internet Protocol-Delivered Video Programming: Implementation of the Twenty-First Century Communications and Video Accessibility Act of 2010*, MB Docket No. 11-154, Report and Order, 27 FCC Rcd 787, 843, para. 97 (2012) (*IP Closed Captioning Order*) (finding that because Congress did not define "technically feasible" as it is used in the Twenty-First Century Communications and Video Accessibility Act of 2010, the Commission was "obligated to interpret the term to best effectuate the purpose of the statute."). *See also* Lawyers' Committee for Civil Rights Under Law Comments at 30 ("Congress gave the Commission wide discretion as to *how* it would identify technical and economic feasibility issues, how those issues interact with ensuring equal access, and how to 'tak[e] into account' these issues.").

[199] *See* Public Knowledge et al. Comments at 41 (writing that the Commission "has often been tasked with determining what is 'feasible' when it comes to following regulatory requirements" and that the Commission should look to these past efforts to determine "what technical and economic feasibility should mean here."); Verizon Comments at 27-28 (writing that the Commission should draw on its prior interpretations of technical and economic feasibility to interpret these concepts to mean more than what is "possible," involving consideration of practical factors related to resource deployment and availability of technology); Public Knowledge et al. Reply at 39-40 (agreeing with Verizon on the appropriateness of drawing on Commission precedent, but arguing that Verizon's analysis is "incomplete" because Verizon does not emphasize the contexts in which the Commission places the burden on carriers to demonstrate technical and economic feasibility and does not simply defer to providers on such determinations).

[200] *See, e.g.*, *Implementation of the Local Competition Provisions in the Telecommunications Act of 1996*, CC Docket Nos. 96-98 and 95-185, Report and Order, 11 FCC Rcd 15499 (1996) (*First Local Competition Order*); *Implementation of the Local Competition Provisions of the Telecommunications Act of 1996*, CC Docket No. 96-98,

(continued….)

and applications of these terms have varied by context, these instances provide guidance for our implementation of section 60506.  For example, the Commission has previously made determinations as to whether an activity was technically and economically feasible based on record support or lack thereof,[201] adopted a rebuttable presumption of technical feasibility based on prior findings by a state commission,[202] adopted a list of activity that is technically feasible,[203] and established a process to analyze feasibility issues on a case-by-case basis.[204]  Furthermore, the Commission has closely scrutinized technical and economic feasibility issues,[205] relied on industry past practice and success as key indicators

---

15 FCC Rcd 3696 (1999) (*UNE Remand Order*); *Deployment of Wireline Services Offering Advanced Telecommunications Capability*, CC Docket No. 98-147, First Report and Order and Further Notice of Proposed Rulemaking, 14 FCC Rcd 4761 (1999) (*First Advanced Services Order*); *Telephone Number Portability*, CC Docket No. 95-116, First Report and Order and Further Notice of Proposed Rulemaking, 11 FCC Rcd 8352 (1996) (*First Number Portability Order*); *IP Closed Captioning Order*, 27 FCC Rcd 787; *Accessible Emergency Information, and Apparatus Requirements for Emergency Information and Video Description: Implementation of the Twenty-First Century Communications and Video Accessibility Act of 2010; Video Description: Implementation of the Twenty-First Century Communications and Video Accessibility Act of 2010*, MB Docket Nos. 12-107 and 11-43, 28 FCC Rcd 4871 (2013) (*2013 CVAA Order*); *Implementation of Section 255 and 251(a)(2) of the Communications Act of 1934, as enacted by the Telecommunications Act of 1996*, Report and Order and Further Notice of Inquiry, 16 FCC Rcd 6417 (1999) (*Section 255 Order*); *Amendment to the Commission's Rules Concerning Market Modification; Implementation of Section 102 of the STELA Reauthorization Act of 2014*, MB Docket No. 15-71, Report and Order, 30 FCC Rcd 10406 (2015) (*STELAR 2014 Reauthorization Report and Order*); *Policies and Rules Implementing the Telephone Disclosure and Dispute Resolution Act*, CC Docket No. 93-22, Report and Order, 8 FCC Rcd 6885 (1993) (*1993 TDDRA Order*).

[201] *See STELAR 2014 Reauthorization Report and Order*, 30 FCC Rcd at 10429-30, para. 30 (stating that "[b]ased on the constraints described in the record, we conclude that it is *per se* not technically and economically feasible for a satellite carrier to provide a station to a new community that is . . . outside the relevant spot beam on which that station is currently carried."); *IP Closed Captioning Order*, 27 FCC Rcd at 844-45, para. 98 (rejecting a request from CTIA to exempt mobile devices from a close captioning requirement because CTIA had not adequately substantiated its claim that providing such a service on mobile devices was technically infeasible).

[202] *UNE Remand Order*, 15 FCC Rcd at 3799, para. 227 ("[W]e establish a further rebuttable presumption that, once one state has determined that it is technically feasible to unbundle subloops at a designated point, it will be presumed that it is technically feasible for any incumbent LEC, in any other state, to unbundle the loop at the same point everywhere."); 47 CFR § 51.319(b)(3)(ii); 47 CFR § 51.321(c).

[203] 47 CFR § 51.305(a)(2) (providing a non-exhaustive list of technically feasible points of interconnection in an incumbent local exchange carrier's network); 47 CFR § 51.321(b); *First Number Portability Order*, 11 FCC Rcd at 8409, para. 110.

[204] *STELAR 2014 Reauthorization Report and Order*, 30 FCC Rcd at 10430, para. 30 ("[W]ith respect to other possible bases for a carrier to assert that carriage would be technically or economically infeasible . . . we will review these assertions on a case-by-case basis."); *Regulations Concerning Indecent Communications by Telephone*, GEN Docket No. 90-64, Report and Order, 5 FCC Rcd 4926, 4932, para. 42 (1990) (*1990 Indecent Communications by Telephone Order*) ("The extent to which a carrier may claim blocking is technically infeasible, by reason of equipment anomaly, cost or regional protocol incompatibility, represents a factual question that can be resolved only on a case by case basis in the context of a particular proceeding."); *Implementation of the Satellite Home Viewer Improvement Act of 1999; Broadcast Signal Carriage Issues; Retransmission Consent Issues*, CS Docket Nos. 00-96 and 99-363, Report and Order, 16 FCC Rcd 1918, 1964-65, para. 108 (2000).

[205] *See, e.g.*, *STELAR 2014 Reauthorization Report and Order*, 30 FCC Rcd at 10438, para. 42 (writing that to demonstrate infeasibility, a satellite carrier "must provide detailed technical or economic information to substantiate its claim of infeasibility."); *Panola County, Texas; Petitions for Modification of the Satellite Television Markets of KFXK-TV, Longview, Texas and KLTV, Tyler, Texas*, MB Docket No. 18-337, CSR No. 8965-A, MB Docket No. 18-338, CSR No. 8966-A, Memorandum Opinion and Order, 34 FCC Rcd 1085, 1091-1093, paras. 15-19 (MB 2019) (*KFXK-TV and KLTV Order)* (rejecting claims of technical and economic infeasibility).

of technical feasibility,[206] and placed the burden on the entity asserting technical or economic infeasibility to prove the claim to the Commission's satisfaction.[207]

69.    Judicial case law also informs our definitions of technical and economic feasibility for section 60506 purposes.  In 2002, the Supreme Court decided a challenge to the Commission's implementation of section 251 of the Communications Act that involved the Commission's interpretations of the statutory phrase "technically feasible."[208]  Petitioners in that case argued that Commission rules requiring incumbent carriers to combine unbundled network elements where "technically feasible" was unreasonable and in conflict with the statutory language.[209]  In upholding the Commission's rules, the Court rejected the petitioners' argument that the rules imposed no reasonable limits on the requirement to combine network elements.  Rather, the Court held that the Commission's definition of "technically feasible" provided real limits on what would be required of incumbent local exchange carriers, concluding that "[i]f 'technically feasible' meant what is merely possible, it would have been no limitation at all."[210]  The Court's ruling, albeit in a different context, instructs that we should be skeptical of arguments suggesting that technical and economic feasibility are concepts operating at the margins of what is technical and economically *convenient* on the one hand, or what is technically and economically *possible* on the other.

70.    *Technical Feasibility*.  Taking into account long-standing Commission precedent, we define a "technically feasible" policy or practice as one that is "reasonably achievable as evidenced by prior success by covered entities under similar circumstances or demonstrated technological advances clearly indicating that the policy or practice in question may reasonably be adopted, implemented, and utilized."  We use the Commission's definition of "technically feasible" from section 54.5 of the Commission's rules as a starting point.[211]  When implementing the interconnection provisions of the 1996 Act, the Commission similarly leveraged prior successful practice to identify and define technical feasibility.[212]  In that context, the Commission adopted rules that established previous points of interconnection or methods of access to unbundled network elements as "substantial evidence" that analogous points or methods are technically feasible.[213]  In the context of section 60506, a policy or practice will be considered technically feasible if it is reasonably achievable, as evidenced by prior success under similar circumstances.  Moreover, because technological advances might provide ready

---

[206] *See, e.g.*, 47 CFR § 51.321(c) ("A previously successful method of obtaining interconnection or access to unbundled network elements at a particular premises or point on any incumbent LEC's network is substantial evidence that such method is technically feasible in the case of substantially similar network premises or points."); 47 CFR § 51.305(c)-(d).

[207] *E.g.*, *STELAR 2014 Reauthorization Report and Order*, 30 FCC Rcd at 10438, para. 42 ("[A] satellite carrier bears the burden of demonstrating that the carriage contemplated in a market modification would not be technically and economically feasible by operation of its satellites."); 47 CFR § 51.305(e); 47 CFR § 51.5; 47 CFR § 51.319(b)(3)(i); 47 CFR § 51.321(d).

[208] *Verizon Communications, Inc. v. F.C.C.*, 535 U.S. 467, 535-36 (2002) (*Verizon*).

[209] *Id.*; 47 CFR § 51.315(c)-(f).

[210] *Verizon*, 535 U.S. at 536.

[211] 47 CFR § 54.5 (defining "technically feasible" to mean "capable of accomplishment as evidenced by prior success under similar circumstances. For example, preexisting access at a particular point evidences the technical feasibility of access at substantially similar points."); Public Knowledge et al. Comments at 41-42 (identifying the definition of "technically feasible" from § 54.5 as an approach that can "provide guidance" to the Commission in interpreting section 60506).

[212] *See First Local Competition Order*, 11 FCC Rcd at 15606, para. 204.

[213] *See* 47 CFR § 51.305(c) ("Previous successful interconnection at a particular point in a network, using particular facilities, constitutes substantial evidence that interconnection is technically feasible at that point."); 47 CFR §§ 51.305(d), 51.321(c).

means of achieving successful outcomes that have not occurred in the past, we will allow for the possibility that technical feasibility may be shown by "demonstrated technological advances clearly indicating the reasonable achievability" of the policy or practice in question.

71.     *Economic Feasibility*.  We define an "economically feasible" policy or practice to mean one that is "reasonably achievable as evidenced by prior success by covered entities under similar circumstances or demonstrated new economic conditions clearly indicating that the policy or practice in question may reasonably be adopted, implemented, and utilized."  We again use the language of the Commission's definition of "technically feasible" in section 54.5 as a baseline because anchoring economic feasibility in past industry practice will provide guidance to allow all interested stakeholders to gauge what is or is not economically feasible.[214]  Factors for analyzing economic feasibility of a policy or practice include, but are not limited to, projected income, projected expenses, net income, expected return on investment, competition, cash flow, market trends, and working capital requirements, and the standards under which such calculations are determined.  A policy or practice will be considered economically feasible if relevant economic variables fall within acceptable ranges based on past industry practice.  Determining economic feasibility thus requires a comparative analysis that accounts for past and present industry practices and new economic conditions that might, in some circumstances, require variances from such historical ranges.

72.     Our definitions of "technically feasible" and "economically feasible" join previous Commission interpretations of these terms with several important attributes specific to the present context.  As a baseline, we interpret the categories of "technical" and "economic" feasibility broadly to encompass any legitimate business impediment to achievement of equal access.[215]  In addition to using prior successful policies and practices as the foundation for determining what is technically or economically feasible, we design our definitions to flexibly encompass future policies and practices and the inherent differences in the operation of covered entities of varying sizes and technologies.  We also take a measured approach that considers the real burdens industry participants face in deploying and providing service, while also ensuring that we do not create "a loophole that renders the rules meaningless."[216]  And lastly, we make clear that issues of technical and economic feasibility are related but ultimately distinct from each other.

73.     We take a measured approach to defining these terms, providing guideposts for understanding what is technically or economically feasible today and what could be feasible in the future.  We emphasize that we do not define technical and economic feasibility as simple deference to a single entity's judgment, as many industry commenters argue we should.[217]  We agree with those commenters

(Continued from previous page) ⎯⎯⎯⎯⎯⎯⎯⎯⎯

[214] 47 CFR § 54.5.

[215] *See Inclusive Communities*, 576 U.S. at 541-42; Letter from Pamela Arluk, Vice President & Associate General Counsel, NCTA, to Marlene H. Dortch, Secretary, FCC, GN Docket No. 22-69, at 4-5 (filed Nov. 3, 2023) (NCTA Nov. 3 *Ex Parte*) (arguing that to align our rules with *Inclusive Communities*, the Commission must "recogniz[e] that a covered entity may have a justification that lies outside the scope of technical and economic feasibility."); Letter from Jordan Goldstein, Comcast, to Marlene H. Dortch, Secretary, FCC, GN Docket No. 22-69, at 2 (filed Nov. 8, 2023) (Comcast Nov. 8 *Ex Parte*).

[216] Local Governments Comments at 17-18; *see also* Leadership Conference on Civil and Human Rights et al. Comments at 6; National Digital Inclusion Alliance and Common Sense Media Comments at 7-8; ACLU Reply at 10; Leadership Conference on Civil and Human Rights et al. Reply at 7; National Hispanic Media Coalition Reply at 6-7; North Suburban Communications Commission Reply at 5; Public Knowledge et al. Reply at 37-40; Texas Coalition of Cities et al. Reply at 8.

[217] *See* NCTA Comments at 30 ("In defining feasibility, the Commission should allow for providers' exercise of business judgment in the provision of services given the particular technologies utilized by the provider in question."); NTCA Comments at 24; TechFreedom Comments at 44-47; T-Mobile Comments at 27-28 ("The Commission must ensure that this standard does not disrupt or impede the market and account for business considerations that drive decisions about how and where to deploy their networks, what services to offer, and how

(continued….)

asserting that Congress did not adopt section 60506 to enshrine the current industry status quo.[218] When considering what is technically or economically feasible, we expect covered entities to consider more than just what is the most convenient.[219] At the same time, we do not create an "impossibility" standard as some commenters have warned against, which would define any action as technically or economically feasible unless it was impossible.[220] Like the Commission's approach to defining "technically feasible" in the *First Local Competition Order*,[221] the definitions we adopt today include reasonable limitations on what is considered technically or economically feasible and do not represent any attempt to "control" covered entities' investment decisions.[222] Complying with the rules we adopt today does not displace the ability of industry participants to make "practical business choices and profit-related decisions."[223] Rather, they are designed to ensure that industry participants incorporate into their decision-making processes consideration of the potential discriminatory impacts of their policies and practices, and that they seek to minimize any such discriminatory impacts.

74. We acknowledge that the technical and economic challenges that covered entities face in deploying and serving rural, Tribal, and urban areas can vary greatly.[224] At the same time, we agree with Public Knowledge et al. that "broadband deployment may still be feasible in areas even where there are no similar circumstances to use as a benchmark," and if feasibility "was limited to circumstances where there is a direct analog, certain areas that have gone long underserved due to unique characteristics might continue to fall through the cracks."[225] Thus, we intend for our approach to technical and economic

---

best to manage and maintain their networks to deliver their services to subscribers."); USTelecom Comments at 40; Verizon Comments at 23-24; Competitive Carriers Association Reply at 6. *But see* Joint Advocates Comments at 21-22 ("ISPs' past business decisions may have been 'rational' but still have a disparate impact on consumers of color, consumers with disabilities, and other unserved and underserved communities.").

[218] *See* Joint Advocates Comments at 21-22; Public Knowledge et al. Comments at 43 ("A project plainly cannot be economically 'feasible' only if a provider would choose to undertake it absent government policy—Congress did not pass a law to tell providers to do things they already were going to do."); ACLU Reply at 11.

[219] For example, the Commission found in other contexts that the novelty or costliness of a particular business path does not, in itself, answer the question of whether that path is feasible, nor does the difficulty of a change in product design. *See Section 255 Order*, 16 FCC Rcd at 6444, para. 63; *IP Closed Captioning Order*, 27 FCC Rcd at 844, para. 98.

[220] *See* NCTA Comments at 30 (writing that Congress "did not intend the Commission to apply an impossibility standard, whereby *any* disparity in services would amount to discrimination unless provision of service was impossible."); NTCA Comments at 26; T-Mobile Comments at 28; USTelecom Comments at 38;. *But see* ACLU Reply at 12 (urging the Commission to define "feasibility" based on the Merriam-Webster definition as "capable of being done or carried out.").

[221] *See First Local Competition Order*, 11 FCC Rcd at 15602-03, 15605-06, paras. 198-99, 203; *Verizon*, 535 U.S. at 535-36.

[222] Verizon Comments at 23-24.

[223] *Inclusive Communities*, 576 U.S. at 533 (finding that Supreme Court precedent "teach[es] that disparate-impact liability must be limited so employers and other regulated entities are able to make the practical business choices and profit-related decisions that sustain a vibrant and dynamic free-enterprise system.").

[224] *See Schools and Libraries Universal Service Support Mechanism; Federal-State Joint Board on Universal Service; Changes to the Board of Directors of the National Exchange Carrier Association, Inc.*, CC Docket Nos. 02-6, 96-45, 97-21, Report and Order and Further Notice of Proposed Rulemaking, FCC 23-56 (rel. July 21, 2023); California Public Utilities Commission Comments at 17, 20 (describing California's efforts to expand broadband to Tribal lands, and providing that "CPUC has found that many tribal communities, particularly those in rural areas of the state, are unconnected or underconnected."); Free Press Comments at 22-33 (comparing the economic challenges of deploying fiber and cable network technology); NCTA Comments at 28-31 (identifying various factors that "may lead to different deployment levels across communities."); USTelecom Comments at 39; WISPA Comments at 9-13 (arguing for the Commission to consider factors in addition to technical and economic feasibility to encompass various deployment obstacles faced by small providers).

feasibility to encompass new, but analogous, policies and practices to account for variations among covered entity types and industry advancement. The Commission has previously crafted a definition of technical feasibility to outlast current technological development in the context of certain unbundling obligations for incumbent local exchange providers.[226] Under those rules, the Commission adopted a rebuttable presumption that once one state had determined an approach was technically feasible, the same approach would be presumed to be technically feasible for incumbent local exchange carriers in every state.[227] We decline at this time to adopt a presumption of feasibility, and therefore do not take the precise approach taken by the Commission in 1999. But we do find that we are similarly defining our concepts of technical and economic feasibility to allow for consideration of technical, infrastructure, economic, or other developments in the area under review.[228]

75. While our definitions of technical and economic feasibility mirror each other, and in certain respects might be related, we consider each to be a distinct concept. The Commission has taken this approach previously,[229] and commenters urge us to adopt the same approach here.[230] We agree that a policy or practice may be technically feasible but not economically feasible, and vice versa.

76. *Standard*. At this time, we find that a case-by-case approach provides the Commission needed flexibility to evaluate issues of technical and economic feasibility. In the *Notice*, the Commission sought comment on whether we should assess infeasibility claims on a case-by-case basis, adopt safe harbors, or take a combination of the two.[231] In response, commenters voiced support for each of these approaches, as well as urging the Commission to adopt blanket presumptions of feasibility as opposed to a case-by-case review.[232] We understand the arguments in favor of the adoption of one or more safe

---

[225] Public Knowledge et al. Comments at 42.

[226] *See UNE Remand Order*, 15 FCC Rcd at 3799, para. 227 (creating a "best practices" approach to identifying technically feasible unbundling practices that would capture developments in technology); 47 CFR § 51.319(b)(3)(ii).

[227] *See UNE Remand Order*, 15 FCC Rcd at 3799, para. 227; 47 CFR § 51.319(b)(3)(ii).

[228] We also decline at this time to adopt any explicitly different standard for evaluating claims of economic feasibility for existing service offerings versus new deployments. *See* Free Press Comments at 36.

[229] 47 CFR § 54.5 ("A determination of technical feasibility does not consider economic, accounting, billing, space or site except that space and site may be considered if there is no possibility of expanding available space."); 47 CFR § 51.5; *First Local Competition Order*, 11 FCC Rcd at 15602-04, paras. 198-201 (adding that in addition to the statutory arguments for why technical and economic feasibility are distinct, the Commission did not "believe the term 'technical,' when interpreted in accordance with its ordinary meaning as referring to engineering and operational concerns in the context of sections 251(c)(2) and 251(c)(3), includes consideration of accounting or billing restrictions.").

[230] NCTA Comments at 31 ("[T]he Commission should account for the independent meaning of both 'economic' and 'technical' feasibility in considering defenses, as underscored by the statute's reference to those 'issues' as plural."); NTCA Comments at 17-18; Public Knowledge et al. Comments at 41-43 (referring to technical and economic feasibility as "distinct but related concepts").

[231] *Notice*, at 19-20, paras. 35-36.

[232] *See, e.g.*, Free Press Comments at 35-36 (arguing that the Commission should proceed on a case-by-case basis because it "does not yet have a complete understanding of these issues, and does not yet have a robust enough record to support the establishment of safe harbors."); NTIA *Ex Parte* at 10-13 (recommending that the Commission "treat actions taken in strict compliance with BEAD program requirements as presumptively also compliant with digital discrimination rules," and potentially apply this principle to other similarly operating federal funding programs); Public Knowledge et al. Comments at 3, 41 ("Congress clearly intended for the Commission to adopt presumptions of technological and economic feasibility."); Verizon Reply at 20 ("Safe harbors would foster certainty in business decisions and would support ongoing efforts to close the digital divide — exactly what Congress sought to do with the Infrastructure Act.").

harbors to promote regulatory certainty[233] and reduce the regulatory burden on providers,[234] as well as arguments favoring a list of *per se* feasible methods of providing broadband internet access service[235] or presumptions of feasibility in all or certain instances to increase compliance.[236]  The Commission has in the past adopted rules taking each of these approaches.[237]  Based on the record and information we have today, however, we find it is premature to incorporate safe harbors or feasibility presumptions into our definitions of technical and economic feasibility.  In this connection, we defer any further decisions regarding the adoption of one or more safe harbors until we have developed experience on how they would operate in practice.[238]  Thus, at this juncture, we will evaluate issues of technical or economic feasibility on a case-by-case basis so as to deter violations of our rules while allowing those issues to be fully explained to and considered by the Commission.[239]

77.     We also design our case-by-case approach to flexibly account for the differences between covered entities of varying sizes, technologies, and circumstances.  We agree with those commenters, like Competitive Carriers Association, who encourage us to take a "a practical and flexible approach that encourages innovation and investment to close the digital divide."[240]  Therefore, we decline at this time to



(Continued from previous page)

[233] *See, e.g.*, CTIA Comments at 3; T-Mobile Comments at 30-31. *But see* Lawyers' Committee for Civil Rights Under Law Comments at 30 ("Nowhere in the statute is technical and economic feasibility considered or recommended to be a complete safe harbor, excuse, or justification for discrimination."); ACLU Reply at 12 (writing that section 60506 "was written because . . .  a provider's profit-seeking behavior has caused the dramatic disparity in access between protected and non-protected classes that we see today. If the Commission were to provide safe harbors . . ., they would cement existing practices, and fail to eliminate digital discrimination, as required by Congress.").

[234] *See, e.g.*, WISPA Comments at 17 ("A safe harbor is a reasonable and practical alternative that will reduce the regulatory burdens on small providers, while balancing the interest of consumers.").

[235] *See* Public Knowledge et al. Comments at 43.

[236] *See* Joint Advocates Comments at 24-26; Local Governments at 17-18; Public Knowledge et al. Comments at 44; ACLU Reply at 12; *but see* Americans for Tax Reform and Digital Liberty Reply at 3 (rec. Apr. 20, 2023); AT&T Reply at 25-26; NCTA Reply at 3.

[237]  *See, e.g.*, *STELAR 2014 Reauthorization Report and Order*, 30 FCC Rcd at 10429-42, paras. 30-50; 47 CFR § 51.321(b), (c).

[238] As explained in more detail in Part E below, we do adopt a presumption of compliance from enforcement action that we find will lower the compliance burden for covered entities without compromising consumer protection.  *See infra* para. 142.

[239] *See* National Digital Inclusion Alliance and Common Sense Comments at 7 (arguing that the "adoption of safe harbors would allow ISPs to sidestep the necessary processes by which all disparate impact complaints, no matter how seemingly non-discriminatory, would be subject to a review process to discover the nature and impact of the discrimination."); Next Century Cities Reply at 5 (rec. Apr. 20, 2023) ("Taking a filtered, case-by-case approach allows for more transparency and leads to a more equitable approach as a result of the established relationships between the working groups and the communities most vulnerable to discrimination."); North Suburban Communications Commission Reply at 5; Public Knowledge et al. Comments at 44-47; Public Knowledge et al. Reply at 37-40.

[240] Joint Advocates Comments at 20-21 (writing that economic and technical feasibility are meant to provide flexibility to smaller providers); Public Knowledge et al. Comments at 44 ("In this context, 'taking into account' questions of feasibility means that the size and resources available to a provider are relevant. What may be economically feasible for a Nationwide cable provider might not be for a non-profit co-op, or a smaller commercial provider."); T-Mobile Comments at 29 ("The Commission's standard must be holistic and consider a totality of circumstances."); USTelecom Comments at 39 ("Because no two broadband providers are alike in the constraints they face, providers must have flexibility in how they assess technical and economic feasibility just as they do in the marketplace today."); Public Knowledge et al. Comments at 44 ("In this context, 'taking into account' questions of feasibility means that the size and resources available to a provider are relevant. What may be economically feasible

(continued….)

adopt distinct standards or definitions for different types of covered entities.[241]  We find that our adopted definitions will allow the Commission to consider what is reasonably achievable for the particular entity under investigation.[242]  Moreover, as the Commission has found previously, legal or regulatory constraints can also be considered when determining technical feasibility.[243]

78.     Furthermore, we find that when the Commission conducts an investigation under the enforcement process described in Part E below, the entity under investigation will have the burden of proving to the Commission that the policy or practice in question is justified by genuine issues of technical or economic feasibility.  The Commission has commonly taken this approach in previous approaches analyzing "technical feasibility," as well as regarding satellite carriers claiming "technical or economic infeasibility" in the market modification context.[244]  In the context of section 60506, we find that assigning this burden to the entity under investigation is inherent in the structure of our definition of "digital discrimination of access."  We find, as the Commission has previously, that as a practical matter, it is the entity providing the justifications for its policies and practices that has access to the necessary information to support their factual assertions.[245]  And, as we have previously stated, those justifications will usually involve arguments and evidence that technical or economic constraints limit the availability of less discriminatory alternatives.

79.     Finally, we emphasize that the Commission will closely scrutinize claims of technical or economic feasibility through review of documentation submitted by the entity under investigation, publicly available reports and other information, interviews and depositions of relevant personnel, and other available information.  Under the Commission's market modification rules, the Commission created a process for satellite carriers to claim an inability to broadcast in certain locations due to technical and economic feasibility.[246]  In practice, the Commission's Media Bureau closely scrutinizes satellite carriers' infeasibility claims under section 76.59 of the Commission's rules.[247]  Similarly, in the context of our

---

(Continued from previous page)

for a Nationwide cable provider might not be for a non-profit co-op, or a smaller commercial provider."); Competitive Carriers Association Reply at 6.

[241] *See also* NCTA Reply at 21-22 (describing AT&T as arguing that it should be subject to lesser economic scrutiny than cable providers, NTCA urges the Commission to "not apply an elevated level of scrutiny to cable broadband providers when assessing deployment feasibility").

[242] *See* AT&T Comment at 12-15 (describing the risks AT&T faces when deploying fiber); Block Reply at 8-10; WISPA Reply at 2, 4-7.

[243] *Section 255 Order*, 16 FCC Rcd at 6445, para. 64 (agreeing with commenters that technical infeasibility "may result from legal or regulatory constraints.");  T-Mobile Comments at 29 (urging the Commission to "account for regulatory or other barriers to deployment and service offerings," such as the timeline of the Commission's own spectrum licensing process); NCTA Comments at 28-29; NTCA Comments at 17-18, 24; Verizon Comments at 8-9, 29-30.

[244] *See UNE Remand Order*, 15 FCC Rcd at 3797, para 223; 47 CFR §§ 51.319(b)(3)(i), (ii), 51.321(d); *STELAR 2014 Reauthorization Report and Order*, 30 FCC Rcd at 10435, para. 38; *First Local Competition Order*, 11 FCC Rcd at 16140, para. 1317.

[245] *STELAR 2014 Reauthorization Report and Order*, 30 FCC Rcd at 10435, para. 38.

[246] 47 CFR § 76.59(e); *STELAR 2014 Reauthorization Report and Order*, 30 FCC Rcd at 10438-42, paras. 43-50.

[247] *See Panola County, Texas; Petitions for Modification of the Satellite Television Markets of KFXK-TV, Longview, Texas and KLTV, Tyler, Texas*, MB Docket No. 18-337, CSR No. 8965-A, MB Docket No. 18-338, CSR No. 8966-A, Memorandum Opinion and Order, 34 FCC Rcd 1085, 1091-1093, paras. 15-19 (MB 2019) (*KFXK-TV and KLTV Order)*; *Harrison County, Texas Petitions for Modification of the Satellite Television Markets of KLTV, Tyler, Texas and KFXK-TV, Longview, Texas*, MB Docket Nos. 18-24 and 18-25, Memorandum Opinion and Order, 33 FCC Rcd 5272 at para. 16, n.47 (MB 2018); *Gray Television Licensee, LLC For Modification of the Satellite Television Market For WSAW-TV, Wausau, Wisconsin*, MB Docket No. 16-293, Memorandum Opinion and Order, 32 FCC Rcd 668 (MB 2017); *Victory Television Network, Inc. For Modification of the Satellite Television Market For*

(continued….)

section 60506 rules, the Commission will not defer to the entity seeking to justify policies and practices alleged to be discriminatory.[248]  We will require proof by a preponderance of the evidence that the policy or practice in question is justified by genuine issues of technical or economic feasibility.[249]  Stated differently, a covered entity can demonstrate that a policy or practice is justified by genuine issues of technical or economic feasibility by showing that less discriminatory alternatives are not reasonably available and achievable because of genuine technical or economic constraints.

## B. Prohibition of Digital Discrimination of Access

80. Today we adopt a rule broadly and directly prohibiting "digital discrimination of access" as we have now defined it.  Our prohibition thus forbids both intentionally discriminatory conduct (that is, applies a disparate treatment standard) as well as conduct that produces discriminatory effects (that is, applies a disparate impact standard).  This approach does not supplant, but rather supplements the Commission's past and ongoing efforts to facilitate broadband access through affirmative approaches.

81. At this time, we find that this broad prohibition and the enforcement mechanisms described below are the most cost-effective means to accomplish Congress's stated objectives in section 60506.[250]  Prohibiting discrimination in access to broadband service is necessary to facilitate equal access to broadband and prevent digital discrimination of access, and both of these goals are required by the statute.  In that same vein, unequal access to broadband service imposes significant costs on unserved and underserved communities, and on the Nation as a whole.[251]  The voluntary informal complaint process described below is a low-cost approach toward meeting the statutory requirement that leverages existing Commission systems.  Similarly, enforcement of the broad prohibition through self-initiated investigations affords the Commission ample flexibility without substantially overhauling the enforcement process.  Such low-cost approaches will allow the Commission to enforce the statute in a cost-effective manner, while bringing the undeniable benefits of expanded broadband access.  Lastly, our rules are designed to minimize the compliance- and other-related costs they will likely impose on broadband providers and the other entities our prohibition covers.

82. Fundamentally, a policy or practice will violate our prohibition on digital discrimination of access if it discriminates, either by intent or in effect, based on one of section 60506's listed characteristics.  In determining whether a policy or practice violates the prohibition we adopt today, the Commission will look first to whether the policy or practice in question differentially affects access to

---

*KVTJ-DT, Jonesboro, Arkansas*, MB Docket No. 17-157, Memorandum Opinion and Order, 32 FCC Rcd 7389 (MB 2017); *Monongalia County, WV and Preston County, WV Petitions for Modification of the Satellite Television Markets of WDTV, Weston, West Virginia, and WBOY-TV and WVFX, Clarksburg, West Virginia*, MB Docket Nos. 17-274, 17- 275, Memorandum Opinion and Order, 33 FCC Rcd 1168 (MB 2018).

[248] *See* Verizon Comments at 8 (citing "negotiating access to multiple tenant environments" as a technical and economic challenge to deploying broadband); AT&T Comments at 13. B*ut see* NMHC and NAA Reply at 13-22 (rec. Apr. 20, 2023) (rejecting claims from providers that owners of multifamily housing are a significant impediment to deploying broadband).  *See also* Michael L. Katz and Bryan Keating, An Economic Approach To Defining "Economic Feasibility" To Prevent & Eliminate Digital Discrimination at 15 (Apr. 20, 2023) (stating that in addition to the financial factors providers use making investment decisions, "[a] firm may take other factors into account in its investment decision-making in ways that fall outside of its formal financial projections.") (submitted with Verizon Reply).

[249] *Section 255 Order*, 16 FCC Rcd at 6445, para. 64 (finding that under section 255, the Commission would not allow manufacturers and providers to make "bald assertions of technical infeasibility," and that "[a]ny engineer or legal conclusions that implantation of a feature is technically infeasible should be substantiated by empirical evidence or documentation.").

[250] 47 U.S.C. § 1754(b).

[251] *Id.* § 1701(2) ("The persistent 'digital divide' in the United States is a barrier to the economic competitiveness of the United States and equitable distribution of essential public services, including health care and education.").

broadband service or is intended to do so. If that question is answered in the affirmative, the Commission will review any issues of technical or economic feasibility that may compel use of the challenged policy or practice rather than a less discriminatory policy or practice.[252] In other words, the rules we adopt today require assessment in the first instance of whether a policy or practice is discriminatory; and if so, whether there were reasonably available and achievable alternatives (i.e., alternatives that were technically and economically feasible) that would have been less discriminatory.

83. We disagree with commenters asserting that section 60506 does not authorize a prohibition on private conduct.[253] These commenters variously claim that section 60506, as part of the Infrastructure Act, only obligates the Commission to undertake affirmative-based efforts, e.g., by funding the expansion of covered entities' broadband footprints[254] or by promoting digital skill building and adoption of broadband by consumers through other initiatives outside this proceeding.[255] Congress did not specify the means by which the Commission should fulfill its obligations under section 60506. As explained above, we conclude that the statutory language authorizes the Commission to address and combat both intentional discrimination and disparate impacts.[256] A prohibition of the kind we adopt today proves necessary to effectuate this charge. It does so by deterring discrimination in the first instance (thereby "preventing" its occurrence) while also enabling the Commission to target behaviors that affirmative-based approaches alone may be insufficient to change.

84. We also disagree with commenters arguing that a broad prohibition against digital discrimination of access will fundamentally transform the current regulatory landscape.[257] As we explain below, our approach, which implements the directive in section 60506, involves self-initiated investigations. Such investigations may be premised on information submitted by the public, communications with state, local, or Tribal officials, or through outreach via other channels. However, we note that a complaint or allegation alone does not necessarily warrant an enforcement response from the Commission,[258] thus ameliorating any such concerns raised by some commenters.[259] Our prohibition—consistent with the Commission's nondiscrimination requirements associated with its ongoing efforts to promote broadband access—and the enforcement methods we outline below represent an important, yet incremental, step in furthering the Commission's and Congress's digital equity goals.

---

[252] *See supra* note 188.

[253] *See, e.g.*, Information Technology and Innovation Foundation Comments at 3-4 (rec. Feb. 21, 2023).

[254] *See, e.g.*, AT&T Comments at 9, 11; John Mayo, Georgetown University Reply at 1 (rec. Apr. 20, 2023); NCTA Comments at 22-23; R Street Institute Reply at 3 (rec. Apr. 20, 2023); U.S. Chamber of Commerce Comments at 4.

[255] *See, e.g.*, Block Communications, Inc. Reply at 4; Information Technology and Innovation Foundation Comments at 6-7; Information Technology and Innovation Foundation Reply at 5-6 (rec. Apr. 20, 2023).

[256] *Supra* paras. 41-42. The U.S. Chamber of Commerce contends that the Commission's adoption of "new civil-rights legislation wholesale, including authorization of unfunded deployment mandates or rate regulation," would constitute a violation of the nondelegation doctrine. U.S. Chamber of Commerce Comments at 4-5. However, our prohibition today—a narrower action than that complained about—simply fulfills the task Congress, using clear language directing the Commission to prevent digital discrimination of access, gave us to perform. Adoption of these rules does not require an impermissible assumption of Congress's legislative powers; it only exercises the authority the Infrastructure Act conferred under the guidance provided in that statute.

[257] *See, e.g.*, American Action Forum Reply at 5 (arguing that section 60506 does not "grant broad rulemaking authority to transform the regulatory regime governing broadband deployment to achieve the policy goal of facilitating equal access").

[258] *See, e.g.*, USTelecom Reply at 18 (arguing that the Commission should examine trends in complaints rather than focusing resources responding to each individual complaint); *see also* NCTA Comments at 26 (arguing that complainants should first demonstrate standing to avoid wasting Commission resources).

[259] *See, e.g.*, USTelecom Comments at 41-42.

### C. Scope of Prohibition

#### 1. Covered Entities

85. We find that the digital discrimination of access rules we adopt today shall apply to entities that provide, facilitate and affect consumer access to broadband internet service. Covered entities include, but are not limited to, broadband providers as defined in rule 54.1600(b),[260] contractors retained by, or entities working through partnership agreements or other business arrangements with, broadband internet access service providers; entities facilitating or involved in the provision of broadband internet access service; entities maintaining and upgrading network infrastructure; and entities that otherwise affect consumer access to broadband internet access service as further discussed below.[261] In the *Notice*, we sought comment on *whose* "policies or practices . . . that differentially impact consumers' access to broadband internet access service" should be covered by our definition of digital discrimination of access.[262] We also sought comment on whether we should understand digital discrimination of access to include policies or practices by a broader range of entities than broadband providers.[263] To achieve the policy that "subscribers should benefit from equal access to broadband internet access service,"[264] and fulfill Congress's directive that the Commission "facilitate equal access to broadband internet access service,"[265] we have determined that the rules must include not only broadband providers, but also other entities that provide services that facilitate and affect consumer access. The record supports this determination. We thus find that there are a range of entities that facilitate and can affect consumer access to broadband. Therefore, we find that our rules and, in particular, our prohibition against digital discrimination of access, extend not only to broadband providers, but also to entities that provide services that facilitate and meaningfully affect consumer access to broadband internet access service.[266]

86. Numerous commenters agree that broadband providers are not the only entities that should be subject to these rules.[267] To be sure, other platforms and organizations affect consumer access to broadband internet access service.[268] For example, Lawyers' Committee for Civil Rights Under Law argues that section 60506 prohibits interference with equal access to broadband by any type of entity because guaranteeing equal access to broadband for all individuals requires applying the statute to any entity that can affect the ability of an individual to access the service, not just those entities that provide

---

[260] 47 U.S.C. § 54.1600(b).

[261] *See Notice* at 15, paras. 29-30; *infra* para. 87 (providing examples of how entities may impact consumer access to broadband internet access service).

[262] *See Notice* at 15, para. 29.

[263] *Id*.

[264] 47 U.S.C. § 1754(a)(1).

[265] *Id.* § 1754(b).

[266] *See* Lawyers' Committee for Civil Rights Under Law Comments at 31-32.

[267] *See, e.g.*, American Library Association Comments at 3 (supporting extending the definition of digital discrimination of access to extend beyond broadband and include all entities involved in the ecosystem of providing Internet access); Benefits Data Trust Comments at 6 (rec. Feb. 21, 2023) (recommending that individuals and communities are covered by the definition of digital discrimination of access); Free Press Comments at 18-20 (explaining "that the Commission has the authority to apply it rules to all entities under its jurisdiction"); Local Governments Comments at 19 (arguing that our rules must cover all broadband providers, including infrastructure owners even if they are not also service providers); New York State Public Service Commission Comments at 3 (supporting adding additional services which may require a broadband service to use); TURN Reply at 2-4 (rec. Apr. 19, 2023) (suggesting that section 60506 is broad enough to encompass all types of technologies in provisioning [broadband internet access service subscriptions]).

[268] *See* Lawyers' Committee for Civil Rights Under Law Comments at 32.

connectivity.[269]  And as TURN states, as technology evolves, the Commission's rules must be able to address future technological evolutions that may affect or interfere with broadband internet access.[270] Lastly, National Digital Inclusion Alliance and Common Sense Media urge us to apply our rules to any entity—subsidiary, parent company, or other—that provides broadband internet access service.[271]

87.     We disagree with arguments that our authority under 60506(b) extends only to providers of broadband internet access service because "only a service provider, and not some other class of entity, can 'offer' a 'service'."[272]  As explained below, we believe the definition of "equal access" in section 60506(a), which applies both to section 60506(b)'s mandate that we facilitate equal access and that we prevent digital discrimination of *access*, focuses on consumers' opportunity to receive and effectively utilize an offered service.  Conduct by entities other than broadband providers might impede equal access to broadband internet access service on the bases specified in the statute.  For example, the Lawyers' Committee for Civil Rights Under Law provides several examples of how entities may impact consumer access based on protected characteristics, including a landlord restricting broadband options within a building even if multiple providers are available.[273]  While we reach no conclusion whether this, or other specific examples in the record would be covered by our rules, we are persuaded that there could be situations – now or in the future – in which non-providers could impede equal access to broadband internet access service based on the listed characteristics.  Moreover, while we are not explicitly tasked with regulating entities outside the communications industry, section 60506 does require us to facilitate equal access to broadband by "preventing" and identifying steps necessary to "eliminate" digital discrimination of access.  Thus, to the extent that entities outside the communications industry provide services that facilitate and affect consumer access to broadband, they may be in violation of our rules if their policies and practices impede equal access to broadband internet access service as specified in the rules.[274]  To the extent that such entities have policies or practices that differentially impact consumers' access to broadband internet access service, we will consider, among other things, the closeness of the relationship between that entity's policies and practices and the provision of broadband service.[275]

88.     Lastly, we acknowledge that commenters disagree on whether to include infrastructure owners and local governments within the scope of our rules, but we decline to expressly carve out

---

[269] *Id.*

[270] *See* TURN Reply at 2-3.

[271] *See* National Digital Inclusion Alliance and Common Sense Media Comments at 6.

[272] *See, e.g.*, NMHC and NAA Comments at 5 (arguing that "only a service provider, and not some other class of entity, can 'offer' a 'service'"); TechFreedom Comments at 38 (arguing that the "service" congress was referring to was "broadband internet access service;" and the Commission is not free to expand that definition to other "services").

[273] *See* Lawyers' Committee for Civil Rights Under Law Comments at 31-32*; see also* National Urban League Reply Comments at 3.

[274] 47 U.S.C. § 1754(a)(1).

[275] By way of example, the U.S. Supreme Court long ago upheld the Commission's exercise of jurisdiction over prohibited surcharges imposed by hotels and apartment owners based on arrangements they made with the telephone company, and where the practice was "so identified" with the communications service that it was brought within the prohibition. *Ambassador, Inc. v. U.S.*, 325 U.S. 317, 324 (1945).  We also note that section 411(a) provides as follows:  "In any proceeding for the enforcement of the provisions of this Act, . . . it shall be lawful to include as parties, in addition to the carrier, all persons interested in or affected by the charge, regulation, or practices under consideration, and inquiries, investigations, orders, and decrees may be made with reference to and against such additional parties in the same manner, to the same extent, and subject to the same provisions as are or shall be authorized by law with respect to carriers."  47 U.S.C. § 411(a).

specified entities from the scope of coverage at this time.[276] City of Philadelphia, City of Oklahoma, City of Minneapolis, etc. (Local Governments) argue that not considering infrastructure owners as providers of broadband services subject to our digital discrimination of access rules would allow broadband providers to outsource their deployments to third parties to avoid our equal access rules.[277] WIA disagrees with Local Governments in their assertion that infrastructure owners should be covered by the rules on digital discrimination of access, arguing that doing so would unlawfully expand the Commission's jurisdiction.[278] Additionally, Local Governments request that we not categorize local governments as "covered entities" based on their roles as right-of-way managers or franchise regulators.[279] While there may be tension in the record as to the role these entities play, our rule is clear that any entity that meaningfully affects access to broadband internet service is subject to our digital discrimination of access rules.

### 2. Covered Consumers

89. The definition of digital discrimination of access adopted today includes "policies and practices . . . that differentially impact *consumers'* access to broadband internet access service . . . or are intended to have such differential impact."[280] In the *Notice,* we sought comment on the meaning of "consumers" and who would fall within the scope of this term.[281] Commenters to the *Notice* proposed various definitions.[282] We today define "consumers" in this context to mean both current and potential subscribers, which includes individual persons, groups of persons, individual organizations, and groups of organizations having the capacity to subscribe to and receive broadband internet access service. We define "subscriber" as a current recipient of broadband internet access service as defined in section 8.1(b) of the Commission's rules.

90. Consistent with the purposes of section 60506, the term "consumers" as used in our adopted definition of digital discrimination of access comprises current subscribers and prospective subscribers of broadband internet access service.[283] And, under this rule, individual or groups of persons, organizations, or businesses fall within the scope of the term "consumer."[284] Covering both current and prospective subscribers is supported for several reasons.[285] First, section 60506's Statement of Policy

(Continued from previous page) ──────────────

[276] *See* Local Governments Comments at 19 (arguing that that our rules must cover all broadband providers, including infrastructure owners even if they are not also service providers); Wireless Infrastructure Association Reply at 1-2 (rec. Apr. 20, 2023) (disagreeing with Local Governments in their assertion that infrastructure owners should be covered by the rules on digital discrimination of access).

[277] *See* Local Governments Comments at 19.

[278] *See* Wireless Infrastructure Association Reply at 1-2 (arguing that section 60506 addresses only the provision of broadband internet access service).

[279] *See* Local Governments Comments at 19.

[280] *See supra* para. 33.

[281] *Notice* at 21, para. 39.

[282] *Id.* at 6, para. 12.

[283] Our rules do not cover other types of broadband service, such as business data services or enterprise customer purchases.

[284] Greenlining Institute Comments at 7*;see generally* 47 CFR § 64.1100(h) ("The term 'subscriber' is any one of the following: (1) The party identified in the account records of a common carrier as responsible for payment of the telephone bill; (2) Any adult person authorized by such party to change telecommunications services or to charge services to the account; or (3) Any person contractually or otherwise lawfully authorized to represent such party.").

[285] *See* American Association of People with Disabilities Comments at 2 (rec. Feb. 21, 2023); American Foundation for the Blind Comments at 4 (rec. Feb. 21, 2023); American Library Association Comments at 4-5; Benefits Data Trust Comments at 6-7; California Public Utilities Commission Comments at 7-8; Claire E. Coleman et al.

(continued….)

directs the Commission to "ensure that all people of the United States benefit from access to broadband."[286] As the American Library Association observes, "[t]here are 'people of the United States' who are not subscribers because they experience digital discrimination that precludes them from becoming subscribers."[287] The California Public Utilities Commission further observes that "one cannot count as a subscriber if broadband service is not offered to them in the first place."[288] We agree. We would not be fulfilling our statutory mandate to facilitate equal access to broadband internet access service if we failed to include unenrolled or prospective subscribers as "consumers" under our rules. Second, limiting "consumers" to existing subscribers would do nothing to expand broadband availability in unserved communities. By way of example, the Japanese American Citizens League expressed that a large number of small businesses in the historic San Francisco Japantown business district remain unconnected to the internet with reliable broadband access.[289] If high-speed broadband service were unavailable in a particular geographic area because of discriminatory conduct, by definition there could be no subscribers in that area. And if the Commission's rules were limited to ensuring equal access by those already subscribing to a service, there would be nothing the Commission could do to investigate the reasons for this lack of access on the part of non-subscribers. Under the argument pressed by certain commenters, the Commission's rules would instead be confined to leveling service quality, pricing and other terms of service as between underserved communities and better-served communities. Such a limitation is not consistent with section 60506's overarching purpose to "ensure that *all people* of the United States benefit from equal access to broadband internet access service."[290]

91. We therefore reject commenters' arguments that the "consumers" covered by our rules should be limited to subscribers.[291] We disagree with NTCA's argument that the Commission's purview is limited to "subscribers," referring to "those who purchase service from the provider."[292] The Commission cannot fulfill Congress's directive to facilitate equal access to broadband internet access service without being able to address the issues that limit the opportunity to subscribe in the first instance. We firmly believe Congress intended the rules implementing section 60506(b) to facilitate the expansion of access of broadband service by eliminating discrimination, not just the leveling of service quality and terms. Therefore, our rules for digital discrimination of access cover all consumers, including both current and prospective subscribers.

92. We also find that, for purposes of our definition of "digital discrimination of access," the term "consumers" includes not only individuals, but also groups of persons, organizations, and businesses. We agree with National Digital Inclusion Alliance and Common Sense Media that digital discrimination of access can manifest differently when it affects a single person, as compared to a group

---

Comments at 4 (rec. Feb. 21, 2023) (Connecticut Office of State Broadband & Office of Consumer General); Free Press Comments at 20-22; Greenlining Institute Comments at 3; Leadership Conference on Civil and Human Rights et al. Comments at 3-4; National Digital Inclusion Alliance and Common Sense Media Comments at 8; National Hispanic Media Coalition Comments at 5; New York State Public Service Commission Comments at 2; Public Knowledge et al. Comments at 58-59; ACLU Reply at 5, 6-7; California Emergency Tech Fund Reply at 5; Joint Advocates Reply at 3-5; Lawyers' Committee for Civil Right Under Law Reply at 21; Next Century Cities Reply at 6; Verizon Reply at 9.

[286] 47 U.S.C. § 1754(a)(3).

[287] American Library Association Comments at 4-5.

[288] California Public Utilities Commission Reply at 7-8.

[289] Japanese American Citizen League Comments at 1; *see also* Asian Americans Advancing Justice Comments at 3 (rec. Feb. 21, 2023).

[290] *See generally* American Association of People with Disabilities Comments at 2; California Public Utilities Commission Comments at 7-8; Free Press Comments at 21-22; ACLU Reply at 6-7.

[291] ACA Connects Comments at 17; Competitive Carriers Association Reply at 3; NTCA Reply at 13-14.

[292] NTCA Comments at 27.

of persons within a community, and either type of discrimination can violate the rules.[293]

93.     In the *Notice*, we sought comment on whether there are practical or administrative costs and benefits to the Commission, industry and those who might suffer discrimination if both persons and organized groups of persons (such as community associations) are covered by our definition.[294]  As supported by the comments, we find no significant additional costs in defining "consumers" to include persons and organized groups of persons, as well as groups of organizations.[295]  As discussed in the informal complaints section below,[296] we recognize that community associations and other organizations might well submit the majority of informal complaints relating to digital discrimination of access, and we have no concerns on that score.

### a.     Listed Characteristics

94.     Congress identified six characteristics as bases for digital discrimination of access – income level, race, ethnicity, color, religion, and national origin.[297]  In the *Notice*, we sought comment on whether we should expand our definition to include additional characteristics, such as disability status, age, sex, sexual orientation, gender identity and expression, familial status, domestic violence survivor status, homelessness, and English language proficiency.[298]  While some commenters argue we should expand the listed characteristics,[299] others disagree.[300]

95.     Based on the language of the statute, we do not add to the listed characteristics of persons protected under the rules that serve as the bases for considering digital discrimination of access.[301]

(Continued from previous page) ————————————

[293] National Digital Inclusion Alliance and Common Sense Media Comments at 8.

[294] *Notice* at 21, para. 38.

[295] Public Knowledge et al. Comments at 58 (asserting that "by looking at communities as well as individuals [a pattern can emerge] that will help the Commission identify where deployment decisions are having a discriminatory impact, regardless of whether the policies or practices are facially neutral.").

[296] *Infra* paras. 116-118.

[297] 47 U.S.C. § 1754(b)(1).

[298] *Notice* at 23, para. 42.

[299] American Association of People with Disabilities Comments at 1-2; American Library Association Comments at 5; Connecticut Office of State Broadband & Office of Consumer Counsel Comments at 3-4; Human Rights Campaign Comments at 1 (rec. Feb. 21, 2023); Joint Advocates Comments at 33; Leadership Conference on Civil and Human Rights et al. Comments at 4; ACLU Reply at 5; Georgia Tech Center for Advanced Communications Policy Reply at 13-14; Public Knowledge et al. Reply at 9-11.

[300]  Free State Foundation Comments at 17-18; NCTA Comments at 12-13; Pelican Institute for Public Policy Comments at 2 (rec. Feb. 21, 2023); TechFreedom Comments at 34-35; USTelecom Comments at 50; CTIA Reply at 24.

[301] Even though the statute affords protection against digital discrimination of access based on national origin, some commenters urge us to incorporate "limited-English proficiency" (LEP) as an express listed characteristic under the rules.  *See* Asian Americans Advancing Justice, Comments at 3; National Hispanic Media Coalition, Comments at 6; NDIA Comments at 9.  It is well established, however, that discriminating against persons based on their limited-English proficiency can constitute a form of national origin discrimination.  *See Lau v. Nichols*, 414 U.S. 563, 569 (1974) (Court stating that "it seems obvious that the Chinese-speaking minority receive fewer benefits than the English-speaking majority from respondents' school system which denies them a meaningful opportunity to participate in the educational program—all earmarks of the discrimination banned by [Title VI] regulations . . . ."); *Casteneda v. Pickard*, 648 F.2d 989, 1008 (5th Cir. 1981) ("In enacting Sec. 1703(f) of [the Equal Educational Opportunity Act of 1974], Congress embraced *Lau*'s 'essential holding' that 'schools are not free to ignore the need of limited English speaking children for language assistance.'"); *see also United States v. Maricopa County*, 915 F. Supp. 2d 1073, 1079-82 (D. Ariz 2012).  Federal agencies have interpreted Title VI's prohibition against national origin discrimination to require that LEP individuals have meaningful access to federally funded programs and

(continued….)

Congress must be presumed to have deliberately limited the list of protected characteristics in section 60506(b) to income level, race, ethnicity, color, religion, and national origin.[302]  While we acknowledge the strong record support for extending the rule to cover persons with other characteristics,[303] federal antidiscrimination laws often vary in terms of the protected classes they cover.  For instance, Title VII of the Civil Rights Act protects against discrimination based on "race, color, religion, sex, or national origin,"[304] whereas the FHA goes further and includes additional protections for "disability and familial status."[305]  Here, Congress chose the six listed, protected characteristics and not others.[306]  We have no discretion to overrule the choice made by Congress in this regard, at least as it applies to our rules implementing section 60506(b).[307]

(Continued from previous page) ———————————

activities.  *See* U.S. Dep't of Justice, *Guidance to Federal Financial Assistance Recipients Regarding Title VI Prohibition Against National Origin Discrimination Affecting Limited English Proficient Persons*, 67 Fed. Reg. 41,455-41,457 (June 18, 2002).  This same interpretation as to national origin discrimination has been given under the Fair Housing Act (U.S. Dept of Housing and Urban Dev., *Office of General Counsel Guidance on Fair Housing Act Protections for Persons with Limited English Proficiency*, Sept. 15, 2016), and Title VII (29 C.F.R. Part 1606, *Guidelines on Discrimination Because of National Origin*).

[302] *University of Texas Medical Center v. Nassar*, 570 U.S. 338, 340 (2013) ("The conclusion that Congress acted deliberately in omitting retaliation claims from § 2000—2(m) is reinforced by the fact that another part of the 1991 Act, § 109, expressly refers to all unlawful employment actions").

[303] For example, many commenters discussed the challenges faced by people with disabilities in securing access to high quality broadband services.  *See, e.g.*, American Association of People with Disabilities Comments at 4-5 (explaining that "[t]he mere presence of a broadband internet connection does not mean that every American has equal access to that connection, as certain vulnerable populations face additional barriers to access. For example, factors such as broadband capacity, speed, and latency affect the use of the assistive technologies that many people with disabilities depend on for access to communications infrastructure"); American Foundation for the Blind Comments at 1; American Library Association Comments at 5; Benefits Data Trust Comments at 7; City of Long Beach Comments at 1; Connecticut Office of State Broadband & Office of Consumer Counsel Comments at 3-4; Advocates for the EMS Disabled Comments at 2 (rec. Feb. 21, 2023); Joint Advocates Comments at 31-33; Public Knowledge, et al. Comments at 4; Texas Coalition of Cities et al. Comments at 2; Washington, D.C. Sept. 14 Listening Session regarding Disability Access to Broadband, https://www.fcc.gov/document/digital-discrimination-task-force-event-gallaudet-univ-sept-14 (discussing accessibility barriers to broadband access and negative impact on employment, education, and health care).

[304] 42 U.S.C. § 2000e-2(a).

[305] *Id.* § 3604.

[306] This does not mean that the legitimate concerns of persons with these additional characteristics is to be minimized.  To the contrary, the record is replete with evidence that classes beyond the six listed groups face varying broadband-related challenges.  *See, e.g.*, U.S. Census Bureau, Anniversary of Americans with Disabilities Act: July 26, 2023, https://www.census.gov/newsroom/facts-for-features/2023/disabilities-act.html (last visited Nov. 14, 2023); Leadership Conference on Civil and Human Rights et al. Comments at 4 (stating that out of approximately 42.5 million Americans with disabilities, only 41% have high-speed broadband access at home); Andrew Perrin and Sara Atske, *Americans With Disabilities Less Likely Than Those Without to Own Some Digital Devices*, Pew Research Center (Sept. 10, 2021), https://www.pewresearch.org/short-reads/2021/09/10/americans-with-disabilities-less-likely-than-those-without-to-own-some-digital-devices/ (last visited Nov. 14, 2023); American Association of People with Disabilities Comments at 2-3 (describing that U.S. adults with disabilities are less likely than those without disabilities to confirm they own a desktop or laptop computer (62% vs. 81%) or a smartphone (72% vs. 88%)); American Foundation for the Blind Comments at 4 (describing accessibility barriers experienced by the disability community include the lack of adequate broadband speed to support required assistive technologies, data caps, and inaccessible web content, among others); American Association of People with Disabilities Comments at 4; Leadership Conference on Civil And Human Rights et al. Comments at 5; Next Century Cities Comments at 11.

[307] 47 U.S.C. § 1754(b).  Under section 60506(c)(3), the Commission and the Attorney General can seek to prohibit "deployment discrimination" based on factors other than those listed in that section, based on the record developed

(continued….)

96.     Our work towards ensuring broadband access does not begin or end with this statute.  We will continue to address access to broadband under other sources of authority.  For example, we have established accessibility protections under other statutory grants that govern the ACP, ECF, and EBB programs.  The ACP supports the purchase of broadband access services and connected devices, such as tablets and laptops, and requires them to be accessible.[308]  In the Emergency Connectivity Fund Report and Order, the Commission established an expectation that connected laptops be accessible to students, school staff, and library patrons with disabilities to address their remote learning needs.[309]  As we move forward, we will continue to use all the tools at our disposal to ease the digital accessibility divide.

### 3.     Covered Services

97.     For purposes of these rules, we apply the same definition of "broadband internet access service" that appears in section 8.1(b) of the Commission's rules.  That definition states:

> The term "broadband internet access service" means "a mass-market retail service by wire or radio that provides the capability to transmit data to and receive data from all or substantially all internet endpoints, including any capabilities that are incidental to and enable the operation of the communications service, but excluding dial-up internet access service.  This term also encompasses any service that the Commission finds to be providing a functional equivalent of the service described in the previous sentence or that is used to evade the protections set forth in this part."[310]

98.     In the *Notice*, we sought comment on the scope of services that should be covered by our rules.[311]  We also specifically sought comment on whether the above-referenced definition of "broadband internet access service" fully captures the scope of technologies relevant to digital discrimination of access.[312]  In determining the scope of our definition of digital discrimination of access, we find that the term "broadband internet access service" in that definition has the same meaning given the term in section 8.1(b), and encompasses the range of services that may give rise to digital discrimination of access.[313]  No commenter opposed using this definition of "broadband internet access service."[314]  We find that the straightforward and well-established definition best delineates the scope of covered services under the

---

in this proceeding.  Further, even if not covered by Section 60506(b), people with disabilities may avail themselves of other federal laws governing digital accessibility, such as the Americans with Disabilities Act of 1990 (ADA), the Rehabilitation Act of 1973, and the Twenty-First Century Communications and Video Accessibility Act of 2010 (CVAA).

[308] *Affordable Connectivity Program; Emergency Broadband Benefit Program*, WC Docket Nos. 21-450 and 20-445, Report and Order and Further Notice of Proposed Rulemaking, 37 FCC Rcd 484, 540, para. 115 (2022) (*ACP and EBB Report and Order and Further Notice*) (adopting requirement that connected devices be accessible and usable); *see also Emergency Broadband Benefit Program*, WC Docket No. 20-445, Report and Order, 36 FCC Rcd 4612, 4653-54, para. 82 & n.280 (2021).

[309] *ECF Report and Order*, 26 FCC Rcd at 8709-10, para. 30.  For these connected laptops, school districts have purchased accessibility features such as software providing screen magnification, screen reading functionalities, captioning services, and touchscreens for students with significant fine motor skills difficulties. *See* https://www.fcc.gov/fcc-grants-several-accessibility-waivers-emergency-connectivity-fund-program (noting that school districts may seek a waiver of the $400 reasonable purchase cap on laptops if reasonably necessary to serve the remote learning needs of people with disabilities).

[310] We use the terms "broadband," "covered services," and "broadband internet access service" interchangeably.

[311] *See Notice* at 13, para. 26.

[312] *Id*. at 14, para. 27.

[313] In the proposed definition of "digital discrimination of access," the Commission sought comment on whether "covered services" should be limited to broadband internet access service.

[314] *See Notice* at 14, para. 27.

rules we adopt today.

99.    Moreover, the record reflects strong support for adopting section 8.1(b)'s definition.[315] As Local Governments notes, including all types of broadband providers is consistent with the *RIF Order,* which found that the term "broadband internet access service" includes "services provided over any technology platform, including but not limited to wire, terrestrial wireless (including fixed and mobile wireless services using licensed or unlicensed spectrum), and satellite."[316]  Providers can use various forms of technology to provision broadband to consumers, including digital subscriber line (DSL), cable modem, fiber, fixed and mobile wireless, and satellite.[317]  By incorporating the established meaning of "broadband internet access service" in the definition of "digital discrimination of access," we ensure that our rules accurately reflect the scope of services that may give rise to instances of digital discrimination of access and thus fulfill the Congressional direction in section 60506 to facilitate equal access to broadband internet access service and prevent digital discrimination of access.

### a.    Covered Elements of Service

100.    The rules we adopt today apply to any lack of comparability in service quality, as indicated by the metrics specifically listed in the statutory definition of "equal access" as well as any "other quality of service metrics in a given area," and to any lack of comparability in terms and conditions of service, including but not limited to price.  We find this scope of coverage to be consistent with section 60506's statutory text and necessary to effectuate its purpose.

101.    In broadly applying our rules to all relevant service quality metrics and all terms and conditions of service, we note that Congress directed the Commission to facilitate equal access to the entirety of broadband internet service, not to certain elements of such service.[318]  Congress defined "equal access" in section 60506's statement of policy to mean that consumers have "the equal opportunity to subscribe" to broadband internet access service with "comparable speeds, capacities, latency, and other quality of service metrics in a given area, for comparable terms and conditions[.]"[319]  As many commenters explain, the inclusion of "other quality of service metrics" and "comparable terms and conditions" in the definition of "equal access" reflects Congressional intent and authorization that the Commission's digital discrimination of access rules cover any aspect of broadband internet access service that impedes, impairs or denies "equal access" to that service.[320]

---

(Continued from previous page)

[315] *See* NTCA Comments at 28-29 (stating that "reliance on the definition of 'broadband internet access service' as provided in 47 CFR § 8(1)(b) is a sound and reasonable approach); Public Knowledge et al. Comments at 40 (stating that "the term 'broadband internet access service' has the meaning given the term in section 8.1(b)").

[316] Local Government Comments at 18 (citing *Restoring Internet Freedom*, WC Docket No. 17-108, Declaratory Ruling, Report and Order, and Order, 33 FCC Rcd 311, 333, para. 22 (2018)); *see also Protecting and Promoting the Open Internet*, WC Docket No. 14-28, Report and Order on Remand, Declaratory Ruling, and Order, 30 FCC Rcd 5601, 5603, para. 4 (2015) (*2015 Open Internet Order*)

[317] *See* National Digital Inclusion Alliance May 16, 2022  Comments at 13; Letter from Harold Feld, Senior Vice President, Public Knowledge, to Marlene H. Dortch, Secretary, FCC, GN Docket No. 22-69, at 2 (filed Dec. 5, 2022).

[318] 47 U.S.C. § 1754(b).

[319] *Id.* § 1754(a)(2).

[320] *Id.*; *see, e.g.*, Lawyers' Committee for Civil Rights Under Law Comments at 22-25 (arguing that "the Commission should understand 'equal access' to involve any element of broadband internet access service that would be material to a consumer"); National Multicultural Organizations Comments at 17 ("By including the phrase 'other quality of service metrics,' the Infrastructure Act expressly gives the Commission authority to consider how factors beyond broadband speed, capacity, and latency may impact the subscriber experience"); WISPA Comments at 15-16 (explaining that WISPA believes that "comparable terms and conditions" counsels that the Commission should consider technical and non-technical elements of broadband service); California Public Utilities Commission

(continued….)

102.     The aspects of service that could affect a consumers' ability to receive and effectively utilize broadband internet access service include, but are not limited to, deployment, technical terms and conditions of service,[321] such as policies and practices regarding speeds,[322] capacities,[323] latency,[324] data caps;[325] network infrastructure deployment,[326] network reliability,[327] network upgrades,[328] network maintenance,[329] customer-premises equipment,[330] and installation;[331] as well as non-technical terms and

(Continued from previous page) ─────────────

Reply at 8 (explaining that the inclusion of "other quality of service metrics" in section 60506(a)(2) "clearly grants the FCC authority to consider other characteristics that it deems appropriate"). *But see* American Action Forum Comments at 10-11 (explaining that "equal access" cabins what the Commission can regulate and that "regulating all aspects of broadband to 'facilitate equal access' goes far beyond what Congress intended"); ACA Connects Comments at 3-4, 18 ("[T]he broadband service characteristics that the Commission may consider in determining whether providers offer 'equal access' are also limited."); CTIA Comments at 11 (explaining that "'other quality of service metrics' must be understood to refer to technical capabilities of broadband akin to comparable speeds, capacities, and latency" and establishing greater authority over a greater list of terms is outside section 60506's scope); NCTA Comments at 11-12; T-Mobile Comments at 25-26 (explaining that section 60506 does not authorize the Commission to "upend decades of light regulator treatment"); U.S. Chamber of Commerce Comments at 2; USTelecom Comments at 19-20; AT&T Reply at 13 (arguing that the language of section 60506 "forecloses proposals to extend section 60506's scope beyond deployment practices"); T-Mobile Reply at 16-17 (agreeing with CTIA that "other quality of service metrics" limits what the Commission can include in our rules); Verizon Comments at 19-23; Verizon Reply at 10.

[321] *See, e.g.*, Lawyers' Committee for Civil Rights Under Law Comments at 22 (asking that we understand "'equal access' to involve any element of broadband internet access service that would be material to a consumer" in addition to technical metrics); Leadership Conference on Civil and Human Rights et al. Comments at 5 (arguing that to fulfill the statute we must include technical and non-technical aspects of service); Public Knowledge et al. Comments at 63 (suggesting that the Commission should compare service offerings over a wide range of technical and non-technical factors); Letter from Marc H. Morial, President & CEO, National Urban League, to Marlene H. Dortch, Secretary, FCC GN Docket No. 22-69, at 2 (filed Oct. 5, 2023) (National Urban League Oct. 5, 2023 *Ex Parte*).

[322] 47 U.S.C. § 1754(a)(2); National Digital Inclusion Alliance and Common Sense Media Comments at 8.

[323] 47 U.S.C. § 1754(a)(2); National Digital Inclusion Alliance and Common Sense Media Comments at 8.

[324] 47 U.S.C. § 1754(a)(2); Joint Advocates Comments at 28 (explaining that "[a] legacy network or distant wireless connection results in substantially higher latency" than a complete fiber or a short range-wireless network connected to fiber); National Digital Inclusion Alliance and Common Sense Media Comments at 8.

[325] Joint Advocates Comments at 26-29; Lawyers' Committee for Civil Rights Under Law Comments at 23-24 ("With millions of Americans relying on smartphones as their primary source of high-speed internet at home, limited availability of low-cost data plans or prohibitive fees for overages will create steep obstacles to access.").

[326] American Library Association Comments at 3; City of Long Beach Comments at 1 (asking that we address existing and historic service gaps from policy decisions like digital redlining); Joint Advocates Comments at 26; National Urban League et al. Comments at 5; *see also* Lawyers' Committee for Civil Rights Under Law Comments at 13; National Multicultural Organizations Comments at 7 (asserting that "[p]roviders are no doubt well aware of existing and historical disparities in broadband access, yet many have not addressed such disparities" but cautioning that we do not adopt such a broad definition it discourages providers from correcting past harms"); California Emergency Tech Fund Reply at 3.

[327] Joint Advocates Comments at 29 ("Consumer reports on the reliability of their service with respect to both latency as well as service disruption and speed of service restoration would also be potentially useful."); National Digital Inclusion Alliance and Common Sense Media Comments at 7 ("[T]he actual speed and reliability of services offered in one area should be similar to those offered in another."); Public Knowledge et al. Comments at 63.

[328] American Library Association Comments at 3; *see also* National Urban League Oct. 5, 2023 *Ex Parte* at 2 (stating that the rule should cover upgrades with "next generation technologies to provide enhanced network, performance, capacity and speeds.").

conditions of service,[332] such as policies and practices regarding contractual terms generally,[333] mandatory arbitration clauses,[334] pricing,[335] deposits,[336] discounts,[337] customer service,[338] language options,[339] credit checks,[340] marketing or advertising,[341] contract renewal,[342] upgrades,[343] account termination,[344] transfers to another covered entity,[345] and service suspension.[346]  Moreover, in order to fully effectuate the goals of

(Continued from previous page) ————————————

[329] American Library Association Comments at 3-4; New York State Public Service Commission Comments at 2-3; National Digital Inclusion Alliance and Common Sense Media Comments at 7; Leadership Conference on Civil and Human Rights et al. Reply at 6; TURN Reply at 2.

[330] Lawyers' Committee for Civil Rights Under Law Comments at 23.

[331] *Id*. at 24.

[332] *See, e.g.*, Lawyers' Committee for Civil Rights Under Law Comments at 22; Leadership Conference on Civil and Human Rights et al. Comments at 5; Public Knowledge et al. Comments at 63 (urging regulation of "[n]on-technical factors and terms of service" such as "actual and advertised service prices, customer service and technician responsiveness, the availability and advertising of promotions, additional fees, and . . . credit checks").

[333] Joint Advocates Comments at 26-29 (asking that we consider "contractual guarantees"); Lawyers' Committee for Civil Rights Under Law Comments at 23-24 (asking that we consider all contractual provisions including "price, duration, and composition of available service contracts, as well as additional contractual provisions, including—but not limited to—customer support options, data caps, promotional offerings, equipment availability and rental terms, deposits, type and number of devices allowed, forced arbitration clauses, and privacy policies.").

[334] Lawyers' Committee for Civil Rights Under Law Comments at 24.

[335] American Association of People with Disabilities Comments at 3; Lawyers' Committee for Civil Rights Under Law Comments at 23-24; Joint Advocates Comments at 26-29 (explaining how a study on pricing from the California Community Foundation "found that lower income communities in Los Angeles County must pay more money under worse terms to have the same service as their wealthier neighbors"); National Digital Inclusion Alliance and Common Sense Media Comments at 8 (arguing that equipment fees are also within section 60506's scope); Next Century Cities Comments at 6-7 (arguing that including price and affordability is necessary to combat digital discrimination of access based on income level); Joint Advocates Reply at 5 (arguing that including promotional rates, pricing, and advertising is necessary to combat digital discrimination based on income); Texas Coalition of Cities et al. Reply at i, 2 (calling on the Commission to "[c]larify that Congress established affordability as a metric in the Infrastructure Act's findings for equal access to broadband service" because "[b]roadband service that is not affordable is not available").

[336] Lawyers' Committee for Civil Rights Under Law Comments at 24.

[337] Mississippi Center for Justice Reply at 3.

[338] American Library Association Comments at 4; Lawyers' Committee for Civil Rights Under Law Comments at 22 (asking that we consider aspects of customer service, "which can be measured by the number of support channels, support wait times and call durations, available languages, and representative expertise" and ease in scheduling repairs); Next Century Cities Comments at 6-7.

[339] Lawyers' Committee for Civil Rights Under Law Comments at 23; TURN Reply at 7.

[340] Lawyers' Committee for Civil Rights Under Law Comments at 24; TURN Reply at 7.

[341] American Library Association Comments at 3; Lawyers' Committee for Civil Rights Under Law Comments at 25; National Digital Inclusion Alliance and Common Sense Media Comments at 8 (suggesting we cover marketing promotional offers); Joint Advocates Reply at 5 (asking that we cover promotional rates and advertising); TURN Reply at 7 (providing the example of "offering lower promotional rates in affluent areas compared to nearby less affluent areas for similar service offerings").

[342] Lawyers' Committee for Civil Rights Under Law Comments at 24; Mississippi Center for Justice Reply at 3.

[343] Lawyers' Committee for Civil Rights Under Law Comments at 24.

[344] *Id.*

section 60506, we find that our rules must cover both actions and omissions, whether recurring or a single instance, concerning these aspects of service, that defeat comparability of service quality, terms, and conditions.[347]

103.     We find that adopting a broad definition of covered elements of service is both consistent with the language of section 60506 and necessary to fulfill its purpose.  First, by including the catch-all language "and other quality of service metrics in a given area," Congress expressly authorized the Commission to supplement the listed elements of service to include all measurable quality-of-service elements that could affect consumers' ability to receive and effectively utilize broadband internet access service.[348]  As the record reflects that policies and practices relating to an array of technical and non-technical aspects of service can affect a consumer's ability to access broadband, a definition with a narrower scope could lead to the Commission's rules failing to cover some aspects of service that result in digital discrimination of access.[349]  Consequently, we agree with Lawyers' Committee for Civil Rights Under Law that adopting a flexible approach is necessary "to capture the long tail of intangible variables that are difficult to list exhaustively and are subject to change."[350]  Second, our definition provides us with the advantage of flexibility, which will "future proof" our rules as technologies, policies, and practices change over time.[351]  For these reasons, we reject the argument that by including certain quality of service metrics in 60506(a)(2), Congress foreclosed consideration of other measurable elements of service quality in evaluating whether equal access has been achieved.[352]

(Continued from previous page) ─────────────────

[345] *Id.*

[346] *Id.*

[347] *See* Benefits Data Trust Comments at 2, 5 (asking that our rules cover provider actions and omissions); National Multicultural Organizations Comments at 7 ("Overt acts of discrimination should be strictly prohibited, even, as suggested in the NPRM, in circumstances in which an intentionally discriminatory policy or practice may not produce observably discriminatory effects."); Next Century Cities Reply at 4.

[348] 47 U.S.C. § 1754(b).

[349] *Supra* para. 102.

[350] Lawyers' Committee for Civil Rights Under Law Comments at 23 (arguing that Congress included "other quality of service metrics" as a catchall term for this purpose).

[351] *Id.*; *see* National Digital Inclusion Alliance and Common Sense Media Comments at 9 ("We encourage the Commission to review and reassess both the technical and nontechnical standards on a biennial basis, at a minimum"); New York State Public Service Commission Comments at 3 (urging the Commission to "ensure that any final rules are flexible so that they are not rendered obsolete over time"); ACLU Reply at 5-6 (providing that we should regularly reassess which metrics are most important "so that outdated metrics do not hamstring protected classes' internet experience"); *see also* National Urban League Oct. 5, 2023 *Ex Parte* at 2.

[352] *See, e.g.*, CTIA Comments at 11 ("It is a well-established canon of interpretation (*ejusdem generis*) that general terms in a list take their meaning from specific preceding terms, so 'other quality of service metrics' must be understood to refer to technical capabilities of broadband akin to comparable speeds, capacities, and latency."); Verizon Comments at 20-21 (arguing that "the phrase 'other quality of service metrics' appears last in a list that begins with the words 'speeds, capacities, [and] latency.' Therefore, the 'quality of service metrics' that can fall within the final phrase in the list must be metrics similar to 'speeds, capacities, [and] latency,' all of which are technical aspects of service. The *ejusdem generis* canon — a related canon of statutory construction — similarly counsels that, 'where general words follow specific words in a statutory enumeration, the general words are [usually] construed to embrace only objects similar in nature to those objects enumerated by the preceding specific words.' Applying that canon here similarly requires interpreting the general phrase 'other quality of service metrics' to encompass only metrics 'similar in nature' to 'speeds, capacities, [and] latency' — again, technical aspects of service.").

104.     We reject arguments that we should limit the scope of covered elements of service to deployment practices[353] or technical terms of service,[354] or that we exclude certain terms, such as pricing.[355] We are persuaded that Congress intended for the Commission's rules implementing section 60506(b) to cover more than deployment practices.[356] As noted above, Congress directed the Commission in section 60506(b) to adopt rules to facilitate equal access to broadband internet access service, including "preventing digital discrimination of access" and identifying necessary steps for the elimination of such discrimination. By contrast, in section 60506(c), Congress directed the Commission and the Attorney General to ensure that federal policies prohibit "deployment discrimination" based on the income level of an area, the predominant race or ethnicity of an area, or other factors the Commission determines to be relevant based on the record in this proceeding. Had Congress wished to limit the scope of section 60506(b) to "deployment discrimination," it would have done so explicitly.[357] The use of two different terms ("digital discrimination of access" and "deployment discrimination") in adjacent subsections of a one-page section of the statute clearly indicates that Congress intended the two terms to have different meanings.[358] Further, Congress was well aware that factors other than initial deployment

[353] *See, e.g.*, NCTA Comments at 2, 8-10 (arguing that the plain meaning of section 60506 limits the Commission to deployment issues); USTelecom Comments at 19-20 (explaining that including "of access" demonstrates Congressional intent to limit our rules to how broadband is accessed, which is deployment); AT&T Reply at 13 (arguing that the language of section 60506 limits the Commission to addressing deployment issues because "by its terms, it addresses only 'discrimination of access'—that is, any discrimination in making broadband available to consumers"); International Center of Law & Economics Reply (arguing that subsection (a) does not provide any additional authority and merely indicates Congress's goals, while subsection (c) empowers the Commission to promote broadband buildout by prohibiting deployment discrimination).

[354] *See, e.g.*, ACA Connects Comments at 18 (arguing that the definition of "equal access" "requires a comparison of the technical characteristics and terms and conditions"); NCTA Comments at 11-12 (positing that we are limited to considering deployment discrimination and certain technical terms because "[t]he statute provides the Commission with a specific and focused list of the items it should consider: speed, capacities, and latency").

[355] *See, e.g.*, ACA Connects Comments at 3, 18 (arguing that the definition of "equal access" "precludes the Commission from requiring or prohibiting specific terms of service or service characteristics" and that section 60506's language does not grant the authority to "regulate broadband network deployment decisions, service offerings, or prices"); Lincoln Network Comments at 6-7, 9-10 (positing that regulating rates under the digital discrimination framework is outside of the scope of section 60506 and would stifle infrastructure investment, raise providers' rates, and widen the digital divide); NTCA Comments at 27-28 (explaining that state and local rules provide oversight over deposits and arguing that "[d]ecisions relating to deployment, privacy, and other issues that are grounded in concerns for economic and technical feasibility are beyond any remedial measures that may be implicated by Section 60506"); Verizon Comments at 19-22 (positing that our rules should not cover pricing because Congress did not clearly state we should consistent with how it does throughout Title 47 of the U.S. Code); Competitive Carriers Association Reply at 3 (agreeing with ACA Connects); T-Mobile Reply at 4 & n.7 (disagreeing that the Commission has the authority to and should not cover provider use of algorithms in our digital discrimination of access rules); Verizon Reply at 9-10, 12 (stating that our rules are limited to infrastructure deployment and giving consumers the opportunity to subscribe, and that our rules should not apply to price or affordability because they do not fall within the definition of "equal access").

[356] 47 U.S.C. § 1754(b), (c); Lawyers' Committee Under Law Comments at 20 (arguing that "digital discrimination of access" in subsection (b) is broader than 'deployment discrimination' in subsection (c) and explaining that we should give them independent meaning because "[t]here is no indication that the distinction Congress made. . . [is] a scrivener's error"); Verizon Reply at 9 & n. 30 ("Thus, 'digital discrimination of access' in Section 60506(b) is broader than 'deployment discrimination' in Section 60506(c)[.]").

[357] 47 U.S.C. § 1754(b), (c); Lawyers' Committee Under Law Comments at 20; Verizon Reply at 9 & n.30.

[358] *See, e.g.*, *INS v. Cardoza-Fonseca*, 480 U.S. 421, 432 (1987) (citing to *Russello v. United States*, 464 U.S. 16, 23 (1983) and quoting *United States v. Wong Kim Bo*, 472 F.2d 720, 722 (5th Cir. 1972) to explain that "'where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion'").

of the necessary network infrastructure, such as network upgrades and maintenance at an absolute minimum, affect the ability of consumers to effectively utilize broadband internet access service.[359] Given that the definition of "equal access" expressly includes "quality of service metrics" that are determined by such network upgrades and maintenance, we cannot accept that Congress intended to limit section 60506(b)'s reach to broadband deployment. Such an interpretation would defeat the purpose of the statute.

105. Finally, regarding the inclusion of pricing within the scope of our rules, we find that the statutory language encompasses discriminatory pricing. We emphasize that the rules we adopt today do not set rates for broadband internet access service and are not an attempt to institute rate regulation. Once again, section 60506(b) directs us to "adopt final rules to facilitate equal access to broadband internet access service," and "equal access" is defined in section 60506(a)(2) as the equal opportunity to subscribe to an offered service that provides comparable quality of service "*for comparable terms and conditions.*" (emphasis added).[360] We are unpersuaded by the arguments of commenters that pricing is not included (or includable) in the terms and conditions that must be "comparable" under the statutory definition of equal access. Indeed, pricing is often the most important term that consumers consider when purchasing goods and services across the Nation's economy. We find this is no less true with respect to broadband internet access service.[361] Consequently, we do not believe it was necessary for Congress to specifically reference pricing in the definition of "equal access" because the most natural reading of "terms and conditions" includes pricing.[362] The Commission need not *prescribe* prices for broadband internet access service, as some commenters have cautioned against,[363] in order to determine whether prices are "comparable" within the meaning of the equal access definition. The record reflects support for the Commission ensuring pricing consistency as between different groups of consumers.[364] We also find that

---

(Continued from previous page) ────────────────

[359] *See Broadband Labels Order and Further Notice* (implementing section 60504 of the Infrastructure Act and requiring providers to create consumer labels that include various price and performance information related to their broadband service); *ACP and EBB Report and Order and Further Notice* (implementing section 60502 of the Infrastructure Act; establishing the Affordable Connectivity Program to offer eligible low-income households discounts off the cost of broadband service and connected devices).

[360] NTIA *Ex Parte* at 8-9 & n.23 (arguing that "terms and conditions" includes pricing because "the Supreme Court upheld an FCC decision that interpreted a statutory reference to 'terms and conditions' to encompass 'rates' as well" in *AT&T v. Iowa Utils. Bd.*, 525 U.S. 366, 377 (1999), which upheld the Commission implementing 47 U.S.C. § 252(i) "by adopting a rule providing that '[a]n incumbent [local exchange carrier] shall make available without unreasonable delay to any requesting telecommunications carrier any individual interconnection, service, or network element arrangement contained in any agreement to which it is a party that is approved by a state commission pursuant to section 252 of the Act, upon the same *rates*, terms, and conditions as those provided in the agreement[,]'" quoting 47 CFR § 51.809(a). (emphasis added)).

[361] *See Broadband Labels Order and Further Notice* at 9-13, paras. 22-36 (requiring broadband providers to include various pieces of price-related information on easy-to-understand labels for consumers); 47 U.S.C. § 1753 (specifying that the broadband consumer labels include information on "introductory rate[s]").

[362] Moreover, it would be odd for Congress to direct the Commission to consider technical and economic feasibility and have our rules not allow any consideration of differential pricing when analyzing a digital discrimination of access claim.

[363] *See, e.g.*, Lincoln Network Comments at 9-10 (arguing that the definition of "equal access" only includes "terms and conditions" and not "rates" similar to sections 201 and 202 of the Communications Act and other legislation, so section 60506 does not authorize the Commission to regulate what providers charge); U.S. Chamber of Commerce Comments at 5; USTelecom Comments at 17-18.

[364] Public Knowledge et al. Comments at 65-66 (asserting that price discrimination should be a violation of comparability); Texas Coalition of Cities et al. Reply at 5 (explaining that they "are not opposed to considering a provider's intent for why not to serve, but the disparate impact on the community, including price discrimination, must be the loadstar"); *see* Free Press Comments at 17-18 (noting that there is value in comparing advertised prices,

(continued….)

the Commission is well situated to analyze comparability in pricing, as we must already do so in other contexts. For example, we analyze the "lowest corresponding price" in the universal service context[365] and conduct the Urban Rate Survey, both of which require comparing the prices that covered entities charge different groups of customers for broadband.[366] We find that the "terms and conditions" covered by the "equal access" definition in section 60506(a) includes pricing terms and conditions, and that "digital discrimination of access" therefore includes discrimination with regard to such pricing.

106. We also reject Verizon's argument that our rules cannot apply to policies and practices that occur after a customer subscribes to broadband internet access service. Verizon argues that the definition of "equal access" limits the scope of our rules to policies and practices affecting only the "opportunity to subscribe" to broadband service *in the first instance*.[367] In other words, Verizon argues that our rules can only address policies and practices concerning the consumer's ability to sign up for service (i.e., contract formation), but cannot address whether the service is actually rendered on equal terms (i.e., contract performance). We disagree with this interpretation. We acknowledge that the definition of "equal access" in section 60506(a) refers to the "equal opportunity to *subscribe* to an offered service . . . ." But we find the word "subscribe" in this context means more than simply signing up for service. It refers, instead, to the ability to receive and effectively utilize the service so as to allow full participation in the social, educational, political and economic life of our Nation.[368] The Statement of Policy in section 60506(a) says that "subscribers should *benefit* from equal access to broadband internet access service" and that "the Commission should take steps to ensure that all people of the United States *benefit* from" such equal access.[369] There is little or no benefit to be derived simply from having the opportunity to sign up for broadband service if the covered entity can freely engage in discriminatory policies and practices with regard to the ongoing provision of that service. Rather, the potential social, educational, political and economic benefits flow from having the opportunity to receive the service and effectively utilize it. We find that interpreting section 60506 in the cramped manner urged by Verizon is flatly inconsistent with Congress's goal of expanding access to broadband internet access service. We therefore reject that interpretation.

---

actual prices offered, and prices charged); Next Century Cities Comments at 7 (arguing that we should include price discrimination because it will ensure that we address digital discrimination of access based on income level).

[365] 47 CFR § 54.511(b) ("Providers of eligible services shall not submit bids for or charge schools, school districts, libraries, library consortia, or consortia including any of these entities a price above the lowest corresponding price for supported services, unless the Commission, with respect to interstate services or the state commission with respect to intrastate services, finds that the lowest corresponding price is not compensatory."); 47 CFR § 54.500 (defining the lower corresponding rate as "the lowest price that a service provider charges to non-residential customers who are similarly situated to a particular school, library, or library consortium for similar services"); *In the Matter of BellSouth Telecommunications, LLC, d/b/a/ AT&T Southeast*, Order, 35 FCC Rcd 8940, 8941, para. 3 (2020).

[366] FCC, *Urban Rate Survey Data & Resources* (Aug. 4, 2023), https://www.fcc.gov/economics-analytics/industry-analysis-division/urban-rate-survey-data-resources ("Each year, the FCC conducts a survey of the fixed voice and broadband service rates offered to consumers in urban areas. The FCC uses the survey data to determine the reasonable comparability benchmarks for fixed voice and broadband rates for universal service purposes."); s*ee also* USTelecom Comments at 21 & n.69 (providing the examples of the Commission comparing rural to urban rates for voice services and Commission rules allowing reliance on comparable service for an emergency discontinuance application, citing respectively to 47 U.S.C. § 254(b)(3) and 47 CFR § 63.63(a)(7), (b)).

[367] Verizon Comments at 10-11; Verizon Reply at 9-14 (explaining that this provides that we cannot regulate conduct after subscription, nor policies and practices regarding adoption).

[368] *See* Merriam-Webster, *Subscribe* , https://www.merriam-webster.com/dictionary/subscribe (last visited Nov. 14, 2023) ("[T]o receive or have access to something (such as a periodical or service) as part of an arrangement to receive a certain number of regular deliveries or a certain period of continuous access especially by prepayment.").

[369] 47 U.S.C. § 1754(a)(1), (3).

### D. Revising Commission's Informal Consumer Complaint Process

107.    We adopt the proposals in the *Notice* to revise our informal consumer complaint process to:  (1) add a dedicated pathway for digital discrimination of access complaints; (2) collect voluntary demographic information from filers who submit digital discrimination of access complaints; and (3) establish a clear pathway for organizations to submit digital discrimination of access complaints.[370] Subsection 60506(e) requires that the Commission "revise its public complaint process to accept complaints from consumers or other members of the public that relate to digital discrimination."[371] Currently, consumers use the Commission's Consumer Complaint Center to file informal complaints.[372] The Commission's informal consumer complaint process, administered by the Consumer and Governmental Affairs Bureau, is a long-standing, free and efficient way for consumers to raise issues with their service providers and bring problems to the attention of the Commission.[373]  The collective data received from informal consumer complaints help the Commission monitor what consumers are experiencing and inform our policy and enforcement work.  In adopting our proposed changes to our informal consumer complaint process, we implement subsection 60506(e).

108.    We agree with the majority of commenters who assert that consumers should have an easily accessible complaint process.[374]  Such a process will not only benefit consumers in filing complaints related to digital discrimination of access but will also assist the Commission in monitoring what consumers are experiencing, identifying trends, and informing potential policy determinations or enforcement.[375]  Consistent with our current process and procedures, consumers may also file complaints via the Consumer Inquiries and Complaint Center, as well as by fax and postal mail.[376]

109.    We thus disagree with commenters who argue that our proposed informal complaint process changes would impose undue burdens on covered entities.[377]  Our proposed changes do not alter the existing informal complaint process.  Rather, our proposed changes make it easier for consumers to file informal complaints related to digital discrimination of access, as mandated by Congress, and allow the Commission to better analyze such complaint data.  Indeed, Commission experience with the dedicated pathway for ACP complaints has demonstrated the utility of such a dedicated pathway.

---

[370] *See Notice* at 31, para. 52.

[371] 47 U.S.C. § 1754(e).

[372] *See* FCC, *Consumer Inquiries and Complaint Center*, https://consumercomplaints.fcc.gov/hc/en-us (last visited Nov. 14, 2023).

[373] The FCC's informal consumer complaint process facilitates a conversation between the consumer and their provider to address the consumer's issues.  The consumer complaint process does not involve arbitration, mediation, or investigation.

[374] *See, e.g.*, American Library Association Comments at 7; Asian Americans Advancing Justice Comments at 5; Benefits Data Trust Comments at 2; Lincoln Network Comments at 17; Public Knowledge et al. Comments at 91-93; Starry Comments at 3 (rec. Feb. 21, 2023); TURN Comments at 2-3 (rec. Feb. 20, 2023); ACLU Reply at 13-14; Verizon Reply at 23.

[375] We note that the Commission's Consumer Complaint Center is responsive on mobile devices and that the FCC's call center is staffed by both English and Spanish speaking agents who can file complaints on behalf of consumers. Individuals who use videophones and are fluent in American Sign Language (ASL) may call the Commission's ASL Consumer Support line for assistance in ASL with filing informal complaints or obtaining consumer information. FCC, *FCC ASL Consumer Support Line*, https://www.fcc.gov/fcc-asl-consumer-support-line (last updated Jan. 12, 2022).

[376] *See, e.g.*, Next Century Cities Reply at 8 (arguing that the Commission should provide a process for those who cannot submit electronically, *e.g.*, creation of regional call centers).

[377] *See, e.g.*, TechFreedom Comments at 31-34; International Center for Law & Economics Reply at 20; WISPA Reply at 21.

110.     We also disagree with the International Center for Law & Economics, which argues that the Commission should implement a legal "standing" requirement for filing informal complaints.[378]  The Commission's informal consumer complaint process is designed specifically to provide consumers with a simple and efficient way raise concerns and file complaints with the Commission without complicated legal procedures, filing fees, or other burdensome requirements.  The Commission does not currently impose any standing requirements for filing informal consumer complaints.  Adopting a standing requirement specifically for digital discrimination of access issues with the Commission would, in effect, thwart a consumer's ability to do so.  Such an outcome would be contrary to the express language of section 60506.

### 1.     Dedicated Pathway for Digital Discrimination of Access Complaints

111.     We adopt our proposal to add a dedicated pathway for digital discrimination of access complaints.  This dedicated pathway will provide digital discrimination informational content in the Consumer Complaint Center to educate consumers about digital discrimination and to provide clear instructions to consumers on how to correctly file a digital discrimination complaint.  Consumers will be able to submit their digital discrimination of access complaints through the Consumer Inquiries and Complaint Center.  They will be required to choose an issue that best describes their complaint and include a narrative with pertinent details.  These complaints will be reviewed and processed.  If the consumer submits a complaint alleging digital discrimination of access by a covered entity, the complaint will be forwarded to the appropriate covered entity for investigation and the Commission may set a due date for the covered entity to provide a written response to the informal complaint to the Commission, with a copy to the complainant.  Complaint information will be reviewed internally to inform policy and shared internally, when appropriate, for potential enforcement.  In addition, we note that the Commission's established administrative processes and procedures afford the Enforcement Bureau access to all consumer complaint data that is submitted through the Consumer Inquiries and Complaint Center.  The record in this proceeding reflects widespread support for establishing such a pathway.[379]  We agree with commenters that adding a dedicated pathway will increase both the accessibility and efficiency of the complaint process.[380]  We direct the Consumer and Governmental Affairs Bureau to implement this dedicated pathway and, in coordination with the Wireline Competition Bureau, to monitor complaints submitted through this pathway to assist in the formulation of future policy and consumer education initiatives.

112.     We also agree with those commenters who stress the need to educate consumers on the issue of digital discrimination of access and the complaint process associated with such complaints.[381]  We direct the Consumer and Governmental Affairs Bureau, in coordination with the Wireline Competition Bureau, to develop materials to educate consumers on digital discrimination of access and on how to file complaints via the dedicated pathway.

113.     *Need for Dedicated Pathway*.  We find that our informal consumer complaints process provides the best opportunity for consumers to inform the Commission of digital discrimination of access

---

[378] *See* International Center for Law & Economics Reply at 20.  Legal "standing" refers to how a party establishes the "right to make a legal claim or seek judicial enforcement of a duty or right." *Standing*, Black's Law Dictionary (11th ed. 2019).  To have standing in federal court, a party must show that "(1) that the challenged conduct has caused the plaintiff actual injury, and (2) that the interest sought to be protected is within the zone of interests meant to be regulated by the statutory or constitutional guarantee in question." *Id.*

[379] *See, e.g.*, Leadership Conference on Civil and Human Rights et al. Comments at 9; Lincoln Network Comments at 17; National Hispanic Media Coalition Comments at 8-9; National Urban League et al. Comments at 8; TURN Comments at 3; Verizon Comments at 30-31; USTelecom Comments at 41.

[380] *See, e.g.*, National Urban League Oct. 5, 2023 *Ex Parte* at 3-4; National Hispanic Media Coalition Comments at 9.

[381] *See* Starry Comments at 4.

issues. The informal complaint process requires no complicated legal procedures, has no filing charge, and does not require the complaining party to appear before the Commission, making it an easy and efficient method for consumers to bring issues to the Commission's attention. The Commission reviews informal consumer complaints and, when applicable, will identify trends and share information internally in furtherance of our enforcement and consumer protection efforts. As the Commission takes seriously its enforcement obligations, we direct the Enforcement Bureau, in coordination with the Consumer Governmental Affairs Bureau and the Wireline Competition Bureau, to expeditiously investigate potential violations and enforce our rules using the Commission's traditional enforcement mechanisms.

### 2. Voluntary Demographic Information Collection

114. We adopt our proposal to collect voluntary demographic information from filers who submit digital discrimination of access complaints.[382] We find that collecting minimal, voluntary demographic information from individuals filing complaints may enable us to identify and understand some underlying patterns of digital discrimination of access that might not otherwise be apparent from the substance of the complaints, thus increasing the utility of the informal complaint process as it relates both to policy development and enforcement.[383] We agree that this collection should be voluntary on the part of the complainant and direct the Consumer and Governmental Affairs Bureau to make clear that this information is not required in order to submit a digital discrimination of access complaint, that the provision of such information will not affect the submission or processing of the complaint, why this information is being collected, how it will be used, and how it will be maintained by the Commission.[384]

115. We disagree with WISPA that providing demographic information should be mandatory.[385] We are concerned that requiring this information may deter consumers from filing complaints. Because the purpose of our changes is to encourage consumers to file informal complaints when they believe our rules may have been violated, we find that the potential deterrence effect from requiring such information outweighs any potential benefit from making the provision of such information mandatory.

### 3. Pathway for Organizations to Submit Digital Discrimination of Access Complaints

116. We adopt our proposal to establish a clear pathway for organizations to submit digital discrimination of access complaints. We agree with commenters that allowing community partners and third-party organizations to file informal complaints on behalf of consumers (individuals or groups of individuals) will enable the Commission to better identify substantive complaints and collaborate with state, local and Tribal governments when addressing such complaints.[386] We also agree with commenters such as the National League of Cities that allowing third parties to file on behalf of consumers will improve access to our informal complaint process for those with language barriers, limited digital skills,

---

[382] We note that the statute requires the Commission to "prevent[] digital discrimination of access based on income level, race, ethnicity, color, religion, or National origin[.]" *See* 47 U.S.C. § 1754(b)(1).

[383] *See* Benefits Data Trust Comments at 8; Free Press Comments at 41; Lincoln Network Comments at 17; National Urban League et al. Comments at 8; Public Knowledge et al. Comments at 91.

[384] *See* National Digital Inclusion Alliance and Common Sense Media Comments at 15; Public Knowledge et al. Comments at 91-92; TURN Comments at 11-12. We note that the Commission's use and disclosure of such information will be subject to the applicable System of Records Notice (SORN) governing our informal complaints system, which the Commission will modify, if necessary, based on this Report and Order. *See* FCC, FCC/CGB-1, Informal Complaints, Inquiries, and Requests for Dispute Assistance, (CGB-1, Informal Complaints, Inquiries, and Responses for Dispute Assistance), 88 Fed. Reg. 60459 (Sept. 1, 2023).

[385] *See* WISPA Reply at 34-35.

[386] *See, e.g.*, Asian Americans Advancing Justice Comments at 5; ACLU Reply at 14-15; California Emerging Technology Fund Comments at 4; Joint Advocates Comments at 30; National League of Cities Comments at 3-4; Next Century Cities Comments at 14; Public Knowledge et al. Comments at 92; TURN Comments at 12-13.

and/or limited access to devices or connectivity.[387]  Improving access to our informal complaint process serves both as an important safeguard for marginalized communities and as a means of ensuring that our complaint data is complete and accurate.

117.    We disagree with commenters who suggest that third party filers should be subject to more burdensome procedural or evidentiary standards.[388]  We find that the benefits of promoting and enhancing access to our informal complaint process far outweigh the limited risks outlined by the commenters.  We agree with Public Knowledge that one of our primary goals is to "further enable marginalized communities to be represented through the complaint process" and that "to throw up additional barriers would undermine this goal."[389]

118.    *Making Available Anonymized Complaint Data*.  We adopt our proposal to make anonymized or otherwise de-identified complaint data available to the public.  We direct the Consumer and Governmental Affairs Bureau, in coordination with the Wireline Competition Bureau, the Office of Economics and Analytics, and the Office of General Counsel, to periodically make publicly available anonymized or otherwise de-identified digital discrimination of access complaint data.  The record in this proceeding reflects widespread support for this proposal.[390]  We agree with commenters that such data would be useful to third parties in conducting research, advocacy, and reporting, and we find that these data can be released without compromising the privacy of individual complainants.[391]  We find that public release of anonymized or otherwise de-identified data would also promote transparency and empower third parties to assist the Commission in identifying trends in digital discrimination of access.

### E.    Enforcement

119.    We find that effective implementation of section 60506 requires use of the Commission's traditional enforcement mechanisms to fulfill Congress's mandate that the Commission prevent and identify necessary steps to eliminate digital discrimination of access.  This includes the full gamut of the Commission's enforcement toolkit, which ranges from letters of inquiry to remedial orders to forfeiture proceedings.  Alleged or otherwise apparent instances of digital discrimination of access will be investigated on a self-initiated basis.  This approach, which affords the Commission necessary flexibility for tackling Congress's directives, will involve data gathering via complaints and allegations made through the Commission's informal complaint process by state, local, and Tribal officials, and via other sources.

120.    As explained above, a policy or practice will violate our prohibition on digital discrimination of access if it discriminates, either by intent or in effect, based on one of section 60506's listed characteristics.[392]  In examining policies and practices, the Commission will look to whether the policy or practice in question differentially affects access to broadband internet access service or is intended to do so.  If yes, then the Commission will look to whether less discriminatory options were available.  Thus, the rules we adopt today involve a twofold assessment:  first, whether a policy or practice is discriminatory; and if so, whether there were reasonably available and achievable alternatives (i.e., alternatives that were technically and economically feasible) that would have been less

---

[387] *See* National League of Cities Comments at 3-4.

[388] *See, e.g.*, NTCA Reply at 15; TechFreedom Comments at 39-40.

[389] Public Knowledge et al. Comments at 92.

[390] *See, e.g.*, American Library Association Comments at 7; Free Press Comments at 41; National Multicultural Organizations Comments at 19; National Hispanic Media Coalition Comments at 11-12; National Digital Inclusion Alliance and Common Sense Media Comments at 13-14; Public Knowledge et al. Reply at 12-13; TURN Comments at 15.

[391] *See, e.g.*, National Multicultural Organizations Comments at 19.

[392] *Supra* paras. 33-34.

discriminatory.

### 1.    Legal Authority

121.    In the *Notice*, we sought comment on how the Commission should enforce any such rules we might adopt, including by use of our existing "enforcement toolkit of letters of inquiry, notice of apparent liability, and forfeiture orders."[393]  We further sought comment on any limitations thereon, highlighting a dispute among commenters about the legal authority underlying the use of these enforcement mechanisms.[394]  We conclude that these same tools may be used to enforce the rules we adopt today pursuant to section 60506.  Implementing the statute's directives necessitates use of these tools and processes, which will facilitate Congress's and the Commission's goal of facilitating equal access by preventing digital discrimination of access and identifying means to eliminate such discrimination.

122.    We find that subsection (b)(1) and (e) under section 60506 provide the Commission express authority to enforce its mandates using the Commission's normal suite of enforcement mechanisms.  Section 60506 directs the Commission to adopt final rules to "prevent[] digital discrimination of access," and to "identify[] necessary steps" for eliminating such discrimination.  Use of the words "prevent" and "eliminate" is unusual in the context of a federal anti-discrimination statute.  Congress usually adopts a statutory prohibition on the types of discrimination it seeks to address, then tasks the relevant administrative agency with implementing the prohibition through agency rules.[395]  As discussed in prior sections of this Order, the words "prevent" and "eliminate" constitute strong medicine and represent a broad mandate for the Commission to take the necessary measures to fully eradicate digital discrimination of access.  Moreover, a prohibition without enforcement cannot reasonably be expected to affect conduct in a meaningful way.  Indeed, various commenters have identified the use of existing Commission enforcement mechanisms as necessary tools for ensuring compliance with our rules.[396]  Others contend that without the use of such tools, section 60506 could not function as Congress intended.[397]  Similarly, there would be little point for Congress to direct the Commission to accept complaints of digital discrimination of access if we lacked any of our traditional powers to act on them.  The existing "public complaints process" serves the agency's general authority to enforce the Communications Act, so we interpret the mandate in subsection (e) to reflect Congress's intent that the agency enforce digital discrimination complaints under the Act's general enforcement provisions.

123.    However, some commenters argue that the Commission lacks authority, both under the Communications Act and section 60506, to enforce any rules prohibiting digital discrimination of access.  They argue that because Congress did not expressly incorporate section 60506 into the Communications Act, any remedies or enforcement mechanisms found in the Communications Act are unavailable, and section 60506 does not authorize the use of such enforcement tools.[398]  AT&T, for example, argues that

---

[393] *Notice* at 38-39, para. 69.

[394] *Id.* at 39-40, para. 71.

[395] *See, e.g.*, 42 U.S.C. § 2000e-12(a) (empowering the Equal Employment Opportunity Commission "to issue, amend, or rescind suitable procedural regulations to carry out the provisions" of Title VII); 20 U.S.C. § 1682 (directing federal agencies to effectuate the provisions of Title IX "by issuing rules, regulations, or orders of general applicability"); 29 U.S.C. § 794(a) (tasking federal agencies with "promulgat[ing] such regulations as may be necessary to carry out . . . the Rehabilitation, Comprehensive Services, and Development Disabilities Act of 1978"); 42 U.S.C. § 6103(a)(4) (requiring federal agencies involved in distributing federal financial assistance promulgate regulations to carry out the provisions of the Age Discrimination Act of 1975).

[396] *See, e.g.*, Connecticut Office of State Broadband & Office of Consumer Counsel Comments at 5-6; Greenlining Institute Comments at 7; Leadership Conference on Civil and Human Rights et al. Comments at 8.

[397] Free Press Reply at 6-7 (arguing that it would be "remarkable" for Congress to enact a law without any enforcement potential, which would effectively render it a "nullity"); Public Knowledge et al. Comments at 5 (contending that section 60506 without enforcement authority would be superfluous).

Congress's decision to "keep [s]ection 60506 out of the Communications Act and to avoid cross-references between it and Title V" reflects Congress's desire to make enforcement by traditional mechanisms unavailable.[399] CTIA similarly observes that unlike other provisions of the Infrastructure Act, such as section 60502, Congress did not explicitly enable the Commission to "impose forfeiture penalties under [s]ection 503 of the Communications Act" in section 60506, rendering those tools unusable.[400]

124.     We disagree with those asserting that section 60506 does not authorize the use of the Commission's existing enforcement mechanisms. Congress's decision not to incorporate section 60506 into the Communications Act does not suggest that it contemplated only voluntary compliance with rules designed to "prevent" digital discrimination of access.[401] Although some commenters argue that Congress implicitly or indirectly incorporated section 60506 into the Communications Act,[402] we need not rely on such arguments to justify our approach. Rather, we agree with commenters asserting that section 60506, standing alone, authorizes the Commission to adopt or amend enforcement rules deemed necessary to facilitate equal access and prevent digital discrimination of access, including the use of the Commission's existing enforcement mechanisms.[403]

125.     As discussed above, section 60506 authorizes the Commission to incorporate both disparate treatment and disparate impact standards in its definition of digital discrimination of access and, consequently, to adopt rules prohibiting covered entities from engaging in such practices. Contrary to arguments that section 60506 tasks the Commission with "facilitat[ing] equal access" by way of funding providers' deployment efforts,[404] the statute expressly commands the Commission to *prevent* digital discrimination of access. That is, Congress tasked the Commission with adopting rules that would curb digital discrimination of access before its occurrence. Even had Congress tasked the Commission only with implementing a statutory prohibition on digital discrimination of access (a mandate that would be less broad than the one we were given), the Commission could not do so merely through suggestion.[405] We are aware of no instance in which a federal anti-discrimination law is without any enforcement mechanism whatsoever. Industry fails to explain how "affirmative-based approaches," like funding opportunities, would effectively implement our mandate to "prevent" digital discrimination of access.[406]

---

(Continued from previous page) ─────────────────

[398] *See, e.g.*, AT&T Comments at 37-42; AT&T Reply at 29-31; CTIA Comments at 27; International Center for Law & Economics Reply at 14-15; U.S. Chamber of Commerce Comments at 3 & n.10; USTelecom Comments at 43-47.

[399] AT&T Reply at 29-30.

[400] CTIA Comments at 27.

[401] *See* Free Press Comments at 11-12.

[402] *See, e.g.*, Connecticut Office of State Broadband & Office of Consumer Counsel Comments at 5-6; Lawyers' Committee for Civil Rights Under Law Comments at 33; Public Knowledge et al. Comments at 5, 32-24, 96-97.

[403] Connecticut Office of State Broadband & Office of Consumer Counsel at 6-7 (arguing that the Commission possesses authority to enforce "other statutes" aside from the Communications Act "that involve national matters concerning communications"); Free Press Comments at 10-11 (arguing that the Commission must interpret the law as written and that the Commission must adopt rules to fulfill the specific, if broad, mandate that Congress imposed); Lawyers' Committee for Civil Rights Under Law Reply at 21-23 (arguing that the language of section 60506 itself authorizes the use of the Commission's enforcement toolkit).

[404] *See, e.g.*, AT&T Reply at 17-19 (arguing that section 60506(b) only directs the Commission to facilitate equal access to broadband, "including through affirmative use of the Infrastructure Act's funding programs," and does not implicate "private conduct").

[405] *See* USTelecom Comments at 47 (arguing that the Commission's responsibilities include "convening parties" and "encouraging action," without any ability to otherwise enforce section 60506).

No commenter suggests that the solution to digital discrimination of access, as we have defined it, requires directing more funds to the entity responsible for such conduct. Indeed, others call such a result absurd.[407] Because preventing digital discrimination of access requires some kind of "stick" in addition to "carrots,"[408] it would render much of section 60506 a "nullity"[409] were the Commission to interpret the statute to preclude enforcement of our rules implementing section 60506.

126. We find that section 60506 provides the Commission authority to enact such rules as are necessary to fulfill its statutory obligations—including, for example, amendment or readoption of our existing enforcement rules in the specific context of digital discrimination of access.[410] Section 60506(b) directs the Commission to "adopt final rules to facilitate equal access to broadband internet service . . . including . . . preventing digital discrimination of access . . . ."[411] And as we explain above, our enforcement tools are indispensable in fulfilling this mandate. Section 60506 therefore authorizes the Commission to adopt, readopt, or amend enforcement-related rules as necessary to accomplish this task.

127. Finally, we find that section 4(i) of the Communications Act provides the Commission ancillary authority to carry out its statutorily mandated duties under section 60506, including enforcement of a prohibition on digital discrimination of access.[412] Section 4(i) provides that "[t]he Commission may perform any and all acts, make such rules and regulations, and issue such orders, . . . as may be necessary in the execution of its functions."[413] Effective enforcement rules are reasonably ancillary to the Commission's statutorily mandated responsibility to combat discrimination in providing access to broadband service.[414] Arguments to the contrary highlight that section 60506 does not fall within the scope of the Communications Act and that its mandate lacks a limiting principle.[415] But as TechFreedom acknowledges, section 4(i) enables the Commission to carry out duties conferred by Congress outside those outlined in the Communications Act.[416] And as explained above, contrary to claims that use of its ancillary authority in this instance would release the Commission "'from its congressional tether'"[417] or would "exceed the bounds of its statutorily[] delineated authority,"[418] the Commission's establishing and enforcement of today's prohibition logically extends from and satisfies Congress's mandate of preventing digital discrimination of access.

---

[406] Letter from Brian J. Benison, Assistant Vice President, Federal Regulatory, AT&T, to Marlene H. Dortch, Secretary, FCC, GN Docket No. 22-69, at 2 (filed June 29, 2023).

[407] *See, e.g.*, Lawyers' Committee for Civil Rights Under Law Reply at 4-5.

[408] *See id.*

[409] Free Press Reply at 7.

[410] *See* Free Press Comments at 11-12.

[411] 47 U.S.C. § 1754(b).

[412] *Id.* § 154(i).

[413] *Id.*

[414] *See Comcast Corp. v. FCC*, 600 F.3d 642, 646 (D.C. Cir. 2010) (explaining that the Commission may exercise its ancillary authority when, in part, "'the regulations are reasonably ancillary to the Commission's effective performance of its statutorily mandated responsibilities'" and citing to the two-part test for determining when the Commission may do so in *American Library Ass'n v. FCC* (406 F.3d 689, 691-92 (D.C. Cir. 2005))).

[415] *See, e.g.*, TechFreedom Reply at 20-21, 23-36; USTelecom Comments at 45-47.

[416] TechFreedom Reply at 21.

[417] *Id.* at 25 (quoting *Comcast Corp=*, 600 F.3d at 655).

[418] USTelecom Comments at 47.

128.     We note that the enforcement measures and final rules that we adopt today do not represent all that the Commission can—and must—do to combat digital discrimination of access.  As noted above, section 60506(b) directs the Commission to adopt "final rules" to:  (1) prevent digital discrimination of access and (2) identify necessary steps for the Commission to take to eliminate such discrimination.[419]  We interpret Congress's directive with respect to "eliminating" digital discrimination of access to include steps not taken in our implementing rules that might ultimately be necessary to ensure that such discrimination does not occur after the effective date of our rules.  Congress has tasked us to identify any such "necessary steps" so they can swiftly be undertaken if and when determined to be necessary, and so Congress can consider what additional statutory authority, if any, might be necessary to allow for full achievement of the equal access goal.  We believe the rules we adopt today, coupled with the affirmative requirements proposed in the *Further Notice*, represent the measures necessary both to "prevent" and "eliminate" digital discrimination of access in the future.  As such, we find our actions today satisfy the Commission's obligations under section 60506(b)(1) and, at a minimum, takes initial steps towards addressing our obligations under section 60606(b)(2).

129.     We disagree with those asserting that enforcement of our prohibition raises a major-questions-doctrine issue.[420]  As explained below, the Commission's self-initiated investigation process does not reflect a substantial overhaul of the Commission's enforcement mission.[421]  Nor does taking this step, modest in comparison to the concerns raised by some commenters, risk fundamentally altering the landscape of the telecommunications industry.[422]  As employers, covered entities should be familiar with the standards and processes for establishing liability under Title VII of the Civil Rights Act of 1964,[423] and many of these entities must already comply with the nondiscrimination requirements associated with the receipt of federal funds.  Moreover, the Commission does not find in section 60506 an "elephant[] in a mousehole" as some commenters argue.[424]  To the contrary, Congress here explicitly called on the Commission to prevent and identify necessary steps to eliminate digital discrimination of access.  It mandated, using clear language, that the Commission adopt rules necessary for doing so.  Our adoption of a prohibition on digital discrimination of access is directly responsive to Congress's charge, and our use of the Commission's enforcement mechanisms a necessary component of those efforts.

130.     At the same time, we do not agree with some commenters' suggestion that section 60506(b)(2) represents a broad grant of authority to the Commission to require covered entities to undertake remedial measures to eradicate the effects of conduct predating the effective date of our rules.[425]  While section 60506(b)(2) authorizes the Commission to "identify" the steps necessary to

---

[419] 47 U.S.C. § 1754(b)(1)-(2).

[420] *See, e.g.*, CTIA Comments at 25-26 (arguing, among other things, that establishment of a "back-and-forth, highly resource intensive process" would result in a "fundamental shift in agency mission" and "raise a major questions doctrine issue").

[421] *See id.* at 26.

[422] *See, e.g.*, AT&T Comments at 43-45 (claiming that a "new regime of unfunded mandates and price regulation . . . would impose massive regulation on 'a significant portion of the American economy'"); NCTA Reply at 4, 24-25 (expressing concerns that the Commission might engage in rate regulation of broadband services); TechFreedom Comments at 4-6 (claiming that the Commission's various proposals in the *Notice* risk imposing "de facto common carriage status upon broadband providers"); AT&T Reply 2, 4-8 (arguing that under the Infrastructure Act, the burden should fall on government subsidy programs, not broadband providers, to address digital discrimination of access and that section 60506 does not open the door broadband price regulation or to "unfunded deployment mandates").

[423] Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e-2000e-17.

[424] *See, e.g.*, TechFreedom Comments at 5 & n.17; International Center for Law & Economics Reply at 5.

[425] *See, e.g.*, Lawyers' Committee for Civil Rights Under Law Comments at 33-34 (contending that it is insufficient to identify necessary steps to eliminate digital discrimination of access and that the Commission must take said steps

(continued….)

eliminate the discrimination identified in subsection (b)(1), it does not, in our view, constitute a clear grant of authority to impose retroactive liability on industry participants.[426] Moreover, we note that determining when and where digital discrimination of access occurred across the country in the past, how to remedy such discrimination, and how to assign and allocate the cost of such remediation, would represent highly time- and resource-intensive undertakings. We will not presume that Congress intended for the Commission to undertake these highly complex tasks without clear evidence to that effect. Accordingly, for purposes of implementing section 60506(b), we will train our focus on preventing—and thus eliminating—digital discrimination of access occurring after the effective date of our rules.

### 2. Amending Commission Rules

131. We amend some of our existing enforcement rules today to enshrine the processes by which the Commission will undertake investigations of claims of digital discrimination of access. These include changes to Rule 1.80, which details our forfeiture procedures, so that it will now reference the provisions of section 60506 in addition to those of the Communications Act and other statutes.[427] Additionally, Rule 0.111 will now reflect the Enforcement Bureau's direction to investigate claims of digital discrimination of access and make recommendations as to potential violations and penalties.[428] We adopt these amendments pursuant to the authority expressly granted to the Commission in section 60506(b).

### 3. Enforcement Framework

132. The Commission will launch investigations into complaints and allegations of digital discrimination of access on a self-initiated basis and, where the Commission determines a violation has occurred, pursue remedies and penalties. Investigations may stem from complaints filed through the informal complaint process or information otherwise brought to the Commission's attention. As outlined above, the Commission will adopt a dedicated pathway for accepting digital discrimination of access claims from the public. Additionally, the Commission may receive allegations of digital discrimination of access from state, local, or Tribal governments. And as proposed in the *Further Notice*, the Commission may in the future obligate covered entities to make filings to the Commission as part of their affirmative obligations to assist in combating digital discrimination of access,[429] filings that similarly might serve as a basis for investigation. Irrespective of the origin of such complaints and information, the Commission will—at its discretion—determine whether investigation by the agency is warranted and whether further response from the entities alleged to have violated our rules will be required. However, we recognize that broadband providers and other covered entities may need time to review their policies and practices in light of the rules we adopt today. Accordingly, we will not initiate any enforcement investigation solely concerning conduct that produces differential impacts under these rules until at least six months after the effective date of the rules.

133. The Commission will conduct its investigations of digital discrimination of access

---

now to remediate past discrimination); Public Knowledge et al. Reply at 13-17 (arguing that imposition of buildout requirements in response to historical wrongs would not be impermissibly retroactive); Lawyers' Committee for Civil Rights Under Law Reply at 20 (observing that even if the Commission cannot impose retroactive liability, it can still impose certain requirements on providers that would help address past discrimination).

[426] *Landgraf v. USI Film Prods.*, 511 U.S. 244, 280 (1994) (explaining that a court must refrain from retroactive application of a new statute "absent clear congressional intent favoring such a result").

[427] 47 CFR § 1.80(a)(1)-(7). Rule 1.80, which acts as our implementing rule for forfeiture proceedings, states that a forfeiture penalty may be assessed against any person found to have violated either designated provisions of the Communications Act (and rules related thereto); Title 18 of the United States Code; or section 6507 of the Middle Class Tax Relief and Job Creation Act of 2012, as well as rules, regulations, and orders promulgated thereunder.

[428] 47 CFR § 0.111.

[429] *Infra* para. 179.

complaints and allegations consistent with federal law and in a manner consistent with the processes and procedures followed by other federal agencies.[430]  Taking this approach ensures alignment with civil rights models, as suggested by some commenters.[431]  In investigating complaints and allegations of digital discrimination of access, we adopt the legal standards for proving discriminatory treatment and disparate impact set out below and in our discussion above of disparate impact and disparate treatment standards as they relate to our definition of digital discrimination of access.

134.    *Investigating complaints alleging that a policy or practice is intended to differentially impact consumers' access to broadband internet access service on a prohibited basis.*  Direct evidence of discriminatory intent is rare.[432]  For that reason, intentional discrimination is typically proven by circumstantial evidence.[433]  Federal agencies historically have used two chief legal frameworks in evaluating whether circumstantial evidence supports an inference of discriminatory intent, depending on the nature of the alleged discrimination.  We will investigate complaints of intentional discrimination under these frameworks.

135.    *When a facially neutral policy or practice is allegedly motivated by discrimination: Arlington Heights standard*.  The Arlington Heights framework applies when an otherwise facially neutral policy or practice is allegedly motivated by discrimination.[434]  Under this framework, as applied in the context of section 60506, the Commission, as factfinder, will evaluate a variety of factors that contributed to the adoption, use or application of the challenged policy or practice in order to determine discriminatory intent.[435]  Where it is determined that the policy or practice was intended to discriminate, the agency evaluates whether the adoption, use or application of the policy or practice would have occurred absent the discrimination.  Importantly, evidence of statistical disparity, alone, generally will not satisfy this standard.[436]  In the context of section 60506, this approach would likely be most applicable to complaints involving treatment of a large group of persons, including but not limited to deployment, upgrade, and large-scale service matters alleged to have been motivated by prohibited discrimination.  The Commission will find a violation of the digital discrimination of access rules where, upon close evaluation of Arlington Heights factors, (1) persons in a protected group were denied equal access to broadband internet access services, (2) the challenged conduct would not have occurred absent the discrimination, and (3) the policy or practice in question is not justified by genuine issues of technical or

---

[430]  *See, e.g.*, Department of Justice, *Title VI Legal Manual*, https://www.justice.gov/crt/fcs/T6manual (last visited Nov. 14, 2023) (setting forth legal standards for addressing complaints discriminatory treatment and policies and practices having discriminatory effect).

[431] *See, e.g.*, CTIA Comments at 18.

[432] *Miller v. Johnson*, 515 U.S. 900, 913-914 (1995); *Hassan v. City of New York*, 804 F.3d 277, 295 (3d Cir. 2015); *Bangerter v. Orem City Corp.*, 46 F.3d 1491, 1501 (10th Cir. 1993).

[433] The two legal standards for reviewing circumstantial evidence of intentional discrimination are set out in *Vill. of Arlington Heights v. Metro. Housing Dev. Corp.*, 429 U.S. 252, 266 (1977) (providing the framework for analyzing whether facially neutral policies or practices are motivated by discrimination) and *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) (providing the framework for allocating proof for claims of disparate treatment discrimination).

[434] *Arlington Heights*, 429 U.S. at 266.

[435] The non-exhaustive list of evidentiary factors include: background of the challenged policy or practice; sequence of events leading up to the challenged policy or practice; departures from normal, procedural sequence (how the challenged policy or practice occurred and was decided on by decisionmakers); pattern of actions that impose greater harm on persons in protected groups (i.e., whether a practice bears more heavily on minority or low-income persons); and awareness of the greater harm (i.e., whether the harm to members in the protected groups was foreseeable to decisionmakers).  *See Arlington Heights*, 429 U.S. at 266-68.

[436] *See Comm. Concerning Community Improvement v. City of Modesto*, 583 F.3d 690, 703 (9th Cir. 2009); *Arlington Heights*, 429 U.S. at 264-66.

economic feasibility, as outlined above.

136. *When policies or practices are intended to impact persons within the protected group differently than similarly situated persons: McDonnell Douglas standard*. This framework applies when a policy or practice is intended to treat similarly situated persons differently because of a protected status.[437] It is typically utilized when investigating complaints involving a smaller, discrete number of complainants and where there are identifiable comparators. In the context of our rules implementing section 60506, this framework may be utilized for investigating complaints as to selection for benefits, special deals, or even qualification for broadband service.

137. The Commission will investigate three elements under this framework: (1) whether there is differential treatment of similarly situated persons;[438] (2) whether there is a legitimate, technical or economic justification for such differential treatment;[439] and, if so, (3) whether the technical or economic justification for the differential treatment is actually a pretext for prohibited discrimination.[440] As to the second element, the Commission will weigh all available evidence bearing on whether the challenged policy or practice is justified by genuine issues of technical or economic feasibility. The Commission will find a violation of the digital discrimination of access rules where persons in a protected group were treated differently, and (1) there is no legitimate technical or economic justification for the difference in treatment, or (2) the proffered technical or economic justification is determined to be pretext for discrimination.

138. *Investigating allegations that policies and practices differentially impact consumers' access to broadband internet access service on a prohibited basis*. We expect most investigations of possible violations of our rules to concern credible allegations that specific policies or practices have meaningful discriminatory effects and are not justified by genuine issues of technical or economic feasibility. We adopt the elements of proof for disparate impact as established in *Inclusive Communities* in a way that comports with section 60506 and the Commission's investigatory process. Thus, investigations concerning allegations that facially neutral policies or practices have discriminatory effects will involve: (1) the identification of a policy or practice that is causing a disparate impact on a prohibited basis; (2) assessment of whether the policy or practice in question is justified by genuine issues of technical or economic feasibility; and (3) a determination of whether there were reasonably achievable, less discriminatory alternatives.[441] If the Commission determines that a covered entity's policy or practice differentially affects access to broadband service on a prohibited basis and that a less discriminatory alternative was reasonably available and achievable, the policy or practice in question will not be deemed justified by genuine issues of technical or economic feasibility.

139. Under the first element of our disparate impact analysis, the Commission will investigate whether an identified policy or practice of the covered entity is causing the discriminatory effect. We will also investigate the nature of the disparate impact that is being complained about or otherwise brought to

---

[437] *McDonnell Douglas*, 411 U.S. at 802-06.

[438] This element is shown with evidence that persons are within a protected group; they were eligible for service; were treated in an adverse manner; and that persons similarly situated, but not in the protected group, received better treatment. *Id.* at 802.

[439] This element will be investigated by the Commission, and any explanation must be clear and reasonably specific, and fully support a showing that there was a "legitimate, nondiscriminatory reason for the different treatment." *Id.*

[440] Under this element, the Commission will investigate whether any reason given for the challenged action was pretext for discrimination. Under this element, the Commission may weigh whether the reasons given were true; any weaknesses, implausibility, inconsistency or contradictions; and if action taken was contrary to written policy or practice, or was a post-hoc fabrication. *McDonnell Douglas*, 411 U.S. at 803-805.

[441] *See* Department of Justice, *Title VI Legal Manual, Section VII: Proving Discrimination – Disparate Impact*, https://www.justice.gov/crt/fcs/T6Manual7 (last visited Nov. 14, 2023).

our attention.  As explained above, we will rely on information provided by the covered entity as well as specified data sources and, where necessary, statistical analyses to assess the extent of the differential impact on access to broadband internet access service.  The Commission recognizes that any such differential impact on broadband access must be caused by a specific policy or practice of the entity under investigation.

140.     Under the second element of our disparate impact analysis, the Commission will determine whether genuine issues of technical or economic feasibility support and give substantial, legitimate justification for the policy or practice that is being investigated.  Third, the Commission will determine whether a less discriminatory alternative policy or practice was reasonably available and achievable and identify any such alternative policy or practice determined to have been reasonably available and achievable.  If such an alternative was available to the covered entity, the policy or practice causing the differential impact will not be deemed justified by genuine issues of technical or economic feasibility, and the covered entity will be exposed to liability for digital discrimination of access.[442]

141.     *Remedies*.  Remedying violations of our prohibition on digital discrimination of access will depend on the context and extent of the violation.  This requires that remedies be established on a case-by-case basis.[443]  To this end, the Commission will bring to bear its full suite of available remedies, including the possibility of monetary forfeitures.

142.     We adopt a presumption of compliance for policies and practices that are in compliance with specific program requirements for the Broadband Equity, Access, and Deployment (BEAD) and Universal Service Fund (USF) high-cost programs.[444] These programs exist to remedy current inequities in broadband deployment[445] and  are consistent with section 60506 and our rules adopted today to facilitate equal access to broadband internet service.[446]  We will also accept a presumption of compliance for future broadband funding programs that account for digital discrimination of access rules.  We decline

(Continued from previous page) ————————————————

[442] Under the Commission's investigative process, the factual and legal bases for any proposed liability determination are set forth in a notice of apparent liability and the respondent has an opportunity to respond to that notice before any final liability determination is made.  47 CFR § 1.80(g).

[443] *See* Leadership Conference on Civil and Human Rights et al. Comments at 8 (arguing that the Commission "must define instances of non-compliance on a granular level").

[444] *See* NTIA *Ex Parte* at 11 (urging the Commission to "recognize the consistency between BEAD and the mandate against digital discrimination of access, and accordingly to treat actions taken in strict compliance with BEAD program requirements as presumptively also compliant with digital discrimination rules"); ; *see also* NTCA Comments at 29-30; WISPA Reply Comments at 24.  As noted below, we will consider whether other presumptions or safe harbor defenses are warranted going forward, including safe harbors or presumptions of compliance for policies and practices that comply with other federal broadband deployment programs that embody similar equity and nondiscrimination principles.

[445] *See, e.g.,* Fourteenth Broadband Deployment Report, 36 FCC Rcd at 874-878, paras. 65-74 (describing how universal service support plays an essential role in deploying broadband networks in rural, insular, and hard-to-serve areas and in increasing access for low-income households); Biden-Harris Administration Announces State Allocations for $42.45 Billion High-Speed Internet Grant Program as Part of Investing in America Agenda, https://broadbandusa.ntia.doc.gov/news/latest-news/biden-harris-administration-announces-state-allocations-4245-billion-high-speed (stating that BEAD funding will be used to deploy or upgrade broadband networks in unserved and underserved areas).

[446] *See, e.g.*, 47 U.S.C. § 1702(g)(2)(C)(i)-(ii) ("requiring that "eligible entities" distributing BEAD funds must "distribute the funds in an equitable and nondiscriminatory manner" and "ensure . . . that each subgrantee uses the funds in an equitable and nondiscriminatory manner."); 47 U.S.C. § 254(b)(2) (providing that universal access to advanced telecommunications and information services is a basic policy principle of the universal service program); WISPA Comment at 2, 16-19 (contending that the Commission should adopt a safe harbor for recipients of the Commission's high-cost federal support programs, as they "are already subject to non-discrimination requirements").

to expand, however, presumptions or safe harbor defenses beyond these funding programs as some commenters urge.[447]  Although T-Mobile correctly identifies that the Commission must take into account issues of technical and economic feasibility, we disagree that for section 60506's language to have "real meaning," the Commission must establish particular safe harbor defenses at this time.[448]  The approaches outlined above prove sufficient for protecting the rights of industry participants, and we do not expect that the Commission's self-initiated approach to investigations will inundate industry participants with meritless claims that they must expend substantial resources defending against.[449]  We also agree with other commenters that prematurely establishing a comprehensive list of safe harbor defenses may immunize covered entities against legitimate complaints or allegations, without commensurate reasons for doing so.[450]  We do, however, recognize that properly developed safe harbors may facilitate regulatory certainty and help focus our enforcement efforts in the future.  Therefore, the Commission charges the CEDC with identifying, evaluating and making recommendations with respect to particular safe harbors, rebuttable presumptions or other similar bright-line guardrails distinguishing permissible from impermissible conduct under the rules we adopt today.

143.    *Structured Complaint Process*.  We decline at this time to adopt a structured formal complaint process for claims of digital discrimination of access.  In the *Notice*, we sought comment on whether the Commission should establish a structured complaint process similar to the formal complaint process of section 208 of the Communications Act.[451]  CTIA argues that the establishment of such a

---

(Continued from previous page) ───────────────

[447] *See, e.g.*, AT&T Comments at 27 (arguing that the Commission should recognize "safe harbors for certain deployment criteria"); CTIA Comments at 3, 18, 24-25 (contending that the Commission should "adopt safe harbors to further minimize regulatory uncertainty about circumstances that could give rise to liability"); Information Technology and Innovation Foundation Comments at 5-6 (arguing that safe harbors are necessary to prevent "perverse outcomes" whereby ISPs delay deploying or upgrading its service "in some areas of a locality for fear that it will face liability for not serving every part of that locality all at once"); Free State Foundation Comments at 14-16 (providing a non-exhaustive list of "bright line" safe harbors that the Commission should adopt); NTCA Comments at 29-30 (arguing in support of a safe harbor that includes "any carrier that serves in an area with population and other characteristics substantially similar to those found in regions in which [eligible telecommunications carriers receiving high-cost universal service support] operate"); R Street Institute Comments at 3 (rec. Feb. 21, 2023) (urging the Commission to "utilize safe-harbors and identify mitigating factors that dissuade the agency of evidence of digital discrimination"); TechFreedom Comments at 44-47 (arguing that providers should be required only to provide a *prima facie* showing of technical infeasibility, such as the existence of a man-made impediment, and that the Commission should be highly deferential to any business judgments made by industry with respect to economic feasibility); T-Mobile Comments at 27, 30-31 (arguing that the Commission should adopt safe harbors for when a "provider has met or exceeded any applicable build-out requirements in the terms of its wireless license" or when "the provider is otherwise subject to an enforceable commitment to deploy service or to cover substantially all of a given population"); WISPA Comment at 2, 16-19 (contending that the Commission should adopt a safe harbor for recipients of the Commission's high-cost federal support programs, as they "are already subject to non-discrimination requirements"); American Action Forum Reply at 1, 5-8 (arguing that the Commission should establish safe harbors); Americans for Tax Reform and Digital Liberty Comments at 4 (claiming that it is "essential that ISPs enjoy safe harbor provisions for technical and economic feasibility"); International Center for Law & Economics Reply at 6, 19-20 (arguing that the Commission should have a presumption of nondiscrimination and that wading through complaints could be resource intensive for the Commission and administration of section 60506, particularly using a disparate impact standard, would become too unwieldly).

[448] T-Mobile Comments at 27.

[449] *See, e.g.*, Americans for Tax Reform and Digital Liberty Comments at 3; AT&T Comments at 27-28; NTCA Comments at 29-30; Lumen Reply at 20.

[450] *See, e.g.*, California Public Utilities Commission Reply at 7; Free Press Comments at 35-36; Lawyers' Committee for Civil Rights Under Law Reply at 17-18.

[451] *Notice* at 41-42, para. 73.

process would burden both staff at the Commission and the resources of covered entities.[452] However, it is unnecessary for us to opine on these arguments. Instead, we agree with Verizon that, currently, the informal complaint process satisfies the requirements of section 60506 and provides the necessary functionality for the Commission to carry out its duties.[453] Although some commenters encourage the Commission to establish a specific formal complaint process for digital discrimination of access claims,[454] these commenters do not articulate the reasons for its necessity in light of the self-initiated investigatory approach the Commission adopts today. We do not foreclose the possibility of adopting a structured complaint process in the future, however. As the Commission gains experience investigating digital discrimination of access complaints, our approach may evolve, leading us to revisit this issue in the future.

144. As noted above, in order effectively to identify and combat potential violations of digital discrimination of access, the Enforcement Bureau will evaluate information provided to the Commission through the dedicated digital discrimination of access informal complaint pathway or through communications from state, local, or Tribal governments. The Enforcement Bureau, in coordination with the Consumer and Governmental Affairs Bureau, will review this information on a monthly basis and examine trends and geographic or demographic clusters, among other things, in the informal complaint filings to determine whether there is possible discrimination of access based on income level, race, ethnicity, color, religion, or national origin. Relevant evidence pertaining to purported differences in the covered elements of service will be especially probative.[455] Where there is credible evidence suggesting that persons in a protected group were treated differently as the result of a policy or practice, the Enforcement Bureau, in its discretion, will use its authority to conduct investigations; issue Letters of Inquiry and subpoenas; conduct audits; inspect licenses and/or facilities; and collect information. Further, the Enforcement Bureau will use the full range of its enforcement options to enforce compliance, including the possibility of forfeiture penalties.

145. *Voluntary Mediation of Digital Discrimination of Access Complaints.* As part of the monthly review process referenced in the preceding paragraph, Commission staff shall identify particular informal complaints that would be suitable candidates for a staff-mediated resolution process. With regard to such complaints, prior to initiation of an Enforcement Bureau investigation, staff from the Bureau's Market Disputes Resolution Division (which has no involvement in Bureau-initiated investigations) may invite the informal complainant and the covered entity identified in the informal complaint to engage in a voluntary mediation process overseen by Division staff. If all parties are willing to engage in such voluntary mediation, the mediation would follow existing Commission procedures as outlined in Rule

(Continued from previous page) ————————————————

[452] *See* CTIA Comments at 25-27.

[453] *See* Verizon Comments at 30-31.

[454] *See, e.g.*, Benefits Data Trust Comments at 3, 9 (claiming that a process modeled after the Consumer Financial Protection Bureau's Consumer Complaint Database would help hold providers accountable and facilities supervision and enforcement activities with state and federal agencies); Free Press Comments at 40-41 (arguing that a structured complaint process would "aid the Commission in identifying and responding to substantive complaints[, and] . . . encourage and facilitate better interaction between community and consumer advocacy organizations, which will ultimately aid the Commission in better understanding the causes and potential solutions to digital discrimination"); National Digital Inclusion Alliance and Common Sense Media Comments at 17 (claiming that a "formal process gives representatives, organizations, and governments flexibility in pursuing violations"); National Multicultural Organizations Comments at 17-18 (contending that a dedicated complaint process would aid individuals and communities impacted by digital discrimination by providing a means to vindicate their rights and help those subject to the Commission's rules by "offering them a forum and straightforward approach to addressing and resolving" complaints).

[455] *See supra* para. 102 (providing a non-exhaustive list of aspects of service—both technical and non-technical— that could affect a consumers' ability to receive and effectively utilize broadband internet access service).

1.737 insofar as practicable.[456]  Any resolution reached through such mediation process will be reduced to writing and will be binding only on the parties to the mediation.  The parties to the mediation may agree, if they so choose, to disclose the terms of any resolution to the Enforcement Bureau's Investigations and Hearings Division, but will not be required to do so.  If the parties choose to disclose the terms of the resolution to the Investigations and Hearings Division, the Enforcement Bureau will consider the terms and scope of the resolution in determining whether to initiate an investigation into the matters raised in the informal complaint.  The Enforcement Bureau will not initiate such an investigation until the mediation process has concluded.  This mediation process represents an alternative means of bringing speedy and effective resolution to disputes.

146.     *Advisory Opinions*.  In order to provide greater regulatory certainty and assist covered entities seeking to comply with our rules, we adopt a process to allow any such covered entity to seek an advisory opinion from Commission staff regarding the permissibility of a policy or practice affecting broadband access.[457]  The Commission adopted such an advisory opinion process in 2015 in connection with its open internet rules.[458]  We find today, as the Commission found in 2015,[459] that an advisory opinion process will promote compliance and provide clarity, guidance, and predictability regarding our rules.

147.     Under the process we adopt today, any covered entity may request an advisory opinion regarding the permissibility of its own policies and practices affecting access to broadband internet access service.[460]  The Commission hereby delegates to the Enforcement Bureau the authority to receive such requests and issue such advisory opinions, and we direct the Enforcement Bureau to coordinate closely with other Bureaus and Offices regarding such advisory opinions.  The Enforcement Bureau will have discretion to determine whether to issue an advisory opinion in response to a particular request or group of requests and will inform each requesting entity, in writing, whether the Bureau plans to issue an advisory opinion regarding the matter in question.  The Enforcement Bureau shall decline to issue an advisory opinion if the relevant policy or practice is the subject of a pending government investigation or proceeding.

148.     Covered entities may submit requests for advisory opinions regarding both current and prospective policies and practices affecting broadband access.  However, a request must pertain to a policy or practice that the requesting party is currently utilizing or intends to utilize, rather than a mere possible or hypothetical scenario.  And as a general matter, the Enforcement Bureau will prioritize responses regarding prospective policies and practices intended to ensure compliance with our rules.  The Enforcement Bureau will also prioritize requests involving substantial questions with no clear Commission precedent and/or subject matter involving significant public interest.

149.     When submitting requests, covered entities must include all material information such that Commission staff can make a fully informed determination on the matter.  Requesting parties will also be required to certify that factual representations made to the Enforcement Bureau are truthful, accurate, and do not contain material omissions.  The Enforcement Bureau will have discretion to request

---

[456] 47 CFR § 1.737.

[457] *See, e.g.*, Letter from Caroline Van Wie, AT&T, to Marlene Dortch, Secretary, FCC, GN Docket No. 22-69, at 1 (filed Nov. 8, 2023); Letter from Diana Eisner, Vice President, Policy & Advocacy, USTelecom, to Marlene H. Dortch, Secretary, FCC, GN Docket No. 22-69, at 8 (filed Nov. 8, 2023) (USTelecom Nov. 8 *Ex Parte*); Letter from Randy Clarke, Verizon, to Marlene Dortch, Secretary, FCC, GN Docket No. 22-69, at 2 (filed Nov. 7, 2023).

[458] *2015 Open Internet Order*, 30 FCC Rcd at 5705-09, paras. 228-39.

[459] *Id.* at 5706, para. 229.

[460] As noted in our rules, requests for an advisory opinion may be filed via the Commission's website or with the Office of the Secretary.  Requests must be copied to the Chief of the Enforcement Bureau and the Chief of the Investigations and Hearings Division of the Enforcement Bureau.

additional information from the requesting entity and from other parties that might have relevant information or be impacted by the request. These might include, for example, impacted consumers or state, local, or Tribal governments.

150. Our advisory opinion process will affect covered entities and the Commission's enforcement actions as described below. First, the process is fully voluntary. No covered entity will be rewarded or penalized for seeking an advisory opinion, and the seeking (or not) of an advisory opinion will not itself influence any enforcement-related decision by the Commission. Second, in an advisory opinion, the Enforcement Bureau will issue a determination of whether or not the policy or practice detailed in the request complies with our rules implementing section 60506. If the Bureau determines that a policy or practice currently in effect violates our rules, it may provide in the opinion that it will not take enforcement action within a designated time period if the policy or practice is promptly corrected. Third, a requesting party may rely on an advisory opinion to the extent that its request fully and accurately describes all material facts and circumstances. Fourth, advisory opinions will be issued without prejudice to the Enforcement Bureau's or the Commission's ability to reconsider the questions involved, and rescind the opinion.[461] Should the Enforcement Bureau or Commission rescind a previously-issued advisory opinion, the requesting party must promptly discontinue use of the relevant policy or practice in order to remain in compliance with our rules.

151. The Enforcement Bureau will attempt to respond to requests for advisory opinions as efficiently as possible. We decline to establish firm deadlines, however, because we anticipate that the nature, complexity, and magnitude of requests might vary widely. Furthermore, it may take time for Commission staff to request any additional information needed to issue an opinion. Once issued, the Enforcement Bureau will make the advisory opinion available to the public. And to provide further guidance to industry and consumers, the Bureau will also release the initial request and any additional materials deemed necessary to contextualize the opinion.[462]

152. *Special Advisor for Equal Broadband Access*. As a further measure to provide assistance to stakeholders regarding the rules and new procedures we adopt today, the Commission shall designate a Special Advisor for Equal Broadband Access within the Wireline Competition Bureau to provide neutral technical assistance to all stakeholders. The Special Advisor will provide consumers and their representatives assistance with: understanding the scope and substance of the rules; understanding the process for filing consumer complaints of digital discrimination of access; understanding what information may best assist the agency in fully assessing such complaints; identifying Commission resources that might be helpful to consumers in determining when digital discrimination of access might have occurred and how it can be challenged; addressing questions regarding the voluntary mediation of digital discrimination of access complaints; addressing questions regarding the advisory opinion process outlined above; and interfacing with various Commission components regarding access to broadband internet access service. The Special Advisor will likewise provide industry participants and their representatives assistance with: understanding the scope and substances of the rules; understanding the process for responding to complaints of digital discrimination of access; understanding what information may best assist the agency in fully assessing such responses; identifying Commission resources that might be helpful to industry participants in complying with the rules we adopt today; questions regarding the voluntary mediation of digital discrimination of access complaints; questions regarding seeking advisory opinions regarding policies or practices affecting access to broadband internet access service; and interfacing with various Commission components regarding access to broadband internet access service. The Special Advisor may be designated other responsibilities associated with the digital discrimination of access rules we adopt today and other matters relating to our efforts to ensure equal access to broadband

---

[461] Because advisory opinions would be issue by the Enforcement Bureau, they would also be issued without prejudice to the Commission's right to later rescind or revoke the findings.

[462] Entities may request confidential treatment of certain information, as provided under Commission rules.

internet access service.

153.    *State and Local Enforcement and Private Rights of Action*.  We decline at this time to authorize state and local enforcement of our rules,[463] as some commenters urge.[464]  As explained above, the Commission is taking a self-initiated approach to investigations of digital discrimination of access.  By doing so, the Commission can best establish the contours of what constitutes a violation of our prohibition in a consistent manner.[465]  We also decline at this time to create a private right of action, as we asked about in the *Notice*,[466] and thus find it unnecessary to opine at this time about our authority to do so.[467]

### F.    Differential Impact

154.    We find that in determining when consumers' access to broadband internet service is "differentially impacted," whether intentionally or not, we must account for all comparable elements of service quality, terms and conditions.[468]  Consistent with our discussion above regarding the elements of service covered by our rules, we may compare service availability, service quality, and the terms and conditions of service as between different geographic areas and communities to determine whether digital discrimination of access has occurred.  This may include all technical and non-technical aspects of service in a given area.[469]  We similarly provide ourselves the flexibility to consider any comparable geographic region that may be relevant to an alleged claim of digital discrimination of access.  Finally, the data we use to determine when a policy or practice differentially impacts consumers' access to broadband service will encompass data both from within the Commission and from any outside sources that we consider relevant to evaluating the issues at hand.[470]

155.    We find this scope of inquiry necessary to meet section 60506's equal access goals.  First, we agree with commenters that we must have a flexible and non-exhaustive approach to comparing broadband internet access service, as quality standards and the criteria to measure quality will change over time.[471]  Second, adopting a comprehensive approach is necessary to meet section 60506's aims regarding equal access because "a series of terms and conditions may have [cumulative effects on access]

---

[463] *Notice* at 42-43, para. 76.

[464] *See, e.g.*, Connecticut Office of State Broadband & Office of Consumer Counsel Comments at 5, 7; County of Santa Clara Comments at 3-6; TURN Comments at 29-30; TURN Reply at 25-26.

[465] *See, e.g.*, Free Press Comments at 11-12 (arguing that the Commission should take an incremental approach and massage the process through experience); R Street Institute Reply at 5 (voicing concerns that allowing state and local enforcement of Commission rules may result in a patchwork of inconsistent rules and regulations).

[466] *Notice* at 42-43, para. 76.

[467] *Id*.

[468] *Id.* at 24-31, paras. 44-51.

[469] *Supra* Part III.C.3.a; *see also* Joint Advocates Comments at 2 (suggesting we use a comprehensive means to assess discrimination to meet section 60506's "equal access" goals in the long term).

[470] Contrary to the concerns expressed by some commenters, we do not expect that our digital discrimination of access rules will require covered entities to collect any new data from their customers in order to determine the differential impacts of their policies and practices.  *See* Letter from Randy Clarke, Verizon, to Marlene Dortch, Secretary, FCC, GN Docket No. 22-69, at 3 (filed Nov. 8, 2023) (expressing concern that "broadband service providers would have to collect demographic information from customers for every aspect of their broadband deployment and provision of services" in order to comply with rules);  USTelecom Nov. 8 *Ex Parte* at 6.  Covered entities should be able to make those determinations based solely on data from the U.S. Census Bureau.

[471] Local Governments Comments at 16-17; *see* Lawyers' Committee for Civil Rights Under Law Comments at 23.

even when each may be only slightly onerous on its own."[472]  In other words, failing to have such a flexible approach could lead to our digital discrimination of access rules undermining Congress's intent for enacting section 60506 by "exacerbat[ing] digital discrimination [of access] rather than eliminating it."[473]  Finally, as the record reflects that digital discrimination of access requires assessing a myriad fact patterns, including various technological and non-technological aspects of broadband service, the unique challenges that covered entities face to deploy to certain areas, and that broadband use may vary within local communities, we must adopt a scope of comparability that can holistically assess each claim.[474]  This analytical approach is consistent with the goal to ensure that "all people" benefit from broadband, including those in historically disadvantaged, Tribal, and rural communities.[475]  Our assessment of whether an "offered service" is of comparable quality to that available to other communities will turn on the *capabilities* of the service rather than the particular technology through which the service is offered.[476]  We will focus our analysis on whether the consumer has the equal opportunity to obtain and utilize broadband internet access service of comparable quality on comparable terms and conditions.[477]  In this regard, we are mindful that "comparable" does not mean "identical."[478]

156.    Our approach to comparability is consistent with established civil rights law.  As explained, we will require that covered entities' policies and practices cause the identified disparities, consistent with the reasoning of *Inclusive Communities*.[479]  As these matters are so fact-driven, our inquiry will also be on a case-by-case basis, consistent both with longstanding precedent in civil rights law and our approach to determining feasibility.[480]

157.    We disagree with commenters asserting that a determination of digital discrimination of access need not require the "robust causality" outlined in *Inclusive Communities*.  Some commenters

---

[472] Lawyers' Committee for Civil Rights Under Law Comments at 24; Multicultural Media, Telecom and Internet Council Reply at 6 ("By taking a comprehensive view of what constitutes broadband 'access' and 'quality,' the Commission will help ensure that the goals underlying the Infrastructure Act's antidiscrimination charge are actually met by all the parties who impact these decisions[.]")

[473] Local Governments Comments at 16.

[474] *See, e.g.*, Georgia Tech Center for Advanced Communications Policy Reply at 3 (recommending a holistic approach to defining digital discrimination).

[475] *See* 47 U.S.C. §§ 1701(3), 1754(a)(3).

[476] *See* Verizon Comments at 12 ("The definition of 'access' does not turn on the underlying technology a provider uses; rather, providers may use multiple technological solutions in a given area to provide consumers the 'opportunity to subscribe' to a comparable broadband service. Thus, if a provider were to use a mix of technologies in a given area to provide the 'opportunity to subscribe' — for example, fixed wireless access and fiber-to-the-home solutions — and if those technologies 'provide[d] comparable speeds, capacities, latency, and other quality of service metrics' to each other, and were made available 'for comparable terms and conditions,' the consumers in that area all would have 'access.'").

[477] *See* AT&T May 16, 2022 Comments at 12 (arguing that "comparability should be viewed from the perspective of a reasonable consumer.  For example, any service is 'comparable' to another service with nominally different performance characteristics if most consumers would not find the differences material to their broadband experience. Similarly, two consumers have 'the equal opportunity to subscribe' to comparable broadband services if each can subscribe to at least one provider of such service, irrespective of how many additional providers offer competing services in their respective areas").

[478] *See* NTCA Comments at 2, 10-11 (asking that "[t]he Commission [s]hould [m]ake C[c]ear that '[c]omparable' [d]oes [n]ot [m]ean '[i]dentical,' but [i]nstead '[s]imilar' or '[l]ike'").

[479] *Supra* para. 49; *Inclusive Communities*, 576 U.S. at 542.  We disagree with T-Mobile that the "robust causality requirement simply is not workable in the broadband context[,]" as our flexible approach will allow to consider the factors that go into a provider's investment decisions.  T-Mobile Comments at 19-20.

[480] *See infra* Part III.E.

argue that we should require only a showing of statistical disparity without any evidence that the challenged policies or practices caused the disparity.[481] We disagree. Instead, we agree with those commenters asserting, consistent with *Inclusive Communities*, that sound disparate impact analysis requires a determination that the challenged policies and practices are a contributing cause of the identified differential in access.[482]

### 1. Comparing Technical Terms of Service

158.    We find that our flexible approach to comparability has several advantages when comparing the technical aspects of broadband. First, this approach is consistent with our definition of covered aspects of service.[483] Second, this flexible approach will allow us to account for the "technical realities of provisioning" broadband when comparing technological aspects of services, such as network degradation and upgrades, by encompassing variables that can explain why network performance may be better or worse during certain periods.[484] Third, it will also provide for comparing technical aspects of service that are present in certain technologies and not others, such as wireless service.[485] Finally, this approach will allow our comparability analysis to adapt as technological preferences change over time and account for substitutability.

159.    The record in this proceeding regarding the "substitutability" (and therefore comparability) of broadband service provided through different technologies is mixed. While some commenters argue that the Commission's focus should be on whether the services are comparable in practical terms because section 60506 is "technology neutral,"[486] Public Knowledge cautions that "there are likely to be significant technical variations between different technologies (e.g. wireline vs wireless), such that the default assumption should be that even with stated similarities a service that employs different technology is not comparable."[487] Commenters also disagree on how substitutability should be considered with regard to emerging technologies, as some argue that service provided over fiber lacks a

(Continued from previous page) ─────────────────

[481] *See* National Digital Inclusion Alliance and Common Sense Media Comments at 5 (arguing that, for example, to find digital discrimination has occurred, the "Commission simply must find that households in a low-income neighborhood are paying the same price for DSL that households in more affluent neighborhoods pay for fiber to the home (FTTH) service.").

[482] *See, e.g.*, AT&T Comments at 20-21 (explaining that mere racial imbalance does not create a prima facie case under Supreme Court precedent and requires "robust causality"); NTCA Comments at 14 (explaining that the Court in *Inclusive Communities* "emphasized that 'showing of a statistical disparity' is not sufficient to establish a claim of discriminatory intent"); International Center for Law & Economics Reply at 4 ("Mere statistical correlation between deployment and protected characteristics is insufficient to support a finding of discrimination.").

[483] *Supra* Part III.C.3.a; *see also* Joint Advocates Comments at 2.

[484] *See, e.g.*, National Digital Inclusion Alliance and Common Sense Media Comments at 8 (explaining that "some circumstances may temporarily create 'differential impact' like network outages and periods of network degradation"); Public Knowledge et al. Comments at 64 (positing that "service outages and interruptions are inevitable due to natural conditions as well as the practicalities of network operation, maintenance, and improvement, and need not be factored in overall network performance for the purpose of comparability").

[485] CTIA Comments at 5 (explaining that wireless service is different from fixed technologies that deliver broadband in important ways, such as the nature of deployments, cell sites covering more than a single location, coverage depending on location and use case, amongst others).

[486] Public Knowledge et al. Comments at 64 (arguing additionally that the Commission should view this inquiry from the customer's perspective and whether their user experience is impacted); Verizon Comments at 12 (supporting the Commission finding that a consumer has "equal access" if a provider uses multiple technologies in a given area because the definition of "equal access" does not turn on the underlying technology used).

[487] Public Knowledge et al. Comments at 64.

substitute[488] and others suggest the opposite.[489]  The range of views on the record counsels that the Commission should take an approach to comparing technical aspects of service that can accommodate the unique considerations of each alleged instance of digital discrimination of access.  The holistic and flexible approach to comparability and substitutability we describe today is consistent with that aim.

160.       We decline to establish at this time a prescriptive range or standard for comparing technical aspects of service.[490]  We are not persuaded by commenters who suggest that we must take a prescriptive approach to comparing technical aspects of service because greater certainty is necessary to promote deployment.[491]  There are simply too many potentially relevant technical variables to each claim to suggest that a prescriptive approach could be practically administered or complied with.  We agree with commenters that the varying technologies and services used to deliver broadband "have different natures and capabilities and should thus be evaluated independently using relevant performance metrics."[492]  Adding to this complexity, we acknowledge commenters' perspective that, while service interruptions may occasionally occur due to events such as network outages or network maintenance,[493] significant or "chronic" network outages are red flags for possible digital discrimination of access.[494]  Our

(Continued from previous page) ———————————————

[488] Joint Advocates Comments at 10-11 (arguing that "[i]f the goal is equal access, the transmission medium that stands at the heart of all high-speed services (both wireless and wired) without exception is fiber optics[]" because "[d]igital discrimination in the 21st century will be driven by where ISPs choose to deploy fiber within their network and, more importantly, where they are not.").

[489] R Street Institute Comments at 3 (arguing the Commission should not take a "one-size-fits-all" approach to closing the digital divide because new entrants using a variety of technologies, such as fixed and mobile wireless and satellite technologies, to access broadband, suggest that "more and more Americans are accessing broadband"); Block Communications, Inc. Reply at 7 ("Customers' access to high-speed broadband is not impaired in communities where fiber-to-the-home facilities are not yet deployed.").

[490] Public Knowledge et al. Comments at 64 ("The Commission should identify and establish a prescriptive range of permissible variability in key quality of service metrics, supported by empirical data from existing networks."); American Action Forum Comments at 5-6 (suggesting we "should clearly define the types of deployment patterns that would give rise to liability"); NMHC and NAA Comments at 18 (asking we define "comparable broadband service" to mean "an FCC-defined speed that is available everywhere in the provider's service area at the same price"); Rosa Mendoza et al. Reply at 2 (rec. Apr. 19, 2023) (ALLvanza et al.) ("[W]e we believe in establishing clear and enforceable standards for service quality."); California Public Utilities Commission Comments at 13 ("To ensure that consumers are adequately protected, the FCC must hold all broadband providers accountable by evaluating and setting standards for: (1) service quality, (2) customer- complaint tracking, and (3) deployment policies, practices, and records to ensure that there is no disparate impact or differential treatment. The FCC should set a baseline level of broadband speed and allow state governments to define affordable rates for this baseline tier of service."); Local Governments at 16-17 (asking the Commission to adopt a measurable and evolving quality of service rule).

[491] *See* American Action Forum Comments at 5-6 (suggesting without certainty providers would not deploy their networks); NMHC and NAA Comments at 18.

[492] National Digital Inclusion Alliance and Common Sense Media Comments at 6.  The approach we adopt is consistent with *Orloff v. FCC*, 352 F.3d 415, 420 (D.C. Cir. 2003); contra Carr Dissent at 4. Indeed, the court in *Orloff* itself pointed out that wireless carriers, even in a competitive market, still "cannot 'decline to serve any particular demographic group (*e.g.*, customers who are of a certain race or income bracket).'" 352 F.3d at 420 (quoting *Orloff v. Vodafone Airtouch Licenses LLC*, 17 FCC Rcd.8987, 8997 (2002)). The ability of wireless carriers generally to provide sales concessions to some customers and not others without being held to have engaged in "unjust and unreasonable discrimination" within the meaning of section 201 and 202 of the Communications Act, *see id.*, Carr Dissent at 4, does not mean that broadband providers may discriminate between customers on the basis of the characteristics protected by section 60506.

[493] *Id.* at 8 ("In these situations, the affected ISP should face relaxed standards of digital discrimination."); Public Knowledge et al. Comments at 64 (positing that "service outages and interruptions are inevitable due to natural conditions as well as the practicalities of network operation, maintenance, and improvement, and need not be factored in overall network performance for the purpose of comparability").

flexible approach will provide for these considerations while avoiding a situation where our technical comparability analysis becomes outdated, the range or scope of comparability becomes too broad or narrow, or our analysis is otherwise ill-suited for the service, service elements, or service terms being compared.[495] We similarly disagree with commenters who assert that standards are necessary to ensure that our rules adequately protect consumers,[496] as our flexible approach does so by "future proofing" our rules as standards change over time.[497]

161. We decline to require network performance testing at this time.[498] As the record is mixed on the issue and such testing is not necessary to accomplish our immediate objectives, we find that adopting a network testing requirement at this time would be premature. While Public Knowledge argues we should adopt network testing requirements similar to those in the universal service context,[499] USTelecom opposes network testing because it is "unjustified as a matter of law, unnecessary, and unduly burdensome."[500]

### 2. Comparing Non-Technical Terms of Service

162. We find that our flexible approach to comparability likewise has several advantages for comparing non-technical elements of broadband service. First, this approach is consistent with the inclusive scope of our definition of covered elements of service.[501] Second, this flexible approach allows us to assess holistically whether and how non-technical aspects of service may vary based on protected status.[502] Third, allowing comparison of a broad range of services, service elements, and terms of service

---

[494] National Digital Inclusion Alliance and Common Sense Media Comments at 8 ("However, when these issues become chronic, they may indicate a pattern of unequal investment and should be considered discriminatory"); Public Knowledge et al. Comments at 64 (arguing that outages occur more often or service interruptions are longer in one geographic location, that could not be comparable service).

[495] *See* ALLvanza et al. Reply at 2 (cautioning against passing complex regulations because "that would create new barriers to entry for small and emerging broadband providers"); California Public Utilities Commission Comments at 13.

[496] California Public Utilities Commission Comments at 13; Local Governments at 16-17 ("Cable franchising has shown that clear standards and requirements are essential to ensuring that deployment and upgrades provide uniform, equal access to the same quality of services throughout a community."); *see also* WISPA Comments (cautioning that the Commission must "account for financial and technical considerations specific to [a] provider and its network" when considering the provider's policies and practices and not hamper competition).

[497] Lawyers' Committee for Civil Rights Under Law Comments at 24; New York State Public Service Commission Comments at 3 (urging the Commission to "ensure that any final rules are flexible so that they are not rendered obsolete over time"); *see* National Digital Inclusion Alliance Comments at 9 ("We encourage the Commission to review and reassess both the technical and nontechnical standards on a biennial basis, at a minimum"); ACLU Reply at 5-6 (providing that we should regularly reassess which metrics are most important "so that outdated metrics do not hamstring protected classes' internet experience").

[498] *Notice* at 26, para 46.

[499] Public Knowledge May 16, 2022 Comments at 7-8 (arguing that testing similar to that used in the universal service context would help the Commission in our comparability analysis).

[500] USTelecom Comments at 51-52 (explaining that it also is unnecessary since Congress chose the Consumer Broadband Label requirement as the method that providers should use to disclose information about their networks).

[501] *Supra* Part III.C.3.a.

[502] Lawyers' Committee for Civil Rights Under Law Comments at 23-24 (providing examples of how various technical and non-technical aspects of service could impact and access and explaining that "[e]ach policy, practice, or provision on its own may have a subtle whittling effect on the number of people able to obtain and maintain broadband access, especially lower-income consumers."); National Digital Inclusion Alliance and Common Sense Media Comments at 9 ("For non-technical aspects, the Commission should consider practices that create additional

(continued….)

allows the Commission to evaluate non-technical terms of service across covered entities.[503]

163.     We decline to establish a prescriptive standard to compare non-technical aspects of service.  Commenters suggest that the Commission should provide different comparability standards when comparing non-technical aspects of service offered by the same covered entity and non-technical aspects of service offered by different covered entities.[504]  Commenters also suggest that for services offered by the same covered entity, we should establish that all customer groups in the same area must have the opportunity to receive the same service on the same terms and conditions.[505]  Adopting this assumption, however, would not give proper weight to the feasibility analysis we adopt for claims of digital discrimination of access.[506]  We agree that "comparing across providers on non-technical factors is considerably more challenging" because "there are compelling competition reasons for different providers to have different terms of service or approaches to customer service."[507]  Nevertheless, our more flexible approach of considering all available information will allow the Commission to determine whether non-technical aspects of service across different covered entities in certain circumstances will provide useful evidence of reasonably available alternative practices.

### 3.     Geographic Comparability

164.     Section 60506(a)(2) defines "equal access" as the equal opportunity to subscribe to an offered service of comparable service "in a given area . . . ."  Thus, when determining whether challenged policies and practices differentially impact access to broadband based on the listed characteristics, to the greatest extent possible, we must compare the service quality and terms and conditions of service in defined geographic areas that are appropriate and reasonably comparable in all respects other than the demographic characteristic(s) giving rise to the digital discrimination of access claim.

165.     We find that we must adopt a broad and flexible approach to assess geographic comparability in this context.[508]  This is consistent with our approach to comparing technical and non-technical aspects of service.  And, as Congress did not define "a given area" in section 60506(a)(2) nor anywhere else in the statute, we agree with commenters that we should determine the appropriate "given area" for an alleged instance of digital discrimination of access on a case-by-case basis.[509]  The record reflects a variety of suggestions and relevant considerations for determining an appropriate geographic area for comparison of service quality and terms, providing that a flexible, case-by-case approach is both necessary and appropriate.  First, commenters suggested a variety of geographic areas may be appropriate depending on the context, including the Nation as a whole, states, counties, metropolitan statistical areas,

---

burdens on some individuals and not others (e.g., where credit checks are required) or provisions that result in more favorable terms for some individuals or groups (e.g., flexibility with contracts).").

[503] *See* Public Knowledge et al. Comments at 65 (explaining that comparisons across providers for non-technical aspects of service is only necessary when conducting substitutability analysis).

[504] Public Knowledge et al. Comments at 64-65.

[505] *Id*.

[506] *Supra* Part III.E.

[507] Public Knowledge et al. Comments at 65.

[508] *Notice* at 27, para. 48.

[509] *See, e.g.*, Lawyers' Committee for Civil Rights Under Law Comments at 25-27 (arguing that "the Commission should recognize that there may not be a one-size-fits-all definition of geographic area that works for all types of digital discrimination [of access]" so we should "consider the totality of the circumstances when determining the appropriate geographic area"); Verizon Comments at 19 ("The Commission should refrain from adopting a blanket definition of a 'given area,' such as one based on a defined geography, outside of the context of a specific complaint."); Verizon Reply at 8 (positing that "the Commission should determine the relevant area for comparison on a case-by-case basis"); WISPA Reply at 17-19 (suggesting we take a "totality of the circumstances" approach to our deliberations).

and census blocks, among others.[510]  Second, the record reflects that there are a variety of factors to consider to determine what area is appropriate to analyze a digital discrimination of access claim.  For example, with respect to covered entities in particular, the record reflects that the geographic area that is appropriate may differ depending on the type of covered entity, such as a cable operator operating under a franchise agreement or an ILEC operating under a license area; the covered entity's size; or the type of broadband technology used to provide the service, such as fiber to the home or fixed wireless service.[511]  Third, though we find that we should compare similar geographic areas to assess claims of digital discrimination of access, the record also includes a variety of suggestions on how we should determine what the relevant geographic area is.  For example, commenters suggest that we consider five factors to determine the correct area, while others generally suggest we use relevant geographic comparators, such as how close areas are to each other, changes in terrain, the cost of deployment, and whether the given area is rural or urban.[512]  As such, we will evaluate each claim holistically and determine what "given area" is appropriate based on the facts presented.  Finally, our flexible, case-by-case approach to determining geographic comparability is consistent with our approach to determining feasibility.  In both determinations, we adopt a flexible approach to account for the challenges of providing service to particular geographic areas, such as topography, population density, and other potential technical and

---

[510] *See, e.g.*, AT&T Comments at 21-22 (suggesting that "robust causality" requirement in *Inclusive Communities* provides that we must "requires aligning the geographic scope of any data analysis with the geographic scope of the relevant ISP deployment policy" and that "if an ISP implements a single Nationally coordinated policy across its broadband service area, as AT&T does, the demographic effects of that policy must be analyzed on a service-area-wide basis"); Public Knowledge et al. Comments at 4, 48 (suggesting that if a provider is not licensed, we consider refining a given area to census blocks within a metropolitan or micropolitan statistical area and county boundaries in rural areas); National Digital Inclusion Alliance and Common Sense Media Comments at 10 (suggesting that we consider a factor to determining the appropriate area for comparison to be a provider's legally defined service area, such as a franchise area, service area, or license area, but that we generally "use the most granular feasible geographic unit"); ACA Connects Reply at 16 (asking that we consider a "given area" to be a provider's "service area[]"); Lumen Reply at 19 (arguing that "the Commission should weigh broader (e.g. Nationwide) geographical comparisons that consider all broadband options available in a relevant area and whether there is a lack of equal access or digital discrimination" and citing to AT&T Comments at 7-8, 21-22, 31-32).

[511] Free Press at 33 & n.69 (explaining that cable multiple system operators operate under a franchise agreement while incumbent providers do not and that "[w]here the concept of service area most requires flexibility and case-by-case examination is for wireless services, particularly fixed wireless, since it is point-to-point (i.e., a distribution antenna to a particular end user)."); Public Knowledge et al. Comments at 4, 48 (reiterating "that for those ISPs already subject to a franchise area or license area for a non-broadband services, the franchise or license area is the appropriate 'service area' for the statute. Where the ISP does not have a license or franchise area, the Commission should consider (in the case of large providers) using the Metropolitan Statistical Area (MSA) where appropriate. The Commission should be cautious when addressing complaints against smaller providers or providers restricted to a particular service area by law.").

[512] National Digital Inclusion Alliance and Common Sense Media Comments at 9-10 (suggesting we consider a "[p]roviders' legally defined service area, be it a franchise area, service area or license area; [m]etropolitan/micropolitan statistical area in which the provider offers service (collectively referred to as core-based statistical area (CBSA)) where they exist, and in given county for areas outside of CBSAs; [a]rea in which providers suggests they offer (or could offer) service, as evidenced by marketing material, service area attestations to federal, state or local agencies (e.g. FCC BDC), grant applications, and other documented information; [i]nput from local stakeholders which is vital to closing the digital divide; [and] [g]eographic continuity, i.e. providers should offer an economic or technical rationale for any "holes" in their coverage that leave some households with worse service than those in the surrounding area"); NCTA Comments at 11 (arguing that "the Commission should compare similarly situated areas within the same general geographic area when analyzing broadband deployment, with greater analytical weight given to a comparison of areas that are in close proximity", and that we should not compare a provider's offerings in different cities or states if there are differences in terrain, costs of deployment, or other importance differences).

economic barriers to providing broadband service.[513]

166. We agree with Verizon that those filing digital discrimination of access complaints should, if possible, identify the given area where the alleged digital discrimination of access occurs.[514] But given that many informal complaints may be filed by members of the public based on their own experiences with broadband access and have little or no information as to how widely their experiences might be shared by others, we will not require precision in this regard. If the informal complaint gives the Commission enough information to determine the nature of the alleged violation and where the alleged violation occurred, that may be sufficient for the Commission to determine whether further inquiry is warranted. Moreover, we will not, as some have suggested, limit our investigations to the four corners of the informal complaint, examining only the policies and practices and the geographic areas identified therein. Rather, the informal complaint will be used as a starting point, a basis for determining whether to seek further information from the complainant, require a response from the covered entity involved, determine whether there are similar complaints forming a pattern, or take some other appropriate action. We understand that many of the comments suggesting that we apply strict "pleading" standards to complaints of digital discrimination of access are premised on the assumption (or possibility) that the Commission would adopt a formal complaint process akin to section 208 of the Communications Act and our rules implementing that section. As we have elected not to adopt such a formal complaint procedure at this time, we will provide maximum flexibility to persons filing informal complaints and will review such informal complaints as liberally and generously as possible to achieve the purposes of the statute as expeditiously as possible.

### 4. Data to Analyze Differential Impact

167. We will avail ourselves of all relevant Commission and external data collections to help us evaluate when access to broadband has been differentially impacted based on a protected characteristic. As in the record compiled in response to the *Notice of Inquiry*, commenters to the *Notice* highlighted various studies and provided a robust debate as to whether the studies were well grounded and whether they agreed with their conclusions.[515] For example, though some commenters continue to argue that certain studies remain convincing examples of digital discrimination of access,[516] others argue that they downplay or ignore important facts or have been successfully rebutted.[517] Commenters also cite a

(Continued from previous page) ─────────────────────────

[513] *Supra* Part III.A.2; WISPA Reply at 17-20 (arguing that the Commission must be flexible in their analysis because "providers in different areas may face different considerations including topography, population density, permitting, supply chain challenges, skilled labor availability limitations, and access issues, all of which go into buildout decisions"); CTIA Comments at 18 (providing that "certain service areas are subject to unreasonable state or local permitting, historical preservation laws, or other unreasonable barriers to entry"); USTelecom Reply at 19 ("In any evaluation of complaints, the Commission should take care to evaluate claims in the full context of a provider's plans and broadly examine the challenged deployment policy, rather than cherry-picking individual localities."); Asian American Advancing Justice Comments at 4 (discussing the unique challenges that American Samoa faces to connectivity because it requires undersea cable).

[514] Verizon Comments at 19; Verizon Reply at 8.

[515] *Notice* at 30, para. 51.

[516] *See, e.g.*, National Digital Inclusion Alliance and Common Sense Media Comments at 13 (continuing to encourage the Commission to review *The Markup* article); Common Sense et al. at 3-6 (refuting AT&T's claims regarding *The Markup* article); Joint Advocates at 35 (providing that *The Markup* article is evidence that the copper and fiber in AT&T's network is segregated by income and race).

[517] *See, e.g.*, AT&T Comments at 28-29, 31-32 (stating that *The Markup* article is flawed because it ignores cable providers and can be refuted with information from the Commission's mapping fabric and finding that studies from the NDIA, USC Annenberg, Free Press, CWA, and Greenlining Institute are flawed); ACA Connects Reply at 7-8 (agreeing with AT&T's criticism of *The Markup* article); Free State Foundation at 6-7 (finding that *The Markup*, USC Annenberg, and NDIA Cleveland Redlining studies have major shortcomings); NDIA Comments at 11 (refuting the ITIF study "Broadband Myths: Do ISPs Engage in Digital Redlining?").

variety of other studies or sources of data as evidence that may help demonstrate or refute that digital discrimination of access actually exists.[518]  As the record is mixed and does not conclusively indicate that some sources of data are more robust or helpful than others, we will evaluate all data relevant to a claim of digital discrimination of access on a case-by-case basis, including all Commission and external data sources and studies.[519]

168.     With particular respect to Commission data collections, the record reflects there could be many productive ways for us to use them both individually and in conjunction with other sources of data.  Commenters suggest, for example, that we could analyze data from Commission broadband maps, broadband consumer labels, the Affordable Connectivity Program, the Lifeline program, or the Consumer Complaint Center to identify possible violations of our rules, identify possible subjects of investigation, or highlight existing disparities in deployment.[520]  Commission data collections coupled with data collected outside the Commission could also provide helpful insight.  For example, comments advise that cross referencing and overlaying various data sets,[521] using state broadband maps or Census Bureau

---

[518] *See, e.g.*, California Public Utilities Commission Comments at 12, 17, Appx. A (providing analysis that it purports to demonstrate a disparate impact amongst the two largest broadband providers in California); NCTA Comments at 33 ("In fact, according to a 2022 NTIA survey, a leading reason provided by Americans who have not adopted broadband is that they 'don't need' or are 'not interested' in subscribing to available broadband service."); R Street Institute Comments at 4 (discussing a GAO report that found nearly a third of households with access to broadband do not subscribe to it); Greenlining Institute at 4 (referencing a 2014 GAO study on usage-based pricing that show the particular burdens such an approach causes for low income consumers); NDIA Comments at 11, 13 (refuting an ITIF study believing that research from Consumer Reports, the California Community Foundation, and *The Markup* article could be helpful to the Commission).

[519] Leadership Conference on Civil and Human Rights et al. Comments at 7 (suggesting that we should "look to external data sources and studies to evaluate claims of digital discrimination and inform Commission's efforts"); NTIA *Ex Parte* at 16-17 (recommending "that the Commission remain open to evaluating all evidence, including external academic studies, on the merits" and that commenters asking that we "preemptively rule out the use of outside research in digital discrimination inquiries seem to misunderstand the nature of these studies and how they might be used in practice").  Moreover, as to the existence (or not) of digital discrimination of access, we simply note that Congress directed the Commission to adopt rules on a short deadline to "prevent" and identify steps to "eliminate" digital discrimination of access.  Arguments that such discrimination does not occur or does not exist should have been directed to Congress.  The Commission's charge is to execute on the mandate we were given by Congress, and we intend to do that.

[520] *See, e.g.*, Leadership Conference on Civil and Human Rights et al. Comments at 7; CTIA Comments at 17 (suggesting that the Commission should take into account technical and economic feasibility, in part, by relying on new broadband maps and other existing sources of data); NCTA Comments at 33 (suggesting that "[t]he Broadband DATA map, coupled with the Broadband Deployment Locations map, will provide the key authoritative and objective basis with which to assess broadband deployment" and that the Commission could leverage Form 477 data and information from the broadband consumer labels proceeding); U.S. Chamber of Commerce at 6 (arguing that the Commission should use the "informal consumer complaints [and]. . . the Broadband Data Collection Program to highlight any broadband deployment disparities"); USTelecom Comments at 15-16 (suggesting we track where federal subsidies are being used to deploy broadband, which is required section 60105 of the Infrastructure Act and we could use it in Commission maps to identify low-income or racially diverse areas lacking access to broadband); Benefits Data Trust Comments at 2 (offering the suggestion that we "conduct [our] own data analysis of discriminatory broadband pricing"); California Emerging Technology Fund Comments at 6 (suggesting we not rely on mapping data but performance based metrics instead); Verizon Comments at 31 (suggesting the BDC and broadband consumer labels provide enough information to analyze claims of digital discrimination of access).

[521] *See, e.g.*, National Urban League et al. Reply at 5-6 (arguing that the Commission should use many data sets and that "[t]his will require not only collecting and utilizing the data in enforcement, but also cross-referencing and overlaying the different data sets."; Leadership Conference on Civil and Human Rights et al. Comments at 7 (suggesting that studies that follow the rulemaking could be "overlayed with internal FCC data"); NCTA Comments at 33 (suggesting we cross reference Form 477 data and information from broadband consumer labels with Census data).

information in conjunction with Commission maps,[522] or comparing information submitted to the Commission, state, or local agencies with information a covered entity publishes regarding their service, could also help the Commission assess digital discrimination of access claims.[523]

169.    The Commission may also require new data collection in the future that could be helpful to analyzing comparability.  As explained in the accompanying *Further Notice*, we propose to make new data available through an annual supplement to the BDC.[524]  Our proposed annual supplement would report (on a state-by-state basis) all major deployment, upgrade and maintenance projects completed or substantially completed in the preceding calendar year, including the nature and size of the project and identification of the communities served by the project, and could be useful to our comparability analysis if adopted.[525]  We also propose requiring covered entities to implement internal compliance programs that would require covered entities to identify the communities served by recently completed, pending and planned major projects, conduct comparability analysis, and identify whether relevant policies and practices are differentially impacting consumers' access to broadband.[526]  This would require covered entities to conduct project evaluations, analyze their policies and practices, and conduct other internal monitoring and auditing that could help remove "invisible" impediments to equal broadband access.[527]

170.    We decline at this time to modify current Commission data collections or undertake new data collections.  Various commenters suggest that we modify Commission data collections to aid our analysis of possible digital discrimination of access, such as by undertaking a new data collection under the Affordable Connectivity Program to allow for disaggregation of program participants by demographic group, or modifying broadband maps so consumers could more easily determine if they have "comparable" broadband service at their street address.[528]  Commenters also suggest we should collect

---

[522] Leadership Conference on Civil and Human Rights et al. Comments at 7 (arguing that we should use state and federal resources and that "[s]tate broadband maps used in combination with the FCC's maps can help the [C]ommission find areas of particular concern when there are discrepancies in federal and state data").

[523] National Digital Inclusion Alliance and Common Sense Media Comments at 10 (suggesting that factor the Commission should consider to determine the geographic area to analyze an alleged claim of digital discrimination of access should be "[t]he area in which the provider suggests they offer (or could offer) service, as evidenced by marketing material; service area attestations to federal, state, or local agencies (e.g., FCC BDC); grant applications; and other documented information").

[524] *Notice* at 30, para. 51 ("What steps can the Commission take, including making new data available, to enable individuals and communities to identify digital discrimination of access?").

[525] *Infra* Part IV.A.1.

[526] *Infra* Part IV.A.2.

[527] *Id.*

[528] *See, e.g.*, Benefits Data Trust Comments at 2, 7-8 (suggesting we consider following data collection guidance from the Office of Management and Budget when collecting this data to identify trends and inform our analysis of digital discrimination of access and how to address it); NMHC and NAA Comments at vi, 19 ("[M]ore work needs to be done to improve the broadband maps, so that potential subscribers can readily determine which provider or providers deliver "comparable" service[] not just [in] the general area in which they live[.]"); Asian Americans Advancing Justice Comments at 2 ("There are very few digital divide studies that include AAPIs in their analysis, and the few that do fail to address the needs and challenges that lower income and non-English speaking groups face,[.]"); Greenlining Institute Comments at 7 (recommending we collect additional consumer level data providers with the goal of having increased granularity in the data collected to identify instances of digital discrimination of access); Joint Advocates at 29 (arguing that the Commission should collect more varied sets of data from a greater variety of sources, as well as collect information on pricing and contractual terms and conditions and overlay it with US Census data, as we cannot do this with the information currently collected); WISPA Comments at 23-24 (arguing that we "should add layers to the Broadband Serviceable Location Fabric that will help [the Commission's] [b]roadband [m]aps readily identify areas where the digital divide persists").

new data to compare advertised and charged pricing.[529]  Since the Commission currently has at its disposal a number of data collections and potential data sources that may assist in our analysis of digital discrimination of access claims, it is unclear whether a new data collection's burdens would outweigh its potential benefits.[530]  As we gain greater experience investigating digital discrimination of access claims, we will evaluate the adequacy of current data collections and other data sources and will determine whether new data collections or modifications of existing data collections might be warranted.[531]

### G.    Other Issues

171.    At this time, we decline to take action in the other policy areas identified in the record where there is possible intersection with the issues we address in this proceeding.  In the *Notice*, we invited comment on various record proposals, including potential action in different Commission proceedings, which could potentially help the Commission fulfill our statutory mandate.[532]  We received numerous proposals that address action we can take on Tribal lands, possible outreach efforts, and organizational changes we should make to promote our efforts to combat digital discrimination of access.[533]  In addition, commenters suggested further action related to broadband service in multiple tenant environments (MTEs),[534] spectrum availability,[535] spectrum policy,[536] the Affordable Connectivity

---

[529] *See, e.g.*, Free Press Comments at 17-18 (arguing that collecting data on advertised prices and the prices actually charged to consumers could reveal discriminatory conduct).

[530] *See, e.g.*, NCTA Comments at 33 ("To assess the state of broadband access, the Commission should rely on existing data collections and not impose duplicative and burdensome new data collections for the purposes of this proceeding.  The Commission already has numerous tools for determining the availability and quality of service of broadband offerings."); CTIA Comments at 17 (suggesting that we rely on the BDC and other current data collections because a new data collection "would be premature and impose unnecessary economic burdens"); USTelecom Reply at 22 (agreeing with NCTA that "the Commission already has numerous tools for determining the availability and quality of service of broadband offerings" and arguing that we should not collecting pricing data); Verizon Reply at 24-25 (arguing we should not impose a new data collection because the Commission has sufficient information between the BDC and broadband consumer labels to conduct comparability analysis to assess claims of digital discrimination of access).

[531] *See* Americans for Tax Reform and Digital Liberty Comments at 4-5 (providing that it could not find data to indicate that adoption rates are lower due to income and that the Commission should consider collecting information on adoption, but that this data should be available to us by analyzing mapping data in conjunction with US Census data); TURN Reply at 14-15 (explaining that current information collections are helpful but have reliability issues).  We note that commenters disagree as to the authority that broadband consumer labels provide for imposing a new BDC.  *See* USTelecom Comments at 33 (arguing that we cannot rely on broadband consumer labels as a source of authority); Free Press Reply at 14 (disagreeing with USTelecom's reasoning and explaining that broadband consumer labels does not preclude the Commission from collecting new data to uncover and understand instances of digital discrimination of access).

[532] *Notice* at 45-47, paras. 83-86.

[533] *See* Public Knowledge et al. Comments at 77-79 (recommending several steps that can be taken to eliminate digital discrimination on Tribal lands); WISPA Reply at 33 (suggesting the Commission "make its Enhanced Competition Incentive Program ("ECIP") mandatory," to help address digital discrimination on Tribal lands).

[534] *See* INCOMPAS Reply at 7-9 (arguing that the Commission "must continue to address provisions and practices that have erected market entry barriers in MTEs" that prevent competition); WISPA Comments at 25-29; City and County of San Francisco Reply at 1-2; TechFreedom Comments at 47-48; Lumen Reply at 14-15; Public Knowledge et al. Comments at 72-73; National Urban League et al. Reply at 3-4.  *But see* NMHC and NAA Comments at 22-24 (writing that further action on MTE's is not required nor advisable).

[535] CTIA Comments at 14-15 (suggesting that the replenish spectrum pipeline and improve federal spectrum coordination); TechFreedom Comments at 47-48; T-Mobile Comments at 21-23.

[536] Public Knowledge et al. Comments at 66-72 (suggesting various spectrum-related policies for the Commission to address digital discrimination of access).

Program,[537] other Commission funding programs,[538] the Commission's broadband speed benchmark,[539] the BDC maps,[540] and various suggestions that commenters argue would aid infrastructure deployment,[541] such as revising the Commission's rules for small wireless facilities,[542] pole attachments,[543] section 214 discontinuances,[544] and cable franchising,[545] and addressing other local and federal regulatory barriers.[546]

---

[537] U.S. Chamber of Commerce Comments at 8 ("[T]he Commission should focus on the fact that the Affordable Connectivity Program ('ACP') is expected to run out of funds sometime in the next year, and should prioritize working with Congress to ensure that the ACP is extended."); American Association of People with Disabilities Comments at 4 (encouraging Commission to "examine ways that the ACP could be used to cover devices, particularly assistive technology for disabled people."); R Street Institute Comments at 3; National Urban League et al. Reply at 5.

[538] *See* CTIA Comments at 14-15 (suggesting that under existing authority the Commission prioritize USF support to "areas within the categories identified by section 60506 where market forces alone have proven insufficient."); Public Knowledge et al. Comments at 73-77 (suggesting the Commission use the E-Rate and High-Cost programs to combat digital discrimination); ACA Connects Comments at 7-8; TechFreedom Comments at 47-48; R Street Institute Comments at 3; ACLU Reply at 17-18; California Public Utilities Commission Comments at 15; Free Press Comments at 34-35; American Association of People with Disabilities Reply at 10-12 (rec. Apr. 20, 2023).

[539] National League of Cities Comments at 3 (suggesting that the Commission "revisit its broadband speed definition"); American Association of People with Disabilities Reply at 7-8.

[540] USTelecom Comments at 14-15 (suggesting that the Commission can remove barriers to deployment by "[c]ontinuing to improve the Broadband Data Collection . . . maps regarding broadband availability"); NMHC and NAA Comments at 19-22.

[541] *See* Joint Advocates Comments at 33-35 (asking that the Commission revisit its copper requirement policies and also reverse the elimination of certain unbundling requirements related to fiber deployments in the *Modernizing Unbundling and Resale Requirements in an Era of Next-Generation Networks and Services*, WC Docket No. 19-308, Report and Order, 35 FCC Rcd 12425 (2020)).

[542] *See* National League of Cities Comments at 4 (suggesting the Commission revisit the September 2018 *Declaratory Ruling and Third Report and Order* on small wireless facilities because the Commission "encroach[ed] on local governments' leverage to require or incentivize broadband infrastructure deployment by inappropriately limiting local franchises and permitting processes."); Local Governments Comments at 4; North Suburban Communications Commission Reply at 2-3; *see also* TechFreedom Comments at 47-48 (recommending that the Commission "mak[e] 5G deployment easier")*; but see* INCOMPAS Reply at 9-12 ("If the FCC were to repeal or revise the Declaratory Ruling, it would erect new barriers to deployment, which would conflict with the Commission's goal of increasing digital access.").

[543] INCOMPAS Reply at 6 (identifying pole attachments as a "significant barrier to deployment" for is members); TechFreedom Comments at 47-48; T-Mobile Comments at 22-23.

[544] USTelecom Comments at 14-15 (suggesting the Commission "[revise] the [s]ection 214 discontinuance process in locations where there are government funded competitors to better reflect current network and market conditions and working with states to remove carrier of last resort ('COLR'), eligible telecommunications carrier, and other similar obligations in similar circumstances").

[545] *See* National League of Cities Comments at 4 (suggesting that the Commission revisit *Implementation of Section 621(a)(1) of the Cable Communications Policy Act of 1984 as Amended by the Cable Television Consumer Protection and Competition Act of 1992*, MB Docket No. 05-311, Third Report and Order, 34 FCC Rcd 6844 (2019)); Local Governments Comments at 4; North Suburban Communications Commission Reply at 2-3.

[546] CTIA Comments at 15 ("Eas[e] infrastructure deployment, including through streamlining permitting"); Lumen Reply at 15 (suggesting that the Commission consider "targeted preemption and other potential reforms to legacy state laws and practices that hinder deployment."); T-Mobile Comments at 22-23; U.S. Chamber of Commerce Comments at 8; USTelecom Comments at 14-15; Block Communications, Inc. Reply at 5; INCOMPAS Reply at 6-7; TechFreedom Comments at 47-48; ACA Connects Comments at 7-8. *But see* National League of Cities Comments at 4 (urging the Commission to "to preserve and strengthen local governments' permitting, rights of way management, and franchise processes").

The Commission's primary focus at this time is to implement effective rules to address digital discrimination of access within the deadline set by Congress. However, we will continue to consider the thoughtful proposals on the record that are not addressed in other sections of this *Report and Order* or in the accompanying *Further Notice*. Our decision to refrain from taking further steps today in those proposals does not reflect any policy or legal conclusions regarding these matters.[547]

172. Although we are not adopting any other record proposals at this time, we note that states and localities can rely on several resources made available to them to address digital equity, such as the Infrastructure Act's broadband funding for states, the National Broadband Map, and the Broadband Funding Map. First, we recommend that states and localities tap in fully to the funding allocated to states and localities to address broadband equity. On June 26, 2023, NTIA announced how it allocated funding to all 50 states, the District of Columbia, and five U.S. territories to deploy affordable, reliable high-speed internet service to everyone in America.[548] States and other jurisdictions will use funding from the Infrastructure Act's $42.45 billion Broadband Equity, Access, and Deployment (BEAD) program to administer grant programs within their borders.[549] We strongly encourage states and other jurisdictions to make full use of the available BEAD funding in order to expand broadband access in hard-to-build areas, increase broadband affordability, and strengthen digital literacy within their respective borders. While these issues are distinct from digital discrimination of access as we have defined it, full utilization of BEAD funding might reduce the instances in which consumers believe they are experiencing digital discrimination of access and thus reduce the burdens on industry participants and the Commission in addressing digital discrimination of access claims.

173. Second, in addition to the CEDC recommendations discussed below,[550] we recommend that states and localities utilize the National Broadband Map to identify unserved and underserved communities. We find, based on the record, that states and localities could benefit from available resources to help them identify unserved and underserved communities and develop solutions to address digital discrimination of access.[551] The National Broadband Map displays where broadband internet

---

[547] Some commenters, in addition to advocating for the Commission to expand upon the listed characteristics Congress included in section 60506(b), ask that the Commission more broadly address concerns over exposure to radiofrequency energy. *See, e.g.*, Advocates for the EMS Disabled Comments at 2-10. This topic is outside the scope of the current proceeding, and we refer commenters to the Commission's website for more information. Federal Communications Commission, *Radio Frequency Safety*, https://www.fcc.gov/general/radio-frequency-safety-0 (last visited Nov. 14, 2023); *Proposed Changes in the Commission's Rules Regarding Human Exposure to Radiofrequency Electromagnetic Fields; Reassessment of Federal Communications Commission Radiofrequency Exposure Limits and Policies, Targeted Changes to the Commission's Rules Regarding Human Exposure to Radiofrequency Electromagnetic Fields*, ET Docket Nos. 03-137, 13-84, and 19-226, Resolution of Notice of Inquiry, Second Report and Order, Notice of Proposed Rulemaking, and Memorandum Opinion and Order, 34 FCC Rcd 11687 (2019).

[548]*See* Biden-Harris Administration Announces State Allocations for $42.45 Billion High-Speed Internet Grant Program as Part of Investing in America Agenda, https://broadbandusa.ntia.doc.gov/news/latest-news/biden-harris-administration-announces-state-allocations-4245-billion-high-speed.

[549] The BEAD funding will be used to deploy or upgrade broadband networks to ensure that everyone has access to reliable, affordable, high-speed internet service. Once deployment goals are met, any remaining funding can be used to pursue eligible access-, adoption-, and equity-related uses. *See* Biden-Harris Administration Announces State Allocations for $42.45 Billion High-Speed Internet Grant Program as Part of Investing in America Agenda, https://broadbandusa.ntia.doc.gov/news/latest-news/biden-harris-administration-announces-state-allocations-4245-billion-high-speed.

[550] *See infra* Part III.H.

[551] *See* Free State Foundation Comments at 23-24 (recommending that the Commission holds regular meetings by and among ISPs with stakeholders such as community leaders, labor organizations, and faith-based organizations to identify unserved and underserved areas and households as well as to develop solutions to overcome barriers to access); Next Century Cities Reply at 5.

services are and are not available across the country.[552]  The map is one step in an ongoing, iterative process that will involve the submission of data by providers, challenges from third parties and the public, and verifications and audits by the Commission.  The maps produced through this process will continually improve and refine the broadband availability data relied upon by the Commission, other government agencies, and the public, as required by the Broadband DATA Act.  An accurate map will help identify the unserved and underserved communities most in need of expanded access to broadband internet access service.

174.    Third, we recommend that states and localities use the Broadband Funding Map to gain insight into the broadband infrastructure deployment projects funded by the Federal government throughout the United States and Territories.  The Broadband Funding Map overlays the availability data reported on the National Broadband Map with the funding data to show locations receiving federal program support.  Finally, we decline at this time to establish an Office of Civil Rights within the Commission, as several commenters have urged us to do.[553]  We recognize the potential benefits of establishing such an office, however, and therefore seek further focused comment in the accompanying *Further Notice of Proposed Rulemaking*.[554]

### H.    State and Local Model Policies and Best Practices

175.    As proposed in the *Notice*, we adopt as guidelines for states and localities the best practices to prevent digital discrimination and promote digital equity recommended by the Communications Equity and Diversity Council (CEDC).[555]  Section 60506(d) of the Infrastructure Act directs the Commission to "develop model policies and best practices that can be adopted by states and localities to ensure that broadband internet access service providers do not engage in digital discrimination."[556]  To help fulfill this direction, in December 2021, Chairwoman Rosenworcel tasked the CEDC with issuing recommendations on the subjects specified in section 60506(d).[557]  In furtherance of that mission, the CEDC "took the lead in facilitating interviews, public events, and town hall meetings with multiple stakeholders, from community leaders to industry experts, state broadband directors, foundations, school district leaders, HBCUs, faith-based organizations, small-, minority-, and women-business owners, concerned citizens, and representatives of historically marginalized groups."[558]  The CEDC members "actively sought out the perspectives of the aforementioned groups and listened attentively to their experiences, challenges and aspirations."[559]  More specifically, the CEDC's Digital Empowerment and Inclusion (DEI) Working Group issued a report (the CEDC report) recommending both (1) model policies and best practices to prevent digital discrimination by broadband providers, and (2) best practices to advance digital equity for states and localities.  On November 7, 2022, the members

---

[552] *See* Free State Foundation Comments at 23-24 (recommending that the Commission holds regular meetings by and among ISPs with stakeholders such as community leaders, labor organizations, and faith-based organizations to identify unserved and underserved areas and households as well as to develop solutions to overcome barriers to access).

[553] Lawyers' Committee for Civil Rights Under Law Comments at 40; Leadership Conference on Civil and Human Rights et al. Comments at 8; National Urban League et al. Comments at 9; Public Knowledge et al. Comments at 4.

[554] *See infra* section IV.B.

[555] The report is attached as Appendix D.

[556] 47 U.S.C. § 1754(d).

[557] *See* Appx. D at 63; *see also Agenda Released For February 23, 2022 Virtual Meeting Of The Communications Equity And Diversity Council*, Public Notice, DA 22-164 (MB Feb. 16, 2022).

[558] *See* Letter from Heather Gate, Chair, Communications Equity and Diversity Council, to Chairwoman Jessica Rosenworcel at 1 (June 21, 2023) (on file at https://www.fcc.gov/sites/default/files/cedc-chair-to-fcc-chair-transmittal-letter-report-06152023.pdf) (CEDC Chair Letter).

[559] *See id.*

of the full CEDC voted unanimously in favor of adopting the report for submission to the Commission.[560] We now adopt both sets of recommendations as guidelines for states and localities, in fulfillment of section 60506(d), while emphasizing that our action does not limit states and localities from taking additional steps to prevent and eliminate digital discrimination of access beyond those set forth in the CEDC report and adopted in this *Report and Order*.

176. As we explained in the *Notice*, the six CEDC recommendations in its report "Model Policies and Best Practices to Prevent Digital Discrimination by ISPs" reflect the perspective of the industry, public interest stakeholders, local government representatives, and others. We conclude that adopting these consensus recommendations will be effective in addressing digital discrimination of access at the state and local level.[561] Additionally, the thirteen recommendations in the report's "Best Practices to Advance Digital Equity for State and Localities" reflect the consensus of industry and public interest stakeholders, and we find that they can serve as an effective framework for states and localities to advance digital equity.[562]

177. We strongly encourage states and localities to implement these recommendations as a starting point, as we find that they can serve as an effective framework to advance digital equity. The record reflects widespread support for adopting both sets of recommendations.[563] We agree with the Texas Coalition of Cities that the CEDC report's "Best Practices to Advance Digital Equity for State and Localities" recommendations appropriately focus on broadband and device programs, disseminate information and increase participation in federal broadband affordability programs, integrate existing social service supports with broadband services and create digital navigator programs where feasible.[564] And as the U.S. Chamber of Commerce highlights, states and localities can adopt these model policies and practices at their discretion.[565] Local Governments cautioned that while we should adopt the CEDC Report recommendations, we should also recognize the potential limits of states and local authorities to adopt those policies, in-part due to a lack of resources.[566] While states and localities may still face potential limitations in implementing these recommendations, we envision that the aforementioned funding will be a good starting point for jurisdictions to begin taking the necessary steps to prevent and eliminate digital discrimination of access. Lastly, as noted by USTelecom, our approach affords us the opportunity to study the effects of implementation of those best practices by states and localities and determine whether further action on this front is warranted.[567]

178. We disagree with arguments submitted by several commenters that we should refrain

---

[560] *See* Appx. D at 12.

[561] *See Notice* at 50, para. 94.

[562] *See id.* at 51, para. 95.

[563] *See* NCTA Comments at 4; North Suburban Communications Commission Reply at 3; Benefits Data Trust Comments at 4, 10-11; Competitive Enterprise Institute Reply at 6 (encourages the adoption of the recommendations to "clear[] away state and local regulatory underbrush that impedes deployment"); Local Governments Comments at 25.

[564] *See* Texas Coalition of Cities et al. Reply at 9-10.

[565] *See* U.S. Chamber of Commerce Comments at 3.

[566] *See* Local Governments Comments at 25-26 (urging the Commission to recognize that many local governments will lack the resources and/or authority to implement the Model Policies and to take steps to address those potential limitations).

[567] We acknowledge that some states and localities may currently lack the necessary resources or authority to adopt and implement the CEDC report recommendations, but we note that the recommendations can be adopted and implemented at any time at the discretion of the governmental entity involved, such as when additional authority is provided or when additional resources are made available. *See* USTelecom Comments at 15; *see also* Local Government Comments at 25; Public Knowledge Reply at 5.

from adopting the recommendations in the CEDC report at this time in part due to the limited representation of local and state officials in the CEDC.[568] We note that the CEDC's working group members did include some state and local representation and its Report was unanimously adopted.[569] In addition, the CEDC members were diligent in their research, and they interviewed several local and state officials to develop their recommendations.[570] The members conducted more than 30 virtual interviews and relied upon data and research by scholars, organizations, and state and local governments that have driven digital equity and inclusion scholarship.[571] The members also analyzed research publications and other publicly available documents issued by a variety of government agencies, academics and think tanks, and advocacy organizations to help inform their development of best practices and model policies to prevent digital discrimination and to promote digital equity.[572] Among other sources, members reviewed federal guidance programs and broadband adoption initiatives, including partnerships between state and local governments and internet service providers in response to the pandemic.[573] While we understand the concerns with the limited representation from state and local governments, we find unpersuasive assertions from some commenters that the recommendations from the CEDC report therefore should not be adopted on this basis. The methodology used to develop both sets of recommendations took into consideration the input and expertise from states and localities to better understand their experiences and lessons learned so that other jurisdictions might adopt and implement their successful strategies and methodologies and avoid their mistakes. We encourage state and local officials responsible for broadband expansion efforts to monitor the proceeding and engage with the rechartered CEDC.

## IV. FURTHER NOTICE OF PROPOSED RULEMAKING

### A. Affirmative Obligations

179. Today we take additional steps in this *Further Notice* to fulfill our statutory mandate to facilitate equal access to broadband internet access service by preventing digital discrimination of access. We seek further, focused comments on affirmative obligations that might be undertaken by broadband service access providers (providers)[574] to expand broadband access and address possible digital discrimination of access. The proposals in this *Further Notice* complement rules we adopt today by focusing on providers' day-to-day business practices that might, in some instances, differentially impact consumers' access to broadband on prohibited bases. Our proposals are intended to make fully transparent to the public what communities are served, and what communities are not served, by large-scale broadband deployment, upgrade, and maintenance projects completed or substantially completed by

---

[568] *See, e.g.*, Public Knowledge Reply at 4 (agreeing with other commenters that the Commission should not adopt the CEDC recommendations because it lacked formal coordination with state and local officials); Next Century Cities Comments at 16-17 (arguing that state and local model codes and best practices can only be created in consultation with those who are intended to adopt them); TURN Comments at 26-28 (suggesting that the Commission should incorporate more state and local perspectives to generate the complementary and dual role that Congress set out in section 60506); California Public Utilities Commission Reply at 13 (recommending that the Commission should look to the knowledge and local conditions and expertise of state and local agencies to collaborate on enforcement efforts).

[569] *See* Appx. D at 3-8.

[570] *See* CEDC Chair Letter at 1.

[571] *See* Appx. D at 24.

[572] *See id.* at 25.

[573] *See id.*

[574] Our digital discrimination of access rules apply to "covered entities" which is broader than broadband providers, but at this time our proposed annual report and compliance program are limited to broadband providers as defined in 47 CFR § 54.1600(b).

each provider over the preceding calendar year. We propose to require the reporting of this information on a state-by-state or territory-by-territory basis in a yearly supplement to the BDC so the public can see not only where broadband service is available, but where and how providers are currently investing in their broadband networks and what communities are benefiting from those investments. Our proposals would also require providers to establish formal compliance programs related to digital discrimination of access and to conduct regular, internal assessments of what communities are served (and not served) by recently completed, pending, and planned large-scale broadband projects and whether their relevant policies and practices might differentially impact consumers' access to broadband service. Such regular assessments, we believe, will help "smoke out" policies and practices that might impede equal access to broadband service without sufficient technical or economic justification as providers pressure test the asserted justifications for policies and practices producing such effects. Affirmative obligations such as these are not foreign to the Commission. Most recently, for example, the Commission has adopted affirmative obligations for voice service providers to better police their own networks against illegal robocalls and protect consumers from widespread fraud,[575] and we believe that targeted affirmative and effective measures can similarly combat discriminatory practices in the context of our duty under section 60506 to prevent and identify steps to eliminate digital discrimination of access.

180.     In this *Further Notice*, we propose two sets of affirmative obligations for broadband providers in furtherance of our mandate to facilitate equal access to broadband internet access service, including by preventing digital discrimination of access. Under our proposal, each broadband provider would be required to: (1) submit an annual, publicly-available supplement to the BDC describing, on a state-by-state or territory-by-territory basis, any large-scale broadband deployment, upgrade, and maintenance projects that were completed or substantially completed during the preceding calendar year and the communities served by such projects; and (2) establish a mandatory internal compliance program requiring regular internal assessment of (a) what communities are served by recent, pending, and planned large-scale projects and (b) whether the provider's broadband-related policies and practices might differentially impact consumers' access to broadband based on a listed characteristic and without adequate technical or economic justification.

181.     *Legal Authority.*  We seek general comment on our authority to require providers to implement affirmative obligations. Section 60506 directs the Commission to adopt rules to prevent digital discrimination of access and identify necessary steps to eliminate such discrimination. Does section 60506 authorize the Commission to impose affirmative obligations on providers? Does the Communications Act provide the Commission such authority, irrespective of whether section 60506 is part of the Communications Act? Does section 4(i) of the Communications Act provide the Commission either direct or ancillary authority to do so? Besides these legal authorities, are there other sources for our authority to implement affirmative obligations of the types set forth below?

### 1.     Annual Report

182.     We propose requiring that providers submit an annual, publicly-available supplement to the BDC describing their recent broadband investments in each state and territory. This supplemental report would identify and describe, on a state-by-state or territory-by-territory basis, all fixed or mobile broadband deployment, upgrade, and maintenance projects completed or substantially completed in the preceding calendar year, that are expected to affect the availability or quality of broadband service at 500 or more housing units.[576] The report would categorize each such project as a deployment, upgrade, or maintenance project (or some combination thereof) and would identify the number of housing units affected by the project through numerical bands (such as 500-999, 1000-4999, 5000-9999, etc.). The

---

[575] *See* 47 CFR § 64.1200(n).

[576] A "housing unit" is defined as a single family house, townhome, mobile home or trailer, apartment, group of rooms, or single room that is occupied as a separate living quarters, or, if vacant, is intended for occupancy as a separate living quarters. *See* 31 CFR § 802.223.

report would identify through the census tract affected by the project, and would provide a brief narrative description of the project and the geographic area served by the project to provide greater precision and clarity regarding what the project is designed to accomplish and what communities are served by the project. The primary goal of requiring this report would be to increase transparency regarding what substantial investments providers are currently making in their networks, what communities are being served—or not served—by those investments, and how they are being served. The information provided in the annual supplement to the BDC would allow the Commission, state and local broadband regulators, public interest organizations, and other stakeholders to review on a jurisdiction-by-jurisdiction basis what major deployment, upgrade, and maintenance projects covered entities have completed or substantially completed within the states and territories of their footprint and what communities are and are not served by those projects. We believe this information would assist in the development of broadband policy, in the strengthening of advocacy for broadband expansion, and in the targeting of our efforts to enforce our digital discrimination of access rules.

183. In the *Notice*, we sought comment on what self-assessment or reporting obligations we should require of providers.[577] In response, the Leadership Conference on Civil and Human Rights suggested that we look to other sources of civil rights law to develop affirmative obligations,[578] Microsoft recommended that providers use Commission data to formulate plans to address digital discrimination of access,[579] and several commenters recommended self-reporting requirements.[580] Based on the comments received in the record, we believe our steps in this *Further Notice* are consistent with recommendations for self-reporting and will result in useful data to stakeholders. We seek comment on this approach.

### a. Components of Report

184. We propose that each annual report must address the following components to provide a comprehensive picture of each major deployment, maintenance, and upgrade project completed or substantially completed for each state and territory within its service area or footprint: (1) the nature of each project completed or substantially completed in the calendar year immediately preceding the submission of the report (i.e., deployment, upgrade, maintenance, or a combination thereof); (2) the number of housing units affected by the project (i.e., the number of housing units whose broadband availability or quality is positively impacted by the project) by census tract (utilizing the system presently used in the BDC); and (3) a narrative description of the project and of the areas served by the project, to allow for greater precision and clarity regarding what the project is designed to accomplish and what communities are served by the project

185. We seek general comment on the pros and cons of an annual report in the context of this proceeding. What are the short-term and long-term benefits of this proposal? Is there a more appropriate way to collect this information other than an annual report? Is there a way we can utilize existing data in connection with or in place of the proposed annual report to promote transparency regarding broadband investments? How could regulators leverage these reports to address potential disparities in broadband

---

[577] *Notice* at 45, para. 82.

[578] Leadership Conference on Civil and Human Rights et al. Comments at 3 (suggesting we look at other agencies civil rights laws, such as the Affirmatively Furthering Fair Housing (AFFH) provision of the FHA).

[579] *Notice* at 43, para. 79; Microsoft May 16, 2022 Comments at 6-7.

[580] Lawyers' Committee for Civil Rights Under Law Comments at 28 (stating that the Commission should study a provider's operations or require them to share their practices for accountability purposes); Local Governments Comments at 22 (urging us to adopt affirmative obligations that encourage build-out of broadband infrastructure); TURN Reply at 13. *See also* National Urban League Oct. 5, 2023 *Ex Parte* at 3 (stating that "[internet service providers] should file an annual certification with the FCC, signed by an executive of the company with responsibility for the provider's compliance with the FCC's digital discrimination rules confirming that the provider has established policies and operating procedures designed to facilitate compliance with [the digital discrimination of access] rules.").

access?  Are there other stakeholders that would benefit from such a report?  Are there other uses for such a report that would foster the equal access policy of section 60506?  Are there other potential benefits or challenges in implementing an annual reporting requirement?

186.    We also invite comment on the proposed components of the annual report, discussed in turn below.  Are they sufficient?  Are there other components that are necessary to meet our transparency goal.  Are any of the proposed components in conflict or tension with the equal access goal of section 60506?  What other reasons or justifications might exist for excluding one or more of the proposed components of the report?  Would there be challenges in implementing this proposal and if so, how can the challenges be addressed?  We seek comment on how to strike the right balance between gathering sufficient information and avoiding undue burdens on reporting entities when implementing this annual report requirement.

187.    *Nature of the projects*.  In identifying the nature of the projects completed or substantially completed in the report, our proposal would require that providers identify any broadband deployment, upgrade, or maintenance projects undertaken within the specified period and affecting 500 or more housing units.  We believe that deployment, maintenance, and upgrade projects are the type of investments that most broadly and directly affect consumer access to broadband service and, thus, should be reported in order to facilitate greater transparency regarding where such investments are being made.  We seek comment on this proposal.  We propose to deem a project *completed* when all the tasks and objectives have been successfully completed, all deliverables have been produced, all milestones have been met, and there is no outstanding work or tasks to be done.  We also seek comment on what should be considered a substantially completed project.  For example, should we define substantially completed as being a project for which, at the providers' discretion, either 85% of the impacted locations are covered, or for which 85% of the most recent budget with commercial approval has been spent?  Should the difference between the definitions of substantially completed and completed be based on providers expected timeline for a project?

188.    *Housing units affected*.  We propose that the reporting requirement apply to projects affecting 500 or more housing units.  We propose to use the definition of a "housing unit" in Commission rule 802.223, which defines the term as "a single family house, townhome, mobile home or trailer, apartment, group of rooms, or single room that is occupied as a separate living quarters, or, if vacant, is intended for occupancy as a separate living quarters."[581]  We seek comment on this definition.  Based on this proposed definition, we seek comment on what number of housing units should trigger the requirement to report on a particular project.  Is the number 500 reasonable in light of our transparency goal?  Should the same threshold number of housing units apply to deployment, upgrade, and maintenance projects?  Should different thresholds be applied to each category?  Once the 500 housing unit threshold is met, is categorizing housing units in metric bands (e.g., 500-999, 1000-4999, 5000-9999) an effective method to report the scope of the deployment, maintenance, or upgrade projects?  We specifically seek comment on the potential impacts on rural and Tribal areas.  Should there be special considerations for rural and Tribal areas?  If so, how can we ensure that these areas are being considered?

189.    *Geographic area of the project.* We seek comment on requiring providers to report the geographic area of each major deployment, upgrade, and maintenance project by census tract.  Would reporting projects at the level of the census tract be appropriate?  What benefits and burdens would be associated with reporting data at the census tract level?  Would census block be too granular?  Should providers be required or permitted to report impacted locations in the same manner as they report deployed locations in the BDC?  Since the BDC allows providers to report availability data in the form of polygon shapefiles, or as broadband serviceable location fabric (fabric),[582] would adopting either one of

---

[581] *See* 47 CFR § 54.1600(l).  An "economic unit" consists of all adult individuals contributing to and sharing in the income and expenses of a household.

these metrics reduce the burden on filers?  In what format do covered entities routinely store data on deployments, upgrades, and maintenance projects?  To the extent covered entities do not routinely collect and store such information, we seek comment on how to specify a single methodology for doing so.

190.    We also seek comment on whether there are more precise metrics to identify the location of projects in rural and Tribal areas than the proposed census tract metric.[583]  Are there any additional issues specific to rural and Tribal areas that we should consider in completion of these annual reports?  Would a census block requirement be workable?  Would it encompass rural and Tribal areas more efficiently?  Should providers be required to identify whether the impacted area is rural or Tribal and, if so, how should they do that?  Should covered entities be required to specifically describe their projects in Tribal areas, irrespective of the number of housing units served by the project?

191.    *Narrative description of project.*  We propose that providers use the narrative description to provide information regarding each project sufficient to determine what the project was designed to accomplish, why it was undertaken, and what communities within the designed census tracts it was intended to serve.  In particular, the designation of a project as a deployment, upgrade, or maintenance project may not sufficiently explain what the project was intended to accomplish (e.g*.,* upgrade service from DSL to fiber) or the specific communities within the designated census tracts that will be served by the project (e.g*.,* naming the neighborhoods served or providing the geographic boundaries of the project).  By requiring the narrative description of the project, we intend to allow greater precision and clarity about the nature of the project and the communities served, without being overly prescriptive.  We seek comment on this proposal.  Should we be more prescriptive about the narrative descriptions required?  Should we require, for example, that providers describe the demographics of the communities served by these projects and/or the dates the projects were completed or substantially completed?  Is there other narrative information we should require in order for the reporting requirement to serve its intended purpose of providing greater transparency regarding recent broadband investments?  More generally, is a report of the type we propose necessary or helpful in light of the data already being collected through the BDC?

### b.    Annual Report Filing Timeline

192.    We propose to require providers to file their annual report as a supplement to the BDC report due in March of each year and that it cover projects completed or substantially completed in the calendar year immediately preceding the submission of the report.  We seek comment on this proposal.  We seek comment on this filing timetable and whether it provides sufficient time for providers to gather and review the information required in the report.  We also seek comment on whether submitting the annual report as a supplement to the year-end BDC filing is the most reasonable and efficient approach.  Should these deadlines be staggered?  If so, how much time should be allotted between the filing of the year-end BDC report and the annual, major projects report?

### c.    Availability of Annual Reports

193.    We propose to make the results of these annual reports available to the public.[584]  As discussed above, we tentatively conclude that significant benefits would flow from making these reports public, such as increasing transparency regarding substantial investments by providers, informing

(Continued from previous page) ────────────────

[582] *Establishing the Digital Opportunity Data Collection; Modernizing the FCC Form 477 Data Program*, WC Docket Nos. 19-195 and 11-10, Second Report and Order and Third Further Notice of Proposed Rulemaking, 35 FCC Rcd 7460 (2020) (*Second Order and Third Further Notice).*

[583] *See Modernizing the FCC Form 477 Data Program*, WC Docket No. 11-10, Further Notice of Proposed Rulemaking, 32 FCC Rcd 6329, para. 37 (2017) ("For example, census blocks in rural areas can be quite large and providers may only deploy service throughout a portion of a census block.").

[584] *See* 47 CFR §§ 0.457, 0.459(d)(3), 19.735-203(a).

broadband policy at the federal, state and local level, strengthening advocacy for expanded broadband access, and targeting the Commission's efforts to enforce the rules we adopt today. We seek comment on our proposal to make these reports public. What is the best method for releasing these reports to the public? Should these reports be easily accessible on the provider's website or should they be made available by another means? We also seek comment on the benefits or burdens of making the reports available to the public. Are there confidentiality concerns we need to consider with respect to the information in question? If so, what measures would be necessary to protect the legitimate confidentiality interests of providers?

### d. Supplements to Existing Commission-Issued Reports

194. We also seek comment on whether the Commission should publish certain data from the proposed annual reports in the Commission's existing reports, such as the Communications Marketplace Report or the Section 706 Report.[585] Although we propose that the annual reports be publicly available, as supplements to the annual BDC filings, would including certain data in either of these existing Commission reports provide greater transparency to consumers and communities? If so, what data should be included? Should we include the entirety of the proposed annual reports, or limit the data to a more narrow set of data points?[586] Should we expand the information published in the Communications Marketplace Report or the Section 706 Report beyond the proposed annual reports to include summaries of filed digital discrimination of access informal complaints, any findings of digital discrimination of access, or steps the Commission has taken to address equal access?[587] Would including this additional information in either these Commission-issued reports enhance transparency and make the proposed annual reports fully available and accessible to more stakeholders?

### e. Intersection with Other Broadband Data

195. We seek comment on how providers can leverage existing data sources, such as the existing BDC, in compiling these reports. To the extent we can model the requirements for this report off the BDC, how would that be helpful to providers? We assume that providers would prefer to use the same criteria and data fields that are used in the BDC to the extent possible. We seek comment on whether this is true.

196. Are the relevant criteria and data fields used in the BDC too broad or narrow for our present purposes? Is there a need for additional data to be collected or for different metrics to be used? Given that providers are aware of their deployment and report the impact of deployments as part of the BDC, what would be the additional burden of providing annual reports? Are there policies or procedures we can adopt to reduce the burden on providers?

197. We tentatively conclude that the annual reports proposed above should be certified by the provider as true and correct, just as occurs with respect to BDC submissions. We propose that the same

---

[585] We note that the Commission is already initiated the inquiry for the next Section 706 Report. *See Inquiry Concerning Deployment of Advanced Telecommunications Capability to All Americans in a Reasonable and Timely Fashion Section 706*, GN Docket No. 22-270, Seventeenth Section 706 Report Notice of Inquiry, FCC 23-89 (Nov. 1, 2023). Comments on the current inquiry, as opposed to future inquiries, should be filed in GN Docket No. 22-270.

[586] *See* Letter from Angela Siefer, Executive Director, National Digital Inclusion Alliance, to Marlene H. Dortch, Secretary, FCC, Docket No. 22-69 at 3 (filed Nov. 7, 2023) (recommending that the Commission make de-identified data available to the public annually).

[587] *See* National Urban League et al. Comments at 8-9; *see also* Letter from National Urban League, et al. to Marlene H. Dortch, Secretary, FCC, Docket No. 22-69 at 2 (filed Nov. 4, 2023); Letter from Cheryl A. Leanza, Co-Chair Media/Telecommunications Task Force of the Leadership Conference, United Church of Christ Media Justice Ministry, to Marlene H. Dortch, Secretary, FCC, Docket No. 22-69 at 4 (filed Nov. 8, 2023); Letter from Leo Fitzpatrick, Telecommunications Policy Analyst, The Utility Reform Network, to Marlene H. Dortch, Secretary, FCC, Docket No. 22-69 at 3 (filed Nov. 8, 2023).

experts who certify the BDC submissions also be required to certify the proposed annual report: (1) a corporate officer, and (2) an engineer.[588] We seek comment on this proposal. Should we consider a different certification process? Is it necessary that both a corporate officer and an engineer certify reports containing the elements we have outlined above? Might other officers or employees of the provider be better informed to certify the contents of this annual report? We seek detailed comment on these matters.

### f. Exemptions

198. We seek comment on whether any providers should be exempted from the requirement to submit an annual report based on their size, footprint, or service area.[589] Should we exempt providers that primarily serve consumers at the rural and Tribal level and, if so, why? What other providers should be exempted from submitting an annual report and why?

### g. Record Retention

199. It is important that records sufficient to determine the veracity of the proposed annual reports be retained for some period of time following submission of the reports. We seek comment on what records should be retained and for how long they should be retained in order to accomplish this verification purpose. We also seek comment on whether records related to the proposed annual reports should be retained for any purpose other than verification of the information contained in such reports.

### 2. Compliance Program

200. In addition to the annual report, we propose to require each provider to adopt and maintain a formal internal compliance program designed to ensure regular assessment of whether and how the provider's policies and practices advance and impede equal access to broadband internet access service in its service area. In proposing to require such compliance programs, our goals are to ensure close internal scrutiny of policies and practices that might impede equal access to broadband and to promote accountability with regard to such policies and practices. In order to facilitate candid internal evaluation and assessment of a provider's policies and practices affecting broadband access, we do *not* propose to require providers to make publicly available any reports or other documentation of such internal evaluations and assessments. However, in order to ensure compliance with the requirement to conduct such evaluations and assessments, and/or in connection with a Commission investigation into alleged digital discrimination of access, the Commission reserves the right to require production of such reports and documentation subject to the Commission's existing confidentiality rules.[590] We seek comment on this proposal.

### a. Components of Compliance Program

201. *Effective Compliance Program*. We propose to model our mandatory internal compliance program on previously established effective compliance programs, while not being overly prescriptive regarding how the compliance program is designed.[591] Such models teach us that effective compliance programs should include, at a minimum: (1) development and implementation of written policies and procedures; (2) designation of a compliance officer and/or compliance committee; (3)

---

[588] *See generally 2019 Form 477 Order and Second Further Notice,* 35 FCC Rcd 7460, 7486, para. 61 (2020) (citing 47 U.S.C. § 642(b)(4)); *Establishing the Digital Opportunity Data Collection; Modernizing the FCC Form 477 Data Program*, WC Docket Nos. 19-195, 11-10, Third Report and Order, 36 FCC Rcd 1126, 1144, para. 43 (2021) (*Third Report and Order*).

[589] 47 USC § 1705(a)(7) (defines the term "eligible service area" as a census block in which broadband service is not available at 1 or more households or businesses in the census block).

[590] *See* 47 CFR §§ 0.457, 0.459(d)(3), 19.735-203(a).

[591] *See, e.g.*, United States Sentencing Commission, *An Overview of the Organizational Guidelines*, https://www.ussc.gov/sites/default/files/pdf/training/organizational-guidelines/ORGOVERVIEW.pdf (last visited Nov. 14, 2023)(explaining that one of the key purposes of these guidelines is deterrence).

conducting effective training and education regarding the purposes and operation of the compliance program; (4) developing effective lines of reporting and communication; (5) conducting internal monitoring and auditing; (6) enforcing standards through well-publicized disciplinary guidelines; and (7) responding promptly to detected problems through corrective action. We seek comment on whether these should be mandatory components of the compliance programs we propose to require. Which of these elements of an effective compliance programs should we require? Which elements should we not require, if any? Are there additional elements we should consider adding in order to ensure that the compliance programs effectively advance their intended purpose of facilitating equal access to broadband? Although we seek comment on each of these elements, we note that our goal is to grant each broadband provider the flexibility to develop and maintain a plan that contains the required elements and serves our intended purposes without prescribing a particular formula as to how each required element should be implemented. We seek comment on whether such flexibility will be beneficial or detrimental to the implementation of effective internal compliance programs by providers.

202.     *Implementing Written Policies and Procedures*. We seek comment on requiring providers to implement internal written policies and procedures with the goal of preventing digital discrimination of access and promoting equal access to broadband internet access service. In the compliance program, are written policies and procedures necessary? What should those internal written policies and procedures include? Who should be knowledgeable about the rules and practices within the organization? How often should these written rules and procedures be reviewed, revised, and updated? Are there any available models that providers can look to when devising their internal policies and procedures to prevent digital discrimination of access and promote equal access?

203.     *Designating a Compliance Officer and/or Compliance Committee*. We seek comment on requiring service providers to appoint a designated compliance officer or establish a compliance committee to ensure compliance with the program's requirements and timely cooperation with the Commission upon request. Is it necessary to designate a compliance officer or establish a compliance committee for the successful implementation of the compliance program? What should the qualifications of the selected compliance officer and compliance committee members be? What should the structure of a compliance committee be, how often should it meet, and what should be its functions? Should the designated compliance officer be required to provide that certification?

204.     *Conducting Effective Training on Commission Rules*. We seek comment on requiring service providers to conduct periodic training for relevant employees on the Commission's digital discrimination of access rules. Who should conduct the training, who should be required to take the training, and how often should they be required to do so? How should the substantive content of the training be developed and what should it cover? Should the content of the training be certified or approved by the Commission in some manner? If so, how often should such certification or approval take place? Providers likely already have compliance programs and employee trainings to maintain compliance with regulatory requirements at many levels. What would be the additional burden for providers to incorporate compliance with digital discrimination of access rules into their existing compliance programs?

205.     *Developing Effective Lines of Reporting and Communication*. We propose requiring broadband providers to put in place mechanisms and processes that: (1) encourage the internal reporting of matters that may constitute, or lead to, digital discrimination of access or otherwise impede equal access to broadband service; (2) channel those concerns to the compliance officer and/or compliance committee for evaluation and response, if warranted; and (3) ensure effective "up the chain" reporting by compliance officers and committees so senior officers are made aware of these matters and can take appropriate action to prevent their recurrence. We seek comment on this proposal. What system(s) can providers implement to encourage employees to raise concerns about potentially problematic conduct? What should be the reporting chain above the compliance officer and compliance committee to ensure that equal access concerns are given the highest possible priority by the provider? Are there other mechanisms and processes that we should require to achieve effective lines of reporting and communication regarding equal-access-related matters?

206.    *Conducting Internal Monitoring and Auditing*.  We seek comment on requiring broadband providers to perform periodic reviews of the compliance program and respond quickly to correct problems when they are detected.  Who should conduct such periodic reviews and how often should they be conducted?  What systems can providers put in place to evaluate the overall effectiveness of the program and its compliance with the requirements we ultimately adopt for such programs?

207.    *Responding Promptly to Detected Problems and Undertaking Corrective Action*.  We seek comment on what requirements we should adopt regarding the handling of problems reported by the compliance officer or committee to senior management, especially when no corrective action has been taken.  What obligations would a compliance officer or committee have under those circumstances?  What recourse would a compliance officer or committee have if a provider routinely fails to address reported violations of our rules?  Should we require, in such instances, that the compliance officer report the matter to the Commission?  Could a compliance officer truthfully certify that a compliance program consistent with our rules has been maintained throughout the certification period if reported violations of our rules are routinely ignored by the provider?  We seek comment on these matters.

### b.    Evaluations of Recently Completed, Pending, and Planned Projects

208.    We seek comment on requiring providers to conduct annually an internal evaluation of recently completed, pending, and planned deployment, upgrade, and maintenance projects affecting 500 or more housing units.  With respect to each such project, the internal evaluation should consist of a comparison of the demographics of the communities served by that project with the demographics of the Metropolitan Statistical Area (MSA) encompassing those served communities.[592]  While the purpose of our proposal to require submission of annual reports to the Commission is to promote greater transparency regarding what communities are served by recently completed projects, the goal of our proposal to require periodic internal evaluation of large-scale projects is to facilitate close internal scrutiny of the provider's policies and practices affecting broadband access, determine whether those policies and practices advance or impede equal access to broadband service, and promote accountability regarding policies and practices that impede (or threaten to impede) equal access without adequate justification.  Moreover, while our proposal regarding annual reporting would apply only to recently completed (or substantially completed) projects of a certain size, our proposal with respect to periodic internal evaluations would also apply to pending and planned projects.  We seek comment on this proposal, and we specifically seek comment on:  (1) how we should define "pending" projects and "planned" projects under this proposal; and (2) whether MSAs are the appropriate geographic comparator for the internal evaluation of covered projects.

209.    We do not propose to prescribe the manner in which providers compare the demographics of served communities with the demographics of the MSAs encompassing those communities.  We would require only that such comparisons be conducted with analytical rigor and in good faith using official data and reports of the U.S. Census Bureau,[593] and that they be reasonably designed to uncover meaningful disparities between the reported demographics of served communities and the reported demographics of the MSAs encompassing those served communities.  While we would never expect precise numerical alignment with respect to any single project, we believe that routinely

---

[592] *See* Centers for Disease Control and Prevention, *Metropolitan statistical area (MSA)* (Aug. 12, 2022), https://www.cdc.gov/nchs/hus/sources-definitions/msa.htm#:~:text=A%20geographic%20entity%20based%20on,ties%20to%20the%20central%20area. (defining metropolitan statistical area as a geographic entity based on a county or a group of counties with at least one urbanized area with a population of at least 50,000 and adjacent counties with economic ties to the central area).

[593] *See supra* para. 199.  According to the Census Bureau, an MSA consists of one or more counties that contain a city of 50,000 or more inhabitants, or contain a Census Bureau-defined urbanized area (UA) and have a total population of at least 100,000 (75,000 in New England). *See* Office of Management and Budget, Standards for Defining Metropolitan and Micropolitan Statistical Areas, 65 Fed. Reg. 249 (Dec. 27, 2000) (adopting the Office of Management and Budget's standards for defining metropolitan and micropolitan statistical areas).

conducting these comparisons will give providers a better sense of what communities are being served (and not served) by their projects over time, and will help to "smoke out" policies and practices that discriminate without adequate justification. We seek comment on this proposal.

### c. Evaluations of Policies and Practices

210. *Evaluation and Assessment of Policies and Practices*. We seek comment on requiring providers to: (1) periodically evaluate their policies and practices affecting broadband access to determine whether they differentially impact consumers' access to broadband internet access service based on income level, race, ethnicity, color, religion, or national origin, or otherwise impede equal access to broadband internet access service; and (2) report to senior management annually, and in writing, regarding the results of such evaluation. As noted above, the proposed requirement that providers periodically determine the demographics of communities served by designated broadband projects is intended to permit an assessment, over time, of whether the provider's broadband-related policies are effectively impeding equal access to broadband service. Those assessments should lead to critical examination of whether any policies and practices impeding such equal access are necessary and justified by legitimate business considerations and whether alternative policies and practices might reasonably be adopted and implemented in their place. We propose that compliance officers and/or committees be required to conduct such annual assessments and report annually to senior management, in writing, the results of such evaluations and assessments. This process will require providers to closely scrutinize policies and practices producing disparate impacts on prohibited bases or otherwise impeding equal access to broadband service. We believe these requirements are necessary to ensure that equal access to broadband service remains a top priority for providers, in fulfillment of Congress's instruction that the Commission "take steps to ensure that *all people of the United States* benefit from equal access to broadband internet access service."[594] We seek comment on this proposal.

### d. Certification

211. *Certification of Completion*. We propose requiring providers to submit, in conjunction with the annual report proposed above, a certification that a compliance program satisfying all requirements finally adopted by the Commission was in place during the calendar year covered by the annual report. We propose that the certification be attested to by an officer and engineer as occurs with respect to the BDC, and that the provider's designated compliance officer (or the chair of the compliance committee) certify the same to the certifying officer and engineer. We seek comment on this proposal, including whether the designated compliance officer (or chair of the compliance committee) should be required to provide a certification directly to the Commission.

### e. Exemptions

212. We also seek comment on whether any providers should be exempted from the proposed requirement to implement and maintain an internal compliance program meeting specified standards based on their size, footprint, or niche service area. Should we exempt providers that primarily serve consumers at the rural and Tribal level and, if so, why? What other providers should be exempted from these requirements, under what circumstances, and why? We seek comment on requiring providers who are entitled to an exemption under our rules to file a certification of exemption in lieu of a certification of compliance in conjunction with the annual report.

### f. Recording and Retention Requirements

213. We seek comment on what records providers should be required to retain, and for how long, relating to the internal assessments of the projects described in the preceding paragraphs. Once a summary report of the internal assessment for a specific project is completed, should the provider be required to retain the underlying documents for some period of time? Should there be different retention

---

[594] 47 U.S.C. §1754(a)(3) (emphasis added).

periods for the summary reports than for the underlying documents?

### B. Office of Civil Rights

214. We seek further, focused comment on establishing an Office of Civil Rights, as both advocates and broadband service providers have urged.[595] In particular, we seek comment on the potential benefits establishing such an office. For example, would such an office be helpful in developing and maintaining the expertise to evaluate the effects of Commission policy initiatives on historically marginalized communities? Could it assist in determining when prohibited discrimination has occurred and aid in developing remedies for such discrimination? Might it help in evaluating claims and possible patterns of digital discrimination of access? And could it aid in monitoring informal complaints alleging digital discrimination of access and other forms of prohibited discrimination, as well as in the mediation process we have outlined in the Order?[596] Why or why not? What other benefits might be associated with establishing an Office of Civil Rights? For example, could it work with broadband service providers to proactively mitigate potential instances of prohibited discrimination? Could such an office collaborate with broadband service providers and federal and state governments to develop broadband adoption and digital literacy skills training that could be used on a nationwide basis?[597] Could such an office be employed to address other substantive Commission policy issues and processes beyond matters arising under section 60506? If so, what other issues might an Office of Civil Rights oversee or how could it support other bureaus and offices in the Commission? Finally, what are the potential challenges associated with establishing an Office of Civil Rights? How should the Commission address these challenges? What are the costs associated with establishing an Office of Civil Rights? How should the Commission structure and staff such an office? What other structural and organizational changes would be required to establish such an office?

### C. Other Efforts to Promote Digital Equity and Inclusion

215. *Digital Equity*. The Commission, as part of its continuing effort to advance digital equity for all,[598] including people of color, persons with disabilities, persons who live in rural or Tribal areas, and others who have been historically underserved, marginalized, and adversely affected by persistent poverty and inequality, invites comments on any equity-related considerations[599] and benefits (if any) that may be associated with the proposals and issues discussed herein. Specifically, we seek comment on how

---

[595] Lawyers' Committee for Civil Rights Under Law Comments at 40; Leadership Conference on Civil and Human Rights et al. Comments at 8; National Urban League et al. Comments at 9; Public Knowledge et al. Comments at 4; Letter from Randy Clarke, Verizon, to Marlene H. Dortch, Secretary, FCC, at 1 (filed July 31, 2023) (Verizon July 31 *Ex Parte*).

[596] *See supra* para. 145.

[597] *See* Communications Equity and Diversity Council, Digital Empowerment and Inclusion Working Group, *Connecting Opportunity Communities to Broadband During the COVID-19 Pandemic: Lessons Learned and Recommendations*, at 5-6 (June 15, 2023).

[598] Section 1 of the Communications Act of 1934 as amended provides that the FCC "regulat[es] interstate and foreign commerce in communication by wire and radio so as to make [such service] available, so far as possible, to all the people of the United States, without discrimination on the basis of race, color, religion, national origin, or sex." 47 U.S.C. § 151.

[599] We define the term "equity" consistent with Executive Order 13985 as the consistent and systematic fair, just, and impartial treatment of all individuals, including individuals who belong to underserved communities that have been denied such treatment, such as Black, Latino, and Indigenous and Native American persons, Asian Americans and Pacific Islanders and other persons of color; members of religious minorities; lesbian, gay, bisexual, transgender, and queer (LGBTQ+) persons; persons with disabilities; persons who live in rural areas; and persons otherwise adversely affected by persistent poverty or inequality. *See* Exec. Order No. 13985, 86 Fed. Reg. 7009, Executive Order on Advancing Racial Equity and Support for Underserved Communities Through the Federal Government (Jan. 20, 2021).

our proposals may promote or inhibit advances in diversity, equity, inclusion, and accessibility, as well as the scope of the Commission's relevant legal authority.

## V. PROCEDURAL MATTERS

216. *Regulatory Flexibility Act.* The Regulatory Flexibility Act of 1980, as amended (RFA),[600] requires that an agency prepare a regulatory flexibility analysis for notice and comment rulemakings, unless the agency certifies that "the rule will not, if promulgated, have a significant economic impact on a substantial number of small entities."[601] Accordingly, we have prepared a Final Regulatory Flexibility Analysis (FRFA) concerning the possible impact of the rule changes contained in this *Report and Order*. The FRFA is set forth in Appendix B.

217. We have also prepared an Initial Regulatory Flexibility Analysis (IRFA) concerning the potential impact of the rule and policy changes contained in the *Further Notice*. The IRFA is set forth in Appendix C. Written public comments are requested on the IRFA. Comments must be filed by the deadlines for comments on the *Further Notice* indicated on the first page of this document and must have a separate and distinct heading designating them as responses to the IRFA.

218. *Paperwork Reduction Act.* This document contains new or modified information collection requirements subject to the Paperwork Reduction Act of 1995 (PRA), Public Law 104-13. All such new or modified information collection requirements will be submitted to the Office of Management and Budget (OMB) for review under section 3507(d) of the PRA. OMB, the general public, and other Federal agencies will be invited to comment on the new or modified information collection requirements contained in this proceeding. In addition, we note that pursuant to the Small Business Paperwork Relief Act of 2002, Public Law 107-198, *see* 44 U.S.C. 3506(c)(4), we previously sought specific comment on how the Commission might further reduce the information collection burden for small business concerns with fewer than 25 employees. In this document, we describe several steps we have taken to minimize the information collection burdens on small entities.[602]

219. The *Further Notice of Proposed Rulemaking* also may contain proposed new and revised information collection requirements. The Commission, as part of its continuing effort to reduce paperwork burdens, invites the general public and OMB to comment on the information collection requirements contained in this document, as required by the Paperwork Reduction Act of 1995, Public Law 104-13. In addition, pursuant to the Small Business Paperwork Relief Act of 2002, Public Law 107-198, *see* 44 U.S.C § 3506(c)(4), we seek specific comment on how we might further reduce the information collection burden for small business concerns with fewer than 25 employees.

220. *Congressional Review Act.* The Commission has determined, and the Administrator of the Office of Information and Regulatory Affairs, Office of Management and Budget, concurs, that this rule is major under the Congressional Review Act, 5 U.S.C. § 804(2). The Commission will send a copy of this *Report and Order* to Congress and the Government Accountability Office pursuant to 5 U.S.C. § 801(a)(1)(A).

221. *Providing Accountability Through Transparency Act*: The Providing Accountability Through Transparency Act requires each agency, in providing notice of a rulemaking, to post online a brief plain-language summary of the proposed rule.[603] Accordingly, the Commission will publish the required summary of this Notice of Proposed Rulemaking/Further Notice of Proposed Rulemaking on

---

[600] 5 U.S.C. §§ 601–612. The RFA has been amended by the Small Business Regulatory Enforcement Fairness Act of 1996 (SBREFA), Pub. L. No. 104-121, Title II, 110 Stat. 857 (1996).

[601] 5 U.S.C. § 605(b).

[602] *See infra* Appx. B at paras. 24-27.

[603] 5 U.S.C. § 553(b)(4). The Providing Accountability Through Transparency Act, Pub. L. No. 118-9 (2023), amended section 553(b) of the Administrative Procedure Act.

https://www.fcc.gov/proposed-rulemakings.

222. *Ex Parte Presentations—Permit-But-Disclose.* The proceeding this *Further Notice of Proposed Rulemaking* initiates shall be treated as a "permit-but-disclose" proceeding in accordance with the Commission's *ex parte* rules.[604] Persons making *ex parte* presentations must file a copy of any written presentation or a memorandum summarizing any oral presentation within two business days after the presentation (unless a different deadline applicable to the Sunshine period applies). Persons making oral *ex parte* presentations are reminded that memoranda summarizing the presentation must (1) list all persons attending or otherwise participating in the meeting at which the *ex parte* presentation was made, and (2) summarize all data presented and arguments made during the presentation. If the presentation consisted in whole or in part of the presentation of data or arguments already reflected in the presenter's written comments, memoranda or other filings in the proceeding, the presenter may provide citations to such data or arguments in his or her prior comments, memoranda, or other filings (specifying the relevant page and/or paragraph numbers where such data or arguments can be found) in lieu of summarizing them in the memorandum. Documents shown or given to Commission staff during *ex parte* meetings are deemed to be written *ex parte* presentations and must be filed consistent with section 1.1206(b) of the Commission's rules. In proceedings governed by section 1.49(f) of the Commission's rules or for which the Commission has made available a method of electronic filing, written *ex parte* presentations and memoranda summarizing oral *ex parte* presentations, and all attachments thereto, must be filed through the electronic comment filing system available for that proceeding, and must be filed in their native format (e.g., .doc, .xml, .ppt, searchable .pdf). Participants in this proceeding should familiarize themselves with the Commission's *ex parte* rules.[605]

223. *Comment Filing Procedures.* Pursuant to sections 1.415 and 1.419 of the Commission's rules, 47 CFR §§ 1.415, 1.419, interested parties may file comments and reply comments on or before the dates indicated on the first page of this document. Comments may be filed using the Commission's Electronic Comment Filing System (ECFS). *See Electronic Filing of Documents in Rulemaking Proceedings*, 63 FR 24121 (1998).

- Electronic Filers: Comments may be filed electronically using the Internet by accessing ECFS: https://www.fcc.gov/ecfs.

- Paper Filers: Parties who choose to file by paper must file an original and one copy of each filing.

- Filings can be sent by commercial overnight courier, or by first-class or overnight U.S. Postal Service mail. All filings must be addressed to the Commission's Secretary, Office of the Secretary, Federal Communications Commission.

- Commercial overnight mail (other than U.S. Postal Service Express Mail and Priority Mail) must be sent to 9050 Junction Drive, Annapolis Junction, MD 20701.U.S. Postal Service first-class, Express, and Priority mail must be addressed to 45 L Street NE, Washington, DC 20554.

- Effective March 19, 2020, and until further notice, the Commission no longer accepts any hand or messenger delivered filings. This is a temporary measure taken to help protect the health and safety of individuals, and to mitigate the transmission of COVID-19. *See* FCC Announces Closure of FCC Headquarters Open Window and Change in Hand-Delivery Policy, Public Notice, DA 20-304 (March 19, 2020). https://www.fcc.gov/document/fcc-closes-headquarters-open-window-and-changes-hand-delivery-policy.

---

[604] 47 CFR §§ 1.1200 *et seq.*

[605] *Id.* § 1.49(f).

224. Pursuant to section 1.49 of the Commission's rules, 47 CFR § 1.49, parties to this proceeding must file any documents in this proceeding using the Commission's Electronic Comment Filing System (ECFS): www.fcc.gov/ecfs.

225. *Accessible Formats*. To request materials in accessible formats for people with disabilities (Braille, large print, electronic files, audio format), send an e-mail to fcc504@fcc.gov or call the Consumer & Governmental Affairs Bureau at 202-418-0530 (voice).

226. *Contact Person.* For additional information on this proceeding, contact the Wireline Competition Bureau.

## VI. ORDERING CLAUSES

227. Accordingly, IT IS ORDERED, pursuant to sections 1, 2, 4(i)-(j), 303(r) of the Communications Act of 1934, as amended, 47 U.S.C. §§ 151, 152, 154(i)-(j), 303(r), and section 60506 of the Infrastructure Investment and Jobs Act, Pub. L. No. 117-58, 135 Stat. 429, 1245-46 (2021), codified at 47 U.S.C. § 1754, that this *Report and Order* IS ADOPTED and Parts 0, 1 and 16 of the Commission's Rules, 47 CFR Parts 0, 1, and 16 ARE AMENDED as set forth in Appendix A. The *Report and Order* shall become effective 60 days after publication in the Federal Register, except that the amendments to 47 CFR § 1.717, as amended in Appendix A, will not become effective until the Office of Management and Budget completes review of any information collection requirements in this *Report and Order* that the Wireline Competition Bureau determines is required under the Paperwork Reduction Act. The Commission directs the Wireline Competition Bureau to announce the effective date for 47 CFR § 1.717 by subsequent Public Notice.

228. IT IS FURTHER ORDERED, pursuant to sections 1, 2, 4(i)-(j), 303(r) of the Communications Act of 1934, as amended, 47 U.S.C. §§ 151, 152, 154(i)-(j), 303(r), and section 60506 of the Infrastructure Investment and Jobs Act, Pub. L. No. 117-58, 135 Stat. 429, 1245-46 (2021), codified at 47 U.S.C. § 1754, that this *Further Notice of Proposed Rulemaking* IS ADOPTED.

229. IT IS FURTHER ORDERED that the Commission's Office of the Secretary SHALL SEND a copy of this *Report and Order* and *Further Notice of Proposed Rulemaking*, including the Final Regulatory Flexibility Analysis and Initial Regulatory Flexibility Analysis, to the Chief Counsel for Advocacy of the Small Business Administration.

230. IT IS FURTHER ORDERED that the Office of the Managing Director, Performance Program Management, SHALL SEND a copy of this *Report and Order* in a report to be sent to Congress and the Government Accountability Office pursuant to the Congressional Review Act, 5 U.S.C. § 801(a)(1)(A).

FEDERAL COMMUNICATIONS COMMISSION

Marlene H. Dortch
Secretary

## APPENDIX A

### Final Rules

The Federal Communications Commission amends Chapter I — Federal Communications Commission, Subchapter A — General of Title 47 of the Code of Federal Regulations as follows:

**Subchapter A — General**

1. Add Part 16 to Subchapter A as follows:

**PART 16:  DIGITAL DISCRIMINATION OF ACCESS**
16.1 Purpose
16.2 Definitions
16.3 Digital discrimination of access prohibited
16.4 Findings of discrimination
16.5 Technical and economic feasibility
16.6 Enforcement
16.7 Advisory Opinions

Authority: 47 U.S.C. § 1754

**§ 16.1 Purpose.**  The purpose of this part is to implement section 60506 of the Infrastructure Investment and Jobs Act, 135 Stat. 429 (2021) that requires the Commission to adopt rules to facilitate equal access to broadband internet access service, taking into account the issues of technical and economic feasibility presented by that objective, including

    (a) Preventing digital discrimination of access based on income level, race, ethnicity, color, religion, or national origin, and

    (b) Identifying necessary steps for the Commission to take to eliminate discrimination described in these rules.

**§16.2  Definitions** – As used in this part:

    (a) *Broadband internet access service* is defined by § 8.1(b) of part 8 of this subchapter.

    (b) *Broadband provider* is defined by § 54.1600(b) of part 54 of this chapter.

    (c) *Consumer* includes current and potential subscribers, individual persons, groups of persons, individual organizations, and groups of organizations having the capacity to subscribe to and receive broadband internet access service.

    (d) *Covered entity* includes broadband internet access service providers and entities that provide services that facilitate and affect consumer access to broadband internet access service, including but not limited to:

        1. Broadband internet access service providers;

        2. Contractors retained by, or entities working through partnership agreements or other business arrangements with, broadband internet access service providers;

        3. Entities facilitating or involved in the provision of broadband internet access service;

        4. Entities maintaining and upgrading network infrastructure; and,

        5. Entities that otherwise affect consumer access to broadband internet access service.

(e) *Covered services* is defined as broadband internet access service by § 8.1(b) of part 8 of this subchapter.

(f) *Covered elements of service* is defined as any components of service quality or terms and conditions on which broadband internet access service is provided. The definition includes, but is not limited to:

1. Deployment of broadband infrastructure, network upgrades, and network maintenance;

2. Service quality components and the terms and conditions on which broadband internet access service is provided, including but not limited to speeds, capacities, latency, data caps, throttling, pricing, promotional rates, imposition of late fees, opportunity for equipment rental, installation time, contract renewal terms, service termination terms, and use of customer credit and account history;

3. Marketing, advertisement, and outreach; and

4. Technical service, onsite service, and other provision of customer service.

(g) *Digital discrimination of access* means policies or practices, not justified by genuine issues of technical or economic feasibility, that differentially impact consumers' access to broadband internet access service based on their income level, race, ethnicity, color, religion, or national origin or are intended to have such differential impact.

(h) *Economically feasible* means reasonably achievable as evidenced by prior success by covered entities under similar circumstances or demonstrated new economic conditions clearly indicating that the policy or practice in question may reasonably be adopted, implemented, and utilized.

(i) *Equal access* means the opportunity to subscribe to an offered service that provides comparable speeds, capacity, latency, and other quality of service metrics in a given area, for comparable terms and conditions.

(j) *Subscriber* is defined as a subscriber to broadband internet access service as defined as in § 8.1(b) of part 8 of this subchapter.

(k) *Technically feasible* means reasonably achievable as evidenced by prior success by covered entities under similar circumstances or demonstrated technological advances clearly indicating that the policy or practice in question may reasonably be adopted, implemented, and utilized.

## § 16.3  Digital discrimination of access prohibited.

(a) This section provides the Commission's interpretation of actions that constitute digital discrimination of access under 47 U.S.C. § 1754.

(b) It shall be unlawful for any broadband provider, or covered entity as described in this part, to adopt, implement or utilize policies or practices, not justified by genuine issues of technical or economic feasibility, that differentially impact consumers' access to broadband internet access service based on their income level, race, ethnicity, color, religion, or national origin or are intended to have such differential impact.

## §16.4  Findings of discrimination.

(a) *Discriminatory treatment*. The Commission may find that a covered entity engaged in intentional discrimination by direct evidence or circumstantial evidence that the covered entity's policy or practice was adopted, implemented, or utilized with the intent to differentially impact consumers' access to covered services or covered elements of service on one or more of the bases listed in section 60506(b).

(b) *Discriminatory effect*. The Commission may find that a covered entity adopted, implemented, or utilized a policy or practice that had a discriminatory effect on one or more of the bases listed in section 60506(b). A discriminatory effect occurs when a facially neutral policy or practice differentially impacts consumers' access to covered services or covered elements of service.

### § 16.5 Technical and Economic Feasibility

(a) Where the Commission determines that a covered entity's policy or practice is motivated by discriminatory intent on the basis of income level, race, ethnicity, color, religion, or national origin, the entity will not be found liable for digital discrimination of access if the policy or practice is justified by genuine issues of technical or economic feasibility.

(b) Where the Commission determines that a covered entity's policy or practice has discriminatory effects on the basis of income level, race, ethnicity, color, religion, or national origin, the entity will not be found liable for digital discrimination of access if the policy or practice is justified by genuine issues of technical or economic feasibility.

(c) Covered entities have the burden of proving to the Commission that a policy or practice under investigation is justified by genuine issues of technical or economic feasibility. This may include proof that available, less discriminatory alternatives were not reasonably achievable at the time the policy or practice was adopted, implemented, or utilized because of genuine technical or economic constraints.

(d) Genuine issues of technical or economic feasibility must be demonstrated by a preponderance of the evidence, with the covered entity providing the Commission all of the empirical evidence and documentation needed to substantiate the technical or economic justifications for the policy or practice under investigation.

(e) The Commission will determine on a case-by-case basis whether genuine issues of technical or economic feasibility justified the adoption, implementation, or utilization of a policy or practice that was motivated by discriminatory intent on the basis of income level, race, ethnicity, color, religion, or national origin, or that caused discriminatory effects on one or more of these bases.

**§ 16.6 Enforcement.** Any allegation that a covered entity has violated these rules may be referred to the Commission's Enforcement Bureau.

### § 16.7 Advisory Opinions

(a) Procedures

1. Any entity that is subject to the Commission's rules implementing section 60506 may request an advisory opinion from the Enforcement Bureau regarding the permissibility of its own policies and practices affecting access to broadband internet access service. Requests for advisory opinions may be filed via the Commission's website or with the Office of the Secretary and must be copied to the Chief of the Enforcement Bureau and the Chief of the Investigations and Hearings Division of the Enforcement Bureau.

2. The Enforcement Bureau may, in its discretion, determine whether to issue an advisory opinion in response to a particular request or group of requests and will inform each requesting entity, in writing, whether the Bureau plans to issue an advisory opinion regarding the matter in question.

3. Requests for advisory opinions must relate to a current or proposed policy or practice that the requesting party intends to pursue. The Enforcement Bureau will not respond to requests if the same or substantially the same conduct is the subject of a current

government investigation or proceeding, including any ongoing litigation or open rulemaking at the Commission.

4. Requests for advisory opinions must be accompanied by all material information sufficient for Enforcement Bureau staff to make a determination on the proposed conduct for which review is requested. Requesters must certify that factual representations made to the Bureau are truthful and accurate, and that they have not intentionally omitted any information from the request. A request for an advisory opinion that is submitted by a business entity or an organization must be executed by an individual who is authorized to act on behalf of that entity or organization.

5. Enforcement Bureau staff will have discretion to ask parties requesting opinions, as well as other parties that may have information relevant to the request or that may be impacted by the proposed conduct, for additional information that the staff deems necessary to respond to the request. Such additional information, if furnished orally or during an in-person conference with Bureau staff, shall be promptly confirmed in writing. Parties are not obligated to respond to staff inquiries related to advisory opinions. If a requesting party fails to respond to a staff inquiry, then the Bureau may dismiss that party's request for an advisory opinion. If a party voluntarily responds to a staff inquiry for additional information, then it must do so by a deadline to be specified by Bureau staff. Advisory opinions will expressly state that they rely on the representations made by the requesting party, and that they are premised on the specific facts and representations in the request and any supplemental submissions.

(b) After review of a request submitted hereunder, the Enforcement Bureau will: (1) issue an advisory opinion that will state the Bureau's determination as to whether or not the policy or practice detailed in the request complies with the Commission's rules implementing section 60506; (2) issue a written statement declining to respond to the request; or (3) take such other position or action as it considers appropriate. An advisory opinion states only the enforcement intention of the Enforcement Bureau as of the date of the opinion, and it is not binding on any party. Advisory opinions will be issued without prejudice to the Enforcement Bureau or the Commission to reconsider the questions involved, or to rescind or revoke the opinion. Advisory opinions will not be subject to appeal or further review.

(c) The Enforcement Bureau will have discretion to indicate the Bureau's lack of enforcement intent in an advisory opinion based on the facts, representations, and warranties made by the requesting party. If the Bureau determines that a policy or practice currently in effect violates Commission rules, it may provide in the opinion that it will not take enforcement action within a designated time period if the policy or practice is promptly corrected. The requesting party may rely on the opinion only to the extent that the request fully and accurately contains all the material facts and circumstances. Should the Bureau or Commission rescind a previously-issued advisory opinion, the requesting party must promptly discontinue use of the relevant policy or practice in order to remain in compliance with our rules.

(d) Public disclosure. The Enforcement Bureau will make advisory opinions available to the public on the Commission's website. The Bureau will also publish the initial request for guidance and any associated materials. Parties soliciting advisory opinions may request confidential treatment of information submitted in connection with a request for an advisory opinion pursuant to § 0.459.

(e) Withdrawal of request. Any requesting party may withdraw a request for review at any time prior to receipt of notice that the Enforcement Bureau intends to issue an adverse opinion, or the

issuance of an opinion.  The Enforcement Bureau remains free, however, to submit comments to such requesting party as it deems appropriate.  Failure to take action after receipt of documents or information, whether submitted pursuant to this procedure or otherwise, does not in any way limit or stop the Bureau from taking such action at such time thereafter as it deems appropriate.  The Bureau reserves the right to retain documents submitted to it under this procedure or otherwise and to use them for all governmental purposes.

**Authority:**  47 USC 1754; ___ Fed. Reg. ___; Executive Order 13985

## PART 0 – COMMISSION ORGANIZATION

2.   Revise the authority citation for Subpart A – Organization to read as follows:

**Authority**:  47 U.S.C. 151, 154(i), 154(j), 155, 225, 409, and 1754, unless otherwise noted.

3.   Amend Subchapter A, Part 0 to add section (a)(30) to § 0.111 as follows:

**§0.111 Functions of the Bureau.**

* * * * *

(a)(30)  Resolve complaints alleging violations of digital discrimination of access pursuant to Part 16 of Subchapter A of these rules.

## PART 1 – PRACTICE AND PROCEDURE

4.   Revise the authority citation for Subchapter A, Part 1 – Practice and Procedure to read as follows:

**Authority:** 47 U.S.C. chs. 2, 5, 9, 13; 28 U.S.C. 2461 note; 47 U.S.C. 1754, unless otherwise noted.

5.   Amend Subchapter A, Part 1, Subpart E as follows:

### § 1.717 Procedure

The Commission will forward informal complaints to the appropriate carrier for investigation and may set a due date for the carrier to provide a written response to the informal complaint to the Commission, with a copy to the complainant. The response will advise the Commission of the carrier's satisfaction of the complaint or of its refusal or inability to do so. Where there are clear indications from the carrier's response or from other communications with the parties that the complaint has been satisfied, the Commission may, in its discretion, consider a complaint proceeding to be closed. In other cases, the Commission may notify the complainant that if the complainant is not satisfied by the carrier's response, or if the carrier has failed to submit a response by the due date, the complainant may file a formal complaint in accordance with § 1.721, except for digital discrimination of access informal complaints filed pursuant to Part 16 of Subchapter A of these rules.  In addition, for the purpose of informal complaints submitted under Part 16 of Subchapter A of these rules, the Commission's informal complaint procedures will apply to all covered entities as defined in § 16.2.

6.   Amend Subchapter A, Part 1 to add (a)(8) to § 1.80 as follows:

### § 1.80 under "Forfeiture proceedings"

* * * * *

(a)(8) Violated section 60506 of the Infrastructure and Jobs Act of 2021 or Part 16 of Subchapter A of these rules.

**APPENDIX B**

**Final Regulatory Flexibility Analysis**

1.       As required by the Regulatory Flexibility Act of 1980, as amended (RFA),[1] an Initial Regulatory Flexibility Analysis (IRFA) was incorporated in the *Implementing the Infrastructure Investment and Jobs Act Prevention and Elimination of Digital Discrimination Notice of Purposed Rulemaking* (*Digital Discrimination Notice*), released in December 2022.[2] The Federal Communications Commission (Commission) sought written public comment on the proposals in the *Digital Discrimination Notice*, including comment on the IRFA. No comments were filed addressing the IRFA. This present Final Regulatory Flexibility Analysis (FRFA) conforms to the RFA.[3]

### A.      Need for, and Objectives of, the *Report and Order*

2.       The Report and Order takes an important step to promote equal access to broadband for all people in the United States by adopting rules pursuant to section 60506 of the Infrastructure Investment and Jobs Act (Infrastructure Act)[4] that establish a balanced framework to facilitate equal access to broadband internet service by preventing digital discrimination of access. Many households in the United States lack equal access to broadband, with disparities that cross income, demographic, and geographic lines, including rural and tribal areas.[5] Among households with broadband access, mid-sized communities, urban, and rural areas are all impacted by inferior service offerings. The *Report and Order* establishes that a policy or practice will violate the Commission's prohibition on digital discrimination of access if it discriminates based on one of section 60506's listed characteristics (either by intent or in effect), and creates a process to report incidents of digital discrimination and determine whether a violation has occurred.

3.       First, the *Report and Order* defines "digital discrimination of access" as "Policies or practices, not justified by genuine issues of technical or economic feasibility, that (1) differentially impact consumers' access to broadband internet access service based on their income level, race, ethnicity, color, religion or national origin, or (2) are intended to have such differential impact."[6] Second, the *Report and Order*, prohibits "digital discrimination of access."[7] Third, it establishes the scope of covered entities, consumers, and services subject to the prohibition.[8] Fourth, the *Report and Order* revises the Commission's informal consumer complaint process to: (1) add a dedicated pathway for digital discrimination of access complaints; (2) collect voluntary demographic information from filers who submit digital discrimination of access complaints; and (3) establish a clear pathway for organizations to submit digital discrimination of access complaints.[9] Fifth, it amends certain existing Commission

---

[1] *See* 5 U.S.C. § 603. The RFA, 5 U.S.C. §§ 601–612, was amended by the Small Business Regulatory Enforcement Fairness Act of 1996 (SBREFA), Pub. L. No. 104-121, Title II, 110 Stat. 857 (1996).

[2] *Implementing the Infrastructure Investment and Jobs Act: Prevention and Elimination of Digital Discrimination*, GN Docket No. 22-69, Notice of Proposed Rulemaking, FCC 22-98, at Appx. A (Dec. 22, 2022) (*Digital Discrimination Notice*)

[3] *See* 5 U.S.C. § 604.

[4] Infrastructure Investment and Jobs Act, Pub. L. No. 117-58, 135 Stat. 429, § 60506 (2021) (codified at 47 U.S.C. §1754) (Infrastructure Act).

[5] *Report and Order* Part II.A.2-3, paras. 10-15.

[6] *Report and Order* Part III.A.1.

[7] *Report and Order* Part III.B.

[8] *Report and Order* Part III.

[9] *Report and Order* Part III.D.

enforcement rules: Rule 1.80, to reference the provisions of section 60506 in addition to those of the Communications Act and other statutes, and Rule 0.111 to reflect the Enforcement Bureau's direction to investigate claims of digital discrimination of access and make recommendations as to potential violations and penalties.[10] Finally, the *Report and Order* adopts, as guidelines, the Communications Equity and Diversity Council's (CEDC's) model policies and best practices to prevent digital discrimination by broadband providers, and best practices to advance digital equity for states, localities, Tribal governments, and United States territories.[11]

### B. Summary of Significant Issues Raised by Public Comments in Response to the IRFA

4.      There were no comments filed that specifically addressed the proposed rules and policies presented in the IRFA or otherwise raised issues addressing the specific concerns of, and impact on small entities.  Nonetheless, the Commission considered the potential impact of the rules proposed in the IRFA on small entities and took steps where appropriate and feasible to reduce the compliance burden for small entities in order to reduce the economic impact of the rules enacted herein on such entities.

### C. Response to Comments by the Chief Counsel for Advocacy of the Small Business Administration

5.      Pursuant to the Small Business Jobs Act of 2010, which amended the RFA, the Commission is required to respond to any comments filed by the Chief Counsel for Advocacy of the Small Business Administration (SBA), and to provide a detailed statement of any change made to the proposed rules as a result of those comments.[12]  The Chief Counsel did not file any comments in response to the proposed rules in this proceeding.

### D. Description and Estimate of the Number of Small Entities to Which the Rules Will Apply

6.      The RFA directs agencies to provide a description of, and where feasible, an estimate of the number of small entities that may be affected by the rules adopted herein.[13] The RFA generally defines the term "small entity" as having the same meaning as the terms "small business," "small organization," and "small governmental jurisdiction."[14] In addition, the term "small business" has the same meaning as the term "small-business concern" under the Small Business Act.[15] A "small-business concern" is one which: (1) is independently owned and operated; (2) is not dominant in its field of operation; and (3) satisfies any additional criteria established by the SBA.[16]

7.      *Small Businesses, Small Organizations, Small Governmental Jurisdictions.*  Our actions, over time, may affect small entities that are not easily categorized at present.  We therefore describe, at the outset, three broad groups of small entities that could be directly affected herein.[17]  First, while there

---

[10] *Report and Order* Part III.E (3).

[11] *Report and Order* Part I.

[12] 5 U.S.C. § 604(a)(3).

[13] *See id.* § 604(a)(4).

[14] *Id.* § 601(6).

[15] *Id.* § 601(3) (incorporating by reference the definition of "small-business concern" in the Small Business Act, 15 U.S.C. § 632).  Pursuant to 5 U.S.C. § 601(3), the statutory definition of a small business applies "unless an agency, after consultation with the Office of Advocacy of the Small Business Administration and after opportunity for public comment, establishes one or more definitions of such term which are appropriate to the activities of the agency and publishes such definition(s) in the Federal Register."  *Id.*

[16] *See* 15 U.S.C. § 632.

[17] *See* 5 U.S.C. § 601(3)-(6).

are industry specific size standards for small businesses that are used in the regulatory flexibility analysis, according to data from the Small Business Administration's (SBA) Office of Advocacy, in general a small business is an independent business having fewer than 500 employees.[18] These types of small businesses represent 99.9% of all businesses in the United States, which translates to 32.5 million businesses.[19]

8. Next, the type of small entity described as a "small organization" is generally "any not-for-profit enterprise which is independently owned and operated and is not dominant in its field."[20] The Internal Revenue Service (IRS) uses a revenue benchmark of $50,000 or less to delineate its annual electronic filing requirements for small exempt organizations.[21] Nationwide, for tax year 2020, there were approximately 447,689 small exempt organizations in the U.S. reporting revenues of $50,000 or less according to the registration and tax data for exempt organizations available from the IRS.[22]

9. Finally, the small entity described as a "small governmental jurisdiction" is defined generally as "governments of cities, counties, towns, townships, villages, school districts, or special districts, with a population of less than fifty thousand."[23] U.S. Census Bureau data from the 2017 Census of Governments[24] indicate there were 90,075 local governmental jurisdictions consisting of general purpose governments and special purpose governments in the United States.[25] Of this number there were 36,931 general purpose governments (county[26], municipal and town or township[27]) with populations of

---

[18] *See* SBA, Office of Advocacy, *Frequently Asked Questions, "What is a small business?"* (Mar. 2023), https://advocacy.sba.gov/wp-content/uploads/2023/03/Frequently-Asked-Questions-About-Small-Business-March-2023-508c.pdf.

[19] *Id*.

[20] *See* 5 U.S.C. § 601(4).

[21] The IRS benchmark is similar to the population of less than 50,000 benchmark in 5 U.S.C § 601(5) that is used to define a small governmental jurisdiction. Therefore, the IRS benchmark has been used to estimate the number small organizations in this small entity description. *See* Annual Electronic Filing Requirement for Small Exempt Organizations — Form 990-N (e-Postcard), https://www.irs.gov/charities-non-profits/annual-electronic-filing-requirement-for-small-exempt-organizations-form-990-n-e-postcard. We note that the IRS data does not provide information on whether a small exempt organization is independently owned and operated or dominant in its field.

[22] *See* Exempt Organizations Business Master File Extract (EO BMF), "CSV Files by Region," https://www.irs.gov/charities-non-profits/exempt-organizations-business-master-file-extract-eo-bmf. The IRS Exempt Organization Business Master File (EO BMF) Extract provides information on all registered tax-exempt/non-profit organizations. The data utilized for purposes of this description was extracted from the IRS EO BMF data for businesses for the tax year 2020 with revenue less than or equal to $50,000, for Region 1-Northeast Area (58,577), Region 2-Mid-Atlantic and Great Lakes Areas (175,272), and Region 3-Gulf Coast and Pacific Coast Areas (213,840) that includes the continental U.S., Alaska, and Hawaii. This data does not include information for Puerto Rico.

[23] *See* 5 U.S.C. § 601(5).

[24] *See* 13 U.S.C. § 161. The Census of Governments survey is conducted every five (5) years compiling data for years ending with "2" and "7." *See also* U.S. Census Bureau, *About Census of Governments*, https://www.census.gov/programs-surveys/cog/about.html (last updated Nov. 2021).

[25] *See* U.S. Census Bureau, 2017 Census of Governments – Organization Table 2. Local Governments by Type and State: 2017 [CG1700ORG02], https://www.census.gov/data/tables/2017/econ/gus/2017-governments.html. Local governmental jurisdictions are made up of general purpose governments (county, municipal and town or township) and special purpose governments (special districts and independent school districts). *See also* tbl.2. CG1700ORG02 Table Notes Local Governments by Type and State_2017.

[26] *See id.* at tbl.5. County Governments by Population-Size Group and State: 2017 [CG1700ORG05], https://www.census.gov/data/tables/2017/econ/gus/2017-governments.html. There were 2,105 county governments with populations less than 50,000. This category does not include subcounty (municipal and township) governments.

less than 50,000 and 12,040 special purpose governments - independent school districts[28] with enrollment populations of less than 50,000.[29] Accordingly, based on the 2017 U.S. Census of Governments data, we estimate that at least 48,971 entities fall into the category of "small governmental jurisdictions."[30]

10. *Wired Telecommunications Carriers.* The U.S. Census Bureau defines this industry as establishments primarily engaged in operating and/or providing access to transmission facilities and infrastructure that they own and/or lease for the transmission of voice, data, text, sound, and video using wired communications networks.[31] Transmission facilities may be based on a single technology or a combination of technologies. Establishments in this industry use the wired telecommunications network facilities that they operate to provide a variety of services, such as wired telephony services, including VoIP services, wired (cable) audio and video programming distribution, and wired broadband internet services.[32] By exception, establishments providing satellite television distribution services using facilities and infrastructure that they operate are included in this industry.[33] Wired Telecommunications Carriers are also referred to as wireline carriers or fixed local service providers.[34]

11. The SBA small business size standard for Wired Telecommunications Carriers classifies firms having 1,500 or fewer employees as small.[35] U.S. Census Bureau data for 2017 show that there were 3,054 firms that operated in this industry for the entire year.[36] Of this number, 2,964 firms operated

---

(Continued from previous page) ──────────────────────────

[27] *See id. at* tbl.6. Subcounty General-Purpose Governments by Population-Size Group and State: 2017 [CG1700ORG06], https://www.census.gov/data/tables/2017/econ/gus/2017-governments.html. There were 18,729 municipal and 16,097 town and township governments with populations less than 50,000.

[28] *See id.* at tbl.10. Elementary and Secondary School Systems by Enrollment-Size Group and State: 2017 [CG1700ORG10], https://www.census.gov/data/tables/2017/econ/gus/2017-governments.html. There were 12,040 independent school districts with enrollment populations less than 50,000. *See also* tbl.4. Special-Purpose Local Governments by State Census Years 1942 to 2017 [CG1700ORG04], CG1700ORG04 Table Notes Special Purpose Local Governments by State Census Years 1942 to 2017.

[29] While the special purpose governments category also includes local special district governments, the 2017 Census of Governments data does not provide data aggregated based on population size for the special purpose governments category. Therefore, only data from independent school districts is included in the special purpose governments category.

[30] This total is derived from the sum of the number of general purpose governments (county, municipal and town or township) with populations of less than 50,000 (36,931) and the number of special purpose governments - independent school districts with enrollment populations of less than 50,000 (12,040), from the 2017 Census of Governments - Organizations tbls.5, 6 & 10.

[31] *See* U.S. Census Bureau, *2017 NAICS Definition, "517311 Wired Telecommunications Carriers,"* https://www.census.gov/naics/?input=517311&year=2017&details=517311.

[32] *Id.*

[33] *Id.*

[34] Fixed Local Service Providers include the following types of providers: Incumbent Local Exchange Carriers (ILECs), Competitive Access Providers (CAPs) and Competitive Local Exchange Carriers (CLECs), Cable/Coax CLECs, Interconnected VoIP Providers, Non-Interconnected VoIP Providers, Shared-Tenant Service Providers, Audio Bridge Service Providers, and Other Local Service Providers. Local Resellers fall into another U.S. Census Bureau industry group and therefore data for these providers is not included in this industry.

[35] *See* 13 CFR § 121.201, NAICS Code 517311.

[36] *See* U.S. Census Bureau, *2017 Economic Census of the United States, Selected Sectors: Employment Size of Firms for the U.S.: 2017*, Table ID: EC1700SIZEEMPFIRM, NAICS Code 517311, https://data.census.gov/cedsci/table?y=2017&n=517311&tid=ECNSIZE2017.EC1700SIZEEMPFIRM&hidePreview=false.

with fewer than 250 employees.[37]  Additionally, based on Commission data in the 2022 Universal Service Monitoring Report, as of December 31, 2021, there were 4,590 providers that reported they were engaged in the provision of fixed local services.[38]  Of these providers, the Commission estimates that 4,146 providers have 1,500 or fewer employees.[39]  Consequently, using the SBA's small business size standard, most of these providers can be considered small entities.

12.      *Local Exchange Carriers (LECs).*  Neither the Commission nor the SBA has developed a size standard for small businesses specifically applicable to local exchange services. Providers of these services include both incumbent and competitive local exchange service providers.  Wired Telecommunications Carriers[40] is the closest industry with an SBA small business size standard.[41]  Wired Telecommunications Carriers are also referred to as wireline carriers or fixed local service providers.[42]  The SBA small business size standard for Wired Telecommunications Carriers classifies firms having 1,500 or fewer employees as small.[43]  U.S. Census Bureau data for 2017 show that there were 3,054 firms that operated in this industry for the entire year.[44]  Of this number, 2,964 firms operated with fewer than 250 employees.[45]  Additionally, based on Commission data in the 2022 Universal Service Monitoring Report, as of December 31, 2021, there were 4,590 providers that reported they were fixed local exchange service providers.[46]  Of these providers, the Commission estimates that 4,146 providers have 1,500 or fewer employees.[47] Consequently, using the SBA's small business size standard, most of these providers can be considered small entities.

13.      *Competitive Local Exchange Carriers (LECs).*  Neither the Commission nor the SBA has developed a size standard for small businesses specifically applicable to local exchange services. Providers of these services include several types of competitive local exchange service providers.[48]

---

[37] *Id.*  The available U.S. Census Bureau data does not provide a more precise estimate of the number of firms that meet the SBA size standard.

[38] Fed.-State Joint Bd. on Universal Serv., Universal Service Monitoring Report at 26, Table 1.12 (2022), https://docs.fcc.gov/public/attachments/DOC-391070A1.pdf.

[39] *Id.*

[40] *See* U.S. Census Bureau, *2017 NAICS Definition, "517311 Wired Telecommunications Carriers,"* https://www.census.gov/naics/?input=517311&year=2017&details=517311.

[41] *See* 13 CFR § 121.201, NAICS Code 517311.

[42] Fixed Local Exchange Service Providers include the following types of providers: Incumbent Local Exchange Carriers (ILECs), Competitive Access Providers (CAPs) and Competitive Local Exchange Carriers (CLECs), Cable/Coax CLECs, Interconnected VoIP Providers, Non-Interconnected VoIP Providers, Shared-Tenant Service Providers, Audio Bridge Service Providers, Local Resellers, and Other Local Service Providers.

[43] *Id.*

[44] *See* U.S. Census Bureau, *2017 Economic Census of the United States, Selected Sectors: Employment Size of Firms for the U.S.: 2017*, Table ID: EC1700SIZEEMPFIRM, NAICS Code 517311, https://data.census.gov/cedsci/table?y=2017&n=517311&tid=ECNSIZE2017.EC1700SIZEEMPFIRM&hidePreview=false.

[45] *Id.*  The available U.S. Census Bureau data does not provide a more precise estimate of the number of firms that meet the SBA size standard.

[46] Fed.-State Joint Bd. on Universal Serv., Universal Service Monitoring Report at 26, Table 1.12 (2022), https://docs.fcc.gov/public/attachments/DOC-391070A1.pdf.

[47] *Id.*

[48] Competitive Local Exchange Service Providers include the following types of providers: Competitive Access Providers (CAPs) and Competitive Local Exchange Carriers (CLECs), Cable/Coax CLECs, Interconnected VoIP Providers, Non-Interconnected VoIP Providers, Shared-Tenant Service Providers, Audio Bridge Service Providers, Local Resellers, and Other Local Service Providers.

Wired Telecommunications Carriers[49] is the closest industry with an SBA small business size standard. The SBA small business size standard for Wired Telecommunications Carriers classifies firms having 1,500 or fewer employees as small.[50] U.S. Census Bureau data for 2017 show that there were 3,054 firms that operated in this industry for the entire year.[51] Of this number, 2,964 firms operated with fewer than 250 employees.[52] Additionally, based on Commission data in the 2022 Universal Service Monitoring Report, as of December 31, 2021, there were 3,378 providers that reported they were competitive local exchange service providers.[53] Of these providers, the Commission estimates that 3,230 providers have 1,500 or fewer employees.[54] Consequently, using the SBA's small business size standard, most of these providers can be considered small entities.

14. *Interexchange Carriers (IXCs)*. Neither the Commission nor the SBA has developed a small business size standard specifically for Interexchange Carriers. Wired Telecommunications Carriers[55] is the closest industry with an SBA small business size standard.[56] The SBA small business size standard for Wired Telecommunications Carriers classifies firms having 1,500 or fewer employees as small.[57] U.S. Census Bureau data for 2017 show that there were 3,054 firms that operated in this industry for the entire year.[58] Of this number, 2,964 firms operated with fewer than 250 employees.[59] Additionally, based on Commission data in the 2022 Universal Service Monitoring Report, as of December 31, 2021, there were 127 providers that reported they were engaged in the provision of interexchange services. Of these providers, the Commission estimates that 109 providers have 1,500 or fewer employees.[60] Consequently, using the SBA's small business size standard, the Commission estimates that the majority of providers in this industry can be considered small entities.

15. *Cable System Operators (Telecom Act Standard)*. The Communications Act of 1934, as amended, contains a size standard for a "small cable operator," which is "a cable operator that, directly or

---

[49] *See* U.S. Census Bureau, *2017 NAICS Definition, "517311 Wired Telecommunications Carriers,"* https://www.census.gov/naics/?input=517311&year=2017&details=517311.

[50] *See* 13 CFR § 121.201, NAICS Code 517311.

[51] *See* U.S. Census Bureau, *2017 Economic Census of the United States, Selected Sectors: Employment Size of Firms for the U.S.: 2017*, Table ID: EC1700SIZEEMPFIRM, NAICS Code 517311, https://data.census.gov/cedsci/table?y=2017&n=517311&tid=ECNSIZE2017.EC1700SIZEEMPFIRM&hidePreview=false.

[52] *Id.* The available U.S. Census Bureau data does not provide a more precise estimate of the number of firms that meet the SBA size standard.

[53] Fed.-State Joint Bd. on Universal Serv., Universal Service Monitoring Report at 26, Table 1.12 (2022),

https://docs.fcc.gov/public/attachments/DOC-391070A1.pdf.

[54] *Id.*

[55] *See* U.S. Census Bureau, *2017 NAICS Definition, "517311 Wired Telecommunications Carriers,"* https://www.census.gov/naics/?input=517311&year=2017&details=517311.

[56] *See* 13 CFR § 121.201, NAICS Code 517311.

[57] *Id.*

[58] *See* U.S. Census Bureau, *2017 Economic Census of the United States, Selected Sectors: Employment Size of Firms for the U.S.: 2017*, Table ID: EC1700SIZEEMPFIRM, NAICS Code 517311, https://data.census.gov/cedsci/table?y=2017&n=517311&tid=ECNSIZE2017.EC1700SIZEEMPFIRM&hidePreview=false.

[59] *Id.* The available U.S. Census Bureau data does not provide a more precise estimate of the number of firms that meet the SBA size standard.

[60] Fed.-State Joint Bd. on Universal Serv., Universal Service Monitoring Report at 26, Table 1.12 (2022), https://docs.fcc.gov/public/attachments/DOC-391070A1.pdf.

through an affiliate, serves in the aggregate fewer than one percent of all subscribers in the United States and is not affiliated with any entity or entities whose gross annual revenues in the aggregate exceed $250,000,000."[61] For purposes of the Telecom Act Standard, the Commission determined that a cable system operator that serves fewer than 677,000 subscribers, either directly or through affiliates, will meet the definition of a small cable operator based on the cable subscriber count established in a 2001 Public Notice.[62] Based on industry data, only six cable system operators have more than 677,000 subscribers.[63] Accordingly, the Commission estimates that the majority of cable system operators are small under this size standard. We note however, that the Commission neither requests nor collects information on whether cable system operators are affiliated with entities whose gross annual revenues exceed $250 million.[64] Therefore, we are unable at this time to estimate with greater precision the number of cable system operators that would qualify as small cable operators under the definition in the Communications Act.

16. *Other Toll Carriers*. Neither the Commission nor the SBA has developed a definition for small businesses specifically applicable to Other Toll Carriers. This category includes toll carriers that do not fall within the categories of interexchange carriers, operator service providers, prepaid calling card providers, satellite service carriers, or toll resellers. Wired Telecommunications Carriers[65] is the closest industry with a SBA small business size standard.[66] The SBA small business size standard for Wired Telecommunications Carriers classifies firms having 1,500 or fewer employees as small.[67] U.S. Census Bureau data for 2017 show that there were 3,054 firms in this industry that operated for the entire year.[68] Of this number, 2,964 firms operated with fewer than 250 employees.[69] Additionally, based on Commission data in the 2021 Universal Service Monitoring Report, as of December 31, 2020, there were

---

[61] 47 U.S.C. § 543(m)(2).

[62] *FCC Announces New Subscriber Count for the Definition of Small Cable Operator*, Public Notice, 16 FCC Rcd 2225 (CSB 2001) (*2001 Subscriber Count PN*). In this Public Notice, the Commission determined that there were approximately 67.7 million cable subscribers in the United States at that time using the most reliable source publicly available. *Id*. We recognize that the number of cable subscribers changed since then and that the Commission has recently estimated the number of cable subscribers to be approximately 58.1 million. *See Communications Marketplace Report*, GN Docket No. 20-60, 2020 Communications Marketplace Report, 36 FCC Rcd 2945, 3049, para. 156 (2020) (*2020 Communications Marketplace Report*). However, because the Commission has not issued a public notice subsequent to the *2001 Subscriber Count PN,* the Commission still relies on the subscriber count threshold established by the *2001 Subscriber Count PN* for purposes of this rule. *See* 47 CFR § 76.901(e)(1).

[63] S&P Global Market Intelligence, S&P Capital IQ Pro, *Top Cable MSOs 12/21Q (*last visited Nov. 29, 2022); S&P Global Market Intelligence, Multichannel Video Subscriptions, Top 10 (April 2022).

[64] The Commission does receive such information on a case-by-case basis if a cable operator appeals a local franchise authority's finding that the operator does not qualify as a small cable operator pursuant to § 76.901(e) of the Commission's rules. *See* 47 CFR § 76.910(b).

[65] *See* U.S. Census Bureau, *2017 NAICS Definition, "517311 Wired Telecommunications Carriers,"* https://www.census.gov/naics/?input=517311&year=2017&details=517311.

[66] *See* 13 CFR § 121.201, NAICS Code 517311.

[67] *Id.*

[68] *See* U.S. Census Bureau, *2017 Economic Census of the United States, Selected Sectors: Employment Size of Firms for the U.S.: 2017,* Table ID: EC1700SIZEEMPFIRM, NAICS Code 517311, https://data.census.gov/cedsci/table?y=2017&n=517311&tid=ECNSIZE2017.EC1700SIZEEMPFIRM&hidePreview=false.

[69] *Id.* The available U.S. Census Bureau data does not provide a more precise estimate of the number of firms that meet the SBA size standard.

115 providers that reported they were engaged in the provision of other toll services.[70] Of these providers, the Commission estimates that 113 providers have 1,500 or fewer employees.[71] Consequently, using the SBA's small business size standard, most of these providers can be considered small entities.

17. *Wireless Telecommunications Carriers (except Satellite).* This industry comprises establishments engaged in operating and maintaining switching and transmission facilities to provide communications via the airwaves.[72] Establishments in this industry have spectrum licenses and provide services using that spectrum, such as cellular services, paging services, wireless internet access, and wireless video services.[73] The SBA size standard for this industry classifies a business as small if it has 1,500 or fewer employees.[74] U.S. Census Bureau data for 2017 show that there were 2,893 firms in this industry that operated for the entire year.[75] Of that number, 2,837 firms employed fewer than 250 employees.[76] Additionally, based on Commission data in the 2022 Universal Service Monitoring Report, as of December 31, 2021, there were 594 providers that reported they were engaged in the provision of wireless services.[77] Of these providers, the Commission estimates that 511 providers have 1,500 or fewer employees.[78] Consequently, using the SBA's small business size standard, most of these providers can be considered small entities.

18. *Satellite Telecommunications.* This industry comprises firms "primarily engaged in providing telecommunications services to other establishments in the telecommunications and broadcasting industries by forwarding and receiving communications signals via a system of satellites or reselling satellite telecommunications."[79] Satellite telecommunications service providers include satellite and earth station operators. The SBA small business size standard for this industry classifies a business with $38.5 million or less in annual receipts as small.[80] U.S. Census Bureau data for 2017 show that 275 firms in this industry operated for the entire year.[81] Of this number, 242 firms had revenue of less than

---

[70] Federal-State Joint Board on Universal Service, Universal Service Monitoring Report at 26, Table 1.12 (2021), https://docs.fcc.gov/*pubId.lic/*attachments/DOC-379181A1.pdf.

[71] *Id.*

[72] *See* U.S. Census Bureau, *2017 NAICS Definition, "517312 Wireless Telecommunications Carriers (except Satellite),"* https://www.census.gov/naics/?input=517312&year=2017&details=517312.

[73] *Id.*

[74] *See* 13 CFR § 121.201, NAICS Code 517312.

[75] *See* U.S. Census Bureau, *2017 Economic Census of the United States*, *Employment Size of Firms for the U.S.: 2017*, Table ID: EC1700SIZEEMPFIRM, NAICS Code 517312, https://data.census.gov/cedsci/table?y=2017&n=517312&tid=ECNSIZE2017.EC1700SIZEEMPFIRM&hidePreview=false.

[76] *Id.* The available U.S. Census Bureau data does not provide a more precise estimate of the number of firms that meet the SBA size standard.

[77] Fed.-State Joint Bd. on Universal Serv., Universal Service Monitoring Report at 26, Table 1.12 (2022), https://docs.fcc.gov/public/attachments/DOC-391070A1.pdf.

[78] *Id.*

[79] *See* U.S. Census Bureau, *2017 NAICS Definition, "517410 Satellite Telecommunications,"* https://www.census.gov/naics/?input=517410&year=2017&details=517410.

[80] *See* 13 CFR § 121.201, NAICS Code 517410.

[81] *See* U.S. Census Bureau, *2017 Economic Census of the United States*, *Selected Sectors: Sales, Value of Shipments, or Revenue Size of Firms for the U.S.: 2017,* Table ID: EC1700SIZEREVFIRM, NAICS Code 517410, https://data.census.gov/cedsci/table?y=2017&n=517410&tid=ECNSIZE2017.EC1700SIZEREVFIRM&hidePreview=false.

$25 million.[82] Additionally, based on Commission data in the 2021 Universal Service Monitoring Report, as of December 31, 2020, there were 71 providers that reported they were engaged in the provision of satellite telecommunications services.[83] Of these providers, the Commission estimates that approximately 48 providers have 1,500 or fewer employees.[84] Consequently, using the SBA's small business size standard, a little more than of these providers can be considered small entities.

19. *Local Resellers*. Neither the Commission nor the SBA have developed a small business size standard specifically for Local Resellers. Telecommunications Resellers is the closest industry with a SBA small business size standard.[85] The Telecommunications Resellers industry comprises establishments engaged in purchasing access and network capacity from owners and operators of telecommunications networks and reselling wired and wireless telecommunications services (except satellite) to businesses and households.[86] Establishments in this industry resell telecommunications; they do not operate transmission facilities and infrastructure.[87] Mobile virtual network operators (MVNOs) are included in this industry.[88] The SBA small business size standard for Telecommunications Resellers classifies a business as small if it has 1,500 or fewer employees.[89] U.S. Census Bureau data for 2017 show that 1,386 firms in this industry provided resale services for the entire year.[90] Of that number, 1,375 firms operated with fewer than 250 employees.[91] Additionally, based on Commission data in the 2022 Universal Service Monitoring Report, as of December 31, 2021, there were 207 providers that reported they were engaged in the provision of local resale services.[92] Of these providers, the Commission estimates that 202 providers have 1,500 or fewer employees.[93] Consequently, using the SBA's small business size standard, most of these providers can be considered small entities.

20. *Toll Resellers*. Neither the Commission nor the SBA have developed a small business size standard specifically for Toll Resellers. Telecommunications Resellers[94] is the closest industry with

---

[82] *Id*. The available U.S. Census Bureau data does not provide a more precise estimate of the number of firms that meet the SBA size standard. We also note that according to the U.S. Census Bureau glossary, the terms receipts and revenues are used interchangeably, *see* https://www.census.gov/glossary/#term_ReceiptsRevenueServices.

[83] Federal-State Joint Board on Universal Service, Universal Service Monitoring Report at 26, Table 1.12 (2021), https://docs.fcc.gov/*pubId.lic*/attachments/DOC-379181A1.pdf.

[84] *Id.*

[85] *See* U.S. Census Bureau, *2017 NAICS Definition*, "*517911 Telecommunications Resellers,"* https://www.census.gov/naics/?input=517911&year=2017&details=517911.

[86] *Id.*

[87] *Id*.

[88] *Id*.

[89] *See* 13 CFR § 121.201, NAICS Code 517911 (as of 10/1/22, NAICS Code 517121).

[90] *See* U.S. Census Bureau, *2017 Economic Census of the United States*, *Selected Sectors: Employment Size of Firms for the U.S.: 2017*, Table ID: EC1700SIZEEMPFIRM, NAICS Code 517911, https://data.census.gov/cedsci/table?y=2017&n=517911&tid=ECNSIZE2017.EC1700SIZEEMPFIRM&hidePreview=false.

[91] *Id.* The available U.S. Census Bureau data does not provide a more precise estimate of the number of firms that meet the SBA size standard.

[92] Fed.-State Joint Bd. on Universal Serv., Universal Service Monitoring Report at 26, Table 1.12 (2022), https://docs.fcc.gov/public/attachments/DOC-391070A1.pdf.

[93] *Id.*

[94] *See* U.S. Census Bureau, *2017 NAICS Definition*, "*517911 Telecommunications Resellers,"* https://www.census.gov/naics/?input=517911&year=2017&details=517911.

an SBA small business size standard. The Telecommunications Resellers industry comprises establishments engaged in purchasing access and network capacity from owners and operators of telecommunications networks and reselling wired and wireless telecommunications services (except satellite) to businesses and households. Establishments in this industry resell telecommunications; they do not operate transmission facilities and infrastructure.[95] Mobile virtual network operators (MVNOs) are included in this industry.[96] The SBA small business size standard for Telecommunications Resellers classifies a business as small if it has 1,500 or fewer employees.[97] U.S. Census Bureau data for 2017 show that 1,386 firms in this industry provided resale services for the entire year.[98] Of that number, 1,375 firms operated with fewer than 250 employees.[99] Additionally, based on Commission data in the 2022 Universal Service Monitoring Report, as of December 31, 2021, there were 457 providers that reported they were engaged in the provision of toll services.[100] Of these providers, the Commission estimates that 438 providers have 1,500 or fewer employees.[101] Consequently, using the SBA's small business size standard, most of these providers can be considered small entities.

21. *All Other Telecommunications*. This industry is comprised of establishments primarily engaged in providing specialized telecommunications services, such as satellite tracking, communications telemetry, and radar station operation.[102] This industry also includes establishments primarily engaged in providing satellite terminal stations and associated facilities connected with one or more terrestrial systems and capable of transmitting telecommunications to, and receiving telecommunications from, satellite systems.[103] Providers of Internet services (e.g. dial-up ISPs) or voice over Internet protocol (VoIP) services, via client-supplied telecommunications connections are also included in this industry.[104] The SBA small business size standard for this industry classifies firms with annual receipts of $35 million or less as small.[105] U.S. Census Bureau data for 2017 show that there were 1,079 firms in this industry that operated for the entire year.[106] Of those firms, 1,039 had revenue of less than $25 million.[107] Based

---

[95] *Id.*

[96] *Id*.

[97] *See* 13 CFR § 121.201, NAICS Code 517911 (as of 10/1/22, NAICS Code 517121).

[98] *See* U.S. Census Bureau, *2017 Economic Census of the United States*, *Selected Sectors: Employment Size of Firms for the U.S.: 2017*, Table ID: EC1700SIZEEMPFIRM, NAICS Code 517911, https://data.census.gov/cedsci/table?y=2017&n=517911&tid=ECNSIZE2017.EC1700SIZEEMPFIRM&hidePreview=false.

[99] *Id.* The available U.S. Census Bureau data does not provide a more precise estimate of the number of firms that meet the SBA size standard.

[100] Fed.-State Joint Bd. on Universal Serv., Universal Service Monitoring Report at 26, Table 1.12 (2022), https://docs.fcc.gov/public/attachments/DOC-391070A1.pdf. https://docs.fcc.gov/public/attachments/DOC-379181A1.pdf.

[101] *Id.*

[102] *See* U.S. Census Bureau, *2017 NAICS Definition*, "*517919 All Other Telecommunications*," https://www.census.gov/naics/?input=517919&year=2017&details=517919.

[103] *Id.*

[104] *Id*.

[105] *See* 13 CFR § 121.201, NAICS Code 517919.

[106] *See* U.S. Census Bureau, *2017 Economic Census of the United States*, *Selected Sectors: Sales, Value of Shipments, or Revenue Size of Firms for the U.S.: 2017*, Table ID: EC1700SIZEREVFIRM, NAICS Code 517919, https://data.census.gov/cedsci/table?y=2017&n=517919&tid=ECNSIZE2017.EC1700SIZEREVFIRM&hidePreview=false.

[107] *Id.* The available U.S. Census Bureau data does not provide a more precise estimate of the number of firms that meet the SBA size standard. We also note that according to the U.S. Census Bureau glossary, the terms receipts and

(continued….)

on this data, the Commission estimates that the majority of "All Other Telecommunications" firms can be considered small.

## E. Description of Projected Reporting, Recordkeeping, and Other Compliance Requirements for Small Entities

22. The *Report and Order* adopts rules defining digital discrimination making it unlawful for any broadband provider or covered entity to adopt, implement or utilize policies or practices, not justified by genuine issues of technical or economic feasibility, that differentially impact consumers' access to broadband internet access service based on their income level, race, ethnicity, color, religion, or national origin or are intended to have such differential impact. When investigating claims of digital discrimination, small entities will need to gather and provide information needed by the Commission to assess claims of technical or economic feasibility, and prove by a preponderance of the evidence that the policy or practice in question is justified by genuine issues of technical or economic feasibility. This may involve additional staff time, possibly by engineering and accounting professionals that can speak to technical or economic issues.

23. In reviewing the record, commenters expressed concern about obstacles faced by small providers. However, we adopt a flexible approach to assessing the technical and economic feasibility of a covered entity's practices, and will review alleged digital discrimination of access on a case-by-case basis. The Commission does not have sufficient information on the record to quantify the cost of compliance for small entities. The Commission, however, anticipates the approaches it has taken to implement the requirements will have minimal implications because its approach to investigations accounts for variations among provider types and industry, and will tailor its interactions with such small entities to account for these burdens.

## F. Steps Taken to Minimize the Significant Economic Impact on Small Entities, and Significant Alternatives Considered

24. The RFA requires an agency to provide "a description of the steps the agency has taken to minimize the significant economic impact on small entities…including a statement of the factual, policy, and legal reasons for selecting the alternative adopted in the final rule and why each one of the other significant alternatives to the rule considered by the agency which affect the impact on small entities was rejected."[108]

25. The *Report and Order* establishes a balanced framework to facilitate equal access to broadband internet service by preventing digital discrimination of access to that service. These rules adopted in the *Report and Order* address business practices and policies that impede equal access to broadband, take into account issues of technical and economic feasibility that pose serious challenges to full achievement of the equal access objective, and consider impacts on small entities. The Commission considered small business interests in including "genuine issues of technical or economic feasibility" in the definition of "digital discrimination of access." The Commission also acknowledged that the technical and economic challenges that providers face in deploying and serving rural and urban areas can vary greatly. The Commission's approach to technical and economic feasibility accounts for variations among provider types and industries. Moreover, the CEDC conducted outreach to small-, minority-, and women- businesses in developing the model policies and best practices to prevent digital discrimination of access adopted by the *Report and Order*.

26. In reaching its final conclusions in this proceeding, the Commission considered a number of alternatives, such as addressing digital discrimination of access issues raised either in other

---

(Continued from previous page)

revenues are used interchangeably. *See* U.S. Census Bureau, *Glossary*, https://www.census.gov/glossary/#term_ReceiptsRevenueServices.

[108] 5 U.S.C. § 604(a)(6).

proceedings, or in the current record, that could potentially impact small businesses. For example, we considered whether to establish an Office of Civil Rights within the Commission, as several commenters have urged us to do, however we will make this assessment outside the scope of this proceeding as a matter of internal structure, organization, and staffing. Additionally, the Commission determined that, at this time, its primary focus is to implement effective rules to address digital discrimination of access by the statutory deadline set by Congress, but will continue to consider the thoughtful proposals not addressed in other sections of the *Report and Order*. We also considered proposals to modify current Commission data collections to accept new data or otherwise undertake new data collections. However, it is currently unclear whether a new data collection's burdens would outweigh its potential benefits, because the Commission has access to a number of data collections and potential data sources that may assist in our analysis of digital discrimination of access claims.

27. We considered additional alternatives that may impact small entities, including how we define terms used in our digital discrimination analysis. For example, we declined to adopt specific standards or definitions for different types of providers because we want these rules to maintain the flexibility needed to address providers of various sizes, difference technologies, and the unique circumstances of each covered entity, including small businesses. We also declined proposals to define digital discrimination in a manner that considers differences in the profitability of serving one area over another, because we weigh profitability separately from technical or economic feasibility. We did not include issues pertaining to personal data that is processed by an algorithm in the definition of digital discrimination because section 60506 is not directly related to those concerns. To eliminate potential loopholes in complying with these rules, we retain the term "genuine" as part of our definition of digital discrimination to ensure that covered entities cannot rely upon unsupported assertions of technical or economic feasibility to refute claims of digital discrimination of access.

### G. Report to Congress

28. The Commission will send a copy of the *Report and Order*, including this FRFA, in a report to Congress pursuant to the Congressional Review Act.[109] In addition, the Commission will send a copy of the *Report and Order*, including this FRFA, to the Chief Counsel for Advocacy of the Small Business Administration. A copy of the *Report and Order* and FRFA (or summaries thereof) will also be published in the Federal Register.[110]

---

[109] *Id.* § 801(a)(1)(A).

[110] *See id*. § 604(b).

## APPENDIX C

### Initial Regulatory Flexibility Analysis

1.    As required by the Regulatory Flexibility Act of 1980, as amended (RFA),[1] the Federal Communications Commission (Commission) has prepared this Initial Regulatory Flexibility Analysis (IRFA) of the possible significant economic impact on small entities by the policies and rules proposed in this Further Notice of Proposed Rulemaking (Further Notice).  The Commission requests written public comments on this IRFA.  Comments must be identified as responses to the IRFA and must be filed by the deadlines for comments provided on the first page of the Further Notice.  The Commission will send a copy of the Further Notice, including this IRFA, to the Chief Counsel for Advocacy of the Small Business Administration (SBA).[2]  In addition, the Further Notice and IRFA (or summaries thereof) will be published in the Federal Register.[3]

### A.  Need for, and Objectives of, the Proposed Rules

2.    In the *Further Notice*, the Commission takes additional steps to advance its efforts to fulfill the congressional direction in section 60506 of the Infrastructure Act to facilitate equal access to broadband internet access service by preventing digital discrimination of access, proposing rules that will address disparities in broadband availability and service offerings.  Specifically, the *Further Notice* seeks comment on affirmative obligations that might be undertaken by broadband providers by complementing proposed rules adopted in the *Report and Order* with a focus on broadband providers' day-to-day business practices that might, in some instances, differentially impact consumers' access to broadband on prohibited bases.[4]  The *Further Notice* also proposes to require the reporting of this information on a state-by-state or territory-by-territory basis in a yearly supplement to the BDC so the public can see not only where broadband coverage is provided, but where and how providers are currently investing in their broadband networks and what communities are benefiting from those investments.[5]  Additionally, the *Further Notice* proposes to require providers to establish formal compliance programs related to digital discrimination of access and to conduct regular, internal assessments of what communities are served (and not served) by recently completed, pending, and planned large-scale broadband projects and whether their relevant policies and practices might differentially impact consumers' access to broadband service.[6]

### B.    Legal Basis

3.    The proposed action is authorized pursuant to sections 1, 2, 4(i)-(j), 303(r) of the Communications Act of 1934, as amended, 47 U.S.C. §§ 151, 152, 154(i)-(j), 303(r), and section 60506 of the Infrastructure Investment and Jobs Act, Pub. L. No. 117-58, 135 Stat. 429, 1245-46 (2021), codified at 47 U.S.C. § 1754.

### C.    Description and Estimate of the Number of Small Entities to Which the Proposed Rules Will Apply

4.    The RFA directs agencies to provide a description of and, where feasible, an estimate of the number of small entities that may be affected by the proposed rules and by the rule revisions on which the *Further Notice* seeks comment, if adopted.[7]  The RFA generally defines the term "small entity" as

---

[1] *See* 5 U.S.C. § 603.  The RFA, *see* 5 U.S.C. § 601-612, has been amended by the Small Business Regulatory Enforcement Fairness Act of 1996 (SBREFA), Pub. L. No. 104-121, Title II, 110 Stat. 857 (1996).

[2] *See* 5 U.S.C. § 603(a).

[3] *See id*.

[4] *See Further Notice* Part IV.A.

[5] *Id.*

[6] *Id.*

[7] *See* 5 U.S.C. § 603(b)(3).

having the same meaning as the terms "small business," "small organization," and "small governmental jurisdiction."[8] In addition, the term "small business" has the same meaning as the term "small-business concern" under the Small Business Act.[9] A "small-business concern" is one which: (1) is independently owned and operated; (2) is not dominant in its field of operation; and (3) satisfies any additional criteria established by the SBA.[10]

5.      *Small Businesses, Small Organizations, Small Governmental Jurisdictions.* Our actions, over time, may affect small entities that are not easily categorized at present. We therefore describe, at the outset, three broad groups of small entities that could be directly affected herein.[11] First, while there are industry specific size standards for small businesses that are used in the regulatory flexibility analysis, according to data from the Small Business Administration's (SBA) Office of Advocacy, in general a small business is an independent business having fewer than 500 employees.[12] These types of small businesses represent 99.9% of all businesses in the United States, which translates to 32.5 million businesses.[13]

6.      Next, the type of small entity described as a "small organization" is generally "any not-for-profit enterprise which is independently owned and operated and is not dominant in its field."[14] The Internal Revenue Service (IRS) uses a revenue benchmark of $50,000 or less to delineate its annual electronic filing requirements for small exempt organizations.[15] Nationwide, for tax year 2020, there were approximately 447,689 small exempt organizations in the U.S. reporting revenues of $50,000 or less according to the registration and tax data for exempt organizations available from the IRS.[16]

7.      Finally, the small entity described as a "small governmental jurisdiction" is defined generally as "governments of cities, counties, towns, townships, villages, school districts, or special

---

[8] *See id*. § 601(6).

[9] *Id*. § 601(3) (incorporating by reference the definition of "small-business concern" in the Small Business Act, 15 U.S.C. § 632). Pursuant to 5 U.S.C. § 601(3), the statutory definition of a small business applies "unless an agency, after consultation with the Office of Advocacy of the Small Business Administration and after opportunity for public comment, establishes one or more definitions of such term which are appropriate to the activities of the agency and publishes such definition(s) in the Federal Register."

[10] *See* 15 U.S.C. § 632.

[11] *See* 5 U.S.C. § 601(3)-(6).

[12] *See* SBA, Office of Advocacy, Frequently Asked Questions, "What is a small business?," https://cdn.advocacy.sba.gov/wp-content/uploads/2021/11/03093005/Small-Business-FAQ-2021.pdf. (Nov 2021).

[13] *Id*.

[14] *See* 5 U.S.C. § 601(4).

[15] The IRS benchmark is similar to the population of less than 50,000 benchmark in 5 U.S.C § 601(5) that is used to define a small governmental jurisdiction. Therefore, the IRS benchmark has been used to estimate the number small organizations in this small entity description. *See* Annual Electronic Filing Requirement for Small Exempt Organizations – Form 990-N (e-Postcard), "Who must file," https://www.irs.gov/charities-non-profits/annual-electronic-filing-requirement-for-small-exempt-organizations-form-990-n-e-postcard. We note that the IRS data does not provide information on whether a small exempt organization is independently owned and operated or dominant in its field.

[16] *See* Exempt Organizations Business Master File Extract (EO BMF), "CSV Files by Region," https://www.irs.gov/charities-non-profits/exempt-organizations-business-master-file-extract-eo-bmf. The IRS Exempt Organization Business Master File (EO BMF) Extract provides information on all registered tax-exempt/non-profit organizations. The data utilized for purposes of this description was extracted from the IRS EO BMF data for businesses for the tax year 2020 with revenue less than or equal to $50,000 for Region 1-Northeast Area (58,577), Region 2-Mid-Atlantic and Great Lakes Areas (175,272), and Region 3-Gulf Coast and Pacific Coast Areas (213,840) that includes the continental U.S., Alaska, and Hawaii. This data does not include information for Puerto Rico.

districts, with a population of less than fifty thousand."[17]  U.S. Census Bureau data from the 2017 Census of Governments[18] indicate there were 90,075 local governmental jurisdictions consisting of general purpose governments and special purpose governments in the United States.[19]  Of this number, there were 36,931 general purpose governments (county,[20] municipal, and town or township[21]) with populations of less than 50,000 and 12,040 special purpose governments—independent school districts[22] with enrollment populations of less than 50,000.[23]  Accordingly, based on the 2017 U.S. Census of Governments data, we estimate that at least 48,971 entities fall into the category of "small governmental jurisdictions."[24]

### D.    Wireline Carriers

8.       *Wired Telecommunications Carriers.*  The U.S. Census Bureau defines this industry as establishments primarily engaged in operating and/or providing access to transmission facilities and infrastructure that they own and/or lease for the transmission of voice, data, text, sound, and video using wired communications networks.[25]  Transmission facilities may be based on a single technology or a combination of technologies.  Establishments in this industry use the wired telecommunications network facilities that they operate to provide a variety of services, such as wired telephony services, including VoIP services, wired (cable) audio and video programming distribution, and wired broadband internet services.[26]  By exception, establishments providing satellite television distribution services using facilities

---

[17] *See* 5 U.S.C. § 601(5).

[18] *See* 13 U.S.C. § 161.  The Census of Governments survey is conducted every five (5) years compiling data for years ending with "2" and "7".  *See also* Census of Governments, https://www.census.gov/programs-surveys/cog/about.html.

[19] *See* U.S. Census Bureau, 2017 Census of Governments – Organization Table 2.  Local Governments by Type and State: 2017 [CG1700ORG02], https://www.census.gov/data/tables/2017/econ/gus/2017-governments.html.  Local governmental jurisdictions are made up of general purpose governments (county, municipal and town or township) and special purpose governments (special districts and independent school districts).  *See also* tbl.2. CG1700ORG02 Table Notes Local Governments by Type and State_2017.

[20] *See id.* at tbl.5.  County Governments by Population-Size Group and State: 2017 [CG1700ORG05], https://www.census.gov/data/tables/2017/econ/gus/2017-governments.html.  There were 2,105 county governments with populations less than 50,000.  This category does not include subcounty (municipal and township) governments.

[21] *See id.* at tbl.6.  Subcounty General-Purpose Governments by Population-Size Group and State: 2017 [CG1700ORG06], https://www.census.gov/data/tables/2017/econ/gus/2017-governments.html.  There were 18,729 municipal and 16,097 town and township governments with populations less than 50,000.

[22] *See id.* at tbl.10.  Elementary and Secondary School Systems by Enrollment-Size Group and State: 2017 [CG1700ORG10], https://www.census.gov/data/tables/2017/econ/gus/2017-governments.html.  There were 12,040 independent school districts with enrollment populations less than 50,000.  *See also* tbl.4.  Special-Purpose Local Governments by State Census Years 1942 to 2017 [CG1700ORG04], CG1700ORG04 Table Notes Special Purpose Local Governments by State Census Years 1942 to 2017.

[23] While the special purpose governments category also includes local special district governments, the 2017 Census of Governments data does not provide data aggregated based on population size for the special purpose governments category.  Therefore, only data from independent school districts is included in the special purpose governments category.

[24] This total is derived from the sum of the number of general purpose governments (county, municipal and town or township) with populations of less than 50,000 (36,931) and the number of special purpose governments - independent school districts with enrollment populations of less than 50,000 (12,040), from the 2017 Census of Governments - Organizations tbls.5, 6 & 10.

[25] *See* U.S. Census Bureau, *2017 NAICS Definition,"517311 Wired Telecommunications Carriers,"* https://www.census.gov/naics/?input=517311&year=2017&details=517311.

[26] *Id.*

and infrastructure that they operate are included in this industry.[27] Wired Telecommunications Carriers are also referred to as wireline carriers or fixed local service providers.[28] [29]

9.      The SBA small business size standard for Wired Telecommunications Carriers classifies firms having 1,500 or fewer employees as small.[30] U.S. Census Bureau data for 2017 show that there were 3,054 firms that operated in this industry for the entire year.[31] Of this number, 2,964 firms operated with fewer than 250 employees.[32] Additionally, based on Commission data in the 2021 Universal Service Monitoring Report, as of December 31, 2020, there were 5,183 providers that reported they were engaged in the provision of fixed local services.[33] Of these providers, the Commission estimates that 4,737 providers have 1,500 or fewer employees.[34] Consequently, using the SBA's small business size standard, most of these providers can be considered small entities.

10.      *Local Exchange Carriers (LECs).*  Neither the Commission nor the SBA has developed a size standard for small businesses specifically applicable to local exchange services. Providers of these services include both incumbent and competitive local exchange service providers.  Wired Telecommunications Carriers[35] is the closest industry with an SBA small business size standard.[36] Wired Telecommunications Carriers are also referred to as wireline carriers or fixed local service providers.[37] The SBA small business size standard for Wired Telecommunications Carriers classifies firms having 1,500 or fewer employees as small.[38] U.S. Census Bureau data for 2017 show that there were 3,054 firms

---

[27] *Id.*

[28] Fixed Local Service Providers include the following types of providers: Incumbent Local Exchange Carriers (ILECs), Competitive Access Providers (CAPs) and Competitive Local Exchange Carriers (CLECs), Cable/Coax CLECs, Interconnected VOIP Providers, Non-Interconnected VOIP Providers, Shared-Tenant Service Providers, Audio Bridge Service Providers, and Other Local Service Providers.  Local Resellers fall into another U.S. Census Bureau industry group and therefore data for these providers is not included in this industry.

[29] Fixed Local Service Providers include the following types of providers: Incumbent Local Exchange Carriers (ILECs), Competitive Access Providers (CAPs) and Competitive Local Exchange Carriers (CLECs), Cable/Coax CLECs, Interconnected VOIP Providers, Non-Interconnected VOIP Providers, Shared-Tenant Service Providers, Audio Bridge Service Providers, and Other Local Service Providers.  Local Resellers fall into another U.S. Census Bureau industry group and therefore data for these providers is not included in this industry.

[30] *See* 13 CFR § 121.201, NAICS Code 517311.

[31] *See* U.S. Census Bureau, *2017 Economic Census of the United States, Selected Sectors: Employment Size of Firms for the U.S.: 2017,* Table ID: EC1700SIZEEMPFIRM, NAICS Code 517311, https://data.census.gov/cedsci/table?y=2017&n=517311&tid=ECNSIZE2017.EC1700SIZEEMPFIRM&hidePreview=false.

[32] *Id.*  The available U.S. Census Bureau data does not provide a more precise estimate of the number of firms that meet the SBA size standard.

[33] Federal-State Joint Board on Universal Service, Universal Service Monitoring Report at 26, Table 1.12 (2021), https://docs.fcc.gov/*pubId.lic*/attachments/DOC-379181A1.pdf.

[34] *Id.*

[35] *See* U.S. Census Bureau, *2017 NAICS Definition, "517311 Wired Telecommunications Carriers,"* https://www.census.gov/naics/?input=517311&year=2017&details=517311.

[36] *See* 13 CFR § 121.201, NAICS Code 517311.

[37] Fixed Local Exchange Service Providers include the following types of providers: Incumbent Local Exchange Carriers (ILECs), Competitive Access Providers (CAPs) and Competitive Local Exchange Carriers (CLECs), Cable/Coax CLECs, Interconnected VOIP Providers, Non-Interconnected VOIP Providers, Shared-Tenant Service Providers, Audio Bridge Service Providers, Local Resellers, and Other Local Service Providers.

[38] *Id.*

that operated in this industry for the entire year.[39] Of this number, 2,964 firms operated with fewer than 250 employees.[40] Additionally, based on Commission data in the 2021 Universal Service Monitoring Report, as of December 31, 2020, there were 5,183 providers that reported they were fixed local exchange service providers.[41] Of these providers, the Commission estimates that 4,737 providers have 1,500 or fewer employees.[42] Consequently, using the SBA's small business size standard, most of these providers can be considered small entities.

11. *Incumbent Local Exchange Carriers (Incumbent LECs).* Neither the Commission nor the SBA have developed a small business size standard specifically for incumbent local exchange carriers. Wired Telecommunications Carriers[43] is the closest industry with an SBA small business size standard.[44] The SBA small business size standard for Wired Telecommunications Carriers classifies firms having 1,500 or fewer employees as small.[45] U.S. Census Bureau data for 2017 show that there were 3,054 firms in this industry that operated for the entire year.[46] Of this number, 2,964 firms operated with fewer than 250 employees.[47] Additionally, based on Commission data in the 2021 Universal Service Monitoring Report, as of December 31, 2020, there were 1,227 providers that reported they were incumbent local exchange service providers.[48] Of these providers, the Commission estimates that 929 providers have 1,500 or fewer employees.[49] Consequently, using the SBA's small business size standard, the Commission estimates that the majority of incumbent local exchange carriers can be considered small entities.

12. *Competitive Local Exchange Carriers (LECs).* Neither the Commission nor the SBA has developed a size standard for small businesses specifically applicable to local exchange services. Providers of these services include several types of competitive local exchange service providers.[50]

---

[39] *See* U.S. Census Bureau, *2017 Economic Census of the United States, Selected Sectors: Employment Size of Firms for the U.S.: 2017,* Table ID: EC1700SIZEEMPFIRM, NAICS Code 517311, https://data.census.gov/cedsci/table?y=2017&n=517311&tid=ECNSIZE2017.EC1700SIZEEMPFIRM&hidePreview=false.

[40] *Id.* The available U.S. Census Bureau data does not provide a more precise estimate of the number of firms that meet the SBA size standard.

[41] Federal-State Joint Board on Universal Service, Universal Service Monitoring Report at 26, Table 1.12 (2021), https://docs.fcc.gov/*pubId.lic/*attachments/DOC-379181A1.pdf.

[42] *Id.*

[43] *See* U.S. Census Bureau, *2017 NAICS Definition, "517311 Wired Telecommunications Carriers,"* https://www.census.gov/naics/?input=517311&year=2017&details=517311.

[44] *See* 13 CFR § 121.201, NAICS Code 517311.

[45] *Id.*

[46] *See* U.S. Census Bureau, *2017 Economic Census of the United States, Selected Sectors: Employment Size of Firms for the U.S.: 2017,* Table ID: EC1700SIZEEMPFIRM, NAICS Code 517311, https://data.census.gov/cedsci/table?y=2017&n=517311&tid=ECNSIZE2017.EC1700SIZEEMPFIRM&hidePreview=false.

[47] *Id.* The available U.S. Census Bureau data does not provide a more precise estimate of the number of firms that meet the SBA size standard.

[48] Federal-State Joint Board on Universal Service, Universal Service Monitoring Report at 26, Table 1.12 (2021), https://docs.fcc.gov/public/attachments/DOC-379181A1.pdf.

[49] *Id.*

[50] Competitive Local Exchange Service Providers include the following types of providers: Competitive Access Providers (CAPs) and Competitive Local Exchange Carriers (CLECs), Cable/Coax CLECs, Interconnected VOIP Providers, Non-Interconnected VOIP Providers, Shared-Tenant Service Providers, Audio Bridge Service Providers, Local Resellers, and Other Local Service Providers.

Wired Telecommunications Carriers[51] is the closest industry with a SBA small business size standard. The SBA small business size standard for Wired Telecommunications Carriers classifies firms having 1,500 or fewer employees as small.[52] U.S. Census Bureau data for 2017 show that there were 3,054 firms that operated in this industry for the entire year.[53] Of this number, 2,964 firms operated with fewer than 250 employees.[54] Additionally, based on Commission data in the 2021 Universal Service Monitoring Report, as of December 31, 2020, there were 3,956 providers that reported they were competitive local exchange service providers.[55] Of these providers, the Commission estimates that 3,808 providers have 1,500 or fewer employees.[56] Consequently, using the SBA's small business size standard, most of these providers can be considered small entities.

13. We have included small incumbent LECs in this present RFA analysis. As noted above, a "small business" under the RFA is one that, *inter alia*, meets the pertinent small-business size standard (e.g., a telephone communications business having 1,500 or fewer employees) and "is not dominant in its field of operation."[57] The SBA's Office of Advocacy contends that, for RFA purposes, small incumbent LECs are not dominant in their field of operation because any such dominance is not "national" in scope.[58] We have therefore included small incumbent LECs in this RFA analysis, although we emphasize that this RFA action has no effect on Commission analyses and determinations in other, non-RFA contexts.

14. *Interexchange Carriers (IXCs).* Neither the Commission nor the SBA have developed a small business size standard specifically for Interexchange Carriers. Wired Telecommunications Carriers[59] is the closest industry with a SBA small business size standard.[60] The SBA small business size standard for Wired Telecommunications Carriers classifies firms having 1,500 or fewer employees as small.[61] U.S. Census Bureau data for 2017 show that there were 3,054 firms that operated in this industry for the entire year.[62] Of this number, 2,964 firms operated with fewer than 250 employees.[63]

---

[51] *See* U.S. Census Bureau, *2017 NAICS Definition, "517311 Wired Telecommunications Carriers,"* https://www.census.gov/naics/?input=517311&year=2017&details=517311.

[52] *See* 13 CFR § 121.201, NAICS Code 517311.

[53] *See* U.S. Census Bureau, *2017 Economic Census of the United States, Selected Sectors: Employment Size of Firms for the U.S.: 2017,* Table ID: EC1700SIZEEMPFIRM, NAICS Code 517311, https://data.census.gov/cedsci/table?y=2017&n=517311&tid=ECNSIZE2017.EC1700SIZEEMPFIRM&hidePreview=false.

[54] *Id.* The available U.S. Census Bureau data does not provide a more precise estimate of the number of firms that meet the SBA size standard.

[55] Federal-State Joint Board on Universal Service, Universal Service Monitoring Report at 26, Table 1.12 (2021), https://docs.fcc.gov/*pubId.lic*/attachments/DOC-379181A1.pdf.

[56] *Id.*

[57] 5 U.S.C. § 601(3).

[58] Letter from Jere W. Glover, Chief Counsel for Advocacy, SBA, to William E. Kennard, Chairman, FCC (filed May 27, 1999). The Small Business Act contains a definition of "small business concern," which the RFA incorporates into its own definition of "small business." 15 U.S.C. § 632(a); 5 U.S.C. § 601(3). SBA regulations interpret "small business concern" to include the concept of dominance on a National basis. 13 CFR § 121.102(b).

[59] *See* U.S. Census Bureau, *2017 NAICS Definition, "517311 Wired Telecommunications Carriers,"* https://www.census.gov/naics/?input=517311&year=2017&details=517311.

[60] *See* 13 CFR § 121.201, NAICS Code 517311.

[61] *Id.*

[62] *See* U.S. Census Bureau, *2017 Economic Census of the United States, Selected Sectors: Employment Size of Firms for the U.S.: 2017,* Table ID: EC1700SIZEEMPFIRM, NAICS Code 517311,

(continued….)

Additionally, based on Commission data in the 2021 Universal Service Monitoring Report, as of December 31, 2020, there were 151 providers that reported they were engaged in the provision of interexchange services. Of these providers, the Commission estimates that 131 providers have 1,500 or fewer employees.[64] Consequently, using the SBA's small business size standard, the Commission estimates that the majority of providers in this industry can be considered small entities.

15. *Cable System Operators (Telecom Act Standard)*. The Communications Act of 1934, as amended, contains a size standard for a "small cable operator," which is "a cable operator that, directly or through an affiliate, serves in the aggregate fewer than one percent of all subscribers in the United States and is not affiliated with any entity or entities whose gross annual revenues in the aggregate exceed $250,000,000."[65] For purposes of the Telecom Act Standard, the Commission determined that a cable system operator that serves fewer than 677,000 subscribers, either directly or through affiliates, will meet the definition of a small cable operator based on the cable subscriber count established in a 2001 Public Notice.[66] Based on industry data, only six cable system operators have more than 677,000 subscribers.[67] Accordingly, the Commission estimates that the majority of cable system operators are small under this size standard. We note however, that the Commission neither requests nor collects information on whether cable system operators are affiliated with entities whose gross annual revenues exceed $250 million.[68] Therefore, we are unable at this time to estimate with greater precision the number of cable system operators that would qualify as small cable operators under the definition in the Communications Act.

16. *Other Toll Carriers*. Neither the Commission nor the SBA has developed a definition for small businesses specifically applicable to Other Toll Carriers. This category includes toll carriers that do not fall within the categories of interexchange carriers, operator service providers, prepaid calling card providers, satellite service carriers, or toll resellers. Wired Telecommunications Carriers[69] is the closest industry with a SBA small business size standard.[70] The SBA small business size standard for Wired

(Continued from previous page) ——————————————
https://data.census.gov/cedsci/table?y=2017&n=517311&tid=ECNSIZE2017.EC1700SIZEEMPFIRM&hidePreview=false.

[63] *Id.* The available U.S. Census Bureau data does not provide a more precise estimate of the number of firms that meet the SBA size standard.

[64] Federal-State Joint Board on Universal Service, Universal Service Monitoring Report at 26, Table 1.12 (2021), https://docs.fcc.gov/public/attachments/DOC-379181A1.pdf.

[65] 47 U.S.C. § 543(m)(2).

[66] *FCC Announces New Subscriber Count for the Definition of Small Cable Operator*, Public Notice, 16 FCC Rcd 2225 (CSB 2001) (*2001 Subscriber Count PN*). In this Public Notice, the Commission determined that there were approximately 67.7 million cable subscribers in the United States at that time using the most reliable source publicly available. *Id*. We recognize that the number of cable subscribers changed since then and that the Commission has recently estimated the number of cable subscribers to be approximately 58.1 million. *See Communications Marketplace Report*, GN Docket No. 20-60, 2020 Communications Marketplace Report, 36 FCC Rcd 2945, 3049, para. 156 (2020) (*2020 Communications Marketplace Report*). However, because the Commission has not issued a public notice subsequent to the *2001 Subscriber Count PN,* the Commission still relies on the subscriber count threshold established by the *2001 Subscriber Count PN* for purposes of this rule. *See* 47 CFR § 76.901(e)(1).

[67] S&P Global Market Intelligence, S&P Capital IQ Pro, *Top Cable MSOs 12/21Q (*last visited May 26, 2022); S&P Global Market Intelligence, Multichannel Video Subscriptions, Top 10 (April 2022).

[68] The Commission does receive such information on a case-by-case basis if a cable operator appeals a local franchise authority's finding that the operator does not qualify as a small cable operator pursuant to § 76.901(e) of the Commission's rules. *See* 47 CFR § 76.910(b).

[69] *See* U.S. Census Bureau, *2017 NAICS Definition, "517311 Wired Telecommunications Carriers,"* https://www.census.gov/naics/?input=517311&year=2017&details=517311.

[70] *See* 13 CFR § 121.201, NAICS Code 517311.

Telecommunications Carriers classifies firms having 1,500 or fewer employees as small.[71] U.S. Census Bureau data for 2017 show that there were 3,054 firms in this industry that operated for the entire year.[72] Of this number, 2,964 firms operated with fewer than 250 employees.[73] Additionally, based on Commission data in the 2021 Universal Service Monitoring Report, as of December 31, 2020, there were 115 providers that reported they were engaged in the provision of other toll services.[74] Of these providers, the Commission estimates that 113 providers have 1,500 or fewer employees.[75] Consequently, using the SBA's small business size standard, most of these providers can be considered small entities.

### E. Wireless Carriers

17. *Wireless Telecommunications Carriers (except Satellite).* This industry comprises establishments engaged in operating and maintaining switching and transmission facilities to provide communications via the airwaves.[76] Establishments in this industry have spectrum licenses and provide services using that spectrum, such as cellular services, paging services, wireless internet access, and wireless video services.[77] The SBA size standard for this industry classifies a business as small if it has 1,500 or fewer employees.[78] U.S. Census Bureau data for 2017 show that there were 2,893 firms in this industry that operated for the entire year.[79] Of that number, 2,837 firms employed fewer than 250 employees.[80] Additionally, based on Commission data in the 2021 Universal Service Monitoring Report, as of December 31, 2020, there were 797 providers that reported they were engaged in the provision of wireless services.[81] Of these providers, the Commission estimates that 715 providers have 1,500 or fewer employees.[82] Consequently, using the SBA's small business size standard, most of these providers can be considered small entities.

18. *Satellite Telecommunications.* This industry comprises firms "primarily engaged in providing telecommunications services to other establishments in the telecommunications and

---

[71] *Id.*

[72] *See* U.S. Census Bureau, *2017 Economic Census of the United States, Selected Sectors: Employment Size of Firms for the U.S.: 2017,* Table ID: EC1700SIZEEMPFIRM, NAICS Code 517311, https://data.census.gov/cedsci/table?y=2017&n=517311&tid=ECNSIZE2017.EC1700SIZEEMPFIRM&hidePreview=false.

[73] *Id.* The available U.S. Census Bureau data does not provide a more precise estimate of the number of firms that meet the SBA size standard.

[74] Federal-State Joint Board on Universal Service, Universal Service Monitoring Report at 26, Table 1.12 (2021), https://docs.fcc.gov/*pubId.lic*/attachments/DOC-379181A1.pdf.

[75] *Id.*

[76] *See* U.S. Census Bureau, *2017 NAICS Definition, "517312 Wireless Telecommunications Carriers (except Satellite),"* https://www.census.gov/naics/?input=517312&year=2017&details=517312.

[77] *Id.*

[78] *See* 13 CFR § 121.201, NAICS Code 517312.

[79] *See* U.S. Census Bureau, *2017 Economic Census of the United States*, *Employment Size of Firms for the U.S.: 2017,* Table ID: EC1700SIZEEMPFIRM, NAICS Code 517312, https://data.census.gov/cedsci/table?y=2017&n=517312&tid=ECNSIZE2017.EC1700SIZEEMPFIRM&hidePreview=false.

[80] *Id*. The available U.S. Census Bureau data does not provide a more precise estimate of the number of firms that meet the SBA size standard.

[81] Federal-State Joint Board on Universal Service, Universal Service Monitoring Report at 26, Table 1.12 (2021),

https://docs.fcc.gov/*pubId.lic*/attachments/DOC-379181A1.pdf.

[82] *Id.*

broadcasting industries by forwarding and receiving communications signals via a system of satellites or reselling satellite telecommunications."[83]  Satellite telecommunications service providers include satellite and earth station operators. The SBA small business size standard for this industry classifies a business with $38.5 million or less in annual receipts as small.[84]  U.S. Census Bureau data for 2017 show that 275 firms in this industry operated for the entire year.[85]  Of this number, 242 firms had revenue of less than $25 million.[86] Additionally, based on Commission data in the 2021 Universal Service Monitoring Report, as of December 31, 2020, there were 71 providers that reported they were engaged in the provision of satellite telecommunications services.[87]  Of these providers, the Commission estimates that approximately 48 providers have 1,500 or fewer employees.[88]  Consequently, using the SBA's small business size standard, a little more than of these providers can be considered small entities.

### F.    Resellers

19.    *Local Resellers*.  Neither the Commission nor the SBA have developed a small business size standard specifically for Local Resellers.  Telecommunications Resellers is the closest industry with a SBA small business size standard.[89]  The Telecommunications Resellers industry comprises establishments engaged in purchasing access and network capacity from owners and operators of telecommunications networks and reselling wired and wireless telecommunications services (except satellite) to businesses and households.[90]  Establishments in this industry resell telecommunications; they do not operate transmission facilities and infrastructure.[91]  Mobile virtual network operators (MVNOs) are included in this industry.[92]  The SBA small business size standard for Telecommunications Resellers classifies a business as small if it has 1,500 or fewer employees.[93]  U.S. Census Bureau data for 2017 show that 1,386 firms in this industry provided resale services for the entire year.[94]  Of that number, 1,375

---

[83] *See* U.S. Census Bureau, *2017 NAICS Definition, "517410 Satellite Telecommunications,"* https://www.census.gov/naics/?input=517410&year=2017&details=517410.

[84] *See* 13 CFR § 121.201, NAICS Code 517410.

[85] *See* U.S. Census Bureau, *2017 Economic Census of the United States*, *Selected Sectors: Sales, Value of Shipments, or Revenue Size of Firms for the U.S.: 2017,* Table ID: EC1700SIZEREVFIRM, NAICS Code 517410, https://data.census.gov/cedsci/table?y=2017&n=517410&tid=ECNSIZE2017.EC1700SIZEREVFIRM&hidePreview=false.

[86] *Id*.  The available U.S. Census Bureau data does not provide a more precise estimate of the number of firms that meet the SBA size standard.  We also note that according to the U.S. Census Bureau glossary, the terms receipts and revenues are used interchangeably, *see* https://www.census.gov/glossary/#term_ReceiptsRevenueServices.

[87] Federal-State Joint Board on Universal Service, Universal Service Monitoring Report at 26, Table 1.12 (2021), https://docs.fcc.gov/*pubId.lic*/attachments/DOC-379181A1.pdf.

[88] *Id.*

[89] *See* U.S. Census Bureau, *2017 NAICS Definition*, "*517911 Telecommunications Resellers,*" https://www.census.gov/naics/?input=517911&year=2017&details=517911.

[90] *Id.*

[91] *Id*.

[92] *Id*.

[93] *See* 13 CFR § 121.201, NAICS Code 517911.

[94] *See* U.S. Census Bureau, *2017 Economic Census of the United States*, *Selected Sectors: Employment Size of Firms for the U.S.: 2017,* Table ID: EC1700SIZEEMPFIRM, NAICS Code 517911, https://data.census.gov/cedsci/table?y=2017&n=517911&tid=ECNSIZE2017.EC1700SIZEEMPFIRM&hidePreview=false.

firms operated with fewer than 250 employees.[95]  Additionally, based on Commission data in the 2021 Universal Service Monitoring Report, as of December 31, 2020, there were 293 providers that reported they were engaged in the provision of local resale services.[96]  Of these providers, the Commission estimates that 289 providers have 1,500 or fewer employees.[97] Consequently, using the SBA's small business size standard, most of these providers can be considered small entities.

20.     *Toll Resellers*.  Neither the Commission nor the SBA have developed a small business size standard specifically for Toll Resellers.  Telecommunications Resellers[98] is the closest industry with a SBA small business size standard.  The Telecommunications Resellers industry comprises establishments engaged in purchasing access and network capacity from owners and operators of telecommunications networks and reselling wired and wireless telecommunications services (except satellite) to businesses and households.  Establishments in this industry resell telecommunications; they do not operate transmission facilities and infrastructure.[99]  Mobile virtual network operators (MVNOs) are included in this industry.[100]  The SBA small business size standard for Telecommunications Resellers classifies a business as small if it has 1,500 or fewer employees.[101]  U.S. Census Bureau data for 2017 show that 1,386 firms in this industry provided resale services for the entire year.[102]  Of that number, 1,375 firms operated with fewer than 250 employees.[103]  Additionally, based on Commission data in the 2021 Universal Service Monitoring Report, as of December 31, 2020, there were 518 providers that reported they were engaged in the provision of toll services.[104]  Of these providers, the Commission estimates that 495 providers have 1,500 or fewer employees.[105]  Consequently, using the SBA's small business size standard, most of these providers can be considered small entities.

21.     *All Other Telecommunications*.  This industry is comprised of establishments primarily engaged in providing specialized telecommunications services, such as satellite tracking, communications telemetry, and radar station operation.[106]  This industry also includes establishments primarily engaged in providing satellite terminal stations and associated facilities connected with one or more terrestrial systems and capable of transmitting telecommunications to, and receiving telecommunications from,

---

[95] *Id.*  The available U.S. Census Bureau data does not provide a more precise estimate of the number of firms that meet the SBA size standard.

[96] Federal-State Joint Board on Universal Service, Universal Service Monitoring Report at 26, Table 1.12 (2021),

https://docs.fcc.gov/*pubId.lic*/attachments/DOC-379181A1.pdf.

[97] *Id.*

[98] *See* U.S. Census Bureau, *2017 NAICS Definition,* "*517911 Telecommunications Resellers,*" https://www.census.gov/naics/?input=517911&year=2017&details=517911.

[99] *Id.*

[100] *Id.*

[101] *See* 13 CFR § 121.201, NAICS Code 517911.

[102] *See* U.S. Census Bureau, *2017 Economic Census of the United States*, *Selected Sectors: Employment Size of Firms for the U.S.: 2017,* Table ID: EC1700SIZEEMPFIRM, NAICS Code 517911, https://data.census.gov/cedsci/table?y=2017&n=517911&tid=ECNSIZE2017.EC1700SIZEEMPFIRM&hidePreview=false.

[103] *Id.*  The available U.S. Census Bureau data does not provide a more precise estimate of the number of firms that meet the SBA size standard.

[104] Federal-State Joint Board on Universal Service, Universal Service Monitoring Report at 26, Table 1.12 (2021), https://docs.fcc.gov/*pubId.lic*/attachments/DOC-379181A1.pdf.

[105] *Id.*

[106] *See* U.S. Census Bureau, *2017 NAICS Definition*, "*517919 All Other Telecommunications,*" https://www.census.gov/naics/?input=517919&year=2017&details=517919.

satellite systems.[107]  Providers of Internet services (e.g. dial-up ISPs) or voice over Internet protocol (VoIP) services, via client-supplied telecommunications connections are also included in this industry.[108] The SBA small business size standard for this industry classifies firms with annual receipts of $35 million or less as small.[109]  U.S. Census Bureau data for 2017 show that there were 1,079 firms in this industry that operated for the entire year.[110]  Of those firms, 1,039 had revenue of less than $25 million.[111]  Based on this data, the Commission estimates that the majority of "All Other Telecommunications" firms can be considered small.

### G. Description of Projected Reporting, Recordkeeping, and Other Compliance Requirements for Small Entities

22. The *Further Notice* proposes two sets of affirmative obligations for broadband providers in furtherance of our mandate to facilitate equal access to broadband internet access service, including by preventing digital discrimination of access by requiring broadband providers to: (1) submit an annual, publicly available supplement to the Broadband Data Collection (BDC) describing, on a state-by-state or territory-by-territory basis, any large-scale broadband deployment, upgrade, and maintenance projects that were completed or substantially completed during the preceding calendar year and the communities served by such projects; and (2) establish a mandatory internal compliance program requiring regular internal assessment of (a) what communities are served by recent, pending and planned large-scale projects and (b) whether the provider's broadband-related policies and practices might differentially impact consumers' access to broadband without adequate technical or economic justification.[112]

23. The *Further Notice* proposes to require the annual report as a supplement to the year-end BDC, and we assume that broadband providers would use the same criteria and data fields that are used in the BDC.  The Commission seeks comment on whether the experts who certify the BDC submissions should also be required to certify the proposed annual report.  The Commission also proposes that each provider adopt and maintain a formal internal compliance program that includes, at a minimum, elements from previously effective compliance programs:  (1) developing and implementing written policies and procedures; (2) designating a compliance officer and/or compliance committee; (3) conducting effective training and education regarding the purposes and operation of the compliance program; (4) developing effective lines of reporting and communication; and (5) conducting internal monitoring and auditing.  We propose to grant each broadband provider the flexibility to develop and maintain a plan that contains the required elements and serves our intended purposes without prescribing a particular formula as to how each required element should be implemented.

### H. Steps Taken to Minimize the Significant Economic Impact on Small Entities, and Significant Alternatives Considered

24. The RFA requires an agency to describe any significant, specifically small business, alternatives that it has considered in reaching its proposed approach, which may include the following

---

[107] *Id*.

[108] *Id.*

[109] *See* 13 CFR § 121.201, NAICS Code 517919.

[110] *See* U.S. Census Bureau, *2017 Economic Census of the United States*, *Selected Sectors: Sales, Value of Shipments, or Revenue Size of Firms for the U.S.: 2017,* Table ID: EC1700SIZEREVFIRM, NAICS Code 517919, https://data.census.gov/cedsci/table?y=2017&n=517919&tid=ECNSIZE2017.EC1700SIZEREVFIRM&hidePreview=false.

[111] *Id*.  The available U.S. Census Bureau data does not provide a more precise estimate of the number of firms that meet the SBA size standard.  We also note that according to the U.S. Census Bureau glossary, the terms receipts and revenues are used interchangeably, *see* https://www.census.gov/glossary/#term_ReceiptsRevenueServices.

[112] *See Further Notice* Part IV.A.

four alternatives (among others): "(1) the establishment of differing compliance or reporting requirements or timetables that take into account the resources available to small entities; (2) the clarification, consolidation, or simplification of compliance and reporting requirements under the rules for such small entities; (3) the use of performance rather than design standards; and (4) an exemption from coverage of the rule, or any part thereof, for such small entities."[113]

25.     The *Further Notice* seeks comment on whether any of the proposed filing, recordkeeping and reporting requirements can be minimized for small entities.  For example, we request comment on whether existing data may be used with or in place of the proposed annual report to promote transparency in broadband investments.  We also seeks comment on whether any broadband providers should be exempted from the requirement to submit an annual report or to implement and maintain an internal compliance program based on their size, footprint, or service area, including rural and Tribal areas.[114]  .  Finally, the Commission seeks comment on whether any of the costs associated with our digital discrimination of access compliance requirements can be alleviated for small entities.

I.      **Federal Rules that May Duplicate, Overlap, or Conflict with the Proposed Rules**

None.

---

[113] 5 U.S.C. § 603(c)(1)-(4).

[114] *See Further Notice* Part IV.A.1-2

**APPENDIX D**

**Recommendations and Best Practices to Prevent Digital Discrimination**
**and Promote Digital Equity**

**Submitted to the Federal Communications Commission**

**by the Working Groups of the Communications Equity and Diversity Council**
**Adopted: November 7, 2022**

**Recommendations and Best Practices to**
**Prevent Digital Discrimination**

**and**

**Promote Digital Equity**



**Submitted to the**
**Federal Communications Commission**

**by the Working Groups of the**
**Communications Equity and Diversity Council**

**Adopted: November 7, 2022**

**Communications Equity and Diversity Council**
**Federal Communications Commission**


**November 7, 2022**


Jessica Rosenworcel, Chairwoman
Federal Communications Commission

Holly Saurer, Chief
Media Bureau
Federal Communications Commission

**CEDC Chairpersons**
Heather Gate, Chair, Vice President of Digital Inclusion
Connected Nation

Nicol Turner Lee, Ph.D., Vice Chair, Director – Center for Technology Innovation
Senior Fellow – Governance Studies Program, Brookings Institution

Susan Au Allen, Vice Chair, Chairman, National President and CEO
US Pan Asian American Chamber of Commerce Education Foundation

**Digital Empowerment and Inclusion Working Group**
Dominique Harrison, Ph.D., Chair
Joint Center for Political and Economic Studies

**Members**
Clayton Banks, CEO
Silicon Harlem

Robert Branson, President and CEO
Multicultural Media Telecom and Internet Council

Joi Chaney, Executive Director of the National Urban League Washington Bureau
Senior Vice President for Policy & Advocacy
National Urban League

Michele Cober, Director of External Affairs & Strategic Alliances in Public Policy Group Verizon

Sarah Kate Ellis, President and CEO
GLAAD

Rebecca Gibbons, Strategic Initiatives Manager, Office for Community Technology
City of Portland, Oregon

Chris James, President and CEO
National Center for American Indian Enterprise Development

Broderick Johnson, Executive Vice President for Public Policy and
Executive Vice President for Digital Equity
Comcast Corporation

Nicolaine Lazarre, Vice President of Policy and External Affairs
Charter Communications, Inc.

Louis Peraertz, Vice President of Policy
Wireless Internet Service Providers Association

Vickie Robinson, General Manager – Airband Initiative
Microsoft

**Alternates for CEDC Members**
Laura Berrocal, Vice President, Policy and External Affairs
Charter Communications, Inc.

Antonio Williams, Vice President, Government Affairs and Local Advocacy
Comcast Corporation

**Working Group Members**
Matthew F. Wood, Vice President of Policy and General Counsel
Free Press

Anisa Green, Director, Federal Regulatory
AT&T

Hooman Hedayati, Strategic Associate for Telecommunications Policy
Communications Workers of America

Angela Siefer, Founder and Executive Director
National Digital Inclusion Alliance

John C. Yang, President and Executive Director
Asian Americans Advancing Justice

**Alternates for Working Group Members**
Tsion Tesfaye, Research and Policy Manager
National Digital Inclusion Alliance

**Subject Matter Experts**
Dr. Christopher Ali, Pioneers Chair in Telecommunications
Professor of Telecommunications
Bellisario College of Communications
Penn State University

Dr. Jon Gant, Dean, School of Library and Information Sciences
North Carolina Central University

Dr. Gooyong Kim, Assistant Professor of Communications Arts
Cheney University of Pennsylvania

**Innovation and Access Working Group**
Robert Brooks, Chair, Digital Solutions Specialist
WHUR-FM, Howard University, Washington, DC

**Members**
Raúl Alarcón, Chairman and CEO
Spanish Broadcasting System

Matthew Bauer, Vice President and Executive Director of Connected Communities
Wireless Research Center

Caroline Beasley, CEO
Beasley Media Group, LLC

Anna Gomez
ACDDE Chair *Emeritus*, Representing Hispanic National Bar Association

Cecelia Gordon, Vice President, Distribution
Starz

David Honig, President and CEO
JulGlo Productions, LLC

Sherman Kizart, Managing Director and Founder
Kizart Media Partners

Henry Rivera, Partner, Wiley Rein, LLP
Representing Emma Bowen Foundation

Steven Roberts, President and Principal
The Roberts Companies

Joycelyn Tate, Senior Policy Advisor
Black Women's Roundtable, National Coalition on Black Civic Participation

**Working Group Members**
Barbara Ciara, Managing Editor
WTKR-TV, Norfolk, VA, Representing the National Association of Black Journalists

Susan Corbett, Founder
National Digital Equity Center

Monica Desai, Global Head, Connectivity and Access Policy
Meta, Representing INCOMPAS

Charles Harrell, II, President and CEO
The IT Architect Corporation

C. Howie Hodges, II, Co-founder and Sr. Vice President of Government and External Affairs Centri Tech

Jennifer J. Jackson, Executive Vice President
Stellar TV and Central City Productions

Leticia Latino-Van Spluteren, CEO
Neptuno USA

Eve Lewis, Assistant City Attorney
City of Coconut Creek, Florida

**Alternates for Working Group Members**
Dan Ball, Head of North America Connectivity Policy
Meta, Representing INCOMPAS

**Subject Matter Experts**
Dr. Jon Gant, Dean, School of Library and Information Sciences
North Carolina Central University

Dr. Dianne Lynch, President
Stephens College

**Diversity and Equity Working Group**
Christopher Wood, Chair, Executive Director
LGBT Technology Partnership & Institute

**Members**
Melody Spann Cooper, Chair and CEO
Midway Broadcasting Corporation

Graham "Skip" Dillard, Brand Manager
Audacy New York 94.7 WXBX-FM

Jill Houghton, President and CEO
Disability:IN

Ronald Johnson, Ph.D., Senior Advisor and Chief Strategist for Diversity, Equity and Inclusion Wireless
Infrastructure Association

Rosa Mendoza, Founder, President & CEO
ALLvanza

Aama Nahuja, Legal Counsel
A Wonder Media Company, LLC

Brian Scarpelli, Senior Policy Counsel
ACT/The App Association

Charlyn Stanberry, Vice President, Government Relations
National Association of Broadcasters

Antonio Tijerino, President and CEO
Hispanic Heritage Foundation

James Winston, President
National Association of Black Owned Broadcasters

**Working Group Members**

Jenna Alsayegh, Senior Director of Strategic Initiatives & Partnerships
US Telecom

Joon Bang, CEO
Iona Senior Services

Faith Bautista, CEO
National Diversity Coalition

Bridgette Daniel Corbin, CEO
Wilco Electronics Systems, Inc

Lili Gangas, Chief Technology Community Officer
Kapor Center

Otto Padron, President and CEO
Meruelo Media

Randi Parker, Senior Director of Partnership Engagement
Creating IT Futures

Ellen Schned, CEO
Strong Women Alliance

Dr. Cathy Schubert, Fellow
American Geriatric Society

Mona Thompson, General Manager
Cheyenne River Sioux Tribe Telephone Authority, Representing NTCA

**TABLE OF CONTENTS**

Acknowledgements……………………………………………………….………...11

Executive Summary……………………………………………………………..12

**PART ONE:  Report and Recommendation from the DEI Working Group…………**19

Introduction………………………………………………………………………...19

Methodology…………………………………………………………………….25

Findings from Interviews…………………………………………………………..26

Model Policies and Best Practices to Prevent Digital Discrimination by Internet Service Providers…………………………………………………………………………33

Best Practices to Advance Digital Equity for States and Localities………………………..36

Conclusion…………………………………………………………………………44

*Appendix A – List of DEI Working Group Interviews*…………………………………...45

*Appendix B – Summary of Definitions of Digital Discrimination from Interviews*………...47


**PART TWO:  Report and Recommendations from the Innovation and Access Working Group – IIJA Contracting and Grants for Small and Diverse Businesses**

Introduction………………………………………………………………………50

Methodology……………………………………………………………………..52

Best Practices on Increasing Participation of Small, Minority- and Women-Owned Businesses in State and Local Infrastructure Grant and Contract Opportunities…………..53

Conclusion………………………………………………………………………..63

*Appendix A – Summary of Resources for Best Practices to Promote Supplier D*iversity…. 64

   I.     Federal Guidance and Programs…………………………………………………….64

   II.    State and Local Guidance Programs…………………………………………………...71

   III.   Educational and Think Tank Guidance and Programs…………………….......……77

   IV.   Other Guidance and Programs…………………………………………………..78

*Appendix B – Innovation and Access Working Group/Workstream #1 Survey for Workstream #1 Members (April 2022)*…………………………………….……79

*Appendix C – Innovation and Access Working Group/Workstream #1 List of Subject Matter Expert Interviews and Summary of Survey Responses*………………………………………….80

**PART THREE: Report and Recommendations from the Diversity and Equity Working Group – Digital Discrimination and Inclusive Populations**…………………………………89

Introduction………………………………………………………………………………...89

Key Conclusions…………………………………………………………………………………90

Recommendations…………………………………………………………………………..92

*Appendix A – List of Diversity and Equity Working Group Interviewees and Survey Respondents*…………………………………………………………………………………96

# ACKNOWLEDGEMENTS

The Digital Empowerment and Inclusion, Innovation and Access, and Diversity and Equity Working Groups would like to extend their sincere appreciation to all of the interviewees that agreed to meet with the respective working groups to examine issues of broadband deployment, entrepreneurship, education, housing, economics, and diversity and equity. Thank you also to former FCC Chairman Michael Powell for meeting with the DEI Working Group to share his unique and keen insights. We appreciate everyone's willingness to engage in this timely and important dialogue.

The CEDC expresses its most sincere appreciation to CEDC Chair Heather Gate who shepherded this important project from its inception on behalf of the Council. She brought her deep knowledge and experience on broadband issues to the report's development – attending interviews, drafting portions of the report, reviewing, and editing drafts – all with good humor and collegiality. CEDC Vice Chair Dr. Nicol Turner Lee contributed her immense expertise as a scholar of the digital divide to this work, both as a reviewer and editor. We are very grateful. CEDC Vice Chair Susan Au Allen, a highly regarded expert in diverse entrepreneurship, was very generous with her time and energy by conducting interviews, as well as reviewing and editing numerous drafts of the report.

The CEDC thanks Dr. Dominique Harrison, Chair, DEI Working Group and Dr. Jon Gant, Independent Subject Matter Expert, for their diligent efforts in coordinating the drafting of the DEI Working Group section of the overall report. They each spent countless hours reviewing the interview and research records, formatting the report, and developing, drafting, and editing the final report. Their contributions were invaluable to the final production of the CEDC's report. Our deep appreciation is also extended to Joi Chaney, National Urban League, for her leadership in conducting interviews and developing the research for the report.

Anna Gomez, ACDDE Chair *Emeritus*, led the work on Part Two of the report addressing the need for engagement of diverse subcontractors and suppliers in IIJA-funded projects. We are indebted to Anna and her subcommittee colleagues for their public service on this report. Thanks and gratitude are also extended to Jill Houghton, Randi Parker and Joon Bang for their efforts to highlight the intersectionality of digital discrimination. Their report in Part Three brings a much-needed focus to diverse Americans also deserving of digital equity. Working Group Chairs Robert Brooks and Chris Wood supported their colleagues in assembling the interviews and conducting research. Our appreciation is extended to each of them as well.

We also thank Marlene Jackson, Consumer and Government Affairs Bureau and Scott Smith (Solo Creative) on behalf of Connected Nation for the design and layout of the report. Finally, thank you to FCC CEDC staff Jamila Bess Johnson, Rashann Duvall, Keyla Hernandez-Ulloa and Aurélie Mathieu for their support of the work of the Council.

# EXECUTIVE SUMMARY

Under the leadership of Federal Communications Commission (FCC or Commission) Chairwoman Jessica Rosenworcel, the Communications Equity and Diversity Council (CEDC), a federal advisory committee, was chartered on June 29, 2021. Under the charter of the CEDC's formation, the Commission appointed members from public interest groups, think tanks, and industry organizations to the federal advisory committee, and divided such members into three Working Groups, which include the Digital Empowerment and Inclusion Working Group ("DEI Working Group"), Innovation and Access Working Group ("I&A Working Group"), and the Diversity and Equity Working Group ("D&E Working Group").[1]

One of the inaugural and urgent tasks of the CEDC was to present recommendations to the Commission on the public policies, programs, and other strategic initiatives to "advance[e] equity in the provision of and access to digital communication services and products for all people of the United States, without discrimination on the basis of race, color, religion, national origin, sex, or disability."[2] The particular request of the Commission in December 2021 was to: (a) examine issues around lack of access to broadband services and products; (b) help better understand the reasons and causes for such lack of access; and (c) offer recommendations for addressing digital discrimination and other barriers that impact equitable access to emerging technology in the U.S., including its territories, particularly in communities that remain unserved, underserved or "under-connected."[3] Such call to action was explicitly legislated by the Congress's Infrastructure Investment and Jobs Act (IIJA), or Bipartisan Infrastructure Law (BIL), that was enacted on November 15, 2021.[4] The legislation directed the Commission to "adopt final rules to facilitate equal access to broadband internet access service, taking into account the issues of technical and economic feasibility…."[5]

This document, or the "Report," compiles the findings from the three CEDC Working Groups, and particularly offers guidance to States and localities[6] seeking to prohibit "digital discrimination" in broadband deployment, adoption, and use, as well as in the contracting and grants processes for funds related to forthcoming broadband infrastructure. This Report was developed with the input of the Working Group Members, and a range of interview respondents (See Appendix A). While all CEDC members may not agree on every detail included in the report, the report is an accurate representation of the work conducted.

---

[1] Federal Communications Commission, "Working Group Members Announced for FCC Diversity Council," January 13, 2022, https://www.fcc.gov/document/working-group-members-announced-fcc-diversity-council. See also, Federal Communications Commission, "FCC Announces Working Group Members of the Communications Equity and Diversity Council," Public Notice, DA 22-41, January 13, 2022, https://docs.fcc.gov/public/attachments/DA-22-41A1.pdf.

[2] Federal Communications Commission, "Communications Equity and Diversity Council (2021)", https://www.fcc.gov/communications-equity-and-diversity-council.

[3] Federal Communications Commission, "Working Group Members Announced for FCC Diversity Council," January 13, 2022, https://www.fcc.gov/document/working-group-members-announced-fcc-diversity-council. See also, Federal Communications Commission, "FCC Announces Working Group Members of the Communications Equity and Diversity Council," Public Notice, DA 22-41, January 13, 2022, https://docs.fcc.gov/public/attachments/DA-22-41A1.pdf.

[4] Congress.gov. "H.R.3684 - 117th Congress (2021-2022): Infrastructure Investment and Jobs Act," Div. F, Tit. I, Sec. 60506 et seq., Pub. L. 117-58 (Nov. 15, 2021), https://www.congress.gov/bill/117th-congress/house-bill/3684/text. Section 60506 of the Infrastructure Act is codified at 47 U.S.C. § 1754, Digital Discrimination.

[5] *Id.* § 1754(b).

[6] Since localities were not defined in the Infrastructure Investment and Jobs Act or in the charge to the CEDC, for purposes of this report, includes within the term "localities" Native communities and Tribal lands through government-to-government coordination and collaboration, as well as, Puerto Rico, American Samoa, Guam, the Northern Mariana Islands, and the United States Virgin Islands.

The Report is organized by Working Group into three sections:

1. The DEI Working Group presents in Part One model policies and best practices for States and localities to adopt to ensure that broadband internet access service providers do not engage in digital discrimination.

2. Part Two expresses the findings and recommendations of the I&A Working Group that includes a roadmap for inclusive participation among diverse, small, and medium-sized businesses to prevent discrimination in the awarding of IIJA loans and grants.

3. Part Three reflects the findings from the D&E Working Group that promotes universal access among intersectional groups and encourages the Commission to be more inclusive and protective of other vulnerable populations, including those from older, disabled, non-gender conforming, and rural areas.

In accordance with the Commission's request for the CEDC to investigate, compile, and present findings about what States and localities can implement to prevent discriminatory behaviors and activities, the Report provides a starting point for further deliberations and actions that promote increased deployment, adoption, and use of high-speed broadband that not only make it easier for populations to engage in daily activities of remote work, learning, and health care, but also encourage affordable and widely deployed connectivity.

The Report aligns with the statutory language of the IIJA, which in Section 60506(d) requires the agency to "develop model policies and best practices that can be adopted by States and localities to ensure that broadband internet access service providers do not engage in digital discrimination." [7] Further, Section 60506(c) requires the Commission and the Attorney General to ensure that "federal policies promote equal access to robust broadband internet access service by prohibiting deployment discrimination based on — (1) the income level of an area; (2) the predominant race or ethnicity composition of an area; or (3) other factors the Commission determines to be relevant . . . ." [8] The IIJA statute also directs the Commission to "revise its public complaint process to accept complaints from consumers or other members of the public that relate to digital discrimination." [9]

Various other requirements regarding the prevention and elimination of digital discrimination are further considered in the statute, including the requirement of the Commission to adopt rules "to facilitate equal access to broadband internet access service." [10] In satisfying that obligation, the Commission must consider "the issues of technical and economic feasibility presented by that objective." [11] The Commission's rules must be aimed at "(1) preventing digital discrimination of access based on income level, race, ethnicity, color, religion or national origin; and (2) identifying necessary steps for the Commission to take to eliminate discrimination." [12]

---

[7] 47 U.S.C. § 1754(d). See also, Agenda Released for February 23, 2022, Virtual Meeting of the Communications Equity and Diversity Council, Public Notice, DA 22-164 (WCB Feb. 16, 2022).

[8] 47 U.S.C. § 1754(d).

[9] *Id.* § 1754(e).

[10] *Id.* § 1754(b).

[11] Federal Communications Commission, "FCC Initiates Inquiry on Preventing Digital Discrimination," March 17, 2022, https://www.fcc.gov/document/fcc-initiates-inquiry-preventing-digital-discrimination.

[12] 47 U.S.C. § 1754(b)(1) - (2).

The three combined draft reports and recommendations from each of the Working Groups present a series of critical and distinguishable next steps for the Commission to consider with findings largely extracted from structured interviews with subject matter experts and secondary research. Among the three Working Groups, numerous individuals were interviewed, and various documents and research reports were further analyzed and discussed for inclusion in each part.

The tireless work of CEDC Members presents to the Commission recommendations for a series of model policies and best practices that can be adopted by States, localities, and Internet Service Providers (ISPs) working to promote equitable broadband deployment while preventing digital discrimination. The Report also includes a series of other considerations to advance digital equity, including increased community engagement and K-12 digital skilling, among other action items. Notwithstanding, States and localities should seek to prevent "digital discrimination" based on income level, race, ethnicity, color, religion, or national origin to the extent they have the authority to do so. ISPs should ensure that they will not discriminate between or among any individuals in the availability of broadband. Respectively, the three Working Groups also offer the following recommendations as model polices and best practices for States and localities looking to close the digital divide and other economic opportunity gaps.

**<u>DEI Working Group Recommendations for Model Policies and Best Practices That Can Be Adopted for States and Localities to Prevent Digital Discrimination by ISPs:</u>**

The DEI Working Group presents a series of recommendations for consideration to prevent digital discrimination by ISPs:

1. **Develop, implement, and make publicly available periodic broadband equity assessments in partnership with ISPs, the community, and other local stakeholders.**

2. **Facilitate greater awareness and information sharing among multi-dwelling unit owners regarding tenant choice and competition considering broadband service agreements.**

3. **Identify local opportunities that could be used to incentivize equitable deployment.**

4. **Engage, where permissible under state and federal law, in the management of public property, such as public rights-of-way, to avert discriminatory behaviors that result in or sustain digital discrimination and redlining.**

5. **Convene regular meetings of broadband providers and other stakeholders, including community anchor institutions, public interest groups, community advocates, labor organizations, and faith-based institutions, to evaluate areas and households unserved or underserved with competitive and quality broadband options.**

6. **Encourage fair competition and choice.**

**<u>DEI Working Group Recommendations to Support Digital Equity:</u>**

In addition to fulfilling the FCC's charge to the DEI working group to provide recommendations to address digital discrimination, the Working Group also provides recommendations to support digital equity more generally. The Working Group seeks to help the FCC remove barriers to equal opportunity and deliver resources and benefits equitably to all Americans to access and use digital communication and

technologies.[13] Our interviews shed light on many factors, including possible digital discrimination, that may contribute to the lack of digital equity in the United States.

The recommendations presented in this section go beyond the goal to address digital discrimination. The DEI Working Group recognizes the importance of increasing affordability and digital navigation services for historically disadvantaged and other vulnerable populations. The Working Group does not put these recommendations forward to diminish or conflate the distinctly different effort needed to address "digital discrimination" based on income level, race, ethnicity, color, religion, or national origin presented above.[14] The Working Group encourages the FCC to work with States and localities to seek, develop and deepen resources and capabilities to:

1. **Make low-cost broadband available to low-income households through government benefit programs, in combination with internet service providers' low-income programs.**

2. **Build on the success of existing benefit programs that allow low-income households to apply a credit to an internet service of their choice**.

3. **Raise awareness about connectivity programs for programs among eligible households.**

4. **Strengthen marketing and communications about available federal and state connectivity programs and other programs that target low-income or other unconnected members of a community.**

5. **Streamline the application process for government benefit programs referred to above.**

6. **Increase support and funding for organizations such as schools, nonprofits, and faith-based organizations to provide digital navigation assistance in communities they serve.**

7. **Fund, promote and leverage the use of digital navigators**.

8. **Stakeholders should encourage Congress to create a digital public service and engagement program (e.g., digital navigators), which could conduct trainings and outreach in non-adopting communities.**

9. **Increase device access and participation.**

10. **Use public-private partnerships to facilitate remote learning and close the homework gap.**

11. **Ensure that members of the community have safe spaces to access the internet.**

12. **Strengthen digital skilling efforts in underserved communities.**

---

[13] Executive Order On Advancing Racial Equity and Support for Underserved Communities Through the Federal Government, Pub. L. No. 13985 (2021). https://www.whitehouse.gov/briefing-room/presidential-actions/2021/01/20/executive-order-advancing-racial-equity-and-support-for-underserved-communities-through-the-federal-government/. See also, Federal Communications Commission, " Federal Communications Commission Equity Action Plan," April 14, 2022, https://www.fcc.gov/document/federal-communications-commission-equity-action-plan.

[14] 47 U.S.C. § 1754.

13. **Encourage the creation of workforce development/training opportunities, focusing on historically underrepresented communities.**

**I&A Working Group Recommendations (Part Two):**

The I&A Working Group presents a series of recommendations for consideration to close the opportunity gaps for diverse, and predominantly minority- and women-owned businesses by encouraging States and localities to:

1. **Adopt definitions of small minority- and women-owned (SMW) businesses.**

2. **Designate a government-wide office to oversee supplier diversity initiatives, including the creation of an annual plan to increase supplier diversity.**

3. **Adopt an accountable goal of no less than 30% participation of SMW businesses in state and local infrastructure grant and contract opportunities and provide incentives to first-tier contractors to partner with SMW businesses.**

4. **Include auditing and in-progress reporting in the contracts/subgrants; implement thoughtful auditing, in-progress reporting, real-time accountability, and enforcement to ensure that SMW goals are met.**

5. **The grantees, working in conjunction with the supplier diversity office, should proactively identify contracting and procurement forecasts and needs.**

6. **Ensure diverse participation in task forces or committees that advise grantees on their broadband plans, including broadband supplier diversity.**

7. **Promote certifications prior to disbursement of funds so that SMW businesses are prepared to participate in the funding opportunities.**

8. **Grantees, subgrantees, and contractors should be required to reach out to SMW businesses.**

**D&E Working Group Recommendations (Part Three):**

The D&E Working Group presents a series of recommendations for consideration by States and localities to ensure the diversity and inclusion of the range of marginalized populations in the U.S. who should benefit from the economic and social benefits of increased broadband access, as well as the digital skills – whether postsecondary or adult workforce training – to compete in the digital economy.

1. **The Commission needs to examine and expand the definition of "equal access" to facilitate greater adoption and use of high-speed broadband, especially among populations experiencing a range of inequalities resulting from a protected characteristic, or an intersection of various attributes or social determinants that limit their full digital engagement.**

2. **The Commission should play a more active role in promoting the relevance of high-speed broadband among populations where broadband can improve quality of lives and increase consumer demand for more equitably deployed broadband services.**

In conclusion, this Report presents findings from the three Working Groups and responds to the Commission's request for recommendations to inform its work in developing model policies and best

practices for States and localities to prevent digital discrimination by ISPs and advance digital equity.

**{This page left intentionally blank.}**

**PART ONE:  REPORT AND RECOMMENDATIONS FROM THE DEI WORKING GROUP**

**Introduction**

All communities deserve to have equal access to high-speed broadband, which should embolden "[an] equal opportunity to subscribe to an offered [internet access] service that provides comparable speeds, capacities, latency, and other quality of service metrics in a given area, for comparable terms and conditions."[15] At least, this is the language in the recently enacted Infrastructure Investment and Jobs Act (IIJA) that is poised to accelerate high-speed broadband as one of its core pillars. According to a recent study from BroadbandNow, 42 million Americans lack affordable, high-speed, quality internet with actual download speeds of at least 25 megabits per second (Mbps) and upload speeds of at least 3 Mbps.[16] The Federal Communications Commission reports that 14.5 million Americans lack access to broadband internet, including wired and fixed wireless connections.[17] Microsoft's data usage suggests as many as 120.4 million people in the U.S. do not use the internet at broadband speeds 25/3 Mbps.[18] This data reflects digital access before the pandemic, and not necessarily the millions of Americans who were left digitally disconnected during the beginning of the COVID-19 pandemic.

As many jobs, schools, healthcare, and government services shifted to online environments over the last two years, the need to deliver high-speed broadband connectivity across the U.S. has been amplified. The COVID-19 pandemic exposed the challenges Americans from unserved and underserved communities face in accessing high-speed internet access to meet their basic needs from working at home, participating in distance learning, or taking part in many other important activities for which internet access is crucial. One research study found that nearly half of all adults said that internet access has been essential during the COVID-19 pandemic.[19] School-aged children from low-income households were at an acute disadvantage as schools shut down, with one survey finding that nearly a quarter of those students used public WI-FI to complete homework assignments due to lack of home internet access.[20] The use of telehealth—some of which utilized video services—also expanded rapidly in some communities during this time, accommodating those who could not see their doctors in person but had broadband access.[21] In earnest, the COVID-19 pandemic brought into focus the gap between those who could easily transition to

---

[15] 47 U.S.C. § 1754(a)(2).

[16] John Busby, Julia Tanberk, and BroadbandNow Team, "FCC Reports Broadband Unavailable to 21.3 Million Americans, BroadbandNow Study Indicates 42 Million Do Not Have Access," February 3, 2020. https://broadbandnow.com/research/fcc-underestimates-unserved-by-50-percent.

[17] Federal Communications Commission, "Fourteenth Broadband Deployment Report," January 19, 2021, https://www.fcc.gov/reports-research/reports/broadband-progress-reports/fourteenth-broadband-deployment-report

[18] Microsoft Airband Initiative, "Maps showing FCC fixed broadband availability and broadband usage based on Microsoft data updated as of October 2020," October 2020, https://app.powerbi.com/view?r=eyJrIjoiYzlhZWIyNWEtMDlkOS00MWJkLWExZGYtOWQ3NTNjNzJiNDIwIiwidCI6ImMxMzZlZWMwLWZlOTItNDVlMC1iZWFlLTQ2OTg0OTczZTIzMiIsImMiOjF9.

[19] Emily A. Vogels, Andrew Perrin, Lee Rainie, and Monica Anderson, "53% of Americans Say the Internet Has Been Essential During the COVID-19 Outbreak," Pew Research Center, April 30, 2020, https://www.pewresearch.org/internet/2020/04/30/53-of-americans-say-the-internet-has-been-essential-during-the-covid-19-outbreak/.

[20] Katherine Schaeffer, "What we know about online learning and the homework gap amid the pandemic," Pew Research Center, October 1, 2021, https://www.pewresearch.org/fact-tank/2021/10/01/what-we-know-about-online-learning-and-the-homework-gap-amid-the-pandemic/.

[21] New York University, "Telemedicine During COVID-19: Video vs. Phone Visits and the Digital Divide," November 15, 2021, https://www.nyu.edu/about/news-publications/news/2021/november/telemedicine-during-covid-19.html.

conducting important activities at home—and those who could not.

**Race, Income, Geography and Broadband**

For some communities, COVID-19 exacerbated economic disparities for those who did not already have access to broadband services, especially in communities of color, where a lack of broadband access can reinforce systemic inequality.[22] Black and Hispanic adults in the United States remain less likely than white adults to say they have high-speed internet at home, according to data from the Pew Research Center.[23] While studies have shown that 78% of English-speaking Asian Americans use the Internet, these analyses are often limited in scope and obscure key inequities within API communities.[24] The American Indian Policy Institute (AIPI) found that 18% of indigenous, tribal residents lack broadband internet access and have the highest poverty rate (25.4%) among all communities of color.[25] Similar concerns abound among U.S. territories, including Puerto Rico where some residents still have limited or no internet access, especially those living in rural areas.[26] In Hawaii, roughly 13% of residents do not have a broadband internet subscription.[27] More data on broadband connections for communities of color is needed to provide a more accurate and wholistic examination of the inequities and opportunities for internet connectivity for these groups.

Research also shows that income is correlated to the availability and adoption of the internet.[28] Many low-income households are not connected to high-speed broadband because they cannot afford the service.[29] Four-in-ten adults with households earning less than $30,000 do not have broadband services (43%).[30]

---

[22] Nicol Turner Lee, Kaya Henderson, Marc Morial, Andre M. Perry, "Can we alleviate racism and systemic inequality by expanding broadband during COVID-19?", (panel, The Brookings Institution, Washington, DC, August 25, 2020), https://www.brookings.edu/events/can-we-alleviate-racism-and-systemic-inequality-by-expanding-broadband-during-covid-19/.

[23] Sara Atske and Andrew Perrin, "Home Broadband Adoption, Computer Ownership Vary By Race, Ethnicity In the U.S.," July 16, 2021, https://www.pewresearch.org/fact-tank/2021/07/16/home-broadband-adoption-computer-ownership-vary-by-race-ethnicity-in-the-u-s/.

[24] National Telecommunications and Information Administration, "NTIA Data Reveal Shifts in Technology Use, Persistent Digital Divide," June 10, 2020, https://www.ntia.gov/blog/2020/ntia-data-reveal-shifts-technology-use-persistent-digital-divide. See also, Emily Chi and Nicole Morgenstern, "Broadband: What Is The Digital Divide And What Does It Look Like?," May 24, 2021, Medium, https://medium.com/advancing-justice-aajc/broadband-what-is-the-digital-divide-and-what-does-it-look-like-6c414656361d.

[25] Poverty USA, "The Population of Poverty USA," https://www.povertyusa.org/facts.

[26] Next Century Cities, "Puerto Rico," https://nextcenturycities.org/wp-content/uploads/Puerto-Rico.pdf.

[27] United States Census, "QuickFacts Hawaii: Computer and Internet Use," July 1, 2021, https://www.census.gov/quickfacts/fact/table/HI#.

[28] Arizona State University American Indian Policy Institute, "Tribal Digital Divide Policy Brief and Recommendations," April 3, 2020, https://aipi.asu.edu/sites/default/files/tribal_digital_divide_stimulus_bill_advocacy_04032020.pdf.

[29] John Horrigan, "Focusing on Affordability: What Broadband Adoption Rates in Cities Tell Us About Getting More People Online," Benton Institute for Broadband and Society, April 19, 2021, https://www.benton.org/blog/focusing-affordability. *See also*, Dominique Harrison, "Affordability & Availability: Expanding Broadband in the Black Rural South," Joint Center for Political and Economic Studies, October 2021, https://jointcenter.org/wp-content/uploads/2021/10/Affordability-Availability-Expanding-Broadband-in-the-Black-Rural-South.pdf.

[30] Emily A Vogels, "Digital Divide Persists Even As Americans With Lower Incomes Make Gains in Tech Adoption," Pew Research Center, June 21, 2022, https://www.pewresearch.org/fact-tank/2021/06/22/digital-divide-persists-even-as-americans-with-lower-incomes-make-gains-in-tech-adoption/.

Beyond income disparities, geographic differences in broadband deployment across communities may also limit full participation in the digital economy. Some studies indicate that disparities are exacerbated by the combination of neighborhood and income effects.[31] For example, neighborhoods with high poverty rates are sometimes found to have slower download speeds.[32] At the same time, significant advancements in the delivery of high-speed broadband have been made.

The Congressional Research Service found that incentivizing sustained private-sector investment in more isolated and sparsely populated communities, including rural and urban areas, has been difficult.[33] The same report also concluded that broadband "[m]arkets tend to be highly localized. Those with favorable geography and demographic profiles often have higher demand, and thus present relatively attractive investment opportunities for broadband providers."[34] While access to high-speed broadband has been increasing[35], undoubtedly the intersection between income, race, geography, and broadband access needs to be better understood to provide more equitable deployment and access to the internet. Where the traditional conversations on discrimination tend to happen around the interconnection of networks and interoperability with devices, more discussion is needed that examines broadband deployment and the actual reach of the physical infrastructure itself in unserved and underserved communities.

Some members of Congress have also asserted the need to examine the practices, decisions, and outcomes facilitated by ISPs that may be related to the deployment and upgrade of broadband in medium and low-income communities. In July 2021, Representative Yvette D. Clarke, [D-NY-9] first introduced H.R.4875 - Anti Digital Redlining Act of 2021 to require the FCC to issue a notice of inquiry related to digital redlining, to prohibit digital redlining, and for other purposes, to evaluate decisions made by ISPs regarding deployment. Clarke's bill, which did not pass, sought to:

> "ensure…that all Americans, especially those in traditionally underserved or marginalized communities, have access to competing broadband networks at the same quality of service, at reasonable prices, as available in other similarly situated communities with higher median incomes or different demographic makeup…"[36]

The development of Clarke's bill was in response to what some communities experienced in their neighborhoods.[37] In the last decade, there have been allegations of what some characterize as digital redlining[38] of broadband availability in various parts of the country.

---

[31] Kendall Swenson and Robin Ghertner, "People in Low-Income Households Have Less Access to Internet Services," Office of the Assistant Secretary for Planning and Evaluation, U.S. Department of Health and Human Services, April 2020. https://aspe.hhs.gov/sites/default/files/private/pdf/26301/Internet_Access_Among_Low_Income.pdf.

[32] *Ibid*.

[33] Brian E. Humphreys, "Demand for Broadband in Rural Areas: Implications for Universal Access," Congressional Research Service, December 9, 2019, https://sgp.fas.org/crs/misc/R46108.pdf;

[34] *See* Humphreys, 2019.

[35] Andrew, and Sara Ataske, "7% of Americans Don't Use the Internet. Who Are They?" Pew Research Center, April 2, 2021. https://pewrsr.ch/2GrhLUj.

[36] Congress.gov. "H.R.4875 - 117th Congress (2021-2022): Anti Digital Redlining Act of 2021." August 2, 2021, https://www.congress.gov/bill/117th-congress/house-bill/4875/. Rep Clarke's bill was not adopted, but did help secure bipartisan support for the digital discrimination inquiry in the subsequent passing of the IIJA.

[37] Stephen Babcock, "With help from Baltimore leaders, US Rep. Yvette Clarke is introducing the Anti-Digital Redlining Act of 2021," August 9, 2021, https://technical.ly/civic-news/anti-digital-redlining-act/

[38] The Committee did not define digital discrimination or digital redlining. Rather, the Committee asked the interviewees to share a definition if they chose. The Committee used the definitions to try to understand what digital

(continued….)

In 2014, the then New York City Mayor accused an ISP of not fulfilling its commitments under a cable franchise agreement.[39] In Cleveland, Ohio in 2017, three Black residents accused an ISP serving the city of not bringing published broadband speeds to their individual households or surrounding communities.[40] While the complaint was dismissed by the FCC in response to a joint motion filed by both parties, it made allegations that the ISP did not equally invest in their wireline broadband infrastructure and did not provide comparable service between middle- and low-income neighborhoods in the city of Cleveland.[41]

While what constitutes digital redlining will require further exploration by the Commission, these allegations suggest the importance of addressing and prohibiting digital discrimination as part of the deployment of IIJA resources. With digital technologies and services evolving, States and localities play a critical role in ensuring equitable broadband access in the U.S. and the FCC has been tasked under the IIJA to develop guidance that can be adopted by States and localities to prevent digital discrimination by ISPs. That is why having a solid set of recommended model policies and best practices to prevent digital discrimination based on income level, race, ethnicity, color, religion, or national origin by ISPs can facilitate greater online engagement amongst all communities.

**Digital Discrimination In The Infrastructure Investment And Jobs Act (IIJA))**

On November 15, 2021, President Biden signed Public Law No: 117-58, the Infrastructure Investment and Jobs Act – which includes the largest federal investment in universal broadband since the American Recovery and Reinvestment Act under the Obama administration. The IIJA instructed the investment of $65 billion into the provision of reliably deployed, affordable, and widely available high-speed broadband for everyone in the U.S. by the end of the decade.[42] Coined the "Internet for All" program, the goals are to build affordable, reliable high-speed internet infrastructure, teach digital skills, and provide necessary technology (e.g., internet-enabled hardware) that enables full participation in today's society and economy, especially for communities of color, rural residents, and older populations.[43]

(Continued from previous page) ——————————————
discrimination and digital redlining are from various perspectives of the interviewees.

[39] The dispute arose under the cable franchise agreement for alleged failure to meet certain deployment commitments which would provide service to residents of varying demographics and income levels across the entire city of New York. See also, The Official Website of the City of New York, "De Blasio Administration Releases Audit Report of Verizon's Citywide FiOS Implementation," June 18, 2015, https://www1.nyc.gov/office-of-the-mayor/news/415-15/de-blasio-administration-releases-audit-report-verizon-s-citywide-fios-implementation. The lawsuit filed by the City of New York in 2017 did not advance any claims of discrimination under the cable franchise agreement or otherwise. *See* Complaint, *City of New York v. Verizon New York et al.*, Index NO 45066-2-17 (filed Mar. 13, 2017).

[40] Federal Communications Commission, "In the matter of Joanne Elkins, Hattie Lanfair, Rachelle Lee Complainants, v. AT&T Corp. Defendant," August 24, 2017, https://digitalinclusion.org/wp-content/uploads/2017/08/ATT-Final-Complaint.08.24.2017.pdf.

[41] Taylor, et al. v. AT&T | Federal Communications Commission (fcc.gov), www.fcc.gov/document.taylor-et-al-v-att.

[42] Congress.gov. "H.R.3684 - 117th Congress (2021-2022): Infrastructure Investment and Jobs Act," Div. F, Pub. L. 117-58 (Nov. 15, 2021), https://www.congress.gov/bill/117th-congress/house-bill/3684/text. See also, National Telecommunications and Information Administration, "NTIA's Role in Implementing the Broadband Provisions of the 2021 Infrastructure Investment and Jobs Act," https://broadbandusa.ntia.doc.gov/news/latest-news/ntias-role-implementing-broadband-provisions-2021-infrastructure-investment-and.

[43] Biden-Harris Administration Launches $45 Billion 'Internet for All' Initiative to Bring Affordable, Reliable High-Speed Internet to Everyone in America." May 13, 2022. https://broadbandusa.ntia.doc.gov/news/latest-news/biden-harris-administration-launches-45-billion-internet-all-initiative-bring.

Section 60506(d) of the IIJA[44] requires the FCC to "develop model policies and best practices that can be adopted by States and localities to ensure that broadband internet access service providers do not engage in digital discrimination."[45] Section 60506 also appears to draw upon the language in the Anti-Digital Redlining Act of 2021 (H.R.4875) introduced by Representative Yvette Clarke. In contrast to the Clarke bill, the language of the IIJA requires that the FCC, the federal agency with oversight over the nation's communications infrastructure, "take steps to ensure that all people of the United States benefit from equal access to broadband internet service. Not later than two years after the date of the enactment of this Act, the Commission shall adopt final rules to facilitate greater access to broadband internet access, considering the issues of technical and economic feasibility presented by that objective, including:

1. Preventing digital discrimination of access based on income level, race, ethnicity, color, religion, or national origin; and
2. Identifying necessary steps for the Commission to take to eliminate discrimination described in paragraph." [46]

**The Charge of the DEI Working Group**

In December 2021, the DEI Working Group, one of three CEDC working groups, was charged with the task from FCC Chairwoman Jessica Rosenworcel to recommend model policies and best practices that could be adopted by States and localities to prevent digital discrimination by ISPs. Members of the DEI Working Group worked alongside other CEDC working groups to identify and interview a diverse set of experts within the telecommunications and civil society sectors, including local government officials, non-profit leaders, internet service providers, economists, executive departments of the U.S. federal government, academics, and digital inclusion advocates.

Over 30 virtual interviews were conducted by the DEI Working Group, and the Working Group developed a questionnaire that explored several issues with respondents:

1. Proposed definitions of "digital discrimination" and "digital redlining,"
2. How States and localities have and can identify and address digital discrimination,
3. The business models and decisions of ISPs and how they can support or contribute to "digital discrimination," and
4. Recommendations of best practices from the public and private sectors to prevent digital discrimination.

The DEI Working Group also relied upon data and research by scholars, organizations, and local governments that have driven digital equity and inclusion scholarship. In all, the Working Group learned during the interviews that ensuring equitable technology access is a very complex endeavor, and there is some variation in how stakeholders define digital discrimination. In the end, these interviews exposed that there may be little to no agreement on what constitutes digital discrimination.

---

[44] 47 U.S.C. § 1754(d).

[45] Federal Communications Commission, "Agenda Released for February 23, 2022, Virtual Meeting of the Communications Equity and Diversity Council," Public Notice, DA 22-164 (WCB Feb. 16, 2022); 47 U.S.C. § 1754(d), https://docs.fcc.gov/public/attachments/DA-22-164A1.pdf.

[46] 47 U.S.C. § 1754(b)(1) - (2).

**METHODOLOGY**

The DEI Working Group engaged in multiple methodologies to meet the Commission's charge.

*Interviews.* The Working Group identified experts from government, industry, academia, and advocacy groups who could discuss digital equity challenges and propose solutions to help inform its recommendations. A full list of interviewees is included in Appendix A.

Sample questions included:

- How to define digital discrimination?
- How to define digital redlining?
- How are constituents experiencing and impacted by digital discrimination?
- What efforts they and their employers/organizations have undertaken to address digital discrimination?
- What equal access looks like?
- What would make the biggest difference in advancing equal access?
- What are the economic and regulatory considerations that incentivize private investment?
- What data or research should be considered?

Interviewees also had the option to provide a formal presentation in addition to the questions that were also shared with the DEI Working Group for further analysis.

*Research.* The DEI Working Group also reviewed research publications and other publicly available documents issued by a variety of government agencies, academics and think tanks, and advocacy organizations to help inform its development of best practices and model policies to prevent digital discrimination and to promote digital equity. Among other sources, Working Group members reviewed:

- Federal guidance and programs, including the Affordable Connectivity Program and its predecessor the Emergency Broadband Benefit Program.
- Prior reports and recommendations to the FCC, including from the Broadband Deployment Advisory Committee Increasing Broadband Investment in Low-Income Communities Working Group.
- Broadband adoption initiatives and digital skills programs, including partnerships between state and local governments and internet service providers in response to the COVID-19 pandemic.
- Advocacy group guidance and programs, including from the Electronic Frontier Foundation and the National Digital Inclusion Alliance.
- Academic and think tank publications, including from the and Pew Research Center.
- Civil Rights Organization publications, including from the National Urban League.

*Working Group Meetings.* The DEI Working Group also participated in weekly meetings to prepare before interviews, debrief post interviews, and write the report. Those meetings also enabled the entire group to be able to contribute to the writing of the report in a transparent manner.

**FINDINGS FROM INTERVIEWS**

Several themes emerged from the interviews to advise the deliverables of the Working Group, particularly the recommendations for state and local leaders. The findings are organized into themes and summarized below. In accordance with the Chatham House rule[47], the names of respondents are not attributed to their specific input, but their scope of work may be described.

- ***Tackling the digital divide is both urgent and imperative.***

The DEI Working Group learned from the interviews that while great progress has been made to connect each person to reliable broadband, there is a sense of the "fierce urgency" to accelerate the rate at which the United States accomplishes this goal. Some snippets from respondents on this topic align with the rationale for the Infrastructure Investment and Jobs Act, where Congress finds namely[48]:

- *"Access to affordable, reliable, high-speed broadband is essential to full participation in modern life in the United States."*
- *The persistent ''digital divide'' in the United States is a barrier to the economic competitiveness of the United States and equitable distribution of essential public services, including health care and education."*
- *"The digital divide disproportionately affects communities of color, lower-income areas, and rural areas, and the benefits of broadband should be broadly enjoyed by all."*
- *"In many communities across the country, increased competition among broadband providers has the potential to offer consumers more affordable, high-quality options for broadband service."*
- *"The 2019 novel coronavirus pandemic has underscored the critical importance of affordable, high-speed broadband for individuals, families, and communities to be able to work, learn, and connect remotely while supporting social distancing."*

- ***Digital discrimination can appear in multiple contexts.***

The DEI Working Group learned from respondents that digital discrimination continues to be defined based on communal experiences in different contexts that describes instances where discrimination occurs in various frameworks moderated through the deployment and use of computers, applications, algorithms, and computer networks. Forms of digital discrimination, for example, have been a point of enforcement by the U.S. Department of Justice in cases over the past decade when access to consumer-facing websites violated the American with Disabilities Act.[49] In addition, advances in the use of digital technologies for financial services, Friedline and Chen find:

---

[47] Under the Chatham House Rule, anyone who comes to a meeting is free to use information from the discussion but neither the identity nor the affiliation of the speaker(s), nor that of any other participant, may be revealed. It is designed to increase openness of discussion. *See also*, https://www.chathamhouse.org/about-us/chatham-house-rule.

[48] Congress.gov. "H.R.3684 - 117th Congress (2021-2022): Infrastructure Investment and Jobs Act," Div. F, Tit. I, Sec. 60101, Pub. L. 117-58 (Nov. 15, 2021), https://www.congress.gov/bill/117th-congress/house-bill/3684/.

[49] Jonathon Hensley, "The High Cost of Digital Discrimination: Why Companies Should Care about Web Accessibility", *The Guardian*, December 31, 2015, https://www.theguardian.com/sustainable-business/2015/dec/31/digital-discrimination-netflix-disney-target-web-accessibility-doj.

"poor black and brown communities experience a form of digital redlining by having the lowest fintech rates. Every percentage increase in a community's black population was associated with an 18% decrease in their rate of high-speed internet access, 1% decrease in smartphone ownership, 12% decrease in online banking, and 3% decrease in mobile banking. Relationships were opposite for communities with increasing white populations where whiteness attracts higher rates of fintech, even amidst high poverty."[50]

Today, algorithms are also under scrutiny for their potential to contribute to discriminatory outcomes. In 2021, a Facebook user "filed a class-action lawsuit against nine companies that manage various apartment buildings in the D.C. area, alleging that they engaged in "digital housing discrimination" by excluding older people — like her — from viewing advertisements on Facebook".[51]

The sense of urgency to confront systemic and structural discrimination is not new to U.S. society. But there has been very little consensus on what constitutes "digital discrimination." Generally, discrimination can be described as the policies, practices, rules, or other systems that deny equal opportunity and outcomes for some groups of people. Legally, the term refers to:

"…the treatment or consideration of, or making a distinction in favor of or against, a person or thing based on the group, class, or category to which that person or thing belongs rather than on individual merit. Discrimination can be the effect of some law or established practice that confers privileges on a certain class or denies privileges to a certain class because of race, age, sex, nationality, religion, or handicap."[52]

The meaning and impact of discrimination in the digital context are very complex and are being defined as our society lives increasingly in the ever-growing digital information ecosystem that is used for most parts of our lives. However, within the IIJA statute, the Commission is charged with adopting rules to facilitate equal access to high-speed broadband, considering issues of technical and economic feasibility presented by that objective, including preventing digital discrimination of access, and identifying necessary steps for the Commission to take to eliminate discrimination. This reflects the policy that "subscribers should benefit from equal access to broadband internet access service within the service area of a provider of such service…with equal opportunity to subscribe to an offered service that provides comparable speeds, capacities, latency, and other quality of service metrics in a given area, for comparable terms and conditions."[53] It is within this specific context that the DEI Working Group focused its efforts and that the recommendations in this report are offered.

   ▪ *Available definitions to understand digital discrimination and digital redlining.*

The Working Group also considered published definitions of digital redlining, which interviewed parties described as a form of digital discrimination. For example, former FCC Chairman, Ajit Pai used the term

---

[50] Terri Friedline and Zibei Chen, "Digital Redlining and the Fintech Marketplace: Evidence from US Zip Codes," *Journal of Consumer Affairs* 55, no. 2 (June 1, 2021): 366–88, https://doi.org/10.1111/joca.12297.

[51] Christianna Silva, "Facebook Ads Have A Problem. It's Called Digital Redlining. How Legal Are The Ads On Facebook?" *Mashable*, May 3, 2022, https://mashable.com/article/facebook-digital-redlining-ads-protected-traits-section-230.

[52] USlegal.com, "Discrimination Law and Legal Definition," accessed June 21, 2022, https://definitions.uslegal.com/d/discrimination/#:~:text=Discrimination%20refers%20to%20the%20treatment,rather%20than%20on%20individual%20merit.

[53] 47 U.S.C. § 1754(a)(2).

"digitally redlined" to describe the "under-investment in broadband networks —in the low-income communities in our cities, in rural areas, and on Tribal lands."[54] In 2019, the previously chartered Advisory Committee on Diversity and Digital Empowerment (ACDDE) submitted to the FCC its own recommendation on digital redlining.[55] Further, the National Digital Inclusion Alliance (NDIA) has defined digital redlining as:

> "...discrimination by internet service providers in the deployment, maintenance, or upgrade of infrastructure or delivery of services. The denial of services has disparate impacts on people in certain areas of cities or regions, most frequently on the basis of income, race, and ethnicity."[56]

In the Working Group's interviews, respondents shared how they define digital discrimination and related terms from their perspective. See Appendix B for respondents' definitions of terms. Overall, widespread agreement among the interview participants suggested that getting to more equitable broadband must be handled with great care, and sufficient data – especially complete, or near complete broadband maps. Digital discrimination must also consider the presence of racialized and poverty differentiation of access to broadband internet services. Many respondents also shared that income and where one lives are connected to access to broadband services and the business decisions that companies make regarding deployment. In these instances, discussions on specific digital redlining cases were deliberated.

As many of the respondents observed, digital redlining as a term evolved from perspectives on redlining in housing and financial services. Interviewees also agreed that the term "redlining" is a part of housing discrimination and can be understood as the practices and decisions that excluded borrowers based on race from the mortgage lending market by denying or discouraging their use and purchase of physical property in specific communities across the United States.[57]

Finally, interviewees commonly agreed that while redlining has its roots in housing and financial services, the results of this kind of discrimination have led to disparate outcomes and decisions for certain communities, including digital redlining which affects the availability and quality of broadband service in different parts of the country and among U.S. territories, the denial of equitable access to information services, and lack of access to broadband services.

▪ *Intent for digital discrimination should be further examined.*

Interviewees and DEI working group members offered diverging perspectives on the foundational matter of whether "discriminatory impact" as opposed to "discriminatory intent" should be the evaluation method by which digital discrimination can be ascertained. The report and the recommendations put forth do not adopt either framework. However, a definition of digital discrimination is critical to executing any best practices to prevent it. The recommendations offered in this Report are also intended to help inform

---

[54] Federal Communications Commission FCC 17-155, "Statement of Chairman Ajit Pai Re: *Bridging the Digital Divide for Low-Income Consumers*, WC Docket No. 17-287; *Lifeline and Link Up Reform and Modernization*, WC Docket No. 11-42; *Telecommunications Carriers Eligible for Universal Service Support*, WC Docket No. 09-197," https://docs.fcc.gov/public/attachments/FCC-17-155A2.pdf.

[55] Submission by the Advisory Committee on Diversity and Digital Empowerment, FCC, June 24, 2019, available at acdde-06242019-access-subgroup-recommendation.docx (live.com).

[56] Caitlin Kvammen, "NDIA Adds to Digital Inclusion Definitions!" National Digital Inclusion Alliance, July 23, 2021, https://www.digitalinclusion.org/blog/2021/07/23/ndia-adds-to-digital-inclusion-definitions/.

[57] Keeanga-Yamahtta Taylor, Race for Profit: How Banks and the Real Estate Industry Undermined Black Homeownership, University of North Carolina Press, (2019).

the FCC as it explores the complex issue of digital discrimination, and this discussion must continue for the recommendations to be implemented.

Some interviewees focused on the concept of discrimination as related to intent. On the one hand, respondents indicated that intent can be somewhat difficult to define. One respondent, who was from an ISP, felt that impact should not be part of the conversations given the fact that focusing on impact could chill innovation, and thwart demand, cost, and technical feasibility. Conversely, respondents from the public interest community and others in the working group felt that intent is often hard to define and that focusing on intent preserves the status quo while undermining the experiences of those who are subject to discrimination. They also proposed that shifting the focus to outcomes appropriately centers the discussion on adversely affected communities. Interviewees also suggested greater transparency on technical and economic feasibility among ISPs to remove barriers to deployment in unserved and underserved communities.

- ▪ *Broadband adoption may drive outcome differences for vulnerable populations.*

Some respondents stated that digital discrimination may contribute to the disparities in broadband adoption and the use of digital technologies that drive the digital divide. However, one subject matter expert observed that it is not accurate to simply look at differences in broadband and computer adoption data and assume that the disparities based on race, gender, income, or other attributes are digital discrimination. The overriding concern among several interview participants was to not focus on the intent as much as the outcomes. That is, among some respondents, if individuals are impacted in a negative way, there is a need to address that and figure out how to avoid it.

- ▪ *Broadband deployment decisions may have unintended negative outcomes.*

The Working Group asked interview participants to share their insight into how business decisions and other factors may shape the extent to which it is economically and technically feasible to connect everyone to broadband. As noted in the IIJA, "subscribers should benefit from equal access to broadband internet access service within the service area of a provider of such service… with equal opportunity to subscribe to an offered service that provides comparable speeds, capacities, latency, and other quality of service metrics in a given area, for comparable terms and conditions." Some interviewees shared that if issues of economic and technical feasibility have different outcomes for specific communities, there may be concerns about discrimination. Other interviewees mentioned that where economic and technical feasibility exists, ISPs should ensure that their services are also widely available, affordable, and have high bandwidth for all people within their service area, including investing in network upgrades. This has implications for both home use of internet services as well as local businesses.

From the beginning, the Working Group sought to understand how the business decisions of ISPs, if at all, connected to the digital divide that certain communities were experiencing. The Working Group wanted to know how ISPs decided where to deploy their services and what if any specific factors incentivized investment in specific communities. The Working Group learned that, in general, building a network includes steps to plan and design the network, construct the network, connect users, and to operate and maintain the network. The internet delivers service to consumers through a complex network of fiber, cable, copper wire technology, fixed-wireless or mobile, or satellite. ISPs configure the network in various ways to optimize the delivery of services on top of the network to offer voice and video in addition to upgrading to next generation of technologies for access to the Internet to consumers. This creates tradeoffs of meeting the basic access needs with prices that are affordable for consumers with bearing critical investment needs for innovation and market growth strategies for ISPs.

There is uncertainty about the economics of broadband investments based on multiple factors such as the geography and typology of the service area, market demand, and expectations to future-proof the network. Several interviewees identified that the predominant approach to building broadband networks in the U.S. uses a facilities-based approach. In this approach, the ISPs bear the costs to access certain public rights of way and assets such as telephone poles if it serves a subscriber using their own network facilities.

According to some interviewees, the central concern for States and localities should be to consider how to encourage expanded coverage to narrow the digital divide for access to next-generation networks to enable high-bandwidth data transfer using fiber-to-the-premises (FTTP), Data Over Cable Service Interface Specification (DOCSIS), or other technologies without discrimination in deployment and the delivery of broadband quality. The Working Group observed that the goal for ISPs is to build a network where the customer has a sufficient quality of service for their computing needs. Quality of service starts with having enough capacity to perform the functions that are needed such as running a business, completing homework online, or working remotely.

An interview with a broadband consulting firm shared some of the quality-of-service concerns in rural America that may lead to disparate outcomes. While most of the respondents saw equity and inclusion in the adoption of broadband as the main reason to address digital discrimination, some respondents addressed the delivery of broadband to the home. For example, one respondent stated:

> "Latency and jitter are a second concern. Latency is the time it takes for a message to make the trip from one end of a channel to the other. Jitter describes variations in latency; it occurs when portions of a signal arrive out of sync from their expected schedule. Think of a video call over the internet. Latency is responsible for the constant small delay between you speaking and the other person registering your voice, while jitter is responsible for glitches, freezes, and other distortions in the stream. Jitter measures the variability of the broadband connection – is it steady from one second to the next. Latency matters a lot to gamers, folks making real time stock trades, and other highly time sensitive transactions."

- ▪ *The consideration of franchise agreements.*

Some of the respondents brought up the consideration of franchise agreements to reduce the potential of digital redlining. Franchise agreements generally are agreements that allow an entity to construct, maintain and operate facilities, such as utility and communications networks, in the publicly owned rights of way. The rights of way include the streets, sidewalks and often beyond the sidewalk, which have been dedicated for transportation and other purposes. Generally, ISPs must get permission to access rights of way from the State and/or locality that is responsible for managing the rights of way.

For example, the franchising model is the framework for cable networks under the federal Cable Act. The Cable Act requires cable companies to obtain franchise agreements from state or local franchising authorities, and franchising authorities have an obligation to make sure that "access to cable service is not denied to any group of potential residential cable subscribers because of the income of the residents of the local area in which such group resides."[58] Now that cable providers are also broadband providers, the build-out provisions included in cable franchises have impacted broadband deployment as well.[59]

---

[58] 47 U.S.C. § 541(a)(3).

[59] *See, e.g*., Implementation of Section 621(a)(1) of the Cable Communications Policy Act of 1984 as amended by the Cable TV Consumer Protection and Competition Act of 1992, Third Report and Order, 34 FCC Rcd 6844 (2019) (aff'd in relevant part by City of Eugene v. FCC, 998 F.3d 701, 706 (6th Cir. 2021)).

During the Working Groups interviews, franchise agreements were seen to hold cable companies accountable for service quality, tracking of customer complaints, and build-out requirements to serve specific communities. A utility official stated that franchise agreements can require service in all communities and determine whether it is equal. One expert in the telecommunications sector stated that communities should ask: who is accessing their communities' rights of way and why and what are they doing when they get there? Are they deploying in an equitable fashion?

Another interviewee suggested the Working Group review California's non-discrimination provisions in the state's video franchising law. California's Public Utilities Commission (CPUC) Assembly Bill (AB) 2987, the Digital Infrastructure and Video Competition Act of 2006 (DIVCA) seeks to "[p]romote the widespread access to the most technologically advanced cable and video services to all California communities in a nondiscriminatory manner, regardless of their socioeconomic status."[60] California's legislation is one example of how franchise agreements have been used to protect against discrimination.

The Working Group heard from some interviewees that franchising or other conditions on access to rights-of-way could delay broadband deployment and increase costs for consumers. While other interviewees mentioned that as franchise agreements have been utilized, States and localities can sometimes make trade-offs through negotiations to ensure that providers are offering service to all communities and/or addressing digital equity needs.

---

[60] California Public Utilities Code, "General Order 169. Digital Infrastructure and Video Competition Act of 2006," accessed July 11, 2022, https://docs.cpuc.ca.gov/word_pdf/GENERAL_ORDER/85773.pdf.

**MODEL POLICIES AND BEST PRACTICES TO PREVENT DIGITAL DISCRIMINATION BY ISPS**

The findings and summarized takeaways from the structured interviews provided the necessary input to construct how States and localities can prohibit digital discrimination by an ISP. More specifically, this Report outlines a series of recommended model policies and best practices that may be pertinent to States, localities, and Internet Service Providers (ISPs) working to promote equitable broadband deployment, while preventing explicit digital discrimination and potential digital redlining. States and localities should prevent "digital discrimination" based on income level, race, ethnicity, color, religion, or national origin. Where economic and technical feasibility exists, ISPs should ensure that their services are widely available to people within their service areas. To prevent any possible regression toward such goals, the DEI Working Group offers in the Report the following model policies and best practices for potential implementation by States and localities.

1. **Develop, implement, and make publicly available periodic broadband equity assessments in partnership with ISPs, the community, and other local stakeholders.**

Through the assessment process, State and local leaders should seek to identify the current broadband needs of their community to ensure equitable deployment of broadband services by ISPs and routinely assess the availability of broadband. The broadband equity assessment could consider what broadband service is currently available, who has reliable and consistent high-speed broadband service at home (e.g., via ongoing review of publicly available data and updating of broadband maps), and the cost needs of broadband services for their community. State and local leaders can use broadband equity assessment data to help identify unserved, underserved, and served areas and effectively direct funds and infrastructure towards areas that need the most support for the deployment of broadband services. Recognizing that timely and accurate data is necessary to produce a useful broadband equity assessment, States and localities should identify key data inputs and consider mechanisms to facilitate reporting by ISPs.

Using broadband equity assessment data, State and local leaders should develop broadband action plans in a way that invites collaboration from relevant stakeholders, including ISPs to better assess and identify where deployment needs to occur, and better target districts and communities for which deployment is required. Such an approach will help ensure greater feedback by ISPs and other interviewees and lead to more participation in addressing the needs identified in the assessment, including considering these needs in infrastructure build-out and upgrade of plans. Further, local broadband action plans, specifically, should include local assessments of broadband deployment efforts and where challenges still exist. This assessment would also include a review of digital adoption programs available in a local community and whether gaps exist to adequately meet the needs of communities.

In addition, ISPs should partner with communities to assess the opportunity and challenges for ISPs to meet unmet needs. ISPs should make this this assessment data publicly available which could help to prevent digital discrimination and ensure product and service delivery is not impacted or driven by such practices.

2. **Facilitate greater awareness and information sharing among multi-dwelling unit owners regarding tenant choice and competition considering broadband service agreements.**

States and localities should raise awareness of FCC rules regarding access to Multiple Tenant Environments (MTEs) or Multiple Dwelling Units (MDUs) and consider new ways to facilitate information sharing with MTE property owners can help inform their decision-making process when considering entering into agreements with ISPs. The FCC has rules in place that prohibit cable and

telecom providers from entering into exclusive property/building access agreements with landlords.[61] However, these regulations may leave room for other types of deals that can lead to lack of choice, slower speeds, higher prices, and low-quality services for communities.[62]

States and localities should consider laws or policies that are designed to eliminate these unintended consequences and ensure expanded access to MTEs. For example, some States, such as Illinois, New Jersey, and Nevada require MTE owners to give competing providers access to their properties. Additionally, localities, like San Francisco, California, have adopted policies that discourage property owners from unreasonably interfering with residents' ability to obtain service, which may be another tool to promote the availability and deployment of broadband to MTEs.[63] States and localities should make efforts to ensure that property owners, cable providers, and ISPs are aware of and comply with these new obligations.

### 3. Identify local opportunities that could be used to incentivize equitable deployment.

State, and localities should, in collaboration with ISPs, community organizations, consumer advocates, and others, identify and pursue opportunities to incentivize collaborative approaches to deployment. Leaders should examine as necessary, how State and local rules, such as dig once policies, permitting requirements, among other activities, can facilitate equitable broadband deployment.

### 4. Engage, where permissible under state and federal law, in the management of public property, such as public rights-of-way, to avert discriminatory behaviors that result in or sustain digital discrimination and redlining.

Agreements to use the rights-of-way should reflect that the privilege of using public assets comes with an obligation to provide a benefit to the public, which includes ensuring that all members of the community have equal access to broadband, subject to economic and technological feasibility. The appropriate public benefit(s) should be discussed by community organizations, consumer advocates, and others, and be determined by local governments based on the potential for digital discrimination in the community.

States should also consider whether statutes preempting or creating barriers to the deployment of broadband services or construction of broadband facilities by non-traditional providers such as electric service providers and municipalities are equally subjected to non-discrimination model policies and best practices. States should examine their statutes and policies to ensure broadband providers benefitting from

---

[61] Recently, the FCC released an order that prohibits exclusive and graduated revenue sharing agreements with cable and telecom providers, requires the disclosure of exclusive marketing arrangements, and clarifies that its existing inside wiring rules prohibit sale-and-leaseback arrangements with cable providers. In adopting this order, the FCC noted that its actions "promote tenant choice and competition in the provision of communication services to the benefit of those who live and work in MTEs." Federal Communications Commission, "FCC Acts to Increase Broadband Competition in Apartment Buildings," February 15, 2022, https://www.fcc.gov/document/fcc-acts-increase-broadband-competition-apartment-buildings.

[62] Federal Communications Commission, "FCC Bans Exclusive Contracts For Telecommunications Services in Apartment Buildings," March 19, 2008, https://www.fcc.gov/document/fcc-bans-exclusive-contracts-telecommunications-services-apartment. *See also*, Sydney Price, "Small, large broadband providers battle over access to multitenant buildings," S&P Global Market Intelligence, October 6, 2021, https://www.spglobal.com/marketintelligence/en/news-insights/latest-news-headlines/small-large-broadband-providers-battle-over-access-to-multitenant-buildings-66751037.

[63] San Francisco Police Code § 5201. *See also*, Community Contributor, "San Francisco's Communications Choice Ordinance is Working," February 21, 2020 Updated June 16, 2022, accessed June 24, 2022, https://www.sfexaminer.com/our_sections/forum/san-francisco-s-communications-choice-ordinance-is-working/article_d0d54312-9a69-53a7-b36c-988cf49c69cb.html.

public assets provide appropriate public benefits to address potential digital discrimination.

5. **Convene regular meetings of broadband providers and other stakeholders, including community anchor institutions, public interest groups, community advocates, labor organizations, and faith-based institutions, to evaluate areas and households unserved or underserved with competitive and quality broadband options.**

Local organizations, including community anchor institutions, public interest groups, community advocates, labor organizations, and faith-based institutions can help States and localities evaluate areas and households that are unserved or underserved with competitive and quality broadband options, and work collaboratively to develop best practices and solutions for overcoming such barriers to equitable broadband deployment and adoption. State and local leaders should also seek to uncover and address areas experiencing digital redlining and strategies to prevent such discrimination.

6. **Encourage fair competition and choice.**

States and localities should continue to explore the role of competition and choice in not only accelerating consumer options but also as a commitment to more regular, seamless engagement with online resources that improve the quality of life for community members through activities such as online education, telehealth, civic engagement, employment, among other activities. Competition among ISPs may lower costs for consumers and improve the quality of service by both new and incumbent ISPs.

**BEST PRACTICES TO ADVANCE DIGITAL EQUITY FOR STATE AND LOCALITIES**

1. **Make low-cost broadband available to low-income households through government benefit programs, in combination with internet service providers' low-income programs.**

The FCC should continue to coordinate with State and localities to maximize the impact of programs to make low-cost broadband available. For example, the Emergency Broadband Benefit Program's (EBB) success ushered in the creation of the Affordable Connectivity Program (ACP) reflecting Congress's recognition that this targeted subsidy should not be limited to a short-term pandemic program.[64] EBB/ACP are available to a wide range of low-income households (including those receiving benefits from Medicaid, Federal Public Housing Assistance, and the National School Lunch Program) and the IIJA avoided requirements, such as the eligible telecommunications carrier requirement that could have limited service provider participation.[65]

As of July 2022, more than 1,500 service providers participate in ACP,[66] and more than 12 million low-income households participate in ACP.[67] Many internet service providers also offer low-cost broadband plans for low-income families. These service offerings can be free to consumers once the ACP benefit is applied.[68] While funding exists currently, the legislation does not provide long-term support. Also, additional guidelines are needed to set standards for quality of service as well as marketing and communication to reach the target audiences more effectively based on lessons learned from the implementation of EBB and ACP to date.

It is also essential for the FCC to improve the USF programs' ability to meet the goals of universal deployment, affordability, adoption, availability, and equitable access to broadband. While the Infrastructure Act provides critical investments, it does not eliminate the need for a robust Lifeline program, continued support for educational and rural healthcare connectivity, and, in all probability, some form of ongoing high-cost support. To ensure these vital programs truly meet the Commission's mandate, it will be critical the Commission to carry out its plan to evaluate the scope of its authority under section 254(d), consider further actions on that basis, and for Congress to provide the Commission with any additional legislative tools needed to make changes to the contributions methodology, as the Commission

---

[64] Federal Communications Commission, "Affordable Connectivity Program Providers, FCC," accessed May 9, 2022, https://www.fcc.gov/sites/default/files/acp_provider_list.xlsx.

[65] Universal Service Administrative Co., "ACP Enrollment and Claims Tracker," accessed July 11, 2022, https://www.usac.org/about/affordable-connectivity-program/acp-enrollment-and-claims-tracker/; Affordable Connectivity Program Providers, FCC, accessed July 11, 2022, https://www.fcc.gov/affordable-connectivity-program-providers (providing participating providers by state and territory).

[66] Federal Communications Commission, "Affordable Connectivity Program Providers, FCC," accessed July 11, 2022, https://www.fcc.gov/sites/default/files/acp_provider_list.xlsx.

[67] ACP Enrollment and Claims Tracker; Affordable Connectivity Program Providers (providing participating providers by state and territory).

[68] T-Mobile, "T-Mobile Brings the Federal Affordable Connectivity Program to More Customers," January 26, 2022, https://www.t-mobile.com/news/offers/t-mobile-brings-the-federal-affordable-connectivity-program-to-more-customers-with-free-wireless-service-at-metro-by-t-mobile; Comcast, "Comcast Expands Affordable Connectivity Program Offers with Faster Internet Essentials Service and Xfinity Mobile," March 1, 2022, https://corporate.comcast.com/press/releases/comcast-affordable-connectivity-program-internet-essentials-service-xfinity-mobile; Verizon, "Verizon Program Helps Bridge Digital Divide," March 15, 2022, https://www.verizon.com/about/news/verizon-program-helps-bridge-digital-divide; Charter Communications, "Charter is Advancing Access to Affordable, Reliable High-Speed Internet Service,", April 28, 2022, https://policy.charter.com/advancing-access-to-affordable-reliable-internet.

recommended in its recent report to Congress on the future of the universal service fund.[69]

**2. Build on the success of existing benefit programs that allow low-income households to apply a credit to an internet service of their choice**.

States and localities should use available funds to supplement federal broadband benefits for low-income households. For example, Maryland's Emergency Broadband Benefit Subsidy Program offers those approved for EBB or ACP an additional $15 a month on top of the federal discount for up to one year.[70] ISPs, States and localities, and community organizations should have intentional strategies to make sure broadband benefit programs are easily accessible and available to anyone that meets the criteria for the programs.

**3. Raise awareness about connectivity programs for programs among eligible households.**

States and localities administering low-income benefit programs (such as SNAP and Medicaid) should inform consumers about broadband benefits such as ACP and Lifeline while they are applying for the benefit qualifying program.[71] For example, during the COVID-19 pandemic, the National Association of Regulatory Utility Commissioners ("NARUC") and FCC partnered to increase awareness about Lifeline in this manner.[72]

**4. Strengthen marketing and communications about available federal and state connectivity programs and other programs that target low-income or other unconnected members of a community.**

Program materials should explain offerings or programs in clear, nontechnical language.[73] Program materials and support should be shared in multiple languages. State and local leaders should also explore providing translation services for consumers seeking to sign up for service. ISPs' customer service teams

---

[69] Federal Communications Commission, "FCC Reports to Congress on Future of the Universal Service Fund," August 15, 2022, https://www.fcc.gov/document/fcc-reports-congress-future-universal-service-fund

[70] The Office of Governor Larry Hogan, "Governor Hogan Announces $400 Million Initiative to Ensure Universal Broadband For Maryland, "August 20, 2021, https://governor.maryland.gov/2021/08/20/governor-hogan-announces-400-million-initiative-to-ensure-universal-broadband-for-maryland/. See also, Montgomery County, "Maryland, Affordable Connectivity Program," accessed May 4, 2022, https://montgomerycountymd.gov/obp/emergency-broadband-benefit.html. (Highlighting that a household eligible for EBB/ACP can receive up to an additional $15 per month toward their monthly internet service bill).

[71] Connect 313, "Bridging the Digital Divide in Detroit," accessed June 14, 2022, https://connect313.org/about-us/. In Detroit, Connect 313 brings together a coalition of companies and organizations seeking to ensure that all residents have internet connections, access to relevant devices, and digital resources/technical support by 2024. Connect 313 efforts have contributed to 67.5% of Detroit households becoming "digitally included," compared with only 30% who were digitally included three years ago. Connect 313 spearheaded an awareness campaign, "EBB 313," which included a call center where consumers could receive guidance about reduced cost internet and device options, information about EBB eligibility and plans, and connection with nonprofit partners to assist in applying. The campaign helped connect more than 82,500 such households.

[72] Brandon Presley, "Helping Low-Income Consumers Stay Connected During the COVID-19 Pandemic Through the Federal Lifeline Program," June 1, 2020, https://bit.ly/LifelineFCCNARUC. Among other recommendations, the FCC and NARUC urged state commissions to circulate a toolkit of Lifeline materials to state agency partners administering various government benefits programs.

[73] For example, Comcast has expanded the number of languages its Internet Essentials call center agents can speak to more than 240, plus American Sign Language, to help break down language barriers that can prevent people from applying or getting online.

should be aware of available programs and be able to redirect a potential customer to the targeted support team. ISPs can also help by having call center teams that are assigned to sponsored-service programs and staffing them to ensure fast, reliable, and effective support with minimal hold times. About 40% of respondents to the national survey ranked "having someone walk me through the process step by step" as one of their top three suggestions for how to make applying easier.[74] Installation instructions could be made clearer with step-by-step illustrations of the installation process that are easy to follow for adults with limited technical experience. ISPs could offer options across their tiers of service offerings, and regularly evaluate ACP program to further increase internet adoption. ISPs should be transparent about any future fees or costs, explain them clearly, and ensure that enrollees consent to any future costs when signing up for a no-cost program.

5. **Streamline the application process for government benefit programs referred to above.**

Multiple steps requiring a consumer to coordinate with a community organization, school, and/or provider can confuse consumers and discourage signups. The complexity of State, localities, and ISP applications for low-income broadband programs—and the time it takes to complete them—often deter potential applicants. Also, programs could allow applicants to confirm their identity using their phone number or another form of official identification, rather than a Social Security Number (SSN), to minimize challenges and hesitancy around personal information sharing and to be more inclusive of those with differing documentation and employment statuses.

6. **Increase support and funding for organizations such as schools, nonprofits, and faith-based organizations to provide digital navigation assistance in communities they serve.**

It is not enough to establish broadband programs to close the digital divide. There is also a need for "boots on the ground" to help drive awareness about these programs, help potential program participants navigate the application and enrollment process, and work with participants to build the digital skills necessary to get the most out of their broadband service.[75] Research has shown that trusted voices in a community can play a pivotal role in these adoption efforts. Trusted voices can include high touch community-based organizations, volunteers or cross-trained staff that already work in education or other fields with close ties to the community and a familiarity with working one-on-one with residents.[76]

For example, one study conducted through a partnership with the Boston Consulting Group and Comcast, shows how local school districts can help boost broadband adoption among their students.[77] Arlington Public Schools in Virginia used school-based "connectivity teams," comprised of teachers, counselors, and administrators, to make students and the adults in their household aware of the sponsored-service programs. The district also relied on the trusted relationship between parents and community leaders to disseminate information. These efforts helped connect more than 900 of the 1,000 students originally

---

[74] Chris Goodchild, Hannah Hill, Matt Kalmus, et al., "Boosting Broadband Adoption and Remote K-12 Education in Low-Income Households," Boston Consulting Group, May 12, 2021.

[75] DigitalUS, Digital Navigators: Connect to Opportunity (last visited July 20, 2022), https://digitalus.org/digital-navigator-playbook/. See also, National Urban League, The Lewis Latimer Plan for Digital Equity and Inclusion at 53-68 ("Closing the Adoption Gap") (Apr. 2021), https://nul.org/sites/default/files/2021-04/NUL%20LL%20DEIA%20041421%20Latimer%20Plan_vFINAL_1136AM.pdf.

[76] Nat'l Digital Inclusion Alliance, The Digital Navigator Model (last visited July 20, 2022), https://www.digitalinclusion.org/digital-navigator-model/.

[77] Goodchild, Chris, Hannah Hill, Matt Kalmus, Jean Lee, and David Webb. Boosting Broadband Adoption and Remote K– 12 Education in Low-Income Households, Boston Consulting Group (May 21, 2021) (last visited July 20, 2022), https://www.bcg.com/publications/2021/accelerating-broadband-adoption-for-remote-education-low-income-households.

identified as lacking internet access at home. As a result of these efforts, the district had a 99% participation rate in distance learning.[78] There are numerous other examples of schools and other community-based organizations meeting the adoption needs of their residents.[79]

Communications should also explain a program in clear, nontechnical language. Trusted sources (such as educators, faith leaders, and community organizations) should share program information with students and others and encourage them to enroll. Program materials and support should be shared in multiple languages. Internet service providers should make sure consumers can contact them about questions or issues and speak with a representative in their preferred language and adopt accessibility best practices across providers.

In addition to schools, other trusted voices, including community partners, educators, and faith leaders, should be encouraged to assist in raising program awareness in historically underserved and marginalized communities.[80] Community anchor institutions including community organizations, faith-based institutions, and others can reinforce program marketing. Because they tend to be highly trusted, they can help recruit and support applicants, and help participants build their digital and technical skills. These organizations can also serve as the voice for applicants and households. For example, Black Churches 4 Digital Equity is training 25 national Black church leaders to support ACP sign-up and digital equity in Black communities in the US.

### 7. Fund, promote and leverage the use of digital navigators.[81]

Digital navigators are typically hired volunteers from libraries, social service agencies, community-based organizations, and philanthropies, who already have local knowledge and experience interacting with people of different backgrounds, including non-native English speakers. Given longstanding feelings of mistrust among those who have not adopted broadband, digital navigators can help bridge gaps that exist in communities.[82] Digital navigators can help address barriers to getting online through one-on-one interactions or in the classroom setting, both virtually and in person:[83]

---

[78] *Id.*

[79] Philadelphia Office of Innovation & Tech., Digital Navigator Report at 7 (2021), https://www.phila.gov/media/20211206155728/DigitalNavigatorReport.pdf.

[80] *Ibid*.

[81] National Urban League, The Lewis Latimer Plan For Digital Equity and Inclusion, (Washington, D.C.: April 2021), 62-63, https://nul.org/program/lewis-latimer-plan; DEI Working Group Meeting, Interview with Zeke Cohen, Baltimore City Council, Mar. 28, 2022; The Digital Navigator Model, NDIA, accessed June 15, 2022, https://www.digitalinclusion.org/digital-navigator-model/.

[82] Nicol Turner Lee, "Bridging digital divides between schools and communities," The Brookings Institution, March 2, 2020, https://www.brookings.edu/research/bridging-digital-divides-between-schools-and-communities/.

[83] About Byte Back – Our Issues, Byte Back, accessed June 14, 2022, https://byteback.org/about-us/our-issues/#digital-equality; Byte Back, a D.C.-based nonprofit, empowers digital navigators as part of its digital equity work. Program Profiles, Digital US, accessed May 14, 2022, https://digitalus.org/digital-navigator-playbook/program-profiles/; Launching its Digital Navigator program in late 2020, students and alumni from Byte Back's certification program assist new adopters with technical issues and software troubleshooting and provide digital literacy training for seniors. Digital Navigation, SEAMAAC, accessed June 14, 2022, https://www.seamaac.org/digital-navigation/; Southeast Asian Mutual Assistance Association Coalition ("SEAMAAC"), based in Philadelphia, has a Digital navigation program to help new immigrants and refugees, including assistance on how to get connected, use a device, use a phone as a hotspot, and use email, as well as assistance for parents register their kids for school and other essential services. NDIA Launches National Digital Navigator Corps, NDIA, accessed June 14, 2022, https://www.digitalinclusion.org/digital-navigator-corps/; The National Digital Inclusion Alliance ("NDIA") is launching the National Digital Navigator Corps, which will involve

(continued….)

- *Encourage Digital Empowerment*: They can emphasize and demonstrate the benefits of broadband, including access to government services, searching and applying for jobs, education, and telehealth. All stakeholders, including leaders in the business community, elected officials, school districts, and grassroots organizations should coordinate to address this barrier to adoption.
- *Affordability*: Navigators can provide information regarding low-cost options and help users select an option.
- *Application/Installation Process*: Navigators can walk consumers through the step-by-step sign-up process and send trained staff to help with using internet self-install kits.
- *Digital Uses and Skills*: Navigators can explain basic concepts, help build comfort with basic activities, and assist consumers in connecting to the Internet.

8. **Stakeholders should encourage Congress to create a digital public service and engagement program (e.g., digital navigators), which could conduct trainings and outreach in non-adopting communities**.[84]

Allocate funding for digital navigators to ensure equity for those doing the high touch work of onboarding communities in most need. It is a time-consuming effort that should not be left to volunteers as that places an undue burden on community-based organizations already involved.[85]

9. **Increase device access and participation.**

Concerns about the adoption of broadband service must also account for computer or tablet access and the fact that many consumers do not have regular access to a broadband enabled device beyond their smartphones. Evaluate the use of ACP benefit for devices to enable more federal investments to reach those in need through ACP and other federal programs.[86]

10. **Use public-private partnerships to facilitate remote learning and close the homework gap.**

States and localities should consider public-private partnerships with schools, libraries, and higher

(Continued from previous page) ————————————————

partnership with 18 sites, including at least six sites in Tribal communities. Digital navigation services will include help with accessing affordable internet access, obtaining devices, acquiring technical skills, and getting application assistance.

[84] National Urban League, "The Lewis Latimer Plan For Digital Equity and Inclusion," 62-63, https://nul.org/sites/default/files/2021-04/NUL%20LL%20DEIA%20041421%20Latimer%20Plan_vFINAL_1136AM.pdf. See also, Nicol Turner-Lee, "Why America Needs A "Tech New Deal" To Build Back Better," January 12, 2021, https://www.brookings.edu/blog/techtank/2021/01/12/why-america-needs-a-tech-new-deal-to-build-back-better/ and Nicol Turner Lee, Brookings TechTank Podcast. TechTank Podcast Episode 15: To build back better, the U.S. Needs a Digital Service Corp., https://www.brookings.edu/blog/techtank/2021/03/22/techtank-podcast-episode-15-to-build-back-better-the-u-s-needs-a-digital-service-corps/.

[85] Nicol Turner Lee, Brookings TechTank Podcast. TechTank Podcast Episode 15: To build back better, the U.S. Needs a Digital Service Corp., https://www.brookings.edu/blog/techtank/2021/03/22/techtank-podcast-episode-15-to-build-back-better-the-u-s-needs-a-digital-service-corps/.

[86] PCs For People, "Get Computers & Low-Cost Internet," accessed June 14, 2022, https://www.pcsforpeople.org/get-technology/. For example, PCs for People offers refurbished desktop and laptop computers to people enrolled in an income-based government assistance program, including Medicaid, Supplemental Security Income, National School Lunch Program, Federal Public Housing Assistance, or those who provide government-issued documentation that their income is below 200% of the federal poverty level based on their household size.

education institutions to help spur broadband adoption, particularly among low-income students.[87] The American Rescue Plan Act ("ARPA") created multiple sources of funding for broadband adoption initiatives, including to benefit students. For example, the FCC is administering a $7.17 billion Emergency Connectivity Fund that allows eligible schools and libraries to purchase broadband service and connected devices for students and patrons to use for remote learning.[88] Such funding sources can be used to subsidize programs that seek to close the homework gap.

### 11. Ensure that members of the community have safe spaces to access the internet.

A safe space for residents to get online can enable them to engage in remote learning, create resumes, apply for jobs, register for government services, and more.[89] Libraries and community centers are integral institutions for addressing connectivity gaps, including the provision of free skills training.[90]

### 12. Strengthen digital skilling efforts in underserved communities.

While cost can be a factor in broadband adoption, affordability is only one piece of the puzzle in facilitating equal access to broadband.[91] States and localities should work with nonprofits, community organizations, and the private sector to promote digital skilling—a lack of digital literacy and skills can be the greatest barrier to adoption.[92] Digital literacy efforts[93] should also focus on reaching and addressing the needs of older Americans.[94]

---

[87] EducationSuperHighway, "K-12 Bridge to Broadband – Leveraging Data to Identify Unconnected Households," accessed June 14, 2022, https://www.educationsuperhighway.org/bridge-to-broadband. For example, NCTA and EducationSuperHighway partnered to create the K-12 Bridge to Broadband program, which enables cable broadband providers to work with school districts to confidentiality exchange information to identify students without home broadband access and enable the school districts to purchase internet service for low-income families through sponsored service agreements.

[88] *See* Federal Communications Commission, "Establishing Emergency Connectivity Fund to Close the Homework Gap," May 11, 2021, https://www.fcc.gov/document/fcc-launch-717-billion-connectivity-fund-program-0.

[89] In partnership with nonprofit organizations and city leaders, Comcast has also created more than 1,000 Lift Zones in community centers nationwide to provide students and families access to free, high-capacity Wi-Fi along with educational and digital skills content to help families and site coordinators navigate online learning.

[90] AT&T, "AT&T, Los Angeles Unified and AT&T Deliver High-Speed Internet to Students' Homes to Bridge the Digital Divide," Press Release, May 3, 2022, https://about.att.com/story/2022/los-angeles-unified-digital-divide.html; AT&T SCREENREADY, "Digital Literacy," accessed May 5, 2022, https://screenready.att.com/digital-literacy/ (highlighting AT&T's offering of free digital literacy courses and workshops in collaboration with the Public Library Association).

[91] Doug Brake & Alexandra Bruer, "Broadband Myths: Are High Broadband Prices Holding Back Adoption?," *ITIF*, February 8, 2021, https://itif.org/publications/2021/02/08/broadband-myths-are-high-broadband-prices-holding-back-adoption.

[92] Collective impact models such as the Town Link and Oakland Undivided are working to leverage local operations (device distribution, digital upskilling resources) in K-12, community colleges, and community-based organizations.

Greenlining, "Oakland Digital Inclusion Program – The Greenlining Institute Launches 'The Town Link,'" accessed June 14, 2022, https://greenlining.org/oakland-digital-inclusion/; OaklandUndivided, "#OaklandUndivided," accessed June 14, 2022, https://www.oaklandundivided.org. See also, Tech Goes Home, "Our Impact," accessed June 14, 2022, https://www.techgoeshome.org/impact. Tech Goes Home, a nonprofit that seeks to help individuals learn to navigate and use the internet, finds that adoption involves access to a (1) computer/tablet, (2) stable and affordable home internet connection, (3) enrollment in digital skills training courses, and (4) lasting access to the digital world and its available resources and opportunities. In 2021, with more than 100 partner sites, more than 360 courses, and more than 4,200 graduates, Tech Goes Home graduates demonstrated success in internet access and skills (2,277 graduates communicated via email and 1,569 graduates managed finances online); education and

(continued….)

**13. Encourage the creation of workforce development/training opportunities, focusing on historically underrepresented communities.**

Per Scholas, Reboot Representation, CodePath, Year UP, and NPower enable adults and students to develop marketable digital skills that can be leveraged for future careers in media and technology.[95] Broadband deployment and adoption investments can also create nontraditional paths into tech enabled careers. As an example, violence intervention job program models such as Blocpower's NY New York programs show upward economic mobility opportunities for populations at most risk[96].

(Continued from previous page)

learning (1,973 graduates reported using their skills to help their children with school and 474 caregivers with school-aged children reported their children's grades improved); and economic opportunity (1,720 graduates reported using their new skills to access job search resources and 1,265 graduates got a new job, a pay raise, entered a work training program, or started a business).

[93] For example, Older Adults Technology Services ("OATS") develops digital skilling curricula for older adults. In addition to offering in-person programming at Senior Planet Centers in New York City, Plattsburgh, Denver, and Palo Alto, OATS offers educational programming online at Seniorplanet.org and through its online learning platform, Senior Planet U.

[94] Older Adults Technology Services, "Older Adults Technology Services," accessed June 14, 2022, https://oats.org/.

[95] Per Scholas, "Mission: Tuition-Free IT Training - About Per Scholas,", accessed May 5, 2022, https://perscholas.org/about-per-scholas/; Reboot Representation, "Reboot Representation: Home," accessed May 5, 2022, https://www.rebootrepresentation.org/; Codepath, "CodePath | Tech Excellence for All Computer Science Students," accessed May 5, 2022, https://www.codepath.org/; Year Up, "About | Year Up,", accessed May 5, 2022, https://www.yearup.org/about; NPower, "NPower: Home," accessed May 5, 2022, https://www.npower.org/.

[96]Bradley-Smith, Anna. "Climate Tech Startup Creates Hundreds of Jobs for Youth in Brownsville." *BKReader* (blog). Accessed July 18, 2022. https://bkreader.com/2021/09/16/climate-tech-startup-creates-hundreds-of-jobs-for-youth-in-brownsville/.

**Conclusion**

The insights gleaned from the DEI Working Group interviews and research revealed invaluable insights that can lead to equal access to broadband service for all communities. The Working Group sought to focus on the lived experiences and inequities faced by specific communities across the U.S. This was paramount to the work that was undertaken.

The CEDC appreciates the opportunity to investigate, compile, and offer recommendations to the FCC to prevent digital discrimination and promote digital equity. Considering the unprecedented investment in broadband via the IIJA and the urgency of the request from Chairwoman Rosenworcel, CEDC members were able to meet the challenge on a very aggressive schedule of four months with the diligence and focus that the process deserved. With the diverse membership – both as individuals and institutions represented – the Council is committed to ensuring equal access and digital equity for all people as the work of all three working groups indicate. The recommendations provided are indicative of an understanding that being intentional about addressing barriers to equal access to broadband is imperative for the success of IIJA broadband programs. Therefore, it is critical that the FCC and other agencies ensure that States and localities are empowered to successfully plan, implement, and manage the equitable broadband programs funded via the IIJA. Additionally, they should ensure that diverse stakeholders can participate in IIJA-funded programs as business owners and trusted community partners.

In closing, while this Report represents a direct response to a request from the Chairwoman's office, the Council recognizes that there remains more work to be done by the Council over the next eleven months of its term. The CEDC was able to recognize other issues that require further attention and examination from the CEDC, FCC, and other relevant stakeholders. These include data transparency, addressing issues of intent and disparate impact, and the urgent issue of the Tribal Digital Divide. Thus, more work remains.

Thank you to Chairwoman Rosenworcel for trusting the CEDC with this important task

**APPENDIX A – LIST OF DEI WORKING GROUP INTERVIEWS**

Interviewees included:

- **Virginia Lam Abrams,** Co-Founder and SVP, Government Affairs and Strategic Advancement, Starry, Inc.
- **Donnel Baird**, CEO, BlocPower
- **Elizabeth Bowles**, President and CEO, Aristotle United Communications LLC
- **Bill Callahan**, Research and Policy Advisor, National Digital Inclusion Alliance, and President and Director, Connect Your Community
- **Zeke Cohen**, Councilman, Baltimore City Council
- **Doug Dawson**, Owner and President, CCG Consulting
- **Diana Eisner**, Vice President of Policy and Advocacy, USTelecom
- **Ernesto Falcon**, Senior Legislative Counsel, Electronic Frontier Foundation
- **Amina Fazlullah**, Senior Director of Equity Policy, Common Sense Media
- **Dr. Tyrone Grandison**, Director, Global Partner Technology Strategy – Public Sector, Microsoft
- **Dr. Tracie Hall**, CEO, American Library Association
- **JoAnne Hovis**, CEO, CTC Technologies
- **Broderick Johnson,** Executive Vice President of Public Policy and Digital Equity, Comcast Corporation
- **Rahman Khan,** Vice President of Community Impact, Charter Communications, Inc.
- **Blair Levin**, Nonresident Senior Fellow, Brookings Metro
- **Anthony Lewis**, Vice President, State Government Affairs and Public Policy, Verizon
- **Dr. Nishal Mohan**, Founder and President, mohuman
- **Dr. Tracy Morris**, Executive Director, American Indian Policy Institute at Arizona State University
- **Francella Ochillo**, Executive Director, Next Century Cities
- **Joe Paul**, CEO, Byte Back
- **Karen Charles Peterson**, Commissioner, Massachusetts Department of Telecommunications and Cable
- **Former FCC Chairman Michael K. Powell,** President and CEO, NCTA
- **Matthew Rantanen**, Co-Chair of Technology Task Force and Co-Chair of Technology and Telecom Subcommittee, National Congress of American Indians **Angela Siefer**, Executive Director, National Digital Inclusion Alliance
- **Deb Socia**, President and CEO, The Enterprise Center
- **Dr. Rikkin Thakker**, CTO, Wireless Infrastructure Association
- **S. Jenell Trigg**, Director of Diversity, Equity & Inclusion, Partner, Lerman Senter PLLC
- **Brenda Villanueva**, Managing Director and Lead Counsel, Telecom, The Utility Reform Network
- **Gino Villarini,** Founder and President, AeroNet
- **Joe Webster**, Chief Broadband Officer, Office of Broadband Programs, Montgomery County, Maryland Government
- **Nancy Werner**, General Counsel, National Association of Telecommunications Officers and Advisors
- **Christopher Yoo**, Founding Director, Center for Technology, Innovation and Competition, Professor, University of Pennsylvania Carey Law School
- **Erich Yost**, Senior Community Planning and Development Specialist, U.S. Department of Housing and Urban Development

***Note:*** *A wider interviewee list was generated by the DEI Working Group; however, there were some*

*interviewees on the wider list that were not able to make meetings based on scheduling by the time this document was finalized. At least one party declined the interview request and a few people recommended that the WG speak to someone else at their organization. The FCC team scheduled interviews based on availability and clearance procedures.*

## APPENDIX B – SUMMARY OF DEFINITIONS OF DIGITAL DISCRIMINATION FROM INTERVIEWS

**Definition of Digital Discrimination (from interviews)**
- Split between Digital Discrimination and Redlining is political. The term is often used to reflect urban versus other areas. However, there are a number of different communities that are redlined. (non-profit leader)
- Assumptions that household in certain low-income brackets would not be able to afford the service or would not be interested in adopting broadband service. (entrepreneur)
- Unjust or prejudicial treatment, unequal digital opportunities and outcomes like other forms of discrimination (non-profit leader)
- Different quality of service in different parts of the territory (industry consultant).
- Lack of competition and choice in ISPs. (academic)
- Discrimination falls into multiple categories (telecom industry consultant/expert within the telecommunications sector):
  - o Deployment Discrimination – ISPs installing where costs of deployment are lower
  - o Maintenance/Upgrade Discrimination – maintenance and upgrade discrimination where cable service is not the same all-around town.
  - o Greenfield Discrimination – every ISP builds in fiber in new places as they are being built. As a result, richer, new subdivisions get fiber and money is not poured into older neighborhoods.
  - o Regional Discrimination – smaller cities are not upgraded and are stuck with older versions of technology (industry consultant)
- Form of discrimination where automated decisions treat digital users unfairly, unethically, and differently based on algorithms that can be found online. Both an indirect and direct form of discrimination. Decisions made more so by machines than individuals, but the machines are programmed by individuals. (government official)
- It's the fact that typically low-income people and people of color and rural residents do not have the same access to broadband structure and services that wealthier and non-poc people have access to. This cuts across all sorts of geographies and population densities. It is the result of underinvestment by broadband companies. (non-profit leader)
- Digital redlining is underinvestment by broadband companies that result in lower speeds and often less affordable service than in wealthier, whiter areas. (government official, citing Vinhcent Le, Greenlining Institute). The fact that typically low-income people, people of color, and rural residents do not have the same access to broadband structure and services that wealthier and non-people of color people have access to. This cuts across all sorts of geographies and population densities. (government official)
- The lack of access to high quality telecommunications service (used as a broad term) and/or have infrastructure that is not being upgraded on par with wealthier communities. (non-profit leader)
- Digital discrimination is any of the following: (expert within the telecommunications sector)
  - o a place where there are no adequate networks that allows someone to do what the majority of people are using it for into the foreseeable future;
  - o where the service is not affordable to all;
  - o where everyone does not have tools to be on it;
  - o where using the tools doesn't provide equitable access to services – healthcare, education, etc.
- Examine who has 21st century access and who does not; who has fiber and who does not. (non-profit leader)
- Defines digital discrimination to include digital redlining and both terms are relatively new but based on analogies for historical dissemination in housing and financial services, such as banking and mortgage lending. (attorney)

- Digital discrimination hard to define; states do not have data about who does not have access. (government official)
- Digital redlining is a subset or form of digital discrimination. The definition of redlining adopted by the previous FCC DEI working group is suggested: "the term most commonly refers to activity consistent with the definition offered by the NDIA. The NDIA has defined "digital redlining" as "the denial, to certain communities or neighborhoods, of equal access to the terms, conditions and level of service of advanced information or telecommunications technologies, on the basis of race, ethnicity, income, or wealth." (attorney, citing prior DEI Working Group Report.)
- "[E]conomic cherry picking" because return on investment is what animates companies' economic planning. (industry consultant)

**Intent vs. Disparate Treatment**
- Disparate treatment (intentional based on race, gender, ability, economic status) and disparate impact (not motivated intentionally). Communities use technology in different ways, so some discriminatory effects are artifacts of the different ways tech is used. (academic)
- Guiding principle is to focus on outcomes, not intent. If individuals are impacted in a negative way, there is a need to address that and figure out how to avoid it. (public interest)
- Intent and market forces do not matter if your community is disconnected. (attorney public interest)
- Policies are created that intentionally or unintentionally result in some people being underserved. When access is provided to resources and the ability to exploit those resources in a way that is not distributed across all groups. (public interest)
- Policies put together today that lead to disparate impacts. (non-profit leader)
- The original drafts of the Infrastructure Act appeared to adopt a disparate impact interpretation – if people of color have a different digital/broadband outcome, then its discrimination. If economics or the technology can determine the different outcomes for people of color, then its discrimination. Then the language shifted to a more de jure approach rather than a disparate impact approach. (expert within the telecommunications sector)

**Workforce**
- Disparities in access to broadband resulting in the Inability of workforce to research available jobs, etc. (academic)
- Consideration of why digital discrimination is happening and for whom information access is considered essential and for whom nonessential. Digital discrimination occurs geographically and in terms of employee and economic hierarchy. (public interest)

**Information Redlining**
- Redlining is intentional and unintentional "practice of arbitrarily denying or limiting financial services to specific neighborhoods, generally because its residents are people of color or are poor." (public interest)
- Information redlining is the systemic denial of equitable access to information, information services, and information retrieval methods. (public interest)
- The role of information and digital access in closing the widening health and socioeconomic divide. (public interest)
- Information poverty is further defined by the lack of visible access points to critical information and the absence of well-coordinated and appropriately scaled information infrastructure. (public interest)
- A "situation in which individuals and communities within a given context, do not have the requisite skills, abilities, or material means to obtain efficient access to information, interpret it and apply it appropriately. (public interest)

**PART TWO: REPORT AND RECOMMENDATIONS FROM THE INNOVATION AND ACCESS WORKING GROUP – IIJA CONTRACTING AND GRANTS FOR SMALL AND DIVERSE BUSINESSES**

## I. INTRODUCTION

Diversity and Inclusion is a core principle and foundational to the telecommunication industry's obligation to break down long-standing and well-known barriers to entry for diverse suppliers in the supply chain ecosystem. Removing historical barriers to entry allows for the development and implementation of innovative and sustainable pathways to growing diverse businesses to scale and profitability. Mentoring, entrepreneurship training, clearinghouses, and corporate partnerships are examples of pathways that could lead to the codification of procurement best practices and industry acceptable standards.

Increasing federal spending on underserved businesses will help more Americans realize their entrepreneurial dreams and narrow persistent wealth disparities. According to new analysis from the White House Council of Economic Advisers, based on data provided by the U.S. Small Business Administration (SBA), by merely closing the gap in small business ownership rates, the average net worth of Hispanic/Latino or Black households could increase by 17-22 percent or $138,800 or $185,900 respectively.[97]

The Innovation and Access (I&A) Working Group is tasked with advancing these principles by:
- Recommending solutions to reduce entry barriers and encourage ownership and management of media, digital, communications services, and next-generation technology properties and start-ups to encourage viewpoint diversity by a broad range of voices, including people of color, women, LGBTQ+, and persons with disabilities, among others.
- Studying successful approaches to fostering diversity, equity, and non-discrimination in video, media, and technology ownership, management, and distribution; making recommendations on how to accelerate the entry of small businesses, including those owned by women and people of color, into the media, digital news and information, and audio and video programming industries, including as owners, suppliers, and employees.
- Examining issues surrounding access to capital, financing, and participation of small, diverse businesses in the media and technology sectors; and evaluating the impact of new technologies, including algorithms, on diverse consumers.

The FCC, therefore, tasked the I&A Working Group with providing recommendations to ensure inclusive practices for identifying and selecting participating entrepreneurs in IIJA contracting and grants processes. Specifically, the Working Group was directed to recommend a framework for federal and state grant administrators and procurement processes to promote access to opportunities for small and diverse businesses. The Working Group goals for this immediate request were to:

1. increase the participation of small minority- and women-owned (SMW) businesses in state/local infrastructure grant and contract opportunities; and

---

[97] The White House, "The Benefits of Increased Equity in Federal Contracting," *The White House*. December 1, 2021, https://www.whitehouse.gov/cea/written-materials/2021/12/01/the-benefits-of-increased-equity-in-federal-contracting/; The White House, "FACT SHEET: Biden- Harris Administration Announces Reforms to Increase Equity and Level the Playing Field for Underserved Small Business Owners," *The White House.* December 2, 2021, https://www.whitehouse.gov/briefing-room/statements-releases/2021/12/02/fact-sheet-biden-harris-administration-announces-reforms-to-increase-equity-and-level-the-playing-field-for-underserved-small-business-owners/.

2. provide best practices guidance to state/local officials on performing successful outreach to SMW businesses about funding and contract opportunities, and how such businesses can apply, partner as subcontractors, and assist in efforts to widely deploy and increase the take-up rate of broadband in diverse communities.[98]

The I&A Working Group offers these recommendations for best practices to increase the participation of SMW businesses in state and local infrastructure grant and contract opportunities:

1. **Adopt Definitions of Small Minority- and Women-Owned (SMW) Businesses that are inclusive of intersectional groups, such as LGBT+ and People With Disabilities.**

2. **Designate a Government-Wide Office to Oversee Supplier Diversity Initiatives, Including the Creation of an Annual Plan to Increase Supplier Diversity.**

3. **Strongly Encourage an Accountable Goal of No Less Than 30% Participation to the Maximum Extent Practicable of SMW Businesses in State and Local Infrastructure Grant and Contract Opportunities and Provide Incentives to First Tier Contractors to Partner with SMW Businesses.**

4. **Include Purposeful Auditing and In-Progress Reporting in the Contracts/Subgrants for Real-Time Accountability and Compliance as Committed that Ensures that SMW Goals Are Met.**

5. **The Grantees, Working in Conjunction with the Supplier Diversity Office, Should Proactively Identify Contracting and Procurement Forecasts and Needs.**

6. **Require Visible Leadership.**

7. **Streamline Procurement Processes for All Businesses.**

8. **Ensure Diverse Participation in Task Forces or Committees that Advise Grantees on Their Broadband Plans, Including Broadband Supplier Diversity.**

9. **Promote Certifications Prior to Disbursement of Funds so that SMW Businesses are Prepared to Participate in the Funding Opportunities.**

10. **Grantees, Subgrantees, and Contractors Should be Required to Reach out to SMW Businesses.**

11. **Promote Local Business Opportunities.**

12. **NTIA Should Collect and Disseminate North Star Best Practices.**

## II. METHODOLOGY

---

[98] "Communications Equity and Diversity Council Meeting - February 2022," *Federal Communications Commission*. February 23, 2022, https://www.fcc.gov/news-events/events/2022/02/communications-equity-and-diversity-council-meeting-february-2022.

The I&A Working Group followed two paths to identify best practices for increasing participation of small minority- and women-owned businesses in state and local infrastructure grant and contract opportunities—research and interviews.

***Research.*** The Research Team reviewed:[99]

- Federal guidance and programs, including from White House Executive Orders and the President's Management Agenda; the U.S. Department of Transportation's and Environmental Protection Agency's Disadvantaged Business Enterprise (DBE) Programs; the U.S. Department of Commerce's Minority Business Development Agency, and its Office of Small and Disadvantaged Business Utilization; and the U.S. Small Business Administration.
- State guidance and programs, including from the California Department of Transportation, the Washington State Office of Minority and Women's Business Enterprises, the Missouri Department of Transportation, the Florida Department of Management Services Office of Supplier Diversity, the Illinois Commission on Equity and Inclusion, and the Michigan Department of Technology, Management, & Budget.
- Local guidance and programs, including Broward County; Florida; City of Coconut Creek, Florida; Chicago, Illinois; and Detroit, Michigan.
- Academic and Think Tank publications, including the Harvard Kennedy School Government Performance Lab, the Milken Institute, and PolicyLink.
- Responses to an Innovation and Access Workstream Members' Survey.[100] The survey requested feedback from organization representatives with various levels of involvement regarding supplier diversity. The inquiries centered around insights on best practices, model codes, and known initiatives that support supplier diversity initiatives that could potentially be used to support the diversity goals of the infrastructure Investment and Jobs Act (IIJA) Contracting and Grant Processes.
- Prior FCC Advisory Committee on Diversity and Digital Empowerment Reports, including the Tech Diversity Best Practices Report (June 24, 2019),[101] the Diversity in the Tech Sector Working Group Report (June 24, 2021),[102] and the Digital Empowerment Subgroup Report (June 24, 2021).[103]
- Other Guidance and Programs, including from Disability: IN, LBGT Tech, Multicultural Media Telecommunications and Internet Council, National Center for American Indian Enterprise Development, National Minority Supplier Development Council, US Black Chambers, Inc./ByBlack.us, US Hispanic Chamber of Commerce, US Pan Asian American Chamber of Commerce Education Foundation, Women's Business Enterprise National Council; and Asian Business Association Los Angeles, California Asian Pacific Chamber of Commerce, and District of Columbia Washington Metropolitan Area Transit Authority.

---

[99] *See* Appendix A to Pat II for a full summary of the resources reviewed.

[100] *See* Appendix B to Part II for the survey sample.

[101] FCC Advisory Committee on Diversity and Digital Empowerment, *Tech Diversity Best Practices Report.* (FCC, June 24, 2019), https://www.fcc.gov/sites/default/files/acdde-tech-diversity-best-practices-report-06242019.pdf.

[102] FCC Advisory Committee on Diversity and Digital Empowerment, *Diversity in the Tech Sector Working Group Report.* (FCC, June 24, 2021), https://www.fcc.gov/sites/default/files/acdde-diversity-in-tech-wg-workforce-diversity-report-06242021.pdf.

[103] FCC Advisory Committee on Diversity and Digital Empowerment, *Digital Empowerment Subgroup Report.* (FCC, June 24, 2021), https://www.fcc.gov/sites/default/files/acdde-digital-empowerment-wg-digital-empowerment-report-06242021.pdf.

*Interviews.* The Working Group identified experts who could discuss procurement or grant administration policies or practices that promote access to opportunities for SMW businesses - and how providing opportunities to SMW businesses helps address digital discrimination. The interviews provided practical advice and guidance to the Working Group.  Summaries of the interviews as well as a list of the experts interviewed were compiled.[104] The information the Working Group gleaned from its interviews, as well as its research, are the bases for the recommendations contained herein.

### III. BEST PRACTICES ON INCREASING PARTICIPATION OF SMALL MINORITY- AND WOMEN-OWNED BUSINESSES IN STATE AND LOCAL INFRASTRUCTURE GRANT AND CONTRACT OPPORTUNITIES

The IIJA's $65 billion investment into broadband deployment and equity presents a historic opportunity in the U.S. to close the digital divide, to eliminate historic inequities that have led to either a lack of meaningful access to high-speed broadband or to utilize broadband due to a lack of digital readiness, and to ensure that SMW businesses are able to tap into the opportunities presented by these funding programs.

Therefore, the FCC should adopt and forward the below best practice recommendations to the National Telecommunications and Information Administration (NTIA)[105] to utilize in its review of State Equity plans and to develop its technical assistance for grantees.[106]

**1. Adopt Definitions of Small Minority- and Women-Owned (SMW) Businesses that are Inclusive of Intersectional Groups, such as LGBT+ and People with Disabilities.**

The grantee should adopt definitions of SMW businesses, as follows:[107]

**Minority-Owned Business:** The Small Business Administration defines a minority-owned business as a business that meets the small business size standard for primary NAISC code which includes the majority (at least 51%) of the company is owned, controlled, and run on a daily basis by a member (or collection of members) of four ethnic or racial groups: African American, Asian American,[108] Hispanic American, and Native American.[109]

**Women-Owned Business:**  A women-owned business is a small business according to SBA size

---

[104] *See* Appendix C of Part II for the list of experts and interview summaries.

[105] These recommended best practices can also be provided to other U.S. agencies that provide broadband funding, such as the U.S. Department of Treasury.

[106] Although the Council does not have a recommendation in this regard, the Commission should consider whether *Adarand* studies are necessary to support any race-based recommendations to NTIA. See FCC Advisory Committee on Diversity for Communications in the Digital Age Constitutional Issues Subcommittee, *Recommendation for Renewed Adarand Studies* (Washington D.C., United States: September 11, 2009), https://transition.fcc.gov/DiversityFAC/adopted-recommendations/constitutional-sub-rec-adarand.pdf.

[107] This recommendation is not meant to alter prior Committee recommendations and Commission decisions as expressed in other contexts dealing with minority and female ownership.

[108] "Asian American" includes Native Hawaiian and Pacific Islanders.

[109] *See* generally 13 CFR Part 124 – 8(a), Subparts A and B, specifically § 124.105 nuanced ownership requirements, and specifically § 124.105 for Small Disadvantaged Businesses; *see also* "8(a) Business Development Program - Federal Contracting," U.S. Small Business Administration, n.d., accessed July 8, 2022, https://www.sba.gov/federal-contracting/contracting-assistance-programs/8a-business-development-program.

standards, has at least 51% owned and controlled by one or more women who are U.S. citizens, and has women manage day-to-day operations who also make long-term decisions.[110]

Factors to determine whether a business qualifies as SMW include: ownership, control, and day-to-day management. Although it is important to be clear about what qualifies as an SMW business, grantees should not assume that minority- and women-owned businesses are only small and disadvantaged for outreach purposes. Rather, they should include large minority- and women-owned businesses, which could help SMW businesses, in outreach activities. Although the majority of SMW businesses are small, they could grow into larger businesses. Large minority- and women-owned businesses tend to contract with members of their own communities and could also help provide technical assistance to SMW businesses.

### 2. Designate a Government-Wide Office to Oversee Supplier Diversity Initiatives, Including the Creation of an Annual Plan to Increase Supplier Diversity.

State and local grantees should establish a government-wide office in charge of supplier diversity (hereinafter referred to as "Supplier Diversity Office" or "Office"), which should be involved from the beginning of the grant process. The Office should be separate from a civil rights division. It should have broader responsibilities and be at the same level as the Grants or Procurement Office. Furthermore, the Office should work hand-in-hand with the Grants or Procurement Office.[111]

The Office staff should participate in and sponsor supplier diversity training, as well as review all procurement practices on a government-wide basis.[112] For example, grantees should be required to route for review the grant publication or formal solicitation through an employee of its internal Supplier Diversity Office before advertising it to the public. Any selection/awarding panel should have meaningful diverse representation or should have at least one (1) member of the panel representing the Supplier Diversity Office.

The Office should avoid an overly lax[113] approach because SMW businesses and other supplier diversity issues could "be overlooked or marginalized when the Supplier Diversity Office is not involved from project inception."[114] Thus, smaller issues could quickly turn into bigger issues.[115]

The Office should include dedicated staff for outreach and technical assistance.[116] The staff members

---

[110] *See* generally 13 CFR Part 127, specifically § 127.201 for Women-owned small business (WOSB) and Economically Disadvantaged WSOB; *see also* "Women-Owned Small Business Federal Contracting Program," U.S. Small Business Administration. n.d., accessed July 8, 2022, https://www.sba.gov/federal-contracting/contracting-assistance-programs/8a-business-development-program.

[111] U.S. Department of Transportation, *Disadvantaged Business Enterprise Program* (Washington D.C., United States: U.S. Department of Transportation, Federal Highway Administration, August 20, 2018), https://www.fhwa.dot.gov/civilrights/programs/dbe_acm_handbook_20180820.pdf.

[112] *Supplier Diversity Best Practices* Tools for Equity in Public Spending - Internal Processes (Washington, United States: Washington State Office of Minority Women's Business Enterprises, n.d.), accessed July 8, 2022, https://omwbe.wa.gov/sites/default/files/public/tools-for-equity/Supplier-Diversity-Best-Practices.pdf, p. 1.

[113] U.S. Department of Transportation, *Disadvantaged Business Enterprise Program,* p. 43.

[114] *Ibid*.

[115] *Ibid*.

[116] Improving Government Vendor Diversity, Harvard Kennedy School, Government Performance Lab, September 2017, https://hwpi.harvard.edu/files/govlabs/files/strategies_for_improving_vendor_diversity_brief.pdf, p. 3.

should build strong relationships with SMW businesses and Chambers of Commerce throughout the areas/region/state it serves, to ensure that they are properly invited to participate as potential sources for suppliers information and connection to the suppliers' community, and to help and encourage them to participate in the grant's opportunities.[117] The staff members should also maintain a regularly updated list of SMW businesses, Chambers of Commerce, and other supporting community-based, business, and educational organizations throughout the area/region/state it serves.[118] In addition, proof of the manner of solicitation should be provided to show compliance with NTIA's[119] requirements that grantees use the resources of organizations such as the Small Business Administration, and the Minority Business Development Agency at the U.S. Department of Commerce, in addition to diverse, minority, and women business organizations, etc.[120]

For example, the City of Boston's Department of Neighborhood Development and Office of Small Business Development builds strong relationships with SMW suppliers and supports their participation in the City's business opportunities. Throughout the procurement process, they provide outreach and technical assistance to small businesses, which are disproportionately SMWs.[121]

The Office should follow up on initial solicitations by contacting SMWs to determine if they are interested or need technical assistance.[122] Ultimately, the staff should use all reasonable and available means to effectively solicit and assist interested SMWs.[123] For example, the Office should be tasked with helping SMW businesses recruit employees capable of executing the contract tasks.

3. **Strongly Encourage an Accountable Goal of No Less Than 30% Participation to the Maximum Extent Practicable of SMW Businesses in State and Local Infrastructure Grant and Contract Opportunities and Provide Incentives to First Tier Contractors to Partner with SMW Businesses.**

Consistent with applicable State and local government regulations, the Office should develop and aim for a documented commitment to achieve a goal of no less than 30% SMW business participation.[124] The goal however, should consider economic factors, such as SMW businesses' ability to meet requirements in a timely and cost-efficient manner.  Efforts should be publicly announced at the highest leadership

---

[117] NTIA, *Broadband Equity Access and Deployment Program, Notice Of Funding Opportunity ("BEAD NOFO"),* p. 88 (Washington D.C., United States: DOC, May 2022), https://broadbandusa.ntia.doc.gov/sites/default/files/2022-05/BEAD%20NOFO.pdf (requiring that grantees ensure that "small and minority businesses, and women's business enterprises are solicited whenever there are potential sources.").

[118] NTIA, *BEAD NOFO*, p. 88.

[119] These recommendations reference NTIA because as noted, *infra*, the Working recommends that the FCC forward these recommendations to NTIA.

[120] *Ibid*., p. 89.

[121] *Improving Government Vendor Diversity*, p. 3. Assistance includes one-on-one support and guidance, certification, bidding, contracting, and payment processes; conducting workshops in predominantly low-income or minority neighborhoods; partnering with nongovernmental organizations to increase access to capital and pro bono legal services for smaller vendors; attending community group meetings; and contacting publicly listed businesses to inform them of new bidding opportunities.

[122] Illinois Commission on Equity & Inclusion, *Guidance for Documenting Good Faith Efforts to Meet BEP Participation Goals* (Illinois, United States: Business Enterprise Program (BEP), n.d.), accessed July 8, 2022, https://cei.illinois.gov/content/dam/soi/en/web/cei/documents/GOOD_FAITH_EFFORTS_GUIDANCE.pdf., p. 3.

[123] Illinois Commission on Equity & Inclusion, *Guidance for Documenting Good Faith Efforts to Meet BEP Participation Goals.*

[124] U.S. Department of Transportation, *Disadvantaged Business Enterprise Program*, p. 44.

level, i.e., the Governor of a state or the Mayor of a county, city, or town.[125] Making a public commitment to the goal elevates the priority of the effort internally and promotes the program to potential SMW businesses, thereby encouraging them to participate.[126] For example, the White House recently announced that its goal for government-wide spending is 11% SMW business participation, which is, up from the statutory goal of 5%, with the ultimate goal of 15% by 2025.[127]  And in 2016, Boston Mayor Marty Walsh signed an Executive Order that sets targets for utilizing SMW businesses in City contracts, as part of Boston's Economic Inclusion and Equity Agenda to address racial and economic disparities.[128]

The participation goal should not only quantify the dollar amount of awards alone. Where possible, it should also quantify the number of minority-, women-owned businesses, and/or diverse supplier organizations. For example, the NTIA BEAD and Middle Mile Notices of Funding Opportunities (NOFOs) require that grantees, where feasible, permit the maximum participation by SMWs by dividing total requirements into smaller tasks.[129] Additionally, the number of businesses signed up for a database should not be the main measure of success, but rather, how many of these businesses received contracts and how many were approved.

Incentives for first tier grantees or contractors could be helpful and when proven successful, they could include awards, recognition, and score cards to ensure that SMWs "pay it forward."  If the grantee or contractor exceeds the 30% SMW businesses participation goal, they might be incentivized with access to additional funds. One example discussed during the interviews included a pension program that helped minority broker dealers enter the industry of international trade by requiring financial firms to use minority managers in order to keep the pension account.

4. **Include Purposeful Auditing and In-Progress Reporting in the Contracts/Subgrants for Real-Time Accountability and Compliance as Committed that Ensures that SMW Goals Are Met.**

The Supplier Diversity Office should report directly to senior leadership, who should ultimately be held responsible for meeting SMW contracting/subcontracting goals. The Supplier Diversity Office should evaluate progress towards the goal. The Office should make publicly available its methods of review, data collection, and documentation.

The Office should check supplier certifications to ensure the accuracy of SMW business status and participation. That could help to inform the Supplier Diversity Office of the absence of certified SMW businesses and/or their potential participation.[130]  In addition, the Office should collect and report its data by specific minority and diverse group (e.g., African American, Asian American, Hispanic American,

---

[125] *See, e.g.*, participation goal of 30%, Illinois General Assembly, Public Act 101-0657 SB1608, https://www.ilga.gov/legislation/publicacts/101/101-0657.htm; participation goal of 35%, OCC, City of Atlanta's Small Business Opportunity Program, https://www.atlantaga.gov/home/showpublisheddocument/53769/637774047143000000.

[126] *Improving Government Vendor Diversity*.

[127] The White House, "FACT SHEET: Biden-   Harris Administration Announces Reforms to Increase Equity."

[128] Mayor's Office, "Mayor Walsh Signs Executive Order to Expand Opportunities for Women and Minority Owned Businesses," City of Boston. July 13, 2016, https://www.boston.gov/news/mayor-walsh-signs-executive-order-expand-opportunities-women-and-minority-owned-businesses.

[129] NTIA, *BEAD NOFO*, p. 89.

[130] U.S. Department of Transportation, *Obtaining [DBE] Certification*, Disadvantaged Business Enterprise. February 3, 2020, https://www.transportation.gov/civil-rights/disadvantaged-business-enterprise/obtaining-certification.

Native American, LGBT+, or people with disabilities). In its revisions to the federal procurement process to increase the share of federal contracts to small, disadvantaged businesses, the White House included federal contracting spending data by the race or ethnic origin of the business owner.[131] These data points will allow comparison at the community level, such as by county or zip code, rather than at a broad level, such as statewide or nationwide. They include data on the contract dollar amount and diversity status of subcontractors.[132] These grassroots data comparisons are invaluable for assessing the success of Supplier Diversity initiatives at the community level, and for determining whether there is an imbalance unfavorable to particular SMW businesses, such as African or Asian or Hispanic or Native American or women-owned businesses.[133] In addition, these data should help the Office and grantee to make sure there is no double-counting of SMW businesses hired or awarded contracts. For example, an African American woman-owned business should only be counted once, not twice, as a minority- and a woman-owned business.

The grantee should be specific regarding the scope of work to be performed pursuant to the grant. The Supplier Diversity Office should ensure the SMW business participation goal is met only through direct and meaningful participation, and not incidental or ad hoc or de minimis participation. For example, for a SMW subcontractor that caters a worksite on a sporadic basis, or does irregular office trash collection, although the nature of work may be within the scope of work under a grant, these sporadic and small jobs standing alone should not be considered as within the scope of work of a grant and should not be used to count for meeting SMW business participation goals.

The NTIA BEAD and Middle Mile NOFOs require grantees to apply the same supplier diversity requirements in the NOFO to their subgrantees and their subcontractors.[134]  Therefore, subgrantees or subcontractors should also report to their grantee or contractor and be held accountable for their own hiring of SMW businesses.

To achieve the necessary accountability, the Office should have a simple, universal form that can be used for all reporting. Grantees, subgrantees, or contractors should include this report in their quarterly performance and financial reports, and contractors should provide the same reports when they request payment. The grantees or contractors' report should be kept in a public file, such as on their website, and their Chief Procurement Officers should receive and review this information to ascertain compliance. This information could be used to determine whether grantees are meeting their goals on a progressive and timely basis.

A universal form allows the Supplier diversity Office to cross-analyze data. It also reduces incentives for individual grantees or contractors to report the data that would put them in the best light.[135] Making the

---

[131] The White House, "FACT SHEET: Biden-   Harris Administration Announces Reforms to Increase Equity."

[132] *See Improving Government Vendor Diversity*.

[133] Denise Fairchild, Kalima Rose, *Inclusive Procurement And Contracting: Building a Field of Policy and Practice* eds. Brian Tell, p.32 (PolicyLink, March 5, 2018), available at https://www.policylink.org/sites/default/files/InclusiveProcurement_final-3-5-18.pdf; Supporting Economic Inclusion in Disadvantaged Communities: A Case for Inclusive Procurement Policies (2018), available at https://www.lisc.org/media/filer_public/64/16/64165a54-93d5-47fc-9011-74c8873d2d7b/a_case_for_inclusive_public_procurement_practices.pdf; Nutua Thrash-Ntuk, *Supporting Economic Inclusion in Disadvantaged* Communities. (LISC, 2018), https://www.lisc.org/media/filer_public/64/16/64165a54-93d5-47fc-9011-74c8873d2d7b/a_case_for_inclusive_public_procurement_practices.pdf.

[134] NTIA, *BEAD NOFO*, p. 88.

[135] *See, e.g.*, State of California Department of Transportation*, DBE Business Enterprises Utilization report,* https://app.box.com/file/947850163254.

reporting process simple will make it easier for grantees or contractors to submit their information. These processes will likewise ease the auditing process.

In sum, a successful supplier diversity program should have a well-defined scope of work and real-time accountability by the grantee or contractor for their commitment to their supplier diversity goals. To that end, the diversity goal commitment must be included in the contract between the federal government and the grantee, accompanied by compliance oversight and audit procedures. If compliance fails, taking into account reasons for non-compliance, measures could be considered to address non-compliance. For example, cancellation of options to renew the contract, financial penalty, or – if appropriate – the loss of opportunity to bid on future opportunities for a period of time.

5. **The Grantees, Working in Conjunction with the Supplier Diversity Office, Should Proactively Identify Contracting and Procurement Forecasts and Needs.**

The EPA has found that, "[e]arly planning and advanced notice support supplier diversity."[136] The grantees therefore should work with the Supplier Diversity Office to identify all contracting and procurement forecasts. A lot could be achieved by focusing on the following objectives: (1) make information on forthcoming opportunities available to SMWs businesses early, (2) arrange time frames for specific deliverables on specific delivery schedules on contracts, and (3) wherever possible, describe the scope of work in a manner that facilitates participation by SMWs in the competitive process. This includes, whenever possible, posting solicitations for bids or proposals for a minimum of 30-calendar days before the bid or proposal closing date.[137]

6. *Require Visible Leadership.*

As noted above, the supplier diversity goals should be adopted by the highest level of leadership of the grantee's organization, i.e., a Governor or a Mayor. Similarly, subgrantees and contractors' highest level of leadership should certify their own compliance with supplier diversity requirements and make transparent their goals, objectives, and achievements. This could be attained by requiring social media campaigns that highlight the goals and achievements, as well as publishing commitments on the official website of the grantees and subgrantees.

7. **Streamline Procurement Processes for All Businesses.**

Grantees should streamline their procurement processes. For example, the Supplier Diversity Office should limit administrative burdens for suppliers by creating a single website with program information and resources, including certification and reciprocity, contract opportunities, and bidding information. It is insufficient just to point companies to the program authorization language, application processes, and acquisition regulations.[138] Administrative burdens may also be reduced by eliminating paper filing requirements and by writing solicitations and contracts in plain language, which helps all bidders and makes contract opportunities more readily accessible.[139] In addition, grantees, subgrantees, and contractors should ensure prompt payment upon receipt of a properly issued invoice for work completed according to agreement and goods delivered. Finally, grantees and subgrantees should provide

---

[136] *Supplier Diversity Best Practices* Tools for Equity in Public Spending - Internal Processes, p. 1.

[137] "Frequently Asked Questions for Disadvantaged Business Enterprises," EPA. April 29, 2022, https://www.epa.gov/grants/frequently-asked-questions-disadvantaged-business-enterprises.

[138] *Improving Government Vendor Diversity,* p. 4.

[139] *Supplier Diversity Best Practices* Tools for Equity in Public Spending - Internal Processes, p. 1.

constructive feedback to SMWs and all businesses that are not selected, to help them strengthen future applications.

8. **Ensure Diverse Participation in Task Forces or Committees that Advise Grantees on Their Broadband Plans, Including Broadband Supplier Diversity.**

NTIA specifically underscores the importance of stakeholder engagement in its NOFO: "NTIA envisions and welcomes extensive coordination and cooperation with all relevant interviewees. . . . Localities and groups representing historically excluded communities can and must make their voices heard to ensure that longstanding equity gaps are finally closed. Existing broadband providers and new entrants must communicate well with Federal, State, Territorial, Local, and Tribal partners to ensure that deployments proceed as expected and that non-deployment activities are designed and implemented in ways that most benefit the communities they are designed to serve."[140]

The grantees should take full use of the knowledge and connections of people in the community who are familiar with the social and economic interests and concerns of the stakeholders in their areas/regions/states. As a diverse Task Force or Advisory Committee for grantees, they could serve as the grantee's goodwill ambassadors, and interpreters of the plans, hopes, aspirations, anxiety, and disappointment that the grantees' broadband plan may bring. They could help to ensure that the grantee's plan and deployment activities will be carried out to bring the most benefits, including supplier diversity, to the communities that the IIJA intended to serve. The grantees should ensure they specifically seek feedback from the Task Force, Advisory Committee, or similar bodies on how to embed supplier diversity in their broadband plans.

9. **Promote Certifications Prior to Disbursement of Funds so that SMW Businesses are Prepared to Participate in the Funding Opportunities.**

Transparency and regular review require a means to identify bona fide SMW businesses to ensure the accuracy of data on the SMW businesses reached and utilized under the IIJA. To be qualified as an SMW business, the entity must be at least 51% owned, controlled, and operated on a day-to-day basis by one or more minorities (African American, Asian American, Hispanic American, and Native American) or by women who are U.S. citizens. The Certification will give SMW businesses access to opportunities to grow revenue, build capacity, and enhance credentials. Certification services are provided for free by governmental entities such as the U.S. Small Business Administration, or for a fee in the private sector. There are numerous federal, state, and local entities that provide free certification services for SMW and disadvantaged businesses owned by U.S. citizens. Eight (8) national nonprofit organizations provide certification services for a fee for SMW, people with disabilities, veteran, and LGBT+ businesses located in the United States. Their requirements are substantially the same, i.e., 51% ownership, control, and day-to-day management of the business.

In order to make it easy for SMW businesses to be certified in various areas/regions/states of the country, we recommend reciprocity of certification among the public and private certification entities.[141] Organizations with cultural and linguistic competence could provide for communities with particular cultural sensitivities. The Supplier Diversity Office should be thoughtful of the SMW businesses' desire for choice of association with whom personal, proprietary and financial information would be divulged during the certification process. Grantees could either adopt existing certification programs or create their own certification programs. However, reciprocity is key to avoiding duplication of efforts and expenses to the SMW businesses, as long as the existing certification organizations and programs have an established

---

[140] NTIA, *BEAD NOFO,* p. 8.

[141] *See Improving Government Vendor Diversity.*

track record of operating a bona fide certification program. Grantees should not adopt one certification program over another, which could create confusion and the appearance of preferential treatment. Additionally, supplier diversity officers should make available toolkits and educational opportunities to ensure SMW businesses are prepared to participate in the certification process.

If a grantee creates its own certification program, it should be streamlined, and the grantee should provide toolkits and training on completing the application form and submitting the required documentation, as well as guidelines for site visits which is an important final step in the certification process. Regardless, however, the grantee should accept reciprocity of certifications issued by similar certification organizations.

Recognizing SMW certifications granted by other entities with similar missions, a bona fide certification program, and a proven track record of integrity, is one way to improve supplier diversity data. The benefit of reciprocity is streamlining certification requirements – if an entity is already certified through one program, it should not have to jump through duplicate or multiple efforts and expense hoops, to get the same certification. There are national trade associations with a track record of certifying minority- and women-owned businesses. The Supplier Diversity Office should consider credentialing these trade associations as certification clearing houses. The more bona fide certification organizations there are, the more minority- and women-owned businesses could be certified, thereby increasing the number of SMW businesses available in the marketplace to access and bid for the opportunities the IIJA provides. To the best of our estimation, IIJA offers more opportunities than ever and there is no better time than now for SMW businesses to get certified. This will further fulfill the intent of the law.

### 10. Grantees, Subgrantees, and Contractors Should be Required to Reach out to SMW Businesses.

Outreach and education are key to increasing SMW business participation on projects such as under the IIJA. The grantees or contractors therefore should require their subgrantees and subcontractors to engage in meaningful outreach to and education of SMW businesses. These efforts should be documented so that SMW businesses can better tailor their supporting program activities to meet the opportunities.[142] The grantees should not condone "window-dressing outreach" designed solely to establish or document good faith implementation.[143] Rather, the grantee should encourage partnership and collaboration. For example, the grantee should encourage subgrantees or contractors to contract with an SMW business consortium when a contract is too large for smaller firms to handle on their own.

In addition, a subgrantee or contractor should make reasonable efforts to assist interested SMW businesses in obtaining bonding, lines of credit, or insurance required by the procuring agency or the bidder/offeror;[144] and necessary equipment, supplies, materials, or related assistance or services.[145]

### 11. Promote Local Business Opportunities.

To ensure that SMW businesses are more likely to participate, grantees and subgrantees should promote local business opportunities early, continuously, and aggressively.[146] Furthermore, grantees and

---

[142] *Ibid*.

[143] *Ibid*.

[144] Illinois Commission on Equity & Inclusion, *Guidance for Documenting Good Faith Efforts to Meet BEP Participation Goals*, p.3.

[145] *Ibid*.

[146] *Ibid*.

subgrantees should publicize contract awards to promote partnerships as early as such opportunities are made known.[147]

### 12. NTIA Should Collect and Disseminate North Star Best Practices.

As NTIA continues its federal, state, and local broadband coordination efforts, it should develop and maintain a *North Star*[148] of best practices across federal agencies and state and local governments for collaboration among each other to serve the best interests of the SMW businesses, close the digital divide, eliminate historic inequities, and open access to meaningful highspeed broadband service and equipment so that SMW businesses could tap with ease into the opportunities presented by the IIJA.

NTIA should disseminate *North Star* guidance among grantees through its powerful s oversight and technical assistance programs. Top-down guidance will be the critical starting point for grantees to dial into sharp focus the goals at hand--to ensure that SMW businesses are included, welcomed, encouraged, and able to participate individually or in collaboration with all Americans in the unprecedented funding and contracting opportunities flowing out of the IIJA.

## IV. CONCLUSION

The Commission tasked the I&A Working Group with recommending ways to increase the participation of SMW businesses in State/local infrastructure grant and contract opportunities, and to provide insightful guidance on successful outreach to SMW businesses regarding funding and contract opportunities, including how to apply directly or partner as subcontractors, to increase deployment of broadband in diverse communities.  The Working Group recommends that the Commission adopt and forward the above best practice recommendations to NTIA to utilize in its review of State Equity plans and to develop its technical assistance for grantees.

---

[147] *Ibid*.

[148] The North Star is the star that lies above the Earths' Northern Pole. See NASA, "What is the North Star and How Do You Find It?" July 28, 2021, available at https://solarsystem.nasa.gov/news/1944/what-is-the-north-star-and-how-do-you-find-it/.  Metaphorically speaking, North Star refers to an overall strategy to reach a named goal.  See Maximilian Schroeck, Jon Kawamura, and Anne Kwan, "Setting the North Star:  Staying Focused and On Track" (2019), available at https://www2.deloitte.com/content/dam/insights/us/articles/5186_setting-the-north-star/DI_setting-the-north-star.pdf.

**APPENDIX A**

**Summary of Resources for Best Practices to Promote Supplier Diversity**

I.  **FEDERAL GUIDANCE & PROGRAMS**

  A.  **The White House**[149]

  i.  In December 2021, the White House released "Reforms to Increase Equity and Level the Playing Field for Underserved Small Business Owners." Background: On June 1, 2021, President Biden announced a goal to increase the share of contracts going to small, disadvantaged businesses by 50% by 2025. The announcement built on the President's Day One Executive Order 13985, which directed agencies to work to make contracting opportunities more readily available to all eligible firms and to remove barriers faced by underserved individuals and communities.

  ii.  Prior to that, on November 18, 2021, the White House launched its President's Management Agenda vision. The third PMA priority—*managing the business of government to build back better*—recognizes that fostering lasting improvements in the Federal acquisition system can create opportunities for underserved communities.

  iii.  Reforms to the federal procurement process to increase the share of federal contracts to SDBs include:
    1.  Asking agencies to increase their goals so that government-wide spending results in 11% of contracting dollars being awarded to small, disadvantaged businesses, up from the current statutory goal of 5%.
    2.  Releasing disaggregated data on federal contracting spending by race/ethnicity of business owners, a powerful transparency and management tool.
    3.  Implementing changes to the federal government's use of "category management" to boost contracting opportunities for underserved small businesses.
    4.  Adopting management practices to drive accountability and institutionalize the achievement of small business contracting goals, with key takeaways such as: holding leaders accountable for meeting small business contracting goals; ensuring agency small business contracting offices have direct reporting lines to senior leadership; increasing the number of new entrants to the federal marketplace; and reversing declines in the small business supplier base.

  B.  **United States Department of Transportation**[150]

---

[149] The White House, "FACT SHEET: Biden-  Harris Administration Announces Reforms to Increase Equity and Level the Playing Field for Underserved Small Business Owners," *The White House.* December 2, 2021, https://www.whitehouse.gov/briefing-room/statements-releases/2021/12/02/fact-sheet-biden-harris-administration-announces-reforms-to-increase-equity-and-level-the-playing-field-for-underserved-small-business-owners/.

[150] U.S. Department of Transportation, "Disadvantaged Business Enterprise (DBE) Program," accessed July 12, 2022, https://www.transportation.gov/civil-rights/disadvantaged-business-enterprise; U.S. Department of

(continued….)

i.  Created a DBE program to remedy ongoing discrimination and the continuing effects of past discrimination in federally assisted highway, transit, airport, and highway safety financial assistance transportation contracting markets nationwide. The goal is to provide small businesses owned and controlled by socially and economically disadvantaged individuals a fair opportunity to compete for federally funded transportation contracts. Background: The original Congressional Mandate that started the DBE Program focused on minority/women's business enterprises in the 1980s by regulation under the authority of Title VI of the Civil Rights Act of 1964 and other nondiscrimination statutes that apply to DOT financial assistance programs. Since then, Congress has codified and repeatedly reauthorized the program—most recently in Section 1101(b) of the "Fixing America's Surface Transportation Act" or "FAST-ACT" (P.L. 114-94). The statute provides that, "Except to the extent that the Secretary [of Transportation] determines otherwise, not less than 10% of the amounts made available for any program under [this Act and Section 403, Title 23 of the U.S. Code] shall be expended through small business concerns owned and controlled by socially and economically disadvantaged individuals." FAST-Act, § 1101(b)(3) (emphasis added).

ii.  Implementing Regulations: The DOT's implementing rules are available at 49 C.F.R. Part 26 (and, for airport concessionaires, at 49 CFR Part 23). Definitions include:

   1.  "Disadvantaged business enterprise" or "DBE" means "a for-profit small business concern – (1) That is at least 51% owned by one or more individuals who are both socially and economically disadvantaged or, in the case of a corporation, in which 51% of the stock is owned by one or more such individuals; and (2) Whose management and daily business operations are controlled by one or more of the socially and economically disadvantaged individuals who own it." 49 C.F.R. § 26.5.
   2.  "African Americans, Hispanics, Native Americans, Asian-Pacific and Subcontinent Asian Americans, and women are presumed to be socially and economically disadvantaged. Other individuals can also qualify as socially and economically disadvantaged on a case-by-case basis."
   3.  Others that may qualify as economically disadvantaged include an individual who has "a personal net worth that does not exceed $1.32 million. To be seen as a small business, a firm must meet SBA size criteria and have average annual gross receipts not to exceed $23.98 million. Size limits for the airport concessions DBE program are higher."

iii.  Program Overview: DOT DBE regulations require state and local transportation agencies that receive DOT financial assistance to establish annual goals as well as contract-specific goals for the participation of DBEs. State and local recipients also certify the eligibility of DBE firms to participate in DOT-assisted

(Continued from previous page) ───────────────────

Transportation, "DBE Laws, Policy, and Guidance," accessed July 12, 2022, https://www.transportation.gov/civil-rights/disadvantaged-business-enterprise/dbe-laws-policy-and-guidance; U.S. Department of Transportation, "DBE Program Best Practices," accessed July 12, 2022, https://www.transportation.gov/civil-rights/disadvantaged-business-enterprise/dbe-program-best-practices.

projects. To participate in the DBE program, a small business owned and controlled by socially and economically disadvantaged individuals must receive DBE certification from the relevant State, which is generally obtained through the state Uniform Certification Program ("UCP"). Certifiers make determinations based upon on-site visits, personal interviews, reviews of licenses, stock ownership, equipment, bonding capacity, work completed, resume of principal owners, and financial capacity.

iv. State and Local Transportation Agency Responsibilities (*State and local agencies are not penalized for falling short of their overall goal unless they fail to administer their program in good faith. See 49 C.F.R. § 26.47):
1. Certify the eligibility of DBE firms to participate in their DOT-assisted contracts;
2. Establish narrowly tailored goals for the participation of disadvantaged entrepreneurs; and
3. Evaluate their DOT-assisted contracts throughout the year and establish contract-specific DBE subcontracting goals as necessary to achieve the overall goal of the agency.

v. U.S. Dept. of Transportation Responsibilities:
1. Developing the rules and regulations for the national DBE Program;
2. Providing guidance and conducting oversight to make sure that these rules and regulations are followed by the recipients of DOT funds; and
3. Considering appeals from state/local certification decisions.
4. DBE Certification Appeals: Entities that have applied for and were denied DBE certification may file an administrative appeal with DOT's Departmental Office of Civil Rights (DOCR) within 90 days from the date of denial. Appeals may be submitted via email and must state why the recipient's decision should be reversed and other essentials. A decision to reverse, affirm, or remand will be made within 180 days upon receipt of the appeal. All DOCR decisions are administratively final.

vi. Fraud: If fraud or any other criminal violation is suspected, the case will be referred to DOT's Office of the Inspector General for investigation.

**C. United States Environmental Protection Agency**[151]

i. The two relevant statutes are known as the EPA's 8% Statute (Public Law 102-389, 42 U.S.C. 4370d) and the EPA's 10% Statute (Title X of the Clean Air Act Amendments of 1990, 42 U.S.C. 7601 note), which require an entity to establish that it is owned and controlled by socially and economically disadvantaged individuals who are of good character and citizens of the United States. Entities that meet the certification criteria under either authorizing statute qualify for the EPA's DBE program. The 8% Statute presumes women to be socially and economically disadvantaged individuals and the 10% Statute presumes Historically Black Colleges and Universities, Black Americans, Hispanic Americans, Native Americans, Asian Americans, Women, and Disabled Americans are socially and economically disadvantaged individuals.

---

[151] U.S. Environmental Protection Agency, "Frequently Asked Questions for Disadvantaged Business Enterprises," accessed July 12, 2022, https://www.epa.gov/grants/frequently-asked-questions-disadvantaged-business-enterprises.

ii. Requirement: Six Good Faith Efforts. Funding recipients are required to make the following good faith efforts whenever procuring construction, equipment, services, and supplies under an EPA financial assistance agreement:

1. Ensure DBEs are made aware of contracting opportunities to the fullest extent practicable through outreach and recruitment activities. For Indian Tribal, State, and Local Government recipients, this will include placing DBEs on solicitation lists and soliciting them whenever they are potential sources.
2. Make information on forthcoming opportunities available to DBEs, arrange time frames for contracts, and establish delivery schedules, where the requirements permit, in a way that encourages and facilitates participation by DBEs in the competitive process. This includes, whenever possible, posting solicitations for bids or proposals for a minimum of 30 calendar days before the bid or proposal closing date.
3. Consider in the contracting process whether firms competing for large contracts could subcontract with DBEs. For Indian Tribal, State, and Local Government recipients, this will include dividing total requirements when economically feasible into smaller tasks or quantities to permit maximum participation by DBEs in the competitive process.
4. Encourage contracting with a consortium of DBEs when a contract is too large for one of these firms to handle individually.
5. Use the services and assistance of the SBA and the Minority Business Development Agency of the Department of Commerce.
6. If the prime contractor awards subcontracts, require the prime contractor to take the steps in items 1 through 5.

D. **United States Department of Commerce**

i. **Minority Business Development Agency (MBDA).**[152] The MBDA is the federal agency dedicated to the growth and global competitiveness of minority business enterprises. In 2016, it issued "Contracting Barriers and Factors Affecting Minority Businesses Enterprises," and the MBDA underscores the most frequently cited contracting barriers:

1. Prime level discriminatory barriers: timely bid notification, explicit discrimination (stereotypes, higher and double standards), MBE/DBE stigma;
2. Prime level non-discriminatory barriers: large project sizes, bonding/insurance, bid requirements, timely payment;
3. Subcontractor level discriminatory barriers: timely bid notification, bid shopping, held bid, lack of good faith effort, only using an MBE if required, explicit discrimination (stereotypes, higher and double standards), MBE/DBE stigma; and

---

[152] U.S. Department of Commerce Minority Business Development Agency, "Minority Business Development Agency," accessed July 12, 2022, https://www.mbda.gov/; Noteworthy items include U.S. Department of Commerce Minority Business Development Agency, *Contracting Barriers and Factors Affecting Minority Business Enterprises- A Review of Existing Disparity Studies*, (Orlando, Florida, Premier Quantitative Consulting, Inc.), https://www.mbda.gov/sites/default/files/migrated/files-attachments/ContractingBarriers_AReviewofExistingDisparityStudies.pdf.

> 4. Pervasive barriers: access to capital, network access, marketplace discrimination

The Report suggests several areas to explore and research with respect to lessening barriers faced by MBEs in public contracting. Most relevant here include:

> 1. To reduce informational asymmetries resulting from established and often exclusive networks, governments can create a centralized bidding notification hub for all city/related agencies where bid posting is mandatory. This will ensure equal access to information as well as timely and equal notification.
>
> 2. The federal government should be a model for state and local governments in addressing and understanding the public contracting process. New technology or innovative tools may be used to educate and inform government contracting officers with respect to barriers faced by MBEs. Identify tools that are transferable to local contracting agencies. By standardizing tools at the federal level, it may help standardize and assist all agencies in the collection and management of procurement data at the prime and subcontractor level. Organizations like the MBDA can push for ways to standardize data collection procedures and elements.
>
> 3. Agencies can generate disparity study fact sheets and distribute them to buyers and office staff. This allows staff to see exactly what issues the disparity study identified with respect to discrimination and should advance the discussion towards finding solutions. An ongoing education process could focus on understanding specific problems and using teamwork to solve them. It could also encourage buy-in across the organization by starting with a thorough understanding of the problem.
>
> 4. Contractors who did not win a bid require objective and accurate feedback to improve in subsequent bidding opportunities. Although not cited as a major barrier, multiple minority business owners reported that they lack feedback on failed proposals.
>
> 5. States and municipalities should evaluate the feasibility and implementation of completely anonymous incident reporting systems. Staff members involved in issues should be

apprised of the situation and if found that they contributed to the problem, should face monitored corrective action or other sanctions.

ii. **Office of Small and Disadvantaged Business Utilization (OSDBU).**[153] This Office features Commerce Small Business Program Manual (CSBPM), which includes a chapter on Procurement Mechanisms. The CSBPM provides guidance to procurement offices to ensure that consistent Small Business Program management procedures and practices conform to the Small Business Act (SBA), Federal Acquisition Regulation (FAR), and DOC Small Business Program policies, which require agencies to ensure that a fair proportion of contracts are awarded to small businesses, including socioeconomic small businesses. The manual is very detailed, and topics addressed include:

1. When planning an acquisition, the contracting officer shall first consider socioeconomic small business concerns for award of a prime contract before small business concerns and consider small business for award prior to seeking alternative suppliers. Socioeconomic and small business concerns must also be given first consideration as a member of a team arrangement, including joint ventures and prime contractor/subcontractor relationships.

2. A focus on maximizing small business utilization by encouraging a set-aside for small businesses including socioeconomic set-asides, the Small Business 8(A) Program, multiple award contracts, the North American industry classification system, similarly situated entities and limitations on subcontracting, the non-manufacturer rule, trade agreements, bundled, consolidation, in-sourcing small business contract requirements, undue restriction, unsolicited proposals, rejecting SBA recommendations, the Small Business Subcontracting Program, small business payment assistances, and administrative responsibilities.

E. **United States Small Business Administration**[154]

i. Regulations dealing with government contracting programs for small businesses are outlined in Title 13 Part 125 of the Code of Federal Regulations (CFR). The government's purchasing process is governed by the Federal Acquisition Regulation (FAR). Some government agencies are authorized to have their own supplement to the FAR. As a government contractor, you also must comply with labor standards statutes (Service Contract Act, Contract Work Hours, Safety Standards Act, and more), as well as other statutes, unless the contract states that a particular statute isn't applicable. There are mandatory contract provisions that

---

[153] U.S. Department of Commerce, "Department of Commerce Office of Small and Disadvantaged Business Utilization (OSDBU)," accessed July 12, 2022, https://www.osec.doc.gov/osdbu/; U.S. Department of Commerce, "U.S. Department of Commerce Small Business Program Manual, Procurement Mechanisms, Chapter One," https://www.osec.doc.gov/osdbu/CSBPM-Chpt%201%20Nov%2001%202018.pdf.

[154] U.S. Small Business Administration, "Governing rules and responsibilities," accessed July 12, 2022, https://www.sba.gov/federal-contracting/contracting-guide/governing-rules-responsibilities; U.S. Small Business Administration, "Small Disadvantaged Business," accessed July 12, 2022, https://www.sba.gov/federal-contracting/contracting-assistance-programs/small-disadvantaged-business.

protect the integrity of the government procurement process. These provisions include the "officials not to benefit" clause, the "anti-kickback" provisions, organizational conflict of interest provisions, the "gratuities" clause, and more.

## II.  STATE AND LOCAL GUIDANCE & PROGRAMS

### A.  California Department of Transportation (Caltrans)[155]

i.  Within Caltrans, there is an Office of Business and Economic Opportunity (OBEO) that tracks DBE contract goals, as well as reviews and approves subrecipient DBE contract goals for Caltrans' Division of Local Assistance (DLA). Per DLA-OB 14-06, subrecipients submit their DBE contract goals for construction contracts over $2 million and consultant contracts over $500,000 for Caltrans' review. Caltrans will either approve the DBE goal or recommend an adjustment. Generally, California State Law mandates public contract provisions for M/WBEs and creates definitions for minority, minority business enterprise, women business enterprise, and adopts "disadvantaged business enterprise: as used in Section 23.62 of Title 49 of the CFRs. Caltrans requires specific reporting form utilization and boilerplate language in every contract as follows: "*Contractor shall maintain records of all subcontracts entered into with certified DBE Subcontractor(s) and records of materiel purchased from certified DBE supplier(s). The records shall show the name and business address of each DBE Subcontractor or vendor and the total dollar amount actually paid to each DBE Subcontractor or vendor, regardless of tier. The records shall show the date of payment and the total dollar figure paid to all firms. DBE (prime) Contractor shall also show the date of work performed by its own forces along with the corresponding dollar value of the work. Contractor shall prepare and submit the Disadvantaged Business Enterprises Utilization Report (ADM-3069) form (Attachment ___) to the Contract Manager with every invoice (refer to Exhibit B, Budget Detail and Payment Provisions).*"

  1.  The only critique of this program is the manner of certifying as Small Business Enterprise (SBE) or a Disadvantaged Business Enterprise (DBE). The entity seeking certification must apply with the individual reviewing entities for the specific region where they are located; and can only certify through those "Unified Certifying Partners." Firms must certify their location as either: Imperial, Riverside & San Diego Area, Los Angeles Area, Central Valley/Bay Area, or Northern California Area. It is not clear how a certification issued by one area is recognized in the other areas. In addition, several different toolkits are offered for each area. It would be more streamlined to have one centralized clearinghouse for certification administration state-wide.

### B.  Washington State Office of Minority and Women's Business Enterprises[156]

---

[155] California Department of Transportation, "Disadvantaged Business Enterprises," accessed July 12, 2022, https://dot.ca.gov/programs/civil-rights/dbe; California Department of Transportation, "Procurement and Contracts (DPAC)," accessed July 12, 2022, https://dot.ca.gov/programs/procurement-and-contracts.

[156] Washington State Office of Minority & Women's Business Enterprises, "Supplier Diversity Best Practices," accessed July 12, 2022, https://omwbe.wa.gov/state-supplier-diversity-reporting/supplier-diversity-best-practices; Washington State Office of Minority and Women's Business Enterprises, "Tools for Equity in Public Spending," accessed July 12, 2022, https://omwbe.wa.gov/state-supplier-diversity-reporting/tools-equity-public-spending.

(continued….)

i. This Office offer Tools for Equity in Public Spending (e.g., toolkit workshops, outreach, inclusion plan guides, templates, and more), and Supplier Diversity Best Practices. Key Recommendations include:

1. Proactively identify contracting and procurement needs. Early planning and advanced notice support supplier diversity. Biannually assess needs or review past spending data to identify general categories of goods and services regularly purchased. Also, examine the procurement type: Master contracts using the master contract sales database, Internal contracts, Direct buy purchases, etc.

2. Review your procurement practices by identifying how purchases are bundled/consolidated and whether unbundling these contracts will create more inclusion opportunities. Understand direct buy purchasing authority and delegated procurement authority. If it is likely that bidders will subcontract some of the work, consider requiring bidders to submit an inclusion plan as part of their bid package where the contractor sets goals, identifies small and diverse vendors, and reports on subcontractor spending with diverse vendors. Make solicitations and contracts simple, written in plain talk, which assists all bidders and makes the contract more accessible. Reevaluate standard contract language and any requirements that may be barriers for small and diverse businesses. This includes providing ample advanced notice and directed publication to encouraging small and diverse businesses' participation.

3. Identify diverse options for each category of spending. The State provides a search tool on its website to identify master contracts with small and diverse vendors. There is a centralized portal for this with a tutorial on how to use it. includes all certified veteran owned businesses and self-registered small businesses

4. Conduct other market research and outreach. In addition, to direct contact with certified small and diverse businesses to make them aware of bid opportunities, the State Offices can be contacted directly to identify currently certified, as well as provide options for utilization of small and diverse businesses that are not currently certified. By developing a communication strategy to engage with small and diverse businesses, more effective outreach may be achieved.

5. Monitor spending with small and diverse businesses throughout the year. Determine what is working and adjust strategies as needed. The State provides access to several government agencies' current small and diverse business spending data reported via the State's Enterprise Reporting Guidelines.

## C. Missouri Department of Transportation (MoDOT)[157]

i. MoDOT submits its a DBE Program to the U.S. Department of Transportation that documents the specific policies and adopts its general definitions for

(Continued from previous page) ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯

---

[157] Missouri Department of Transportation, "DBE Program," accessed July 12, 2022, https://www.modot.org/dbe-program; Missouri Department of Transportation, "Disadvantaged Business Enterprise Program Submittal," August 1, 2020, https://www.modot.org/sites/default/files/documents/DBE%20Program%20Submittal%20FFY20.pdf.

classifications. The State has a unified certification process, known as Missouri Regional Certification Committee, which was approved by USDOT in January 2005. Overall administration goals and statewide goals are updated every three (3) years. Emphasis is placed on data collection with the following in place:

1. All contractors, subcontractors, suppliers, and truckers will be required to be registered and obtain a vendor number prior to authorization to commence work on a project.
2. The registration form will gather the name, address, DBE/non-DBE status, age of firm, annual gross receipts, geographical preference, and type of work performed, for each firm.
3. The registration will be mailed to all contractors, subcontractors, DBE firms, material suppliers, and any other firm contained in MoDOT records. The firms will receive a vendor number and the information will be entered into a database. The firms will be required to update their filing on a yearly basis.
4. MoDOT will compile a listing of all registered firms and forms will be mailed at least semiannually to all firms, requesting that they provide the names of any firms they received quotes from that may not be listed. The listing will be available on the MoDOT internet site. Project office personnel will check all subcontractors, suppliers, and haulers on a project to verify they have been registered. If a firm is not registered, it must do so prior to commencement of work.

## D. Florida Department of Management Services Office of Supplier Diversity[158]

i. Like many of the states already summarized, this State Office hosts a website that includes an Agency Resources page with documents, presentations, and templates that Florida agencies and universities can use to demonstrate compliance with supplier diversity requirements. It also offers Sample State Agency Small Business Participation Plans and assistance with applicable state certification and recertification. All forms are readily available. There is also a comprehensive vendor database and interactive calendar for current bidding opportunities. A unique aspect of this State Office is its work with The Florida Advisory Council on Small and Minority Business Development (Council). The Council was established in Section 287.0947, Fla. Stat. The State Office works with the Council to keep citizens of the State of Florida and various stakeholder groups informed on issues relating to minority enterprise procurement and other diversity issues. Membership of the Council includes practitioners, laypersons, financiers, and others with business development experience who can provide invaluable insight and expertise for this state in the diversification of its markets and networking of business opportunities. Responsibilities of the Council include:

1. Research and review the roles of small and minority businesses in the state's economy.
2. Review the issues and emerging topics relating to small and minority business economic development.

---

[158] Florida Department of Management Services, "Office of Supplier Diversity," accessed July 12, 2022, https://www.dms.myflorida.com/agency_administration/office_of_supplier_diversity_osd.

3. Study and understand financial markets' and institutions' abilities to meet small business credit needs and determine the impact of government demands on credit for small businesses.
4. Evaluate the execution of Section 287.09451, Fla. Stat., requiring a state economic development comprehensive plan, as it relates to small and minority businesses.
5. Assess the efforts by any state agency or by all state agencies collectively, to assist minority business enterprises.
6. Advise the Florida Governor, the Secretary of the Department of Management Services and the Legislature on matters relating to small and minority business development that are important to the international strategic planning and activities of this state.

    a. **Broward County, Florida –** Also has a similar advisory board and other requirements within its Code of Ordinances and Administrative Code that advance supplier diversity and public procurement opportunities to small and minority businesses.[159]

    b. **City of Coconut Creek, Florida –** Also, recently created a grant offering targeted toward small local businesses having 25 or fewer employees: Butterfly Small Business Relief Program.[160]

### E. Illinois Commission on Equity and Inclusion[161]

i. The Commission on Equity and Inclusion (CEI) was created through the passage of 30 ILCS 574/40-10. CEI was created to expand access to state contracts for minorities, women, persons with disabilities, and veterans, and assist the state in enhancing the equity and inclusion throughout its workforce. Among several programs, the CEI created the Business Enterprise Program (BEP) for businesses owned by minorities, women, and persons with disabilities. The program is committed to fostering an inclusive, equitable and competitive business environment that will support underrepresented businesses and enhance their increase their capacity, grow revenue, and enhance credentials. Generally, the CEI focuses on:

1. All State and university procurement;
2. Standardizing scoring evaluations for State agency directors, public university presidents and chancellors, and public community college

---

[159] Broward County Government, "Broward County, FL, Administrative Code, Part VII. – Certification of Small Disadvantaged Business Enterprises," https://library.municode.com/fl/broward_county/codes/administrative_code?nodeId=CH19OPPOCOADGE_PTVII CESMDIBUEN; Broward County Government, "Broward County, FL, Administrative Code, Part XXIII. – Small Business Development Advisory Board," https://library.municode.com/fl/broward_county/codes/administrative_code?nodeId=CH12ORCOBOCO_PTXXIIIS MBUDEADBO.

[160] Coconut Creek News, "City Establishes Unprecedented Business Relief Fund," April 14, 2022, https://coconutcreeknews.net/city-establishes-unprecedented-business-relief-fund-p1986-186.htm.

[161] State of Illinois Commission on Equity and Inclusion, "Welcome to the Business Enterprise Program Website," accessed July 12, 2022, https://www2.illinois.gov/cms/business/sell2/bep/Pages/default.aspx; see also https://cei.illinois.gov/about-the-commission.html.

presidents that shall be based on the following three principles: (i) increasing capacity; (ii) growing revenue; and (iii) enhancing credentials;

3. Fulfill duties provided to it under the Illinois Procurement Code 30 ILCS 500/5-7 and 500/45-57;

4. Work with State agencies to provide support for diversity in State hiring and oversee the implementation of diversity training of the State workforce;

5. Propose and submit to the Governor and the General Assembly legislative changes to increase inclusion and diversity in State government;

6. Exercise oversight over several other entities and adopt rules necessary for the implementation and administration of the requirements of the Commission on Equity and Inclusion Act.

   a. **City of Chicago, Illinois**[162] - Chicago has a specific Minority and Women-owned Business (M/WBE) Procurement Program. Through hosting quarterly Workshops and other outreach efforts, the City promotes contracting opportunities to M/WBEs. The City has established its own certification process, and the Official City of Chicago certification is accepted by other government agencies and some private agencies.

F.  **Michigan Department of Technology, Management, & Budget**[163]

i. The Michigan Supplier Community (MiSC) was established in 2019 to encourage expanded business opportunities within low-income communities and underutilized business areas. To be eligible for certification under MiSC, the vendor must have its principal place of business in Michigan; be a small business with less than 500 employees and annual revenues equal to or less than $25 million; be classified as a Michigan Geographically Disadvantaged Business Enterprise; and meet one of the following criteria as defined in Executive Directive 2019-08:

   1. Certified HUBZone Small Business Concern by the United States Small Business Administration; or
   2. Have a majority of their employees maintain a Principal Residence within a Qualified Opportunity Zone; or
   3. Michigan-based Business with its Principal Place of Business within a Qualified Opportunity Zone; or
   4. Community Rehabilitation Organization (CRO); or
   5. Veteran-Owned or Service-Disabled Veteran-Owned (SDVOB) business.

[162] City of Chicago, "MBE/ WBE/ DBE," accessed July 12, 2022, https://www.chicago.gov/city/en/ofinterest/bus/mwdbe.html.

[163] Michigan.gov, "Michigan Supplier Community (MiSC)," accessed July 12, 2022, https://www.michigan.gov/dtmb/procurement/contractconnect/programs-and-policies/programs/misc; State of Michigran, "State of Michigan Procurement," February 2020, https://www.michigan.gov/dtmb/-/media/Project/Websites/dtmb/Procurement/training/contracting101.pdf?rev=8e139d9ed3464c649d15ee3d5250b16e&hash=D0D3F7246C5170C97515E01536164549.

a. **City of Detroit, Michigan**[164] - Detroit has The Detroit Business Opportunity Program (DBOP), which processes applications and maintains an online register of annually certified and recertifies Detroit Based Businesses (DBB), Detroit Headquartered Businesses (DHB), Detroit Resident Businesses (DRB), Detroit Small Businesses (DSB), Detroit Based Micro Businesses (DBMB), Detroit Start-Ups (DSU), Minority-Owned Business Enterprises (MBE), and Woman-Owned Business Enterprises (WBE). The Program offers appreciation events, networking and capacity building opportunities, equalization credits and visibility on the City's register.

## III.  EDUCATIONAL AND THINK TANK GUIDANCE & PROGRAMS

**A.**  Harvard University, Kennedy School, Government Performance Lab – 2017 Publication: *Improving Government Vendor Diversity*," (2017).[165]

**B.**  Milken Institute, Local Initiatives Support Corporation (LISC) Publications:

   i.  *Supporting Economic Inclusion in Disadvantaged Communities: A Case for Inclusive Procurement Policies* (2018)[166]
   ii.  *Tactical Guide Tactical Guide: Inclusive Small Business Support* (2020)[167]

**C.**  PolicyLink Publication: *Inclusive Procurement and Contacting: Building a Field of Policy and Practice* (2018)[168]

**D.**  Key Points (synthesized from all of the above publications) include:

   i.  *Publicly establish* concrete goals, and hold departments and vendors accountable for meeting them by tracking performance;
   ii.  *Develop* specific goals and performance targets for vendor diversity.
   iii.  Senior executive (*e.g.* Secretary-level) should *make a public commitment* to those goals, which elevates the priority for staff and helps reach potential vendors.
   iv.  *Evaluate progress* towards the goals—collect data and use it to improve the program.
   v.  Check vendor certifications to ensure accuracy and identify potential missing vendors or groups.

---

[164] City of Detroit, "Detroit Business Opportunity Program," accessed July 12, 2022, https://detroitmi.gov/departments/civil-rights-inclusion-opportunity-department/detroit-business-opportunity-program;, Mayor Michael E. Duggan, "Executive Order No. 2014-3," City of Detroit Mayor's Office, https://detroitmi.gov/sites/detroitmi.localhost/files/2018-02/EO%202014-3%20Certification%20of%20Businesses%20-%20Mayor%20Duggan.pdf.

[165] Improving Government Vendor Diversity.

[166] Milken Institute, *Supporting Economic Inclusion in Disadvantaged Communities, A Case for Inclusive Public Procurement Policies*, (Santa Monica, CA, 2018), https://www.lisc.org/media/filer_public/64/16/64165a54-93d5-47fc-9011-74c8873d2d7b/a_case_for_inclusive_public_procurement_practices.pdf.

[167] Bloomberg Philanthropies COVID-19 Response, Bloomberg Associates, Local Initiatives Support Corporation (LISC), *Tactical Guide: Inclusive Small Business Support* (2020), https://www.lisc.org/media/filer_public/7b/a6/7ba61381-119d-4452-abfb-5c7c4b767eed/12082020_resource_ba-inclusive-small-business-support.pdf.

[168] Denise Fairchild and Kalima Rose, Inclusive Procurement and Contracting: Building a Field of Policy and Practice (Oakland, CA, 2018), https://www.policylink.org/sites/default/files/InclusiveProcurement_final-3-5-18.pdf.

vi. Data should enable comparisons at a granular level such as by county or zip code—not just nationwide or statewide.

vii. Data should include outputs: for example, contractors should report out subcontracts, and the dollar amount and diversity status of subcontractors

viii. Where programs use prime contractors with subcontractor diversity goals, track and *hold primes accountable* for meeting the goals.

ix. *Dedicate staff resources* for outreach and technical assistance to small businesses.

x. Use the data collected for goal tracking to help target technical assistance and outreach.

xi. Support businesses that do not have the resources or experience to navigate the federal procurement process.

xii. *Streamline procurement processes* for all businesses.

xiii. *Develop and maintain a community* of practice across Federal agencies, and state and local governments to collaborate on guidance, best practices, and simplifying processes for businesses.

xiv. *Limit administrative burdens* for vendors, such as:
1. Single website with program information and resources, including certification, contract opportunities, and bidding; it is not enough to just point companies to the program authorization language, application process, and the FAR.
2. Enable certifications to work across multiple programs, agencies within the department, and federal departments where possible.
3. Eliminate paper filing requirements, if any;
4. *Publicize RFI responses* and winners to promote partnerships.
5. *Provide feedback* to contractors who did not win to help them strengthen future applications.
6. *Make prompt payments* to vendors.

## IV. OTHER GUIDANCE & PROGRAMS

A. Asian Business Association Los Angeles
B. District of Columbia; Washington Metropolitan Area Transit Authority (WMATA)152
C. Multicultural Media Telecommunications and Internet Council
D. National Center for American Indian Enterprise Development
E. National Minority Supplier Development Council153
F. US Black Chambers, Inc. / ByBlack.us
G. US Hispanic Chamber of Commerce
H. US Pan Asian American Chamber of Commerce Education Foundation
I. Women's Business Enterprise National Council

**Appendix B**

**INNOVATION AND ACCESS WORKING GROUP**
**Workstream #1**

**Survey for Workstream #1 Members in April 2022**

_____

For Recommendations to Ensure Inclusive Practices in Identifying and Selecting
Entrepreneurs to Participate in Infrastructure Investment and Jobs Act (IIJA).

Contracting and Grants Processes

1.  Identify your organization:
    a.  Media -- Audio/Video/News/Information – Including start-ups
    b.  Digital Communications Services – Including start-ups
    c.  Technology Development – Including start-ups
    d.  Other – please list: _____.

3.  Is your organization a:
    a.  Small business – Yes or No.
    b.  Minority-owned business– Yes or No.
    c.  Woman/Women-Owned – Yes or No.
    d.  Start-up– Yes or No.
    e.  Other– Please list: _____.

4.  What policies or practices does your organization use specifically in the context of
    procurement (goods/services) and/or grant administration to promote access to
    opportunities for small minority- and women-owned (SMW) businesses?

5.  What policies or practices does your organization use to foster diversity, equity and non-
    discrimination in procurement of goods/services and/or grant administration?

6.  What procurement or grant administration policies or practices does your organization
    use to accelerate the entry of SMW businesses?

7.  Are you aware of any best practices or model codes on increasing grant/contract
    opportunities for SMW businesses?

**APPENDIX C**

**Innovation and Access Working Group, Workstream #1**
**Conducted 10 Interviews with the Following Experts**
_____

● Robert Branson, President and CEO
Multicultural Media Telecommunications and Internet Council

● Ron Busby, President and CEO
US Black Chambers, Inc. / Buy Black.us

● Ramiro Cavazos, President and CEO
US Hispanic Chamber of Commerce

● James Clayborne (Former Illinois State Senator), Founding Partner
Clayborne & Wagner, LLP

● Dennis Huang, Executive Director and CEO
Asian Business Association

● Ronald Johnson, Ph.D., Senior Advisor and Chief Strategist for Diversity, Equity and Inclusion
Wireless Infrastructure Association

● Chris James, President and CEO
National Center for American Indian Enterprise Development

● Pat Fong Kushida, President and CEO, Founder
California Asian Pacific Chamber of Commerce

● Leticia Latino-Van Spluteren, CEO
Neptuno USA

● Ralph Moore, President
Ralph G. Moore & Associates

Below is a summary of the interviewees' responses to the Working Group's questions.

> **2. What procurement or grant administration policies or practices promote access to opportunities for small, minority- and women-owned (SMW) businesses?**

The procurement or grant administration policies or practices that promote access and accelerate opportunities for small minority-, and women-owned (SMW) businesses should consider:

• The FCC Cable Procurement rules, Business Enterprise Program (BEP) in the State of Illinois, and the Disadvantaged Business Enterprise (DBE) Program at the US Department of Transportation.
• Embedding supplier diversity policy as to how States will access this money through infrastructure funding.
• Create a scorecard to track infrastructure spending to ensure SMW businesses are included.

- *See* Public Policy Rule 955507.
- SBA 8A - Personal Net Worth Analysis and increasing 8A Certification caps.
- Corporation commitments to SMW firms.

Important actions for continued access and accelerations of Contracts include goal-setting for grantor and grantee, accountability for providing accurate spend on SMW businesses, transparency of published data, stakeholder input from SMW businesses, and creation of a small business utilization department/division at the federal level that assists with truthful feedback on gaps and pitfalls, training preparation, access to accurate databases, clear methods of communication about opportunities, and relationship-building support.

> **3. What procurement or grant administration policies or practices can accelerate the entry of SMW businesses?**

See responses to Question 1. above.

> **4. What procurement incentives and penalties do you recommend to the federal grantor and local government grantee as it relates to federal contracts and grants received by grantee?**

The incentives and penalties recommendations to the federal government should include:

- Internal Audit Controls with due diligence reporting with incentives tied to supplier diversity goals. For example, adopt an incentive-driven scorecard process that tracks agency/prime and subcontractor progress; the percentage of diverse board of directors; the percentage of total contracts spent with diverse suppliers; and the percentage of total number diverse suppliers and employees. An example of an incentive is to have a utility company's annual rate increase granted when the utility meets or exceeds its committed supplier diversity goal.

- Transparency, accountability, and publicized misconduct for not meeting SMW requirements. In terms of penalties, the State of Illinois Investment Act provides for felony charges for certain illegitimate or other actions that violate the law.
  Hold federal, state, and local governments and the business sector accountable for meeting agreed-upon targets and goals works. Recipients of major government contracts need to be held accountable for including SMW subcontractors in their projects. It is also important to conduct due diligence to verify that companies are utilizing SMW businesses, are not just putting up a front and/or that opportunities do not just go to White women business owners.

> **5. What methods would you recommend grantees implement and execute to retain SMW businesses that ensure compliance with model codes/best practices?**

Methods for grantees to implement and execute to ensure SMW compliance with model codes/best practices include intentionality, transparency, accountability, and enforcement. More specifically,

- **Intentionality** of the inclusion of SMW businesses: Require SMW Certification and identify qualified SMW businesses (More consistent reviews) - Make sure SMW firms are certified as truly minority-owned and/or woman-owned firms. They shouldn't just be White women. Need a procedure that eliminates the possibility of using minority firms as "fronts," such as by conducting monthly or quarterly meetings with prime contractors. This eliminates the risk of not finding SMW firms. Solidify partnerships with minority chambers across the country and with the SBA. Conduct stakeholder engagement, including Black churches and other faith organizations, Minority Serving Institutions, and other community-based groups, to prepare and

train diverse community representatives to work with local and state governments in the distribution of the federal funding.  Provide **capital and technical training** to ensure vendor success.  For example, banks partner with diverse firms at the front end so access to capital is not a problem in the middle of the process.

    a. Provide training and technical assistance for present and future workforce talents. Marketing, business development and equipment investments are areas where diverse businesses often lack the necessary resources to compete effectively for the plethora of procurement opportunities that fall within their core competencies and business growth strategies. This problem is exacerbated by the payment terms offered in second and third tier procurements, where most diverse companies are relegated to in the communications supply chain. Most often, sixty-to-ninety-day payment terms are deleterious to the cashflow of diverse companies and thus create the need to acquire additional funding at higher interest rates for capital projects.

    b. Ensure **transparency** of SMW business data reported by and to the government and other agencies/organizations.

    c. Ensure **accountability** of grantees or recipients of major contracts, such as via score card tracking.

    d. **Adopt enforcement** procedures.  Have a policy to incentivize and/or penalize grantees or recipients for the proper or improper use of funds from grantors.

6. **What steps should state, and local grantees take to monitor and assess these practices?**

The steps that state and local grantees should take to monitor and access practices include:

- **Intentionality**
      a. Undertake a business strategy analysis
      b. Provide consistent reviews on a monthly or quarterly basis to assist firms
      c. Engage with interviewees

- **Accountability and Transparency**
      a. Require certifications
      b. Track progress via a scorecard
      c. Create timely guidelines for inclusion of SMW businesses
      d. Federal government must adopt policies to manage the expectations of state administrators.

Change and leadership occur top down, and engaging SMW businesses should be a top priority for funding and contracting. Some companies call working with minority firms a diversity tax, saying they have to pay more and get less. It requires a shift in the mindset because SMW businesses and CEOs can deliver if given the opportunity. The narrative is around partnership and collaboration as opposed to only compliance and mandates. Examples of implementation and best practices by other companies, organizations, and governing bodies include:

- Disadvantaged Business Enterprise Program at the Department of Transportation.

      i. The Wireless Infrastructure Association (WIA) is an organization of 127 wireless carriers, infrastructure providers, and professional services firms, WIA

encourages its members to understand the importance of diversity in their procurement practices and workforces. Its annual conference invites participation by SMW women- and minority-owned businesses to build partnerships between WIA members and diverse businesses. WIA also sponsors an apprenticeship program with the Department of Labor that creates pathways for disadvantaged and underrepresented communities to access employment opportunities within the wireless industry.

ii. The Tollway Contract monitors the contract from start to finish, reviews invoices, reports, on-site inspections, and takes enforcement action if the firm does not meet the benchmarks. Remedies upon discovery of non-compliance include to suspend payment, call them in for correction, or terminate the contract.

iii. The California Public Utility Commission requires that any public utility seeking a rate increase must demonstrate that they have met their supplier diversity goal, and that supplier diversity is 25% of their total spend.

**7. How do you define a successful procurement program for small, minority- and women-based (SMW) business inclusion and how do you measure its success?**

A successful diverse supplier procurement program should include:

- Capital Access.  SMW businesses cannot assume carrying costs.  Grantees or contractors should partner with firms at front end so there are no complications during the process.

- Require certification of the SMW business.  Include reciprocity with other certification programs.

- Accountability and Equity.   Agencies should ensure opportunities are for SMW businesses.  In addition, grantees and contractors should track and meet targets and goals for bids, including through scorecard measurements and compliance review.

  o Furthermore, grantees should publish accurate, current data on the recipients of federal contracts including race, sex/gender, ethnicity, type of contract (competing or sole source).   For example, while there is a goal to appoint 20% Hispanic Americans to the current Administration, only 10% of positions are currently held by Hispanic Americans. In addition, the U.S. Government currently awards 1.67% of contracts to Black-owned companies; the US Black Chamber goal is to increase this number to 4%.

- Stakeholder Awareness.  Share information and access for SMW businesses.  Include partnerships with minority organizations, such as the National Black Broadcasters, US Black Chambers, Inc./ByBlack.us, Hispanic American organizations, and Asian Pacific American organizations.  Ensure database accuracy and clear communication for measurement and access to information.

Measurement defines success. Ensure accountability and transparency through scorecards and compliance review by the Federal Government for assessment and methodology to reach success goals. If the scorecards are not being assessed accurately, then equity and opportunities for SMW business goals will not be achieved. The Federal Government could provide a blueprint plan to the states. Achievement of contract goals includes educating the parties controlling the grant and contract opportunities.  For example, contract administrators must understand the scope of work and how to provide opportunities to SMW businesses.

8. **What policies or practices specific to federal dollars distributed to state and local government foster diversity, equity, and non-discrimination in procurement of goods/services and/or grant administration?**

The policies or practices specific to federal dollars distributed to state and local government that foster diversity, equity, and non-discrimination in procurement of goods/services and/or grant administration should include those listed in response to questions 1. above. The President signed an Executive Order to increase the goal from 5% to 11%, but a champion is needed to open those opportunities to get to the 15% goal.

9. **How can state and local grantees (the service providers and other applicants for the infrastructure funds) ensure that SMW businesses have meaningful and robust opportunities to partner and compete for funding under grant programs?**

State and local grantees should consider:

● A process similar to the FCC's cable procurement rule.

● Requesting that the FCC issue a fast-track Notice of Proposed Rulemaking to adopt a ubiquitous equal procurement opportunity rule.

● Requiring agencies to communicate with unsuccessful bidders/contractors to explain why and how they can improve their bids.

● Ensuring that information and data sharing methods are clear and accessible.

● Ensuring that businesses are receiving invitations for opportunities.

● Tracking progress, such as by requiring contractors to meet quarterly with reviewers to ensure they are delivering on the targets and goals in their bids, providing consistent reviews, adopting a methodology for accurate and current tracking model, and auditing and identifying granular details in management of opportunities.

● Maintaining a directory of SMW contractors and SMW organizations and communities.

● Including the goals in meetings, policy-setting, and discussions.

● Provide training for SMW businesses to navigate complex Federal contracting.

The Federal government must set out the expectations for the State administrators, and the State must sign-off on what is expected. For example, in the State of Illinois:

● The RFP sets out prime contractor goals.

● A Letter of Intent lists the scope of work and pricing accompanied by a utilization plan (describing how the contractor would meet the goals of utilizing SMW businesses). The Letter of Intent becomes part of the contract, and the prime and subcontractors will enter into a contract with those terms included.

● The Legislature is considering modifying its scoring for evaluating SMW contracting.

The State should be required to enter into a contract with the Federal government. The State should create

a utilization Plan, which is sent to the Federal Government for incorporation into the Federal and State contract. The Federal government should conduct an evaluation, utilizing a scoring procedure, of how the State implemented the program and met its goals, The higher the State's score, the more likely that state will be eligible for more federal dollars. Senators and Congresspersons may have to answer to constituents on why that state is not eligible for federal funding. Conversely, each contractor's score will dictate eligibility.

It needs to come from the top that SMW businesses are top priorities for this funding and contracting. The Working Group and the CEDC needs to develop guidelines in a timely manner to ensure all communities are including diverse community organizations and SMW businesses in their processes.

10. **Are you aware of any best practices or model codes (i.e., rules or regulations) on increasing grant/contract opportunities for SMW businesses?**

See responses to Question 1. above. In addition, the grantees should partner with SMW Chambers and continue conversations with the Office of Diversity and Economic Development at the U.S. Department of Treasury.

11. **Do you have examples of successful programs for ensuring robust participation by SMW businesses at federal, state, and local levels and what characteristics do they have to make them successful?**

See responses to question 6. above. In addition:

- San Antonio created a Small Business Department for minority businesses and increased accepted opportunities by 40%.

- ABC Telecom provides all telecom services to the government entity. It is important to understand the scope of work for any particular contract and how to separate the various components for SMW companies to participate. ABC Telecom uses an Application Programming Interface that allows access to internal purchasing, rather than the company making those orders, so that subcontractors can fill those orders.

- Contract caps negatively impact SMW businesses. Caps typically are set at $4 million for black-owned firms, which can participate in the Small Business Administration's 8A Certification program for minority-owned businesses for no more than 9 years. Those caps disallow black-owned contractors from participating in major sole-source contracts and from building intergenerational wealth. USBC is asking for a $20 million cap on contracts and 20 years on 8A Certification. There should be reciprocity between the certification programs of the USBC and the SBA; all programs should be held accountable for ensuring opportunities for all SMW businesses.

- Provide examples of programs that have established contractors work with SMW businesses and help develop their business plans. Have collective reports by the center of excellence and have information synthesized for review and accountability.

12. **Are there examples in the private sector and what characteristics make them successful?**

Examples in the private sector include:

- The City of Atlanta ensured that SMW businesses benefited from public dollars for the Atlanta Airport.

- Corporations committed to spending $6 billion with Black firms after the murder of George Floyd, although less than $250 million has been spent.

- The Wireless Infrastructure Association (see above).

- Replevin, which oversaw a three-year contract to replace utility meters with smart meters. The company was able to hire three more workers to monitor this contract. It met with utility companies to create sustainability and to provide ongoing work based upon the current relationship, which gives opportunities to SMW businesses.

## 13. Any other recommendations or thoughts for us?

- Sole sourcing and the general nine-year time limit for contracts is a problem for minority firms. Generally, those inhibit the opportunity for Black firms to create generational wealth.

- The processes for contracting need more transparency. It is not straightforward if minority firms are participating with prime contractors and there is no accountability.

- Having reasonable conditions is important, which may require a revision on how things are currently approached.

- Providers of telecommunication services often bundle procurements into multi-million dollar bid opportunities, which mostly puts these procurement opportunities out of the reach of diverse prime and second tier suppliers. Ironically, prime company winners of these large grants and contracts subsequently unbundle the procurements and subcontract to second tier companies, and they often outsource to third tier diverse suppliers. The economic disadvantages of this practice to second and particularly third tier diverse contractors are obvious and must be addressed.

  a. With respect to broadband funding to grantees under present federal programs, this type of bundling procurement process is a serious impediment to extending broadband to underserved and rural minority communities. Additionally, it could slow down the development of a well-trained telecommunications workforce that this broadband funding is mandated to reach. And most certainly, it will not enhance the utilization level of diverse suppliers.

**PART THREE: REPORT AND RECOMMENDATIONS FROM THE DIVERSITY AND EQUITY WORKING GROUP – DIGITAL DISCRIMINATION AND INCLUSIVE POPULATIONS**

**Introduction:** While the Commission requested the CEDC offer recommendations to the Commission on model policies and best practices for States and localities to prevent digital discrimination by Internet Service Providers (ISPs), the Diversity and Equity (D&E) Working Group was specifically charged with

exploring the issue of digital discrimination from a broad and complex perspective that impacts marginalized communities across the country. The Working Group delved into interviewing a diverse group of subject matter experts to determine what populations are most affected by the lack of sufficient and widely available online access. Given the D&E Working Group's mission to affirmatively advance equity, civil rights, racial justice and equal opportunity in the telecommunications industry, the Working Group concluded that the CEDC's efforts to respond to the request from the Commission, and subsequently the Infrastructure Investment and Jobs Act (IIJA),[169] may not truly cover all potential marginalized communities.

The Working Group found through interviews with subject matter experts that the Commission should view the concept of "digital discrimination" more broadly and with guidance from the Communications Act of 1934 and the Telecommunications Act of 1996, which clearly states that the agency is charged with creating and encouraging access for all residents of the United States.

Under this framework for advancing equity and inclusion, populations that extend beyond normal and prescribed federally protected categories will be covered by any statutory suggestion of the reverse of "digital discrimination," including those bound by age, economic limitations, access to local digital upskilling tools, language proficiency, sexual orientation, gender, gender-identification, and disability, among other potentially intersectional categories.

Thus, the Working Group offers both broad and specific recommendations that assist the Commission to promote greater inclusivity of populations who experience singular, multiple, and other vulnerabilities not necessarily defined or clear in the limited language of the IIJA statute around what constitutes discrimination in broadband service, adoption, and use.

Furthermore, the current charge by the Commission to the CEDC to define "digital discrimination" - pursuant to the effort to recommend model policies and best practices for ISPs to avoid it - may lead to a definition that may conflict with other congressional and previously substantiated definitions of the problem. While not addressed in Part One of this report, the D & & E Working Group found in its research a definition of digital discrimination that is unrelated to deployment by ISPs. Karen Yeung and Martin Lodge**,** co-authors of Algorithmic Regulation in 2019 define digital discrimination a**s** unfair, unethical, or just differential treatment based on access to personal data that is automatically processed by an algorithm. They further underscore that instances of discrimination often found in digital formats are often reproductions of discrimination in the offline world, either inheriting the biases of prior decision-makers, or simply reflecting widespread prejudices in society.[170] While the specific IIJA charge is not directly related to how emerging technologies facilitate greater precision of structural discrimination, it is worth pointing to the inferences that are extracted that contribute to multiple layers of the types of inequalities imposed on vulnerable populations.

Key conclusions of the D&E Working Group's efforts are that:

**Equal access may not necessarily result in equal treatment and outcomes**

Having equal access to connectivity does not guarantee all demographic groups can adopt or fully utilize broadband and technology services available to them. The main reasons for lack of uptake include

---

[169] Infrastructure Investment and Jobs Act, Pub. L. 117-58, 135 Stat. 429, 117th Cong. (2021),

https://www.govinfo.gov/content/pkg/BILLS-117hr3684enr/pdf/BILLS-117hr3684enr.pdf ("Infrastructure Act").

[170] Natalia Criado and Jose M Such. "Digital Discrimination." In Algorithmic Regulation, edited by Karen Yeung, and Martin Lodge. Oxford: Oxford University Press, 2019. Oxford Scholarship Online, 2019. doi: 10.1093/oso/9780198838494.003.0004.

affordability, lack of education, lack of digital skills, lack of accommodations for accessibility, lack of meaningful language access, and useability needs, lack of role models, and lack of trust. Such findings were gleaned from a series of interviews conducted with various subject matter experts and local stakeholders. Select findings from some of the interviews are presented below:

**Equal access does not result in equality**

- *Broadband Research Firm* - In a survey of 10,000 consumers from one ISP's footprint, the firm found that 22% of respondents said that their broadband service was too expensive, 8% of respondents were not interested in using the service, and 3% were concerned about data collection efforts and thought higher speeds made them more susceptible to hackers. The survey also found that promotions about affordability programs like the Emergency Broadband Benefit (EBB) were less likely to reach older populations.

- *Advocacy Organization for the hearing-impaired* - When there is equal access to communications, access alone is not enough to close the digital divide. Fortunately, there are a wide variety of digital solutions available to support the total life experience of deaf and hard of hearing people. Currently, hearing-impaired communities rely heavily on video-based communication, but the cost of high-speed broadband services necessary to support video is a barrier for some people. A lack of accommodations in the workplace also can prevent deaf and hard of hearing people from taking full advantage of employment opportunities. It's imperative for workplaces to identify a person's communications preferences (Do they sign? Do they wear a hearing aid? Are they reliant on captioning?) and implement best practices to accommodate those preferences.

- *Smart city initiative in major metropolitan area* - Affordability and digital literacy are major barriers to adoption of broadband services for many residents of this large metropolitan area. While many of the large metropolitan residents are aware of subsidies available to them, their lack of trust in institutions and the lack of educational programs prevent them from taking advantage of affordable options as we see an example of in the report Achieving Digital Equity in Baltimore.[171] This study by the Johns Hopkins 21st Century Cities Initiative found that affordability and digital literacy are major barriers to adoption of broadband services.

- *Foundation* - The leader of a distinguished foundation focused on leveling the playing field when it comes to technology investments among diverse start-ups shared that "Very few people understand the algorithms of technology – even within the companies creating them – and the impact they have on communities of color and employment. Artificial intelligence can filter out applicants and can impact the entire application process. This can impact access to high wage and growth jobs for marginalized communities." A recent study found that 80% of Black loan applicants were denied based on algorithms. Furthermore, online platforms are also associated with the increase in misinformation and disinformation, disproportionately impacting vulnerable populations who cannot decipher through the accelerated sophistication of emerging technologies. The inability to decipher misinformation decipher misinformation, which can lead to confusion, can create a chilling effect preventing marginalized communities from accessing resources, applying for jobs, and developing digital literacy.

---

[171] Mary Miller and Mac McCormas, *Achieving Digital Equity in Baltimore* (Baltimore, MD, Johns Hopkins University's 21st Century Cities Initiative, January 2021), https://21cc.jhu.edu/research/current-baltimore-research/achieving-digital-equity-in-baltimore/.

- *Veterans Association* - Digital discrimination is compounded by a range of other social and economic challenges, especially among veterans and military families. On average, 200,000 individuals transition out of service into civilian life annually with most going directly into the civilian workforce or higher education. Twenty five percent of veterans live in rural communities, compared to 17% of non-veterans meaning our veterans might have less access online and face higher rates of digital discrimination just because of their geographic location.

These snippets from a wide range of stakeholders suggest that when defining and developing solutions around digital discrimination, it is imperative to first identify the various populations explicitly and implicitly impacted by the lack of sufficient, equal access and opportunity to connect to high-speed broadband, and to recognize that these populations may not cohesively show up or be covered by the statutory aspirations of the IIJA when it comes to protections against "digital discrimination."

As it stands, the Working Group believes how the IIJA defines equal access in Section 60506 does not fully align with prior statutory language that clearly states that clearly states, "the Commission should take steps to ensure that all people in the United States benefit from equal access to broadband internet access service;" and the provisions of the Communications Act of 1934 and the Telecommunications Act of 1996 that clearly charge the Commission with ensuring ALL citizens have equal access. The IIJA excludes discrimination around age, sexual orientation, gender, gender identity, geographic location, or disabilities.

Thus, we strongly urge the commission to expand the definition under which they approach digital discrimination to comply with the original Communications Act of 1934. The D&E Working Group also finds that definitions around who is impacted by "digital discrimination" needs to be further explored, and the intersectionality of singular, and multiple circumstances and identities be further incorporated into the IIJA's statutory goals.

**RECOMMENDATIONS**

To proactively address these perceived discrepancies among covered populations by the statute, the D&E Working Group proposes the following recommendations:

1. **The Commission needs to examine and expand the definition of "equal access" to facilitate greater adoption and use of high-speed broadband, especially among populations experiencing a range of inequalities resulting from a protected characteristic, or an intersection of various attributes or social determinants that limit their full digital engagement.**

Based upon the feedback heard during interviews, there is not a one-size fits-all approach to ensuring equal access since diverse groups have different needs and confront different barriers. In addition to equal access broadband infrastructure, we must also ensure access to resources such as digital skills training programs and the promotion of affordability programs. Technology should be made accessible and useable for individuals with disabilities, the aging population, people who are limited in language capacity, and made available to fit the needs of all individuals and communities.

2. **The Commission should play a more active role in promoting the relevance of high-speed broadband among populations where broadband can improve quality of lives and increase consumer demand for more equitably deployed broadband services.**

Here, the D&E Working Group espouses that as a complement to efforts to define "digital discrimination," the Commission also encourages the following best practices among States and localities to make their work more inclusive and equitable:

A. *Increase outreach and awareness about existing affordability programs that address broadband access among various populations, including veterans, the limited English-proficient LGBTQ+, the disabled, and older populations.*

States and localities should leverage existing affordability programs like the Affordable Connectivity Program (ACP) to increase broadband adoption rates. They also should encourage local organizations to promote affordability options and digital skills programs to their communities. Partnerships between these local organizations and industry stakeholders can help ensure a viable pathway toward hiring and retention among underrepresented groups.

B. *Encourage community engagement in digital skilling and adoption activities.*

Partnerships between community organizations and industry stakeholders also can help highlight the unique ways connectivity can provide workforce development opportunities and workplace accommodations to marginalized groups. Some examples of these levels of engagement include:

- o Comcast's Lift Zones are centers throughout the nation developed in partnership with local community-based organizations to help connect low-income families to the internet so that they can fully participate in educational opportunities and the digital economy. Lift Zones are designed to supplement the Internet Essentials program to help students as well as older people get online.[172]

- o AT&T is building 20 AT&T Connected Learning Centers in under-resourced communities across the U.S. to provide students and families free access to AT&T Fiber internet, Wi-Fi, and computers, as well as education, tutoring and mentoring resources.[173]

- o CompTIA partnered with Dallas-based Girls Embracing Mothers to provide a 12- week training course, vouchers for the CompTIA A+ certification exam, and a financial stipend to 10 formerly incarcerated mothers in the fall of 2021. None of the program participants had any experience or background in technology but were given the opportunity to learn new skills to further their professional development through this pilot training program.[174]

- o Microsoft launched an initiative to help more people acquire digital skills[175] as well as its AI for Accessibility Initiative[176] in partnership with Georgia Tech to accelerate the development of accessible AI solutions for people with disabilities.

---

[172] Comcast, "Lift Zones," accessed July 12, 2022, https://corporate.comcast.com/impact/digital-equity/lift-zones.

[173] AT&T, "AT&T Connected Learning," accessed May 18, 2022, https://about.att.com/csr/home/society/education.html.

[174] CompTIA, "New Hopes, New Opportunities: Girls Embracing Mothers and CompTIA Helping Dallas Area Women Build Futures for Themselves and Their Children", accessed July 15, 2022. https://www.comptia.org/newsroom/2021/10/27/new-hopes-new-opportunities-girls-embracing-mothers-and-comptia-helping-dallas-area-women-build-futures-for-themselves-and-their-children#:~:text=CompTIA%20Press%20Releases&text=DALLAS%20%E2%80%93%20Ten%20Dallas%20area%20mothers,based%20Girls%20Embracing%20Mothers%2C%20Inc.

[175] Microsoft, "Microsoft launches initiative to help 25 million people worldwide acquire the digital skills needed in a COVID-19 economy", accessed May 18, 2022, https://blogs.microsoft.com/blog/2020/06/30/microsoft-launches-initiative-to-help-25-million-people-worldwide-acquire-the-digital-skills-needed-in-a-covid-19-economy/

o   Verizon Innovative Learning supports Verizon's digital inclusion goal to help provide ten million youths with digital skills training by 2030, providing students free technology, access, and a next generation, tech-infused curriculum. In addition, Verizon has programs that provide digital skills training to adults in rural communities with a specific focus on people of color and partnerships with 11 historically black colleges and universities to provide 15,000 adults with basic digital skills.[177]

o   Charter offers support to community organizations through Spectrum Digital Education grants, which provide computers, digital education classes, and technology labs for thousands across the country.[178] In 2021, Charter launched Spectrum Community Assist ("SCA"), a $30 million, 5-year commitment to improve community centers and enhance jobs skills for communities across Charter's footprint. Through SCA, Charter is revitalizing community centers with physical improvements, gig internet service, and job skills training across underserved, rural, and urban communities.[179]

C.  *Promote digital skilling in K-12 education*

To advance equal access to job opportunities in the tech sectors, broadband infrastructure and technology education must be available to all communities from an early age. States and localities should support starting digital education as early as Kindergarten to empower students to become deeply engaged digital citizens with fundamental digital literacy skills. In addition to expanding access to home broadband, states should look at how they are investing in teachers and school resources to provide connectivity and the education needed around that connectivity in K-12 education.

D.  *Support for training programs for groups transitioning into civilian life, especially among veterans and ex-offenders.*

During structured interviews, some experts described the technology and workforce challenges people face when re-entering civilian life. While veterans are educated about how to attain a job or healthcare benefits upon leaving the military, they typically are not made aware of options for gaining access to connectivity. States and localities can help by promoting connectivity options to the veteran community. Formerly incarcerated citizens are also further marginalized upon re-entering society due to lack of digital skills. This problem can be addressed by providing justice- impacted populations with access to technology and digital literacy courses while they are incarcerated. Access to technology must also expand to halfway houses and other institutions that house and assist justice-impacted individuals while they transition out of the prison system.

E.  *Removal of technical and economic barriers to accelerate broadband deployment, including regulatory overreach.*

(Continued from previous page) ─────────────────────

[176] Microsoft, "AI for Accessibility," accessed May 18, 2022,  https://www.microsoft.com/en-us/ai/ai-for-accessibility.

[177] Verizon, "Verizon Innovative Learning," accessed May 18, 2022, https://www.verizon.com/about/responsibility/digital-inclusion/verizon-innovativelearning.

[178] Charter, Spectrum Digital Education, https://corporate.charter.com/digital-education/grants.

[179] Charter, Spectrum Community Assist, https://corporate.charter.com/community-assist.

While the IIJA's $65 billion commitment to broadband deployment is a landmark investment in the goal of universal connectivity, States and localities can take further steps to prepare their communities to receive broadband service. In addition to promoting funding programs, policies should aim to remove technical and economic barriers that slow down deployment. Broadband providers and community partners can face several delays and obstacles along the deployment journey. This can include supply chain issues, topographical challenges, acquiring access rights for infrastructure (railroad tracks, highways, bridges) and private property (landlord permissions, HOA rules, wiring inside buildings), negotiating utility pole attachments, and navigating rules that seek to protect and preserve historic districts.[180] States and localities should take the necessary actions to remove these regulatory barriers to accelerate and encourage continued investment in broadband infrastructure deployment.

F. *Develop, fund, and promote digital skilling programs and access to technology for mature workers and the aging population*

a. *Support for Mature Workers*

According to the Indeed Hiring Lab, "unretirement" is on the rise in the United States as older workers are returning to the labor market. Analysis suggests an estimated 1.5 million retirees have returned over the past year, citing rising cost of living against their fixed incomes. Over the course of the past 50 years, mature workers have significantly increased and played an important role in the labor market. However, mature workers are being left behind from digital skilling programs and opportunities.

b. *Support for the Aging Population*

The digital divide is worsening for the aging population and not enough resources exist to help older adults overcome barriers to digital access. Information and communication technologies can enable an older adult to access healthcare safely and can often be the key to overcoming isolation. An investment to bridge the digital divide experienced by older people should be made to develop programs to help them not only learn but gain access to the technology is needed now more than ever.

The proposed resolution from the D&E Working Group to expand the covered entities under the IIJA's charge to the Commission around the definition of "digital discrimination" should be further explored, and States and localities can support such inclusivity by advancing policies and engaging in collaborative outreach that encompass the wide range of historically disadvantaged and other marginalized populations.

---

[180] Diana Eisner, "Broadband Deployment: Smoothing the Nation's Path to 100 Percent Connectivity," USTelecom, May 12, 2022, https://ustelecom.org/broadband-deployment-smoothing-the-nations-path-to-100-percent-connectivity/.

**APPENDIX A – LIST OF DIVERSITY AND EQUITY WORKING GROUP INTERVIEWEES AND SURVEY RESPONDENTS**

**Interviewees**
- **Michael Adams**, CEO, Sage

- **Brittany Barnett, Founder**, Girls Embracing Mothers; Founder, Buried Alive Project

- **Faith Bautista**, CEO, National Diversity Coalition

- **Paula Boyd,** Senior Director, Government and Regulatory Affairs, Microsoft

- **Dr. Iva Carruthers**, General Secretary, Samuel DeWitt Proctor Conference

- **Jonathan Chaplin**, Wall Street Analyst

- **Shelbi Doyeto**, Operations Manager, United Keetoowah Bank (UKB) of Cherokee Indians, Oklahoma

- **Charles Eaton**, CEO, Creating IT Futures

- **Roger Entner**, Founder, Recon Analytics

- **J. Michael Haney**, Ph.D., Vice Chancellor for Strategic Initiatives and Innovation, IVMF Founder and Executive Director, Institute for Veterans and Military Families, Syracuse University

- **Victoria Holland**, Esq., Devol Law

- **Dr. Nicol Howard**, University of the Redlands

- **Dr. Nicol Pinkard**, Founder, Digital Youth Network

- **Mac McComas**, Senior Program Manager, 21st Century Cities Initiative
- Johns Hopkins University

- **Travis Noland**, Government Relations, Cherokee Nation

- **Dr. Allison Scott**, CEO, Kapor Foundation

- **Chris Soukup**, CEO, Communications Services for the Deaf

**Survey Respondents**
- **Joon Bang**, CEO, Iona Senior Services

- **Karyne Jones**, CEO, National Council on Black Aging

- **Christopher Wood**, Executive Director, LGBT Technology Partnership & Institute

**STATEMENT OF
CHAIRWOMAN JESSICA ROSENWORCEL**

Re: *Implementing the Infrastructure Investment and Jobs Act: Prevention and Elimination of Digital Discrimination*, GN Docket No. 22-69, Report and Order and Further Notice of Proposed Rulemaking (November 15, 2023)

Two years ago today, Congress passed the Bipartisan Infrastructure Law. This law is a big deal. It made a $65 billion investment to ensure that everyone, everywhere in the United States has access to broadband. Nothing in our history has come close to the commitment this legislation makes to address equitable access to the opportunities of the digital age. This unprecedented investment in broadband features both deployment initiatives like the Broadband Equity Access and Deployment program at the Department of Commerce and affordability efforts like the Affordable Connectivity Program here at the Federal Communications Commission that has helped more than 21 million low-income households get online and stay online. But Congress knew that more than just this set of deployment and affordability initiatives was needed. That is why in Section 60506 of the Bipartisan Infrastructure Law Congress directed this agency to prevent and eliminate digital discrimination.

This section is the most definitive statement in the law that our work to close the digital divide is not done until we reach those who are unconnected, underserved, and overlooked. It reads: "It is the policy of the United States that, insofar as technically and economically feasible, subscribers should benefit from equal access to broadband."

To ensure this happens, Congress directed the FCC to "adopt rules to facilitate equal access to broadband internet access service." What should these rules involve? Again, Congress was clear. The law directs us to develop rules "preventing digital discrimination of access based on income level, race, ethnicity, color, religion, or national origin; and identifying necessary steps for the Commission to take to eliminate discrimination."

This statutory language is powerful. It is also remarkable because it represents the consensus of a bipartisan majority of Congress. Today we give these words meaning.

But before we get into the details, let me tell you what we have done over the last two years that lead us to this moment here today. We built an extensive record through our rulemaking process. We created the Task Force to Prevent Digital Discrimination that conducted eight listening sessions in places far and wide, including Baltimore, Maryland; Los Angeles, California; and Topeka, Kansas. At each, we were able to hear from the community, listen to people fighting digital discrimination on the ground, and learn about experiences with industry.

We also rechartered the Communications Equity and Diversity Council and broadened its lens, looking beyond media to explore diversity and equity across the broader technology and communications sector. Because the only way we were going to create rules that prevent and eliminate digital discrimination is by hearing from everyone who has a role to play, including state, local, and Tribal governments, public interest advocates, and providers.

We took this it all in. We listened to communities across the country. We read the record from front to back. It demonstrated that there are gaps in access for low-income, rural, Tribal, and minority communities. It showed that the digital divide often tracks the residential redlining that came into existence under the National Housing Act of 1934. It showed that many of the communities that lack adequate access to broadband today are the same areas that suffer from longstanding patterns of residential segregation and economic disadvantage.

Back to the statute. The language is broad. But Congress was explicit—these rules have to "facilitate equal access to broadband." As part of this goal, Congress also told us we need to prevent and eliminate digital discrimination of access. That means our rules would miss the mark if they cover just discriminatory intent because we would fall short of meeting our statutory obligation to "facilitate equal access" to broadband. As a result, we define digital discrimination to include disparate treatment and

disparate impact.  I believe this approach puts us both on the right side of history and the right side of the law.

These rules are strong.  When you consider Congress explicitly directed us to "prevent" and "eliminate" digital discrimination of access, they had better be.  But I would also argue that they are fair and reasonable.

Let me explain why.  We do more than just define digital discrimination.  As the law directs, we create a new, dedicated pathway for digital discrimination complaints.  But we have created a process that is aimed at finding solutions that work for all parties.  And if that is not feasible, our Enforcement Bureau will step in with the entire enforcement toolkit at its disposal to seek remedies.

As the law requires, we accept genuine reasons of technical and economic feasibility as valid reasons why it may not be possible for equal access to a provider's network.  We will review those defenses carefully and thoughtfully on a case-by-case basis.

But that is not all.  We are standing up a process by which providers can request guidance from us to make sure they stay on the right side of the law.  On top of this, we also offer guidance to help solve these problems before they even get to the FCC.  This is because the law directed us develop model policies and best practices for preventing digital discrimination that can be adopted by states and localities.  So we had our Communications Equity and Diversity Council take the lead developing these best practices and they are included in what we adopt today.

Like I said at the start, Section 60506 is a big deal.  It is the first bipartisan civil rights law focused on the digital age.  I am grateful to so many in the civil rights community who have helped us give it meaning and the companies that worked with us to improve our process.  I am also grateful to my colleagues Commissioner Starks for his input on developing an Office of Civil Rights, and Commissioner Gomez for her input on creating a point person in the agency on these matters and identifying reporting mechanisms going forward.

In addition, I want to thank the staff across the agency who worked on this effort, including Bradford Berry, Emily Caditz, Callie Coker, Lisa Edwards, CJ Ferraro, Jesse Goodwin, Trent Harkrader, Heather Hendrickson, Ed Krachmer, Aurelie Mathieu, Jodie May, Jaime McCoy, and Kiara Ortiz from the Wireline Competition Bureau; Alejandro Roark, Samantha Steen, D'wana Terry, and Sanford Williams from the Task Force to Prevent Digital Discrimination; Diane Burstein, Darryl Cooper, Aaron Garza, Suzy Rosen Singleton, and Kimberly Wild from the Consumer and Governmental Affairs Bureau; Pamela Gallant, Rosemary McEnery, Patrick McGrath, and Keith Morgan from the Enforcement Bureau; Hillary DeNigro from the Media Bureau; John Blumenschein, David Furth, Nicole McGinnis, and James Wiley from the Public Safety and Homeland Security Bureau; Susannah Larson and John Lockwood from the Wireless Telecommunications Bureau; Chin Yoo, Malena Barzilai, Michael Janson, Andrea Kearney, Jacob Lewis, Rick Mallen, William Scher, Anjali Singh, and Michele Ellison from the Office of General Counsel; Joycelyn James from the Office of Communications Business Opportunities; Mark Azic, Stacy Jordan, Eugene Kiselev, Kenneth Lynch, Eric Ralph, and Maciej Wachala from the Office of Economics and Analytics; Edward Bartholme, Chelsea Fallon, Jean Kiddoo, Kimia Nikseresht, and Steven Rosenberg from the Broadband Data Task Force; and Edward Carlson from the Office of International Affairs.

**DISSENTING STATEMENT OF
COMMISSIONER BRENDAN CARR**

Re: *Implementing the Infrastructure Investment and Jobs Act: Prevention and Elimination of Digital Discrimination*, GN Docket No. 22-69, Report and Order and Further Notice of Proposed Rulemaking.

The Biden Administration's entire approach to the Internet—its broadband agenda, if you will—can be boiled down to one word: control. You can see it with the Biden Administration's call for Title II utility-style regulation of the Internet—a move that two of President Obama's former Solicitors General described as an enormous and transformative expansion of the government's authority over the Internet. You can see it in the Biden Administration's campaign to pressure Internet companies into censoring Americans' protected political speech—a coordinated effort that is now on appeal to the Supreme Court. And you can see it in the Biden Administration's demand that the FCC adopt these "digital equity" rules today—a framework that gives the FCC a nearly limitless power to veto private sector decisions.

None of these are isolated decisions—they share and advance the same goal of increasing government control. But it is never enough. Consider this: Democrats have been in control of the FCC and administrative agencies in DC for approaching 12 out of the last 16 years. They have had the opportunity, over that stretch of time, to put in place nearly any federal telecom policy of their choosing. In fact, the federal government has allocated hundreds of billions of taxpayer dollars for the purpose of ending the digital divide while Democrats have run the Administrative State. After all of that time and after all of that spending, the Biden Administration has concluded that the Democrats' policies are not working.

I agree with President Biden on this point. The Administration's broadband policies are failing. The costs of building Internet infrastructure in this country have skyrocketed thanks to the Biden Administration's inflationary policies. The Administration has needlessly blocked and delayed new broadband infrastructure builds. Fiber and cell site components are laying fallow in warehouses and laydown yards across the country due to the government's failure to remove regulatory red tape. Permitting reform has gone nowhere. The Biden Administration is preparing to waste additional taxpayer dollars through its multi-billion dollar "Internet for All" initiative by pursuing extraneous political goals at the expense of connecting Americans. And just this week, the Administration confirmed that it has no plan for filling a now empty spectrum pipeline—one that is vital to America's economy and geopolitical leadership. Meanwhile, the FCC is just sitting on spectrum that could connect millions of Americans to new, 5G services.

But the Biden Administration is taking away all the wrong lessons from its failed broadband policies. Rather than righting the ship, the Biden Administration is going hard left. It is now blaming the private sector and free market capitalism itself for the Administration's own policy shortfalls. The problem, the Administration has apparently concluded, is that up to now the FCC has failed to exercise enough authority—it has never tried real command and control regulation when it comes to the Internet.

So last month, President Biden gave the FCC its marching orders.[1] The President called on the FCC to implement a one-page section of the 2021 Infrastructure Investment and Jobs Act (Infrastructure Act) by adopting new rules of breathtaking scope, all in the name of "digital equity." For the first time

---

[1] U.S. National Telecommunications and Information Administration, Ex Parte Comments, GN Docket No. 22-69, (Oct. 6, 2023) (Biden Administration Comments), https://www.ntia.gov/sites/default/files/publications/ntia_ digital_discrimination_ex_parte_comment_10.6.23.pdf.

ever, those rules would give the federal government a roving mandate to micromanage nearly every aspect of how the Internet functions—from how ISPs allocate capital and where they build, to the services that consumers can purchase; from the profits that ISPs can realize and how they market and advertise services, to the discounts and promotions that consumers can receive. Talk about central planning.

Needless to say, Congress never contemplated the sweeping regulatory regime that President Biden asked the FCC to adopt—let alone authorized the agency to implement it. Nonetheless, the FCC is voting to put President Biden's plan in place. I oppose the plan for several reasons.

First off, President Biden's plan effectively hands the Administrative State veto power over every decision about the provision of Internet service in the country. Never before, in the roughly 40-year history of the public Internet, has the FCC (or any federal agency for that matter) claimed this degree of control over the Internet. Indeed, President Biden's plan calls for the FCC to apply a far-reaching set of government controls that the agency has not applied to any technology in the modern era, including to Title II common carriers. The closest analog would be the heavy-handed rules the FCC applied to the Ma Bell telephone monopoly during the height of the New Deal era—a copper wire period of time when it was hard to distinguish between government regulator and telephone provider.

But do not take my word for it. The text of the order expressly provides that the FCC would be empowered, for the first time, to regulate each and every ISP's:

● "network infrastructure deployment, network reliability, network upgrades, network maintenance, customer-premises equipment, and installation";

● "speeds, capacities, latency, data caps, throttling, pricing, promotional rates, imposition of late fees, opportunity for equipment rental, installation time, contract renewal terms, service termination terms, and use of customer credit and account history";

● "mandatory arbitration clauses, pricing, deposits, discounts, customer service, language options, credit checks, marketing or advertising, contract renewal, upgrades, account termination, transfers to another covered entity, and service suspension."

As exhausting as it is to read that list, the FCC says it is not an exhaustive list. The Biden Administration's plan empowers the FCC to regulate every aspect of the Internet sector for the first time ever. The plan is motivated by an ideology of government control that is not compatible with the fundamental precepts of free market capitalism.

But it gets worse. The FCC reserves the right under this plan to regulate both "actions and omissions, whether recurring or a single instance." In other words, if you take any action, you may be liable, and if you do nothing, you may be liable. There is no path to complying with this standardless regime. It hangs together like an M.C. Escher drawing does—on paper only.

President Biden's plan also sweeps entire industries within the FCC's jurisdiction for the first time in the agency's 90-year history. It would be one thing if the FCC cabined its intrusive new regime to ISPs or even businesses within the communications sector. It does not. The Order says that "we are not explicitly tasked with regulating entities outside the communications industry" (a rare moment of regulatory humility) but it then goes on to say that the FCC will do so in this case nonetheless (the moment passed). Landlords are now covered, construction crews are now covered, unions are now covered, marketing agencies are now covered, banks are now covered, the government itself is now covered—all newly subject to these FCC rules and liable under them for both acts and omissions. Congress never authorized the FCC to regulate all of these industries or entities. So, to everyone that will be subject to FCC regulation for the first time ever, welcome, I hope you have good lawyers.

One reason those lawyers will be needed is because President Biden's plan allows the FCC to impose unfunded build mandates and unlimited monetary fines on every covered entity. Section 60506 does not authorize the Commission to create or enforce new punitive liability rules or compel builds. Instead, it directs the FCC to "facilitate equal access to broadband internet access service." Nonetheless, the item determines that the agency will apply the full suite of the Communications Act's enforcement powers to any act or omission that violates its new regime. This means that ISPs could very well be compelled to build out Internet infrastructure without any compensation. And every decision from the C-Suite to the call center will be subject to FCC second-guessing.

In this regard, the Order's approach runs afoul of several limits Congress imposed on the FCC's enforcement authority. For one, Congress did not codify Section 60506 in the Communications Act or otherwise indicate that the FCC's Title V enforcement provisions apply here. Indeed, the FCC's Title V authority is limited by Congress to violations of the Communications Act (except in limited cases where Congress has expressly provided otherwise). For another, Congress imposed several meaningful restrictions on the FCC's Title V enforcement powers that the agency simply ignores as it transplants that authority into this new context. For instance, Congress included ceilings on forfeitures, which the agency does not carry over here. Congress also included restraints on the Commission's authority to fine people and businesses that do not hold FCC licenses or authorizations,[2] which the agency ignores here.

But these are not the only lines that the FCC crosses today. Despite the repeated refrain that the agency has no interest in regulating broadband rates, the Commission votes today to regulate broadband rates. This comes on the heels of last month's meeting where, at the eleventh hour, the FCC slightly softened its proposal to use its Title II proceeding to impose price controls. Now we know why. The order before us today expressly states that the FCC can regulate broadband pricing and even an ISP's profitability. Title II is no longer necessary to achieve that end.[3]

But as a legal matter, the statute is clear. Congress did not include the word "price" or the term "rate regulation" in the text of Section 60506. Nor does it reference "affordability." Instead, Congress chose to use the phrase "terms and conditions." In context, it is clear that Congress used that phrase—as opposed to "rates, terms, and conditions"—because Congress decided not to give the FCC rate regulation authority in Section 60506. This is confirmed by other Infrastructure Act provisions that do use the phrase "rates, terms, and conditions" and, similarly, the Infrastructure Act's multiple references to the phrase "terms and conditions," all of which focus on non-price details or components of a service.

The Communications Act and the FCC's own rules and precedent confirm this point. In the Communications Act, Congress routinely distinguished between "rates" on the one hand and "terms and conditions" on the other. In the limited set of circumstances in which Congress wanted the FCC to exercise rate regulation authority, it stated so clearly. Here's just one example. In the 1992 Cable Act, Congress expressly directed the Commission to regulate the rates of cable service tiers.[4] Seeing the results that flowed from that express delegation, Congress thought better of it in the 1996 Act and stripped the FCC of this rate regulation authority.[5] Given that Congress raked back an earlier, narrower,

---

[2] *See* 47 U.S.C. § 503(b)(5) (codifying Congress's decision to prohibit the FCC from proceeding directly to a proposed fine against persons or business that, among other things, do not hold an FCC license or authorization).

[3] The FCC's Section 60506 rules do more than this, too. The FCC gives itself the power to review and determine the lawfulness of promotional pricing and discounts. It even puts the use of credit checks squarely in the cross hairs. Of course, Congress did not give the FCC the power to do any of this—the agency just creates it out of whole cloth.

[4] Cable Television Consumer Protection and Competition Act of 1992, Pub. L. No. 102-385, 106 Stat. 1460 (1992 Cable Act). Section 3 of the 1992 Cable Act was helpfully titled "Regulation of Rates."

and express delegation of rate regulation authority, the FCC has no basis for concluding that Congress chose to give us more expansive rate regulation authority through an implicit delegation.

In other words, the FCC's conclusion that Congress provided the FCC with the strong medicine of rate regulation authority not only sub silentio but through a phrase that is ordinarily read as denying rate regulation authority stretches any reasonable theory of statutory interpretation well past its breaking point.

The legal errors only compound from there. For instance, the Order rolls back decades of considered Commission precedent without so much as acknowledging those decisions—let alone providing a reasoned explanation for the departure as required by the APA. *Orloff* is just one example.[6] In that case, Jacqueline Orloff challenged a Title II cellular telephone provider's practice of offering prospective new customers special deals or sales concessions as an inducement to sign up with the carrier. She argued that the practice (which could include discounted phones, monetary credits, or fee waivers—in other words, the types of practices regulated by the FCC in this decision) constituted unlawful discrimination. The FCC disagreed. In doing so, it recounted the agency's intentional shift over the years from intrusive regulation to reliance on market forces to protect consumers in the case of non-dominant providers, which the FCC enshrined in a series of deregulatory precedents.

Today's FCC order cannot be squared with either the *Orloff* precedents or the outcome in that case. Take haggling over rates. The D.C. Circuit found that "Haggling is a normal feature of many competitive markets. It allows consumers to get the full benefit of competition by playing competitors against each other."[7] As a result, the D.C. Circuit stated, "Rates are determined by the market, not the Commission, as are the level of profits."[8] Not so under today's decision—the agency will no longer leave those determinations to the market. Or take concessions. The D.C. Circuit stated in *Orloff* that providers were free to "offer concessions to some customers and not others, even though there is no discernible difference between the two groups."[9] Not so under today's decision—the agency targets decisions to offer concessions to some customers and not others. Or take advertising. The D.C. Circuit stated in *Orloff* that a provider may "run a commercial in the morning offering prospective customers a free cell phone, revoke the offer that afternoon, and then offer a cell phone for half price on the following day."[10] Not so under today's decision—all of those actions are now subject to regulatory second-guessing. There is simply no way to reconcile *Orloff* and its underlying precedents with the FCC's decision today. In fact, the Order does not even try. There is no analysis at all, let alone substantial evidence, to support the FCC's determination that any ISP or covered entity has the market power necessary to justify this type of prescriptive regime.

Stepping back—many of the Order's flaws flow from a single, fundamental error. They can be traced back to President Biden's call for the FCC to adopt an expansive and disfavored theory of liability (disparate impact) that Congress neither directed nor authorized the FCC to adopt.[11] Section 60506 of the Infrastructure Act speaks in brief and straightforward terms: it states that it is the policy of the United

(Continued from previous page) ────────────────

[5] Telecommunications Act of 1996, Pub. L. No. 104–104, 110 Stat. 56 (1996). In a subsection titled "Rate Deregulation," the FCC's rate-making authority was terminated for services provided after March 31, 1999.

[6] *Orloff v. FCC*, 352 F.3d 415 (D.C. Cir. 2003).

[7] *Id.* at 421.

[8] *Id.* at 420.

[9] *Id.* at 420-21.

[10] *Id.* at 420.

[11] Biden Administration Comments at 4-8.

States that, insofar as technically and economically feasible, subscribers should benefit from equal access to broadband. Section 60506 then directs the FCC to adopt rules that facilitate equal access to broadband (again, to the extent technically and economically feasible) and to prevent and eliminate "digital discrimination" based on income level, race, ethnicity, color, religion, or national origin.

After nearly two years and several rounds of comments, the FCC concludes that "there is little or no evidence" in the agency's record to even indicate that there has been any intentional discrimination in the broadband market within the meaning of the statute. But instead of proceeding with forward-looking rules on that basis, the FCC—at President Biden's direction—reads this extraordinary theory of liability into the law that exists nowhere in the statutory text. Even in the absence of any evidence of intentional discrimination, the Biden plan states the FCC can impose potentially unbounded liability if the agency finds that some act or even failure to act happened to result in a disparate impact based on the FCC's own judgment.

Reading this theory of liability into the law conflicts with the Supreme Court's civil rights precedent and the terms of the statute itself. The plain language of Section 60506 shows that Congress codified a disparate treatment standard—not a disparate impact one. Notably, Congress expressly stated that the FCC shall adopt rules preventing discrimination "based on" certain specific characteristics. As Congress was well aware when it drafted Section 60506, the "based on" formulation has been interpreted by the courts as codifying a disparate treatment standard. Indeed, this reading of the statute is reinforced by the other terms included in Section 60506. For instance, Congress decided to include income level as an express and protected characteristic. But that decision does not make sense in the context of disparate impact statute because it would effectively prohibit ISPs from charging a uniform price to all consumers or running credit checks because those actions would necessarily have a disparate impact on low-income consumers. In other words, many of the most anomalous outcomes produced by the FCC's reading of the statute are a product of the FCC's erroneous decision to read a disparate impact standard into a disparate treatment statute.

Even if disparate impact was appropriate under the statute, the item inexplicably fails to follow established Supreme Court precedent for how to structure such a process. While the Order acknowledges the controlling Supreme Court precedent in *Inclusive Communities*, it fails to adhere to the Court's holding in multiple respects.

Broadly speaking, the Supreme Court observed "that disparate-impact liability must be limited so . . . regulated entities are able to make the practical business choices and profit-related decisions that sustain a vibrant and dynamic free-enterprise system."[12] The process set forth by the Commission fails spectacularly in this regard. Instead of sustaining the free-enterprise system, the order supplants the business judgement of essentially the entire Internet delivery ecosystem, relying instead on a standardless process of post hoc second guessing by the Administrative State.

But more specifically, the item fails to adhere to *Inclusive Communities'* three-part process for evaluating disparate impact claims. First, to establish a prima facie case, a plaintiff must demonstrate that the disparate impact was caused by a policy of the defendant. In fact, the Court in *Inclusive Communities* rejected the idea that a single decision that was not the result of a corporate policy could satisfy this test. But the item ignores the Court's guidance and instead adopts an enforcement regime that covers all "actions and omissions, whether recurring or a single instance." Furthermore, the order sets the threshold showing necessary for establishing a prima facie case far lower than required by Supreme Court law— namely, it does not require the requisite causation, statistical significance, or comparators.

---

[12] *Texas Dep't of Hous. & Cmty. Affs. v. Inclusive Communities Project, Inc.*, 576 U.S. 519, 533 (2015).

Under Supreme Court precedent, if the plaintiff can establish a prima facie case, the burden then shifts to the defendant to show that the "challenged practice is necessary to achieve one or more substantial, legitimate, nondiscriminatory interests."[13] The FCC's process, in contrast, artificially limits this defense to "genuine issues of technical or economic feasibility."[14] While Section 60506 specifically mandates that the Commission take technical and economic feasibility into consideration, there is no indication that Congress intended to deviate from standard practice by rendering those two considerations the only relevant ones. Under *Inclusive Communities*, businesses must remain free to make valid business decisions, some of which will have nothing to do with technical or economic feasibility. Disparate-impact requirements are about eliminating "artificial, arbitrary, and unnecessary barriers," after all, not second-guessing any and all valid business decisions that do not relate specifically to technical and economic feasibility.

Turning from the second to the third step in the analysis, Supreme Court precedent is clear. If a defendant satisfies its burden at the second step, the burden shifts back to the plaintiff to establish that the "substantial, legitimate, nondiscriminatory interests supporting the challenged practice could be served by another practice that has a less discriminatory effect." This is important. The burden here is on the plaintiff, not the defendant. But the FCC collapsed the final two steps in the original draft of the Order and required the ISP or other covered entity to show that "there is not a reasonably available and achievable alternative policy or practice that would serve the entity's legitimate business objectives with less discriminatory effect." The FCC has attempted address this shortcoming through a series of pre-adoption edits, but those changes do not fix the fundamental error.[15] In other words, the FCC is still requiring the defendant to prove a negative. This falls well short of the *Inclusive Communities* standard.

Importantly, these failures are not simply interesting questions for a future law school exam. As the Supreme Court stated in *Inclusive Communities*, "were standards for proceeding with disparate-impact suits not to incorporate at least the safeguards discussed here, then disparate-impact liability might displace valid governmental and private priorities."[16] The Supreme Court views these safeguards as the bare minimum that must be done to uphold disparate impact liability. The FCC's failure to adhere to them not only undermines the agency's case on appeal—it raises questions about the application of disparate impact theory more broadly.

Now, sticking with the Supreme Court for the moment, the FCC's adoption of President Biden's plan sets up another headlong run in with the major questions doctrine. The Supreme Court has rooted this doctrine in the Constitution's separation of powers. It reflects the Framer's decision to vest a democratically accountable Congress with the legislative power. That is why the Supreme Court has held that administrative agencies cannot enact new rules on matters of great economic and political significance unless Congress has provided "clear congressional authorization."

---

[13] *Inclusive Communities*, 576 U.S. at 527.

[14] The Commission purports to address this legal infirmity through a set of late round edits, but the Order continues to miss the mark. In particular, while the Commission now states that it will allow consideration of some additional legitimate business considerations, the Order does so in a way that fails to line up with *Inclusive Communities*. For instance, the FCC purports to allow those additional business considerations only to the extent that they are viewed through the lens of technical and economic feasibility.

[15] As noted in the text above, the FCC has not really solved the fundamental issue—it has only shifted the problem to a different point in the analysis. The FCC now says it will consider any "legitimate business impediment to the use of less discriminatory alternatives." So a defendant is once again in the position of proving the existence—or not—of less discriminatory alternatives and that their policy is animated by a legitimate business impediment, whatever the FCC determines that means.

[16] *Inclusive Communities*, 576 U.S. at 544.

First, there is no doubt that the rules adopted by the FCC address matters of great economic and political significance. As noted earlier, they allow the FCC to exert unprecedented control over Internet services and infrastructure. And they sweep entire industries into the FCC's jurisdiction for the first time ever.

Second, Congress did not include in Section 60506 any clear congressional authorization for a regime like this. Nowhere in the statute's one page of text does it provide unambiguous authority for rules that mimic the common carrier regime codified in Title II of the Communications Act. Indeed, a number of Senators that voted in favor of the Infrastructure Act recently wrote the FCC to make this clear: they stated that the FCC's digital equity rules are not the types of rules authorized by the statutory text passed by Congress.[17] As the saying goes, Congress does not hide an elephant in a mousehole. Yet the FCC finds a whole herd of them in Section 60506.

But even assuming that the FCC's implementation of Section 60506 were to satisfy the major questions doctrine, the agency's decision would not be clear of all constitutional hurdles. There's still the nondelegation doctrine in the way. As noted recently by Justice Gorsuch, "[t]he nondelegation doctrine ensures democratic accountability by preventing Congress from intentionally delegating its legislative powers to unelected officials."[18] To avoid an unconstitutional delegation of legislative authority, Congress must provide sufficient guardrails and direction to restrict an agency's power. Even a light skimming of this item shows that the FCC can find no such limitation on its power in Section 60506. And if the FCC's reading of Section 60506 is correct—a big if—then Congress has effectively given the FCC the authority to create a new Communications Act from a one-page section of the Infrastructure Act. This would make a mockery of the separation of powers.

On top of this, there is due process. The vague regime the FCC adopts today does not provide anyone with the type of fair notice required by the Constitution.

In a set of late round edits, the FCC attempts to fix some of the problems with today's Order. But those changes only highlight the arbitrary and capricious nature of the decision-making. One example? The Order now exempts the Biden Administration's signature "Internet for all" initiative (BEAD) and the FCC's own Universal Service Fund high-cost programs from these new rules through a presumption of compliance. Well surprise, surprise. The Biden Administration does not want to live by the same anti-discrimination standard it applies to everyone else. Is this because the Biden Administration wants to engage in digital discrimination? Is it because they don't want to promote digital equity? Or is it because the Biden Administration is worried that applying these burdensome rules would sink its highest profile Internet initiative? Hard to say because the Order does not explain the exemption. Nor does it explain why it makes any sense to draw the line where it has. Why single out those two initiatives but not one or more of the 100 plus other broadband initiatives that are being administered by more than a dozen separate federal agencies.[19] It may remain a riddle wrapped in a mystery inside an enigma.

---

[17] Letter from Sen. Ted Cruz, Ranking Member, Senate Committee on Commerce, Science, and Technology, *et al.*, to Hon. Jessica Rosenworcel, Chair, FCC (Nov. 10, 2023) (urging the FCC "to adhere to the will of Congress and conform to the plain meaning of section 60506 to avoid causing serious damage to the competitive and innovative U.S. broadband industry" on behalf of 28 U.S. Senators).

[18] *Nat'l Fed'n of Indep. Bus. v. Dep't of Lab., Occupational Safety & Health Admin.*, 595 U.S. 109, 124 (2022) (Gorsuch, J., concurring).

[19] U.S. Government Accountability Office, Broadband: National Strategy Needed to Guide Federal Efforts to Reduce Digital Divide, GAO-22-104611 (May 31, 2022), https://www.gao.gov/assets/gao-22-104611.pdf.

But regardless, the Biden Administration has given away the game. It cannot claim that these rules are necessary to prohibit discrimination, and then exempt its preferred programs. It cannot claim that these rules will not harm investment and buildout, and then exempt the two broadband initiatives whose success matters the most, politically, to the Biden Administration. It is obvious to everyone what is going on here. It is not about discrimination; it is about control.

Another telling last minute addition is a new advisory opinion process. This is the very definition of swapping out permissionless innovation for a mother-may-I pre-approval process. What's more? The FCC undermines whatever value that type of process could provide because, to the extent the FCC does—at some point in the future—authorize your conduct, the Order says that the agency reserves the right to rescind an advisory opinion at any time and on a moment's notice. At that time, the covered provider "must promptly discontinue" the practice or policy. That does not provide the confidence necessary to invest and innovate.

Now, I have talked a lot about what is in today's Order. But I would remiss if I did not mention something that is not in it: a cost-benefit analysis. And that may be because the Order before us would not fare very well under that type of scrutiny. In its stead, the Order just asserts that the disparate impact standard will not chill investment. But nowhere is there any analysis of the actual costs imposed by and through the various new legal requirements associated with this Order. That does not reflect the type of reasoned decision-making required by the APA.

What's also missing? An appropriate recognition of the government's own decisions. When one looks at a broadband map today, you are looking at an outcome that is inextricably intertwined with choices that the government itself has made. The government awards cable franchises that delineate the contours of service territories—and it can also deny those franchises. The government issues spectrum licenses that delineate geographic areas and the percentage of Americans that must be served—and it can also deny those licenses. The government grants permits that authorize cell sites and infrastructure builds to be constructed—and it can also deny those permits. The government offers subsidies to extend broadband to certain communities on specific terms—and, yes, it can also deny those subsidies. There simply is no administrable way to look at the current broadband landscape and the government's own role in producing it and then assign liability to a covered business. Not even attempting to account for the complex role that the government itself plays, as the Order before us does, certainly provides no such path forward.

Of course, it didn't have to be this way. Instead of creating multiple vectors of unnecessary litigation risk, the FCC could have adopted an order that lawfully and faithfully implemented Congress's bipartisan decisions in the Infrastructure Act. And the FCC could have focused on broadband infrastructure deployment—on ensuring that every American has a fair shot at affordable, next-generation connectivity. But as I indicated at the outset of this statement, the theme running through the Biden Administration's Internet policies is not one of connectivity or capacity—it is control.

Finally, an unsolicited word of advice for industry. I understand that the Infrastructure Act included some $65 billion in subsidies for broadband. I understand that lobbyists read Section 60506 before it passed and satisfied themselves that it was a limited and narrow provision. But I also understand how Washington works. There is no such thing as free money in this town. Or as the *Wall Street Journal* Editorial Board put it just last week: "Industry made a Faustian bargain by supporting the bill . . . . The FCC is now seeking Faust's payment." So, for my part, I would urge far greater caution going forward.

\* \* \*

In closing, I remain hopeful that the FCC will correct course (sooner or later). I remain hopeful that the Commission will move beyond these ideological decisions and towards common sense policies

that deliver wins in the real world.  And I look forward to voting in favor of those decisions.

But that is not the decision the agency chooses today.  Accordingly, I dissent.

## STATEMENT OF
## COMMISSIONER GEOFFREY STARKS

Re:    *Implementing the Infrastructure Investment and Jobs Act: Prevention and Elimination of Digital Discrimination*, GN Docket No. 22-69, Report and Order and Further Notice of Proposed Rulemaking.

If you've listened to music at all this past year, you've probably heard the song, "Fast Car." The song was first released a whopping 35 years ago by singer-songwriter Tracy Chapman, but was recently covered by country star Luke Combs. Just last week, "Fast Car" won song of the year at the Country Music Association awards. It is, of course, a beautiful song, but one of the most powerful messages—and a line that in particular stands out to me—comes in the refrain: "I had a feeling that I could be someone." And I truly believe that's a message that we deliver here today – eradicating digital discrimination anywhere will empower individuals everywhere. This is a proceeding that will impact generations of Americans, and work to ensure a more just and equitable future for tomorrow. I'm proud to approve.

***

In the Infrastructure Investment and Jobs Act, a bipartisan Congress recognized that the trajectory of digital progress hasn't always been even – a result that has held back our collective achievements as a Nation. It focused on broadband access as an essential aspect of the remedy. Congress found that "[a]ccess to affordable, reliable, high-speed broadband is essential to full participation in modern life in the United States,"[1029] and that the "persistent 'digital divide' in the United States is a barrier to the economic competitiveness of the United States and equitable distribution of essential public services, including health care and education."[1030] It continued, finding that "[t]he digital divide disproportionately affects communities of color, lower-income areas, and rural areas, and the benefits of broadband should be broadly enjoyed by all."[1031]

With those findings well established, Congress told the FCC to get to work. It told us that "subscribers should benefit from equal access to broadband internet access service" which includes the opportunity to subscribe to an offered service of comparable speeds and other quality of service metrics, for comparable terms and service.[1032] To achieve that result, it directed us to prevent and eliminate digital discrimination of access.

This is a large and complex item, so I highlight just a few of the many policy issues covered in this proceeding. **First**, by including both disparate impact and intent in our definition of digital discrimination, we recognize the multifaceted nature of digital discrimination and take the right steps under the law to eliminate it. Our disparate impact analysis is consistent with recent Supreme Court precedent. In *Texas Department of Housing and Community Affairs v. Inclusive Communities Project*, the Court in 2015 stated that a disparate impact legal standard is authorized where the statutory text is "results based" and the standard is "consistent with statutory purpose."[1033] I believe we have such authority under section 60506, and furthermore, that we hew closely to the criteria of *Inclusive Communities* by limiting potential liability to "where the challenge is shown to cause the disparity

---

[1029] 47 U.S.C. § 1701.

[1030] *Id.*

[1031] *Id.*

[1032] 47 U.S.C. § 1754(a).

[1033] *Texas Dep't of Housing and Comm'ty Affairs v. Inclusive Communities Project*, 576 U.S. 519, 533 (2015).

complained about" and "business owners are permitted to explain the valid interests served by the challenged policy or practice."[1034]

The alternative—ignoring disparate impact—would have denied Congress's directive to the agency. It is simply implausible that we could prevent and eliminate digital discrimination by solely addressing intentional discrimination.

**Second**, the rules we adopt today are not the end of our work here. I support the item's various proposals to help guide and support ISP decisionmakers as they work to implement our rules. Annual reporting will illuminate the many competing factors that broadband providers weigh in providing service. Our ISPs lead the world thanks to the investment in their networks, and that is about to be supercharged by BEAD and other federal programs. Now is the ideal time to ensure transparency into how broadband providers utilize these federal dollars.

Internal compliance is equally important. ISP executives must understand the basis for deployment, maintenance, upgrade, and other decisions. These are the individuals who can ensure that nondiscrimination of access is a core business goal, built in by design from day one, just like accessibility, privacy, and security. This information will rightly not be public, but creating an internal process is vital to seeing through the goal of what so many stakeholders told me personally in meetings about this item: that they believe in the purpose of this proceeding and want it to succeed.

**Third**, I want to thank the Chairwoman for accepting my request to seek further comment on forming an Office of Civil Rights within the FCC. The record is clear—advocates and industry alike think this is a strong idea, and I'm eager to develop a record on how best to structure and deploy such an Office, as many other agencies, from the Department of State to the Department of Homeland Security, have done.

**Finally**, I'm glad the draft now reflects my additional edits to create a presumption of compliance for ISPs and others that participate in and have adopted policies and procedures consistent with NTIA's BEAD program and our Universal Service Fund high-cost programs. Numerous industry associations and advocates,[1035] as well as NTIA,[1036] requested these edits. These broadband programs are consistent

---

[1034] *Id.* at 541-542.

[1035] *See e.g.*, Letter from Pamela Arluk, Vice President & Associate General Counsel, NCTA, to Marlene H. Dortch, Secretary, FCC, GN Docket No. 22-69, at 4 (filed Oct. 25, 2023) (advocating for "[a] safe harbor for broadband providers that are bound by existing nondiscrimination standards and comply with those standards, such as BEAD and [RDOF] requirements"); Letter from Diana Eisner, Vice President, Policy & Advocacy, USTelecom, to Marlene H. Dortch, Secretary, FCC, GN Docket No. 22-69 at 6-7 (filed Nov. 8, 2023) (stating that the Commission should adopt rebuttable presumptions of compliance where "a provider fulfills deployment obligations pursuant to funding programs such as BEAD"); Letter from Amy E. Bender, Vice President, Regulatory Affairs, CTIA, to Marlene H. Dortch, Secretary, FCC, GN Docket No. 22-69 at 3, fn. 15 (filed Oct. 13, 2023) (asserting that the Commission should establish a safe harbor for compliance with license build-out obligations, which conforms with NTIA's call for clarification that actions consistent with BEAD requirements are presumptively lawful); Letter from Louis Peraertz, Vice President of Policy, WISPA, to Marlene H. Dortch, Secretary, FCC, GN Docket No. 22-69 at 7 (filed Nov. 8, 2023) ("[t]he Commission must be more definitive, and establish a 'safe harbor' for recipients of federal or state program that imposes deployment obligations across a defined geographic area"); Letter from Randolph J. May, President, Free State Foundation, to Marlene H. Dortch, Secretary, FCC, GN Docket No. 22-69 at 3 (filed Oct. 20, 2023) (asserting for a "safe harbor" when "broadband providers offer service based on guidelines for participating in federal and state-administered broadband deployment subsidy programs, including universal service, the ACP program, and the BEAD Program").

[1036] Letter from Stephanie Weiner, Chief Counsel, National Telecommunications and Information Administration, to the Federal Communications Commission, GN Docket No. 22-69, at 4-5 (filed Oct. 6, 2023) (urging the Commission to "recognize the consistency between BEAD and the mandate against digital discrimination of access, and accordingly to treat actions taken in strict compliance with BEAD program requirements as presumptively also compliant with digital discrimination rules").

with section 60506, and stating this loud and clear will support ISP participation in the many programs across the FCC and the Biden Administration that are helping to close the digital divide and reach unserved and underserved communities.

***

As I've long said, it is our responsibility to ensure that the internet reaches all Americans everywhere.  Today, we fulfill our explicit Congressional directive to enact rules to prevent and eliminate digital discrimination of access.  And in doing so, we take a huge step toward fulfilling that mission.

Thank you to the Chairwoman for her leadership, and the Commission staff for their dedicated work.  I'm proud to support this item.

## DISSENTING STATEMENT OF
## COMMISSIONER NATHAN SIMINGTON

Re:     *Implementing the Infrastructure Investment and Jobs Act: Prevention and Elimination of Digital Discrimination*, GN Docket No. 22-69, Report and Order and Further Notice of Proposed Rulemaking.

I have no choice but to dissent from this order. It will have the Commission run a permanent inquisition against the broadband industry, creating a climate of fear and uncertainty when we should instead be encouraging greater investment and innovation. Under the digital equity rules we are adopting today, every business practice or decision, by any company remotely connected to the provision of broadband, is prohibited unless any disparate impact is unavoidable due to "technical or economic infeasibility." This is an impossible standard to meet, and the only way for a company to even attempt to comply is to practice racial, ethnic, and religious discrimination in every business decision.

Surely, Congress would not have authorized, in a less than one page section of a thousand-page bill, the most open-ended liability regime that the FCC has ever seen—indeed, one broader than any civil rights law Congress has ever passed. And in fact, it did not. Nowhere does Section 60506 authorize the Commission to issue fines, forfeitures, or injunctions. My colleagues' primary argument to the contrary is that by ordering the FCC to adopt rules "preventing digital discrimination," Section 60506 allows the FCC to use its Titles IV and V enforcement powers toward that end. But the enforcement provisions in Titles IV and V of the Communications Act could not be clearer: they only apply to rules deriving from that Act, not from totally separate laws like Section 60506. When Congress has wished to give the FCC new authority, enforceable through those provisions, it has done so by explicitly amending the Communications Act, which it took care to avoid here. This refusal by Congress to grant new powers is consistent with the facial interpretation of Section 60506: that it directs the FCC to use its existing authority, such as by modifying Universal Service Fund programs, to achieve the goals of the statute.

Aware of these difficulties with their primary argument, my colleagues turn to the ancillary authority provision in Section 4(i) of the Communications Act. Reliance on ancillary authority is usually a sign that the Commission is overreaching, and so it is here. Invoking it here raises troubling questions about the Commission's deference to Congress. If Section 4(i) on its own authorizes fines, forfeitures, and other remedies for any rule adopted by the Commission, then ninety years of precedent and understanding of Titles IV and V of the Communications Act are wrong. By the logic of this rule, the *grants* of enforcement powers under those titles are actually *limitations* on those powers, which would otherwise be unlimited under Section 4(i).

This cannot possibly be correct. The provisions of Titles IV and V are written as grants of authority, not limitations on Section 4(i), and the Commission has always interpreted them this way. A fallback to Section 4(i) would also require us to believe that by mere silence on the question of enforcement in Section 60506, Congress intended to give us enforcement powers greater than those we have in any other area we regulate. Section 4(i) has none of the limitations on fines, for example, that Title V does. In short, this order suggests that the Commission's powers are greatest when Congress is silent.

I cannot agree with this. The obvious meaning of Section 60506, in line with decades of Commission precedent, is that Congress intended for the FCC to adopt rules directing our own conduct and using our previously existing authority to address disparities in connectivity.

I am further concerned that the disparate impact standard adopted by this order, which makes "technical or economic infeasibility" the only defense, is impossible to comply with. Like any business, ISPs and their partners have to decide how to invest limited capital in a way that maximizes their returns.

When choosing between investing the same amount into serving an area where they stand to make more money or an area where they stand to make less money, they should choose to deploy to the area where they will make the most profit. When the FCC believes that the public interest will be served by build-outs to less profitable areas, we sweeten the pot by offering subsidies through our high-cost USF programs. Under established disparate impact law, this profit maximization—the pursuit of a "legitimate, nondiscriminatory interest"— insulates broadband providers, like any other businesses, from liability. But, breaking with established law, this order explicitly rejects the idea that profit maximization should be a defense to disparate impact liability.

Instead of protecting the pursuit of "legitimate, nondiscriminatory interests", this rule only allows a defense of "technical or economic infeasibility." How much profitability, then, is a company supposed to sacrifice in pursuit of digital equity goals? The rule provides neither guidance nor safe harbors. After all, every dollar of profit is a dollar that feasibly could have been invested in serving other areas. And why stop at profits? Companies routinely make losses for decades in pursuit of longer-term goals, so why not in service of digital equity? In a competitive market for investment dollars, projects under the shadow of these digital equity rules will be disfavored. Therefore, the liability regime under this rule, both as to standards and penalties, cannot help but have a chilling effect out of all proportion to its stated benefits. No amount of diligence in complying with this order can prevent the FCC from reasonably arguing that a company violated it anyway, that it could have made less money in better pursuit of digital equity. No business decision can be known to be defensible or safe to make. When everyone is guilty, and enforcement is discretionary, the only real rule is to stay on the good side of the prosecutor, in this case, whoever controls the FCC.  It is no exaggeration to say that this order establishes an inquisition against the broadband industry. The Commission will sit not merely as judge, jury, and executioner, but also police and legislature.

Beyond being indeterminate and impossible to reliably comply with, a disparate impact standard limited only by technical or economic feasibility is an unconstitutional requirement for companies to engage in racial, ethnic, and religious discrimination. Rather than looking only to their own self-interest when planning investments, companies will have to consider the racial, ethnic, and religious effects of their decisions. They will have to disregard their own profitability in pursuit of FCC-desired racial, ethnic, and religious outcomes. When a company makes business decisions on the basis of race, that is called racial discrimination, and that is exactly what we are requiring here.

The Supreme Court anticipated exactly this difficulty in *Texas Dep't of Hous. & Cmty. Affs. v. Inclusive Communities Project, Inc.*, 576 U.S. 519 (2015), when it upheld a disparate impact liability regime only because it had safeguards that included a defense for decisions motivated by "legitimate, nondiscriminatory interests," such that disparate impact liability would only attach to "artificial, arbitrary, and unnecessary barriers." It said:

> Difficult questions might arise if disparate-impact liability … caused race to be used and considered in a pervasive and explicit manner … Courts should avoid interpreting disparate-impact liability to be so expansive as to inject racial considerations into every housing decision … Were standards for proceeding with disparate-impact suits not to incorporate at least the safeguards discussed here, then disparate-impact liability might displace valid governmental and private priorities, rather than solely removing artificial, arbitrary, and unnecessary barriers. And that, in turn, would set our Nation back in its quest to reduce the salience of race in our social and economic system.

*Id.* at 544 (cleaned up). Today, the Commission ignores this warning and creates a regime that requires the pervasive and explicit consideration of race, ethnicity, and religion for every business decision, however grand or picayune. More recent caselaw should give the Commission further pause, especially the Supreme Court's rejection of affirmative consideration of race even for remedial purposes. *Students*

*for Fair Admissions v. Harvard*, 600 U.S. 181 (2023). This Order is on the wrong side of the Constitution.

My colleagues have also failed to justify the necessity of this expansive regulatory scheme. Not even the majority interprets the statute to *require* such a draconian liability regime, so one would expect them to justify taking such a maximalist position by showing the existence of pervasive discrimination and inequality in access to broadband. But they have made no such showing. The order does not even deny that whatever disparities do exist are best attributed to the difficulty and unprofitability of serving certain geographic areas, which are best addressed by reductions in cost or the provision of subsidies, not by a punitive civil rights regime. Even if all other legal difficulties were overcome, the complete lack of factual justification makes this order arbitrary and capricious, and invalid under the Administrative Procedures Act.

**STATEMENT OF**
**COMMISSIONER ANNA M. GOMEZ**

Re:     *Implementing the Infrastructure Investment and Jobs Act: Prevention and Elimination of Digital Discrimination*, Report and Order and Further Notice of Proposed Rulemaking, GN Docket No. 22-69 (Nov. 15, 2023).

*We are the rule, not the exception.*  A friend shared this saying with me last week, and it resonated with me, especially as I had the opportunity to reflect about what we are doing here today.  Two years ago, Congress came together, and passed the Bipartisan Infrastructure Law, investing $65 billion to ensure that everyone in America has access to affordable, reliable, high-speed Internet.

In making this historic investment in our country and our future, Congress recognized two things that many of us have long known.  First, high-speed broadband is essential to full participation in modern life in the United States and we must invest to ensure that everyone has affordable, reliable access.  And second, we must ensure that equal access to broadband is enjoyed by all, particularly communities that have been historically underserved.

In other words, Congress recognized that connectivity for all—is the rule, not the exception.  And Congress recognized that access for historically underserved communities—communities of color, low-income communities, rural communities, Tribal, and Latino communities— needs to be the rule, not the exception.  As we make historic investments in our nation's infrastructure that will impact generations to come, we must prioritize digital equity, along with our other guiding policy principles—promoting economic opportunity, competition and innovation, and protecting consumers.  In recognition of this moment, Congress understood that money alone was not enough to close the digital divide, and directed the Commission to adopt rules to prevent and eliminate digital discrimination.

And that is exactly what we do here today.  This *Report and Order* is the culmination of two years of tremendous thought and work. We are implementing a bipartisan directive from Congress to facilitate equal access to broadband and prevent digital discrimination of access to communities based on income level, race, ethnicity, color, religion, or national origin.  While there are details to sort out, the most important thing is that we start.  We are committed to working with consumers and providers to ensure that we accomplish the ultimate goal of this statute—facilitating equal access to broadband.

I want to thank the Chairwoman for her leadership in proposing these rules, establishing the Task Force to Prevent Digital Discrimination, and recognizing the need to bring in experts such as Brad Berry and Lisa Edwards to ensure that we are getting this right.  I also would like to thank the Chairwoman, Commissioner Starks and Bureau staff for the collaborative efforts to implement changes to Commission processes and reflect such changes in the draft to address stakeholder concerns about how the rules adopted today will be implemented.  Last but certainly not least, I thank the FCC staff throughout the agency that worked on this item.

## DECLARACIÓN DE LA COMISIONADA
## ANNA M. GOMEZ

"Somos la regla, no la excepción."  Una amiga compartió conmigo este significativo dicho la semana pasada, y eso me ayudó a reflexionar sobre lo que estamos haciendo hoy aquí.  Hace dos años, el Congreso se reunió y aprobó la ley bipartidista de infraestructura (Bipartisan Infrastructure Law) invirtiendo 65 mil millones de dólares para garantizar que todos en Estados Unidos tengan acceso a una internet asequible, confiable y de alta velocidad.

Al realizar esta inversión histórica en nuestro país y en nuestro futuro, el Congreso reconoció dos cosas que muchos de nosotros sabemos desde hace mucho tiempo.  Primero, la banda ancha de alta velocidad es esencial para la plena participación en la vida moderna en los Estados Unidos y debemos invertir para garantizar que todos tengan un acceso asequible y confiable.  Y, en segundo lugar, debemos garantizar que todos gocen de un acceso igualitario a la banda ancha, en particular las comunidades que históricamente han estado desatendidas.

En otras palabras, el Congreso reconoció que la conectividad para todos es la regla, no la excepción.  Y el Congreso reconoció que el acceso de las comunidades históricamente desatendidas (comunidades étnicamente diversas, comunidades de bajos ingresos, comunidades rurales, comunidades nativo-americanas y latinas) debe ser la regla, no la excepción.  A medida que realizamos inversiones históricas en la infraestructura de nuestra nación que influirán en las vidas de las generaciones venideras, debemos priorizar la equidad de acceso a las tecnologías digitales, junto con nuestros otros principios rectores de políticas: promover las oportunidades económicas, la competencia y la innovación, y proteger a los consumidores.  En reconocimiento de este momento, el Congreso entendió que el dinero por sí solo no era suficiente para cerrar la brecha digital y ordenó a la Comisión adoptar reglas para prevenir y eliminar la discriminación en el acceso a las tecnologías digitales.

Y eso es exactamente lo que hacemos hoy aquí. Este Informe y Orden es la culminación de dos años de enorme reflexión y trabajo.  Estamos implementando una directiva bipartidista del Congreso para facilitar el acceso igualitario a internet de banda ancha y prevenir la discriminación de las comunidades en su acceso a las tecnologías digitales según su nivel de ingresos, raza, etnia, color, religión u origen nacional.  Si bien hay detalles que resolver, lo más importante es que comencemos.  Estamos comprometidos a trabajar con los consumidores y proveedores para garantizar el logro del objetivo final de este estatuto: facilitar el acceso equitativo de todos a la internet de banda ancha.

Quiero agradecer a la presidenta de la FCC por su liderazgo al proponer estas reglas, al establecer el Grupo de Trabajo para Prevenir la Discriminación Digital y al reconocer la necesidad de incorporar expertos como Brad Berry y Lisa Edwards para garantizar que estemos haciendo esto bien.  También me gustaría agradecer a la presidenta de la Comisión, al Comisionado Starks y al personal de las Oficinas, por los esfuerzos de colaboración destinados a implementar cambios en los procesos de la Comisión.  Y por reflejar dichos cambios en el borrador, para abordar las preocupaciones de las partes interesadas sobre cómo se implementarán las reglas adoptadas hoy.  Por último, pero no menos importante, agradezco a todos los funcionarios de la FCC que trabajaron en este tema.

# Exhibit B



## FEDERAL COMMUNICATIONS COMMISSION

**47 CFR Parts 0, 1, and 16**

[GN Docket No. 22–69; FCC 23–100; FR ID 190877]

### The Infrastructure Investment and Jobs Act: Prevention and Elimination of Digital Discrimination

**AGENCY:** Federal Communications Commission.

**ACTION:** Final rule.

**SUMMARY:** In this document, the Federal Communications Commission (Commission) adopts rules pursuant to section 60506 of the Infrastructure Investment and Jobs Act (Infrastructure Act) that establish a framework to facilitate equal access to broadband internet access service by preventing digital discrimination of access. These rules address policies and practices that impede equal access to broadband, while taking into account issues of technical and economic feasibility that pose serious challenges to full achievement of the equal access objective. The rules constitute an effective, balanced means to accomplish Congress's objective of ensuring that historically unserved and underserved communities throughout the Nation have equal opportunity to receive high-speed broadband service comparable to that received by others, without discrimination as to the terms and conditions on which that service is received.

**DATES:** Effective March 22, 2024, except for the amendment to 47 CFR 1.717 (amendatory instruction 5), which is delayed indefinitely. FCC will publish a document in the **Federal Register** announcing the effective date for the amendment to 47 CFR 1.717.

**FOR FURTHER INFORMATION CONTACT:** Wireline Competition Bureau, Competition Policy Division, Aurélie Mathieu, at (202) 418–2194, *Aurelie.Mathieu@fcc.gov.* For additional information concerning the Paperwork Reduction Act information collection requirements contained in this document, send an email to *PRA@fcc.gov* or contact Nicole Ongele, *Nicole.Ongele@fcc.gov.*

**SUPPLEMENTARY INFORMATION:** This is a summary of the Commission's Report and Order (*Report and Order*) in GN Docket No. 22–69, FCC 23–100, adopted on November 15, 2023, and released on November 20, 2023. The full text of this document is available for download at *https://docs.fcc.gov/public/attachments/FCC-23-100A1.pdf.* To

request materials in accessible formats for people with disabilities (*e.g.,* braille, large print, electronic files, audio format, etc.), send an email to *FCC504@fcc.gov* or call the Consumer & Governmental Affairs Bureau at (202) 418–0530 (voice) or (202) 418–0432 (TTY).

### Final Paperwork Reduction Act of 1995 Analysis

This document may contain new or modified information collection requirements subject to the Paperwork Reduction Act of 1995 (PRA), Public Law 104–13. This document will be submitted to the Office of Management and Budget (OMB) for review under section 3507(d) of the PRA. OMB, the general public, and other Federal agencies will be invited to comment on the new or modified information collection requirements contained in this proceeding.

### Congressional Review Act

The Commission sent a copy of the *Report and Order* to Congress and the Government Accountability Office pursuant to the Congressional Review Act, *see* 5 U.S.C. 801(a)(1)(A).

### Synopsis

1. In this *Report and Order,* we adopt rules pursuant to section 60506 of the Infrastructure Act that establish a framework to facilitate equal access to broadband internet access service by preventing digital discrimination of access. The Infrastructure Act defines "broadband internet access service" for section 60506 and the remainder of Title V as having "the meaning given the term in § 8.1(b) of [the Commission's rules], or any successor regulation." Infrastructure Act 60501(1); 47 CFR 8.1(b) (defining broadband internet access service as "a mass-market retail service by wire or radio that provides the capability to transmit data to and receive data from all or substantially all internet endpoints, including any capabilities that are incidental to and enable the operation of the communications service, but excluding dial-up internet access service. This term also encompasses any service that the Commission finds to be providing a functional equivalent of the service described in the previous sentence or that is used to evade the protections set forth in this part."). In this *Report and Order,* we use the terms "broadband," "broadband service," and "broadband internet access service" interchangeably. These rules address policies and practices that impede equal access to broadband, while taking into account issues of technical and

economic feasibility that pose serious challenges to full achievement of the equal access objective. The rules we adopt today constitute an effective, balanced means to accomplish Congress's objective of ensuring that historically unserved and underserved communities throughout the Nation have equal opportunity to receive high-speed broadband service comparable to that received by others, without discrimination as to the terms and conditions on which that service is received.

2. The actions taken today are summarized below. Digital Discrimination of Access Defined. In furtherance of our goal to facilitate equal access to broadband internet access service, we adopt the following definition of "digital discrimination of access": "policies or practices, not justified by genuine issues of technical or economic feasibility, that differentially impact consumers' access to broadband internet access service based on their income level, race, ethnicity, color, religion or national origin, or are intended to have such differential impact." Under the rules we adopt today, we will investigate conduct alleged to be motivated by discriminatory intent, as well as conduct alleged to have discriminatory effect, based on income level, race, ethnicity, color, religion, or national origin. Consistent with the definition of "equal access" in the statute, we find that differentiation as to any available quality of service metric for broadband service may provide a basis for liability under these rules, absent sufficient justification.

3. Technical and Economic Feasibility. Consistent with Congress's directive, our definition of digital discrimination of access fully takes into account "issues of technical and economic feasibility," constituting impediments to full achievement of the equal access goal of the statute. We define "technically feasible" to mean "reasonably achievable as evidenced by prior success by covered entities under similar circumstances or demonstrated technological advances clearly indicating that the policy or practice in question may reasonably be adopted, implemented, and utilized." We similarly define "economically feasible" to mean "reasonably achievable as evidenced by prior success by covered entities under similar circumstances or demonstrated new economic conditions clearly indicating that the policy or practice in question may reasonably be adopted, implemented, and utilized."

4. Consumers Afforded Protection from Digital Discrimination, and

Entities and Services that are Subject to the Prohibition Against Digital Discrimination of Access. We adopt rules focusing on whether policies and practices differentially impact consumers' access to broadband internet access service or are intended to do so. In this vein, we specify that "consumer" means current and prospective subscribers to broadband internet access service, including individuals, groups of individuals, organizations, and groups of organizations. Moreover, the scope of the rules we adopt today extends not only to providers of broadband internet access service, but also to entities that facilitate and otherwise affect consumer access to broadband internet access service.

5. We adopt today the same definition of "broadband internet access service" that appears in our rules at 47 CFR 8.1(b). In accordance with section 60506, the rules we adopt today shall apply to all policies and practices that affect a consumer's ability to have equal access to broadband internet access service, including but not limited to deployment, network upgrades, and maintenance. Covered elements of service include both technical and non-technical elements of service that may affect a consumer's ability to receive and effectively utilize the service.

6. Enforcement. We adopt rules that allow for enforcement of our prohibition against digital discrimination of access through self-initiated Commission investigations and revise our informal complaint process to accept complaints alleging digital discrimination of access, including offering parties voluntary mediation overseen by Commission staff when appropriate. Possible violations will be investigated by Commission staff using our standard investigative toolkit, and all penalties and remedies will be available when we determine that our rules have been violated. The Commission will consider utilizing consent decrees when appropriate. We decline, at this time, to create an additional process for the filing and adjudication of formal complaints akin to section 208 of the Communications Act.

7. Consumer Complaints. Consistent with Congress's directive, we revise our informal consumer complaint process to accept complaints from consumers or other members of the public that relate to digital discrimination of access by establishing a dedicated pathway for digital discrimination of access complaints including from organizations, and collecting voluntary demographic information from complainants.

8. State and Local Model Policies and Best Practices. We adopt the Communications Equity and Diversity Council's recommendations that propose model policies and practices for states and localities to address digital discrimination of access. We emphasize that these model policies and practices do not foreclose adoption by states and localities of additional measures to ensure equal access to broadband service in their communities.

**Background**

9. Section 60506 of Division F, Title V of the Infrastructure Act is entitled "Digital Discrimination." This provision supports extensive broadband expansion programs in the Infrastructure Act and requires that the Commission adopt rules to facilitate equal access to broadband internet service. Section 60506(b) reads: "Not later than 2 years after November 15, 2021, the Commission shall adopt final rules to facilitate equal access to broadband internet access service, taking into account the issues of technical and economic feasibility presented by that objective, including— (1) preventing digital discrimination of access based on income level, race, ethnicity, color, religion, or national origin; and (2) identifying necessary steps for the Commission to take to eliminate discrimination described in paragraph (1)."

10. The Commission's implementation of section 60506 builds on a robust history of Commission regulatory action premised on nondiscrimination and universal service, which, in turn, furthers the goal of broadband internet access for all and addresses the digital divide.

*Commission's Efforts To Further Consumer Access to Broadband Internet Service*

11. At the core of the Commission's commitment to broadband internet access for all is section 1 of the Communications Act of 1934, as amended, which states the agency's purpose "to make available, so far as possible," a "rapid, efficient, Nation-wide" wire and radio communication service with adequate facilities "to all people of the United States, without discrimination on the basis of race, color, religion, national origin, or sex." Nondiscrimination and universal service are cornerstone principles and drive agency policies to achieve the broadest possible consumer access to communications services. In the Telecommunications Act of 1996 (1996 Act), Congress expanded the traditional goal of universal service to include

increased access to telecommunications and advanced services, such as broadband internet access service, for all consumers at just, reasonable, and affordable rates. The 1996 Act established principles for universal service that focus on increasing access for consumers living in rural and insular areas, and for low-income consumers. Section 706 of the 1996 Act requires the Commission to report annually on whether broadband "is being deployed to all Americans in a reasonable and timely fashion."

12. In 2009, Congress directed the Commission to develop a National Broadband Plan to ensure every American has "access to broadband capability." The Commission released the National Broadband Plan in March 2010, highlighting ways to "[r]eform current universal service mechanisms to support deployment of broadband and voice in high-cost areas; and ensure that low-income Americans can afford broadband; and in addition, support efforts to boost adoption and utilization."

13. The Commission has long used its Universal Service funding programs to further consumer access to broadband and bridge the digital divide. These funding programs, which preceded the Infrastructure Act, have historically helped to deliver broadband services to low-income consumers and to unserved and underserved communities in rural and insular areas. Further, these programs provide support in various ways, including: offering to low-income consumers discounts on voice service and/or broadband internet access service; providing funding to eligible schools and libraries for affordable broadband services to help connect students and members of local communities; providing funding for health care providers to ensure that patients have access to broadband enabled healthcare services; and offering subsidies to providers to build out, deploy, and maintain networks that provide voice and broadband service in high-cost areas.

14. These Commission actions help to ameliorate a digital divide that has underpinnings in the country's historical segregation and redlining practices in housing. Relying on historical research, data, and surveys, numerous commenters correlate inequities in broadband access to historically segregated housing patterns and discriminatory housing practices. The record in this proceeding reflects that the digital divide significantly tracks housing redlining that came into existence under the National Housing Act of 1934, when the Federal Housing

Administration directed the Home Owners' Loan Corporation to create ''residential security maps.'' These federally created maps outlined as ''high-risk'' those areas highly populated by minorities. Banks used these maps to deny mortgage capital to minority residents living in those high-risk areas, leading to disinvestment in these communities. Against this historical and demographic backdrop, researchers have long found that metropolitan areas with a history of redlining ''generally remain more segregated and more economically disadvantaged, [and] . . . have lower median household income, lower home values, older housing stock, and rents which are lower in absolute terms (but often higher as a percentage of income).'' This history has carried forward to broadband access, as researchers have found that access to broadband in the home can decrease in tandem with historical residential risk classifications, and such differences in broadband access vary depending on income levels, race, and ethnicity.

*Consumer Access to Broadband*

15. The Commission regularly reports on the number of Americans who lack access to broadband internet access service. While the Commission reported in 2021 that 14.5 million Americans lack access to broadband, an independent study suggested that the actual number was as high as 42 million. Further, Microsoft's data usage, as of 2020, suggested that as many as 120.4 million people in the United States did not *use* the internet at broadband speeds of 25/3 Mbps.

16. The uncomfortable reality is that too many households in the United States lack equal access to broadband. Lack of equal access to broadband is not limited to historically redlined urban communities, but also encompasses and acutely affects both rural and urban low-income communities, other rural communities, and Tribal areas.

*The Global COVID–19 Pandemic Heightened the Inequities in Broadband Internet Access*

17. The global COVID–19 pandemic compounded the problem of unequal access to broadband internet access service in the United States. The digital divide became more stark as shutdowns caused a heightened need for high-quality broadband internet access service to meet basic needs such as working from home, distance learning, accessing public benefits and services, telehealth, job-hunting, remote worship activities, remote family and social connections, and other daily activities.

In 2020, a Pew Research Center survey found that nearly half of adults surveyed stated that internet access was essential during the pandemic. And in that same survey, Pew found that at that time, ''[s]ome 43% of lower-income parents with children whose schools shut down say it is very or somewhat likely their children will have to do schoolwork on their cellphones; 40% report the same likelihood of their child having to use public Wi-Fi to finish schoolwork because there is not a reliable internet connection at home.'' Subsequently, in 2021, Pew surveys found that 57% of households making less than $30,000 had home broadband, compared to 93% of households making $100,000 or more, and additionally, white survey participants were more likely than black and Hispanic survey participants to report having home broadband access.

18. Moreover, based on data contributed by civil society organizations, educational institutions, and private sector companies, among households with broadband access, lower-income communities were observed to have slower effective speeds. For example, broadband internet access service has been found to be 21% lower in Tribal areas, compared to neighboring non-Tribal areas, and download speeds were lower. Overall, research and data indicate that during the pandemic, entrenched disparities in broadband internet access service in low-income, rural, and minority households adversely affected all aspects of daily life, including accessing education, seeking housing and employment online, accessing telehealth medical care, and applying for services. For example, as the pandemic caused the vast majority of K–12 students across the country to receive online instruction, 14% of parents had to access public Wi-Fi because there was no reliable connection to the home. This figure was 4% in high-income households and 23% in lower income households.

*Infrastructure Investment and Jobs Act of 2021*

19. On November 15, 2021, in the midst of the pandemic, Congress enacted the Infrastructure Act providing $65 billion for broadband programs for the purpose of expanding access and affordability to under-served and unserved areas and addressing the ''digital divide.'' During House debates on the Infrastructure Act, House Majority Whip James Clyburn (D–SC) testified about the harm caused by the digital divide and the need to address inequities in access to high-speed

broadband internet service. Division F of the Infrastructure Act is entitled ''Broadband.'' In the legislation, Congress found: (1) Access to affordable, reliable, high-speed broadband is essential to full participation in modern life in the United States; (2) The persistent ''digital divide'' in the United States is a barrier to the economic competitiveness of the United States and equitable distribution of essential public services, including health care and education; (3) The digital divide disproportionately affects communities of color, lower-income areas, and rural areas, and the benefits of broadband should be broadly enjoyed by all; and (4) In many communities across the country, increased competition among broadband providers has the potential to offer consumers more affordable, high quality options for broadband service.

20. The 2019 novel coronavirus pandemic has underscored the critical importance of affordable, high speed broadband for individuals, families, and communities to be able to work, learn, and connect remotely while supporting social distancing.

*The Infrastructure Act's Funding Measures Promote Equal Access*

21. The Infrastructure Act's funding measures are intended to promote access to broadband internet access service and reduce the digital divide. Under Title I through Title V of Division F of the Act, Congress authorized funding for expansive broadband access, affordability, and digital literacy programs. These programs fall into seven major program areas: the Broadband Equity, Access, and Deployment Program ($42.45 billion), the Affordable Connectivity Program ($14.2 billion) Digital Equity Planning, Capacity and Competitive Grants ($2.75 billion), the Tribal Broadband Connectivity Program ($2 billion), Rural Utilities Service at the Department of Agriculture ($2 billion), the Middle Mile Grant Program ($1 billion), and Private Activity Bonds (approximately $600 million).

*The Infrastructure Act Requires That the Commission Undertake Specific Measures To Support the Goal of Equal Access*

22. In addition to providing funding for broadband deployment in unserved and underserved communities, the Infrastructure Act sets out specified measures for the Commission in service of the goal that ''every American ha[ve] access to reliable high-speed internet.'' Title I directs the Commission to create a broadband funding map, which is an ''online mapping tool to provide a

locations overview of the overall geographic footprint of each broadband infrastructure deployment project funding by the Federal Government.'' Through this map, and the National Broadband Map, the Commission and other governmental and non-governmental stakeholders can track broadband deployment projects to ensure that broadband is deployed in historically unserved and underserved areas. Title V, entitled ''Broadband Affordability,'' addresses affordability of broadband internet for low-income consumers. In addition to expanding funding to offset the cost of broadband internet for low-income households through the Affordable Connectivity Program (ACP), Title V promotes transparency by requiring the Commission to adopt rules for broadband providers to display easy-to-understand labels that allow consumers to comparison shop for broadband services. This promotes competition by providing consumers clear, concise, and accurate information about broadband internet prices and fees, performance, and network practices.

23. Most relevant here, section 60506 of the Infrastructure Act sets out further measures to support the fundamental objective of ensuring equal access to broadband. The Statement of Policy provides that ''insofar as technically and economically feasible'' the Commission ''should take steps to ensure that all people of the United States benefit from equal access to broadband internet access service.'' In addition to mandating the adoption of rules to facilitate equal access by ''preventing digital discrimination of access'' on specified bases and identifying necessary steps to eliminate such discrimination, matters we discuss in great depth throughout this *Report and Order,* section 60506 requires the Commission and the Attorney General to ''ensure that Federal policies promote equal access to robust broadband internet access service by prohibiting deployment discrimination'' on specified bases. The Commission must also ''develop model policies and best practices that can be adopted by States and localities to ensure that broadband internet access service providers do not engage in digital discrimination,'' and revise its ''public complaint process to accept complaints from consumers or other members of the public that relate to digital discrimination.''

*Commission's Actions To Further Promote Equal Access*

Commission Funding Programs

24. The Commission's most recent efforts to get marginalized communities connected to high-quality broadband internet access service include administration of well-targeted subsidy programs. The Affordable Connectivity Program and its predecessor, the Emergency Broadband Benefit (EBB) Program, have been instrumental in helping low-income households afford broadband internet. Under the program, eligible low-income households can receive a discount of $30 per month toward internet service and up to $75 per month for eligible households on qualifying Tribal lands. Eligible households can also receive a one-time discount of up to $100 to purchase a laptop, desktop computer, or tablet from participating providers. As of August 2023, more than 20 million households in the United States have enrolled in the program.

25. During the pandemic, the Commission expedited adoption of the Emergency Connectivity Fund (ECF) and COVID–19 Telehealth Programs to provide funding to eligible schools and libraries for broadband services and connected devices for use by students, school staff, or library patrons and health care providers for telecommunications services, information services, and connected devices.

Communications Equity and Diversity Council

26. On June 29, 2021, the Commission chartered the Communications Equity and Diversity Council (CEDC), a federal advisory committee created for the purpose of presenting recommendations to the Commission on ''advancing equity in the provision of and access to digital communication services and products for all people of the United States, without discrimination on the basis of race, color, religion, national origin, sex, or disability.'' In chartering the CEDC, the Commission renewed the charter of the Advisory Committee on Diversity and Digital Empowerment under a new name. Within the CEDC is the Digital Empowerment and Inclusion Working Group that was tasked with recommending ''model policies and best practices that can be adopted by States and localities to ensure that broadband internet access service providers do not engage in digital discrimination'' as required by section 60506(d).

27. Since its formation, the CEDC and its working groups have taken significant steps towards satisfying its

mission. On November 7, 2022, the CEDC submitted Recommendations and Best Practices to Prevent Digital Discrimination and Promote Digital Equity to the Commission. The CEDC found that ''COVID–19 exacerbated economic disparities for those who did not already have access to broadband services, especially in communities of color, where a lack of broadband access can reinforce systemic inequality. The CEDC further found that data supported the conclusion that minority status and income correlated with broadband access. To that end, the CEDC compiled findings from its three CEDC Working Groups and proposed recommendations for, among other things, model policies and best practices for states and localities that address discrimination in broadband access.

28. Moreover, in furtherance of its mission, on March 23, 2023, the CEDC convened a range of community organizations, broadband internet access providers, federal agencies with emergency broadband funding, and state agencies to assess lessons learned concerning programs that provided broadband connectivity to communities during the pandemic. The CEDC released recommendations on this topic on June 15, 2023.

Task Force To Prevent Digital Discrimination

29. Force to Prevent Digital Discrimination (Task Force). The Task Force is charged with coordinating the development of rules and policies to combat digital discrimination and promote equal access to broadband, overseeing the development of model state and local policies, and improving how the Commission seeks feedback from persons facing digital discrimination in their communities.

30. The Task Force has engaged in significant outreach nationwide to understand the depth of problems in accessing broadband, particularly as experienced by persons in historically excluded, low-income, rural, and marginalized communities. On January 25, 2023, the Task Force released a Broadband Access Experience Form for consumers to state their experience with accessing broadband internet. The Task Force explained that the experiences shared by consumers help inform the work of the Commission. Further, the Task Force has held numerous public listening sessions to gain additional information and understanding from affected communities, state, local and Tribal governments, public interest advocates, and providers about challenges, barriers, and experiences with accessing broadband. In addition,

the Task Force conducted outreach efforts to educate the public on the Commission's rulemaking procedure, and to gather data, narratives, best practices, and recommendations. Summaries of these listening sessions and meetings have been entered into the record in this proceeding.

*Notice of Inquiry and Notice of Proposed Rulemaking*

31. The Commission has taken iterative steps to form a robust record for the rules adopted in today's *Report and Order.* In March 2022, the Commission released a *Notice of Inquiry* seeking comment on the rules that the Commission should adopt to implement section 60506. By the *Notice of Inquiry,* the Commission invited comment on the requirements encompassed in section 60506, in order to inform a forthcoming rulemaking to implement the requirements of the statute.

32. In December 2022, the Commission released a *Notice of Proposed Rulemaking* (*NPRM*) seeking focused comment on potential rules to address digital discrimination of access pursuant to section 60506. The Commission sought comments on its proposals to: (1) adopt a definition of "digital discrimination of access," (2) revise the Commission's informal consumer complaint process to accept complaints of digital discrimination of access, and (3) adopt model policies and best practices for states and localities combatting digital discrimination of access. The Commission also sought comment on other rules the Commission should adopt to facilitate equal access and combat digital discrimination of access, and on the legal authority for adopting rules. The Commission received more than 1,400 pages of record comments and ex partes from a wide range of stakeholders including public interest organizations, broadband internet access providers, state, local and Tribal governments, industry advocacy organizations, and research institutes. Informed by this record, we adopt rules in fulfillment of our mandate from Congress in section 60506 of the Infrastructure Act.

**Discussion**

33. Based on our review of the record received in response to the *Notice of Inquiry* and *NPRM,* we adopt rules in this *Report and Order* to implement subsections (b), (d) and (e) of section 60506. First, we adopt a definition of "digital discrimination of access" and explain its component parts. Next, we adopt rules to prohibit digital discrimination of access. Third, we outline the scope of that prohibition,

identifying the consumers, entities, and services covered by the prohibition. Fourth, we adopt rules for enforcing the prohibition and other requirements set forth in our rules, and we explain how we will assess when a policy or practice differentially affects consumer access to broadband internet access service. Finally, we adopt changes to our informal complaints process so the Commission can accept digital discrimination of access complaints, address other issues on the record, and adopt model policies and best practices for states and localities combating digital discrimination.

*Definition of Statutory Terms*

34. Section 60506 is part of a comprehensive broadband access and affordability framework intended to expand broadband coverage in the United States, improve the quality of broadband services, and increase broadband adoption rates in low-income communities. As many commenters note, the bulk of the Infrastructure Act's broadband-related provisions are directed toward (1) improving broadband access in unserved and underserved communities by incentivizing investment in hard-to-build areas (principally through tens of billions of dollars in federally administered grants), and (2) improving broadband adoption rates in low-income communities through subsidies to qualifying consumers for high-speed broadband service and related equipment.

35. The Infrastructure Act's historic investment incentives represent an acknowledgement by Congress that: (1) deploying, upgrading, and maintaining high-speed broadband networks is an expensive enterprise, even for the largest of broadband providers, (2) networks will only be built where they can be deployed at acceptable cost and then profitably operated, and (3) such legitimate, profit and loss considerations likely account for many of the gaps in access to high-speed broadband service across the United States. The investment incentives in the Infrastructure Act directly address the very real technical and economic constraints facing many broadband providers as they work to expand their networks to reach unserved and underserved communities across the country.

36. But even while seeking to address these legitimate business constraints, Congress recognized that other factors might also have played a significant role in creating and maintaining the digital divide in the United States. Thus, alongside the ambitious programs in the

Infrastructure Act for improving broadband access in unserved and underserved communities, Congress, in section 60506, specifically directed the Commission to facilitate equal access to broadband service, including addressing discrimination in the provision of access to broadband service.

37. Section 60506(a) first declares "the policy of the United States that, insofar as technically and economically feasible . . . subscribers should benefit from equal access to broadband internet access service within the service area of a provider of such service . . . [and that] the Commission should take steps to ensure that all people of the United States benefit from equal access to broadband internet access service." Section 60506(b) then directs the Commission to "adopt final rules to facilitate equal access to broadband internet access service, taking into account the issues of technical and economic feasibility presented by that objective," and mandates that those rules include "preventing digital discrimination of access based on income level, race, ethnicity, color, religion, or national origin" and "identifying necessary steps for the Commission[] to take to eliminate" such digital discrimination of access.

38. Critically important to our understanding of the reach of section 60506 is its definition of "equal access." Section 60506(a) declares in the Statement of Policy that the Commission should take steps to ensure "equal access" to broadband internet access service across our Nation, and section 60506(b) directs the Commission to adopt rules to "facilitate equal access" to broadband internet access service. The "equal access" that we are to ensure and facilitate is defined in subsection (a)(2) as "the *equal opportunity* to subscribe to an offered service that provides comparable speeds, capacities, latency, and other quality of service metrics in a given area, for comparable terms and conditions." The statute thus focuses the Commission's energies on the objective of *equal opportunity,* a concept and goal that is well known in American life. And in service of this equal opportunity goal, the Commission is directed, and thereby authorized, to adopt rules to prevent discrimination on the listed bases and to identify ways to eliminate its occurrence and effects.

*Digital Discrimination of Access Defined*

39. By enacting section 60506, Congress vested the Commission with authority to adopt and enforce rules to address the problem of digital discrimination of access. To achieve

that purpose, the *Notice* advanced proposals for defining "digital discrimination of access" and the legal standard for determining a violation of the rules. We adopt the following definition of "digital discrimination of access," which is essentially identical to our proposal in the *Notice:* Policies or practices, not justified by genuine issues of technical or economic feasibility, that (1) differentially impact consumers' access to broadband internet access service based on their income level, race, ethnicity, color, religion, or national origin or (2) are intended to have such differential impact.

40. In so defining "digital discrimination of access," we find that to achieve the statute's equal access purposes, the legal standard must address not only business conduct motivated by discriminatory intent, but also business conduct having discriminatory effects.

41. Virtually all commenters agree that digital discrimination of access encompasses business conduct motivated by discriminatory intent. Certainly treating a person or a group of persons "less favorably than others because of a protected trait" is "the most easily understood type of discrimination." Under our adopted rules, business conduct motivated *by discrimination* on one of the six listed bases (income level, race, color, ethnicity, religion, and national origin) would generally be prohibited.

42. The disagreement among commenters centers on whether policies and practices having discriminatory *effects* should be prohibited under our definition of digital discrimination of access. Most industry commenters argue that the definition must be limited to disparate treatment, *i.e.,* intentional discrimination, relying largely on case law interpreting the Fair Housing Act (FHA) and asserting that a Commission rule permitting claims based on disparate impact, *i.e.,* discriminatory effect, would conflict with other provisions of the Infrastructure Act, and could disincentivize investment in broadband networks. On the other hand, most public interest and government commenters, relying on the same case law, argue that the rule must encompass disparate impact claims because most discrimination in broadband access stems from business practices having discriminatory effect, and any rule that excludes a disparate impact liability standard would render section 60506 largely meaningless. In adopting a definition of digital discrimination of access that encompasses both disparate treatment and disparate impact, we are guided primarily by the text of the statute, including its expressly stated goal of ensuring "equal access" to broadband internet access service.

*Section 60506 Supports the Commission's Adoption of the Legal Standards Stated in the Defined Term*

43. Statutory interpretation focuses on "the language itself, the specific context in which that language is used, and the broader context of the statute as a whole." The text and context of section 60506 of the Infrastructure Act fully support our adopted definition of digital discrimination of access and its application, as does the overall framework of the Infrastructure Act and section 60506.

*Disparate Treatment*

44. Section 60506 plainly addresses intentional discrimination, *i.e.,* an intentional act that treats a person, or group of persons, "less favorably than others because of a protected trait." Virtually all commenters agree on this point, and we find no basis for disagreeing with this consensus view. Our definition of "digital discrimination of access" thus includes any act by a covered entity that is intended to differentially impact access to broadband internet access service on one of the listed bases and is not justified by genuine issues of technical or economic feasibility. Based on the record before us, we do not expect to encounter many instances of intentional discrimination with respect to deployment and network upgrades, as there is little or no evidence in the legislative history of section 60506 or the record of this proceeding indicating that intentional discrimination by industry participants based on the listed characteristics substantially contributes to disparities in access to broadband internet service across the Nation. Moreover, in the cases in which we do encounter intentional discrimination, we believe the entity that engaged in the discriminatory conduct will be hard pressed to justify such conduct on technical or economic feasibility grounds. Therefore, while we will allow such justifications to be raised and will consider them on a case-by-case basis, we expect that in most cases, a determination that a covered entity engaged in intentional discrimination will lead to a finding of liability under our rules.

*Disparate Impact*

45. In determining whether section 60506 authorizes us to include disparate impact in our definition of digital discrimination of access, we look to the guidance provided in the Supreme Court's decision in *Texas Department of Housing and Comm'ty Affairs* v. *Inclusive Communities Project,* 576 U.S. 519, 533 (2015) (*Inclusive Communities*). There, the Court set out a framework for determining when an antidiscrimination statute "must be construed to encompass disparate impact claims." Under that framework, a disparate impact legal standard is authorized where the statutory text is "results based" and such a standard is "consistent with statutory purpose." And, where evidence of a statistical disparity is shown to support a complaint of disparate impact, liability is properly limited where (1) the challenged policy or practice is shown to cause the disparity complained about, and (2) business owners are permitted to explain the valid interests served by the challenged policy or practice. We find that 60506 authorizes a disparate impact liability standard and that our implementing rules, outlined below, fully comport with the limiting criteria set out in *Inclusive Communities.*

*Statutory Text and Context*

46. The language of section 60506 falls within Division F (Broadband Access) of the Infrastructure Act, where Congress addresses the problem of the "digital divide" in our country and the urgency of corrective action because "[a]ccess to affordable, reliable, high-speed broadband is essential to full participation in modern life in the United States." The term "equal access" is defined in section 60506 as "the equal opportunity to subscribe to an offered service" of comparable quality on comparable terms and conditions. The term "equal access" lies at the center of section 60506's Statement of Policy in subsection (a). At subsection (b) Congress directs the Commission to adopt final rules to "facilitate equal access" which includes "preventing digital discrimination" and "identifying necessary steps . . . to eliminate [such] discrimination." As we explain below, the facial text, context and purposes of the statute establish Congress's intent that our implementing rules address conduct having discriminatory effects as well as conduct motivated by discriminatory intent.

47. The operative text mandates the adoption of rules to "facilitate equal access to broadband" which includes "preventing digital discrimination of access based on" specified characteristics, and "identifying necessary steps . . . to eliminate [such] discrimination." The term "equal access" is defined in section 60506(a) as "the *equal opportunity* to subscribe to an offered service" of comparable

quality on comparable terms and conditions and lies at the center of section 60506's Statement of Policy. We reject the argument that section 60506(a)(2) ''is irrelevant to the meaning of 'discrimination''' even if it focuses on consequence. As explained, we interpret ''of access'' in subsection (b)(1) to incorporate the definition of ''equal access'' in (a)(2). At subsection (b), Congress directs the Commission to adopt final rules to ''facilitate equal access'' to broadband internet access service. Like Title VII of the Civil Rights Act of 1964 and the Age Discrimination in Employment Act, section 60506 defines ''access'' in terms of opportunity. Because the statute defines ''access'' as the ''*opportunity* to subscribe,'' this operative text focuses on the impact of a policy or practice on the consumer's chance or right to obtain service rather than intent.

48. Courts commonly look to the ''ordinary meaning'' of a statute's words to interpret their meaning when the statute itself does not provide a definition. Looking at other operative text of section 60506, given its ordinary meaning, we find that each term targets the ''consequences of actions.'' For undefined statutory terms, courts can look to the ''dictionary for clarification of the plain meaning of words selected by Congress.'' For instance, subsection (a)(1) of the statute focuses on the ''opportunity'' to subscribe[1] and subsection (a)(3) states that consumers should ''benefit'' from equal access to broadband. The plain meaning of ''opportunity'' is ''a good chance for advancement or progress,'' and ''benefit'' means ''to receive help or an advantage.'' Neither term depends on the mindset of the actor, but rather the effect of the action. Section 60506(b), moreover, directs the Commission to ''facilitate'' equal access by ''preventing'' digital discrimination of access, and identifying necessary steps to ''eliminate'' it. The plain meaning of ''facilitate'' is ''to make easier or help bring about.'' The meaning of ''prevent'' as referenced in subsection (b)(1) is ''keep[ing] (something) from happening or arising,'' and ''eliminate'' as referenced in subsection(b)(2) means to ''put an end to or get rid of.'' Commenters urge us to adopt a disparate impact legal standard due to the documented disparities in broadband access nationwide. Again, these definitions, taken from the Merriam-Webster's (online) Dictionary, clearly suggest an effects-based orientation—whether looking at each word independently or in context as

[1] 47 U.S.C. 1754(a)(1).

written in the statute—rather than a singular focus on the mindset of the actor. Equal access can be denied by policies and practices having discriminatory effects even where no discriminatory motive is present, and it is our considered view that most of the gaps in access to broadband internet service in our country, to the extent that they are not a product of legitimate business constraints that Congress sought to address in other provisions of the Infrastructure Act, stem from policies and practices that are neutral on their face, rather than from intentionally discriminatory conduct on the part of covered entities and other industry participants. Further, the use of the words ''based on'' in section 60506(b)(1) does not limit its reach to instances of intentional discrimination under controlling precedent. Some commenters argue that the statute's use of the term ''based on'' limits the statute to an intent-only legal standard. This argument by commenters has already been expressly rejected by the Supreme Court in *Griggs* v. *Duke Power Co.,* 401 U.S. 424 (1971) (*Griggs*) and its progeny. Looking at the other nondiscrimination statutes that contain similar ''based on'' language—section 703(a)(2) of Title VII, section 4(a)(2) of the ADEA, and section 804(a) of the FHA—each of these statutes were found by the Court to authorize disparate impact claims because of the results-based statutory language. Just as with these antidiscrimination statutes, section 60506's ''based on'' text does not foreclose utilizing a disparate impact legal standard. The disparate impact standard is authorized by section 60506, as it is drawn from the ''equal access'' and other ''results-based'' statutory language and clear purposes of the statute.

49. In reaching this conclusion, we are mindful of the history of disparate impact analysis as it applies to federal anti-discrimination statutes. It was first addressed in *Griggs.* where the Supreme Court interpreted section 703(a)(2) of Title VII of the Civil Rights Act to authorize disparate impact liability. Section 703(a)(2) of Title VII made it ''an unlawful practice for an employer'' to ''limit, segregate, or classify . . . employees or applicants for employment in any way which would deprive any individual of employment opportunities *or otherwise adversely affect* his status as an employee because of such individual's race, color, religion, sex or national origin.'' There, the Court interpreted the statutory text to prohibit not only ''overt discrimination'' but also ''practices that are fair in form, but

discriminatory in operation.'' Further, the Court stated that ''[u]nder [Title VII], practices, procedures, or tests neutral on their face, and even neutral in terms of intent, cannot be maintained if they operate to 'freeze' the status quo of prior discriminatory employment practices.'' The Court reasoned that from this language ''Congress directed the thrust of [Sec. 703(a)(2)] to the consequences of employment practices, not simply the motivation.'' Notably, the Court stated that the statute's goal of achieving ''*equality of employment opportunities* and remov[ing] barriers that have operated in the past'' to favor some individuals over others afforded protected status must be interpreted to allow disparate impact claims. Section 4(a)(2) of the Age Discrimination in Employment Act (ADEA) contains similar language as that of Title VII, and a plurality of the Court in *Smith* v. *City of Jackson,* 544 US 228 (2005) (*Smith*), ruled that the statutory text authorized disparate impact liability just as it did in *Griggs.*

50. Similar reasoning was employed in examining section 804(a) of the FHA by the Court in *Inclusive Communities,* even though the provision used different results-based language than did Title VII and the ADEA. The FHA makes it unlawful to ''refuse to sell or rent . . . or otherwise make unavailable or deny, a dwelling to any person because of'' a protected status. The Court in *Inclusive Communities* observed ''the logic of *Griggs* and *Smith* provides strong support for the conclusion that the FHA encompasses disparate-impact claims'' even though the results-oriented language was different. The Court observed that ''[i]t is true that Congress did not reiterate Title VII's exact language in the FHA, but that is because to do so would have made the relevant sentence awkward and unclear.'' So, instead, ''Congress thus chose words that serve the same purpose and bear the same basic meaning but are consistent with the structure and objectives of the FHA.'' Likewise, in the context of section 60506, Congress did not repeat the results-based language that appears in Title VII, the ADEA, the FHA or the many other federal anti-discrimination statutes that have been determined to prohibit disparate impacts on specified bases. Title VI authorizes promulgation of disparate impact regulations. Instead, Congress chose words appropriate to the statute's purpose of promoting equal access to broadband internet service; the statute appropriately references ''equal access,'' ''equal opportunity'' and other terminology that goes to results or

consequences of actions (or counteracting those results or consequences), and not to the mindset of actors. For these reasons, we disagree with commenters who argue that section 60506 does not have results-oriented language or other textual markers that authorize disparate impact liability.

*Statutory Purpose*

51. Our reading of the statutory text to encompass disparate impact aligns with the overall scheme of the Infrastructure Act, and with the purpose of section 60506 specifically. As described above, promoting broadband internet access has been a longstanding policy objective for the Commission. The 1996 Act expanded the goal of universal service to include advanced services such as broadband internet service, and the Commission used its universal funding programs to address the persistent digital divide. Then, in 2020, the global COVID–19 pandemic necessitated social distancing that made the ongoing digital divide even more evident and troublesome. Some commenters in this proceeding argue, directly or indirectly, that ''digital discrimination'' does not exist. But those arguments are belied by Congress's findings in the Infrastructure Act and the record compiled in this proceeding correlating the digital divide with historical discrimination. In all events, Congress has directed the Commission to take swift action to prevent digital discrimination of access. Therefore, we do not find it necessary to evaluate claims by commenters that digital discrimination of access does not exist. Such arguments would more appropriately have been made to Congress when it was considering this legislation. We have neither the authority, nor the inclination, to question the factual bases for Congress's directives to the Commission. Indeed, section 60506 aligns with the Commission's longstanding obligation to promote nondiscrimination in the telecommunications sector. Section 202(a) of the Communications Act is a nondiscrimination provision that makes it unlawful for common carriers to ''discriminat[e] in charges, practices, classifications, regulations, facilities, or services for or in connection with like communications service . . . or to . . . . advantage . . . any particular person, class of persons, or locality, or to subject any particular person, class of persons, or locality to any undue or unreasonable prejudice or disadvantage.'' It requires no showing of discriminatory intent to establish a violation. Under section 202, where ''like communications services'' are

provided by the same provider but on different terms or conditions, the provider must justify any difference as reasonable.

52. Gaps in access to high-quality broadband across the country led Congress to enact the broadband-related provisions of the Infrastructure Act, which creates historic investment incentives and affordability subsidies to address some of the causes of the digital divide. The Infrastructure Act also clearly mandates certain prophylactic measures to address discriminatory conduct that is not addressed elsewhere in the legislation. For the past half century, our country's civil rights jurisprudence has recognized that equal opportunity to achieve economic and social benefits can be denied intentionally because of the personal characteristics or status of the person seeking the opportunity or benefit, or it can be denied unintentionally because of facially neutral policies or practices that disproportionately exclude persons possessing such characteristics or status, and both types of denial are unlawful. Disparate impact analysis has maintained its foundational standing in the courts, most recently in *Inclusive Communities,* as a means for addressing harm caused by policies or practices that have discriminatory effects and lack adequate business justification. We find that by defining the goals of section 60506 in terms of ''equal access'' and ''equal opportunity,'' especially in light of the 52-year history of disparate impact analysis in civil rights law, Congress expressed its intention that the Commission's implementing regulations address business conduct having the effect of denying designated groups of consumers the equal opportunity to subscribe to an offered broadband service, regardless of the motivation for such actions.

53. As further support for the Congressional purpose that drives our actions today, the record in this proceeding contains substantial evidence of gaps in access among persons in some low-income, rural, Tribal, and minority communities. As noted above, there is little or no evidence in the legislative history of the Infrastructure Act or the record of this proceeding that impediments to broadband internet access service are the result of intentional discrimination based on the criteria set forth in the statute. Rather, we must conclude that such impediments are more likely driven by neutral policies or practices (*i.e.,* business decisions) that have discriminatory effects.

*Section 60506 Properly Limits Disparate Impact Liability*

54. Even where a statute contains ''results-based'' text that authorizes disparate impact claims, the liability standard must require a showing that a challenged policy or practice is causing the disparity complained about, and ''avoid displacement of legitimate practices.'' Both of these factors are met by the rules we adopt today.

55. First, we will require that any determination of differential impact that relies on observed disparity must point to a specific policy or practice that is causing the disparity. A ''robust causality requirement'' ensures that any statistical imbalance does not alone establish liability and thus protects covered entities ''from being held liable for . . . disparities they did not create.'' We therefore require that any determination of liability under our rules that is founded on statistical disparity must include a determination that the disparity is caused by a specific policy or practice of the covered entity under investigation.

56. Next, the rules will give covered entities an opportunity to present justifications for discriminatory policies and practices. Section 60506 sets out such limitation by requiring that our rules facilitate equal access while taking into account ''issues of technical and economic feasibility.'' Where the Commission believes there is credible evidence that a covered entity's policy or practice differentially impacts access to broadband internet access service on the basis of income level, race, ethnicity, color, religion, or national origin, the covered entity will have the opportunity to prove that the policy or practice is nevertheless ''justified by genuine issues of technical or economic feasibility.'' We anticipate that such justification will include proof that there is not a reasonably available and achievable alternative policy or practice that would serve the entity's legitimate business objectives with less discriminatory effect. In this *Report and Order,* we explain the meaning of these terms, and how they will be applied on a case-by-case basis in the context of our self-initiated investigations of digital discrimination of access complaints.

*Adopting a Rule That Encompasses Disparate Impact Claims Does Not Conflict With the Infrastructure Act's Funding Programs and Will Not Chill Broadband Investment*

57. Contrary to some commenters' claims, including disparate impact in our definition of digital discrimination of access does not conflict with the

broadband funding programs set out in the Infrastructure Act and will not otherwise chill investment in broadband networks. The deployment and digital equity funds provided for in the Infrastructure Act prioritize unserved and underserved areas by addressing technical and economic issues that have hindered investment in "hard-to-build" areas. By contrast, section 60506 and the Commission's implementing rules are centered on conduct that does not stem from such issues. Our definition of "digital discrimination of access" highlights this contrast by specifically exempting policies and practices that are justified by "genuine issues of technical and economic feasibility." Thus, the discrimination addressed in section 60506 and our implementing rules is not addressed in other provisions of the statute, and vice versa. There is no conflict.

58. Nor do we believe that including disparate impact in our definition of digital discrimination of access will chill investments in broadband networks. Congress has provided historic funding incentives aimed to spur broadband investments in unserved and underserved communities throughout the United States. Those incentives, once again, address the very real technical and economic challenges that have hindered deployment, upgrades, and maintenance of networks in those communities. We are not persuaded that adoption of a disparate impact standard will disincentivize economic investments in networks out of fear that doing so might somehow require uneconomic investments. Again, we emphasize that under the rules we adopt today, there can be no liability determination for disparate impact unless (1) there is a differential in access to broadband service; (2) the differential is caused by a specific policy or practice of the covered entity; and (3) the covered entity fails to prove that the policy or practice is justified on genuine technical or economic grounds. When providing broadband access to a particular area is impeded by genuine issues of technical or economic feasibility, the covered entity should be able to explain those issues and offer substantial evidence to support them. While our rules will require greater diligence by covered entities in determining and documenting the reasons for access gaps in their service areas, we do not think that result is overly burdensome in furtherance of the statutory goal of equal access, nor do we think it will disincentivize investment in broadband networks.

*Other Considerations*

59. Having reached the central determinations for adopting a definition of digital discrimination of access and the applicable legal standards, we respond to other considerations commenters raise. Commenters raise additional arguments regarding interpretation of "equal access," legislative history, and the role that a covered entity's profitability and access to consumer data should play in our definition of digital discrimination of access analysis. We address each of those considerations in turn.

60. *Interpretation of "equal access."* Commenters urge us to interpret "equal access" to require a showing of intent. Given that "equal access" is defined by statute, is inherently "results based," and is coupled with other operative terms that are "results based," we must reject each of these proposals. Some commenters argue that the intent legal standard should apply specifically to digital discrimination of access claims that pertain to the characteristics of particular technologies. We find no basis for adopting different legal standards for specific technologies because the rules we adopt today are sufficiently flexible to accommodate all technologies through which broadband internet access service is provided. Certainly, requiring any showing of intent would conflict with our reasoned interpretation of the statutory text and purpose. Commenters disagree as to whether language in recent telecommunications laws explicitly referencing intent is relevant. Given the disagreement on the record and that section 60506's statutory text authorizes a legal standard showing for discriminatory effect, we are not persuaded that we should adopt an intent-only legal standard. We likewise decline the City of Long Beach's suggestion that we "should seek to achieve and facilitate *equitable* access[ ] rather than equal access," because that interpretation would directly conflict with the Statement of Policy. We also reject TechFreedom's proposal to give a fluid meaning to "equal access" that would vary from the definition in the statute. In particular, TechFreedom argues that the word "access" in section 60506(b)(1) "has a purely technical meaning: it is the technological 'capability to transmit [. . .] and receive data' enjoyed by the user." We disagree. Because "preventing digital discrimination of access" is included within the broader mandate of rules to "facilitate equal access," the word "access" in the phrase "preventing digital discrimination of access"

incorporates the statutory definition of "equal access." Congress defined "equal access" as "the equal opportunity to subscribe" to broadband. Thus, "digital discrimination of access" is best understood as referring to discrimination in the "opportunity to subscribe." For those same reasons, we also disagree with commenters who argue that section 60506's operative text does not contain results-oriented language. As the term "equal access" is expressly defined in section 60506(a)(2) and "access" as used in section 60506 (b)(1) is a derivative of that definition, we find no basis or authority to deviate from the statutory text. Some commenters request that we give "digital discrimination" and "digital discrimination of access" the same meaning, or define only the term "digital discrimination" We decline to do so. We define and give meaning to "digital discrimination of access" because Congress charged the Commission with adopting rules that "prevent[ ] digital discrimination of access" in subsection (b), and defining that term in our rules better aligns with our mandate to "facilitate equal access" in this proceeding.

61. We also disagree with Lincoln Network's argument that the statute's reference to an "opportunity" to subscribe requires a disparate treatment standard. This interpretation ignores that a consumer's "opportunity" to subscribe could be impeded by policies and practices having discriminatory effects even where discriminatory intent is absent. Consequently, limiting our definition to conduct motivated by discriminatory intent would not fully accomplish our mandate from Congress to facilitate equal access to broadband service and prevent discrimination on the listed bases.

62. *Interpretation of legal standards.* We disagree with commenters who argue that the terms of section 60506 do not support including disparate impact in our definition of digital discrimination of access. AT&T argues that the phrase "to facilitate equal access" speaks only to the Commission's broader obligations to incentivize broadband deployment and does not support using disparate impact analysis to reach that objective. CTIA argues that Congress would not have used the term "facilitate" "if it intended for the Commission to create a burdensome liability and enforcement regime." As explained herein, the statutory text, context, and purposes of the Infrastructure Act and section 60506 make clear that Congress intended that our rules addressing digital discrimination of access reach not only

discriminatory treatment, but also policies and practices having discriminatory effect. By commenters' own admission, there is little to no evidence of intentional digital discrimination of access. The Commission is obligated to adhere to Congress's mandate and adopt rules that address the problems that do exist rather than those that do not.

63. *Legislative History.* Commenters argue that the sparse legislative history of section 60506 and/or the absence of a specific mention of disparate impact in the legislative history forecloses inclusion of a disparate impact liability standard. We disagree. As explained by this *Report and Order,* we conclude that the text, context, and purpose of the statute clearly authorize that liability standard. USTelecom argues, however, that Title VII of the Civil Rights Act, the FHA, and the ADEA were all grounded in a congressional record of ''specific, historic discrimination that the statute was designed to remedy and prevent'' and that history of discrimination in the legislative history supported a disparate impact liability standard. While the legislative history of section 60506 is not as robust as that of Title VII, the ADEA, and the FHA, the Supreme Court has made clear that even ''silence in the legislative history . . . cannot defeat the better reading of the text and statutory context. . . . If the text is clear, it needs no repetition in the legislative history; and if the text is ambiguous, silence in the legislative history cannot lend any clarity.'' As to section 60506, the text, statutory context, and purpose is clear. The statute's text and purpose, to promote equal access to broadband internet, fully authorize including a disparate impact liability standard for enforcing our prohibition against digital discrimination of access. Some commenters argue that our reading of section 60506 is foreclosed because disparate-impact liability would enable the Commission to regulate the rates of broadband internet access service providers, ''impose requirements to build-out service, and more.'' But the ''new regime of unfunded mandates and price regulation'' that these commenters posit has no foundation in the rules we adopt herein. We also note our agreement with the Lawyers' Committee that the major questions doctrine has no application to our implementation of section 60506.

64. *Profitability Considerations.* We additionally decline the suggestion in the policy paper submitted by the Americans For Tax Reform and Digital Liberty that we define digital discrimination of access ''[as] when differences in the deployment of and/or the quality, terms, and conditions of access to broadband services are not explained by differences in the profitability of serving the different areas, but instead reflect non-economic decisions to underserve protected classes in a manner that causes adverse or negative consequences.'' This definition would limit the Commission to considering ''profitability'' rather than ''issues of technical and economic feasibility,'' and would appear to place primary weight on economic rather than technical considerations. Our adopted rule properly includes both technical and economic considerations, as explained in this *Report and Order.*

65. *Data Access.* The LGBT Technology Partnership proposes that we adopt a definition of digital discrimination of access that encompasses data access concerns and issues pertaining to personal data that is processed by an algorithm. We decline to include that within the scope of our covered services. By LGBT Technology Partnership's own admission, section 60506 is ''not directly related to how emerging technologies like algorithms facilitate greater precision of structural discrimination.'' However, to the extent that such privacy- and data-related practices can be shown to differentially affect consumer access to broadband service on one or more of the listed bases, those practices might fall within the scope of our definition.

### Technical and Economic Feasibility

66. Section 60506 twice references technical and economic feasibility. First, as noted above, Congress declared in section 60506(a)(1) the ''policy of the United States that, *insofar as technically and economically feasible* . . . subscribers should benefit from equal access to broadband internet access service within the service area of a provider of such service . . . .'' And in section 60506(b), Congress directed the Commission to ''adopt final rules to facilitate equal access to broadband internet access service, *taking into account the issues of technical and economic feasibility presented by that objective* . . . .''

67. These references are clear indicators that full achievement of the ''equal access'' and ''equal opportunity'' goals of the statute might, in some instances, be limited by genuine technical or economic constraints. If the technology does not yet exist to provide a particular broadband internet access service to a particular geographic area, or the technology to provide the service does exist but utilizing it to reach the area in question would be prohibitively expensive, the failure to provide that specific service to that specific area would be explained by genuine technical or economic constraints. In order to account for these types of circumstances, in our December 2022 *NPRM,* we proposed to define the term ''digital discrimination of access'' in section 60506(b)(1) such that any Commission determination that prohibited discrimination has occurred must be preceded by analysis of whether the policy or practice in question was ''justified by genuine issues of technical or economic feasibility.'' Having adopted a definition of ''digital discrimination of access'' that includes a specific carve out for conduct found to be so justified, we now adopt definitions for the terms ''technically feasible'' and ''economically feasible'' in the context of section 60506 and we explain how the Commission will evaluate ''genuine issues of technical or economic feasibility'' under our rules. We agree with commenters that our application of these concepts is critical to the successful implementation of section 60506.

### Technical and Economic Feasibility Are Fundamental Components of Digital Discrimination of Access

68. We first find that including the carve out for technical and economic feasibility in our definition of ''digital discrimination of access'' is the soundest, most straightforward, and most effective means of satisfying our statutory responsibility to facilitate equal access while ''taking into account the issues of technical and economic feasibility presented by that objective.'' We disagree with those commenters that suggest we omit the carve out language or argue that it should only be considered as an affirmative defense if the Commission were to create a structured complaint process to receive allegations of digital discrimination of access. We are also not persuaded by the argument that feasibility should not be included in our definition because it is not included in subsections (b)(1), (d), or (e). The proffered construction misreads subsection (b), which places feasibility concerns squarely within each of the tasks assigned to the Commission under that subsection. We similarly decline USTelecom and WISPA's request that we omit the word ''genuine'' from the carve out. The record reflects widespread concern that naked assertions of technical or economic infeasibility could become a loophole to complying with our digital discrimination of access rules such that they would not actually ''facilitate equal access to broadband'' as Congress intended. We include the word

''genuine'' in our definition of digital discrimination of access to convey that bare assertions and justifications created after the fact will not suffice to prove that a business practice falls within the carve out and is therefore exempt from liability.

*Consideration of Technical and Economic Feasibility Supports a Disparate Impact Approach*

69. We further find that Congress's directive in section 60506(b) that we take into account issues of technical and economic feasibility supports including a disparate impact approach in our definition of ''digital discrimination of access'' and fits neatly into the framework of disparate impact analysis. Under traditional disparate impact analysis, once a policy or practice is shown to have a meaningful adverse impact on a protected group, the covered entity may affirmatively produce evidence that the challenged policy or practice is justified by a substantial, legitimate business interest. If the covered entity does so, it may still be liable if there is a less discriminatory alternative to the challenged policy or practice. Congress's directive that the Commission take into account issues of technical and economic feasibility represents a formulation of this traditional test as tailored to the specific context of section 60506 and the issues it aims to address. As further discussed above in the disparate impact paragraphs and below in the enforcement-related paragraphs, a covered entity in a Commission investigation under section 60506 will likewise have the opportunity to show that the policy or practice under scrutiny is justified by genuine technical or economic constraints. And as part of the Commission's consideration of these issues, a covered entity will be allowed to present for the Commission's review any legitimate business impediment to the use of less discriminatory alternatives. We find that the feasibility provision is largely superfluous to intentional discrimination of access, and that when Congress directed the Commission to be mindful of technical and economic considerations, its objective was to ensure that covered entities in any investigation the Commission conducts under our rules to prevent digital discrimination of access would have an opportunity to explain and justify their conduct.

70. We disagree with commenters asserting that the technical and economic feasibility language in section 60506 does not support inclusion of disparate impact in our definition of

digital discrimination of access. These commenters fail to explain why consideration of technical and economic feasibility makes sense only in the context of disparate treatment claims or why it makes more sense in the context of disparate treatment claims than in the context of disparate impact claims.

71. We are also not persuaded by AT&T's argument that Congress's contemplation of technical and economic justifications for challenged practices does not support an inference that Congress intended to capture cases of disparate impact. AT&T argues that section 60506's feasibility provision has ''independent significance even if Congress intended the Commission to address only intentional discrimination'' because ''income levels are routinely used [ ] as a basis for business decisions in a wide variety of [] industries.'' But as the Lawyers' Committee for Civil Rights Under Law notes, ''there is still no scenario in which intentional discrimination on the basis of income level—or any other protected characteristic—could ever be justified by technical feasibility.'' We find that AT&T's reading ''is thus at odds with one of the most basic interpretive canons, that '[a] statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant . . . .' '' And, as we have stated elsewhere, there is little or no evidence in the legislative history or in the record of this proceeding that intentional discrimination on *any* basis by industry participants contributes meaningfully to the digital divide in this country. AT&T also argues that the feasibility provision does not support the existence of disparate-impact liability under section 60506 because it ''applies to the broader mandate to the Commission to 'facilitate equal access' and is not restricted only to the narrower included 'discrimination' provision.'' In response, Lawyers' Committee for Civil Rights Under Law argues that, ''the feasibility qualifier must also apply to [(b)(1)] providing specific instructions on how the Commission needs to execute that preamble. AT&T does not explain how the 'preventing discrimination' provision—if interpreted to cover only intentional discrimination—would 'tak[e] into account technical and economic feasibility.' ''

*Definitions of ''Technically Feasible'' and ''Economically Feasible''*

72. As discussed in more detail below, we adopt clear definitions of the terms ''technically feasible'' and ''economically feasible'' based on the

record in this proceeding and Commission precedent; and, we explain how the Commission will assess issues of technical or economic feasibility under section 60506(b). We interpret section 60506(b)'s reference to ''issues of technical and economic feasibility'' to mean issues of ''technical feasibility'' on the one hand, and issues of ''economic feasibility'' on the other. We understand subsection (a)'s use of ''technically and economically feasible'' and subsection (b)'s use of ''technical and economic feasibility'' to reference the same concepts. We define a ''technically feasible'' policy or practice to mean one that is ''reasonably achievable as evidenced by prior success by covered entities under similar circumstances or demonstrated technological advances clearly indicating that the policy or practice in question may reasonably be adopted, implemented, and utilized.'' Similarly, we define an ''economically feasible'' policy or practice to mean a policy or practice that is ''reasonably achievable as evidenced by prior success by covered entities under similar circumstances or demonstrated new economic conditions clearly indicating that the policy or practice in question may reasonably be adopted, implemented, and utilized.''

73. In the *NPRM,* we sought comment on how to define and incorporate into our rules the concepts of technical and economic feasibility as they are used in section 60506. We asked detailed questions on the merits and mechanisms of adopting various approaches, including safe harbors, case-by-case analyses, or a combination thereof. Because neither the statute nor the legislative history contain definitions of these terms, the Commission must adopt an interpretation that, taken in the context of the statute as a whole, best effectuates the goal of section 60506. Based on this touchstone, the record we received in response to the *NPRM,* and Commission precedent, we adopt definitions of these terms that balance the goal of facilitating equal access to broadband internet access services with the technical and economic challenges facing covered entities as they work to expand and improve their networks in unserved and underserved communities.

74. *Commission and Legal Precedent.* We adopt definitions of ''technical feasibility'' and ''economic feasibility'' that are consistent with the Commission's precedent. The Commission has previously interpreted, individually or as a pair, the concepts of technical and economic feasibility in connection to its implementation of various statutes. While the

Commission's previous interpretations and applications of these terms have varied by context, these instances provide guidance for our implementation of section 60506. For example, the Commission has previously made determinations as to whether an activity was technically and economically feasible based on record support or lack thereof, adopted a rebuttable presumption of technical feasibility based on prior findings by a state commission, adopted a list of activity that is technically feasible, and established a process to analyze feasibility issues on a case-by-case basis. Furthermore, the Commission has closely scrutinized technical and economic feasibility issues, relied on industry past practice and success as key indicators of technical feasibility, and placed the burden on the entity asserting technical or economic infeasibility to prove the claim to the Commission's satisfaction.

75. Judicial case law also informs our definitions of technical and economic feasibility for section 60506 purposes. In 2002, the Supreme Court decided a challenge to the Commission's implementation of section 251 of the Communications Act that involved the Commission's interpretations of the statutory phrase ''technically feasible.'' Petitioners in that case argued that Commission rules requiring incumbent carriers to combine unbundled network elements where ''technically feasible'' was unreasonable and in conflict with the statutory language. In upholding the Commission's rules, the Court rejected the petitioners' argument that the rules imposed no reasonable limits on the requirement to combine network elements. Rather, the Court held that the Commission's definition of ''technically feasible'' provided real limits on what would be required of incumbent local exchange carriers, concluding that ''[i]f 'technically feasible' meant what is merely possible, it would have been no limitation at all.'' The Court's ruling, albeit in a different context, instructs that we should be skeptical of arguments suggesting that technical and economic feasibility are concepts operating at the margins of what is technical and economically *convenient* on the one hand, or what is technically and economically *possible* on the other.

76. *Technical Feasibility.* Taking into account long-standing Commission precedent, we define a ''technically feasible'' policy or practice as one that is ''reasonably achievable as evidenced by prior success by covered entities under similar circumstances or demonstrated technological advances clearly indicating that the policy or

practice in question may reasonably be adopted, implemented, and utilized.'' We use the Commission's definition of ''technically feasible'' from § 54.5 of the Commission's rules as a starting point. When implementing the interconnection provisions of the 1996 Act, the Commission similarly leveraged prior successful practice to identify and define technical feasibility. In that context, the Commission adopted rules that established previous points of interconnection or methods of access to unbundled network elements as ''substantial evidence'' that analogous points or methods are technically feasible. In the context of section 60506, a policy or practice will be considered technically feasible if it is reasonably achievable, as evidenced by prior success under similar circumstances. Moreover, because technological advances might provide ready means of achieving successful outcomes that have not occurred in the past, we will allow for the possibility that technical feasibility may be shown by ''demonstrated technological advances clearly indicating the reasonable achievability'' of the policy or practice in question.

77. *Economic Feasibility.* We define an ''economically feasible'' policy or practice to mean one that is ''reasonably achievable as evidenced by prior success by covered entities under similar circumstances or demonstrated new economic conditions clearly indicating that the policy or practice in question may reasonably be adopted, implemented, and utilized.'' We again use the language of the Commission's definition of ''technically feasible'' in § 54.5 as a baseline because anchoring economic feasibility in past industry practice will provide guidance to allow all interested stakeholders to gauge what is or is not economically feasible. Factors for analyzing economic feasibility of a policy or practice include, but are not limited to, projected income, projected expenses, net income, expected return on investment, competition, cash flow, market trends, and working capital requirements, and the standards under which such calculations are determined. A policy or practice will be considered economically feasible if relevant economic variables fall within acceptable ranges based on past industry practice. Determining economic feasibility thus requires a comparative analysis that accounts for past and present industry practices and new economic conditions that might, in some circumstances, require variances from such historical ranges.

78. Our definitions of ''technically feasible'' and ''economically feasible'' join previous Commission interpretations of these terms with several important attributes specific to the present context. As a baseline, we interpret the categories of ''technical'' and ''economic'' feasibility broadly to encompass any legitimate business impediment to achievement of equal access. In addition to using prior successful policies and practices as the foundation for determining what is technically or economically feasible, we design our definitions to flexibly encompass future policies and practices and the inherent differences in the operation of covered entities of varying sizes and technologies. We also take a measured approach that considers the real burdens industry participants face in deploying and providing service, while also ensuring that we do not create ''a loophole that renders the rules meaningless.'' And lastly, we make clear that issues of technical and economic feasibility are related but ultimately distinct from each other.

79. We take a measured approach to defining these terms, providing guideposts for understanding what is technically or economically feasible today and what could be feasible in the future. We emphasize that we do not define technical and economic feasibility as simple deference to a single entity's judgment, as many industry commenters argue we should. We agree with those commenters asserting that Congress did not adopt section 60506 to enshrine the current industry status quo. When considering what is technically or economically feasible, we expect covered entities to consider more than just what is the most convenient. For example, the Commission found in other contexts that the novelty or costliness of a particular business path does not, in itself, answer the question of whether that path is feasible, nor does the difficulty of a change in product design. At the same time, we do not create an ''impossibility'' standard as some commenters have warned against, which would define any action as technically or economically feasible unless it was impossible. Like the Commission's approach to defining ''technically feasible'' in the *First Local Competition Order,* 61 FR 45476, the definitions we adopt today include reasonable limitations on what is considered technically or economically feasible and do not represent any attempt to ''control'' covered entities' investment decisions. Complying with the rules we adopt today does not

displace the ability of industry participants to make ''practical business choices and profit-related decisions.'' Rather, they are designed to ensure that industry participants incorporate into their decision-making processes consideration of the potential discriminatory impacts of their policies and practices, and that they seek to minimize any such discriminatory impacts.

80. We acknowledge that the technical and economic challenges that covered entities face in deploying and serving rural, Tribal, and urban areas can vary greatly. At the same time, we agree with Public Knowledge et al. that ''broadband deployment may still be feasible in areas even where there are no similar circumstances to use as a benchmark,'' and if feasibility ''was limited to circumstances where there is a direct analog, certain areas that have gone long underserved due to unique characteristics might continue to fall through the cracks.'' Thus, we intend for our approach to technical and economic feasibility to encompass new, but analogous, policies and practices to account for variations among covered entity types and industry advancement. The Commission has previously crafted a definition of technical feasibility to outlast current technological development in the context of certain unbundling obligations for incumbent local exchange providers. Under those rules, the Commission adopted a rebuttable presumption that once one state had determined an approach was technically feasible, the same approach would be presumed to be technically feasible for incumbent local exchange carriers in every state. We decline at this time to adopt a presumption of feasibility, and therefore do not take the precise approach taken by the Commission in 1999. But we do find that we are similarly defining our concepts of technical and economic feasibility to allow for consideration of technical, infrastructure, economic, or other developments in the area under review. We also decline at this time to adopt any explicitly different standard for evaluating claims of economic feasibility for existing service offerings versus new deployments.

81. While our definitions of technical and economic feasibility mirror each other, and in certain respects might be related, we consider each to be a distinct concept. The Commission has taken this approach previously, and commenters urge us to adopt the same approach here. We agree that a policy or practice may be technically feasible but not economically feasible, and vice versa.

82. *Standard.* At this time, we find that a case-by-case approach provides the Commission needed flexibility to evaluate issues of technical and economic feasibility. In the *NPRM,* the Commission sought comment on whether we should assess infeasibility claims on a case-by-case basis, adopt safe harbors, or take a combination of the two. In response, commenters voiced support for each of these approaches, as well as urging the Commission to adopt blanket presumptions of feasibility as opposed to a case-by-case review. We understand the arguments in favor of the adoption of one or more safe harbors to promote regulatory certainty and reduce the regulatory burden on providers, as well as arguments favoring a list of *per se* feasible methods of providing broadband internet access service or presumptions of feasibility in all or certain instances to increase compliance. The Commission has in the past adopted rules taking each of these approaches. Based on the record and information we have today, however, we find it is premature to incorporate safe harbors or feasibility presumptions into our definitions of technical and economic feasibility. In this connection, we defer any further decisions regarding the adoption of one or more safe harbors until we have developed experience on how they would operate in practice. As explained in more detail below, we do adopt a presumption of compliance from enforcement action that we find will lower the compliance burden for covered entities without compromising consumer protection. Thus, at this juncture, we will evaluate issues of technical or economic feasibility on a case-by-case basis so as to deter violations of our rules while allowing those issues to be fully explained to and considered by the Commission.

83. We also design our case-by-case approach to flexibly account for the differences between covered entities of varying sizes, technologies, and circumstances. We agree with those commenters, like Competitive Carriers Association, who encourage us to take a ''a practical and flexible approach that encourages innovation and investment to close the digital divide.'' Therefore, we decline at this time to adopt distinct standards or definitions for different types of covered entities. We find that our adopted definitions will allow the Commission to consider what is reasonably achievable for the particular entity under investigation. Moreover, as the Commission has found previously, legal or regulatory constraints can also

be considered when determining technical feasibility.

84. Furthermore, we find that when the Commission conducts an investigation under the enforcement process described below, the entity under investigation will have the burden of proving to the Commission that the policy or practice in question is justified by genuine issues of technical or economic feasibility. The Commission has commonly taken this approach in previous approaches analyzing ''technical feasibility,'' as well as regarding satellite carriers claiming ''technical or economic infeasibility'' in the market modification context. In the context of section 60506, we find that assigning this burden to the entity under investigation is inherent in the structure of our definition of ''digital discrimination of access.'' We find, as the Commission has previously, that as a practical matter, it is the entity providing the justifications for its policies and practices that has access to the necessary information to support their factual assertions. And, as we have previously stated, those justifications will usually involve arguments and evidence that technical or economic constraints limit the availability of less discriminatory alternatives.

85. Finally, we emphasize that the Commission will closely scrutinize claims of technical or economic feasibility through review of documentation submitted by the entity under investigation, publicly available reports and other information, interviews and depositions of relevant personnel, and other available information. Under the Commission's market modification rules, the Commission created a process for satellite carriers to claim an inability to broadcast in certain locations due to technical and economic feasibility. In practice, the Commission's Media Bureau closely scrutinizes satellite carriers' infeasibility claims under § 76.59 of the Commission's rules. Similarly, in the context of our section 60506 rules, the Commission will not defer to the entity seeking to justify policies and practices alleged to be discriminatory. We will require proof by a preponderance of the evidence that the policy or practice in question is justified by genuine issues of technical or economic feasibility. Stated differently, a covered entity can demonstrate that a policy or practice is justified by genuine issues of technical or economic feasibility by showing that less discriminatory alternatives are not reasonably available and achievable because of genuine technical or economic constraints.

**Prohibition of Digital Discrimination of Access**

86. Today we adopt a rule broadly and directly prohibiting ''digital discrimination of access'' as we have now defined it. Our prohibition thus forbids both intentionally discriminatory conduct (that is, applies a disparate treatment standard) as well as conduct that produces discriminatory effects (that is, applies a disparate impact standard). This approach does not supplant, but rather supplements the Commission's past and ongoing efforts to facilitate broadband access through affirmative approaches.

87. At this time, we find that this broad prohibition and the enforcement mechanisms described below are the most cost-effective means to accomplish Congress's stated objectives in section 60506. Prohibiting discrimination in access to broadband service is necessary to facilitate equal access to broadband and prevent digital discrimination of access, and both of these goals are required by the statute. In that same vein, unequal access to broadband service imposes significant costs on unserved and underserved communities, and on the Nation as a whole. The voluntary informal complaint process described below is a low-cost approach toward meeting the statutory requirement that leverages existing Commission systems. Similarly, enforcement of the broad prohibition through self-initiated investigations affords the Commission ample flexibility without substantially overhauling the enforcement process. Such low-cost approaches will allow the Commission to enforce the statute in a cost-effective manner, while bringing the undeniable benefits of expanded broadband access. Lastly, our rules are designed to minimize the compliance- and other-related costs they will likely impose on broadband providers and the other entities our prohibition covers.

88. Fundamentally, a policy or practice will violate our prohibition on digital discrimination of access if it discriminates, either by intent or in effect, based on one of section 60506's listed characteristics. In determining whether a policy or practice violates the prohibition we adopt today, the Commission will look first to whether the policy or practice in question differentially affects access to broadband service or is intended to do so. If that question is answered in the affirmative, the Commission will review any issues of technical or economic feasibility that may compel use of the challenged policy or practice rather than a less discriminatory policy or practice.

In other words, the rules we adopt today require assessment in the first instance of whether a policy or practice is discriminatory; and if so, whether there were reasonably available and achievable alternatives (*i.e.,* alternatives that were technically and economically feasible) that would have been less discriminatory.

89. We disagree with commenters asserting that section 60506 does not authorize a prohibition on private conduct. These commenters variously claim that section 60506, as part of the Infrastructure Act, only obligates the Commission to undertake affirmative-based efforts, *e.g.,* by funding the expansion of covered entities' broadband footprints or by promoting digital skill building and adoption of broadband by consumers through other initiatives outside this proceeding. Congress did not specify the means by which the Commission should fulfill its obligations under section 60506. As explained above, we conclude that the statutory language authorizes the Commission to address and combat both intentional discrimination and disparate impacts. The U.S. Chamber of Commerce contends that the Commission's adoption of ''new civil-rights legislation wholesale, including authorization of unfunded deployment mandates or rate regulation,'' would constitute a violation of the nondelegation doctrine. However, our prohibition today—a narrower action than that complained about—simply fulfills the task Congress, using clear language directing the Commission to prevent digital discrimination of access, gave us to perform. Adoption of these rules does not require an impermissible assumption of Congress's legislative powers; it only exercises the authority the Infrastructure Act conferred under the guidance provided in that statute. A prohibition of the kind we adopt today proves necessary to effectuate this charge. It does so by deterring discrimination in the first instance (thereby ''preventing'' its occurrence) while also enabling the Commission to target behaviors that affirmative-based approaches alone may be insufficient to change.

90. We also disagree with commenters arguing that a broad prohibition against digital discrimination of access will fundamentally transform the current regulatory landscape. As we explain below, our approach, which implements the directive in section 60506, involves self-initiated investigations. Such investigations may be premised on information submitted by the public, communications with state, local, or Tribal officials, or through outreach via

other channels. However, we note that a complaint or allegation alone does not necessarily warrant an enforcement response from the Commission, thus ameliorating any such concerns raised by some commenters. Our prohibition— consistent with the Commission's nondiscrimination requirements associated with its ongoing efforts to promote broadband access—and the enforcement methods we outline below represent an important, yet incremental, step in furthering the Commission's and Congress's digital equity goals.

*Scope of Prohibition*

Covered Entities

91. We find that the digital discrimination of access rules we adopt today shall apply to entities that provide, facilitate and affect consumer access to broadband internet service. Covered entities include, but are not limited to, broadband providers as defined in rule 54.1600(b), contractors retained by, or entities working through partnership agreements or other business arrangements with, broadband internet access service providers; entities facilitating or involved in the provision of broadband internet access service; entities maintaining and upgrading network infrastructure; and entities that otherwise affect consumer access to broadband internet access service as further discussed below. In the *Notice of Inquiry,* we sought comment on *whose* ''policies or practices . . . that differentially impact consumers' access to broadband internet access service'' should be covered by our definition of digital discrimination of access. We also sought comment on whether we should understand digital discrimination of access to include policies or practices by a broader range of entities than broadband providers. To achieve the policy that ''subscribers should benefit from equal access to broadband internet access service,'' and fulfill Congress's directive that the Commission ''facilitate equal access to broadband internet access service,'' we have determined that the rules must include not only broadband providers, but also other entities that provide services that facilitate and affect consumer access. The record supports this determination. We thus find that there are a range of entities that facilitate and can affect consumer access to broadband. Therefore, we find that our rules and, in particular, our prohibition against digital discrimination of access, extend not only to broadband providers, but also to entities that provide services that facilitate and meaningfully affect

consumer access to broadband internet access service.

92. Numerous commenters agree that broadband providers are not the only entities that should be subject to these rules. To be sure, other platforms and organizations affect consumer access to broadband internet access service. For example, Lawyers' Committee for Civil Rights Under Law argues that section 60506 prohibits interference with equal access to broadband by any type of entity because guaranteeing equal access to broadband for all individuals requires applying the statute to any entity that can affect the ability of an individual to access the service, not just those entities that provide connectivity. And as TURN states, as technology evolves, the Commission's rules must be able to address future technological evolutions that may affect or interfere with broadband internet access. Lastly, National Digital Inclusion Alliance and Common Sense Media urge us to apply our rules to any entity—subsidiary, parent company, or other—that provides broadband internet access service.

93. We disagree with arguments that our authority under 60506(b) extends only to providers of broadband internet access service because "only a service provider, and not some other class of entity, can 'offer' a 'service'." As explained below, we believe the definition of "equal access" in section 60506(a), which applies both to section 60506(b)'s mandate that we facilitate equal access and that we prevent digital discrimination of *access,* focuses on consumers' opportunity to receive and effectively utilize an offered service. Conduct by entities other than broadband providers might impede equal access to broadband internet access service on the bases specified in the statute. For example, the Lawyers' Committee for Civil Rights Under Law provides several examples of how entities may impact consumer access based on protected characteristics, including a landlord restricting broadband options within a building even if multiple providers are available. While we reach no conclusion whether this, or other specific examples in the record would be covered by our rules, we are persuaded that there could be situations—now or in the future—in which non-providers could impede equal access to broadband internet access service based on the listed characteristics. Moreover, while we are not explicitly tasked with regulating entities outside the communications industry, section 60506 does require us to facilitate equal access to broadband by "preventing" and identifying steps necessary to "eliminate" digital discrimination of access. Thus, to the extent that entities outside the communications industry provide services that facilitate and affect consumer access to broadband, they may be in violation of our rules if their policies and practices impede equal access to broadband internet access service as specified in the rules. To the extent that such entities have policies or practices that differentially impact consumers' access to broadband internet access service, we will consider, among other things, the closeness of the relationship between that entity's policies and practices and the provision of broadband service. By way of example, the U.S. Supreme Court long ago upheld the Commission's exercise of jurisdiction over prohibited surcharges imposed by hotels and apartment owners based on arrangements they made with the telephone company, and where the practice was "so identified" with the communications service that it was brought within the prohibition. We also note that section 411(a) provides as follows: "In any proceeding for the enforcement of the provisions of this Act, . . . it shall be lawful to include as parties, in addition to the carrier, all persons interested in or affected by the charge, regulation, or practices under consideration, and inquiries, investigations, orders, and decrees may be made with reference to and against such additional parties in the same manner, to the same extent, and subject to the same provisions as are or shall be authorized by law with respect to carriers."

94. Lastly, we acknowledge that commenters disagree on whether to include infrastructure owners and local governments within the scope of our rules, but we decline to expressly carve out specified entities from the scope of coverage at this time. City of Philadelphia, City of Oklahoma, City of Minneapolis, etc. (Local Governments) argue that not considering infrastructure owners as providers of broadband services subject to our digital discrimination of access rules would allow broadband providers to outsource their deployments to third parties to avoid our equal access rules. WIA disagrees with Local Governments in their assertion that infrastructure owners should be covered by the rules on digital discrimination of access, arguing that doing so would unlawfully expand the Commission's jurisdiction. Additionally, Local Governments request that we not categorize local governments as "covered entities" based on their roles as right-of-way managers or franchise regulators. While there may be tension in the record as to the role these entities play, our rule is clear that any entity that meaningfully affects access to broadband internet service is subject to our digital discrimination of access rules.

Covered Consumers

95. The definition of digital discrimination of access adopted today includes "policies and practices . . . that differentially impact *consumers'* access to broadband internet access service . . . or are intended to have such differential impact." In the *NPRM,* we sought comment on the meaning of "consumers" and who would fall within the scope of this term. Commenters to the *NPRM* proposed various definitions. We today define "consumers" in this context to mean both current and potential subscribers, which includes individual persons, groups of persons, individual organizations, and groups of organizations having the capacity to subscribe to and receive broadband internet access service. We define "subscriber" as a current recipient of broadband internet access service as defined in § 8.1(b) of the Commission's rules.

96. Consistent with the purposes of section 60506, the term "consumers" as used in our adopted definition of digital discrimination of access comprises current subscribers and prospective subscribers of broadband internet access service. Our rules do not cover other types of broadband service, such as business data services or enterprise customer purchases. And, under this rule, individual or groups of persons, organizations, or businesses fall within the scope of the term "consumer." Covering both current and prospective subscribers is supported for several reasons. First, section 60506's Statement of Policy directs the Commission to "ensure that all people of the United States benefit from access to broadband." As the American Library Association observes, "[t]here are 'people of the United States' who are not subscribers because they experience digital discrimination that precludes them from becoming subscribers." The California Public Utilities Commission further observes that "one cannot count as a subscriber if broadband service is not offered to them in the first place." We agree. We would not be fulfilling our statutory mandate to facilitate equal access to broadband internet access service if we failed to include unenrolled or prospective subscribers as "consumers" under our rules. Second, limiting "consumers" to existing subscribers would do nothing to expand

broadband availability in unserved communities. By way of example, the Japanese American Citizens League expressed that a large number of small businesses in the historic San Francisco Japantown business district remain unconnected to the internet with reliable broadband access. If high-speed broadband service were unavailable in a particular geographic area because of discriminatory conduct, by definition there could be no subscribers in that area. And if the Commission's rules were limited to ensuring equal access by those already subscribing to a service, there would be nothing the Commission could do to investigate the reasons for this lack of access on the part of non-subscribers. Under the argument pressed by certain commenters, the Commission's rules would instead be confined to leveling service quality, pricing and other terms of service as between underserved communities and better-served communities. Such a limitation is not consistent with section 60506's overarching purpose to ''ensure that *all people* of the United States benefit from equal access to broadband internet access service.''

97. We therefore reject commenters' arguments that the ''consumers'' covered by our rules should be limited to subscribers. We disagree with NTCA's argument that the Commission's purview is limited to ''subscribers,'' referring to ''those who purchase service from the provider.'' The Commission cannot fulfill Congress's directive to facilitate equal access to broadband internet access service without being able to address the issues that limit the opportunity to subscribe in the first instance. We firmly believe Congress intended the rules implementing section 60506(b) to facilitate the expansion of access of broadband service by eliminating discrimination, not just the leveling of service quality and terms. Therefore, our rules for digital discrimination of access cover all consumers, including both current and prospective subscribers.

98. We also find that, for purposes of our definition of ''digital discrimination of access,'' the term ''consumers'' includes not only individuals, but also groups of persons, organizations, and businesses. We agree with National Digital Inclusion Alliance and Common Sense Media that digital discrimination of access can manifest differently when it affects a single person, as compared to a group of persons within a community, and either type of discrimination can violate the rules.

99. In the *NPRM,* we sought comment on whether there are practical or administrative costs and benefits to the Commission, industry and those who might suffer discrimination if both persons and organized groups of persons (such as community associations) are covered by our definition. As supported by the comments, we find no significant additional costs in defining ''consumers'' to include persons and organized groups of persons, as well as groups of organizations. As discussed in the informal complaints section below, we recognize that community associations and other organizations might well submit the majority of informal complaints relating to digital discrimination of access, and we have no concerns on that score.

Listed Characteristics

100. Congress identified six characteristics as bases for digital discrimination of access—income level, race, ethnicity, color, religion, and national origin. In the *NPRM,* we sought comment on whether we should expand our definition to include additional characteristics, such as disability status, age, sex, sexual orientation, gender identity and expression, familial status, domestic violence survivor status, homelessness, and English language proficiency. While some commenters argue we should expand the listed characteristics, others disagree.

101. Based on the language of the statute, we do not add to the listed characteristics of persons protected under the rules that serve as the bases for considering digital discrimination of access. Even though the statute affords protection against digital discrimination of access based on national origin, some commenters urge us to incorporate ''limited-English proficiency'' (LEP) as an express listed characteristic under the rules. It is well established, however, that discriminating against persons based on their limited-English proficiency can constitute a form of national origin discrimination. Federal agencies have interpreted Title VI's prohibition against national origin discrimination to require that LEP individuals have meaningful access to federally funded programs and activities. This same interpretation as to national origin discrimination has been given under the Fair Housing Act. Congress must be presumed to have deliberately limited the list of protected characteristics in section 60506(b) to income level, race, ethnicity, color, religion, and national origin. While we acknowledge the strong record support for extending the rule to cover persons with other characteristics, federal antidiscrimination laws often vary in terms of the protected classes they cover. For example, many commenters discussed the challenges faced by people with disabilities in securing access to high quality broadband services. For instance, Title VII of the Civil Rights Act protects against discrimination based on ''race, color, religion, sex, or national origin,'' whereas the FHA goes further and includes additional protections for ''disability and familial status.'' Here, Congress chose the six listed, protected characteristics and not others. This does not mean that the legitimate concerns of persons with these additional characteristics is to be minimized. To the contrary, the record is replete with evidence that classes beyond the six listed groups face varying broadband-related challenges. We have no discretion to overrule the choice made by Congress in this regard, at least as it applies to our rules implementing section 60506(b). Under section 60506(c)(3), the Commission and the Attorney General can seek to prohibit ''deployment discrimination'' based on factors other than those listed in that section, based on the record developed in this proceeding. Further, even if not covered by Section 60506(b), people with disabilities may avail themselves of other federal laws governing digital accessibility, such as the Americans with Disabilities Act of 1990 (ADA), the Rehabilitation Act of 1973, and the Twenty-First Century Communications and Video Accessibility Act of 2010 (CVAA).

102. Our work towards ensuring broadband access does not begin or end with this statute. We will continue to address access to broadband under other sources of authority. For example, we have established accessibility protections under other statutory grants that govern the ACP, ECF, and EBB programs. The ACP supports the purchase of broadband access services and connected devices, such as tablets and laptops, and requires them to be accessible. In the Emergency Connectivity Fund Report and Order, the Commission established an expectation that connected laptops be accessible to students, school staff, and library patrons with disabilities to address their remote learning needs. For these connected laptops, school districts have purchased accessibility features such as software providing screen magnification, screen reading functionalities, captioning services, and touchscreens for students with significant fine motor skills difficulties. As we move forward, we will continue to use all the tools at our disposal to ease the digital accessibility divide.

Covered Services

103. For purposes of these rules, we apply the same definition of "broadband internet access service" that appears in § 8.1(b) of the Commission's rules. That definition states: The term "broadband internet access service" means "a mass-market retail service by wire or radio that provides the capability to transmit data to and receive data from all or substantially all internet endpoints, including any capabilities that are incidental to and enable the operation of the communications service, but excluding dial-up internet access service. This term also encompasses any service that the Commission finds to be providing a functional equivalent of the service described in the previous sentence or that is used to evade the protections set forth in this part." We use the terms "broadband," "covered services," and "broadband internet access service" interchangeably.

104. In the *NPRM,* we sought comment on the scope of services that should be covered by our rules. We also specifically sought comment on whether the above-referenced definition of "broadband internet access service" fully captures the scope of technologies relevant to digital discrimination of access. In determining the scope of our definition of digital discrimination of access, we find that the term "broadband internet access service" in that definition has the same meaning given the term in § 8.1(b), and encompasses the range of services that may give rise to digital discrimination of access. In the proposed definition of "digital discrimination of access," the Commission sought comment on whether "covered services" should be limited to broadband internet access service. No commenter opposed using this definition of "broadband internet access service." We find that the straightforward and well-established definition best delineates the scope of covered services under the rules we adopt today.

105. Moreover, the record reflects strong support for adopting § 8.1(b)'s definition. As Local Governments notes, including all types of broadband providers is consistent with the *Restoring Internet Freedom Order,* 80 FR 19737, which found that the term "broadband internet access service" includes "services provided over any technology platform, including but not limited to wire, terrestrial wireless (including fixed and mobile wireless services using licensed or unlicensed spectrum), and satellite." Providers can use various forms of technology to provision broadband to consumers, including digital subscriber line (DSL), cable modem, fiber, fixed and mobile wireless, and satellite. By incorporating the established meaning of "broadband internet access service" in the definition of "digital discrimination of access," we ensure that our rules accurately reflect the scope of services that may give rise to instances of digital discrimination of access and thus fulfill the Congressional direction in section 60506 to facilitate equal access to broadband internet access service and prevent digital discrimination of access.

Covered Elements of Service

106. The rules we adopt today apply to any lack of comparability in service quality, as indicated by the metrics specifically listed in the statutory definition of "equal access" as well as any "other quality of service metrics in a given area," and to any lack of comparability in terms and conditions of service, including but not limited to price. We find this scope of coverage to be consistent with section 60506's statutory text and necessary to effectuate its purpose.

107. In broadly applying our rules to all relevant service quality metrics and all terms and conditions of service, we note that Congress directed the Commission to facilitate equal access to the entirety of broadband internet service, not to certain elements of such service. Congress defined "equal access" in section 60506's statement of policy to mean that consumers have "the equal opportunity to subscribe" to broadband internet access service with "comparable speeds, capacities, latency, and other quality of service metrics in a given area, for comparable terms and conditions[.]" As many commenters explain, the inclusion of "other quality of service metrics" and "comparable terms and conditions" in the definition of "equal access" reflects Congressional intent and authorization that the Commission's digital discrimination of access rules cover any aspect of broadband internet access service that impedes, impairs or denies "equal access" to that service.

108. The aspects of service that could affect a consumers' ability to receive and effectively utilize broadband internet access service include, but are not limited to, deployment, technical terms and conditions of service, such as policies and practices regarding speeds, capacities, latency, data caps; network infrastructure deployment, network reliability, network upgrades, network maintenance, customer-premises equipment, and installation; as well as non-technical terms and conditions of service, such as policies and practices regarding contractual terms generally, mandatory arbitration clauses, pricing, deposits, discounts, customer service, language options, credit checks, marketing or advertising, contract renewal, upgrades, account termination, transfers to another covered entity, and service suspension. Moreover, in order to fully effectuate the goals of section 60506, we find that our rules must cover both actions and omissions, whether recurring or a single instance, concerning these aspects of service, that defeat comparability of service quality, terms, and conditions.

109. We find that adopting a broad definition of covered elements of service is both consistent with the language of section 60506 and necessary to fulfill its purpose. First, by including the catch-all language "and other quality of service metrics in a given area," Congress expressly authorized the Commission to supplement the listed elements of service to include all measurable quality-of-service elements that could affect consumers' ability to receive and effectively utilize broadband internet access service. As the record reflects that policies and practices relating to an array of technical and non-technical aspects of service can affect a consumer's ability to access broadband, a definition with a narrower scope could lead to the Commission's rules failing to cover some aspects of service that result in digital discrimination of access. Consequently, we agree with Lawyers' Committee for Civil Rights Under Law that adopting a flexible approach is necessary "to capture the long tail of intangible variables that are difficult to list exhaustively and are subject to change." Second, our definition provides us with the advantage of flexibility, which will "future proof" our rules as technologies, policies, and practices change over time. For these reasons, we reject the argument that by including certain quality of service metrics in 60506(a)(2), Congress foreclosed consideration of other measurable elements of service quality in evaluating whether equal access has been achieved.

110. We reject arguments that we should limit the scope of covered elements of service to deployment practices or technical terms of service, or that we exclude certain terms, such as pricing. We are persuaded that Congress intended for the Commission's rules implementing section 60506(b) to cover more than deployment practices. As noted above, Congress directed the Commission in section 60506(b) to adopt rules to facilitate equal access to broadband internet access service,

including ''preventing digital discrimination of access'' and identifying necessary steps for the elimination of such discrimination. By contrast, in section 60506(c), Congress directed the Commission and the Attorney General to ensure that federal policies prohibit ''deployment discrimination'' based on the income level of an area, the predominant race or ethnicity of an area, or other factors the Commission determines to be relevant based on the record in this proceeding. Had Congress wished to limit the scope of section 60506(b) to ''deployment discrimination,'' it would have done so explicitly. The use of two different terms (''digital discrimination of access'' and ''deployment discrimination'') in adjacent subsections of a one-page section of the statute clearly indicates that Congress intended the two terms to have different meanings. Further, Congress was well aware that factors other than initial deployment of the necessary network infrastructure, such as network upgrades and maintenance at an absolute minimum, affect the ability of consumers to effectively utilize broadband internet access service. Given that the definition of ''equal access'' expressly includes ''quality of service metrics'' that are determined by such network upgrades and maintenance, we cannot accept that Congress intended to limit section 60506(b)'s reach to broadband deployment. Such an interpretation would defeat the purpose of the statute.

111. Finally, regarding the inclusion of pricing within the scope of our rules, we find that the statutory language encompasses discriminatory pricing. We emphasize that the rules we adopt today do not set rates for broadband internet access service and are not an attempt to institute rate regulation. Once again, section 60506(b) directs us to ''adopt final rules to facilitate equal access to broadband internet access service,'' and ''equal access'' is defined in section 60506(a)(2) as the equal opportunity to subscribe to an offered service that provides comparable quality of service ''*for comparable terms and conditions.*'' (emphasis added). We are unpersuaded by the arguments of commenters that pricing is not included (or includable) in the terms and conditions that must be ''comparable'' under the statutory definition of equal access. Indeed, pricing is often the most important term that consumers consider when purchasing goods and services across the Nation's economy. We find this is no less true with respect to broadband internet access service. Consequently, we do not believe it was necessary for

Congress to specifically reference pricing in the definition of ''equal access'' because the most natural reading of ''terms and conditions'' includes pricing. Moreover, it would be odd for Congress to direct the Commission to consider technical and economic feasibility and have our rules not allow any consideration of differential pricing when analyzing a digital discrimination of access claim. The Commission need not *prescribe* prices for broadband internet access service, as some commenters have cautioned against, in order to determine whether prices are ''comparable'' within the meaning of the equal access definition. The record reflects support for the Commission ensuring pricing consistency as between different groups of consumers. We also find that the Commission is well situated to analyze comparability in pricing, as we must already do so in other contexts. For example, we analyze the ''lowest corresponding price'' in the universal service context and conduct the Urban Rate Survey, both of which require comparing the prices that covered entities charge different groups of customers for broadband. We find that the ''terms and conditions'' covered by the ''equal access'' definition in section 60506(a) includes pricing terms and conditions, and that ''digital discrimination of access'' therefore includes discrimination with regard to such pricing.

112. We also reject Verizon's argument that our rules cannot apply to policies and practices that occur after a customer subscribes to broadband internet access service. Verizon argues that the definition of ''equal access'' limits the scope of our rules to policies and practices affecting only the ''opportunity to subscribe'' to broadband service *in the first instance.* In other words, Verizon argues that our rules can only address policies and practices concerning the consumer's ability to sign up for service (*i.e.,* contract formation), but cannot address whether the service is actually rendered on equal terms (*i.e.,* contract performance). We disagree with this interpretation. We acknowledge that the definition of ''equal access'' in section 60506(a) refers to the ''equal opportunity to *subscribe* to an offered service . . . .'' But we find the word ''subscribe'' in this context means more than simply signing up for service. It refers, instead, to the ability to receive and effectively utilize the service so as to allow full participation in the social, educational, political and economic life of our Nation. The Statement of Policy

in section 60506(a) says that ''subscribers should *benefit* from equal access to broadband internet access service'' and that ''the Commission should take steps to ensure that all people of the United States *benefit* from'' such equal access. There is little or no benefit to be derived simply from having the opportunity to sign up for broadband service if the covered entity can freely engage in discriminatory policies and practices with regard to the ongoing provision of that service. Rather, the potential social, educational, political and economic benefits flow from having the opportunity to receive the service and effectively utilize it. We find that interpreting section 60506 in the cramped manner urged by Verizon is flatly inconsistent with Congress's goal of expanding access to broadband internet access service. We therefore reject that interpretation.

*Revising Commission's Informal Consumer Complaint Process*

113. We adopt the proposals in the *NPRM* to revise our informal consumer complaint process to: (1) add a dedicated pathway for digital discrimination of access complaints; (2) collect voluntary demographic information from filers who submit digital discrimination of access complaints; and (3) establish a clear pathway for organizations to submit digital discrimination of access complaints. Subsection 60506(e) requires that the Commission ''revise its public complaint process to accept complaints from consumers or other members of the public that relate to digital discrimination.'' Currently, consumers use the Commission's Consumer Complaint Center to file informal complaints. The Commission's informal consumer complaint process, administered by the Consumer and Governmental Affairs Bureau, is a long-standing, free and efficient way for consumers to raise issues with their service providers and bring problems to the attention of the Commission. The FCC's informal consumer complaint process facilitates a conversation between the consumer and their provider to address the consumer's issues. The consumer complaint process does not involve arbitration, mediation, or investigation. The collective data received from informal consumer complaints help the Commission monitor what consumers are experiencing and inform our policy and enforcement work. In adopting our proposed changes to our informal consumer complaint process, we implement subsection 60506(e).

114. We agree with the majority of commenters who assert that consumers should have an easily accessible complaint process. Such a process will not only benefit consumers in filing complaints related to digital discrimination of access but will also assist the Commission in monitoring what consumers are experiencing, identifying trends, and informing potential policy determinations or enforcement. We note that the Commission's Consumer Complaint Center is responsive on mobile devices and that the FCC's call center is staffed by both English and Spanish speaking agents who can file complaints on behalf of consumers. Individuals who use videophones and are fluent in American Sign Language (ASL) may call the Commission's ASL Consumer Support line for assistance in ASL with filing informal complaints or obtaining consumer information. Consistent with our current process and procedures, consumers may also file complaints via the Consumer Inquiries and Complaint Center, as well as by fax and postal mail.

115. We thus disagree with commenters who argue that our proposed informal complaint process changes would impose undue burdens on covered entities. Our proposed changes do not alter the existing informal complaint process. Rather, our proposed changes make it easier for consumers to file informal complaints related to digital discrimination of access, as mandated by Congress, and allow the Commission to better analyze such complaint data. Indeed, Commission experience with the dedicated pathway for ACP complaints has demonstrated the utility of such a dedicated pathway.

116. We also disagree with the International Center for Law & Economics, which argues that the Commission should implement a legal ''standing'' requirement for filing informal complaints. The Commission's informal consumer complaint process is designed specifically to provide consumers with a simple and efficient way raise concerns and file complaints with the Commission without complicated legal procedures, filing fees, or other burdensome requirements. The Commission does not currently impose any standing requirements for filing informal consumer complaints. Adopting a standing requirement specifically for digital discrimination of access issues with the Commission would, in effect, thwart a consumer's ability to do so. Such an outcome would be contrary to the express language of section 60506.

*Dedicated Pathway for Digital Discrimination of Access Complaints*

117. We adopt our proposal to add a dedicated pathway for digital discrimination of access complaints. This dedicated pathway will provide digital discrimination informational content in the Consumer Complaint Center to educate consumers about digital discrimination and to provide clear instructions to consumers on how to correctly file a digital discrimination complaint. Consumers will be able to submit their digital discrimination of access complaints through the Consumer Inquiries and Complaint Center. They will be required to choose an issue that best describes their complaint and include a narrative with pertinent details. These complaints will be reviewed and processed. If the consumer submits a complaint alleging digital discrimination of access by a covered entity, the complaint will be forwarded to the appropriate covered entity for investigation and the Commission may set a due date for the covered entity to provide a written response to the informal complaint to the Commission, with a copy to the complainant. Complaint information will be reviewed internally to inform policy and shared internally, when appropriate, for potential enforcement. In addition, we note that the Commission's established administrative processes and procedures afford the Enforcement Bureau access to all consumer complaint data that is submitted through the Consumer Inquiries and Complaint Center. The record in this proceeding reflects widespread support for establishing such a pathway. We agree with commenters that adding a dedicated pathway will increase both the accessibility and efficiency of the complaint process. We direct the Consumer and Governmental Affairs Bureau to implement this dedicated pathway and, in coordination with the Wireline Competition Bureau, to monitor complaints submitted through this pathway to assist in the formulation of future policy and consumer education initiatives.

118. We also agree with those commenters who stress the need to educate consumers on the issue of digital discrimination of access and the complaint process associated with such complaints. We direct the Consumer and Governmental Affairs Bureau, in coordination with the Wireline Competition Bureau, to develop materials to educate consumers on digital discrimination of access and on how to file complaints via the dedicated pathway.

119. *Need for Dedicated Pathway.* We find that our informal consumer complaints process provides the best opportunity for consumers to inform the Commission of digital discrimination of access issues. The informal complaint process requires no complicated legal procedures, has no filing charge, and does not require the complaining party to appear before the Commission, making it an easy and efficient method for consumers to bring issues to the Commission's attention. The Commission reviews informal consumer complaints and, when applicable, will identify trends and share information internally in furtherance of our enforcement and consumer protection efforts. As the Commission takes seriously its enforcement obligations, we direct the Enforcement Bureau, in coordination with the Consumer Governmental Affairs Bureau and the Wireline Competition Bureau, to expeditiously investigate potential violations and enforce our rules using the Commission's traditional enforcement mechanisms.

*Voluntary Demographic Information Collection*

120. We adopt our proposal to collect voluntary demographic information from filers who submit digital discrimination of access complaints. We note that the statute requires the Commission to ''prevent[ ] digital discrimination of access based on income level, race, ethnicity, color, religion, or National origin[.]'' We find that collecting minimal, voluntary demographic information from individuals filing complaints may enable us to identify and understand some underlying patterns of digital discrimination of access that might not otherwise be apparent from the substance of the complaints, thus increasing the utility of the informal complaint process as it relates both to policy development and enforcement. We agree that this collection should be voluntary on the part of the complainant and direct the Consumer and Governmental Affairs Bureau to make clear that this information is not required in order to submit a digital discrimination of access complaint, that the provision of such information will not affect the submission or processing of the complaint, why this information is being collected, how it will be used, and how it will be maintained by the Commission. We note that the Commission's use and disclosure of such information will be subject to the applicable System of Records Notice

(SORN) governing our informal complaints system, which the Commission will modify, if necessary, based on this *Report and Order.*

121. We disagree with WISPA that providing demographic information should be mandatory. We are concerned that requiring this information may deter consumers from filing complaints. Because the purpose of our changes is to encourage consumers to file informal complaints when they believe our rules may have been violated, we find that the potential deterrence effect from requiring such information outweighs any potential benefit from making the provision of such information mandatory.

*Pathway for Organizations To Submit Digital Discrimination of Access Complaints*

122. We adopt our proposal to establish a clear pathway for organizations to submit digital discrimination of access complaints. We agree with commenters that allowing community partners and third-party organizations to file informal complaints on behalf of consumers (individuals or groups of individuals) will enable the Commission to better identify substantive complaints and collaborate with state, local and Tribal governments when addressing such complaints. We also agree with commenters such as the National League of Cities that allowing third parties to file on behalf of consumers will improve access to our informal complaint process for those with language barriers, limited digital skills, and/or limited access to devices or connectivity. Improving access to our informal complaint process serves both as an important safeguard for marginalized communities and as a means of ensuring that our complaint data is complete and accurate.

123. We disagree with commenters who suggest that third party filers should be subject to more burdensome procedural or evidentiary standards. We find that the benefits of promoting and enhancing access to our informal complaint process far outweigh the limited risks outlined by the commenters. We agree with Public Knowledge that one of our primary goals is to ''further enable marginalized communities to be represented through the complaint process'' and that ''to throw up additional barriers would undermine this goal.''

124. *Making Available Anonymized Complaint Data.* We adopt our proposal to make anonymized or otherwise de-identified complaint data available to the public. We direct the Consumer and

Governmental Affairs Bureau, in coordination with the Wireline Competition Bureau, the Office of Economics and Analytics, and the Office of General Counsel, to periodically make publicly available anonymized or otherwise de-identified digital discrimination of access complaint data. The record in this proceeding reflects widespread support for this proposal. We agree with commenters that such data would be useful to third parties in conducting research, advocacy, and reporting, and we find that these data can be released without compromising the privacy of individual complainants. We find that public release of anonymized or otherwise de-identified data would also promote transparency and empower third parties to assist the Commission in identifying trends in digital discrimination of access.

*Enforcement*

125. We find that effective implementation of section 60506 requires use of the Commission's traditional enforcement mechanisms to fulfill Congress's mandate that the Commission prevent and identify necessary steps to eliminate digital discrimination of access. This includes the full gamut of the Commission's enforcement toolkit, which ranges from letters of inquiry to remedial orders to forfeiture proceedings. Alleged or otherwise apparent instances of digital discrimination of access will be investigated on a self-initiated basis. This approach, which affords the Commission necessary flexibility for tackling Congress's directives, will involve data gathering via complaints and allegations made through the Commission's informal complaint process by state, local, and Tribal officials, and via other sources.

126. As explained above, a policy or practice will violate our prohibition on digital discrimination of access if it discriminates, either by intent or in effect, based on one of section 60506's listed characteristics. In examining policies and practices, the Commission will look to whether the policy or practice in question differentially affects access to broadband internet access service or is intended to do so. If yes, then the Commission will look to whether less discriminatory options were available. Thus, the rules we adopt today involve a twofold assessment: first, whether a policy or practice is discriminatory; and if so, whether there were reasonably available and achievable alternatives (*i.e.,* alternatives that were technically and economically

feasible) that would have been less discriminatory.

*Legal Authority*

127. In the *NPRM,* we sought comment on how the Commission should enforce any such rules we might adopt, including by use of our existing ''enforcement toolkit of letters of inquiry, notice of apparent liability, and forfeiture orders.'' We further sought comment on any limitations thereon, highlighting a dispute among commenters about the legal authority underlying the use of these enforcement mechanisms. We conclude that these same tools may be used to enforce the rules we adopt today pursuant to section 60506. Implementing the statute's directives necessitates use of these tools and processes, which will facilitate Congress's and the Commission's goal of facilitating equal access by preventing digital discrimination of access and identifying means to eliminate such discrimination.

128. We find that subsection (b)(1) and (e) under section 60506 provide the Commission express authority to enforce its mandates using the Commission's normal suite of enforcement mechanisms. Section 60506 directs the Commission to adopt final rules to ''prevent[ ] digital discrimination of access,'' and to ''identify[ ] necessary steps'' for eliminating such discrimination. Use of the words ''prevent'' and ''eliminate'' is unusual in the context of a federal anti-discrimination statute. Congress usually adopts a statutory prohibition on the types of discrimination it seeks to address, then tasks the relevant administrative agency with implementing the prohibition through agency rules. As discussed in prior sections of this Order, the words ''prevent'' and ''eliminate'' constitute strong medicine and represent a broad mandate for the Commission to take the necessary measures to fully eradicate digital discrimination of access. Moreover, a prohibition without enforcement cannot reasonably be expected to affect conduct in a meaningful way. Indeed, various commenters have identified the use of existing Commission enforcement mechanisms as necessary tools for ensuring compliance with our rules. Others contend that without the use of such tools, section 60506 could not function as Congress intended. Similarly, there would be little point for Congress to direct the Commission to accept complaints of digital discrimination of access if we lacked any of our traditional powers to act on them. The existing ''public complaints

process'' serves the agency's general authority to enforce the Communications Act, so we interpret the mandate in subsection (e) to reflect Congress's intent that the agency enforce digital discrimination complaints under the Act's general enforcement provisions.

129. However, some commenters argue that the Commission lacks authority, both under the Communications Act and section 60506, to enforce any rules prohibiting digital discrimination of access. They argue that because Congress did not expressly incorporate section 60506 into the Communications Act, any remedies or enforcement mechanisms found in the Communications Act are unavailable, and section 60506 does not authorize the use of such enforcement tools. AT&T, for example, argues that Congress's decision to ''keep [s]ection 60506 out of the Communications Act and to avoid cross-references between it and Title V'' reflects Congress's desire to make enforcement by traditional mechanisms unavailable. CTIA similarly observes that unlike other provisions of the Infrastructure Act, such as section 60502, Congress did not explicitly enable the Commission to ''impose forfeiture penalties under [s]ection 503 of the Communications Act'' in section 60506, rendering those tools unusable.

130. We disagree with those asserting that section 60506 does not authorize the use of the Commission's existing enforcement mechanisms. Congress's decision not to incorporate section 60506 into the Communications Act does not suggest that it contemplated only voluntary compliance with rules designed to ''prevent'' digital discrimination of access. Although some commenters argue that Congress implicitly or indirectly incorporated section 60506 into the Communications Act, we need not rely on such arguments to justify our approach. Rather, we agree with commenters asserting that section 60506, standing alone, authorizes the Commission to adopt or amend enforcement rules deemed necessary to facilitate equal access and prevent digital discrimination of access, including the use of the Commission's existing enforcement mechanisms.

131. As discussed above, section 60506 authorizes the Commission to incorporate both disparate treatment and disparate impact standards in its definition of digital discrimination of access and, consequently, to adopt rules prohibiting covered entities from engaging in such practices. Contrary to arguments that section 60506 tasks the

Commission with ''facilitat[ing] equal access'' by way of funding providers' deployment efforts, the statute expressly commands the Commission to *prevent* digital discrimination of access. That is, Congress tasked the Commission with adopting rules that would curb digital discrimination of access before its occurrence. Even had Congress tasked the Commission only with implementing a statutory prohibition on digital discrimination of access (a mandate that would be less broad than the one we were given), the Commission could not do so merely through suggestion. We are aware of no instance in which a federal anti-discrimination law is without any enforcement mechanism whatsoever. Industry fails to explain how ''affirmative-based approaches,'' like funding opportunities, would effectively implement our mandate to ''prevent'' digital discrimination of access. No commenter suggests that the solution to digital discrimination of access, as we have defined it, requires directing more funds to the entity responsible for such conduct. Indeed, others call such a result absurd. Because preventing digital discrimination of access requires some kind of ''stick'' in addition to ''carrots,'' it would render much of section 60506 a ''nullity'' were the Commission to interpret the statute to preclude enforcement of our rules implementing section 60506.

132. We find that section 60506 provides the Commission authority to enact such rules as are necessary to fulfill its statutory obligations— including, for example, amendment or readoption of our existing enforcement rules in the specific context of digital discrimination of access. Section 60506(b) directs the Commission to ''adopt final rules to facilitate equal access to broadband internet service . . . including . . . preventing digital discrimination of access . . . .'' And as we explain above, our enforcement tools are indispensable in fulfilling this mandate. Section 60506 therefore authorizes the Commission to adopt, readopt, or amend enforcement-related rules as necessary to accomplish this task.

133. Finally, we find that section 4(i) of the Communications Act provides the Commission ancillary authority to carry out its statutorily mandated duties under section 60506, including enforcement of a prohibition on digital discrimination of access. Section 4(i) provides that ''[t]he Commission may perform any and all acts, make such rules and regulations, and issue such orders, . . . as may be necessary in the execution of its functions.'' Effective

enforcement rules are reasonably ancillary to the Commission's statutorily mandated responsibility to combat discrimination in providing access to broadband service. Arguments to the contrary highlight that section 60506 does not fall within the scope of the Communications Act and that its mandate lacks a limiting principle. But as TechFreedom acknowledges, section 4(i) enables the Commission to carry out duties conferred by Congress outside those outlined in the Communications Act. And as explained above, contrary to claims that use of its ancillary authority in this instance would release the Commission '' 'from its congressional tether' '' or would ''exceed the bounds of its statutorily[ ] delineated authority,'' the Commission's establishing and enforcement of today's prohibition logically extends from and satisfies Congress's mandate of preventing digital discrimination of access.

134. We note that the enforcement measures and final rules that we adopt today do not represent all that the Commission can—and must—do to combat digital discrimination of access. As noted above, section 60506(b) directs the Commission to adopt ''final rules'' to: (1) prevent digital discrimination of access and (2) identify necessary steps for the Commission to take to eliminate such discrimination. We interpret Congress's directive with respect to ''eliminating'' digital discrimination of access to include steps not taken in our implementing rules that might ultimately be necessary to ensure that such discrimination does not occur after the effective date of our rules. Congress has tasked us to identify any such ''necessary steps'' so they can swiftly be undertaken if and when determined to be necessary, and so Congress can consider what additional statutory authority, if any, might be necessary to allow for full achievement of the equal access goal. We believe the rules we adopt today, coupled with the affirmative requirements proposed in the *Further Notice of Proposed Rulemaking,* FCC 23–100, released November 20, 2023, (*Further Notice*), represent the measures necessary both to ''prevent'' and ''eliminate'' digital discrimination of access in the future. As such, we find our actions today satisfy the Commission's obligations under section 60506(b)(1) and, at a minimum, takes initial steps towards addressing our obligations under section 60606(b)(2).

135. We disagree with those asserting that enforcement of our prohibition raises a major-questions-doctrine issue. As explained below, the Commission's

self-initiated investigation process does not reflect a substantial overhaul of the Commission's enforcement mission. Nor does taking this step, modest in comparison to the concerns raised by some commenters, risk fundamentally altering the landscape of the telecommunications industry. As employers, covered entities should be familiar with the standards and processes for establishing liability under Title VII of the Civil Rights Act of 1964, and many of these entities must already comply with the nondiscrimination requirements associated with the receipt of federal funds. Moreover, the Commission does not find in section 60506 an ''elephant[ ] in a mousehole'' as some commenters argue. To the contrary, Congress here explicitly called on the Commission to prevent and identify necessary steps to eliminate digital discrimination of access. It mandated, using clear language, that the Commission adopt rules necessary for doing so. Our adoption of a prohibition on digital discrimination of access is directly responsive to Congress's charge, and our use of the Commission's enforcement mechanisms a necessary component of those efforts.

136. At the same time, we do not agree with some commenters' suggestion that section 60506(b)(2) represents a broad grant of authority to the Commission to require covered entities to undertake remedial measures to eradicate the effects of conduct predating the effective date of our rules. While section 60506(b)(2) authorizes the Commission to ''identify'' the steps necessary to eliminate the discrimination identified in subsection (b)(1), it does not, in our view, constitute a clear grant of authority to impose retroactive liability on industry participants. Moreover, we note that determining when and where digital discrimination of access occurred across the country in the past, how to remedy such discrimination, and how to assign and allocate the cost of such remediation, would represent highly time- and resource-intensive undertakings. We will not presume that Congress intended for the Commission to undertake these highly complex tasks without clear evidence to that effect. Accordingly, for purposes of implementing section 60506(b), we will train our focus on preventing—and thus eliminating—digital discrimination of access occurring after the effective date of our rules.

*Amending Commission Rules*

137. We amend some of our existing enforcement rules today to enshrine the processes by which the Commission

will undertake investigations of claims of digital discrimination of access. These include changes to Rule 1.80, which details our forfeiture procedures, so that it will now reference the provisions of section 60506 in addition to those of the Communications Act and other statutes. Rule 1.80, which acts as our implementing rule for forfeiture proceedings, states that a forfeiture penalty may be assessed against any person found to have violated either designated provisions of the Communications Act (and rules related thereto); Title 18 of the United States Code; or section 6507 of the Middle Class Tax Relief and Job Creation Act of 2012, as well as rules, regulations, and orders promulgated thereunder. Additionally, Rule 0.111 will now reflect the Enforcement Bureau's direction to investigate claims of digital discrimination of access and make recommendations as to potential violations and penalties. We adopt these amendments pursuant to the authority expressly granted to the Commission in section 60506(b).

*Enforcement Framework*

138. The Commission will launch investigations into complaints and allegations of digital discrimination of access on a self-initiated basis and, where the Commission determines a violation has occurred, pursue remedies and penalties. Investigations may stem from complaints filed through the informal complaint process or information otherwise brought to the Commission's attention. As outlined above, the Commission will adopt a dedicated pathway for accepting digital discrimination of access claims from the public. Additionally, the Commission may receive allegations of digital discrimination of access from state, local, or Tribal governments. And as proposed in the *Further Notice,* the Commission may in the future obligate covered entities to make filings to the Commission as part of their affirmative obligations to assist in combating digital discrimination of access,[2] filings that similarly might serve as a basis for investigation. Irrespective of the origin of such complaints and information, the Commission will—at its discretion— determine whether investigation by the agency is warranted and whether further response from the entities alleged to have violated our rules will be required. However, we recognize that broadband providers and other covered entities may need time to review their policies and practices in light of the rules we adopt today. Accordingly, we will not

initiate any enforcement investigation solely concerning conduct that produces differential impacts under these rules until at least six months after the effective date of the rules.

139. The Commission will conduct its investigations of digital discrimination of access complaints and allegations consistent with federal law and in a manner consistent with the processes and procedures followed by other federal agencies. Taking this approach ensures alignment with civil rights models, as suggested by some commenters. In investigating complaints and allegations of digital discrimination of access, we adopt the legal standards for proving discriminatory treatment and disparate impact set out below and in our discussion above of disparate impact and disparate treatment standards as they relate to our definition of digital discrimination of access.

140. *Investigating complaints alleging that a policy or practice is intended to differentially impact consumers' access to broadband internet access service on a prohibited basis.* Direct evidence of discriminatory intent is rare. For that reason, intentional discrimination is typically proven by circumstantial evidence. The two legal standards for reviewing circumstantial evidence of intentional discrimination are set out in *Vill. of Arlington Heights* v. *Metro. Housing Dev. Corp.,* 429 U.S. 252, 266 (1977) (*Arlington Heights*) (providing the framework for analyzing whether facially neutral policies or practices are motivated by discrimination) and *McDonnell Douglas Corp.* v. *Green,* 411 U.S. 792 (1973) (*McDonnell Douglas*) (providing the framework for allocating proof for claims of disparate treatment discrimination). Federal agencies historically have used two chief legal frameworks in evaluating whether circumstantial evidence supports an inference of discriminatory intent, depending on the nature of the alleged discrimination. We will investigate complaints of intentional discrimination under these frameworks.

141. *When a facially neutral policy or practice is allegedly motivated by discrimination: Arlington Heights standard.* The *Arlington Heights* framework applies when an otherwise facially neutral policy or practice is allegedly motivated by discrimination. Under this framework, as applied in the context of section 60506, the Commission, as factfinder, will evaluate a variety of factors that contributed to the adoption, use or application of the challenged policy or practice in order to determine discriminatory intent. The non-exhaustive list of evidentiary factors include: background of the

---

[2] *Infra* para. 179.

challenged policy or practice; sequence of events leading up to the challenged policy or practice; departures from normal, procedural sequence (how the challenged policy or practice occurred and was decided on by decisionmakers); pattern of actions that impose greater harm on persons in protected groups (*i.e.,* whether a practice bears more heavily on minority or low-income persons); and awareness of the greater harm (*i.e.,* whether the harm to members in the protected groups was foreseeable to decisionmakers). Where it is determined that the policy or practice was intended to discriminate, the agency evaluates whether the adoption, use or application of the policy or practice would have occurred absent the discrimination. Importantly, evidence of statistical disparity, alone, generally will not satisfy this standard. In the context of section 60506, this approach would likely be most applicable to complaints involving treatment of a large group of persons, including but not limited to deployment, upgrade, and large-scale service matters alleged to have been motivated by prohibited discrimination. The Commission will find a violation of the digital discrimination of access rules where, upon close evaluation of *Arlington Heights* factors, (1) persons in a protected group were denied equal access to broadband internet access services, (2) the challenged conduct would not have occurred absent the discrimination, and (3) the policy or practice in question is not justified by genuine issues of technical or economic feasibility, as outlined above.

142. *When policies or practices are intended to impact persons within the protected group differently than similarly situated persons: McDonnell Douglas standard.* This framework applies when a policy or practice is intended to treat similarly situated persons differently because of a protected status. It is typically utilized when investigating complaints involving a smaller, discrete number of complainants and where there are identifiable comparators. In the context of our rules implementing section 60506, this framework may be utilized for investigating complaints as to selection for benefits, special deals, or even qualification for broadband service.

143. The Commission will investigate three elements under this framework: (1) whether there is differential treatment of similarly situated persons; This element is shown with evidence that persons are within a protected group; they were eligible for service; were treated in an adverse manner; and

that persons similarly situated, but not in the protected group, received better treatment. (2) whether there is a legitimate, technical or economic justification for such differential treatment; This element will be investigated by the Commission, and any explanation must be clear and reasonably specific, and fully support a showing that there was a ''legitimate, nondiscriminatory reason for the different treatment.'' And, if so, (3) whether the technical or economic justification for the differential treatment is actually a pretext for prohibited discrimination. Under this element, the Commission will investigate whether any reason given for the challenged action was pretext for discrimination. Under this element, the Commission may weigh whether the reasons given were true; any weaknesses, implausibility, inconsistency or contradictions; and if action taken was contrary to written policy or practice, or was a post-hoc fabrication. As to the second element, the Commission will weigh all available evidence bearing on whether the challenged policy or practice is justified by genuine issues of technical or economic feasibility. The Commission will find a violation of the digital discrimination of access rules where persons in a protected group were treated differently, and (1) there is no legitimate technical or economic justification for the difference in treatment, or (2) the proffered technical or economic justification is determined to be pretext for discrimination.

144. *Investigating allegations that policies and practices differentially impact consumers' access to broadband internet access service on a prohibited basis.* We expect most investigations of possible violations of our rules to concern credible allegations that specific policies or practices have meaningful discriminatory effects and are not justified by genuine issues of technical or economic feasibility. We adopt the elements of proof for disparate impact as established in *Inclusive Communities* in a way that comports with section 60506 and the Commission's investigatory process. Thus, investigations concerning allegations that facially neutral policies or practices have discriminatory effects will involve: (1) the identification of a policy or practice that is causing a disparate impact on a prohibited basis; (2) assessment of whether the policy or practice in question is justified by genuine issues of technical or economic feasibility; and (3) a determination of whether there were reasonably

achievable, less discriminatory alternatives. If the Commission determines that a covered entity's policy or practice differentially affects access to broadband service on a prohibited basis and that a less discriminatory alternative was reasonably available and achievable, the policy or practice in question will not be deemed justified by genuine issues of technical or economic feasibility.

145. Under the first element of our disparate impact analysis, the Commission will investigate whether an identified policy or practice of the covered entity is causing the discriminatory effect. We will also investigate the nature of the disparate impact that is being complained about or otherwise brought to our attention. As explained above, we will rely on information provided by the covered entity as well as specified data sources and, where necessary, statistical analyses to assess the extent of the differential impact on access to broadband internet access service. The Commission recognizes that any such differential impact on broadband access must be caused by a specific policy or practice of the entity under investigation.

146. Under the second element of our disparate impact analysis, the Commission will determine whether genuine issues of technical or economic feasibility support and give substantial, legitimate justification for the policy or practice that is being investigated. Third, the Commission will determine whether a less discriminatory alternative policy or practice was reasonably available and achievable and identify any such alternative policy or practice determined to have been reasonably available and achievable. If such an alternative was available to the covered entity, the policy or practice causing the differential impact will not be deemed justified by genuine issues of technical or economic feasibility, and the covered entity will be exposed to liability for digital discrimination of access. Under the Commission's investigative process, the factual and legal bases for any proposed liability determination are set forth in a notice of apparent liability and the respondent has an opportunity to respond to that notice before any final liability determination is made.

147. *Remedies.* Remedying violations of our prohibition on digital discrimination of access will depend on the context and extent of the violation. This requires that remedies be established on a case-by-case basis. To this end, the Commission will bring to bear its full suite of available remedies,

including the possibility of monetary forfeitures.

148. We adopt a presumption of compliance for policies and practices that are in compliance with specific program requirements for the Broadband Equity, Access, and Deployment (BEAD) and Universal Service Fund (USF) high-cost programs. As noted below, we will consider whether other presumptions or safe harbor defenses are warranted going forward, including safe harbors or presumptions of compliance for policies and practices that comply with other federal broadband deployment programs that embody similar equity and nondiscrimination principles. These programs exist to remedy current inequities in broadband deployment and are consistent with section 60506 and our rules adopted today to facilitate equal access to broadband internet service. We will also accept a presumption of compliance for future broadband funding programs that account for digital discrimination of access rules. We decline to expand, however, presumptions or safe harbor defenses beyond these funding programs as some commenters urge. Although T-Mobile correctly identifies that the Commission must take into account issues of technical and economic feasibility, we disagree that for section 60506's language to have ''real meaning,'' the Commission must establish particular safe harbor defenses at this time. The approaches outlined above prove sufficient for protecting the rights of industry participants, and we do not expect that the Commission's self-initiated approach to investigations will inundate industry participants with meritless claims that they must expend substantial resources defending against. We also agree with other commenters that prematurely establishing a comprehensive list of safe harbor defenses may immunize covered entities against legitimate complaints or allegations, without commensurate reasons for doing so. We do, however, recognize that properly developed safe harbors may facilitate regulatory certainty and help focus our enforcement efforts in the future. Therefore, the Commission charges the CEDC with identifying, evaluating and making recommendations with respect to particular safe harbors, rebuttable presumptions or other similar bright-line guardrails distinguishing permissible from impermissible conduct under the rules we adopt today.

149. *Structured Complaint Process.* We decline at this time to adopt a structured formal complaint process for claims of digital discrimination of access. In the *Notice,* we sought comment on whether the Commission should establish a structured complaint process similar to the formal complaint process of section 208 of the Communications Act. CTIA argues that the establishment of such a process would burden both staff at the Commission and the resources of covered entities. However, it is unnecessary for us to opine on these arguments. Instead, we agree with Verizon that, currently, the informal complaint process satisfies the requirements of section 60506 and provides the necessary functionality for the Commission to carry out its duties. Although some commenters encourage the Commission to establish a specific formal complaint process for digital discrimination of access claims, these commenters do not articulate the reasons for its necessity in light of the self-initiated investigatory approach the Commission adopts today. We do not foreclose the possibility of adopting a structured complaint process in the future, however. As the Commission gains experience investigating digital discrimination of access complaints, our approach may evolve, leading us to revisit this issue in the future.

150. As noted above, in order effectively to identify and combat potential violations of digital discrimination of access, the Enforcement Bureau will evaluate information provided to the Commission through the dedicated digital discrimination of access informal complaint pathway or through communications from state, local, or Tribal governments. The Enforcement Bureau, in coordination with the Consumer and Governmental Affairs Bureau, will review this information on a monthly basis and examine trends and geographic or demographic clusters, among other things, in the informal complaint filings to determine whether there is possible discrimination of access based on income level, race, ethnicity, color, religion, or national origin. Relevant evidence pertaining to purported differences in the covered elements of service will be especially probative. Where there is credible evidence suggesting that persons in a protected group were treated differently as the result of a policy or practice, the Enforcement Bureau, in its discretion, will use its authority to conduct investigations; issue Letters of Inquiry and subpoenas; conduct audits; inspect licenses and/or facilities; and collect information. Further, the Enforcement Bureau will use the full range of its enforcement options to enforce compliance, including the possibility of forfeiture penalties.

151. *Voluntary Mediation of Digital Discrimination of Access Complaints.* As part of the monthly review process referenced in the preceding paragraph, Commission staff shall identify particular informal complaints that would be suitable candidates for a staff-mediated resolution process. With regard to such complaints, prior to initiation of an Enforcement Bureau investigation, staff from the Bureau's Market Disputes Resolution Division (which has no involvement in Bureau-initiated investigations) may invite the informal complainant and the covered entity identified in the informal complaint to engage in a voluntary mediation process overseen by Division staff. If all parties are willing to engage in such voluntary mediation, the mediation would follow existing Commission procedures as outlined in Rule 1.737 insofar as practicable. Any resolution reached through such mediation process will be reduced to writing and will be binding only on the parties to the mediation. The parties to the mediation may agree, if they so choose, to disclose the terms of any resolution to the Enforcement Bureau's Investigations and Hearings Division, but will not be required to do so. If the parties choose to disclose the terms of the resolution to the Investigations and Hearings Division, the Enforcement Bureau will consider the terms and scope of the resolution in determining whether to initiate an investigation into the matters raised in the informal complaint. The Enforcement Bureau will not initiate such an investigation until the mediation process has concluded. This mediation process represents an alternative means of bringing speedy and effective resolution to disputes.

152. *Advisory Opinions.* In order to provide greater regulatory certainty and assist covered entities seeking to comply with our rules, we adopt a process to allow any such covered entity to seek an advisory opinion from Commission staff regarding the permissibility of a policy or practice affecting broadband access. The Commission adopted such an advisory opinion process in 2015 in connection with its open internet rules. We find today, as the Commission found in 2015, that an advisory opinion process will promote compliance and provide clarity, guidance, and predictability regarding our rules.

153. Under the process we adopt today, any covered entity may request an advisory opinion regarding the permissibility of its own policies and practices affecting access to broadband

internet access service. As noted in our rules, requests for an advisory opinion may be filed via the Commission's website or with the Office of the Secretary. Requests must be copied to the Chief of the Enforcement Bureau and the Chief of the Investigations and Hearings Division of the Enforcement Bureau. The Commission hereby delegates to the Enforcement Bureau the authority to receive such requests and issue such advisory opinions, and we direct the Enforcement Bureau to coordinate closely with other Bureaus and Offices regarding such advisory opinions. The Enforcement Bureau will have discretion to determine whether to issue an advisory opinion in response to a particular request or group of requests and will inform each requesting entity, in writing, whether the Bureau plans to issue an advisory opinion regarding the matter in question. The Enforcement Bureau shall decline to issue an advisory opinion if the relevant policy or practice is the subject of a pending government investigation or proceeding.

154. Covered entities may submit requests for advisory opinions regarding both current and prospective policies and practices affecting broadband access. However, a request must pertain to a policy or practice that the requesting party is currently utilizing or intends to utilize, rather than a mere possible or hypothetical scenario. And as a general matter, the Enforcement Bureau will prioritize responses regarding prospective policies and practices intended to ensure compliance with our rules. The Enforcement Bureau will also prioritize requests involving substantial questions with no clear Commission precedent and/or subject matter involving significant public interest.

155. When submitting requests, covered entities must include all material information such that Commission staff can make a fully informed determination on the matter. Requesting parties will also be required to certify that factual representations made to the Enforcement Bureau are truthful, accurate, and do not contain material omissions. The Enforcement Bureau will have discretion to request additional information from the requesting entity and from other parties that might have relevant information or be impacted by the request. These might include, for example, impacted consumers or state, local, or Tribal governments.

156. Our advisory opinion process will affect covered entities and the Commission's enforcement actions as described below. First, the process is fully voluntary. No covered entity will

be rewarded or penalized for seeking an advisory opinion, and the seeking (or not) of an advisory opinion will not itself influence any enforcement-related decision by the Commission. Second, in an advisory opinion, the Enforcement Bureau will issue a determination of whether or not the policy or practice detailed in the request complies with our rules implementing section 60506. If the Bureau determines that a policy or practice currently in effect violates our rules, it may provide in the opinion that it will not take enforcement action within a designated time period if the policy or practice is promptly corrected. Third, a requesting party may rely on an advisory opinion to the extent that its request fully and accurately describes all material facts and circumstances. Fourth, advisory opinions will be issued without prejudice to the Enforcement Bureau's or the Commission's ability to reconsider the questions involved, and rescind the opinion. Because advisory opinions would be issued by the Enforcement Bureau, they would also be issued without prejudice to the Commission's right to later rescind or revoke the findings. Should the Enforcement Bureau or Commission rescind a previously-issued advisory opinion, the requesting party must promptly discontinue use of the relevant policy or practice in order to remain in compliance with our rules.

157. The Enforcement Bureau will attempt to respond to requests for advisory opinions as efficiently as possible. We decline to establish firm deadlines, however, because we anticipate that the nature, complexity, and magnitude of requests might vary widely. Furthermore, it may take time for Commission staff to request any additional information needed to issue an opinion. Once issued, the Enforcement Bureau will make the advisory opinion available to the public. And to provide further guidance to industry and consumers, the Bureau will also release the initial request and any additional materials deemed necessary to contextualize the opinion. Entities may request confidential treatment of certain information, as provided under Commission rules.

158. *Special Advisor for Equal Broadband Access.* As a further measure to provide assistance to stakeholders regarding the rules and new procedures we adopt today, the Commission shall designate a Special Advisor for Equal Broadband Access within the Wireline Competition Bureau to provide neutral technical assistance to all stakeholders. The Special Advisor will provide consumers and their representatives assistance with: understanding the

scope and substance of the rules; understanding the process for filing consumer complaints of digital discrimination of access; understanding what information may best assist the agency in fully assessing such complaints; identifying Commission resources that might be helpful to consumers in determining when digital discrimination of access might have occurred and how it can be challenged; addressing questions regarding the voluntary mediation of digital discrimination of access complaints; addressing questions regarding the advisory opinion process outlined above; and interfacing with various Commission components regarding access to broadband internet access service. The Special Advisor will likewise provide industry participants and their representatives assistance with: understanding the scope and substances of the rules; understanding the process for responding to complaints of digital discrimination of access; understanding what information may best assist the agency in fully assessing such responses; identifying Commission resources that might be helpful to industry participants in complying with the rules we adopt today; questions regarding the voluntary mediation of digital discrimination of access complaints; questions regarding seeking advisory opinions regarding policies or practices affecting access to broadband internet access service; and interfacing with various Commission components regarding access to broadband internet access service. The Special Advisor may be designated other responsibilities associated with the digital discrimination of access rules we adopt today and other matters relating to our efforts to ensure equal access to broadband internet access service.

159. *State and Local Enforcement and Private Rights of Action.* We decline at this time to authorize state and local enforcement of our rules, as some commenters urge. As explained above, the Commission is taking a self-initiated approach to investigations of digital discrimination of access. By doing so, the Commission can best establish the contours of what constitutes a violation of our prohibition in a consistent manner. We also decline at this time to create a private right of action, as we asked about in the *NPRM,* and thus find it unnecessary to opine at this time about our authority to do so.

*Differential Impact*

160. We find that in determining when consumers' access to broadband internet service is "differentially

impacted,'' whether intentionally or not, we must account for all comparable elements of service quality, terms and conditions. Consistent with our discussion above regarding the elements of service covered by our rules, we may compare service availability, service quality, and the terms and conditions of service as between different geographic areas and communities to determine whether digital discrimination of access has occurred. This may include all technical and non-technical aspects of service in a given area. We similarly provide ourselves the flexibility to consider any comparable geographic region that may be relevant to an alleged claim of digital discrimination of access. Finally, the data we use to determine when a policy or practice differentially impacts consumers' access to broadband service will encompass data both from within the Commission and from any outside sources that we consider relevant to evaluating the issues at hand. Contrary to the concerns expressed by some commenters, we do not expect that our digital discrimination of access rules will require covered entities to collect any new data from their customers in order to determine the differential impacts of their policies and practices. Covered entities should be able to make those determinations based solely on data from the U.S. Census Bureau.

161. We find this scope of inquiry necessary to meet section 60506's equal access goals. First, we agree with commenters that we must have a flexible and non-exhaustive approach to comparing broadband internet access service, as quality standards and the criteria to measure quality will change over time. Second, adopting a comprehensive approach is necessary to meet section 60506's aims regarding equal access because ''a series of terms and conditions may have [cumulative effects on access] even when each may be only slightly onerous on its own.'' In other words, failing to have such a flexible approach could lead to our digital discrimination of access rules undermining Congress's intent for enacting section 60506 by ''exacerbat[ing] digital discrimination [of access] rather than eliminating it.'' Finally, as the record reflects that digital discrimination of access requires assessing a myriad fact patterns, including various technological and non-technological aspects of broadband service, the unique challenges that covered entities face to deploy to certain areas, and that broadband use may vary within local communities, we must adopt a scope of comparability that can

holistically assess each claim. This analytical approach is consistent with the goal to ensure that ''all people'' benefit from broadband, including those in historically disadvantaged, Tribal, and rural communities. Our assessment of whether an ''offered service'' is of comparable quality to that available to other communities will turn on the *capabilities* of the service rather than the particular technology through which the service is offered. We will focus our analysis on whether the consumer has the equal opportunity to obtain and utilize broadband internet access service of comparable quality on comparable terms and conditions. In this regard, we are mindful that ''comparable'' does not mean ''identical.''

162. Our approach to comparability is consistent with established civil rights law. As explained, we will require that covered entities' policies and practices cause the identified disparities, consistent with the reasoning of *Inclusive Communities.* We disagree with T-Mobile that the ''robust causality requirement simply is not workable in the broadband context[,]'' as our flexible approach will allow to consider the factors that go into a provider's investment decisions. As these matters are so fact-driven, our inquiry will also be on a case-by-case basis, consistent both with longstanding precedent in civil rights law and our approach to determining feasibility.

163. We disagree with commenters asserting that a determination of digital discrimination of access need not require the ''robust causality'' outlined in *Inclusive Communities.* Some commenters argue that we should require only a showing of statistical disparity without any evidence that the challenged policies or practices caused the disparity. We disagree. Instead, we agree with those commenters asserting, consistent with *Inclusive Communities,* that sound disparate impact analysis requires a determination that the challenged policies and practices are a contributing cause of the identified differential in access.

*Comparing Technical Terms of Service*

164. We find that our flexible approach to comparability has several advantages when comparing the technical aspects of broadband. First, this approach is consistent with our definition of covered aspects of service. Second, this flexible approach will allow us to account for the ''technical realities of provisioning'' broadband when comparing technological aspects of services, such as network degradation and upgrades, by encompassing variables that can explain why network

performance may be better or worse during certain periods. Third, it will also provide for comparing technical aspects of service that are present in certain technologies and not others, such as wireless service. Finally, this approach will allow our comparability analysis to adapt as technological preferences change over time and account for substitutability.

165. The record in this proceeding regarding the ''substitutability'' (and therefore comparability) of broadband service provided through different technologies is mixed. While some commenters argue that the Commission's focus should be on whether the services are comparable in practical terms because section 60506 is ''technology neutral,'' Public Knowledge cautions that ''there are likely to be significant technical variations between different technologies (*e.g.,* wireline vs wireless), such that the default assumption should be that even with stated similarities a service that employs different technology is not comparable.'' Commenters also disagree on how substitutability should be considered with regard to emerging technologies, as some argue that service provided over fiber lacks a substitute and others suggest the opposite. The range of views on the record counsels that the Commission should take an approach to comparing technical aspects of service that can accommodate the unique considerations of each alleged instance of digital discrimination of access. The holistic and flexible approach to comparability and substitutability we describe today is consistent with that aim.

166. We decline to establish at this time a prescriptive range or standard for comparing technical aspects of service. We are not persuaded by commenters who suggest that we must take a prescriptive approach to comparing technical aspects of service because greater certainty is necessary to promote deployment. There are simply too many potentially relevant technical variables to each claim to suggest that a prescriptive approach could be practically administered or complied with. We agree with commenters that the varying technologies and services used to deliver broadband ''have different natures and capabilities and should thus be evaluated independently using relevant performance metrics.'' Indeed, the court in *Orloff* itself pointed out that wireless carriers, even in a competitive market, still ''cannot 'decline to serve any particular demographic group (*e.g.,* customers who are of a certain race or income bracket).' '' The ability of wireless

carriers generally to provide sales concessions to some customers and not others without being held to have engaged in ''unjust and unreasonable discrimination'' within the meaning of sections 201 and 202 of the Communications Act does not mean that broadband providers may discriminate between customers on the basis of the characteristics protected by section 60506. Adding to this complexity, we acknowledge commenters' perspective that, while service interruptions may occasionally occur due to events such as network outages or network maintenance, significant or ''chronic'' network outages are red flags for possible digital discrimination of access. Our flexible approach will provide for these considerations while avoiding a situation where our technical comparability analysis becomes outdated, the range or scope of comparability becomes too broad or narrow, or our analysis is otherwise ill-suited for the service, service elements, or service terms being compared. We similarly disagree with commenters who assert that standards are necessary to ensure that our rules adequately protect consumers, as our flexible approach does so by ''future proofing'' our rules as standards change over time.

167. We decline to require network performance testing at this time. As the record is mixed on the issue and such testing is not necessary to accomplish our immediate objectives, we find that adopting a network testing requirement at this time would be premature. While Public Knowledge argues we should adopt network testing requirements similar to those in the universal service context, USTelecom opposes network testing because it is ''unjustified as a matter of law, unnecessary, and unduly burdensome.''

## Comparing Non-Technical Terms of Service

168. We find that our flexible approach to comparability likewise has several advantages for comparing non-technical elements of broadband service. First, this approach is consistent with the inclusive scope of our definition of covered elements of service. Second, this flexible approach allows us to assess holistically whether and how non-technical aspects of service may vary based on protected status. Third, allowing comparison of a broad range of services, service elements, and terms of service allows the Commission to evaluate non-technical terms of service across covered entities.

169. We decline to establish a prescriptive standard to compare non-technical aspects of service. Commenters suggest that the Commission should provide different comparability standards when comparing non-technical aspects of service offered by the same covered entity and non-technical aspects of service offered by different covered entities. Commenters also suggest that for services offered by the same covered entity, we should establish that all customer groups in the same area must have the opportunity to receive the same service on the same terms and conditions. Adopting this assumption, however, would not give proper weight to the feasibility analysis we adopt for claims of digital discrimination of access. We agree that ''comparing across providers on non-technical factors is considerably more challenging'' because ''there are compelling competition reasons for different providers to have different terms of service or approaches to customer service.'' Nevertheless, our more flexible approach of considering all available information will allow the Commission to determine whether non-technical aspects of service across different covered entities in certain circumstances will provide useful evidence of reasonably available alternative practices.

## Geographic Comparability

170. Section 60506(a)(2) defines ''equal access'' as the equal opportunity to subscribe to an offered service of comparable service ''in a given area . . . .'' Thus, when determining whether challenged policies and practices differentially impact access to broadband based on the listed characteristics, to the greatest extent possible, we must compare the service quality and terms and conditions of service in defined geographic areas that are appropriate and reasonably comparable in all respects other than the demographic characteristic(s) giving rise to the digital discrimination of access claim.

171. We find that we must adopt a broad and flexible approach to assess geographic comparability in this context. This is consistent with our approach to comparing technical and non-technical aspects of service. And, as Congress did not define ''a given area'' in section 60506(a)(2) nor anywhere else in the statute, we agree with commenters that we should determine the appropriate ''given area'' for an alleged instance of digital discrimination of access on a case-by-case basis. The record reflects a variety of suggestions and relevant

considerations for determining an appropriate geographic area for comparison of service quality and terms, providing that a flexible, case-by-case approach is both necessary and appropriate. First, commenters suggested a variety of geographic areas may be appropriate depending on the context, including the Nation as a whole, states, counties, metropolitan statistical areas, and census blocks, among others. Second, the record reflects that there are a variety of factors to consider to determine what area is appropriate to analyze a digital discrimination of access claim. For example, with respect to covered entities in particular, the record reflects that the geographic area that is appropriate may differ depending on the type of covered entity, such as a cable operator operating under a franchise agreement or an ILEC operating under a license area; the covered entity's size; or the type of broadband technology used to provide the service, such as fiber to the home or fixed wireless service. Third, though we find that we should compare similar geographic areas to assess claims of digital discrimination of access, the record also includes a variety of suggestions on how we should determine what the relevant geographic area is. For example, commenters suggest that we consider five factors to determine the correct area, while others generally suggest we use relevant geographic comparators, such as how close areas are to each other, changes in terrain, the cost of deployment, and whether the given area is rural or urban. As such, we will evaluate each claim holistically and determine what ''given area'' is appropriate based on the facts presented. Finally, our flexible, case-by-case approach to determining geographic comparability is consistent with our approach to determining feasibility. In both determinations, we adopt a flexible approach to account for the challenges of providing service to particular geographic areas, such as topography, population density, and other potential technical and economic barriers to providing broadband service.

172. We agree with Verizon that those filing digital discrimination of access complaints should, if possible, identify the given area where the alleged digital discrimination of access occurs. But given that many informal complaints may be filed by members of the public based on their own experiences with broadband access and have little or no information as to how widely their experiences might be shared by others, we will not require precision in this regard. If the informal complaint gives

the Commission enough information to determine the nature of the alleged violation and where the alleged violation occurred, that may be sufficient for the Commission to determine whether further inquiry is warranted. Moreover, we will not, as some have suggested, limit our investigations to the four corners of the informal complaint, examining only the policies and practices and the geographic areas identified therein. Rather, the informal complaint will be used as a starting point, a basis for determining whether to seek further information from the complainant, require a response from the covered entity involved, determine whether there are similar complaints forming a pattern, or take some other appropriate action. We understand that many of the comments suggesting that we apply strict ''pleading'' standards to complaints of digital discrimination of access are premised on the assumption (or possibility) that the Commission would adopt a formal complaint process akin to section 208 of the Communications Act and our rules implementing that section. As we have elected not to adopt such a formal complaint procedure at this time, we will provide maximum flexibility to persons filing informal complaints and will review such informal complaints as liberally and generously as possible to achieve the purposes of the statute as expeditiously as possible.

*Data To Analyze Differential Impact*

173. We will avail ourselves of all relevant Commission and external data collections to help us evaluate when access to broadband has been differentially impacted based on a protected characteristic. As in the record compiled in response to the *Notice of Inquiry,* commenters to the *NPRM* highlighted various studies and provided a robust debate as to whether the studies were well grounded and whether they agreed with their conclusions. For example, though some commenters continue to argue that certain studies remain convincing examples of digital discrimination of access, others argue that they downplay or ignore important facts or have been successfully rebutted. Commenters also cite a variety of other studies or sources of data as evidence that may help demonstrate or refute that digital discrimination of access actually exists. As the record is mixed and does not conclusively indicate that some sources of data are more robust or helpful than others, we will evaluate all data relevant to a claim of digital discrimination of access on a case-by-case basis, including

all Commission and external data sources and studies. Moreover, as to the existence (or not) of digital discrimination of access, we simply note that Congress directed the Commission to adopt rules on a short deadline to ''prevent'' and identify steps to ''eliminate'' digital discrimination of access. Arguments that such discrimination does not occur or does not exist should have been directed to Congress. The Commission's charge is to execute on the mandate we were given by Congress, and we intend to do that.

174. With particular respect to Commission data collections, the record reflects there could be many productive ways for us to use them both individually and in conjunction with other sources of data. Commenters suggest, for example, that we could analyze data from Commission broadband maps, broadband consumer labels, the Affordable Connectivity Program, the Lifeline program, or the Consumer Complaint Center to identify possible violations of our rules, identify possible subjects of investigation, or highlight existing disparities in deployment. Commission data collections coupled with data collected outside the Commission could also provide helpful insight. For example, comments advise that cross referencing and overlaying various data sets, using state broadband maps or Census Bureau information in conjunction with Commission maps, or comparing information submitted to the Commission, state, or local agencies with information a covered entity publishes regarding their service, could also help the Commission assess digital discrimination of access claims.

175. The Commission may also require new data collection in the future that could be helpful to analyzing comparability. As explained in the accompanying *Further Notice,* we propose to make new data available through an annual supplement to the BDC. Our proposed annual supplement would report (on a state-by-state basis) all major deployment, upgrade and maintenance projects completed or substantially completed in the preceding calendar year, including the nature and size of the project and identification of the communities served by the project, and could be useful to our comparability analysis if adopted. We also propose requiring covered entities to implement internal compliance programs that would require covered entities to identify the communities served by recently completed, pending and planned major projects, conduct comparability analysis, and identify whether relevant

policies and practices are differentially impacting consumers' access to broadband. This would require covered entities to conduct project evaluations, analyze their policies and practices, and conduct other internal monitoring and auditing that could help remove ''invisible'' impediments to equal broadband access.

176. We decline at this time to modify current Commission data collections or undertake new data collections. Various commenters suggest that we modify Commission data collections to aid our analysis of possible digital discrimination of access, such as by undertaking a new data collection under the Affordable Connectivity Program to allow for disaggregation of program participants by demographic group, or modifying broadband maps so consumers could more easily determine if they have ''comparable'' broadband service at their street address. Commenters also suggest we should collect new data to compare advertised and charged pricing. Since the Commission currently has at its disposal a number of data collections and potential data sources that may assist in our analysis of digital discrimination of access claims, it is unclear whether a new data collection's burdens would outweigh its potential benefits. As we gain greater experience investigating digital discrimination of access claims, we will evaluate the adequacy of current data collections and other data sources and will determine whether new data collections or modifications of existing data collections might be warranted. We note that commenters disagree as to the authority that broadband consumer labels provide for imposing a new BDC.

*Other Issues*

177. At this time, we decline to take action in the other policy areas identified in the record where there is possible intersection with the issues we address in this proceeding. In the *NPRM,* we invited comment on various record proposals, including potential action in different Commission proceedings, which could potentially help the Commission fulfill our statutory mandate. We received numerous proposals that address action we can take on Tribal lands, possible outreach efforts, and organizational changes we should make to promote our efforts to combat digital discrimination of access. In addition, commenters suggested further action related to broadband service in multiple tenant environments (MTEs), spectrum availability, spectrum policy, the Affordable Connectivity Program, other Commission funding programs, the

Commission's broadband speed benchmark, the BDC maps, and various suggestions that commenters argue would aid infrastructure deployment, such as revising the Commission's rules for small wireless facilities, pole attachments, section 214 discontinuances, and cable franchising, and addressing other local and federal regulatory barriers. The Commission's primary focus at this time is to implement effective rules to address digital discrimination of access within the deadline set by Congress. However, we will continue to consider the thoughtful proposals on the record that are not addressed in other sections of this *Report and Order* or in the *Further Notice.* Our decision to refrain from taking further steps today in those proposals does not reflect any policy or legal conclusions regarding these matters. Some commenters, in addition to advocating for the Commission to expand upon the listed characteristics Congress included in section 60506(b), ask that the Commission more broadly address concerns over exposure to radiofrequency energy. This topic is outside the scope of the current proceeding, and we refer commenters to the Commission's website for more information.

178. Although we are not adopting any other record proposals at this time, we note that states and localities can rely on several resources made available to them to address digital equity, such as the Infrastructure Act's broadband funding for states, the National Broadband Map, and the Broadband Funding Map. First, we recommend that states and localities tap in fully to the funding allocated to states and localities to address broadband equity. On June 26, 2023, NTIA announced how it allocated funding to all 50 states, the District of Columbia, and five U.S. territories to deploy affordable, reliable high-speed internet service to everyone in America. States and other jurisdictions will use funding from the Infrastructure Act's $42.45 billion Broadband Equity, Access, and Deployment (BEAD) program to administer grant programs within their borders. The BEAD funding will be used to deploy or upgrade broadband networks to ensure that everyone has access to reliable, affordable, high-speed internet service. Once deployment goals are met, any remaining funding can be used to pursue eligible access-, adoption-, and equity-related uses. We strongly encourage states and other jurisdictions to make full use of the available BEAD funding in order to expand broadband access in hard-to-

build areas, increase broadband affordability, and strengthen digital literacy within their respective borders. While these issues are distinct from digital discrimination of access as we have defined it, full utilization of BEAD funding might reduce the instances in which consumers believe they are experiencing digital discrimination of access and thus reduce the burdens on industry participants and the Commission in addressing digital discrimination of access claims.

179. Second, in addition to the CEDC recommendations discussed below, we recommend that states and localities utilize the National Broadband Map to identify unserved and underserved communities. We find, based on the record, that states and localities could benefit from available resources to help them identify unserved and underserved communities and develop solutions to address digital discrimination of access. The National Broadband Map displays where broadband internet services are and are not available across the country. The map is one step in an ongoing, iterative process that will involve the submission of data by providers, challenges from third parties and the public, and verifications and audits by the Commission. The maps produced through this process will continually improve and refine the broadband availability data relied upon by the Commission, other government agencies, and the public, as required by the Broadband DATA Act. An accurate map will help identify the unserved and underserved communities most in need of expanded access to broadband internet access service.

180. Third, we recommend that states and localities use the Broadband Funding Map to gain insight into the broadband infrastructure deployment projects funded by the Federal government throughout the United States and Territories. The Broadband Funding Map overlays the availability data reported on the National Broadband Map with the funding data to show locations receiving federal program support. Finally, we decline at this time to establish an Office of Civil Rights within the Commission, as several commenters have urged us to do. We recognize the potential benefits of establishing such an office, however, and therefore seek further focused comment in a *Further Notice.*

*State and Local Model Policies and Best Practices*

181. As proposed in the *NPRM,* we adopt as guidelines for states and localities the best practices to prevent

digital discrimination and promote digital equity recommended by the Communications Equity and Diversity Council (CEDC). Section 60506(d) of the Infrastructure Act directs the Commission to "develop model policies and best practices that can be adopted by states and localities to ensure that broadband internet access service providers do not engage in digital discrimination." To help fulfill this direction, in December 2021, Chairwoman Rosenworcel tasked the CEDC with issuing recommendations on the subjects specified in section 60506(d). In furtherance of that mission, the CEDC "took the lead in facilitating interviews, public events, and town hall meetings with multiple stakeholders, from community leaders to industry experts, state broadband directors, foundations, school district leaders, HBCUs, faith-based organizations, small-, minority-, and women-business owners, concerned citizens, and representatives of historically marginalized groups." The CEDC members "actively sought out the perspectives of the aforementioned groups and listened attentively to their experiences, challenges and aspirations." More specifically, the CEDC's Digital Empowerment and Inclusion (DEI) Working Group issued a report (the CEDC report) recommending both (1) model policies and best practices to prevent digital discrimination by broadband providers, and (2) best practices to advance digital equity for states and localities. On November 7, 2022, the members of the full CEDC voted unanimously in favor of adopting the report for submission to the Commission. We now adopt both sets of recommendations as guidelines for states and localities, in fulfillment of section 60506(d), while emphasizing that our action does not limit states and localities from taking additional steps to prevent and eliminate digital discrimination of access beyond those set forth in the CEDC report and adopted in this *Report and Order.*

182. As we explained in the *NPRM,* the six CEDC recommendations in its report "Model Policies and Best Practices to Prevent Digital Discrimination by ISPs" reflect the perspective of the industry, public interest stakeholders, local government representatives, and others. We conclude that adopting these consensus recommendations will be effective in addressing digital discrimination of access at the state and local level. Additionally, the thirteen recommendations in the report's "Best Practices to Advance Digital Equity for

State and Localities'' reflect the consensus of industry and public interest stakeholders, and we find that they can serve as an effective framework for states and localities to advance digital equity.

183. We strongly encourage states and localities to implement these recommendations as a starting point, as we find that they can serve as an effective framework to advance digital equity. The record reflects widespread support for adopting both sets of recommendations. We agree with the Texas Coalition of Cities that the CEDC report's ''Best Practices to Advance Digital Equity for State and Localities'' recommendations appropriately focus on broadband and device programs, disseminate information and increase participation in federal broadband affordability programs, integrate existing social service supports with broadband services and create digital navigator programs where feasible. And as the U.S. Chamber of Commerce highlights, states and localities can adopt these model policies and practices at their discretion. Local Governments cautioned that while we should adopt the CEDC Report recommendations, we should also recognize the potential limits of states and local authorities to adopt those policies, in-part due to a lack of resources. While states and localities may still face potential limitations in implementing these recommendations, we envision that the aforementioned funding will be a good starting point for jurisdictions to begin taking the necessary steps to prevent and eliminate digital discrimination of access. Lastly, as noted by USTelecom, our approach affords us the opportunity to study the effects of implementation of those best practices by states and localities and determine whether further action on this front is warranted. We acknowledge that some states and localities may currently lack the necessary resources or authority to adopt and implement the CEDC report recommendations, but we note that the recommendations can be adopted and implemented at any time at the discretion of the governmental entity involved, such as when additional authority is provided or when additional resources are made available.

184. We disagree with arguments submitted by several commenters that we should refrain from adopting the recommendations in the CEDC report at this time in part due to the limited representation of local and state officials in the CEDC. We note that the CEDC's working group members did include some state and local representation and its Report was unanimously adopted. In addition, the CEDC members were diligent in their research, and they interviewed several local and state officials to develop their recommendations. The members conducted more than 30 virtual interviews and relied upon data and research by scholars, organizations, and state and local governments that have driven digital equity and inclusion scholarship. The members also analyzed research publications and other publicly available documents issued by a variety of government agencies, academics and think tanks, and advocacy organizations to help inform their development of best practices and model policies to prevent digital discrimination and to promote digital equity. Among other sources, members reviewed federal guidance programs and broadband adoption initiatives, including partnerships between state and local governments and internet service providers in response to the pandemic. While we understand the concerns with the limited representation from state and local governments, we find unpersuasive assertions from some commenters that the recommendations from the CEDC report therefore should not be adopted on this basis. The methodology used to develop both sets of recommendations took into consideration the input and expertise from states and localities to better understand their experiences and lessons learned so that other jurisdictions might adopt and implement their successful strategies and methodologies and avoid their mistakes. We encourage state and local officials responsible for broadband expansion efforts to monitor the proceeding and engage with the rechartered CEDC.

## Procedural Matters

185. *Regulatory Flexibility Act.* The Regulatory Flexibility Act of 1980, as amended (RFA), requires that an agency prepare a regulatory flexibility analysis for notice and comment rulemakings, unless the agency certifies that ''the rule will not, if promulgated, have a significant economic impact on a substantial number of small entities.'' Accordingly, we have prepared a Final Regulatory Flexibility Analysis (FRFA) concerning the possible impact of the rule changes contained in this *Report and Order.*

186. *Paperwork Reduction Act.* This document contains new or modified information collection requirements subject to the Paperwork Reduction Act of 1995 (PRA), Public Law 104–13. All such new or modified information collection requirements will be submitted to the Office of Management and Budget (OMB) for review under section 3507(d) of the PRA. OMB, the general public, and other Federal agencies will be invited to comment on the new or modified information collection requirements contained in this proceeding. In addition, we note that pursuant to the Small Business Paperwork Relief Act of 2002, Public Law 107–198, *see* 44 U.S.C. 3506(c)(4), we previously sought specific comment on how the Commission might further reduce the information collection burden for small business concerns with fewer than 25 employees. In this document, we describe several steps we have taken to minimize the information collection burdens on small entities.

187. *Congressional Review Act.* The Commission has determined, and the Administrator of the Office of Information and Regulatory Affairs, Office of Management and Budget, concurs, that this rule is major under the Congressional Review Act, 5 U.S.C. 804(2). The Commission will send a copy of this *Report and Order* to Congress and the Government Accountability Office pursuant to 5 U.S.C. 801(a)(1)(A).

188. *Contact Person.* For additional information on this proceeding, contact the Wireline Competition Bureau at *WCBDigDiscrimInfo@fcc.gov.*

## Ordering Clauses

189. Accordingly, *it is ordered,* pursuant to sections 1, 2, 4(i) and (j), 303(r) of the Communications Act of 1934, as amended, 47 U.S.C. 151, 152, 154(i)–(j), 303(r), and section 60506 of the Infrastructure Investment and Jobs Act, Public Law 117–58, 135 Stat. 429, 1245–46 (2021), codified at 47 U.S.C. 1754, that this *Report and Order is adopted* and parts 0, 1, and 16 of the Commission's Rules, 47 CFR parts 0, 1, and 16 *are amended* as set forth in Appendix A. The *Report and Order* shall become effective 60 days after publication in the **Federal Register**, except that the amendments to 47 CFR 1.717, as amended in Appendix A, will not become effective until the Office of Management and Budget completes review of any information collection requirements in this *Report and Order* that the Wireline Competition Bureau determines is required under the Paperwork Reduction Act. The Commission directs the Wireline Competition Bureau to announce the effective date for 47 CFR 1.717 by subsequent Public Notice.

190. *It is further ordered* that the Commission's Office of the Secretary *shall send* a copy of this *Report and Order,* including the Final Regulatory

Flexibility Analysis, to the Chief Counsel for Advocacy of the Small Business Administration.

191. *It is further ordered* that the Office of the Managing Director, Performance Program Management, *shall send* a copy of this *Report and Order* in a report to be sent to Congress and the Government Accountability Office pursuant to the Congressional Review Act, 5 U.S.C. 801(a)(1)(A).

*Final Regulatory Flexibility Analysis*

Need for, and Objectives of, the ''Second Report and Order''

192. The Report and Order takes an important step to promote equal access to broadband for all people in the United States by adopting rules pursuant to section 60506 of the Infrastructure Investment and Jobs Act (Infrastructure Act) that establish a balanced framework to facilitate equal access to broadband internet service by preventing digital discrimination of access. Many households in the United States lack equal access to broadband, with disparities that cross income, demographic, and geographic lines, including rural and tribal areas. Among households with broadband access, mid-sized communities, urban, and rural areas are all impacted by inferior service offerings. The *Report and Order* establishes that a policy or practice will violate the Commission's prohibition on digital discrimination of access if it discriminates based on one of section 60506's listed characteristics (either by intent or in effect), and creates a process to report incidents of digital discrimination and determine whether a violation has occurred.

193. First, the *Report and Order* defines ''digital discrimination of access'' as ''Policies or practices, not justified by genuine issues of technical or economic feasibility, that (1) differentially impact consumers' access to broadband internet access service based on their income level, race, ethnicity, color, religion or national origin, or (2) are intended to have such differential impact.'' Second, the *Report and Order,* prohibits ''digital discrimination of access.'' Third, it establishes the scope of covered entities, consumers, and services subject to the prohibition. Fourth, the *Report and Order* revises the Commission's informal consumer complaint process to: (1) add a dedicated pathway for digital discrimination of access complaints; (2) collect voluntary demographic information from filers who submit digital discrimination of access complaints; and (3) establish a clear pathway for organizations to

submit digital discrimination of access complaints. Fifth, it amends certain existing Commission enforcement rules: Rule 1.80, to reference the provisions of section 60506 in addition to those of the Communications Act and other statutes, and Rule 0.111 to reflect the Enforcement Bureau's direction to investigate claims of digital discrimination of access and make recommendations as to potential violations and penalties. Finally, the *Report and Order* adopts, as guidelines, the Communications Equity and Diversity Council's (CEDC's) model policies and best practices to prevent digital discrimination by broadband providers, and best practices to advance digital equity for states, localities, Tribal governments, and United States territories.

Summary of Significant Issues Raised by Public Comments in Response to the Initial Regulatory Flexibility Analysis (IRFA)

194. There were no comments filed that specifically addressed the proposed rules and policies presented in the IRFA or otherwise raised issues addressing the specific concerns of, and impact on small entities. Nonetheless, the Commission considered the potential impact of the rules proposed in the IRFA on small entities and took steps where appropriate and feasible to reduce the compliance burden for small entities in order to reduce the economic impact of the rules enacted herein on such entities.

Response to Comments by the Chief Counsel for Advocacy of the Small Business Administration

195. Pursuant to the Small Business Jobs Act of 2010, which amended the RFA, the Commission is required to respond to any comments filed by the Chief Counsel for Advocacy of the Small Business Administration (SBA), and to provide a detailed statement of any change made to the proposed rules as a result of those comments. The Chief Counsel did not file any comments in response to the proposed rules in this proceeding.

Description and Estimate of the Number of Small Entities to Which the Rules Will Apply

196. The RFA directs agencies to provide a description of, and where feasible, an estimate of the number of small entities that may be affected by the rules adopted herein. The RFA generally defines the term ''small entity'' as having the same meaning as the terms ''small business,'' ''small organization,'' and ''small governmental

jurisdiction.'' In addition, the term ''small business'' has the same meaning as the term ''small-business concern'' under the Small Business Act. A ''small-business concern'' is one which: (1) is independently owned and operated; (2) is not dominant in its field of operation; and (3) satisfies any additional criteria established by the SBA.

197. *Small Businesses, Small Organizations, Small Governmental Jurisdictions.* Our actions, over time, may affect small entities that are not easily categorized at present. We therefore describe, at the outset, three broad groups of small entities that could be directly affected herein. First, while there are industry specific size standards for small businesses that are used in the regulatory flexibility analysis, according to data from the Small Business Administration's (SBA) Office of Advocacy, in general a small business is an independent business having fewer than 500 employees. These types of small businesses represent 99.9% of all businesses in the United States, which translates to 32.5 million businesses.

198. Next, the type of small entity described as a ''small organization'' is generally ''any not-for-profit enterprise which is independently owned and operated and is not dominant in its field.'' The Internal Revenue Service (IRS) uses a revenue benchmark of $50,000 or less to delineate its annual electronic filing requirements for small exempt organizations. Nationwide, for tax year 2020, there were approximately 447,689 small exempt organizations in the U.S. reporting revenues of $50,000 or less according to the registration and tax data for exempt organizations available from the IRS.

199. Finally, the small entity described as a ''small governmental jurisdiction'' is defined generally as ''governments of cities, counties, towns, townships, villages, school districts, or special districts, with a population of less than fifty thousand.'' U.S. Census Bureau data from the 2017 Census of Governments indicate there were 90,075 local governmental jurisdictions consisting of general purpose governments and special purpose governments in the United States. Of this number there were 36,931 general purpose governments (county, municipal and town or township) with populations of less than 50,000 and 12,040 special purpose governments— independent school districts with enrollment populations of less than 50,000. Accordingly, based on the 2017 U.S. Census of Governments data, we estimate that at least 48,971 entities fall

into the category of ''small governmental jurisdictions.''

200. *Wired Telecommunications Carriers.* The U.S. Census Bureau defines this industry as establishments primarily engaged in operating and/or providing access to transmission facilities and infrastructure that they own and/or lease for the transmission of voice, data, text, sound, and video using wired communications networks. Transmission facilities may be based on a single technology or a combination of technologies. Establishments in this industry use the wired telecommunications network facilities that they operate to provide a variety of services, such as wired telephony services, including VoIP services, wired (cable) audio and video programming distribution, and wired broadband internet services. By exception, establishments providing satellite television distribution services using facilities and infrastructure that they operate are included in this industry. Wired Telecommunications Carriers are also referred to as wireline carriers or fixed local service providers.

201. The SBA small business size standard for Wired Telecommunications Carriers classifies firms having 1,500 or fewer employees as small. U.S. Census Bureau data for 2017 show that there were 3,054 firms that operated in this industry for the entire year. Of this number, 2,964 firms operated with fewer than 250 employees. Additionally, based on Commission data in the 2022 Universal Service Monitoring Report, as of December 31, 2021, there were 4,590 providers that reported they were engaged in the provision of fixed local services. Of these providers, the Commission estimates that 4,146 providers have 1,500 or fewer employees. Consequently, using the SBA's small business size standard, most of these providers can be considered small entities.

202. *Local Exchange Carriers (LECs).* Neither the Commission nor the SBA has developed a size standard for small businesses specifically applicable to local exchange services. Providers of these services include both incumbent and competitive local exchange service providers. Wired Telecommunications Carriers is the closest industry with an SBA small business size standard. Wired Telecommunications Carriers are also referred to as wireline carriers or fixed local service providers. The SBA small business size standard for Wired Telecommunications Carriers classifies firms having 1,500 or fewer employees as small. U.S. Census Bureau data for 2017 show that there were 3,054 firms

that operated in this industry for the entire year. Of this number, 2,964 firms operated with fewer than 250 employees. Additionally, based on Commission data in the 2022 Universal Service Monitoring Report, as of December 31, 2021, there were 4,590 providers that reported they were fixed local exchange service providers. Of these providers, the Commission estimates that 4,146 providers have 1,500 or fewer employees. Consequently, using the SBA's small business size standard, most of these providers can be considered small entities.

203. *Competitive Local Exchange Carriers (LECs).* Neither the Commission nor the SBA has developed a size standard for small businesses specifically applicable to local exchange services. Providers of these services include several types of competitive local exchange service providers. Wired Telecommunications Carriers is the closest industry with an SBA small business size standard. The SBA small business size standard for Wired Telecommunications Carriers classifies firms having 1,500 or fewer employees as small. U.S. Census Bureau data for 2017 show that there were 3,054 firms that operated in this industry for the entire year. Of this number, 2,964 firms operated with fewer than 250 employees. Additionally, based on Commission data in the 2022 Universal Service Monitoring Report, as of December 31, 2021, there were 3,378 providers that reported they were competitive local exchange service providers. Of these providers, the Commission estimates that 3,230 providers have 1,500 or fewer employees. Consequently, using the SBA's small business size standard, most of these providers can be considered small entities.

204. *Interexchange Carriers (IXCs).* Neither the Commission nor the SBA has developed a small business size standard specifically for Interexchange Carriers. Wired Telecommunications Carriers is the closest industry with an SBA small business size standard. The SBA small business size standard for Wired Telecommunications Carriers classifies firms having 1,500 or fewer employees as small. U.S. Census Bureau data for 2017 show that there were 3,054 firms that operated in this industry for the entire year. Of this number, 2,964 firms operated with fewer than 250 employees. Additionally, based on Commission data in the 2022 Universal Service Monitoring Report, as of December 31, 2021, there were 127 providers that reported they were engaged in the provision of

interexchange services. Of these providers, the Commission estimates that 109 providers have 1,500 or fewer employees. Consequently, using the SBA's small business size standard, the Commission estimates that the majority of providers in this industry can be considered small entities.

205. *Cable System Operators (Telecom Act Standard).* The Communications Act of 1934, as amended, contains a size standard for a ''small cable operator,'' which is ''a cable operator that, directly or through an affiliate, serves in the aggregate fewer than one percent of all subscribers in the United States and is not affiliated with any entity or entities whose gross annual revenues in the aggregate exceed $250,000,000.'' For purposes of the Telecom Act Standard, the Commission determined that a cable system operator that serves fewer than 677,000 subscribers, either directly or through affiliates, will meet the definition of a small cable operator based on the cable subscriber count established in a 2001 Public Notice. Based on industry data, only six cable system operators have more than 677,000 subscribers. Accordingly, the Commission estimates that the majority of cable system operators are small under this size standard. We note however, that the Commission neither requests nor collects information on whether cable system operators are affiliated with entities whose gross annual revenues exceed $250 million. Therefore, we are unable at this time to estimate with greater precision the number of cable system operators that would qualify as small cable operators under the definition in the Communications Act.

206. *Other Toll Carriers.* Neither the Commission nor the SBA has developed a definition for small businesses specifically applicable to Other Toll Carriers. This category includes toll carriers that do not fall within the categories of interexchange carriers, operator service providers, prepaid calling card providers, satellite service carriers, or toll resellers. Wired Telecommunications Carriers is the closest industry with a SBA small business size standard. The SBA small business size standard for Wired Telecommunications Carriers classifies firms having 1,500 or fewer employees as small. U.S. Census Bureau data for 2017 show that there were 3,054 firms in this industry that operated for the entire year. Of this number, 2,964 firms operated with fewer than 250 employees. Additionally, based on Commission data in the 2021 Universal Service Monitoring Report, as of December 31, 2020, there were 115

providers that reported they were engaged in the provision of other toll services. Of these providers, the Commission estimates that 113 providers have 1,500 or fewer employees. Consequently, using the SBA's small business size standard, most of these providers can be considered small entities.

207. *Wireless Telecommunications Carriers (except Satellite).* This industry comprises establishments engaged in operating and maintaining switching and transmission facilities to provide communications via the airwaves. Establishments in this industry have spectrum licenses and provide services using that spectrum, such as cellular services, paging services, wireless internet access, and wireless video services. The SBA size standard for this industry classifies a business as small if it has 1,500 or fewer employees. U.S. Census Bureau data for 2017 show that there were 2,893 firms in this industry that operated for the entire year. Of that number, 2,837 firms employed fewer than 250 employees. Additionally, based on Commission data in the 2022 Universal Service Monitoring Report, as of December 31, 2021, there were 594 providers that reported they were engaged in the provision of wireless services. Of these providers, the Commission estimates that 511 providers have 1,500 or fewer employees. Consequently, using the SBA's small business size standard, most of these providers can be considered small entities.

208. *Satellite Telecommunications.* This industry comprises firms "primarily engaged in providing telecommunications services to other establishments in the telecommunications and broadcasting industries by forwarding and receiving communications signals via a system of satellites or reselling satellite telecommunications." Satellite telecommunications service providers include satellite and earth station operators. The SBA small business size standard for this industry classifies a business with $38.5 million or less in annual receipts as small. U.S. Census Bureau data for 2017 show that 275 firms in this industry operated for the entire year. Of this number, 242 firms had revenue of less than $25 million. Additionally, based on Commission data in the 2021 Universal Service Monitoring Report, as of December 31, 2020, there were 71 providers that reported they were engaged in the provision of satellite telecommunications services. Of these providers, the Commission estimates that approximately 48 providers have

1,500 or fewer employees. Consequently, using the SBA's small business size standard, a little more than of these providers can be considered small entities.

209. *Local Resellers.* Neither the Commission nor the SBA have developed a small business size standard specifically for Local Resellers. Telecommunications Resellers is the closest industry with a SBA small business size standard. The Telecommunications Resellers industry comprises establishments engaged in purchasing access and network capacity from owners and operators of telecommunications networks and reselling wired and wireless telecommunications services (except satellite) to businesses and households. Establishments in this industry resell telecommunications; they do not operate transmission facilities and infrastructure. Mobile virtual network operators (MVNOs) are included in this industry. The SBA small business size standard for Telecommunications Resellers classifies a business as small if it has 1,500 or fewer employees. U.S. Census Bureau data for 2017 show that 1,386 firms in this industry provided resale services for the entire year. Of that number, 1,375 firms operated with fewer than 250 employees. Additionally, based on Commission data in the 2022 Universal Service Monitoring Report, as of December 31, 2021, there were 207 providers that reported they were engaged in the provision of local resale services. Of these providers, the Commission estimates that 202 providers have 1,500 or fewer employees. Consequently, using the SBA's small business size standard, most of these providers can be considered small entities.

210. *Toll Resellers.* Neither the Commission nor the SBA have developed a small business size standard specifically for Toll Resellers. Telecommunications Resellers is the closest industry with an SBA small business size standard. The Telecommunications Resellers industry comprises establishments engaged in purchasing access and network capacity from owners and operators of telecommunications networks and reselling wired and wireless telecommunications services (except satellite) to businesses and households. Establishments in this industry resell telecommunications; they do not operate transmission facilities and infrastructure. Mobile virtual network operators (MVNOs) are included in this industry. The SBA small business size standard for Telecommunications Resellers classifies a business as small if

it has 1,500 or fewer employees. U.S. Census Bureau data for 2017 show that 1,386 firms in this industry provided resale services for the entire year. Of that number, 1,375 firms operated with fewer than 250 employees. Additionally, based on Commission data in the 2022 Universal Service Monitoring Report, as of December 31, 2021, there were 457 providers that reported they were engaged in the provision of toll services. Of these providers, the Commission estimates that 438 providers have 1,500 or fewer employees. Consequently, using the SBA's small business size standard, most of these providers can be considered small entities.

211. *All Other Telecommunications.* This industry is comprised of establishments primarily engaged in providing specialized telecommunications services, such as satellite tracking, communications telemetry, and radar station operation. This industry also includes establishments primarily engaged in providing satellite terminal stations and associated facilities connected with one or more terrestrial systems and capable of transmitting telecommunications to, and receiving telecommunications from, satellite systems. Providers of internet services (*e.g.,* dial-up ISPs) or voice over internet protocol (VoIP) services, via client-supplied telecommunications connections are also included in this industry. The SBA small business size standard for this industry classifies firms with annual receipts of $35 million or less as small. U.S. Census Bureau data for 2017 show that there were 1,079 firms in this industry that operated for the entire year. Of those firms, 1,039 had revenue of less than $25 million. Based on this data, the Commission estimates that the majority of "All Other Telecommunications" firms can be considered small.

*Description of Projected Reporting, Recordkeeping, and Other Compliance Requirements for Small Entities*

212. The *Report and Order* adopts rules defining digital discrimination making it unlawful for any broadband provider or covered entity to adopt, implement or utilize policies or practices, not justified by genuine issues of technical or economic feasibility, that differentially impact consumers' access to broadband internet access service based on their income level, race, ethnicity, color, religion, or national origin or are intended to have such differential impact. When investigating claims of digital discrimination, small entities will need to gather and provide information needed by the Commission

to assess claims of technical or economic feasibility, and prove by a preponderance of the evidence that the policy or practice in question is justified by genuine issues of technical or economic feasibility. This may involve additional staff time, possibly by engineering and accounting professionals that can speak to technical or economic issues.

213. In reviewing the record, commenters expressed concern about obstacles faced by small providers. However, we adopt a flexible approach to assessing the technical and economic feasibility of a covered entity's practices, and will review alleged digital discrimination of access on a case-by-case basis. The Commission does not have sufficient information on the record to quantify the cost of compliance for small entities. The Commission, however, anticipates the approaches it has taken to implement the requirements will have minimal implications because its approach to investigations accounts for variations among provider types and industry, and will tailor its interactions with such small entities to account for these burdens.

*Steps Taken To Minimize the Significant Economic Impact on Small Entities, and Significant Alternatives Considered*

214. The RFA requires an agency to provide ''a description of the steps the agency has taken to minimize the significant economic impact on small entities . . . including a statement of the factual, policy, and legal reasons for selecting the alternative adopted in the final rule and why each one of the other significant alternatives to the rule considered by the agency which affect the impact on small entities was rejected.''

215. The *Report and Order* establishes a balanced framework to facilitate equal access to broadband internet service by preventing digital discrimination of access to that service. These rules adopted in the *Report and Order* address business practices and policies that impede equal access to broadband, take into account issues of technical and economic feasibility that pose serious challenges to full achievement of the equal access objective, and consider impacts on small entities. The Commission considered small business interests in including ''genuine issues of technical or economic feasibility'' in the definition of ''digital discrimination of access.'' The Commission also acknowledged that the technical and economic challenges that providers face in deploying and serving rural and urban areas can vary greatly. The Commission's approach to technical and economic feasibility accounts for variations among provider types and industries. Moreover, the CEDC conducted outreach to small-, minority-, and women- businesses in developing the model policies and best practices to prevent digital discrimination of access adopted by the *Report and Order.*

216. In reaching its final conclusions in this proceeding, the Commission considered a number of alternatives, such as addressing digital discrimination of access issues raised either in other proceedings, or in the current record, that could potentially impact small businesses. For example, we considered whether to establish an Office of Civil Rights within the Commission, as several commenters have urged us to do, however we will make this assessment outside the scope of this proceeding as a matter of internal structure, organization, and staffing. Additionally, the Commission determined that, at this time, its primary focus is to implement effective rules to address digital discrimination of access by the statutory deadline set by Congress, but will continue to consider the thoughtful proposals not addressed in other sections of the *Report and Order.* We also considered proposals to modify current Commission data collections to accept new data or otherwise undertake new data collections. However, it is currently unclear whether a new data collection's burdens would outweigh its potential benefits, because the Commission has access to a number of data collections and potential data sources that may assist in our analysis of digital discrimination of access claims.

217. We considered additional alternatives that may impact small entities, including how we define terms used in our digital discrimination analysis. For example, we declined to adopt specific standards or definitions for different types of providers because we want these rules to maintain the flexibility needed to address providers of various sizes, difference technologies, and the unique circumstances of each covered entity, including small businesses. We also declined proposals to define digital discrimination in a manner that considers differences in the profitability of serving one area over another, because we weigh profitability separately from technical or economic feasibility. We did not include issues pertaining to personal data that is processed by an algorithm in the definition of digital discrimination because section 60506 is not directly related to those concerns. To eliminate potential loopholes in complying with these rules, we retain the term ''genuine'' as part of our definition of digital discrimination to ensure that covered entities cannot rely upon unsupported assertions of technical or economic feasibility to refute claims of digital discrimination of access.

*Report to Congress*

218. The Commission will send a copy of the *Report and Order,* including this FRFA, in a report to Congress pursuant to the Congressional Review Act.[3] In addition, the Commission will send a copy of the *Report and Order,* including this FRFA, to the Chief Counsel for Advocacy of the Small Business Administration. A copy of the *Report and Order* and FRFA (or summaries thereof) will also be published in the **Federal Register**.

## List of Subjects in 47 CFR Parts 0, 1, and 16

Communications, Telecommunications, Organizations and Functions, Equal Access to Justice, Investigations, Penalties, Digital Discrimination, Equal access.

Federal Communications Commission.

**Marlene Dortch,**

*Secretary.*

## Final Rules

For the reasons discussed in the preamble, the Federal Communications Commission amends 47 CFR parts 0, 1, and 16 as follows:

## PART 0—COMMISSION ORGANIZATION

■ 1. Effective March 22, 2024, the authority citation for part 0 is revised to read as follows:

**Authority:** 47 U.S.C. 151, 154(i), 154(j), 155, 225, 409, and 1754, unless otherwise noted.

■ 2. Effective March 22, 2024, amend § 0.111 by adding paragraph (a)(30) to read as follows:

### § 0.111 Functions of the Bureau.

(a) * * *

(30) Resolve complaints alleging violations of digital discrimination of access pursuant to 47 CFR part 16.

\* \* \* \* \*

## PART 1—PRACTICE AND PROCEDURE

■ 3. Effective March 22, 2024, the authority citation for part 1 is revised to read as follows:

---

[3] *Id.* section 801(a)(1)(A).

**Authority:** 47 U.S.C. chs. 2, 5, 9, 13; 28 U.S.C. 2461 note; 47 U.S.C. 1754, unless otherwise noted.

■ 4. Effective March 22, 2024, amend § 1.80 by adding paragraph (a)(8) to read as follows:

#### § 1.80 Forfeiture proceedings.

(a) * * *

(8) Violated section 60506 of the Infrastructure and Jobs Act of 2021 or 47 CFR part 16.

* * * * *

■ 5. Delayed indefinitely, amend § 1.717 by adding '', except for digital discrimination of access informal complaints filed pursuant to 47 CFR part 16'' after ''in accordance with § 1.721'' and before the period in the last sentence and by adding a new last sentence.

The addition reads as follows:

#### § 1.717 Procedure.

* * * In addition, for the purpose of informal complaints submitted under 47 CFR part 16, the Commission's informal complaint procedures will apply to all covered entities as defined in 47 CFR 16.2.

■ 6. Effective March 22, 2024, add part 16 to read as follows:

#### PART 16—DIGITAL DISCRIMINATION OF ACCESS

Sec.
16.1   Purpose.
16.2   Definitions.
16.3   Digital discrimination of access prohibited.
16.4   Findings of discrimination.
16.5   Technical and economic feasibility.
16.6   Enforcement.
16.7   Advisory opinions.

**Authority:** 47 U.S.C. 1754, unless otherwise noted.

#### § 16.1   Purpose.

The purpose of this part is to implement section 60506 of the Infrastructure Investment and Jobs Act, 135 Stat. 429 (2021) (Infrastructure Act) that requires the Commission to adopt rules to facilitate equal access to broadband internet access service, taking into account the issues of technical and economic feasibility presented by that objective, including:

(a) Preventing digital discrimination of access based on income level, race, ethnicity, color, religion, or national origin; and

(b) Identifying necessary steps for the Commission to take to eliminate discrimination described in this part.

#### § 16.2   Definitions.

*Broadband internet access service* is defined by § 8.1(b) of this subchapter.

*Broadband provider* is defined by § 54.1600(b) of this chapter.

*Consumer* includes current and potential subscribers, individual persons, groups of persons, individual organizations, and groups of organizations having the capacity to subscribe to and receive broadband internet access service.

*Covered entity* includes broadband internet access service providers and entities that provide services that facilitate and affect consumer access to broadband internet access service, including but not limited to:

(1) Broadband internet access service providers;

(2) Contractors retained by, or entities working through partnership agreements or other business arrangements with, broadband internet access service providers;

(3) Entities facilitating or involved in the provision of broadband internet access service;

(4) Entities maintaining and upgrading network infrastructure; and,

(5) Entities that otherwise affect consumer access to broadband internet access service.

*Covered elements of service* is defined as any components of service quality or terms and conditions on which broadband internet access service is provided. The definition includes, but is not limited to:

(1) Deployment of broadband infrastructure, network upgrades, and network maintenance;

(2) Service quality components and the terms and conditions on which broadband internet access service is provided, including but not limited to speeds, capacities, latency, data caps, throttling, pricing, promotional rates, imposition of late fees, opportunity for equipment rental, installation time, contract renewal terms, service termination terms, and use of customer credit and account history;

(3) Marketing, advertisement, and outreach; and

(4) Technical service, onsite service, and other provision of customer service.

*Covered services* is defined as broadband internet access service by § 8.1(b) of this subchapter.

*Digital discrimination of access* means policies or practices, not justified by genuine issues of technical or economic feasibility, that differentially impact consumers' access to broadband internet access service based on their income level, race, ethnicity, color, religion, or national origin or are intended to have such differential impact.

*Economically feasible* means reasonably achievable as evidenced by

prior success by covered entities under similar circumstances or demonstrated new economic conditions clearly indicating that the policy or practice in question may reasonably be adopted, implemented, and utilized.

*Equal access* means the opportunity to subscribe to an offered service that provides comparable speeds, capacity, latency, and other quality of service metrics in a given area, for comparable terms and conditions.

*Subscriber* is defined as a subscriber to broadband internet access service as defined as in § 8.1(b) of this subchapter.

*Technically feasible* means reasonably achievable as evidenced by prior success by covered entities under similar circumstances or demonstrated technological advances clearly indicating that the policy or practice in question may reasonably be adopted, implemented, and utilized.

#### § 16.3   Digital discrimination of access prohibited.

(a) This section provides the Commission's interpretation of actions that constitute digital discrimination of access under 47 U.S.C. 1754.

(b) It shall be unlawful for any broadband provider, or covered entity as described in this part, to adopt, implement or utilize policies or practices, not justified by genuine issues of technical or economic feasibility, that differentially impact consumers' access to broadband internet access service based on their income level, race, ethnicity, color, religion, or national origin or are intended to have such differential impact.

#### § 16.4   Findings of discrimination.

(a) *Discriminatory treatment.* The Commission may find that a covered entity engaged in intentional discrimination by direct evidence or circumstantial evidence that the covered entity's policy or practice was adopted, implemented, or utilized with the intent to differentially impact consumers' access to covered services or covered elements of service on one or more of the bases listed in section 60506(b) of the Infrastructure Act.

(b) *Discriminatory effect.* The Commission may find that a covered entity adopted, implemented, or utilized a policy or practice that had a discriminatory effect on one or more of the bases listed in section 60506(b) of the Infrastructure Act. A discriminatory effect occurs when a facially neutral policy or practice differentially impacts consumers' access to covered services or covered elements of service.

**§ 16.5  Technical and economic feasibility.**

(a) Where the Commission determines that a covered entity's policy or practice is motivated by discriminatory intent on the basis of income level, race, ethnicity, color, religion, or national origin, the entity will not be found liable for digital discrimination of access if the policy or practice is justified by genuine issues of technical or economic feasibility.

(b) Where the Commission determines that a covered entity's policy or practice has discriminatory effects on the basis of income level, race, ethnicity, color, religion, or national origin, the entity will not be found liable for digital discrimination of access if the policy or practice is justified by genuine issues of technical or economic feasibility.

(c) Covered entities have the burden of proving to the Commission that a policy or practice under investigation is justified by genuine issues of technical or economic feasibility. This may include proof that available, less discriminatory alternatives were not reasonably achievable at the time the policy or practice was adopted, implemented, or utilized because of genuine technical or economic constraints.

(d) Genuine issues of technical or economic feasibility must be demonstrated by a preponderance of the evidence, with the covered entity providing the Commission all of the empirical evidence and documentation needed to substantiate the technical or economic justifications for the policy or practice under investigation.

(e) The Commission will determine on a case-by-case basis whether genuine issues of technical or economic feasibility justified the adoption, implementation, or utilization of a policy or practice that was motivated by discriminatory intent on the basis of income level, race, ethnicity, color, religion, or national origin, or that caused discriminatory effects on one or more of these bases.

**§ 16.6  Enforcement.**

Any allegation that a covered entity has violated the regulations in this part may be referred to the Commission's Enforcement Bureau.

**§ 16.7  Advisory opinions.**

(a) *Procedures.* (1) Any entity that is subject to the Commission's rules implementing section 60506 of the Infrastructure Act may request an advisory opinion from the Enforcement Bureau regarding the permissibility of its own policies and practices affecting access to broadband internet access service. Requests for advisory opinions may be filed via the Commission's website or with the Office of the Secretary and must be copied to the Chief of the Enforcement Bureau and the Chief of the Investigations and Hearings Division of the Enforcement Bureau.

(2) The Enforcement Bureau may, in its discretion, determine whether to issue an advisory opinion in response to a particular request or group of requests and will inform each requesting entity, in writing, whether the Bureau plans to issue an advisory opinion regarding the matter in question.

(3) Requests for advisory opinions must relate to a current or proposed policy or practice that the requesting party intends to pursue. The Enforcement Bureau will not respond to requests if the same or substantially the same conduct is the subject of a current government investigation or proceeding, including any ongoing litigation or open rulemaking at the Commission.

(4) Requests for advisory opinions must be accompanied by all material information sufficient for Enforcement Bureau staff to make a determination on the proposed conduct for which review is requested. Requesters must certify that factual representations made to the Bureau are truthful and accurate, and that they have not intentionally omitted any information from the request. A request for an advisory opinion that is submitted by a business entity or an organization must be executed by an individual who is authorized to act on behalf of that entity or organization.

(5) Enforcement Bureau staff will have discretion to ask parties requesting opinions, as well as other parties that may have information relevant to the request or that may be impacted by the proposed conduct, for additional information that the staff deems necessary to respond to the request. Such additional information, if furnished orally or during an in-person conference with Bureau staff, shall be promptly confirmed in writing. Parties are not obligated to respond to staff inquiries related to advisory opinions. If a requesting party fails to respond to a staff inquiry, then the Bureau may dismiss that party's request for an advisory opinion. If a party voluntarily responds to a staff inquiry for additional information, then it must do so by a deadline to be specified by Bureau staff. Advisory opinions will expressly state that they rely on the representations made by the requesting party, and that they are premised on the specific facts and representations in the request and any supplemental submissions.

(b) *Response.* After review of a request submitted hereunder, the Enforcement Bureau will:

(1) Issue an advisory opinion that will state the Bureau's determination as to whether or not the policy or practice detailed in the request complies with the Commission's rules implementing section 60506 of the Infrastructure Act;

(2) Issue a written statement declining to respond to the request; or

(3) Take such other position or action as it considers appropriate. An advisory opinion states only the enforcement intention of the Enforcement Bureau as of the date of the opinion, and it is not binding on any party. Advisory opinions will be issued without prejudice to the Enforcement Bureau or the Commission to reconsider the questions involved, or to rescind or revoke the opinion. Advisory opinions will not be subject to appeal or further review.

(c) *Enforcement effect.* The Enforcement Bureau will have discretion to indicate the Bureau's lack of enforcement intent in an advisory opinion based on the facts, representations, and warranties made by the requesting party. If the Bureau determines that a policy or practice currently in effect violates Commission rules, it may provide in the opinion that it will not take enforcement action within a designated time period if the policy or practice is promptly corrected. The requesting party may rely on the opinion only to the extent that the request fully and accurately contains all the material facts and circumstances. Should the Bureau or Commission rescind a previously issued advisory opinion, the requesting party must promptly discontinue use of the relevant policy or practice in order to remain in compliance with our rules.

(d) *Public disclosure.* The Enforcement Bureau will make advisory opinions available to the public on the Commission's website. The Bureau will also publish the initial request for guidance and any associated materials. Parties soliciting advisory opinions may request confidential treatment of information submitted in connection with a request for an advisory opinion pursuant to § 0.459 of this subchapter.

(e) *Withdrawal of request.* Any requesting party may withdraw a request for review at any time prior to receipt of notice that the Enforcement Bureau intends to issue an adverse opinion, or the issuance of an opinion. The Enforcement Bureau remains free, however, to submit comments to such requesting party as it deems appropriate. Failure to take action after receipt of documents or information,

whether submitted pursuant to this procedure or otherwise, does not in any way limit or stop the Bureau from taking such action at such time thereafter as it deems appropriate. The Bureau reserves the right to retain documents submitted to it under this procedure or otherwise and to use them for all governmental purposes.

[FR Doc. 2023–28835 Filed 1–19–24; 8:45 am]

**BILLING CODE 6712–01–P**